**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **IN RE:** | **CHAPTER 11** |
| **LIMETREE BAY SERVICES, LLC,** *et al.*,[1] | **CASE NO.: 21-32351** |
| Debtors. | **(Joint Administration Requested)** |

**DECLARATION OF MARK SHAPIRO IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mark Shapiro, declare as follows:

1.      I am a Senior Managing Director for GlassRatner Advisory & Capital Group LLC, d/b/a B. Riley Advisory Services ("**B. Riley**" or the "**CRO**").  On or about June 17, 2021, Limetree Bay Services,  LLC, Limetree Bay Refining Holdings, LLC, Limetree Bay Refining Holdings II, LLC, Limetree Bay Refining, LLC, Limetree Bay Refining Operating, LLC, and Limetree Bay Refining Marketing, LLC (collectively, the "**Debtors**") retained B. Riley as chief restructuring officer.  I am the principal representative of B. Riley in its capacity as CRO.

2.      I am a duly authorized representative of the Debtors for purposes of executing any and all documents in connection with the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), including, without limitation, the Debtors' respective chapter 11 bankruptcy petitions filed contemporaneously herewith (collectively, the "**Petitions**"), and representing the Debtors in the course of these Chapter 11 Cases and any related proceedings.  I am authorized to submit this Declaration on behalf of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

3.      On July 12, 2021 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**")—thereby commencing the Chapter 11 Cases.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      I submit this Declaration in support of the Debtors' Petitions and the First Day Motions (defined below).  I am familiar with the Debtors' businesses, day-to-day operations, and financial affairs.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and records created and maintained by the Debtors in the ordinary course of business, information provided to me by employees and consultants working under my supervision with personal knowledge of the veracity of such information, and/or my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5.      Part I of this Declaration provides a basic overview of the Chapter 11 Cases.  Part II of this Declaration describes the Debtors' businesses and organizational structure.  Part III of this Declaration describes the circumstances that led to the Debtors' filing of these Chapter 11 Cases.  Part IV of this Declaration pertains to the relief sought in the First Day Motions.

## I.      OVERVIEW OF CHAPTER 11 CASES

6.      The Debtors own and operate an oil refinery (the "**Refinery**") located on the island of St. Croix in the United States Virgin Islands ("**USVI**").  The Refinery is part of a 2,000-acre industrial complex located on the southern coast of St. Croix comprised of (a) the Refinery and

2

(b)  an oil storage facility (or terminal) and docks (the "**Terminal**") owned and operated by non-debtor affiliates of the Debtors (the "**Terminal Entities**").[2]  For the avoidance of doubt, the Terminal Entities are not debtors in these Chapter 11 Cases.

7.     The Debtors and the Terminal Entities acquired the Refinery and Terminal, respectively, in or about December 2015.  Since acquiring the Refinery, the Debtors have invested approximately $4.1 billion in repairing, refurbishing and modernizing the Refinery to bring the operation into compliance with existing regulations.  The Debtors restarted Refinery operations on or about February 1, 2021 following a preliminary restart in December 2020.

8.     Despite years of planning and preparation, the Debtors began experiencing operational issues shortly after restarting the Refinery, which prompted investigations by the United States Environmental Protection Agency (the "**EPA**") and Virgin Islands Department of Planning and National Resources (the "**DPNR**"), as well as a request from the United States Attorney for the Virgin Islands (the "**U.S. Attorney**") to visit and tour certain operations at the Refinery.  Then, on May 12, 2021, an incident occurred at the Refinery—causing a small amount of oil to disperse in certain areas downwind of the Refinery.  In response, on May 13, 2021, the Debtors voluntarily ceased all refining operations at the Refinery on a temporary basis to investigate and remedy potential issues prior to any further incidences.  Despite the voluntary cessation of operations, on May 14, 2021, the Debtors received an order from the EPA directing the Debtors to immediately cease any and all Refinery operations for a period of 60 days pending the completion of certain operational and compliance audits (as discussed further below).

---

[2]  The Terminal Entities include Limetree Bay Terminal Holdings, LLC, Limetree Bay Terminal Holdings II, LLC, Limetree Bay Cayman, Ltd., and Limetree Bay Terminals, LLC.

4819-4445-7457.1

9.      As a result of the foregoing, and the Debtors' deteriorating liquidity position, the Debtors retained professionals to advise on potential strategies to address any compliance issues identified in the audits, address the Debtors' liquidity position, explore options to attract new capital, and restructure existing obligations in light of the shutdown and contemplated remediation efforts and expenses.  Additionally, each of the Debtors also appointed an independent board member, who has extensive experience as a director for distressed companies, including in the context of evaluating strategies for maximizing stakeholder value, navigating potential stakeholder conflicts, and raising debtor in possession financing and other capital.  On or about July 9, 2021, the Debtors' members and boards of directors, as applicable, adopted resolutions approving the commencement of the Chapter 11 Cases.

10.      The Debtors filed these Chapter 11 Cases in an effort to maintain the *status quo* while pursuing the following key objectives:  (1) obtaining new liquidity through the DIP Financing (as defined below) that will avoid the need for an immediate liquidation and that will be used to satisfy certain environmental, community, safety, employee, and administrative obligations of the Debtors; (2) pursuing other potential sources of financing and (3) in consultation with the EPA and DPNR, devising a plan to address the findings of the audits required under the EPA Order (defined below) and the Debtors' internal investigations.  The successful accomplishment of these objectives should provide the Debtors with an opportunity to attract, develop, and hopefully effectuate a chapter 11 exit strategy that will be in the best interests of the Debtors' bankruptcy estates and their creditors.

## II.      DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESSES

### A.      Debtors' Organizational Structure

4819-4445-7457.1

11.     A true and correct copy of the organizational chart for the Debtors is attached hereto as **Exhibit A** and incorporated herein by reference.

12.     Limetree Bay Energy, LLC ("**LBE**") is a Delaware limited liability company.  LBE is the parent company of each of the Debtors (directly or indirectly through subsidiaries) as well as the Terminal Entities (directly or indirectly through subsidiaries).  LBE, however, is not a debtor in these Chapter 11 Cases.  From January 7, 2016 up until April 20, 2021, LBR (defined below) and its affiliates were sponsored by certain parties, which had acquired the Refinery through the 2015 Hovensa Chapter 11 Cases (as defined below).  Because LBR was unable to complete the Refinery restart under prior ownership, a number of preferred equity investors were forced to equitize their interests pursuant to a consensual restructuring process that resulted in a new owner consortium acquiring a majority interest in the Refinery Entities and the Terminal Entities through LBE on April 20, 2021.

13.     Limetree Bay Ventures, LLC ("**LBV**"), is a Delaware limited liability company.  LBV is not a debtor in these Chapter 11 Cases.  Prior to April 2021, LBS and LBC II (defined below) were wholly owned subsidiaries of LBV and, as such, LBV was the parent company of the Limetree Bay entities identified in Paragraphs 15 to 21 of this Declaration (collectively, the "**Refinery Entities**").  In April 2021, in conjunction with the restructuring, LBE replaced LBV as the holding company for the Refinery Entities through the acquisition of LBV's interest in LBS and LBC II, as well as other assets and interests associated with the Refinery Entities, pursuant to the terms of that certain Share Transfer Agreement dated as of April 20, 2021 (the "**April 2021 Equity Restructuring**").

14.     Limetree Bay Services, LLC ("**LBS**"), is a Delaware limited liability company with its principal place of business at 842 West Sam Houston Parkway North, Houston, Texas 77024. LBS is a wholly owned subsidiary of LBE.

15.     Limetree Bay Cayman II, Ltd. ("**LBC II**") is a Cayman Islands exempted company. LBC II is a wholly owned subsidiary of LBE.  LBC II is not a debtor in these Chapter 11 Cases.

16.     Limetree Bay Refining Holdings, LLC ("**LBRH**") is a limited liability company formed under the laws of the United States Virgin Islands with its principal place of business at 1 Estate Hope Christiansted, Virgin Islands 00820.  LBRH is a wholly owned subsidiary of LBC II.

