IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| LIMETREE BAY SERVICES, LLC, *et al.*,[1] | CASE NO.: 21-32351 |
| Debtors. | (Joint Administration Requested) |

DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION
FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(III) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (IV) APPROVING ADEQUATE
PROTECTION TO PRE-PETITION SECURED CREDITORS, (V) MODIFYING
THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING

Emergency relief has been requested. A hearing will be conducted on this matter on July 13, 2021, at 3:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk St., Houston, Texas 77002. You may participate in the hearing either in person or by audio/video connection.

Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long-distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691.

You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeJones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **Relief is requested not later than July 13, 2021.**

Limetree Bay Services, LLC ("**Limetree**") and its debtor affiliates (together with Limetree, the "**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), represent as follows in support of this motion (the "**Motion**"):

## Jurisdiction and Venue

1.      This United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of the Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This Court has constitutional authority to enter final orders with respect to the relief requested herein. The Debtors further confirm their consent to this Court's entry of final orders or judgments on this Motion, if it is later determined that, in the absence of the consent of the parties, this Court does not have constitutional authority to enter final orders or judgments.

## Relief Requested

3.      Pursuant to sections 105(a), 361, 362, 363, 364, 503, 506(c), 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rule of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-1(b), 5005-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Local Rules**"), the Debtors seek entry of an interim order, substantially in the form attached hereto (the "**Interim DIP Order**"), and, subsequently, a final order to be

2

proposed granting the relief requested herein on a final basis (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), providing as follows:

    a.    authorizing the Debtors to obtain postpetition financing in an aggregate principal amount of up to $5.5 million on an interim basis (the "**DIP Financing**" or "**DIP Facility**"), with a committed financing facility up to $25 million proposed by the Debtors to be considered at a subsequent hearing, pursuant to that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement  attached hereto as **Exhibit A** (the "DIP Credit Agreement"), and such other agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, including the agreements related to the DIP Financing, (the "**DIP Loan Documents**"), among the Debtor Limetree Bay Refining, LLC, as borrower ("**LBR**" or the "**Borrower**"), Debtors Limetree Bay Services, LLC., Limetree Bay Refining Holdings, LLC, Limetree Bay Refining Holdings II, LLC ("**LBRHII**"), Limetree Bay Refining Operating, LLC ("**LBRO**"), and Limetree Bay Refining Marketing, LLC ("**LBRM**" and each a "**Guarantor**" and together the "**Guarantors**"), 405 Sentinel, LLC, and the financial institutions from time to time parties thereto as lenders (each individually a "**DIP Lender**," and collectively, the "**DIP Lenders**"), and 405 Sentinel, LLC, as administrative and collateral agent for the DIP Lenders (the "**DIP Agent**" together with the DIP Lenders, the "**DIP Secured Parties**");

    b.    authorizing the Debtors to use the DIP Lenders' and the Prepetition Secured Parties' (as defined below) (x) "cash collateral," as such term is defined in Section 363 of the Bankruptcy Code, other than, until such time as the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement) occurs, any such "cash collateral" that constitutes Inventory Financing Collateral (as defined below) and (y) until such time as the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement) occurs, "cash collateral," as such term is defined in Section 363 of the Bankruptcy Code that constitutes Inventory Financing Collateral, solely to the extent that the same is (A) cash or amounts on deposit in or credited to any deposit account or securities account or (B) proceeds of accounts receivable in respect of propane sales contemplated to be received by the Debtors pursuant to the Approved Budget (as defined below) in an aggregate amount not to exceed $1,000,000 (such "cash collateral" as described in this clause (y) and the foregoing clause (x), the "**Cash Collateral**")

    c.    granting (y) to the DIP Agent for the benefit of the DIP Secured Parties the DIP Liens (as defined in the Interim DIP Order) on the DIP Collateral (as defined below) to secure all amounts owed under the DIP Loan Documents (the "**DIP Obligations**"), and (z) to the DIP Secured Parties

the DIP Superpriority Claims (as defined below) in respect of the DIP Obligations, in each case subject to the terms and conditions hereof;

d.      approving certain stipulations by the Debtors with respect to the Prepetition Secured Documents (as defined below) and the liens and security interests arising therefrom;

e.      modifying the automatic stay to the extent provided for herein;

f.      granting adequate protection for the liens and security interests granted for the benefit of the Prepetition Secured Parties in connection with the prepetition agreements described in Paragraphs 14-30, below; and

g.      scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of a final order (the "<u>Final Order</u>") authorizing the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing, which order shall be in form and substance and on terms satisfactory in all respects to the DIP Secured Parties.

## <u>Summary of Terms of DIP Facility and Use of Cash Collateral</u>

4.      In accordance with Bankruptcy Rules 4001(b), (c) and (d), and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "**Complex Rules**"), the following is a concise statement and summary of the material terms of the proposed DIP Facility, as set forth in the DIP Documents and Interim DIP Order:[2]

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Parties**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Borrower**.  Limetree Bay Refining, LLC, as a debtor and debtor-in-possession<br><br>**Guarantors.**  Limetree Bay Services, LLC, Limetree Bay Refining Holdings, LLC, Limetree Bay Refining Holdings II, LLC, Limetree Bay Refining Operating, LLC, and Limetree Bay Refining Marketing, LLC<br><br>**DIP Agent**.  405 Sentinel, LLC<br><br>**DIP Lenders**.  Such lenders from time to time who are parties thereto. |

---

[2] The summary of the DIP Documents and Interim DIP Order set forth herein is a summary of material terms; accordingly, certain terms of the DIP Documents and Interim DIP Order may be omitted, in whole or in part. Interested parties should read the DIP Documents and Interim DIP Order in their entirety.  In the event of any inconsistencies between this summary and the DIP Documents or Interim DIP Order, the DIP Documents or Interim DIP Order, as applicable, shall control.  If there are any inconsistencies between the DIP Documents and DIP Orders, the terms of the Interim DIP Order shall control until entry of the Final DIP Order, at which time the terms of the Final DIP Order shall govern, including in the event of any inconsistency between the Interim DIP Order and the Final DIP Order.  Unless otherwise states, capitalized terms used in this summary shall have the meanings ascribed to them in the Interim DIP Order, Final DIP Order, or DIP Documents, as applicable.

4

| | |
|---|---|
| | *See* Interim DIP Order Preamble; DIP Credit Agreement, p. 1. |
| **DIP Facility and Borrowing Limits** *FED. R. BANKR. P. 4001(c)(1)(B)* | The DIP Facility shall consist of a new money Term Loan Facility in the aggregate principal amount of up to $5.5 million on an interim basis (the "DIP Financing"), with a committed financing facility up to $25 million proposed by the Debtors to be considered at a subsequent hearing, pursuant to that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement.<br><br>*See* Interim DIP Order Preamble; DIP Credit Agreement at Section 2.01. |
| **Roll-Up** *FED. R. BANKR. P. 4001(c)(1)(B)* | N/A |
| **Interest Rate** *FED. R. BANKR. P. 4001(c)(1)(B)* | All obligations of the Debtors under the DIP Facility will bear cash interest at 3.00%, payable monthly in arrears, and monthly PIK interest at 9.00%. All interest and fees shall be computed on the basis of a year of 360 days for the actual days elapsed. In lieu of PIK interest, the Borrower may pay such interest in cash, subject to compliance with the Budget.<br><br>The default interest rate shall be at a rate of 11.00% per annum.<br><br>*See* DIP Credit Agreement at Sections 2.05 and 3.01. |
| **Term** *FED. R. BANKR. P. 4001(c)(1)(B)* | The DIP Facility shall be repaid in full at the earliest of:<br><br>(a)    the occurrence of the "Maturity Date" (as defined in the DIP Loan Documents) of the DIP Financing under the DIP Loan Documents;<br><br>(b)    acceleration of the obligations under the DIP Loan Documents upon the occurrence of an "Event of Default" under and as defined by the DIP Loan Documents;<br><br>(c)    nine (9) months following the entry of the Interim Order;<br><br>(d)    failure to obtain entry of the Final Order within 30 days from the entry of this Interim Order;<br><br>(e)    entry of an order authorizing the Borrower or any Guarantor to incur DIP financing from any party other than the DIP Secured Parties;<br><br>(f)    the closing date of a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code (whether in one transaction or a series of related or unrelated transactions) (a "**363 Sale**");<br><br>(g)    the effective date of a confirmed chapter 11 plan (a "**Plan**") that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Loan Documents or is otherwise acceptable to the DIP Agent and the DIP Lenders in their sole discretion;<br><br>(h)    the failure by the Debtors to timely perform any of the material terms, provisions, conditions, covenants, or other obligations under this Interim Order;<br><br>(i)    the filing of a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee, other estate fiduciary or an examiner with special/expanded powers which the Debtors fail to timely oppose without the prior written consent of the DIP Agent and the Prepetition Secured Parties;<br><br>(j)    an order converting any Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;<br><br>(k)    the filing or support by any Debtor of any plan of reorganization that (1) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Loan Documents and (2) is not otherwise acceptable to DIP Agent and the DIP Lenders in their sole discretion;  and<br><br>(l)    any modifications, amendments, reversal, or extensions of this Interim |

