# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |
|---|---|
| In re: | § Chapter 11 |
| LIMETREE BAY SERVICES, LLC, *et al.*,[1] | § Case No. 21-32351 |
| Debtors. | § (Jointly Administered) |

**AD HOC GROUP OF TERMINAL LENDERS' LIMITED OBJECTION TO THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) APPROVING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

The ad hoc group of lenders (the "Terminal Lenders") to Limetree Bay Terminals, LLC (the "Terminal") hereby submits this Limited Objection to the Debtors' *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Approving Adequate Protection to Pre-Petition Secured Creditors, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing* [ECF No. 14] (the "DIP Motion").[2] The Terminal Lenders hold more than 70% of the approximately $450 million senior secured term loan debt of the Terminal.

---

[1] The Debtors in these chapter 11 cases (the "Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2] Capitalized terms used herein and not defined have the meanings ascribed to such terms in the Terminal Entities' *Declaration of Mark Shapiro in support of Chapter 11 Petitions and First Day Motions* [ECF No. 8] (the "Shapiro Declaration").

## BACKGROUND

1. The Terminal and the Terminal Lenders will be significantly affected by these Cases. The Terminal is a non-Debtor affiliate (by way of common equity sponsorship) of and commercial counterparty to the Debtors. Indeed, certain Debtors are, collectively, the Terminal's largest customer. Pursuant to two terminal services agreements, the Terminal Entities provide storage for the Debtors' petroleum products and services that allow the Debtors' refined products to be sold and transported to customers. Without the services provided by the Terminal Entities, the Debtors would not be able to store and sell their refined products. The Debtors and the Terminal also share (i) the physical Refinery/Terminal complex and certain hydrocarbon-related systems and infrastructure located thereon (which constitutes the collateral of the Terminal Lenders to the extent of the Terminal's joint, undivided interest therein) and (ii) management and other personnel.

### Terminal Services Agreements

2. The first terminal services agreement, referred to as the Terminal Services Agreement (Included Locations) (the "**Included TSA**"), covers storage and transfer of petroleum products that are subject to certain of the J. Aron Transaction Documents. J. Aron, as the inventory financing provider to the Debtors, is also a party to the Included TSA. The second, referred to as the Terminal Services Agreement (Non-Included Locations) (the "**Non-Included TSA**" and together with the Included TSA, the "**TSAs**"), covers storage and transfer of petroleum products that are not financed by J. Aron.

3. Pursuant to the TSAs, the Debtors exclusively reserve storage capacity in tanks at the Terminal; the Terminal cannot use those tanks to store inventory from other customers. Each month, the Debtors incur approximately $5.5 million in tank storage fees plus additional fees as

provided under the TSAs.  Under applicable law, the Terminal Entities may have warehouseman's liens with respect to payment of fees owed to them by the Debtors in respect of the storage of petroleum products.[3]

4. The Debtors have missed multiple payments to the Terminal Entities under the TSAs.  As of the Petition Date, the Debtors owed approximately $11 million in past due payments to the Terminal Entities under the TSAs, which claims for payment are secured by warehouseman's liens on the products stored at the Terminal.  The next payment owed to the Debtors will be payable on July 21, 2021, in the amount of at least $5.5 million.

### Shared Services Systems Agreement

5. Under the Shared Services Systems Agreement, the Refinery Entities and the Terminal Entities are able to access the full Limetree Bay facility to conduct their businesses and share common services and facilities.  The Shared Services Systems Agreement outlines the rights of the Refinery Entities and Terminal Entities vis-à-vis each other, including, without limitation, dividing shared costs and providing for step-in rights in the event of nonperformance.

6. Additionally, under the Shared Services Systems Agreement, Limetree Bay Terminals, LLC conveyed an undivided ownership interest to Limetree Bay Refining, LLC in the properties and facilities owned and operated by Limetree Bay Terminals, LLC.  Likewise, Limetree Bay Refining, LLC conveyed an undivided ownership interest to Limetree Bay Terminals, LLC in properties and facilities owned and operated by Limetree Bay Refining, LLC. As a result of these conveyances, Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC jointly own, as tenants in common, certain of the facilities and property in the percentages set forth in more detail in the Shared Services Systems Agreement.