17.     Limetree Bay Refining Holdings II, LLC ("**LBRH  II**") is a limited liability company formed under the laws of the United States Virgin Islands with its principal place of business at 1 Estate Hope Christiansted, Virgin Islands 00820.  LBRH II is a wholly owned subsidiary of LBRH.

18.     Limetree Bay Refining, LLC ("**LBR**") is a limited liability company formed under the laws of the United States Virgin Islands with its principal place of business at 1 Estate Hope Christiansted, Virgin Islands 00820.  LBR is a wholly owned subsidiary of LBRH II.

19.     Limetree Bay Refining Marketing, LLC ("**LBRM**") is a limited liability company formed under the laws of the United States Virgin Islands with its principal place of business at 1 Estate Hope Christiansted, Virgin Islands 00820.  LBRM is a wholly owned subsidiary of LBR.

20.     Limetree Bay Refining Operating, LLC ("**LBRO**") is a limited liability company formed under the laws of the United States Virgin Islands with its principal place of business at 1 Estate Hope Christiansted, Virgin Islands 00820.  LBRO is a wholly owned subsidiary of LBR.

21.     I am informed and believe that the Debtors constitute affiliates, as that term is defined in Section 101(2) of the Bankruptcy Code and used in Bankruptcy Rule 1015(b).

4819-4445-7457.1

**B.      Acquisition and Historical Business Operations**

22.      Based on my review of relevant documents, including documents filed in the HOVENSA Chapter 11 Case (defined below), I believe the following to be true and correct:

a.      In or about September 1965, the USVI and Hess Oil Virgin Islands Corp. ("**HOVIC**"), a subsidiary of Hess Corporation (f/k/a Amerada Hess Corporation), entered into a Concession Agreement dated September 1, 1965 providing for the construction and operation of the Refinery and Terminal facilities on St. Croix.  HOVIC continued operating the Refinery and Terminal until 1998, at which time HOVIC assigned its interests to HOVENSA—a joint venture of HOVIC and PDVSA V.I., Inc. ("**PDVSA**"), a subsidiary of the national oil company of Venezuela, Petróleos de Venezuela, S.A.

b.      Since commencing operations, the Refinery has been an integral part of the St. Croix community and economy—providing hundreds of jobs (at times employing up to 25% of St. Croix's workforce) and generating upwards of $125 million per year in tax revenues for the USVI.

c.      While the Refinery and Terminal have brought economic prosperity, the operation of an industrial oil refinery on a tropical island created dissonance with residents, federal and local environmental agencies, and non-governmental organizations concerned about the impacts of the operation on the local ecosystem and environment at large—a dissonance only amplified in recent decades as the Refinery aged amidst increasingly stringent environmental regulation.

d.      Ultimately, adverse economic and regulatory climates, as well as increased competition in the region, resulted in HOVENSA's refinery operations suffering losses totaling approximately $1.3 billion between 2009 and 2011.

e.      On or about February 16, 2012, HOVENSA idled the Refinery operations due to mounting losses and, in or about 2013, began marketing the Refinery and Terminal for sale.

f.      In September 2015, HOVENSA and Limetree Bay Holdings, LLC ("**LBH**") entered into a purchase and sale agreement for the Terminal, pursuant to which LBH agreed to serve as the stalking horse bidder for a sale through bankruptcy.

g.      On September 15, 2015, HOVENSA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**HOVENSA Chapter 11 Case**") in the United States District Court for the Virgin Islands, Bankruptcy Division (the "**HOVENSA Court**").

h.      On or about December 1, 2015, the HOVENSA Court entered an order approving the sale of substantially all assets of HOVENSA to LBH, or its assignee, including, without limitation, the Terminal and Refinery.  As consideration for the acquisition, LBH paid $190 million in cash and assumed certain liabilities of HOVENSA.

23.      In conjunction with the acquisition of the Refinery and Terminal, LBR and Limetree Bay Terminals, LLC ("**LBT**") entered into operating agreements with USVI (as amended and supplemented, the "**Operating Agreements**"), which, among other things, granted the USVI certain entitlements and financial incentives in exchange for the right to acquire and operate the Refinery and Terminal; however, if the Refinery did not restart operations, the Operating Agreements obligated LBR to dismantle or deconstruct portions of the Refinery.  Under the terms of the Operating Agreements, the USVI asserts a security interest in "all personal property of [LBR] required to operate" the Refinery "and Related Facilities…."

24.      Following the sale of the Refinery and Terminal to LBH, Arclight and Freepoint, through their investment in LBH, acquired a majority equity interest in LBV, the former parent company of LBH, and began seeking other investors to finance the refurbishment and

recommissioning of the Refinery and modernization of the Terminal.   Arclight obtained commitments to invest approximately $3 billion into the Refinery and Terminal, with the goal of processing 210,000 barrels of crude oil per day into gasoline, diesel and fuel oil to serve a variety of sectors, with a focus on South and Central America and an emerging market for low-sulfur fuels for the maritime transportation industry.

   **C.**  **The Refinery**

   25.  The Refinery occupies 1,500 acres of the Limetree Bay facility.   The Refinery operations are principally conducted at the East Refinery, which includes the crude units, a vacuum unit, a delayed coker unit, platformers, and hydrotreaters.   In addition to facilities related to the refining operations, the Refinery includes office space, onsite housing for certain employees, as well as facilities ancillary to the refining operations, including a power generation complex, which provides power to the Refinery and related facilities.   The Terminal occupies the remaining portions of the Limetree Bay facility.

   26.  In connection with the Refinery and Terminal operations, LBR and LBRM, on the one hand, and LBT, on the other hand, have entered into a series of agreements governing the use and occupancy of the Limetree Bay facility and business dealings between the Refinery and Terminal, including, without limitation, the Shared Services Systems Agreement dated as of November 30, 2018 (as amended and supplemented, the "**Shared Services Agreement**").   The Shared Services Agreement provides, in pertinent part, that the Refinery Entities and Terminal Entities authorize each other, subject to certain restrictions to avoid business interruption, to access and use the properties and facilities of the other for purposes of conducting the parties' respective business operations.   The Shared Services Agreement further provides that the Refinery Entities and Terminal Entities share certain services (e.g., water, power, wastewater, etc.), facilities (e.g.,

on-site office space, employee housing, parking lots, etc.), employees, and insurance coverage (some of which is maintained by LBE),[3] and allocate the costs of such services and facilities between the Refinery Entities and Terminal Entities. The Debtors and LBT are evaluating potential amendments and modifications to the Shared Services Agreement that would be appropriate in light of the suspension of operations at the Refinery.[4] Based on such discussions, the Debtors anticipate filing a motion to authorize certain amendments and modifications to the Shared Services Agreement following the Petition Date.

**D.    Efforts to Refurbish the Refinery and Restart Operations**

27.    Beginning in 2018, the Debtors began refurbishing the Refinery and preparing to restart operations. At the time, the Refinery was more than 50 years old and had been dormant since February 2012, following its idling by HOVENSA—rendering the task of restarting the Refinery a substantial undertaking by any measure.

28.    Initially, the Debtors anticipated restarting operations of the Refinery in early 2020 with an investment of approximately $2.1 billion. The projected completion date served one of the principal objectives of the Refinery refurbishment—establishing a Caribbean-based oil refinery capable of producing low-sulfur transportation fuels compliant with emerging International Marine Organization standards that were expected to come into full force and effect in the beginning of 2020.

29.    As the project progressed, the Debtors encountered unanticipated impediments to completion, including, without limitation, issues with infrastructure and certain foundational

---

[3] As of the Petition Date, the Debtors are current on all obligations owing under its insurance policies and, as such, the Debtors do not anticipate having to make any postpetition payment on account of prepetition insurance obligations.