| | |
|---|---|
| | Order that are adverse to the DIP Secured Parties or the Prepetition Secured Parties.<br><br>The Interim Dip Order also contains certain provisions that may terminate the Debtors' use of Cash Collateral.<br><br>*See* Interim DIP Order at Paragraph 15. |
| **DIP Facility Events of Default**<br>*FED. R. BANKR. P. 4001(c)(1)(B)* | The DIP Credit Agreement contains events of default that generally are usual and customary for debtor-in-possession financings of this type.<br><br>*See* Interim DIP Order at Paragraph 15; DIP Credit Agreement at Article VII. |
| **Liens and Priority Granted for New Credit**<br>*FED. R. BANKR. P. 4001(c)(1)(B)* | **DIP Liens.** All obligations of the Borrower to the DIP Lenders and to the DIP Agent, including, without limitation, all principal and accrued interest, costs, fees and expenses or any exposure of a DIP Lender or any of its affiliates in respect of cash management incurred on behalf of the Borrower (collectively, the "DIP Obligations"), shall be secured, pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3) and 364(d), by a valid, binding, continuing, enforceable, fully-perfected, nonavoidable, automatically and properly perfected lien on, and security interest in all DIP Collateral (as defined in the Interim DIP Order and subject to the exclusions set forth therein), as of the Petition Date in the following priorities:<br><br>(i)  priming security interests in and liens on, pursuant to section 364(d) of the Bankruptcy Code, all prepetition and post-petition property of the Debtors' estates, subject to the Carve-Out and the Permitted Prior Liens,<br><br>(ii)  first priority security interests in and liens on, pursuant to section 364(c)(2) of the Bankruptcy Code, all unencumbered DIP Collateral, subject to the Carve-Out, including, subject to entry of the Final Order, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations secured by the DIP Liens, any Avoidance Proceeds (as defined in the Interim DIP Order), and<br><br>(iii)  junior priority security interests and liens on certain additional DIP Collateral, pursuant to section 364(c)(3) of the Bankruptcy Code, which liens are subject and subordinate to the Carve-Out and the Aron Rights as more fully described in the Interim DIP Order and below.<br><br>*See* Interim DIP Order at Paragraph 7; DIP Credit Agreement at Section 3.08. |
| **Superpriority Expense Claims for New Credit**<br>*FED. R. BANKR. P. 4001(c)(1)(B)(i)* | Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever (the "DIP Superpriority Claims") and shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof, subject only to (i) the Carve-Out and (ii) the Aron Rights.<br><br>In addition, the Term Administrative Agent (for the benefit of the Prepetition Term Lenders), the Revolving Administrative Agent (for the benefit of the Revolver Lenders), and J. Aron shall receive superpriority claims for diminution in value of their collateral.  *See* Interim DIP Order at Paragraphs 7, 9, Section M; DIP Credit Agreement at Section 3.08. |
| **Carve-Out**<br>*FED. R. BANKR. P. 4001(c)(1)(B)(i)* | The Interim DIP Order provides a "Carve Out" of certain statutory fees and allowed professional fees of bankruptcy professionals whose retention has been approved by the Court and provided for in the Budget.<br><br>*See* Interim DIP Order at Paragraph 5. |

| | |
|---|---|
| **Parties with an Interest in Cash Collateral** <br> FED. R. BANKR. P. 4001(c)(1)(B)(i) | The following parties have an interest in Cash Collateral: <br><br> a.  The DIP Lenders, <br><br> b.  The Prepetition Secured Parties. <br><br> *See* Interim DIP Order at Section J. |
| **Duration/Use of Cash Collateral** <br> FED. R. BANKR. P. 4001(b)(1)(B)(ii) | **Cash Collateral**.  Subject to the terms and conditions of the Interim DIP Order and DIP Credit Agreement, and in accordance with the Budget (as defined below), the Debtors may use Cash Collateral until the occurrence of the Cash Collateral Termination Date. <br><br> *See* Interim DIP Order at Paragraphs 1, 5, 16; DIP Credit Agreement at Section 7.01. |
| **Liens, Cash Payments, or Adequate Protection Provided for Use of Cash Collateral** <br> FED. R. BANKR. P. 4001(b)(1)(B)(iv) <br> 4001(c)(1)(B)(ii) | As adequate protection for any diminution of the Prepetition Collateral resulting from the subordination of their existing liens to the DIP Liens and the other relief granted in the Interim Order in favor of the DIP Secured Parties, the Debtors' use of Prepetition Collateral (including Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and in exchange for the their consent to the priming of the their liens by the DIP Liens pursuant to the Interim Order, the Debtors grant the Prepetition Secured Parties adequate protection, including in the forms of replacement liens upon all real and personal property of the Debtors, monthly payments to reimburse the reasonable and documented professional fees of the Prepetition Secured Parties, payment of accrued interest in kind, superpriority administrative claims for the diminution in value of collateral, and payment of unpaid prepetition professional fees <br><br> *See* Interim DIP Order at Paragraph 9. |
| **DIP Budget** <br> FED. R. BANKR. P. 4001(c)(1)(B) | The use of DIP Facility proceeds and Cash Collateral is subject to the Budget attached as **Exhibit B** to the Interim DIP Order, as amended from time to time. Any amendments or modifications to the Budget will require the consent of the DIP Lenders and the Prepetition Secured Parties, subject to the conditions set forth in paragraph 26 of the Interim DIP Order. <br><br> *See* Interim DIP Order at Paragraph 26, Section N. |
| **Conditions to Borrowing** <br> FED. R. BANKR. P. 4001(c)(1)(B) | The DIP Documents include standard and customary conditions to borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to provide the DIP Facility. <br><br> *See* DIP Credit Agreement at Article IV. |
| **Covenants** <br> FED. R. BANKR. P. 4001(c)(1)(B) | The DIP Credit Agreement contains usual and customary affirmative and negative covenants for financings of this type. <br><br> *See* DIP Credit Agreement at Sections 6.01 and 6.02. |
| **Fees, Expenses, and Additional Payments** <br> FED. R. BANKR. P. 4001(c)(1)(B) | **Delayed Draw Fee**:  One and one-half percent (1.50%) of the undrawn amount of the DIP Loan Commitment, payable monthly in arrears. <br><br> **Deferred Commitment Fee**: (A) $110,000, which shall be fully earned and nonrefundable as of the Interim Closing Date, and paid on the earlier of (i) payment in full of the DIP Facility and (ii) the Termination Date; and (B) $390,000, which shall be fully earned and nonrefundable as of the Final Closing Date, and paid on the earlier of (i) payment in full of the DIP Facility and (ii) the Termination Date. <br><br> **DIP Agent Fee**:  $62,500 which shall be fully earned and nonrefundable as of the Interim Closing Date, and paid on the Interim Closing Date. <br><br> **Break-Up Fee**:  $250,000 in the event that alternative DIP financing is approved before entry of the Final Order with a lender other than the DIP Lenders, and in |

4829-5574-6033.1

| | lieu of the Deferred Commitment Fee. |
|---|---|
| | **Fees and Expenses of DIP Agent and Prepetition Secured Parties:**  Borrower shall promptly pay or reimburse DIP Agent and Prepetition Secured Parties when invoiced for all reasonable costs and expenses of the counsel (including, without limitation, local counsel) and financial advisors relating to the DIP Facility and the administration and interpretation of, and the enforcement of remedies under, the DIP Facility and including all due-diligence, including but not limited to printing costs, consultation, travel, and attendance at court hearings, regardless of whether the DIP Facility is consummated. Failure to pay such fees and expenses within ten days of delivery of the applicable invoice shall be an Event of Default under the DIP Facility. Additionally, in the event the DIP Facility is not consummated, Borrower shall pay any accrued fees and expenses of the DIP Agent within five business days of delivery of the applicable invoice. *See* Interim DIP Order at Paragraph 8, 38; DIP Credit Agreement at Section 3.02, 3.07. |
| **Prepayments** *FED. R. BANKR. P. 4001(c)(1)(B)* | **Mandatory Prepayments**:  Mandatory prepayments of the DIP Loans shall be required with 100.0% of the net cash proceeds exceeding the Threshold Amount (as defined below) from sales or other dispositions (including casualty events) of any Collateral (as defined below) (excluding sales or dispositions of the Inventory Financing Collateral (as defined in the A&R Depositary and Intercreditor Agreement) prior to the Discharge of Inventory Financing Obligations (as defined in A&R Depositary Agreement) and dispositions in the ordinary course of business subject to other exceptions to be agreed, provided that the Borrower shall be permitted to reinvest 50% of net cash proceeds from casualty and condemnation events so long as (x) such reinvestment is consummated on or prior to the DIP Facility Termination Date and (y) the aggregate principal amount of DIP Loans outstanding at such time of receipt shall be less than $5,500,000. Additionally, the incurrence of indebtedness not permitted by the DIP Loan Documents shall require mandatory prepayment of the net cash proceeds thereof in a customary manner to be agreed. "Threshold Amount" means $5,000,000 (individually) and $10,000,000 in the aggregate. **Voluntary Prepayments**:  The Borrower may, upon at least 3 business days' notice prepay in full or in part without penalty or premium the DIP Loans; provided that each such partial prepayment shall be in a minimum aggregate amount to be agreed. *See* DIP Credit Agreement at Section 2.04. |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral** *FED. R. BANKR. P. 4001(c)(1)(B) 4001(b)(1)(B)(ii)* | The Debtors are authorized to use proceeds of the DIP Financing in accordance with the Interim Order and the Approved Budget, subject to the Budget Variance. Proceeds of the DIP Facility may be used for payment of  (i)   interest, fees and expenses to the DIP Agent in accordance with the DIP Facility,  (ii)  post-petition operating expenses and other working capital and financing requirements of the Debtors, including provision of adequate protection measures to the Prepetition Secured Parties and pre-petition expenses whose payment is approved by the Court and is consistent with the Budget and the expenses of safely shutting down and preparing for sale the Debtors' assets;  (iii) certain transaction and bankruptcy related fees, costs and expenses, (including the attorneys' fees and disbursements of counsel to the Debtors and Guarantors, and the professional fees and disbursements of other professional advisors of the Debtors and Guarantors), |

<table>
<tr><td></td><td>

(iv) the Carve-Out;

(v) Prepetition claims of critical vendors, only as approved by the Court; and

(vi) the fees, costs and expenses incurred by the DIP Agent and its professionals.