---

[3]  V.I. Code Ann. tit. 11A § 7-209.

**The Debtors' and the Terminal Entities' Shared Managment**

7. While the Terminal Entities and the Debtors have interconnected operations and common ownership and management, they have separate capital structures and their operations are managed by separate fiduciary boards, and each operating entity owes its duties solely to its own creditors and shareholders. For that reason, the Debtors and the Terminal Entities are represented by separate restructuring counsel, and are acting independently in these chapter 11 cases. Importantly, the Terminal has fiduciary duties to its own creditors and shareholders, whose interests may differ from those of the Debtors.

**LIMITED OBJECTION**

8. The Terminal Lenders are supportive of the Terminal Entities' efforts to ensure that the Debtors have a smooth transition into chapter 11 and that the Cases are properly and adequately financed so the Debtors have sufficient time and space to reorganize in a manner that maximizes value for their constituents. The Terminal Lenders also want to ensure that the Debtors do not—and are not forced to—take actions that harm the value of the Terminal to the detriment of all stakeholders. In particular, given the interconnectedness of the Terminal Entities, the Debtors and their respective assets, the Terminal Lenders are focused on protecting the Terminal's (and ultimately the Terminal Lenders') interest in property that constitutes collateral of the Terminal Lenders, including all property rights of the Terminal arising from its relationship with the Debtors.[4] Specifically, the Terminal Lenders' collateral includes substantially all of the Terminal Entities' interests in the property shared by the Debtors and the Terminal, as well as payment

---

[4] The Terminal Entities granted a lien on substantially all of their assets for the benefit of the Terminal Lenders and as security for their obligations under that certain Credit Agreement, dated as of February 15, 2017, among the Terminal Entities, the Terminal Lenders, Limetree Bay Cayman, Ltd. and Barclays Bank PLC, and related loan documentation.

intangibles owed to the Terminal that are secured by warehouseman's liens on inventory stored there.

9. As of the Petition Date, the Debtors' accrued obligations to the Terminal under certain storage agreements totaled approximately $13 million, with approximately $11 million past due. Additional storage fees under those agreements continue to accrue on a postpetition basis. However, the proposed DIP Financing budget does not contemplate either current payment of past due amounts and provides for minimal ongoing payments to the Terminal Entities for those necessary storage services. The Terminal Lenders submit that the Terminal should receive payment at the contractual rate for services that they are and will be providing to the Debtors on a postpetition basis (and which give rise to administrative expense claims) consistent with the most basic principles of the Bankruptcy Code. In light of the foregoing, and for all of the reasons stated in the Terminal Entities' objection:

a) **No Priming Liens on Terminal Assets**. The DIP Financing should not be permitted to take priming liens on any assets of the Debtors that the Terminal or the Terminal Lenders have a security interest in or lien on, including hydrocarbons and other materials stored at the Terminal. In addition, under no circumstances should the lenders under the DIP Financing (the "DIP Lenders") be permitted to take liens on any property or assets of the Terminal, including to the extent of the Terminal's interest in the shared assets governed by the Shared Services Systems Agreement. The Terminal Entities and the Terminal Lenders have not consented to priming liens, and the Debtors have not shown or purported to provide adequate protection. Accordingly, the DIP Lenders should only be permitted to take junior liens on any such assets (to the extent they are permitted to take liens at all).

b) **No Requirement to Perform Ongoing Services without Payment.**  Because the DIP budget, on its face, *expressly does not permit the Debtors to pay the vast majority of administrative expenses coming due to the Terminal for postpetition storage*, the Court should clarify that nothing in any first day motion or order or in the Bankruptcy Code shall compel or be used to compel the Terminal to provide ongoing services to the Debtors absent current postpetition payments.  To be clear, the Debtors already currently owe approximately $11 million in past due prepetition storage fees to the Terminal (the Terminal Lenders believe the Terminal's claims for such past due payment to be secured by the inventory held by the Terminal via a warehouseman's lien), with total accrued obligations as of the Petition Date totaling approximately $13 million, and the DIP budget provides for only minimal ongoing payment of postpetition storage fees to the Terminal.  To nonetheless require the Terminal to assist in the liquidation of that inventory (*i.e.*, to hand over the Terminal's collateral) without being compensated is beyond the pale.