[4] It is my understanding that the Terminal Entities intend to appoint one or more independent directors with authority to address issues related to the Debtors and these Chapter 11 Cases.

4819-4445-7457.1

systems.  Identifying and correcting these issues caused the timeline to expand and budget for completion of the Refinery refurbishment to swell.  The emergence of the COVID-19 virus in early 2020 only exacerbated the delay due to restrictions on available workers, access to the island and the Refinery, and the need to implement protocols to ensure the health and safety of employees.

30.     Ultimately, the Debtors completed the refurbishment of the main process units of the Refinery in or about December 2020—nearly a year later than projected and more than $1 billion over-budget.  Shortly thereafter, the Refinery began producing small amounts of refined petroleum products, including, without limitation, approximately 216,000 barrels of naphtha, to test the facilities' operational capabilities.  The operational outlook based on the preliminary production runs was promising; accordingly, the Debtors continued to move forward preparing for a relaunch of the facility in early 2021.  In January 2021, the Debtors began readying the Refinery to begin production of additional refined products—testing the operational capabilities of additional processes necessary to produce more refined products, such as gasoline.

E.  **Funding of the Refinery Refurbishment Project and Existing Capital Structure**

31.     Ultimately, the Debtors invested approximately $4.1 billion into refurbishing the Refinery.  The Debtors funded the project through a combination of equity contributions and debt financing.  Between 2018 and 2021, the Debtors raised approximately $2.5 billion from equity through capital contributions, issuance of membership interests, as well as subordinated shareholder loans.  In addition to equity contributions, the Debtors incurred approximately $1.6 billion in debt financing under three principal facilities—(a) a $900 million term loan facility (the "**LBR Term Loan**") from a consortium of lenders (collectively, the "**Term Lenders**") with Goldman Sachs Bank USA ("**Goldman Sachs**") serving as administrative agent and project collateral agent, (b) a $50 million revolving line of credit (the "**Revolving LOC**") from certain

11

lenders, with Goldman Sachs serving as administrative agent and project collateral agent, and (c) the LBRH II Holdco Loan (defined below).[5]

32.     Under the LBR Term Loan, the lenders committed to lend to LBR, as borrower, up to $900 million (after giving effect to the LBR Debt Restructuring referred to below).  The LBR Term Loan is comprised of five (5) tranches—tranches A through E.  Access to each tranche is dependent on satisfying certain conditions related to the Refinery refurbishment and restarting.  As of the Petition Date, the Debtors have drawn the following amounts on the LBR Term Loan: (a) Tranche A, approximately $518 million; (b) Tranche B, approximately $110.47 million; (c) Tranche C, approximately $29.46 million; and (d) Tranche D, approximately $111 million. The Debtors have not drawn on Tranche E of the LBR Term Loan.  In sum, the Debtors owe approximately $768.9 million under the LBR Term Loan—leaving approximately $131 million of committed capital available under Tranche E; however, the conditions precedent to accessing Tranche E of the LBR Term Loan have not been satisfied and the Debtors do not expect to be able to satisfy such conditions precedent.  The obligations of LBR, as borrower, due under the LBR Term Loan are guaranteed by LBRM and LBRO.  The LBR Term Loan matures on November 20, 2025.

33.     LBR entered into certain hedging arrangements, including an ISDA Master Agreement dated as of January 18, 2019 (the "**J. Aron ISDA Agreement**") with J. Aron & Company LLC ("**J. Aron**") and certain transactions thereunder, to hedge interest rate risk associated with the LBR Term Loan.  The J. Aron ISDA Agreement is a "Secured Hedge Agreement" under the terms LBR Term Loan.  The J. Aron ISDA Agreement is not a J. Aron

---

[5] The loan balances stated herein account for the principal due under the facilities as of July 9, 2021, based upon available information.  To the extent necessary, the Debtors will update these balances prior to or during the hearing on the First Day Motions.

Transaction Document described below.  On or about June 28, 2021, J. Aron averred that one or more "Events of Default" had occurred with respect to LBR under the terms of the J. Aron ISDA Agreement and designated June 29, 2021 as the "Early Termination Date" under the J. Aron ISDA Agreement.  On or about July 1, 2021, J. Aron submitted to LBR a notice stating that J. Aron had calculated that the amount due and payable by LBR in respect of the Early Termination Date was no less than $1,804,000.00 (the "**J. Aron Early Termination Payment**").  The Debtors are evaluating the alleged Events of Default and calculation of the J. Aron Early Termination Payment. As of the Petition Date, the Debtors have not paid the J. Aron Early Termination Payment.

34.    Under the Revolving LOC, the lenders committed to lend to LBRM, as borrower, up to $50 million on a revolving line of credit.  As of the Petition Date, the Debtors have drawn $50 million on the Revolving LOC.  The obligations due under the Revolving LOC are guaranteed by LBR and LBRO.  The Revolving LOC matures on November 20, 2023.

35.    In addition to the LBR Term Loan and Revolving LOC, the Debtors also borrowed funds via intercompany unsecured and subordinated loan transactions memorialized in certain subordinated promissory notes—classified in the Debtors' records as the Original LBV Subordinated Notes and Supplemental LBV Subordinated Notes (collectively, the "**LBV Subordinated Notes**").  LBV was the promisee and LBR was the borrower under the LBV Subordinated Notes.

36.    In December 2020, the Term Lenders, LBV and the Debtors agreed to a consensual restructuring of certain of LBR's outstanding debt (the "**LBR Debt Restructuring**"), pursuant to which (a) approximately $402 million of LBV Subordinated Notes, and (b) approximately $349 million of then-outstanding LBR Term Loans, were, in each case, assigned by LBR to LBRH II and evidenced under a separate loan agreement with Wilmington Trust, National Association

13

("**Wilmington Trust**") serving as administrative agent and project collateral agent (the "**LBRH II Holdco Loan**").   In connection with (and prior to) the April 2021 Equity Restructuring, LBV assigned all of its interests as a lender under the LBRH II Holdco Loan to LBC II.  As of the Petition Date, the lenders under the LBRH II Holdco Loan include the Term Lenders and LBC II (collectively, the "**Holdco Lenders**"). The LBR Debt Restructuring was consummated and became effective on February 25, 2021.  Since the effectiveness of the LBR Debt Restructuring, certain cash contributions made by the members of LBE to fund liquidity needs of the Debtors in connection with the Refinery have been via LBC II as advances to LBRH II under the LBRH II Holdco Loan. As of the Petition Date, LBRH II owes approximately $782.56 million under the LBRH II Holdco Loan.  The LBRH II Holdco Loan matures on November 20, 2025.

37.     Goldman Sachs and the Term Lenders contend that the indebtedness under the LBR Term Loan, Secured Hedge Agreements (as defined therein), and Revolving LOC are secured by assets of the Debtors (the "**Senior Lenders' Collateral**") pursuant to that certain Security Agreement dated as of November 20, 2018 (the "**General Security Agreement**") and that certain Pledge Agreement dated as of November 20, 2018 (the "**Pledge Agreement**").  Per the General Security Agreement, the Senior Lenders' Collateral is comprised of certain tangible and intangible personal property assets of LBR and LBRM, including, without limitation, certain accounts, chattel paper, deposit accounts, documents, equipment, fixtures, general intangibles, instruments, intellectual property, investment property, letters of credit, commercial tort claims, and any supporting obligations or proceeds of any Senior Lenders' Collateral.  Per the Pledge Agreement, the Senior Lenders' Collateral includes the equity interests of LBRH II in LBR, the wholly owned subsidiary of LBRH II.