Proceeds of the DIP Collateral and the DIP Loans shall not be used:

(i) in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the DIP Financing.  In addition, none of the proceeds of the DIP Collateral, the DIP Loans, or the Prepetition Collateral shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the Prepetition Secured Documents (provided that, notwithstanding anything to the contrary herein, the Committee may use proceeds of the DIP Financing and/or the DIP Collateral (including Cash Collateral) to investigate but not to prosecute (i) the claims and liens of the Prepetition Secured Parties, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties up to an aggregate cap of $50,000 (the "Committee Investigation Budget")).

(iii) to make any Restricted Payments or Capital Expenditures, with certain exceptions.

*See* Interim DIP Order at Paragraph 3(b), 5; DIP Credit Agreement at Section 3.07, 6.02(g)(n).

</td></tr>
<tr><td>

**Waiver or Modification of the Automatic Stay**
*FED. R. BANKR. P. 4001(c)(1)(B)(iv)*

</td><td>

Pursuant to the Interim DIP Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim DIP Order. Upon entry of a final order, the stay is modified to allow J. Aron to set off and net any Margin (as defined in the J. Aron Monetization Master Agreement (as defined below)) in its possession against any obligations owed by the Debtors to J. Aron under the J. Aron Transaction Documents (as defined below).

*See* Interim DIP Order at Paragraph 14.

</td></tr>
<tr><td>

**Stipulations of the Debtor**
*FED. R. BANKR. P. 4001(b)(1)(B)(iii)*

</td><td>

The Debtors have stipulated to, among other things, the validity, enforceability, perfection, priority and amount, as applicable, of the claims, rights and liens of the Prepetition Secured Parties.

*See* Interim DIP Order at Section F.

</td></tr>
<tr><td>

**Releases, Waivers, or Limitation on any Claim or Cause of Action**
*FED. R. BANKR. P. 4001(c)(1)(B)(viii)*

</td><td>

DIP Secured Parties. The DIP Orders shall contain releases and exculpations for the DIP Agent and each DIP Lender (in any capacity) and the Prepetition Secured Parties, in form and substance satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions.

*See* Interim DIP Order at Section F.

</td></tr>
<tr><td>

**Effect of Stipulations and Releases; Challenge Period** *FED. R. BANKR. P. 4001(b)(1)(B)(iii), 4001(c)(1)(B)(iii), (viii)*

</td><td>

Paragraph 41 of the Interim DIP Order provides that the Stipulations and Releases contained in the Interim DIP Order are binding on the Debtors, their estates, any Committee, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors and any other person acting on behalf of the Debtors' estates, under all circumstances and for all purposes, subject to certain modifications in paragraph 42, including but not limited to a sixty (60) day challenge period for

</td></tr>
</table>

9

| | |
|---|---|
| | any Committee and parties in interest (other than the Debtors and the DIP Lenders).<br><br>*See* Interim DIP Order at Section F, Paragraphs 5, 41 and 42. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>*FED. R. BANKR. P. 4001(c)(1)(B)(vii)* | All DIP Liens and Adequate Protection Liens (each as defined in the Interim DIP Order) shall be valid and automatically perfected upon the entry of the Interim DIP Order.<br><br>*See* Interim DIP Order at Paragraph 7(c). |
| **Reporting Information**<br>*FED. R. BANKR.P. 4001(c)(1)(B)* | Under the DIP Credit Agreement, the DIP Secured Parties and Prepetition Secured Parties shall receive customary financial reporting from the Debtors during the chapter 11 case.<br><br>*See* Interim DIP Order at Paragraph 12; DIP Credit Agreement at Section 6.03. |
| **Indemnification**<br>*FED. R. BANKR. P. 4001(c)(1)(B)(ix)* | The Debtors shall indemnify and hold DIP Agent, and all DIP Lenders and their respective officers, directors, employees and agents (including all of their professionals) from claims of the sort that are typical in DIP facility indemnity provisions, except for gross negligence or willful misconduct, as described in more detail in the Interim DIP Order.<br><br>*See* DIP Credit Agreement at Sections 3.05, 10.02; Interim DIP Order at Paragraph 37. |
| **Section 506(c) and 552(b) Waivers**<br>*FED. R. BANKR. P. 4001(c)(1)(B)* | Subject to entry of the Final Order, the Interim DIP Order provides that the DIP Lenders' liens will have priority over any claims arising under Section 506(c) and 552 (b) and such provisions are waived as to the Prepetition Secured Parties.<br><br>*See* Interim DIP Order at Paragraphs 35-36. |
| **Liens on Avoidance Actions**<br>*FED. R. BANKR. P. 4001(c)(1)(B)(xi)* | The DIP Liens exclude any Avoidance Actions of the Debtors, but, subject to entry of the Final Order, including, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations secured by the DIP Liens, include any proceeds of, or property recovered in connection with, any successful Avoidance Action (whether by judgment, settlement or otherwise, and unencumbered or not). *See* Interim DIP Order at Paragraph 7. |
| **Milestones**<br>*FED. R. BANKR. P. 4001(c)(1)(B)(vi)* | The Debtors shall have (i) prepared a contingency plan for the wind-down of the Debtors' operations in the event that a going concern sale is not achieved, which plan shall be reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (ii) prepared a 13-week budget that is reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (iii) filed with the Court a motion requesting approval of proposed bidding procedures that are reasonably acceptable to the Prepetition Secured Parties and that adhere to the milestones described in clauses (iv) and (v) below no later than ten (10) business days after the Petition Date, (iv) obtained, within sixty (60) calendar days after the Petition Date, a binding stalking horse bid for the sale of all or substantially all of the Debtors' assets which bid shall be reasonably acceptable to each Prepetition Secured Party, and (v) completed the closing of a sale of all or substantially all of the Debtors' assets that is reasonably acceptable to each Prepetition Secured Party, within one hundred twenty (120) calendar days after the Petition Date (collectively with (i) through (iv), the "<u>Milestones</u>"). |

**<u>Statement Highlighting Certain Provisions per the Complex Rules</u>**

5.      The DIP Orders contain certain provisions (the "**Highlighted Provisions**") listed in section J, paragraph 27 of the Complex Rules.  A summary of the Highlighted Provisions is set forth below:

     a.     ***Sale or Plan Confirmation Milestones.***  The Interim DIP Order provides that the Debtors shall have (i) prepared a contingency plan for the wind-down of the Debtors' operations in the event that a going concern sale is not achieved, which plan shall be reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (ii) prepared a 13-week budget that is reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (iii) filed with the Court a motion requesting approval of proposed bidding procedures that are reasonably acceptable to the Prepetition Secured Parties and that adhere to the milestones described in clauses (iv) and (v) below no later than ten (10) business days after the Petition Date, (iv) obtained, within sixty (60) calendar days after the Petition Date, a binding stalking horse bid for the sale of all or substantially all of the Debtors' assets which bid shall be reasonably acceptable to each Prepetition Secured Party, and (v) completed the closing of a sale of all or substantially all of the Debtors' assets that is reasonably acceptable to each Prepetition Secured Party, within one hundred twenty (120) calendar days after the Petition Date (collectively with (i) through (iv), the "Milestones").

     b.     ***Cross-collateralization.*** The Interim DIP Order does not provide for cross-collateralization.

     c.     ***Roll-up or Requirement that Postpetition Loans be Used to Repay Prepetition Debt.***  The Interim DIP Order does not provide for roll-up, or that postpetition loans be used to repay prepetition debt.

     d.     ***Liens on Avoidance Actions and Proceeds Thereof.*** The DIP Liens exclude any Avoidance Actions of the Debtors, but, subject to entry of the Final Order, including, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations secured by the DIP Liens, include any proceeds of, or property recovered in connection with, any successful Avoidance Action (whether by judgment, settlement or otherwise, and unencumbered or not). *See* Interim DIP Order at Paragraph 7.

     e.     ***Default Provisions and Remedies.*** The DIP Facility includes certain usual and customary events of default and related remedies, and the use of Cash Collateral is subject to various usual and customary termination events. The Interim DIP Order provides for procedures concerning the Debtors', the DIP Secured Parties', and the Prepetition Secured Parties' respective rights in the event that a default or termination event occurs during the chapter 11 case.  *See* Interim DIP Order at Paragraph 15; DIP Credit Agreement at Article VII.

4829-5574-6033.1

f.   ***Release of Claims.***  The Interim DIP Order provides for the Debtor's release of, among other things, (i) prepetition claims and causes of action against the Prepetition Secured Parties, and (ii) claims and causes of action against the DIP Secured Parties and the Prepetition Secured Parties arising out of or related to the DIP Facility. *See* Interim DIP Order at Sections F, G, I.  No insiders are being released under the Interim DIP Order.  Releases with respect to the Prepetition Secured Parties are subject to a (60) day Challenge Period, subject to extension by the Court or by consent.  *See* Interim DIP Order at Paragraph 42.

g.   ***Limitations on the Use of Cash Collateral Other than General "Carve-Outs" to Pay Approved Fees and Expenses of Advisors to Official Committees or Future Trustees.***  The Debtors are authorized to use proceeds of the DIP Financing in accordance with the Interim Order and the Approved Budget, subject to the Budget Variance.  Proceeds of the DIP Collateral and the DIP Loans shall not be used (i) in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the DIP Financing.  In addition, none of the proceeds of the DIP Collateral, the DIP Loans, or the Prepetition Collateral shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the Prepetition Secured Documents (provided that, notwithstanding anything to the contrary herein, the Committee may use proceeds of the DIP Financing and/or the DIP Collateral (including Cash Collateral) to investigate but not to prosecute (i) the claims and liens of the Prepetition Secured Parties, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties up to an aggregate cap of $50,000 (the "<u>Committee Investigation Budget</u>")).