c) **No Stipulations Binding on, or Impacting the Rights of, the Terminal Lenders.**  The Terminal Lenders disagree with certain of the stipulations regarding the liens, property and status of the Debtors' lenders and financing counterparties, including J. Aron & Company, that are contained in the proposed DIP Financing order, and reserve all rights in connection with such stipulations.  To the extent any stipulations purport to apply to the Terminal Lenders and their interests, such stipulations should be read as applicable solely to the Debtors.  The Debtors are not entitled to unilaterally declare as true the state of contractual relationships or the

status, validity and scope of legal interests that will be of import in these proceedings.

10. Specifically, to address these and other related issues, the Terminal Lenders submit that the Interim DIP Order should be revised to contain the following language:

   a) Notwithstanding anything to the contrary in this Order,

      i. "**Permitted Prior Liens**" shall include any valid, perfected and non-avoidable liens of the Terminal Entities (as defined in the First Day Declaration) (the "**Permitted Prior Terminal Liens**"); and

      ii. the DIP Liens and the replacement liens granted to the Prepetition Secured Parties pursuant to paragraph 9 of this Interim Order shall be subject and subordinate to the Permitted Prior Terminal Liens.

   b) Until the discharge of the Permitted Prior Terminal Liens, no property of the Debtors' Estates (including any IFF Property or proceeds thereof or other assets that are not currently property of the Debtors' estates but become property of the Debtors' Estates after the Petition Date) that is subject to the Permitted Prior Terminal Liens shall be used to fund the Carve-Out, and the Carve Out shall be subordinate to the Permitted Prior Terminal Liens with respect to such property.

   c) Any rights to credit bid provided in this Interim DIP Order are expressly made subject to the satisfaction, in cash, of any valid, perfected and non-avoidable liens of the Terminal Entities that are senior to the liens of the party submitting such credit bid.

   d) For the avoidance of doubt, the DIP Collateral shall not include any property to the extent that it does not constitute property of the Debtors' estates within the scope of 11 U.S.C. § 541, and shall not include the Terminal Entities' interest in any property that

is jointly owned by the Debtors (or any of them) and the Terminal Entities (or any of them)."

e) Notwithstanding anything in paragraph 42 of this Order, the stipulations, waivers and releases contained in sections F, G, and I of this Interim Order with respect to the Prepetition Secured Parties shall not be binding on the Terminal Entities.

f) Nothing set forth in paragraph 28 of this Order shall limit the right of the Terminal Entities to enforce any provision of this Interim Order.

g) Nothing in this Interim Order is intended to change or otherwise modify the validity or prepetition priority of any liens or other rights of the Terminal Entities, including any warehousemens' or other similar liens, setoff, recoupment, contract, and other security rights.

**The DIP Process and the Debtors' Lack of Engagement with the Terminal Lenders**

11.     Additionally, the Terminal Lenders are concerned about the Debtors' refusal to engage with them, especially with respect to the DIP Financing.  In multiple conversations over the July 4th weekend, the advisors to the Terminal Lenders indicated potential interest among the Terminal Lenders in providing DIP Financing for the Debtors' chapter 11 process and requested to see marketing materials on an advisors-only basis to be able to assess the potential opportunity. Following those conversations, beginning on July 5 and as demonstrated in Exhibits 1-5 to the Terminal Lenders *Witness and Exhibit List* [ECF No. 68], the Terminal Lenders' advisors emailed the Debtors' advisors on an almost daily basis for further information on participating in the DIP process—this elicited only brief replies from the Debtors' advisors on July 5 and 6, followed by complete silence thereafter.  (*See* ECF No. 68, Exhibits 1-5.)  the Terminal Lenders accordingly view the Debtors' statement that "the DIP Facility is the best debtor in possession financing option available" or that they do not "believe financing with terms similar to those in the DIP Facility is