38.     Wilmington Trust contends that the obligations under the LBRH II Holdco Loan are secured by assets of LBRH II (the "**Holdco Lenders' Collateral**") pursuant to that certain Security Agreement dated as of April 6, 2021 (the "**Holdco Security Agreement**") and that certain Pledge Agreement dated as of February 22, 2021 (the "**Holdco Pledge Agreement**").  Per the Holdco Security Agreement, the Holdco Lenders' Collateral is comprised of the tangible and intangible personal property assets of LBRH II, including, without limitation, all accounts, chattel paper, deposit accounts, documents, equipment, fixtures, general intangibles, instruments, intellectual property, investment property, letters of credit, commercial tort claims, and any supporting obligations or proceeds of any Holdco Lenders' Collateral.  Per the Holdco Pledge Agreement, the Holdco Lenders' Collateral includes the equity interests of LBRH in LBRH II, the wholly owned subsidiary of LBRH.

39.     In the course of the Refinery project, the Debtors used the services of numerous vendors and contractors.  Several vendors and contractors have asserted certain common law and statutory liens (e.g., construction liens) against certain assets of the LBR and LBT based on amounts purportedly due and owing for services rendered (collectively, the "**Construction Liens**"), including, without limitation, the following:

a.      On or about February 2, 2021, Cleaver-Brooks Sales and Service, Inc. filed a construction lien (the "**Cleaver Lien**") against certain assets of LBR in the amount of $120,738.00;

b.      On or about May 7, 2021, Great Southern Technologies, LLC filed a construction lien against certain assets of LBR and/or LBT in the amount of $393,206.53;

c.      On or about May 12, 2021, InServ Field Services USVI, LLC filed a construction lien against certain assets of LBR "and its affiliates" in the amount of $19,670,362.10;

d.      On or about May 14, 2021, AltairStrickland V.I., LLC filed a construction lien against certain assets of LBR in the amount of $4,106,717.42;

4819-4445-7457.1

e.     On or about June 8, 2021, Universal Plant Services (VI), LLC filed a construction lien against certain assets of LBR in the amount of $26,263,226.16;

f.     On or about June 10, 2021, Computer Solutions, Inc. (d/b/a CosTrack Project Controls) filed a construction lien against certain assets of LBR in the amount of $376,100.91;

g.     On or about June 21, 2021, Vivot Equipment Corporation filed a construction lien against certain assets of LBR and/or LBT in the amount of $9,765,557.08;

h.     On or about June 21, 2021, Virgin Islands Industrial Services, LLC filed a construction lien against certain assets of LBR and/or LBT in the amount of $4,466,993.76;

i.     On or about June 21, 2021, Panametrics LLC filed a construction lien against certain assets of LBR in the amount of $21,844.00;

j.     On or about June 21, 2021, EXCEL Construction & Maintenance VI, Inc. (f/k/a Sun Constructors, Inc.) filed a construction lien against certain assets of LBR, LBT and LBE in the amount of $24,943,041.69;

k.     On or about June 22, 2021, Cust-O-Fab, LLC filed a construction lien against certain assets of LBR and LBT in the amount of $2,064,855.00;

l.     On or about June 22, 2021, Cust-O-Fab Specialty Services, LLC filed a construction lien against certain assets of LBR and LBT in the amount of $3,284,871.07;

m.     On or about June 22, 2021, Enermech Mechanical Services, Inc. filed a construction lien against certain assets of LBR in the amount of $501,059.41;

n.     On or about June 24, 2021, Worley Pan-American Corporation (f/k/a Jacobs Pan-American Corporation) filed a construction lien against certain assets of LBR in the amount of $2,664,105.61;

o.     On or about June 24, 2021, Christiansted Equipment Ltd. filed a construction lien against certain assets of LBR in the amount of $3,780,074.66;

p.     On or about June 29, 2021, Strategic Contract Resources, LLC filed a construction lien against certain assets of LBR in the amount of $830,079.50;

q.     On or about July 6, 2021, HKA Enterprises, LLC filed a construction lien against certain assets of LBR in the amount of $450,172.78; and

4819-4445-7457.1

r.      On or about July 7, 2021, Complan USA LLC filed a construction lien against certain assets of LBR in the amount of $1,409,410.13.

The obligations associated with the alleged Construction Liens total approximately $105.11 million.  The Debtors are investigating the validity of the alleged Construction Liens.  While the investigation remains ongoing, it is my understanding that, with limited exception for the Cleaver Lien, (i) each of the Construction Liens was asserted after the Debtors incurred the obligations under the LBR Term Loan, Revolving LOC, LBRH II Holdco Loan, J. Aron Transaction Documents (defined below) with J. Aron (defined below), and LBV Subordinated Notes[6] and (ii) each of the Construction Liens was asserted in the 90-day period immediately preceding the Petition Date.

F.   **Funding for Refinery Operations**

40.      In addition to the funding required to completed the Refinery refurbishment and relaunch, the Debtors secured capital and certain liquidity arrangements to fund existing Refinery operations and future expansions thereof, obtain a stable source of and competitive price for  feedstock and the off-take of refined products under commodity purchase and sale and marketing agreements, and to provide liquidity for the purchase of materials essential to Refinery operations, including, without limitation, catalysts used in the processing of refined products under an inventory financing agreement.  This liquidity was secured through a series of agreements with BP Products North America Inc. ("**BP**") as well as a supply and offtake agreement and other agreements relating to the purchase and sale by J. Aron of Feedstock (as defined below) and Product (as defined below) (collectively, the "**Safe Harbor Agreements**"), a monetization master agreement and a financing agreement (collectively, together with the Safe Harbor Agreements and

---

[6] The Cleaver Lien was asserted prior to the consummation of the LBR Debt Restructuring, but after the Debtors incurred the other obligations identified.

all other transaction documents associated therewith, the "**J. Aron Transaction Documents**") with J. Aron.

41.     In or about November 2018, the Debtors entered into a series of agreements with BP governing the supply of crude oil and additional investments in the Refinery, including a feedstock agreement (the "**BP Feedstock Agreement**"), a product off-take agreement (the "**BP Off-Take Agreement**"), and a tolling agreement (the "**BP Tolling Agreement**").  Under the terms of the BP Feedstock Agreement, BP agreed to provide crude oil (i.e., feedstock) and other materials to the Refinery.  Per the BP Off-Take Agreement, BP agreed to market refined petroleum products from the Refinery.  As consideration for a share in the net margin of the Refinery, BP agreed to invest up to $533 million in the Refinery to complete improvements and expansions related to the manufacture of certain petroleum products, including low-sulfur transportation fuel.  BP would recoup its investment under the Tolling Agreement via its share in the net margin generation of the Refinery.  BP's obligation to invest funds pursuant to the Tolling Agreement was subject to certain operational benchmarks.

42.     On February 22, 2021, LBRM, LBR, and BP entered into an Amended and Restated Tolling Agreement (the "**A&R Tolling Agreement**" and, together with the BP Feedstock Agreement and BP Off-Take Agreement, each as amended, the "**BP Agreements**") reflecting a renegotiation of certain operational benchmarks for the financing commitments and a further discounted price for the refined petroleum products available to BP under the BP Off-Take Agreement.  BP's investment obligation remains subject to those modified operational benchmarks contained in the BP Agreements. The Debtors do not believe that these conditions precedent have been satisfied as of the Petition Date.

4819-4445-7457.1

43.    On or about March 3, 2020, LBRM entered into the J. Aron Transaction Documents, pursuant to which:  (a) J. Aron agreed to purchase and sell crude oil, crude oil blends, fuel oil, naphtha, debutanized natural gasoline and certain other feedstocks (each as more fully defined in the J. Aron Monetization Master Agreement (as defined below), the "**Feedstock**"), and certain refined hydrocarbon products (each as more fully defined in the J. Aron Transaction Documents, the "**Product**") to LBRM (and LBRM agreed to purchase and sell Feedstock and Product from and to J. Aron, as applicable) pursuant to the Safe Harbor Agreements, and which also governed certain terms of purchases and sales of Feedstock and Product between J. Aron and third parties (including BP), in each case, subject to additional terms and conditions set forth in the J. Aron Transaction Documents; and (b) J. Aron advanced to LBRM a one-time term loan based on certain catalyst units that contain certain base metals and certain catalyst units that contain certain precious metals, which were, in each case, designed for use in refining or processing activities, pursuant to a financing agreement (the "**J. Aron Financing Agreement**").