Further, the Debtors may not make any Restricted Payments or Capital Expenditures, with certain exceptions.  *See* Interim DIP Order at Paragraph 3(b), 5; DIP Credit Agreement at Section 3.07, 6.02(g)(n).

h.

i.   ***Priming Liens.***  The Interim DIP Order provides that the DIP Superpriority Liens granted thereunder shall, pursuant to section 364(d)(1) of the Bankruptcy Code, be subject to the Carve-Out and the Aron Rights (as defined therein), and certain other permitted prior liens.  *See* Interim DIP Order at ¶ 6.

j.   ***Limitations on the Ability of Estate Fiduciaries to Fulfill their Duties.***  There are no limitations on the ability of estate fiduciaries to fulfill their respective duties in the Interim DIP Order.

6.    As discussed below, the Debtors require immediate access to funding to maintain or suspend existing operations at the facility in an economically and environmentally reasonable manner. The Debtors engaged in an extensive marketing and solicitation campaign to procure

debtor in possession financing on the most advantageous terms available.  While the DIP Facility contains the Highlighted Provisions, the DIP Secured Parties would not have agreed to provide financing, and the Prepetition Secured Parties would not have agreed to the use of Cash Collateral, without the inclusion of the Highlighted Provisions in the Interim DIP Order or the other DIP Documents.  Based on their sound business judgment, as determined by the Debtors independent manager, restructuring professional Steven J. Pully, the Debtors have concluded that the DIP Facility is the best debtor in possession financing option available to the Debtors and serves the best interests of the estates and interested parties.  Accordingly, the Debtors submit that the Highlighted Provisions are appropriate under the facts and circumstances of the Chapter 11 Cases and, thus, the DIP Facility, including the Highlighted Provisions, should be approved.

<u>**Background**</u>

A.      **Chapter 11 Cases**

7.      On July 12, 2021 (the "**Petition Date**"), each of the Debtors filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code—thereby commencing the Chapter 11 Cases.  The Debtors continue to operate their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no official committees have been appointed or designated.

8.      By separate motion submitted to the Court, the Debtors have sought entry of an order authorizing the joint administration of the Debtors' respective bankruptcy cases with the Limetree Bay Services, LLC case as the lead case, and granting permission to use a consolidated case caption, as detailed therein.

9.      A discussion of the facts and circumstances surrounding the Chapter 11 Cases and the relief requested herein is set forth in the *Declaration of Mark Shapiro in Support of Chapter*

*11 Petitions and First Day Motions* (the "**First Day Declaration**"), which is being filed simultaneously with the Motion and incorporated herein by reference in its entirety.[3]

## B.    Summary of the Debtors' Prepetition Capital Structure

### 1.    Debtors' Cash Management System

10.     The Debtors maintain a decentralized cash management system (the "**Cash Management System**"), which principally consists of twenty (20) bank accounts (collectively, the "**Bank Accounts**") maintained by Limetree Bay Refining, LLC ("**LBR**"), Limetree Bay Refining Marketing, LLC ("**LBRM**"), and Limetree Bay Refining Operating, LLC ("**LBRO**")[4] with Deutsche Bank Trust Company Americas ("**Deutsche Bank**") and Oriental Bank ("**Oriental Bank**" and, together with Deutsche Bank, the "**Depositors**").  A list of the Bank Accounts is attached hereto as **Exhibit B** and incorporated herein by reference.

11.     The Cash Management System is maintained in accordance with the terms of (a) that certain Amended and Restated Depositary and Intercreditor Agreement, dated as of March 3, 2020 (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "**A&R Depositary and Intercreditor Agreement**") between the LBR, LBRM, LBRO, LBRH II, the Prepetition Term Agent (as defined below), the Revolving Administrative Agent (as defined below), Goldman Sachs Bank USA ("**Goldman Sachs**") as collateral agent for the Project Secured Parties (as defined therein) (in such capacity, together with its successors and permitted assigns in such capacity, the "**Project Collateral Agent**"), J. Aron & Company LLC ("**J. Aron**"), and Deutsche Bank Trust Company Americas (the "**Depositary Agent**"), (b) that certain Deposit Account Control Agreement dated as of January 24, 2019 (the "**Oriental Bank**

---

[3] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the First Day Declaration.

[4] Limetree Bay Services, LLC ("**LBS**") maintains an account with Citibank (the "**LBS Account**").  The Debtors are not aware of any security interests in LBS Account.

DACA"), between LBR and LBRO as Grantors, the Bank of Nova Scotia (as predecessor to Oriental Bank ("**Oriental Bank**")) as Depositary Bank, and the Project Collateral Agent; (c) that certain Deposit Account Control Agreement dated as of March 3, 2020 (the "**J. Aron DACA**"), between LBRM as Grantor, Oriental Bank as Depositary Bank, and J. Aron as Secured Party; and (d) a certain deposit account control agreement with Citibank (the "**Citibank DACA**") as Depositary Bank, and LBRH II, as the Grantor, pertaining to an account of LBRH II, as specified therein, on deposit with Citibank.

12.     Under the terms of the A&R Depositary and Intercreditor Agreement, revenues from the Debtors' operations are deposited in revenue accounts with Deutsche Bank (collectively, the "**Revenue Accounts**") maintained by LBR and LBRM.  Following receipt of the revenues, funds are disbursed to operating accounts with Oriental Bank (collectively, the "**Operational Accounts**") maintained LBR and/or LBRM, from which LBR and LBRM pay operational expenses associated with the Refinery, either directly or through further distribution of revenues to affiliates in accordance with the provisions of the A&R Depositary and Intercreditor Agreement.

13.     As of the Petition Date, the Debtors currently have $3,479,722.90 of cash on hand, which amount is held in the Bank Accounts and LBS Account.  *See* **Exhibit B**.

**2. Prepetition Secured Indebtedness.**

14.     The Debtors are parties to three (3) principal debt facilities and one (1) inventory arrangement inclusive of safe harbored forward contracts regarding Feedstock and Product (each as defined below) and a term loan in respect of certain catalysts owned by LBRM at the Refinery (collectively, the "**Prepetition Facilities**").  As of the Petition Date, the principal amount of the Debtors' obligations under the Prepetition Facilities total approximately $1.848 billion

(excluding interest, obligations under various hedging arrangements, letters of credit, and other charges), as summarized on a consolidated basis below:

| Obligations | Maturity | Principal Balance[5] |
|---|---|---|
| Prepetition Term Loan Credit Facility | Nov. 20, 2025 | $768,956,393 |
| Prepetition Revolving Credit Facility | Nov. 20, 2023 | $50,000,000 |
| Prepetition Holdco Credit Facility | Nov. 20, 2025 | $782,558,090 |
| J. Aron Transactions | N/A | $246,920,809[6] |
| *Total Debt Obligations* | | $1,848,435,292 |

15.     Prepetition Term Loan Credit Facility.  LBR, as borrower, LBRM and LBRO, as guarantors, and LBRH II, as pledgor (together with LBR, LBRM, and LBRO, in such capacities, the "**Prepetition Term Parties**"), each lender party thereto from time to time (the "**Prepetition Term Lenders**"), and Goldman Sachs, as administrative agent (in such capacity, the "**Prepetition Term Agent**") are parties to that certain Amended and Restated Credit Agreement, dated as of December 24, 2020 (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "**Prepetition Term Credit Agreement**" and, together with the other loan documents defined therein, in each case, as amended, amended and restated,

---

[5] The Debtors will confirm and/or update these balances prior to, or at, the Hearing.

[6] Amount represents the Debtors' estimate of aggregate amounts owed to J. Aron as of the Petition Date in connection with the J. Aron Transaction Documents (as defined below), and is inclusive of (i) amounts owed under the J. Aron Financing Agreement in a principal amount not less than $24,968,754.95, and (ii) estimates of amounts that may be owed under the Safe Harbor Agreements (as defined below), which, as described in greater detail in Paragraph 24 below, cannot be determined at this time and may be higher or lower than what the Debtors' have estimated herein.

4829-5574-6033.1

waived, supplemented and/or modified from time to time, the "**Prepetition Term Documents**"),

which provided for the issuance of a term loan, consisting of five (5) tranches, in the aggregate

principal amount of up to $900 million (the "**Prepetition Term Credit Facility**").

16.     As of the Petition Date, the LBR was indebted to the Prepetition Term Secured

Parties under the Prepetition Term Documents in the aggregate principal amount of not less than

$768.9 million on account of outstanding Advances (as defined in the Prepetition Term Credit

Agreement) (the "**Prepetition Term Loans**"), plus certain fees, expenses, and other Obligations

(as defined in the Prepetition Term Loan Credit Agreement) (collectively, the "**Prepetition**

**Term Obligations**").

17.     Prepetition Revolving Credit Facility.  LBRM, as borrower, LBR and LBRO, as

guarantors, and LBRH II, as holdings (together with LBR, LBRM, and LBRO, in such

capacities, the "**Revolver Borrower Parties**"), each lender party thereto from time to time (the

"**Revolver Lenders**"), and Goldman Sachs, as administrative agent (in such capacity, the

"**Revolving Administrative Agent**"), are parties to that certain Credit Agreement, dated as of

November 20, 2018 (as amended, amended and restated, waived, supplemented and/or modified

from time to time, the "**Revolver Credit Agreement**" and, together with the other loan

documents defined therein, in each case, as amended, amended and restated, waived,

supplemented and/or modified from time to time, the "**Revolver Transaction Documents**" and

collectively with the Prepetition Term Documents, the "**Prepetition Loan Documents**"), which

provided for the issuance of revolving loans and letters of credit in an aggregate amount not to

exceed $50 million (the "**Revolver Facility**").

18.     Outstanding Revolver Secured Obligations.  As of the Petition Date, the Debtors

were indebted and liable to Revolver Lenders, without objection, defense, counterclaim or offset

of any kind, in the aggregate amount of not less than $50,000,000, with respect to the Revolver

Transaction Documents, plus accrued (both before and after the Petition Date) and unpaid interest as specified therein, plus fees, expenses and all other obligations under the Revolver Transaction Documents, including attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Revolver Transaction Documents.