8

available to the Debtors for lower fees or better terms overall" (Shapiro Declaration, pp. 34, 36) with some skepticism.[5]

12. On multiple occasions, the Terminal Lenders' advisors also requested to review, on a professionals' eyes only basis, draft first day pleadings to ensure that none of the relief sought would impact the Terminal's property and collateral interests, and to reach a consensual resolution with respect to any potential objections. From the morning of July 6th through the Petition Date the Debtors' advisors simply did not respond. (*See* ECF No. 68, Exhibits 1-5.) As a result, the Terminal Lenders' advisors continue to review and analyze the terms of the DIP Financing and other first day relief in real time as related documents are filed, and have continued to attempt to contact the Debtors' advisors to consensually resolve as many of the objections set forth herein as possible.

## Concerns Regarding Conflicts of Interest

13. As of this filing, the Terminal Entities have not filed any pleading either in support of or in opposition to the DIP Motion and the other first day relief sought by the Debtors. On several occasions, the Terminal Lenders' advisors have emphasized the importance of the issues raised herein to the Terminal Entities' separate advisors. Upon information and belief, the Terminal Entities have not yet hired an independent director, although they plan to do so shortly, and we understand that as of the time of this filing the Terminal Entities' advisors have not been authorized to raise any objections to the DIP Motion. Also upon information and belief, the Terminal's board of managers is comprised of individuals who also sit on the boards of one or more of the Debtors. Given that the Debtors' chapter 11 filing may heighten the divergence of

---

[5] Upon information and belief, the Terminal's own advisors also sought advance copies of documentation related to the DIP Financing, which were similarly not provided prior to filing.

interest between the Debtors and the Terminal Entities, it will be important to ensure that decisions being made for the Terminal Entities are being made not to to advance the interests of the Debtors, but instead are made to advance the separate (although potentially overlapping) interests of the Terminal Entities.

## Conclusion

14. At bottom, as long as the interim order approving the DIP Financing does not harm the Terminal Entities' interests in collateral—for instance, by priming those interests non-consensually—or force the Terminal to provide essential services to the Debtors without compensation, the Terminal Lenders expect and hope that their objections can be resolved. The Interim DIP Order simply should not do anything that cannot be undone; after all, the Terminal Lenders (or a subset thereof) may be willing to provide final-basis DIP financing on the same or better terms as the current DIP Lenders—an opportunity that the Terminal Lenders hope the Court will encourage the Debtors to explore. Indeed, based on the terms of the DIP financing set forth in the Motion, the Terminal Lenders' advisors believe that members of the Terminal Lender group may well have been willing to provide DIP financing on substantially similar or better terms, and may still be willing to do so. The Terminal Lenders respectfully request that the Court not approve the DIP Motion absent the modifications requested herein, especially given that alternative DIP financing may be available and was not fully examined by the Debtors' advisors in their prepetition marketing process.

15. The Terminal Lenders hereby reserve all rights under the Bankruptcy Code or other applicable law, including to prosecute any and all outstanding objections to the DIP Financing at the first day hearing or otherwise.

Dated: July 13, 2021
       Houston, Texas

Respectfully Submitted,

**RAPP & KROCK, PC**

By: */s/ Henry Flores*
Henry Flores
Texas State Bar No. 00784062
1980 Post Oak Blvd. Suite 1200
Houston, TX 77056
Telephone.: (713) 759-9977
Facsimile.: (713) 759-9967
Email: hflores@rappandkrock.com

-and-

**DAVIS POLK & WARDWELL LLP**
Damian S. Schaible (*pro hac vice* pending)
Elliot Moskowitz (*pro hac vice* pending)
Aryeh Ethan Falk (*pro hac vice* pending)
Jonah A. Peppiatt (*pro hac vice* pending)
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: damian.schaible@davispolk.com
Email: elliot.moskowitz@davispolk.com
Email: aryeh.falk@davispolk.com
Email: jonah.peppiatt@davispolk.com

**CERTIFICATE OF SERVICE**

I certify that on July 13, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Henry Flores
Henry Flores