44.    As of the Petition Date, the applicable Debtors were indebted to J. Aron in an amount of approximately $24.97 million under the J. Aron Financing Agreement[7].  In addition, J. Aron has commenced the process of liquidating certain Feedstock and Products owned by it in connection with the J. Aron Transaction Documents.  If J. Aron is unable to liquidate such Feedstock and Products, and/or incurs losses or costs as a result of such liquidation and termination of J. Aron's rights and obligations under the Safe Harbor Agreements, LBRM, LBR and LBRO may be liable to J. Aron for such losses under the J. Aron Transaction Documents.  Given that the liquidation of the Feedstock and Products has only recently commenced, the Debtors are unable to

---

[7] The amount due under the J. Aron Financing Agreement accounts for the principal due under the facilities as of July 9, 2021, based upon available information.  To the extent necessary, the Debtors will update these balances prior to or during the hearing on the First Day Motions.  The Debtors estimate that the potential liability under the Safe Harbor Agreements may be as much as $221.95 million.

determine whether any additional amounts will be due on account of such liquidation.  Further, under the J. Aron Transaction Documents, the Debtors may be liable to and owe J. Aron accrued (both before and after the Petition Date) and unpaid interest, fees, expenses and certain other obligations under the J. Aron Transaction Documents, to the extent permitted under such documents and the Bankruptcy Code. LBR and LBRO are guarantors under the J. Aron Transaction Documents.

45.     J. Aron contends that the indebtedness due under the J. Aron Transaction Documents is secured by assets of LBRM (the "**J. Aron Collateral**") pursuant to that certain Security Agreement dated as of March 3, 2020 (the "**J. Aron Security Agreement**").  Per the J. Aron Security Agreement, the J. Aron Collateral is comprised of certain tangible and intangible personal property assets of LBRM, including accounts, accounts receivable, hydrocarbons and other inventory, deposit accounts, instruments, chattel paper, documents, tax refunds, commercial tort claims, and replacements and proceeds of the J. Aron Collateral.

46.     On or about June 25, 2021, J. Aron asserted that the Debtors were in default under the J. Aron Transaction Agreements and, as a result, J. Aron was no longer required to perform thereunder and, moreover, that J. Aron has the right to liquidate, and has commenced liquidation of, the Feedstock and Product purchased and owned by J. Aron pursuant to or in connection with any Safe Harbor Agreements.

**G. The Debtors' Cash Management System**

47.     The Debtors maintain a decentralized cash management system (the "**Cash Management System**"), which principally utilizes twenty (20) bank accounts (collectively, the

4819-4445-7457.1

"**Bank Accounts**") maintained by LBR, LBRM and LBRO[8] with Deutsche Bank Trust Company Americas ("**Deutsche Bank**"), Oriental Bank ("**Oriental Bank**"), and Citibank ("**Citibank**" and, together with Deutsche Bank and Oriental Bank, the "**Depositors**").

48.    The Cash Management System is maintained in accordance with the terms of (a) that certain Amended and Restated Depositary and Intercreditor Agreement, dated as of March 3, 2020 (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "**Prepetition Depositary Agreement**") between the LBR, LBRM, LBRO, LBRH II, Goldman Sachs (as (i) administrative agent for the Term Lenders (as defined therein), (ii) the Revolving Administrative Agent, and (iii) as collateral agent for the Project Secured Parties (as defined therein) (in such capacity, together with its successors and permitted assigns in such capacity, the "**Project Collateral Agent**")), Deutsche Bank (the "**Depositary Agent**"), and J. Aron, (b) that certain Deposit Account Control Agreement dated as of January 24, 2019 (the "**Oriental Bank DACA**"), between LBR and LBRO, as grantors, the Bank of Nova Scotia (as predecessor to Oriental Bank), as depositary bank, and Goldman Sachs, as Project Collateral Agent; (c) that certain Deposit Account Control Agreement dated as of March 3, 2020 (the "**J. Aron DACA**"), among LBRM, as grantor, Oriental Bank, as depositary bank, and J. Aron, as secured party; and (d) a certain deposit account control agreement (the "**Citibank DACA**") with Citibank, as depositary bank, and LBRH II, as the grantor, pertaining to an account of LBRH II, as specified therein, on deposit with Citibank.

49.    Under the terms of the Prepetition Depositary Agreement, revenues from the Debtors' operations are deposited in revenue accounts with Deutsche Bank (collectively, the

---

[8] Limetree Bay Services, LLC ("**LBS**") maintains an account with Citibank (the "**LBS Account**").  The Debtors are not aware of any security interests in LBS Account.

4819-4445-7457.1

"**Revenue Accounts**") maintained by LBR and LBRM.  Following receipt of the revenues, funds are disbursed to operating accounts with Oriental Bank (collectively, the "**Operational Accounts**") maintained LBR and/or LBRM, from which LBR and LBRM pay operational expenses associated with the Refinery, either directly or through further distribution of revenues to affiliates in accordance with the provisions of the Prepetition Depositary Agreement.

50.     As of the Petition Date, the Debtors have approximately $3,479,722 of cash on hand, which amount is held in the Bank Accounts.[9]

### H.  Permitting and Environmental Compliance

51.     In conjunction with the commencement of work on the Refinery, the Debtors filed an application in or about 2018 for a Plantwide Applicability Limit (PAL) permit (i.e., the EPA Permit) to modify existing operations without needing a Prevention of Significant Deterioration (PSD) permit as long as the Refinery operated within certain limits.  On or about December 2, 2020, the EPA issued the EPA Permit for the Refinery.  Following the change in administrations in January 2021, the EPA began reviewing permits issued under the prior administration, including the EPA Permit, to evaluate compliance with existing law and the environmental regulatory agenda of the new administration.  On March 25, 2021, the EPA withdrew the EPA Permit.

52.     With the exception of the EPA Permit (to the extent such permit is required), I am informed and believe that the Debtors possess all permits required to operate the Refinery, subject to the EPA Order and EPA Stipulation (defined below).  Notwithstanding, the Debtors are not presently authorized to operate the Refinery.  Under the terms of the EPA Order, the Debtors are prohibited from operating the Refinery for a period of 60-days from the date of the EPA Order.

---

[9] The stated balances in the Bank Accounts is based upon the balances in such accounts as of July 9, 2021.  To the extent necessary, the Debtors will provide updated balances prior to or during the hearing on the First Day Motions.

4819-4445-7457.1

While the EPA Order is scheduled to expire on or about July 13, 2021, the Debtors are presently in discussions with the EPA regarding the entry of a stipulated order (the "**EPA Stipulation**"), providing for the continued suspension of operations and conditioning any renewal of operations on the satisfaction of certain prerequisites.

## III.    EVENTS PRECIPITATING FILING OF CHAPTER 11 CASES

53.    Throughout, the Refinery project faced significant hurdles—from delays in construction resulting in substantial budget overruns to a global pandemic.  Ultimately, the Debtors substantially completed the Refinery refurbishment in December 2020—a year late and more than $1 billion over the initial budget—and, on February 1, 2021, the Refinery resumed operations and began producing certain refined products for commercial sale.

54.    While the initial relaunch of the Refinery proved successful in many respects, the Refinery experienced intermittent operational issues and incidents of varying severity beginning shortly after the resumption of operations.  In late April 2021, residents in the communities neighboring the Refinery began reporting a foul odor allegedly emanating from the Refinery, which prompted internal investigations as well as inquiries by the EPA and DPNR into the Refinery's emissions of gaseous by-products of the refining processes.  The Debtors cooperated with the EPA and DPNR in an effort to expeditiously identify the source of the odor and, moreover, ensure Refinery emissions comported with applicable standards.  Although the investigation concluded that the odor was due, at least in part, to an exposed sewage access point on USVI government property, the investigation also uncovered irregularities in the emission of certain gases from the Refinery.  In conjunction with the EPA and DPNR, the Debtors began creating a plan to remedy the issues and ensure emissions complied with applicable standards.