19.     <u>Security Agreement.</u> Pursuant to the Security Agreement, dated as of November 20, 2018, between the LBR, LBRM and LBRO, as Grantors, and the Project Collateral Agent (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "**Security Agreement**"), LBRO, LBRM, and LBR granted the Project Collateral Agent, for the benefit of the Prepetition Term Lenders, the Revolver Lenders, the Project Term Agent, the Revolving Administrative Agent and certain other "Secured Parties" specified therein (collectively, the "**Project Secured Parties**") liens (the "**Prepetition Debt Liens**") on certain property of the Debtors (the "**Prepetition Debt Collateral**") as more fully described in the Security Agreement.

20.     <u>J. Aron Transaction Documents</u>.    LBRM, LBR, LBRO (collectively, the "**Transaction Entities**") and J. Aron & Company LLC ("<u>**J. Aron**</u>"), made and entered into Transaction Documents (as defined in the J. Aron Monetization Master Agreement), each originally dated as of March 3, 2020, consisting of, among others (each as amended, amended and restated, supplemented and/or modified from time to time, collectively, the "**J. Aron Transaction Documents**"):

> a.  the Supply and Offtake Agreement and the Marketing and Sales Agreement  (the "**J. Aron Supply and Offtake Agreement**" and the "**J. Aron Marketing and Sales Agreement**", respectively), by and among LBRM and J. Aron, pursuant to which J. Aron agreed to purchase and sell crude oil, crude oil blends, fuel oil, naphtha, debutanized natural gasoline and certain other feedstocks (each as more fully defined in the J. Aron Monetization Master Agreement (as defined below), the "**Feedstock**"), and certain refined hydrocarbon products (each as more fully

defined in the J. Aron Monetization Master Agreement, the "**Product**") to LBRM (and LBRM agreed to purchase and sell Feedstock and Product from and to J. Aron, as applicable), and which also governed certain terms of purchases and sales of Feedstock and Product between J. Aron and third parties (including BP Products North America Inc. ("**BP**")), in each case, subject to additional terms and conditions set forth in the J. Aron Transaction Documents;

b.  the Monetization Master Agreement (the "**J. Aron Monetization Master Agreement**") by and among the Transaction Entities and J. Aron, setting forth the general transaction terms, covenants, events of default and certain termination provisions;

c.  the Financing Agreement (the "**J. Aron Financing Agreement**"), by and between LBRM and J. Aron, providing for a one-time term loan by J. Aron based on certain catalyst units that contain certain base metals and certain catalyst units that contain certain precious metals, which were, in each case, designed for use in refining or processing activities;

d.  the A&R Depositary and Intercreditor Agreement which sets forth the relative rights (including the respective collateral access and cooperation rights) of the Project Secured Parties, on the one hand, and J. Aron as the Inventory Financing Facility Agent and an Inventory Financing Secured Party (as such terms are defined in the A&R Depositary and Intercreditor Agreement), on the other.  No J. Aron Secured Obligations (as defined below) are secured by any LBR Collateral under and as defined in the A&R Depositary and Intercreditor Agreement;

e.  the Security Agreement ("**J. Aron Security Agreement**"), by and between LBRM as Grantor and J. Aron, as secured party, pursuant to which LBRM granted J. Aron a first-priority security interest in and continuing lien (the "**J. Aron Liens**") on the "Collateral" under and as defined in the J. Aron Security Agreement ("**Inventory Financing Collateral**" and collectively with the Prepetition Debt Collateral, the "**Prepetition Collateral**") which corresponds to the defined term "Inventory Financing Collateral" under and as defined in the A&R Depositary and Intercreditor Agreement.  Under the J. Aron Security Agreement and J. Aron Perfection Documents (as defined below), the Secured Obligations under and as defined in the J. Aron Security Agreement (the "**J. Aron Secured Obligations**") are secured by a perfected, first-priority security interest in and continuing lien on the Inventory Financing Collateral;

f.  that certain UCC financing statement (with LBRM as debtor and J. Aron as secured party) that was filed with the U.S. Virgin Islands Office of the Lieutenant Governor on March 5, 2020 (Filing No. 20200000134) and that certain UCC financing statement (with LBRM as debtor and J. Aron as secured party) that was filed with the Washington, D.C. Record of Deeds on March 4, 2020 (Filing No. 2020030037) (collectively, the "**J. Aron Financing Statements**" and, together with J. Aron DACA (as defined above) and the A&R Depositary and Intercreditor Agreement, collectively, the "**J. Aron Perfection Documents**");

4829-5574-6033.1

g.  that certain Subordinated Guarantee, made by LBR and LBRO in favor of J. Aron, dated as of March 3, 2020 ("**Subordinated Guarantee**"), each of LBR and LBRO jointly and severally guaranteed LBRM's payment obligations under the J. Aron Transaction Documents as and when due ("**Guaranteed Obligations**"), subject to the terms of the "Terms of Subordination" under and as defined therein, which provide that, among other things, the Guaranteed Obligations are subordinated in right of payment to the prior payment in full in cash of all Secured Obligations under and as defined in the A&R Depositary and Intercreditor Agreement; and

h.  additional agreements related to the supply, marketing, storage, the initial sale of Feedstock and Product by LBRM to J. Aron and other transactions contemplated by the J. Aron Supply and Offtake Agreement, the J. Aron Marketing and Sales Agreement, the J. Aron Financing Agreement and the J. Aron Monetization Master Agreement.

21.     J. Aron's IFF Property.   J. Aron owns all right, title and interest in the IFF Property (as defined in the A&R Depositary and Intercreditor Agreement), which consists of Feedstock and Product owned by J. Aron.  No Debtor has any right, title, or interest in the IFF Property, and accordingly, the IFF Property is not property of the estate under Section 541 of the Bankruptcy Code.

22.     J. Aron Termination.   On June 25, 2021 (the "**J. Aron Early Termination Date**"), as a result of certain events of default that had occurred and were continuing in respect of LBRM, LBR and LBRO, J. Aron properly and validly exercised its right pursuant to the J. Aron Transaction Documents of declaring an early termination date whereby, among other things, all commitments of J. Aron to provide any intermediation or to purchase or sell Feedstock or Products were terminated, all loans under the Financing Agreement became immediately due and payable and all of the obligations of the Transaction Entities under the J. Aron Transaction Documents (other than that certain Terminal Services Agreement (Included Locations), dated as of March 3, 2020, by and among LBT, LBRM and J. Aron) became due and payable on June 25, 2021.   As a result of such early termination, pursuant to the J. Aron Supply and Offtake

Agreement and as set forth in certain other of the J. Aron Transaction Documents, J. Aron has the right to liquidate and has commenced the liquidation of its own IFF Property.

23.    <u>J. Aron Safe Harbor Agreements</u>. (a) J. Aron is a "forward contract merchant" (as such term is defined in the Bankruptcy Code and used in Section 556 of the Bankruptcy Code) and each purchase and sale agreed to under the Safe Harbor Agreements (as defined in the J. Aron Monetization Master Agreement, collectively, the "Safe Harbor Agreements") constitutes a "forward contract" (as such term is defined in the Bankruptcy Code and used in Section 556 of the Bankruptcy Code); (b) J. Aron is a "master netting agreement participant" and each Safe Harbor Agreement constitutes a "master netting agreement" for all purposes as each such term is defined in sections 101(38A) and 101(38B) of the Bankruptcy Code and as used in Section 561 of the Bankruptcy Code; (c) J. Aron's, as the Non-Defaulting Party, right to liquidate, collect, net and set off rights and obligations under the Safe Harbor Agreements, and liquidate the Safe Harbor Agreements is not stayed, avoided, or otherwise limited by the Bankruptcy Code, including sections 362(a), 547, 548 or 553 thereof, and J. Aron is entitled to the rights, remedies and protections afforded by and under, among other sections, sections 362(b)(6), 362(b)(17), 362(b)(27), 546(e), 546(g), 546(j), 548(d), 553, 556, 560, 561 and 562 of the Bankruptcy Code.

24.    <u>Outstanding J. Aron Obligations</u>.  As of the Petition Date, the applicable Debtors were indebted to J. Aron, without objection, defense, counterclaim or offset of any kind, in an amount not less than $24,968,754.95 in principal amount of loans outstanding under the J. Aron Financing Agreement.  In addition, J. Aron has commenced the process of liquidating all IFF Property in accordance with the terms of the Safe Harbor Agreements and the J. Aron Monetization Master Agreement and, if J. Aron is unable to liquidate such IFF Property and/or incurs losses or costs as a result of such liquidation and termination of J. Aron's rights and obligations under the Safe Harbor Agreements (including any Forward Contract Settlement

Amount (as defined in the J. Aron Supply and Offtake Agreement)), the Debtors would be liable and owe to J. Aron, without objection, defense, counterclaim or offset of any kind, an aggregate amount of not less than such aggregate losses or costs, taking into account any gains, incurred or realized by J. Aron as a result of such liquidations and terminations with respect to the J. Aron Transaction Documents.  Given that the liquidation of J. Aron's IFF Property has only recently commenced, the S&O Settlement Amount (as defined in the J. Aron Supply and Offtake Agreement) cannot be determined at this time.  Further, under the J. Aron Transaction Documents, the applicable Debtors are also liable to and owe J. Aron accrued (both before and after the Petition Date) and unpaid interest, fees, expenses and all other obligations under the J. Aron Transaction Documents, including attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the J. Aron Transaction Documents, plus Make-Whole Amounts (as defined in the J. Aron Monetization Master Agreement).

25.    The Inventory Financing Collateral includes funds of those Debtors obligated under the terms of the Prepetition Loan Documents.  The Oriental Bank DACA purports to grant Goldman Sachs a security interest in certain accounts of LBR and LBRO on deposit with Oriental Bank, as identified in the Oriental Bank DACA.

26.    Similarly, LBRM, Oriental Bank, and J. Aron entered into the J. Aron DACA pursuant to the terms of the Monetization Master Agreement Documents.  The J. Aron DACA grants J. Aron a security interest in certain accounts of LBRM on deposit with Oriental Bank, as identified in the J. Aron DACA.