55.     Before the Debtors were able to finalize and implement any remediation plan(s), on May 12, 2021, an incident occurred resulting in the release of small amount of oil from a flare located at the Refinery, which affected homes and property in the surrounding neighborhoods. The Debtors immediately began an incident response process and, on May 13, 2021, voluntarily suspended operations at the Refinery to permit a full and complete investigation of the incident and to address any contributing factors.

56.     On May 14, 2021, the EPA issued a Clean Air Act Emergency Order (the "**EPA Order**") for the Refinery.  In the EPA Order, the EPA alleged that the Refinery failed to comply with certain aspect of the United States Clean Air Act pertaining to the emission of certain gaseous by-products of the refining processes.  Based on these purported violations, the EPA ordered the Debtors to suspend all operations at the Refinery for a period of 60 days and retain independent auditors to investigate compliance with environmental regulations in the operations of the Refinery.  Upon receipt, the Debtors immediately took action to comply with the EPA Order, including the continuation of the voluntary suspension of Refinery operations and engagement of qualified auditors to evaluate the Debtors' operations and processes as well as the Debtors' compliance with applicable regulations.  The auditors concluded their audits and provided final reports simultaneously to the EPA and the Debtors on or about June 25, 2021.

57.     As a result of the EPA Order, among other events, the Debtors' investors and lenders began expressing concerns about the ability to restart the Refinery, which severely impacted the Debtors' ability to access funding necessary to maintain operations and preserve the Refinery's assets.  Concerns were heightened further due to a June 11, 2021 request from the U.S. Attorney to visit and tour certain operations at the Refinery (the "**U.S. Attorney Request**").  Furthermore, certain Debtors and non-debtor affiliates have been named as defendants in multiple

class actions lawsuits (the "**Class Actions**") alleging private causes of action related to purported pollution caused by the Refinery following the February 1, 2021 relaunch.  As of the Petition Date, the Debtors are cooperating with the EPA, DPNR, and U.S. Attorney, and the Class Actions remain in the early stages of litigation.

58.      Following the May 13, 2021 suspension of operations, the Debtors explored various options for renewing operations at the Refinery.  The Debtors engaged financial advisors and counsel to advise on potential restructuring and recapitalization options, and retained the CRO to lead these efforts.  Additionally, on or about July 4, 2021, each of the Debtors appointed Steven J. Pully (the "**Independent Director**") as an independent director and/or member, as appropriate, vested with the authority to address matters pertaining to the restructuring of the Debtors, including the resolution of any conflicts that may arise between the Debtors and their officers, directors, members, and shareholders as well as their non-debtor affiliates of the Debtors, including the Terminal Entities.  In selecting the Independent Director, the Debtors interviewed numerous qualified candidates.  I am informed and believe that the Independent Director was selected due to his extensive experience as an independent director, chief restructuring officer, investment banker, and financial advisor, prior service as the chief executive officer for an oil and gas company following emergence from bankruptcy, as well as his prior experience as an attorney, which made the Independent Director qualified not only to serve as a director and/or member, as applicable, of the Debtors, but to fulfill his duty of identifying, investigating and evaluating any potential conflicts of interest that may arise in the context of these complex Chapter 11 Cases.  Copies of the Independent Director's resume and a non-exhaustive list of relevant experience are attached hereto as **Exhibit B** and incorporated herein by reference.

4819-4445-7457.1

59.     Regrettably, despite the involvement of qualified professionals to evaluate and pursue potential financing and restructuring options, the Debtors were unable to devise a plan to preserve the Refinery in operational condition without new capital.  Indeed, the Debtors estimated that the Refinery would require at least $150 million in additional funding to maintain operational capabilities, complete ongoing repairs and retrofitting, fund necessary repairs identified by the EPA audits, and establish a reserve for potential expenses pending the restart of the Refinery— which amount is exclusive of funds required for working capital and payment of outstanding obligations.  The Debtors, however, lacked access to adequate financing.

60.     Accordingly, the Debtors engaged with their investors and their primary lender constituencies to see if they would be willing to provide such new capital.  However, due to, among other things, the suspension of operations under the EPA Order, the U.S. Attorney Request, and looming deadlines under the Debtors' agreement with BP, the Debtors have been unable to attract the new capital necessary to fund operational costs during the temporary shutdown and ultimately restart operations after remediating any alleged deficiencies.

61.     As a result of the declining prospects for funding, on June 21, 2021, the Debtors announced that they were suspending indefinitely plans to restart the Refinery.  Simultaneously, on June 21, 2021, LBRO, which employs the principal workforce of the Refinery, provided notice to its employees in accordance with the The Worker Adjustment and Retraining Notification (WARN) Act and, out of an abundance of caution, the Virgin Islands Plant Closing Act of its intention to reduce its workforce by 271 employees.

62.     Since announcing the indefinite suspension of operations at the Refinery, the Debtors have worked diligently to idle the Refinery pending a sale or reorganization through these Chapter 11 Cases.  In conjunction with the EPA, the Debtors have prepared portions of a plan to

purge hydrocarbons from the Refinery equipment (the "**Hydrocarbon Purge Plan**"), which is necessary before the Debtors may safely idle the facility.  In early July 2021, the Debtors submitted to the EPA a proposal for the first phase of their Hydrocarbon Purge Plan, which is pending agency review and approval.  The Debtors are in the process of preparing a proposal for the second phase of their Hydrocarbon Purge Plan, which the Debtors intend to submit to the EPA shortly.  Additionally, the Debtors have provided for the anticipated expenses associated with the Hydrocarbon Purge Plan and other remedial and operational expenses under the DIP Facility (defined below) and associated budget for the use of the debtor in possession financing and cash collateral (the "**Budget**").

63.     In addition to the foregoing, the Debtors have been working with the citizens and government of the USVI to redress the potential environmental, safety and other impacts of the Refinery.  Due to the Debtors' belief in the importance of these payments and their relationship with the government of the USVI, and the potential impact on the value of the Debtors' assets and any marketing and sales process, the Debtors are working with their lenders to provide for the payment of certain amounts to the citizens of the USVI in the Budget.  As of the Petition Date, these discussions remain ongoing.  Any proposed payments shall be subject to the Budget, the provisions of the DIP Financing, and any orders authorizing the use of the DIP Financing or cash collateral in these Chapter 11 Cases, unless otherwise ordered by this Court.

64.     As the Debtors lack sufficient funds to implement the Hydrocarbon Purge Plan, pay operational expenses, or fund these Chapter 11 Cases without a new source of liquidity, the Debtors engaged in arms' length negotiations with potential sources of debtor in possession financing in the weeks leading up to the Petition Date, and have secured a commitment for debtor

in possession financing in an aggregate amount of up to $25 million, as described below, which is the subject of the DIP Motion (defined below).

65.    On or about July 9, 2021, the boards of directors and/or managers, as applicable, of the Debtors adopted resolutions (collectively, the "**Resolutions**") approving the commencement of these Chapter 11 Cases as well as other associated restructuring efforts, including, without limitation, obtaining the DIP Financing (defined below).