27.    Mezzanine Financing: LBRH II, as borrower, Limetree Bay Refining Holdings, LLC ("**LBRH**"), as pledgor (together with LBRH II, in such capacities, the "**Prepetition Holdco Loan Parties**"), each lender party thereto from time to time (the "**Prepetition Holdco**

Lenders"), and Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, the "**Prepetition Holdco Agent**," and the Prepetition Holdco Agent together with the Prepetition Holdco Lenders, the "**Prepetition Holdco Loan Secured Parties**") are parties to that certain Credit Agreement, dated as of December 24, 2020 (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "**Prepetition Holdco Credit Agreement**" and, together with the other Loan Documents (as defined in the Prepetition Holdco Credit Agreement), in each case, as amended, amended and restated, waived, supplemented and/or modified from time to time, the "**Prepetition Holdco Loan Documents**"), which provided for the issuance of certain mezzanine loans (the "**Prepetition Holdco Credit Facility**").  Pursuant to that certain Security Agreement, dated as of April 6, 2021 (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "**Prepetition Holdco Security Agreement**") and that certain Pledge Agreement, dated as of February 22 2021, the obligations owed to the Prepetition Holdco Loan Secured Parties are secured by first priority Liens (as defined the Prepetition Holdco Credit Agreement) (the "**Prepetition Holdco Financing Liens**") on, and security interests in, all of the Collateral (as defined in the Prepetition Holdco Credit Agreement) (collectively, the "**Prepetition Holdco Financing Collateral**").

28.     As of the Petition Date, the Prepetition Holdco Loan Parties were indebted to the Prepetition Holdco Loan Secured Parties under the Prepetition Holdco Loan Documents in the aggregate principal amount of not less than $782,558,090 on account of outstanding Advances (as defined in the Prepetition Holdco Loan Credit Agreement) (the "**Prepetition Holdco Loans**"), plus certain fees, expenses, indemnification obligations, guarantee obligations, reimbursement obligations, including, without limitation, any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable to or

reimbursable by the Prepetition Holdco Loan Parties, and all other Obligations (as defined in the Prepetition Holdco Loan Credit Agreement) (collectively, the "**Prepetition Holdco Loan Obligations**").

29.     Subordinated Notes.  In addition to the foregoing, the Debtors also borrowed funds via intercompany unsecured and subordinated loan transactions memorialized in certain subordinated promissory notes—classified in the Debtors' records as the Original LBV Subordinated Notes and Supplemental LBV Subordinated Notes (collectively, the "**LBV Subordinated Notes**").  Limetree Bay Ventures, LLC ("**LBV**") was the promisee and LBR was the borrower under the LBV Subordinated Notes.  In December 2020, the Prepetition Term Loan Lenders, LBV and the Debtors agreed to a consensual restructuring of certain of LBR's outstanding debt (the "**LBR Debt Restructuring**"), pursuant to which (a) approximately \$402 million of LBV Subordinated Notes, and (b) approximately \$349 million of then-outstanding mezzanine financing, were, in each case, assigned by LBR to LBRH II and evidenced under a separate loan agreement with Prepetition Holdco Agent.

30.     In or about April 2021, Limetree Bay Energy, LLC ("**LBE**") replaced LBV as the holding company for the Refinery Entities through the acquisition of LBV's interest in LBS and LBC II, as well as other assets and interests associated with the Refinery Entities, pursuant to the terms of that certain Share Transfer Agreement dated as of April 20, 2021 (the "**April 2021 Equity Restructuring**").

**Solicitation of Debtor in Possession Financing Proposals**

31.     Following an incident involving the aerosolized disbursement of hydrocarbons from a flare at the Refinery, the Debtors suspended operations at the Refinery on or about May 13, 2021, pending the completion of an investigation.  On May 14, 2021, the Environmental Protection Agency served the Debtors with an order alleging purported violations of the Clean

Air Act and requiring the Debtors to suspend operations at the Refinery for a period of 60 days and conduct an audit of regulatory compliance and operational capabilities. Shortly after the suspension of operations, the Debtors commenced a process to evaluate potential restructuring options, including, without limitation, retaining a chief restructuring officer, appointing an independent manager, and engaging advisors to solicit proposals for traditional and debtors in possession financing.

32.     Over the following month, the Debtors contacted more than 50 lenders and financial institutions, including the Debtors' existing lenders, regarding extensions of existing credit arrangements, access to alternative and governmental funding sources, and the provision of distress or debtor in possession financing. The Debtors received interest from five (5) potential debtor-in-possession lenders; however, only two (2) entities submitted proposals that provided sufficient funding on commercially reasonable terms. Thereafter, the Debtors and the potential debtors-in-possession lenders negotiated the terms of the proposed facilities at arms' length through their respective representatives. Ultimately, the Debtors selected the DIP Facility based on the conclusion that the DIP Facility provided the funding required on the most advantageous terms.

**Liquidity Needs and Proposed DIP Facility**

33.     The Debtors are in the midst of an extreme liquidity crisis. As of the Petition Date, the Debtors have $3,479,722.90 cash on hand. Aside from the proposed DIP Facility, the Debtors do not have access to funds for operational expenses through existing credit facilities as such facilities are either fully drawn or the Debtors are unable to satisfy certain prerequisites to access the funds. Unless the DIP Facility is approved on an interim basis, the Debtors will be unable to meet certain immediate obligations, including, without limitation, the payment of $1,150,110.50 in payroll on July 16, 2021.

34.     The DIP Facility will provide the Debtors with a $5.5 million draw upon entry of the Interim DIP Order, with a committed financing facility up to $25 million proposed by the Debtors to be considered at a subsequent hearing, subject to the terms and conditions described herein, and set forth in the Credit Agreement and Interim DIP Order.

35.     The DIP Facility is the product of arms-length, good faith negotiations between the Debtors and the DIP Agent.  The DIP Agent is not an insider, affiliate, or control person of the Debtors, but is a third-party lender.

### Basis for Relief Requested

36.     After evaluating available funding under existing facilities and a broad solicitation effort to obtain the most advantageous terms for debtor in possession financing, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility serves the best interests of the estates and creditors in the Chapter 11 Cases.  Accordingly, the Debtors request that the Court authorize the Debtors to enter into the DIP Documents and access and utilize the DIP Facility and advances thereunder as well as Cash Collateral (as defined below) in accordance with the initial form of budget attached to the Interim DIP Order as **Exhibit B**, as modified from time to time in accordance with the DIP Orders and the DIP Credit Agreement (the "**Budget**").

37.     The proceeds from the proposed DIP Facility will be used for, among other things, making payments integral to the Debtors' business operations. Indeed, the liquidity to be provided under the DIP Facility, combined with access to Cash Collateral, will enable the Debtors to (a) fund their operations during the course of this chapter 11 case, as well as an orderly suspension of activity at its refinery; (b) ensure that administrative costs, including Adequate Protection Obligations, are paid in full and value is preserved during the course of the

Debtors' Chapter 11 Cases; and (c) pursue sale or restructuring transactions that will help the Debtors maximize value for all of their stakeholders.

## A. The DIP Facility Satisfies Section 364 of the Bankruptcy Code and Represents a Sound Exercise of the Debtors' Business Judgment.

38.     The Debtors propose to obtain financing under the DIP Facility by providing the DIP Secured Parties with security interests, liens, and claims as set forth in the DIP Documents pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code.   Specifically, the Debtors propose to provide liens and superpriority administrative claims to the DIP Secured Parties as follows:

a.     **DIP Lender Superpriority Claim**.  Subject to the Carve-Out, the Aron Rights (as defined in the Interim DIP Order), and the payment priority provisions set forth in the Interim DIP Order, the Debtors seek to grant the DIP Secured Parties an allowed superpriority administrative expense claim, pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code in each of the Chapter 11 Cases or any Successor Cases (the "DIP Superpriority Claims") on account of the DIP Obligations.  The DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and their estates and all proceeds thereof, excluding Avoidance Actions (as defined below) but, subject to entry of the Final Order, including, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations, Avoidance Proceeds;

b.     **Priming Lien Pursuant to Section 364(d)(1)**.  The Debtors seek to grant to the DIP Secured Parties a first priority, priming security interest in and lien on, pursuant to section 364(d)(1), all encumbered DIP Collateral, which shall be senior to any existing liens or claims, including, but not limited to, the Prepetition Secured Parties Liens (as defined in the Interim DIP Order), and subject and junior only to (i) the Carve-Out, (ii) valid, perfected, and non-avoidable liens on property of a Debtor that are in existence on the Petition Date and are senior in priority to any of the Prepetition Secured Parties Liens, and (iii) the Aron Rights;

c.     **First Priority Lien on Unencumbered Property Pursuant to Section 364(c)(2)**. The Debtors seek to grant the DIP Secured Parties a first priority security interest in and lien on, pursuant to section 364(c)(2), all unencumbered DIP Collateral (the "Section 364(c)(2) Liens"), which Section 364(c)(2) Liens shall be subject only to the Carve-Out;

d.     **Junior Lien on Inventory Financing Collateral Pursuant to Section 364(c)(3)**. The Debtors seek to grant the DIP Secured Parties a valid, binding, continuing, enforceable, fully-perfected, nonavoidable, automatically and properly perfected junior lien on and security interest in all Inventory Financing Collateral, which lien

and security interest shall be subordinate and subject to the Aron Rights and subject to the Carve-Out;

e.  **Junior Lien on Certain Encumbered Property Pursuant to Section 364(c)(3)**. The Debtors seek to grant the DIP Secured Parties a junior security interest in and lien on, pursuant to section 364(c)(3) of the Bankruptcy Code, all other DIP Collateral that is subject to a Permitted Prior Lien (as defined in the Interim DIP Order) (the "Section 364(c)(3) Liens,") which Section 364(c)(3) Liens also shall be subject to the Carve-Out;

## 1.  Obtaining the DIP Facility is a Sound Exercise of the Debtors' Business Judgment

39.    Courts give debtors in possession considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (approving postpetition-financing on an interim basis as an exercise of debtors' business judgment); *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Debtors correctly posit that courts will almost always defer to the business judgment of a debtor in the selection of a lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

40.    To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06- 11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (internal citations omitted); *see also In re Monitor Dynamics*, Inc., No. 10-51821, 2010 WL 4780371 (Bankr. W.D. Tex. June 11, 2010) (approving financing motion on interim basis as exercise of debtor's prudent business judgment).