66.    On the Petition Date, the Debtors filed their respective Petitions—thereby commencing these Chapter 11 Cases.

## IV.    FIRST DAY MOTIONS AND EMERGENCY RELIEF

### A.    First Day Motions

67.    Concurrently with the filing of the Chapter 11 Cases, the Debtors have filed the following motions requesting relief, with the exception of the Lease Rejection Motion (defined below), on an emergency basis (collectively, the "**First Day Motions**"):

a.    Debtors' *Emergency* Motion Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases;

b.    Debtors' *Emergency* Motion for Authority to (I) Pay Prepetition Wages, Benefits, and Employee Business Expenses; and (II) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in the Ordinary Course;

c.    Debtors' *Emergency* Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363, and 364 Authorizing: (I) the Continued Use of the Debtors' Prepetition Cash Management System, including Existing Bank Accounts, Business Forms, and Company Credit Cards; (II) Continued Use of Intercompany Arrangements and Historical Practices; and (III) Opening New Debtors-in-Possession Accounts, if Necessary;

d.    Debtors' *Emergency* Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures

28

for Resolving Additional Assurance Requests, and (IV) Granting Related Relief;

e.    Debtors' _Emergency_ Application for Order Appointing BMC Group, Inc. as Claims, Noticing, Solicitation, and Administrative Agent;

f.    Debtors' Motion to Reject Unexpired Lease of Real Property (842 West Sam Houston Parkway North, Houston, Texas 77024) (the "**Lease Rejection Motion**"); and

g.    Debtors' _Emergency_ Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-petition Financing, (II) Authorizing the Debtor to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Approving Adequate Protection to Pre-petition Secured Creditors, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing (the "**DIP Motion**").

68.    I have reviewed each of the First Day Motions, including the attachments thereto, and believe the facts set forth therein are true and correct, to the best of my knowledge, information and belief. I believe that the relief sought in each of the First Day Motions is appropriate under the circumstances presented and necessary to preserve the assets and operations of the Debtors for the benefit of the estates and their creditors pending completion of a sale and/or confirmation of a plan of reorganization or liquidating in these Chapter 11 Cases. The bases for seeking the relief sought in the First Day Motions is described in more detail below:

a.    **Joint Administration.** The Debtors have filed a motion requesting entry of an order directing the joint administration of the Debtors' Chapter 11 Cases for procedural purposes only. I believe the joint administration of these Chapter 11 Cases will dispense with the need for duplicative notices, motions, applications, hearings, and orders and will save the Debtors and interested parties considerable time and expense. I believe the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors, and it will make the Debtors' transition into chapter 11 smoother, less costly, and more orderly.

b.    **Motion to Pay Prepetition Employee Obligations**. The Debtors have filed an emergency motion requesting the authority to pay certain pre-petition obligations due to the Debtors' employees. The Debtors request authority pay the employees' prepetition wages and honor certain employee policies (for example, paid time off, health and welfare obligations, and retirement plan obligations). The Debtors' next payroll date is July 16,

2021, and it is critical to the Debtors' ability to continue maintaining the Refinery and preserving estate assets that they pay their employees on that date.   If the Debtors are not permitted to fulfill their obligations to employees, the employees will not receive full payment for services that have already been performed.   I believe such a result would undermine the morale and loyalty of the Debtors' workforce, and substantially jeopardize the Debtors' bankruptcy efforts.   I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

c.   **Motion to Continue Use of Cash Management System**.   The Debtors have filed an emergency motion requesting that the Court authorize the Debtors to continue using their prepetition cash management system, including existing bank accounts and business forms.   The motion also requests the authority to continue certain intercompany arrangements and historical practices.   The Debtors maintain a cash management system in the ordinary course of the Debtors' businesses.   This system allows the Debtors to identify the Debtors' cash requirements, transfer cash as needed, forecast cash needs, maintain accounting records, and pay necessary expenses.   I believe that discontinuing the use of the Debtors' existing cash management system would require a significant amount of time and effort and could negatively impact the Debtors' ability to efficiently fund necessary expenses and preserve assets of the estates.   These negative results would ultimately adversely affect the Debtors' ability to maximize the value of their estates for the benefit of all interested parties.   I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

d.   **Utilities**.   The Debtors have filed an emergency motion requesting that the Court determine that the Debtors have provided adequate assurance of payment for certain utility services and preclude these utility providers from altering, refusing, or discontinuing utility services.   The monthly average cost of these utility services combined is approximately $402,533.00.   In my opinion, the continuity of these utility services is essential for the Debtors' to preserve and prevent damage to the value of the Debtors' estates.   I believe a deposit payable to each utility provider in an amount equal to the Debtors' monthly average utility bill is appropriate adequate assurance of payment for these utility services.   I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

e.   **Claims Agent**.   The Debtors have filed an emergency motion requesting that the Court approve the Debtors' retention of BMC Group, Inc., as a claims and noticing agent.   I believe the retention of a claims and noticing agent is necessary primarily to (i) handle the significant burden of noticing interested parties, including the Debtors' former customers and (ii) handle the potentially voluminous proofs of claim filed in these Chapter 11 Cases.

30

I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

f.    **Lease Rejection.**  The Debtors have filed a motion requesting authority to reject a lease for certain non-residential real property located at 842 West Sam Houston Parkway North, Houston, Texas 77024 (the "**Houston Property**").  Due to the indefinite suspension of Refinery operations, the Debtors no longer require and, indeed, on or about July 1, 2021, vacated the Houston Property.  Accordingly, the Debtors seek authority to reject the lease for the Houston Property effective as of the Petition Date.  I believe that the relief requested in the Lease Rejection Motion is in the best interests of the Debtors, their estates, and their creditors.

g.    **Debtor in Possession Financing/Cash Collateral**.  As detailed below, the Debtors require immediate access to funding to preserve the assets of the estates for the benefit of creditors and ensure the protection of the communities neighboring the Refinery through the responsible idling of the facility.  The debtor in possession facility (the "**DIP Facility**") provides the Debtors with initial availability of $5.5 million upon entry of an Interim DIP Order (attached to the DIP Motion), with a committed financing facility up to $25 million, to be considered at the Final Hearing (as defined in the DIP Motion), under the Credit Agreement (defined below).  The proposed DIP Lenders (defined below) have no affiliation or financing history with these Debtors.  The DIP Facility includes liens that prime prepetition liens, and provide the holders of the prepetition liens with adequate protection.  The terms of the DIP Facility are described in more detail, below, and in the DIP Motion.  For the reasons stated therein, I believe that the relief requested in the DIP Motion is in the best interests of the Debtors, their estates, and their creditors.

**B.    The Terms of the DIP Facility**

69.    The DIP Motion requests authority for the Debtors to enter into that certain *Senior Secured Superpriority Debtor-In-Possession Credit Agreement* (the "**Credit Agreement**"), a copy of which is attached as an exhibit to the DIP Motion, between (i) LBR, as borrower, (ii) LBS, LBRH, LBRH II, LBRO, and LBRM, jointly, as guarantors, (iii) 405 Sentinel LLC, as administrative agent (the "**DIP Agent**"), and (iv) various lenders who will provide funding thereunder (the "**DIP Lenders**").  The DIP Facility provides the Debtors with an interim amount of $5,500,000 (the "**Initial Availability**"), with a commitment of up to $25 million (the "**Additional Availability**"), in total, upon final agreement to applicable terms and Court approval

(the "**DIP Financing**").  While the Debtors have obtained a commitment for a total of $25,000,000 in financing, the conditions for such financing, particularly the DIP Lenders' request for priming liens for amounts in excess of $5,500,000, have not been finalized and are continuing to be discussed with the Debtors, the DIP Lenders, the Prepetition Lenders and their respective advisors.

70.     The DIP Motion also seeks authority to grant to the DIP Agent, for the benefit of the DIP Lenders, (i) allowed superpriority administrative claims pursuant to Section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out and the Aron Rights (as those terms are defined in the Interim DIP Order) in respect of all DIP Obligations (as that term is defined in the DIP Motion), (ii) valid, enforceable, non-avoidable and automatically perfected first priority liens pursuant to Section 364(c)(2) on all unencumbered assets of the Debtors, subject only to the Carve-Out, (iii) valid, enforceable, non-avoidable and automatically perfected junior liens pursuant to Section 364(c)(3) of the Bankruptcy Code on the Inventory Financing Collateral, subordinate and subject to the Aron Rights and subject to the Carve-Out, and (iv) priming liens pursuant to Section 364(d) of the Bankruptcy Code, on all encumbered DIP Collateral (as defined in the Credit Agreement), subject and junior to the Carve-Out, valid, perfected and non-avoidable liens in existence on the Petition Date and senior in priority to any of the Prepetition Secured Parties' (defined below) liens, and the Aron Rights.