41.     Here, the Debtors' decision to obtain debtor in possession financing under the terms of the DIP Facility is a sound exercise of their business judgment, as determined by their independent manager, seasoned business executive and restructuring professional, Steven J. Pully.  There is no question that the Debtors require the immediate infusion of liquidity provided under the DIP Facility; absent the relief requested, the Debtors could not maintain operations and ensure ongoing efforts to protect the health and safety of the surrounding community. Furthermore, the failure to approve the DIP Financing would substantially diminish the value of the Debtors' assets, including the Refinery.   Additionally, the DIP Facility was negotiated at arm's length, with each of the parties thereto utilizing disinterested counsel and advisors, and was approved by the Debtors' independent manager.  Finally, the terms of the DIP Facility are fair and reasonable.  The DIP Facility is "right sized" for the needs of the Debtors during the pendency of the Chapter 11 Cases.  Accordingly, the Court should authorize the Debtor's entry into the DIP Documents as a reasonable exercise of the Debtor's business judgment.

### 2.  The Debtors Should Be Authorized to Grant the DIP Liens on Encumbered and Unencumbered Property as well as the DIP Superpriority Claims

42.     Section 364(c) of the Bankruptcy Code provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt— [¶] (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [¶] (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or [¶] (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C.  § 364(c).  In evaluating whether a debtor has satisfied the requirements of Section 364(c) of the Bankruptcy Code, courts consider (a) whether the debtor made reasonable efforts to obtain unsecured credit under Sections 364(a) and 364(b) of the Bankruptcy Code, (b) whether the credit transaction benefits the debtor or are necessary to preserve estate assets, and (c) whether the terms of the credit transaction are fair, reasonable, and adequate, given the

4829-5574-6033.1

circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at \*11; *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Beechgrove Redevelopment, L.L.C.*, Nos. 07-12057 and 07-12058, 2007 WL 4414777 (Bankr. E.D. La. Dec. 13, 2007); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40.

43.     Notwithstanding, Section 364 of the Bankruptcy Code "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Section 364(c) of the Bankruptcy Code. *Id.*; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).  The Debtors have satisfied the requirements of Section 364(c) of the Bankruptcy Code and, thus, should be authorized to grant priming liens and superpriority claims provided under the DIP Facility.

44.     The DIP Facility is the result of a robust solicitation process and arms' length negotiations through qualified, disinterested representatives overseen by the Debtors' independent manager.  Following the suspension of operations at the Refinery, the Debtors commenced a process to evaluate potential restructuring options.  To that end, the Debtors retained a chief restructuring officer, appointed an independent manager, and engaged advisors to solicit proposals for traditional and debtors in possession financing.  All told, the Debtors contacted more than 50 potential financiers regarding extensions of existing credit arrangements, access to alternative and governmental funding sources, and the provision of distressed or debtor in possession financing.  Debtors received interest from five (5) potential financier; however, only two (2) entities submitted proposals that provided the funding required on commercially

reasonable terms.  Thereafter, Debtors and the potential debtors in possession lenders negotiated the terms of the proposed facilities at arms' length through their respective representatives. Ultimately, the Debtors accepted the terms of the DIP Facility, which provided the funding required on the most advantageous terms to the Debtors and their respective estates.

45.     Further, the DIP Facility is necessary to preserve the Debtors' estates and protect the health and safety of the communities surrounding the Refinery.  Subject to a recent Order of the U.S. Environmental Protection Agency, the Debtors have been engaged in a suspension of operations at their Refinery.  Approval of the DIP Facility will permit the Debtors to continue this process, and protect the health and safety of surrounding communities, as well as the interests of all parties to the Chapter 11 Cases.

46.     Based on the foregoing, the Debtors submit that the requirements of Section 364(c) of the Bankruptcy Code have been satisfied and, as such, the Court should authorize the Debtors to grant the DIP Secured Parties (i) superpriority administrative expenses status for the obligations under the DIP Facility as provided for in Section 364(c)(1) of the Bankruptcy Code and the DIP Orders, (ii) liens on the Debtors' unencumbered property pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Orders, and (iii) junior liens on the Debtors' encumbered property pursuant to Section 364(c)(3) of the Bankruptcy Code and the DIP Orders.

**3.  Authorizing Debtors to Grant Priming Liens on Encumbered Assets is Appropriate**

47.     Authorization to grant the DIP Secured Parties "priming" liens on certain assets of the Debtors is necessary and appropriate under the circumstances presented.  Section 364(d)(1) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if— [¶] (A) the trustee is unable to obtain such credit otherwise; and [¶] (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

31

11 U.S.C. § 364(d)(1).  Under the DIP Facility, the Debtors propose granting the DIP Secured

Parties the following priming liens on certain encumbered assets.  As set forth herein, the

Debtors were unable to obtain postpetition financing on more advantageous terms than

governing the DIP Facility.  More specifically, the Debtors engaged in an extensive marketing

campaign in an effort to locate potential distressed or debtor in possession financing.  *In re

Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11 ("Section 364(d) [of the Bankruptcy

Code] 'does not require that debtors seek alternative financing from every possible lender.

However, the debtor must make an effort to obtain credit without priming a senior lien.'").

While the Debtors received multiple proposals, the only proposals containing reasonable market

terms required the Debtors to grant "priming" liens as a prerequisite to funding the debtor in

possession facility.

48.     As set forth herein, the Prepetition Secured Parties have consented to the DIP

Financing after extensive negotiation, in exchange for the bargained-for protections set forth in

the Interim DIP Order (the "**Prepetiton Secured Party Protections**"), including both adequate

protection and certain other protections set forth in the Interim DIP Order, absent each of which

the Prepetition Secured Parties would not have consented to such DIP Financing, and subject to

the reservation of rights contained in paragraph 43 of the Interim Order.  To the extent that the

DIP Financing implicates section 364(d)(1)(B) of the Bankruptcy Code, the Debtors submit that

the interests of senior lenders are adequately protected under the DIP Facility by virtue of these

Prepetition Secured Party Protections.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R.

117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured]

creditors relieved the debtor of having to demonstrate that they were adequately protected.").

49.     Based on the foregoing, the Debtors submit that the requirements for granting

priming liens for the benefit of the DIP Secured Parties pursuant to Section 364(d)(1) of the

Bankruptcy Code and, therefore, respectfully requests that the Court authorize the Debtors to grant such liens in accordance with the terms of the DIP Facility.

**4.   Authorization to Pay Fees under the DIP Documents is Appropriate and Necessary**

50.   Finally, under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Secured Parties.  The Debtors have also agreed to pay the fees and expenses of counsel and certain other professionals retained by the Prepetition Secured Parties, as provided for in the Interim DIP Order.  The provisions regarding the payment of such fees and expenses were negotiated at arm's length through the parties' respective representative and are integral conditions to the bargain struck between the Debtors, the DIP Lenders, and the relevant Prepetition Secured Parties.  Further, the Debtors considered the amounts described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the post-petition financing necessary to continue their operations and administer the Chapter 11 Cases.  As set forth herein, no financing, let alone with terms similar to those in the DIP Facility, is available to the Debtors for lower fees or better terms overall.  Accordingly, the Debtors respectfully submits that the Court should authorize the Debtors to pay the fees and expenses provided for under the DIP Documents or Interim DIP Order in connection with the DIP Facility.

**B.   The DIP Secured Parties Constitute Good-Faith Lenders Under Section 364(e) of the Bankruptcy Code**

51.   Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  11 U.S.C. § 364(e).

52.   Here, the terms of the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Secured Parties have offered the most favorable terms

under the circumstances.  All negotiations of the DIP Facility were conducted in good faith and at arm's length.  The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, DIP Orders and the Budget, as amended or modified consistent with the foregoing.  Accordingly, the Court should find that the DIP Secured Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code.

**C.     The Proposed Adequate Protection and Use of Cash Collateral should be Approved**

53.     Section 363(c)(1) of the Bankruptcy Code permits a debtor to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Section 363(c)(1) of the Bankruptcy Code provides a debtor flexibility to operate its business without unnecessary creditor or court oversight. *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.") (internal quotation omitted).  A debtor may use, sell, or lease cash collateral if either: (a) each entity that has an interest in such collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of Section 363 of the Bankruptcy Code.  11 U.S.C. § 363(c)(2).

54.     It is axiomatic that the continued availability of cash postpetition is essential to the ability of a debtor to effectively reorganize under chapter 11.  As such, courts generally recognize that the use of cash collateral is appropriate where necessary to preserve a debtor's estate or ability to maintain operations and reorganize.  *See, e.g., In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (stating that "the purpose of Chapter 11 is to rehabilitate debtors, and, generally, access to such cash collateral is necessary in order to operate a business") (internal citations omitted); *Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc. (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017, 1020 (11th Cir. 1984)

4829-5574-6033.1

(allowing debtor to use cash collateral over secured creditor's objection after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982) (granting cash collateral motion and noting that access to cash is imperative for a debtor to operate its business); *In re Constable Plaza Assocs.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991).