71.     The DIP Motion also seeks authority to grant adequate protection to prepetition secured lenders whose collateral will be primed by the liens under the DIP Facility (collectively, the "**DIP Liens**"), among other terms more fully described in the DIP Motion.

72.     The Debtors have fully described in the DIP Motion all terms of the DIP Facility that address issues raised in Bankruptcy Rules 4001(b), (c) and (d), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "**Highlighted Provisions**"), all

of which I believe are ordinary for debtor in possession financing obtained in a case such as this one, involving significant prepetition financing and a debtor in possession in the process of suspending the activities of its main business.

73.     I believe the process for soliciting and selecting the DIP Facility was fair, reasonable and designed to obtain financing on the most advantageous terms available, under the circumstances presented.  Over the past month, the Debtors contacted more than 50 lenders and financial institutions, including the Debtors' existing lenders, regarding extensions of existing credit arrangements, access to alternative and governmental funding sources, and the provision of distress or debtor in possession financing.  The Debtors received interest from five (5) potential debtor in possession lenders; however, only two (2) entities submitted proposals that provided sufficient funding on commercially reasonable terms.  Thereafter, the Debtors and the potential debtors in possession lenders negotiated the terms of the proposed facilities at arms' length through their respective representatives.  Ultimately, the Debtors selected the DIP Facility based on the conclusion that the DIP Facility provided the funding required on the most advantageous terms available.

74.     I believe immediate access to the DIP Financing is imperative.  The Debtors are in the midst of a liquidity crisis.  As of the Petition Date, the Debtors have approximately $3,479,722 cash on hand.  Aside from the proposed DIP Facility, the Debtors do not have access to funds for operational expenses through existing credit facilities, as such facilities are either fully drawn or the Debtors are unable to satisfy certain prerequisites to access additional funding.  Unless the DIP Facility is approved on an interim basis, the Debtors will be unable to meet certain immediate obligations, including, without limitation, the payment of more than $1.15 million in payroll on July 16, 2021.

33

75.     The DIP Facility is the product of arms-length, good faith negotiations between the Debtors, the DIP Agent, and the Prepetition Secured Parties.  The DIP Agent is not an insider, affiliate, or control person of the Debtors, but is a third-party lender.

76.     While the DIP Facility contains the Highlighted Provisions, the DIP Agent and DIP Lenders would not have agreed to provide financing without the inclusion of the Highlighted Provisions in the DIP Documents, and, based on the Debtors' extensive solicitation and marketing efforts, I do not believe that the Debtors would have been able to obtain similar financing without such Highlighted Provisions.  Based on their sound business judgment, the Debtors have concluded that the DIP Facility is the best debtor in possession financing option available to the Debtors and serves the best interests of the estates and interested parties.

77.     The proceeds from the proposed DIP Facility will be used for, among other things, making payments integral to the Debtors' business operations. Indeed, the liquidity to be provided under the DIP Facility, combined with access to Cash Collateral, will enable the Debtors to fund immediate expenses following the Petition Date and sustain efforts to winddown the Refinery during the interim period, which providing the liquidity necessary to preserve assets and  pursue sale or restructuring transactions to maximize the value of the estates and their assets for the benefit of all stakeholders.

78.     In addition to the funds available under the DIP Facility, the Debtors require immediate access to cash collateral to maintain operations and ensure the continued preservation of the Refinery.  The Prepetition Secured Parties assert security interests in the Debtors' Bank Accounts.  Accordingly, prior to the Petition Date, the Debtors and the Prepetition Secured Parties negotiated terms for the use of the Cash Collateral of the Prepetition Secured Parties, which agreement is memorialized in the provisions of the Budget and the Interim DIP Order, including a

4819-4445-7457.1

reservation of rights with respect to any future requests to use Cash Collateral other than as expressly permitted under the DIP Orders. In addition to the terms of the Budget, the Prepetition Secured Parties consented to the use of Cash Collateral subject to the following provisions, among others identified in the DIP Motion:

      a.  valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition;

      b.  monthly payments to reimburse the Prepetition Secured Parties' reasonable and documented professional fees;

      c.  (i) in the case of the Prepetition Term Lenders, in lieu of cash payments of interest when and as required under any of the Prepetition Secured Debt Documents, all accrued and unpaid interest shall, on each applicable date when such interest payments are due under such documents, be paid in kind by adding the amount of such accrued interest to the outstanding aggregate principal balance of the term loans, and (ii) in the case of the Revolver Lenders and J. Aron, monthly payments in cash of an amount equal to all interest (other than default interest) accrued under the Revolver Transaction Documents and J. Aron Transaction Documents, as applicable;

      d.  super priority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, with priority as provided therein, to the extent of any diminution in each Prepetition Secured Parties' respective Prepetition Collateral, and

      e.  an acknowledgement of the unconditional right to credit bid the prepetition obligations under each Prepetition Secured Parties' respective Prepetition Secured Debt Documents in connection with any sale of their respective Prepetition Collateral.

79.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Secured Parties. The Debtors have also agreed to pay the fees and expenses of counsel and certain other professionals retained by the Prepetition Secured Parties, as provided for in the DIP Documents. The provisions regarding the payment of such fees and expenses were negotiated at arm's length through the parties' respective representatives. Further, the Debtors considered the amounts of such fees when determining, in

4819-4445-7457.1

their sound business judgment, that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and administer these Chapter 11 Cases.

80.     Under the DIP Documents, the Debtors have agreed to certain releases and exculpations for the DIP Agent and each DIP Lender (in any capacity) and the Prepetition Secured Parties, in form and substance satisfactory to such parties, respectively, including, without limitation, releases from any avoidance actions.  Prior to agreeing to such provisions, the Debtors investigated potential claims against the Prepetition Secured Parties, including, without limitation, an investigation regarding the liens asserted by such parties, the current balances of the debt and payment history for the obligations, and the prior dealings between the parties, in order to determine whether the Debtors may have claims against the Prepetition Secured Parties.  Based on the information obtained, it is my understanding that the Debtors do not have any claims against the Prepetition Secured Parties.  No investigation was conducted with respect to the DIP Agent and DIP Lender, as the Debtors have not had any prior dealings with these entities.

81.     Based on the Debtors' extensive marketing and soliciting efforts, and extensive negotiations over the past weeks with multiple potential lenders, I do not believe that financing with terms similar to those in the DIP Facility is available to the Debtors for lower fees or better terms overall.

82.     I believe that the Debtors may suffer immediate and irreparable harm if the Interim DIP Order approving the DIP Facility is not entered sooner than 14 days after service of the Motion and if the Debtors are not permitted to access the up to $5,500,000 of the DIP Facility prior to the Final Hearing (as defined in the DIP Motion) in order to, among other things, continue ongoing remediation and repairs to the Refinery, address any issues identified for remediation in the audits

under the EPA Order, pay employee wages and benefits, maintain the Refinery in operational condition to preserve the value of such assets, and fund expenses associated with the Chapter 11 Cases.  Such relief is necessary for the Debtors to preserve and maximize the value of assets of the estates and, therefore, to avoid immediate and irreparable harm and prejudice to the Debtors' estates and parties in interest.

        **C.**    **Emergency First-Day Relief Requested**

83.    With the exception of the Lease Rejection Motion, I believe that it is critical that the First Day Motions be heard as soon as practicable.  If such motions are not considered on an expedited basis, it could threaten the Debtors' ability to satisfy their obligations to, among others, employees, customers, suppliers, and governmental agencies—leading to immediate and irreparable harm to the Debtors' businesses.  Accordingly, I believe expedited consideration and approval of the emergency First Day Motions is vital to the continued viability of the Debtors and is in the best interest of all interested parties in these Chapter 11 Cases.

4819-4445-7457.1

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated:  July 12, 2021 _\_\_/s/ Mark Shapiro\_\__

Mark Shapiro, CRO