55.     In addition to the funds available under the DIP Facility, the Debtors require immediate access to cash collateral to maintain operations and ensure the continued preservation of the Refinery.  The Prepetition Secured Parties hold security interests in the Debtors' Bank Accounts.  Accordingly, prior to the Petition Date, the Debtors and the Prepetition Secured Parties negotiated terms for the use of the Cash Collateral of the Prepetition Secured Parties, which agreement is memorialized in the provisions of the Budget and the Interim DIP Order, including a reservation of rights with respect to any future requests to use Cash Collateral other than as expressly permitted under the DIP Orders.  In addition to the terms of the Budget and the DIP Orders, both of which were the subject of extensive negotiations, the Prepetition Secured Parties consented to the use of Cash Collateral subject to the following provisions:

   a.   valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition;

   b.   monthly payments to reimburse the Prepetition Secured Parties' reasonable and documented professional fees;

   c.   (i) in the case of the Prepetition Term Lenders, in lieu of cash payments of interest when and as required under any of the Prepetition Secured Debt Documents, all accrued and unpaid interest shall, on each applicable date when such interest payments are due under such documents, be paid in kind by adding the amount of such accrued interest to the outstanding aggregate principal balance of the term loans, and (ii) in the case of the Revolver Lenders and J. Aron, monthly payments

4829-5574-6033.1

in cash of an amount equal to all interest (other than default interest) accrued under the Revolver Transaction Documents and J. Aron Transaction Documents, as applicable;

d.      super priority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, with priority as provided therein, to the extent of any diminution in each Prepetition Secured Parties' respective Prepetition Collateral, and

e.      an acknowledgement of the unconditional right to credit bid the prepetition obligations under each Prepetition Secured Parties' respective Prepetition Secured Debt Documents in connection with any sale of their respective Prepetition Collateral.

56.      In addition, pursuant to the DIP Orders and the agreement of Prepetition Secured Parties, the Debtors' ability to use Cash Collateral is limited by the Budget.

57.      The Debtors submit that their continued use of their cash resources on an interim basis, including Cash Collateral, subject to the provisions of the Interim DIP Order and Budget, is reasonable and necessary, consistent with the Bankruptcy Code and applicable law, and serves the best interest of the Debtors' estates and all interest holders, including the Prepetition Secured Parties.  Therefore, the Debtors seek authority to continue to use their cash, including any Cash Collateral, on the terms of the Interim DIP Order and Budget.

**D.      Limited Modification of the Automatic Stay to Effectuate the DIP Documents is Necessary**

58.      The proposed Interim DIP Order provides that the automatic stay provisions of Section 362 of the Bankruptcy Code will be modified to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim DIP Order. Specifically, the Interim DIP Order provides that:

> The automatic stay provisions of section 362 of the Bankruptcy Code hereby are vacated and modified without the need for any further order of this Court to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to grant the Prepetition Secured Parties' Adequate Protection Liens, and to perform such acts as the Prepetition Secured Parties may request to assure the perfection

and priority of the Prepetition Secured Parties' Adequate Protection Liens; (c) the Debtors to incur all liabilities and obligations, including all of (i) the DIP Obligations, to the DIP Secured Parties and (ii) the Adequate Protection Obligations to the Prepetition Secured Parties, in each case as contemplated under this Interim Order and the DIP Loan Documents; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order, including any Adequate Protection Obligations; (e) the DIP Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order; (f) the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to exercise the rights and remedies set forth in paragraph 17 hereof, upon the occurrence of a Termination Event (as defined below); (g) the Prepetition Secured Parties to exercise the rights and remedies under their respective Prepetition Secured Documents, as applicable, pursuant to paragraph 17(c) hereof; (h) without a determination that the automatic stay applies, but out of an abundance of caution, J. Aron to retain and apply amounts received from the liquidation of its IFF Property to obligations owed by the Debtors to J. Aron under the J. Aron Transaction Documents; (i) upon entry of a Final Order, J. Aron to set off and net any Margin (as defined in the J. Aron Monetization Master Agreement) in its possession against any obligations owed by the Debtors to J. Aron under the J. Aron Transaction Documents; (j) the Debtors to perform under the DIP Loan Documents and any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and any transactions contemplated therein or in this Interim Order; and (k) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents, in each case without further notice, motion or application to, or order of, or hearing before, this Court, subject to the terms of this Interim Order, except that to the extent any Prepetition Secured Party seeks to enforce its respective rights, benefits, privileges, remedies under, or provisions of, this Interim Order and the Prepetition Secured Documents against property of the Debtors' estates (other than any such rights, benefits, privileges, or remedies described in clauses (h) and (i)), such Prepetition Secured Party shall provide the Debtors with ten (10) days written notice prior to any such enforcement. The Debtors and DIP Lenders have consented to the exercise of rights, benefits, privileges, and remedies described in clauses (h) and (i).  Nothing in this Interim Order shall impair or abridge the Debtors' right to seek and, if granted by the Bankruptcy Court, obtain the use of Cash Collateral on a nonconsensual basis, and the rights of the DIP Secured Parties, the holders of the Permitted Prior Liens and the Prepetition Secured Parties to object to such request are fully preserved.

Interim DIP Order at ¶ 14.

59.     Stay modifications of this kind are ordinary features of debtor in possession financing arrangements, and, indeed, are necessary to effectuate the terms and purposes of the

4829-5574-6033.1

DIP Facility. Accordingly, the Debtors request that the Court modify the automatic stay in accordance with the terms of the proposed Interim DIP Order.

**E.      Access to the DIP Facility on an Interim Basis is Necessary to Avoid Immediate and Irreparable Harm to the Debtors and Their Estates**

60.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

61.      The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtor, from entry of the Interim DIP Order until the Final Hearing, to withdraw and borrow funds under the DIP Facility, subject to the Interim DIP Order and Budget. The Debtors will suffer immediate and irreparable harm if the Interim DIP Order approving the DIP Facility is not entered sooner than 14 days after service of the Motion and if the Debtors are not permitted to access the up to $5,500,000 of the DIP Facility during the interim period. The Debtors require access to the DIP Facility prior to the Final Hearing on the Motion and entry of the Final DIP Order approving the DIP Facility in order to, among other things, continue ongoing remediation and repairs to the Refinery, address any issues identified for remediation in the pending audits under the EPA Order, pay employee wages, maintain the Refinery in operational condition to preserve the value of such assets, and fund expenses associated with the Chapter 11 Cases. Such relief is necessary for the Debtors to preserve and maximize the value of assets of the estates and, therefore, to avoid immediate and irreparable harm and prejudice to the Debtors' estates and parties in interest.

**Request for Emergency Relief**

62.     As set forth herein and in the First Day Declaration, the Debtors have an immediate need to access the funds available under the DIP Facility and use existing Cash Collateral.  The DIP Facility is structured to provide immediate liquidity to the Debtors to fund imminent expenses essential to continued maintenance of the Refinery and preservation of the Debtors' assets for the benefit of all creditors, including, without limitation, funds necessary to pay employees on July 16, 2021.  Absent the relief sought in this Motion, the Debtors and their estates would suffer immediate and irreparable harm and, thus, the Debtors respectfully request that the Court approve the interim relief request in the Motion on an emergency basis.

**Request for Final Hearing**

63.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Reservation of Rights**

64.     Except to the extent provided in the Interim DIP Order and the DIP Documents, nothing contained herein is intended or should be construed as, or deemed to constitute, an agreement or admission as to the validity of any claim against the Debtors on any grounds, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds, or an assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  Except as expressly provided in the Interim DIP Order and the DIP Documents, the Debtors reserve any and all rights to contest any claims related to the DIP Facility under applicable bankruptcy and non-bankruptcy law.  Similarly, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be

4829-5574-6033.1

construed, as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Compliance with Bankruptcy Rule 6004(a) and
## Waiver of Stay under Bankruptcy Rule 6004(h)

65.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances presented.  The Debtors further request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As discussed, *supra*, the Debtors require immediate access to the funds under the DIP Facility.  Delaying the availability of such funds will result in immediate and irreparable harm, including, without limitation, the inability to pay employees as the Debtors transition into bankruptcy, which may have a catastrophic effect on the Debtors' ability to preserve assets of the estates and maximize the value of such assets for the benefit of creditors.  Accordingly, the Debtors respectfully submit that ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## Notice

66.     Notice of this Motion, whether by facsimile, electronic mail, or overnight courier, will be given to the following parties: (a) the United States Trustee for the Southern District of Texas; (b) all secured creditors; (c) the Offices of the Attorney General of the State of Texas and the United States Virgin Islands; (d) the thirty (30) largest consolidated unsecured creditors for the Debtors; (e) the Debtors' identified, interested taxing authorities, including the Internal

Revenue Service; (f) the Debtors' identified, interested government and regulatory entities; (g) other interested parties as identified by the Debtors; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The method of service for each party will be described more fully in the certificate of service prepared by the Debtors' claims and noticing agent. The Debtors respectfully submit that, under the circumstances, such notice is sufficient and that no other or further notice of this Motion is required.

**WHEREFORE,** the Debtors respectfully request entry of the Proposed Interim Order granting the relief requested herein and for all other relief that is appropriate under the circumstances.

RESPECTFULLY SUBMITTED this 13th day of July, 2021.

**BAKER & HOSTETLER LLP**

/s/ Elizabeth A. Green
**Elizabeth A. Green, Esq.**
Fed ID No.: 903144
**Jimmy D. Parrish, Esq.**
Fed. ID No. 2687598
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Facsimile:   407.841.0168
Email:  egreen@bakerlaw.com
            jparrish@bakerlaw.com


**BAKER & HOSTETLER LLP**
**Jorian L. Rose, Esq.**
N.Y. Reg. No. 2901783
45 Rockefeller Plaza
New York, New York
Telephone:  212.589.4200
Facsimile:  212.589.4201
Email: jrose@bakerlaw.com
*(Motion for admission pro hac vice to be filed)*

*Proposed Counsel for the Debtors and Debtors
in Possession*

## Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Elizabeth A. Green*
Elizabeth A. Green


## Certificate of Service

I certify that on July 13, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Elizabeth A. Green*
Elizabeth A. Green

4829-5574-6033.1