

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
07/14/2021

| | |
|---|---|
| In re: | **CHAPTER 11** |
| **LIMETREE BAY SERVICES, LLC, *et al.* [1]** | **CASE NO.: 21-32351** |
| Debtors. | **Jointly Administered** |

(Docket No. 14)

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING AND (B) USE
CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>") of the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") seeking entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules (the "<u>Local Rules</u>") for the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>"), and the Procedures for Complex Cases in the Southern District of Texas (the "<u>Complex Rules</u>"),[2]

(i)    authorizing the Debtors to (a) obtain postpetition financing up to an aggregate principal amount of up to $5.5 million on an interim basis (the "<u>DIP Financing</u>"), with a committed financing facility up to $25 million proposed by the Debtors to be considered at a subsequent hearing, pursuant to that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement  attached hereto as **<u>Exhibit A</u>** (the "<u>DIP Credit Agreement</u>"), and such other agreements, documents, certificates and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services,  LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement (defined below) as applicable.

instruments delivered or executed from time to time in connection therewith, including the agreements related to the DIP Financing, (the "DIP Loan Documents"), among the Debtor Limetree Bay Refining, LLC, as borrower ("LBR" or the "Borrower"), Debtors Limetree Bay Services, LLC., Limetree Bay Refining Holdings, LLC, Limetree Bay Refining Holdings II, LLC ("LBRHII"), Limetree Bay Refining Operating, LLC ("LBRO"), and Limetree Bay Refining Marketing, LLC ("LBRM" and each a "Guarantor" and together the "Guarantors"), 405 Sentinel, LLC and the financial institutions from time to time parties thereto as lenders (each individually a "DIP Lender," and collectively, the "DIP Lenders"), and 405 Sentinel, LLC, as administrative and collateral agent for the DIP Lenders (the "DIP Agent" together with the DIP Lenders, the "DIP Secured Parties"); (b) authorizing the Debtors to use the DIP Lenders' and the Prepetition Secured Parties' (as defined in the Motion) (x) "cash collateral" as such term is defined in section 363 of the Bankruptcy Code other than, until such time as the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement defined below) occurs, any such "cash collateral" that constitutes Inventory Financing Collateral (as defined below) and (y) until such time as the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement defined below) occurs, "cash collateral" as such term is defined in section 363 of the Bankruptcy Code that constitutes Inventory Financing Collateral, solely to the extent that the same is (A) cash or amounts on deposit in or credited to any deposit account or securities account or (B) accounts receivable in respect of propane sales contemplated to be received by the Debtors pursuant to the Approved Budget (as defined below) in an aggregate amount not to exceed $1,000,000, in each case that constitutes Inventory Financing Collateral as of the Petition Date (such "cash collateral" as described in this clause (y) and the foregoing clause (x), the "Cash Collateral");

(ii)     granting (y) to the DIP Agent for the benefit of the DIP Secured Parties the DIP Liens on the DIP Collateral (as defined below) to secure all amounts owed under the DIP Loan Documents (the "DIP Obligations") on a first priority priming basis, except as otherwise set forth herein, and (z) to the DIP Secured Parties the DIP Superpriority Claims (as defined below) in respect of the DIP Obligations, in each case subject to the terms and conditions hereof;

(iii)    approving certain stipulations by the Debtors with respect to the Prepetition Secured Documents (as defined below) and the liens and security interests arising therefrom;

(iv)     modifying the automatic stay to the extent provided for herein;

(v)      granting adequate protection for the liens and security interests granted for the benefit of the Prepetition Secured Parties in connection with the prepetition agreements described in Paragraphs F and G, below; and

(vi)     scheduling a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing, which order shall be in form and substance and on terms satisfactory in all respects to the DIP Secured Parties.

The Court having considered the Motion, the DIP Loan Documents, and the Declaration of Mark Shapiro in support of the First Day Motions, the pleadings filed with the Court, and the evidence proffered and presented at the interim hearing held on July 13, 2021 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Rules and Complex Rules; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is necessary for the continued operation of the Debtors' businesses; and upon the record of these Chapter 11 Cases; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED:[3]**

A.    Filing Date.    On July 12, 2021 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (these "Chapter 11 Cases").

B.    Jurisdiction; Venue.    The Court has exclusive jurisdiction to consider this matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, and 507 of

---

[3]    Where appropriate in this Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

4823-3938-9938.1

the Bankruptcy Code; Bankruptcy Rules 2002, 4001, 6004, and 9014; and Local Rules 2002-1, 4001-1, 4002-2, and 9013-1.

C.      Committee Formation.  The Office of the United States Trustee (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in these Chapter 11 Cases (if appointed, the "Committee"). No trustee or examiner has been appointed.

D.      Notice.  Due notice of the Interim Hearing and the Motion was afforded, whether by facsimile, electronic mail, overnight courier, or hand delivery, to parties in interest, including to: (a) the United States Trustee for the Southern District of Texas; (b) all secured creditors of record, including (as defined herein) the DIP Agent, the Revolving Administrative Agent, the Term Administrative Agent, J. Aron, and the Project Collateral Agent; (c) the Offices of the Attorney General of the State of Texas and the United States Virgin Islands; (d) the thirty (30) largest consolidated unsecured creditors for the Debtors; (e) the Debtors' identified, interested taxing authorities, including the Internal Revenue Service; (f) the Debtors' identified, interested government and regulatory entities; (g) other interested parties as identified by the Debtors; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.   Under the circumstances, such notice of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rules 4001 and 9014 and the Local Rules, and no other or further notice of the relief sought at the Interim Hearing was required.

E.      Debtors' Stipulations Regarding DIP Loan Documents and DIP Secured Parties.  In requesting the DIP Financing, upon entry of this order (the "Interim Order"), the Debtors acknowledge, represent, stipulate, and agree that:

(a)      none of the DIP Secured Parties are control persons or insiders (as defined in the Bankruptcy Code) of the Debtors by virtue of determining to make any loan, providing the DIP Financing or performing obligations under the DIP Loan Documents;

(b)      as of the date hereof, there exist no claims or causes of action against any of the DIP Secured Parties arising from, related to or connected with the DIP Loan Documents that may be asserted by the Debtors;

(c)      the Debtors forever and irrevocably release, discharge, and acquit the DIP Secured Parties and each of their respective officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "DIP Releasees"), in each case in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened as of the date hereof including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, existing as of the date of this Interim Order, arising out of, in connection with, or relating to the DIP Financing, the DIP Loan Documents, the DIP Obligations, and ancillary documentation, guarantees, security documentation and collateral documents executed in support of the foregoing or the transactions contemplated hereunder or thereunder including, without limitation, (i) any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), except as permitted herein, so-called "lender liability" claims,

counterclaims, cross-claims, recoupment, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Secured Parties with respect to the DIP Loan Documents.

F.      <u>Debtors' Stipulations Regarding Prepetition Secured Debt Obligations</u>. Upon entry of the Interim Order, subject to paragraph 42, the Debtors acknowledge, represent, stipulate, and agree as follows and make the releases and waivers set forth below:

(a)      Prior to the Petition Date, pursuant to (i) the Prepetition Term Credit Agreement, the Prepetition Term Lenders extended credit to LBR in the form of term loans, (ii) the Revolver Credit Agreement, the Revolver Lenders extended credit to LBRM in the form of a revolving credit facility and (iii) the Prepetition HoldCo Credit Agreement, the Prepetition HoldCo Lenders[4] extended credit to LBRH in the form of term loans.  Pursuant to the Prepetition Term Credit Agreement, the obligations of LBR under the Prepetition Term Credit Agreement are unconditionally and irrevocably guaranteed on a joint and several basis by LBRO and LBRM. Pursuant to the Revolver Credit Agreement, the obligations of LBRM under the Revolver Credit Agreement are unconditionally and irrevocably guaranteed on a joint and several basis by LBRO and LBR.  As of the Petition Date, the obligors under the Prepetition Term Documents and Revolver Transaction Documents (such documents, the "<u>Prepetition Secured Debt Documents</u>" and such obligors, the "<u>Prepetition Obligors</u>") were truly and justly indebted to the Prepetition

---

[4] As used in this Interim Order, the term "Prepetition HoldCo Lenders" extends only to Prepetition Holdco Lenders to the extent they are, as of the date of this Interim Order, a Prepetition Term Lender or an affiliate of a Prepetition Term Lender.  The term specifically does not encompass insiders or affiliates of the Debtors, as such terms are defined in the Bankruptcy Code.

Secured Parties pursuant to the Prepetition Secured Debt Documents, without defense, counterclaim, offset, claim, or cause of action of any kind, in the aggregate amount of not less than (i) $768,956,393 of outstanding principal with respect to term loans under the Prepetition Term Credit Agreement plus accrued and unpaid interest with respect thereto, fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the Prepetition Term Credit Agreement) and all other "Obligations" (as defined in the Prepetition Term Credit Agreement or any security document related thereto) under the Prepetition Secured Debt Documents (the "Prepetition Term Obligations") and (ii) $50 million of outstanding principal under the Revolver Credit Agreement plus accrued and unpaid interest with respect thereto, fees, costs, and expenses (including any attorneys', financial advisors, and other professionals' fees and expenses that are chargeable or reimbursable under the Revolver Credit Agreement) under the Prepetition Secured Debt Documents and all other "Obligations" (as defined in the Revolver Credit Agreement or any security document related thereto) under the Prepetition Secured Debt Documents (the "Revolver Secured Obligations" and, together with the Prepetition Term Obligations, the "Prepetition Term and Revolver Debt Obligations"). As of the Petition Date, the obligors under the Prepetition Holdco Loan Documents (such obligors, the "Prepetition Holdco Loan Parties") were truly and justly indebted to the Prepetition Holdco Lenders pursuant to the Prepetition Holdco Loan Documents, without defense, counterclaim, offset, claim, or cause of action of any kind, for their share of an aggregate amount of not less than $782,558,090[5] of outstanding principal under the Prepetition Holdco Credit Agreement plus accrued and unpaid interest with respect thereto, fees,

---

[5]   This amount includes sums related to entities that are not Prepetition Holdco Lenders. The Debtors' acknowledgements, representations, stipulations, and agreements only extend to the share of such claims belonging to the Prepetition Holdco Lenders.

costs, and expenses (including any attorneys', financial advisors, and other professionals' fees and expenses that are chargeable or reimbursable under the Prepetition Holdco Credit Agreement) under the Prepetition Holdco Loan Documents and all other "Obligations" (as defined in the Prepetition Holdco Credit Agreement or any security document related thereto) under the Prepetition Holdco Loan Documents (the "Prepetition Secured Holdco Debt Obligations" and, together with the Prepetition Term and Revolver Debt Obligations, the "Prepetition Secured Debt Obligations").

(b)     The Prepetition Secured Debt Obligations constitute legal, valid, and binding obligations of the Prepetition Obligors and the Prepetition Holdco Loan Parties.  No offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or priority of, the Prepetition Secured Debt Obligations exist.  No portion of the Prepetition Secured Debt Obligations is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.  The Prepetition Secured Debt Documents and the Prepetition Holdco Loan Documents are valid and enforceable by each of the Prepetition Term Lenders, Revolver Lenders (together with the Prepetition Term Lenders, the "Prepetition Secured Lenders") and Prepetition Holdco Lenders, as applicable against each of the Prepetition Obligors or the Prepetition Holdco Loan Parties, as applicable.  The Prepetition Secured Debt Obligations constitute allowed claims against the applicable Prepetition Obligors' and the Prepetition Holdco Loan Parties' estates.  As of the Petition Date, the Debtors or their estates have no claim or cause of action against any of the Prepetition Secured Parties, the Prepetition Holdco Loan Secured Parties or their respective agents,

in such capacities, whether arising under applicable state, federal, or foreign law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Secured Debt Documents (or the transactions contemplated thereunder), the Prepetition Holdco Financing Loan Documents (or the transactions contemplated thereunder), the Prepetition Secured Debt Obligations, the Prepetition Debt Liens (as defined below) or the Prepetition Holdco Financing Liens (as defined below).

(c)       Pursuant to and as more particularly described in the Prepetition Secured Debt Documents, the Prepetition Term and Revolver Debt Obligations and certain associated hedge obligations are secured by, among other things, first priority liens or mortgages on, security interests in, and assignments or pledges of (the "Prepetition Debt Liens"), (i) substantially all of the assets of the Borrower and the Guarantors, including, without limitation, certain cash collateral, and other "Collateral" as such term is defined in the Prepetition Secured Debt Documents, subject to certain exclusions including Inventory Financing Collateral, as defined in the A&R Depositary and Intercreditor Agreement, and (ii) the equity interests in the Borrower held by LBRHII and all rights and benefits of LBRHII under the Amended and Restated Operating Agreement, dated as of November 20, 2018 (collectively, the "Prepetition Debt Collateral"). The Collateral Agency and Intercreditor Agreement, dated as of November 20, 2018, by and among LBR, LBRH, LBRO, LBRM, the Prepetition Term Agent, the Revolving Administrative Agent, and the Project Collateral Agent  (as defined in the A&R Depositary and Intercreditor Agreement (as defined herein)) (amended, amended and restated, supplemented and/or modified from time to time, the "Intercreditor Agreement") sets forth, among other things, the priority of the Revolver Lenders, Prepetition Term Lenders, and certain other parties in respect of the Prepetition Debt Collateral

and establishes that (a) prior to the Toll Coverage Threshold Date (as defined therein) (i) the priority of the lien of the Project Collateral Agent in respect of the Project Tolling Collateral (as defined therein) shall be the holders of the Prepetition Term Obligations, any Permitted Refinancing Facility (as defined in the Term Credit Agreement) in respect of the Term Credit Agreement and any Secured Interest Rate Hedge Agreement (as defined in the Term Credit Agreement) entered into in respect of each of the foregoing (the "Term and Associated Holders"), followed by the holders of the Revolver Secured Obligations, any Permitted Refinancing Facility (as defined in the Revolver Credit Agreement) in respect of the Revolver Credit Agreement and any Secured Interest Rate Hedge Agreement (as defined in the Revolver Credit Agreement) entered into in respect of each of the foregoing (the "Revolver and Associated Holders"), and (ii) the priority of the lien of the Project Collateral Agent in respect of all Prepetition Debt Collateral (other than the Project Tolling Collateral, the Account Collateral (as defined therein) and certain Cash Collateral Accounts (as defined therein)), which Prepetition Debt Collateral includes any equipment and fixtures (as those terms are defined in the Uniform Commercial Code as in effect in the State of New York) of the Debtors, shall be the Revolver and Associated Holders followed by the Term and Associated Holders and (b) the Revolver and Associated Holders and the Term and Associated Holders shall share the priority of the lien of the Project Collateral Agent in respect of the Account Collateral (other than the Debt Service Account (as defined therein) and the Account Collateral held therein and credit thereto) Equally and ratably (as defined in the Intercreditor Agreement).[6]  As of the date hereof, the Toll Coverage Threshold

---

[6] The description of the relative priorities of the Revolver Lenders, Prepetition Term Lenders, and certain other parties in respect of the Prepetition Debt Collateral set forth herein is qualified in its entirety by reference to the Intercreditor Agreement. In the event of any conflict between the description set forth herein and the terms of the Intercreditor Agreement, the Intercreditor Agreement shall govern. Nothing contained herein shall be construed or deemed to modify or amend the term of the Intercreditor Agreement.

4823-3938-9938.1

Date has not occurred.  Pursuant to and as more particularly described in the Prepetition Holdco Loan Documents, the Prepetition Secured Holdco Debt Obligations are secured by, among other things, first priority liens or mortgages on, security interests in, and assignments or pledges of (the "Prepetition Holdco Financing Liens") all of the Collateral (as defined in the Prepetition Holdco Credit Agreement) (the "Prepetition Holdco Financing Collateral").

(d)     As of the Petition Date, the Prepetition Debt Liens and the Prepetition Holdco Financing Liens are (i) valid, binding, perfected, and enforceable liens on and security interests in the applicable Prepetition Debt Collateral and Prepetition Holdco Financing Collateral; and (ii) not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind by any person or entity, and each Debtor irrevocably waives, for itself and its estate, any right to challenge or contest in any way the scope, extent, perfection, priority, validity, non-avoidability, and enforceability of the Prepetition Debt Liens or the Prepetition Holdco Financing Liens or the validity, enforceability, or priority of payment of the Prepetition Secured Debt Obligations, the Prepetition Secured Debt Documents and the Prepetition Holdco Loan Documents.  The Prepetition Debt Liens were granted to the respective Prepetition Lenders, and the Prepetition Holdco Financing Liens were granted to the Prepetition Holdco Lenders, for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of loans, commitments, and/or other financial accommodations under the Prepetition Secured Debt Documents or the Prepetition Holdco Loan Documents.

(e)     All of the Debtors' cash, including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Prepetition Debt Collateral and, following the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement), of the Inventory Financing Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

(f)     None of the Prepetition Secured Parties or the Prepetition Holdco Loan Secured Parties[7] control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted, or are control persons or insiders (as defined in the Bankruptcy Code) of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Financing, the DIP Loan Documents, the Prepetition Secured Debt Documents or the Prepetition Holdco Loan Documents.

G.     Stipulations Regarding J. Aron Transaction Documents and Inventory Financing Collateral.  Upon entry of the Interim Order, subject to paragraph 42, the Debtors acknowledge, represent, stipulate, and agree as follows and make the releases and waivers set forth below:

(a)     J. Aron Transaction Documents.  LBRM, LBR, LBRO (collectively, the "Transaction Entities") and J. Aron & Company LLC ("J. Aron"), made and entered into Transaction Documents (as defined in the J. Aron Monetization Master Agreement), each originally dated as of March 3, 2020, consisting of, among others (each as amended, amended and restated, supplemented and/or modified from time to time, collectively, the "J. Aron Transaction Documents"):

---

[7] As used in this Interim Order, the term "Prepetition HoldCo Loan Secured Parties" extends only to Prepetition Holdco Loan Secured Parties to the extent they are, as of the date of this Interim Order, a Prepetition Term Lender or an affiliate of a Prepetition Term Lender.  The term specifically does not encompass insiders or affiliates of the Debtors as defined under the Bankruptcy Code.

4823-3938-9938.1

i.     the Supply and Offtake Agreement and the Marketing and Sales Agreement (the "J. Aron Supply and Offtake Agreement" and the "J. Aron Marketing and Sales Agreement", respectively), by and among LBRM and J. Aron, pursuant to which J. Aron agreed to purchase and sell crude oil, crude oil blends, fuel oil, naphtha, debutanized natural gasoline and certain other feedstocks (each as more fully defined in the J. Aron Monetization Master Agreement (as defined below), the "Feedstock"), and certain refined hydrocarbon products (each as more fully defined in the J. Aron Monetization Master Agreement, the "Product") to LBRM (and LBRM agreed to purchase and sell Feedstock and Product from and to J. Aron, as applicable), and which also governed certain terms of purchases and sales of Feedstock and Product between J. Aron and third parties (including BP Products North America Inc. ("BP")), in each case, subject to additional terms and conditions set forth in the J. Aron Transaction Documents;

ii.     the Monetization Master Agreement (the "J. Aron Monetization Master Agreement") by and among the Transaction Entities and J. Aron, setting forth the general transaction terms, covenants, events of default and certain termination provisions;

iii.     the Financing Agreement (the "J. Aron Financing Agreement"), by and among LBRM and J. Aron, providing for a one-time term loan by J. Aron based on certain catalyst units that contain certain base metals and certain catalyst units that contain certain precious metals, which were, in each case, designed for use in refining or processing activities;

iv.     the Amended and Restated Depositary and Intercreditor Agreement, dated as of March 3, 2020, by and among LBR as Term Borrower, LBRM and LBRO as Term Guarantors, Goldman Sachs Bank USA as Term Administrative Agent, Revolving

13

Administrative Agent and Project Collateral Agent, J. Aron as Inventory Financing Facility Agent and Deutsche Bank Trust Company Americas as Depositary, as amended by that certain Amendment No. 1 to Amended and Restated Depositary and Intercreditor Agreement, dated as of March 10, 2021 ("A&R Depositary and Intercreditor Agreement"). The relative rights (including the respective collateral access and cooperation rights) of the Project Secured Parties, on the one hand, and J. Aron as the Inventory Financing Facility Agent and an Inventory Financing Secured Party (as such terms are defined in the A&R Depositary and Intercreditor Agreement), on the other, are set forth in the A&R Depositary and Intercreditor Agreement.   No J. Aron Secured Obligations (as defined below) are secured by any LBR Collateral under and as defined in the A&R Depositary and Intercreditor Agreement;

v.     the Security Agreement ("J. Aron Security Agreement"), by and between LBRM as Grantor and J. Aron, as secured party, pursuant to which LBRM granted J. Aron a first-priority security interest in and continuing lien (the "J. Aron Liens") on the "Collateral" under and as defined in the J. Aron Security Agreement ("Inventory Financing Collateral") which corresponds to the defined term "Inventory Financing Collateral" under and as defined in the A&R Depositary and Intercreditor Agreement.   Under the J. Aron Security Agreement and J. Aron Perfection Documents (as defined below), the Secured Obligations under and as defined in the J. Aron Security Agreement (the "J. Aron Secured Obligations") are secured by a perfected, first-priority security interest in and continuing lien on the Inventory Financing Collateral;

vi.     that certain UCC financing statement (with LBRM as debtor and J. Aron as secured party) that was filed with the U.S. Virgin Islands Office of the Lieutenant

Governor on March 5, 2020 (Filing No. 20200000134) and that certain UCC financing statement (with LBRM as debtor and J. Aron as secured party) that was filed with the Washington, D.C. Record of Deeds on March 4, 2020 (Filing No. 2020030037) (collectively, the "J. Aron Financing Statements");

vii.    that certain Deposit Account Control Agreement, dated as of March 3, 2020, among LBRM as Grantor, Oriental Bank as Depositary Bank and J. Aron as Secured Party  (the "J. Aron DACA", and together with the A&R Depositary and Intercreditor Agreement and the J. Aron Financing Statements, collectively, the "J. Aron Perfection Documents");

viii.    that certain Subordinated Guarantee, made by LBR and LBRO in favor of J. Aron, dated as of March 3, 2020 ("Subordinated Guarantee"), each of LBR and LBRO jointly and severally guaranteed LBRM's payment obligations under the J. Aron Transaction Documents as and when due ("Guaranteed Obligations"), subject to the terms of the "Terms of Subordination" under and as defined therein, which provide that, among other things, the Guaranteed Obligations are subordinated in right of payment to the prior payment in full in cash of all Secured Obligations under and as defined in the A&R Depositary and Intercreditor Agreement; and

ix.    additional agreements related to the supply, marketing, storage, the initial sale of Feedstock and Product by LBRM to J. Aron and other transactions contemplated by the J. Aron Supply and Offtake Agreement, the J. Aron Marketing and Sales Agreement, the J. Aron Financing Agreement and the J. Aron Monetization Master Agreement.

(b)      J. Aron's IFF Property.  J. Aron owns all right, title and interest in the IFF Property (as defined in the A&R Depositary and Intercreditor Agreement), which consists of Feedstock and Product owned by J. Aron.  No Debtor has any right, title, or interest in the IFF Property, and accordingly, the IFF Property is not property of the estate under section 541 of the Bankruptcy Code.

(c)      J. Aron Termination.  On June 25, 2021 (the "J. Aron Early Termination Date"), as a result of certain events of default that had occurred and were continuing in respect of LBRM, LBR and LBRO, J. Aron properly and validly exercised its right pursuant to the J. Aron Transaction Documents of declaring an early termination date whereby, among other things, all commitments of J. Aron to provide any intermediation or to purchase or sell Feedstock or Products were terminated, all loans under the Financing Agreement became immediately due and payable and all of the obligations of the Transaction Entities under the J. Aron Transaction Documents (other than that certain Terminal Services Agreement (Included Locations), dated as of March 3, 2020, by and among LBT, LBRM and J. Aron) became due and payable on June 25, 2021.  As a result of such early termination, pursuant to the J. Aron Supply and Offtake Agreement and as set forth in certain other of the J. Aron Transaction Documents, J. Aron has the right to liquidate and has commenced the liquidation of its own IFF Property.

(d)      J. Aron Safe Harbor Agreements. J. Aron is a "forward contract merchant" (as such term is defined in the Bankruptcy Code and used in section 556 of the Bankruptcy Code) and each purchase and sale agreed to under the Safe Harbor Agreements (as defined in the J. Aron Monetization Master Agreement, collectively, the "Safe Harbor Agreements") constitutes a "forward contract" (as such term is defined in the Bankruptcy Code and used in Section 556 of the Bankruptcy Code); (b) J. Aron is a "master netting agreement participant" and each Safe Harbor

Agreement constitutes a "master netting agreement" for all purposes as each such term is defined in sections 101(38A) and 101(38B) of the Bankruptcy Code and as used in Section 561 of the Bankruptcy Code; (c) J. Aron's, as the Non-Defaulting Party, right to liquidate, collect, net and set off rights and obligations under the Safe Harbor Agreements, and liquidate the Safe Harbor Agreements is not stayed, avoided, or otherwise limited by the Bankruptcy Code, including sections 362(a), 547, 548 or 553 thereof, and J. Aron is entitled to the rights, remedies and protections afforded by and under, among other sections, sections 362(b)(6), 362(b)(17), 362(b)(27), 546(e), 546(g), 546(j), 548(d), 553, 556, 560, 561 and 562 of the Bankruptcy Code.

(e)     All of the Debtors' cash, including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Inventory Financing Collateral (excluding Margin) constitutes Cash Collateral of J. Aron.

(f)     Enforceability of J. Aron Liens and J. Aron Secured Obligations. (i) The J. Aron Liens on the Inventory Financing Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, J. Aron for fair consideration and reasonably equivalent value, (ii) the J. Aron Transaction Documents are fully enforceable in accordance with their terms; (iii) the J. Aron Liens were senior in priority over any and all other liens on the Inventory Financing Collateral, subject only to liens senior by operation of law or otherwise permitted by the J. Aron Transaction Documents (solely to the extent any such permitted liens were valid, properly perfected, nonavoidable, and senior in priority to the J. Aron Liens as of the Petition Date); (iv) the J. Aron Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the applicable Debtors enforceable in accordance with the terms of the applicable J. Aron Transaction Documents; (v) no offsets, setoffs, recoupments, challenges, objections, defenses, "claims" (as defined in the Bankruptcy Code), impairment, cross-claims,

17

counterclaims, or causes of action or any other challenge of any kind or nature by any person or entity to any of the J. Aron Liens or J. Aron Secured Obligations exist, and no portion of the J. Aron Liens or J. Aron Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, attachment, reduction, recovery or subordination (whether equitable, contractual, or otherwise) under or pursuant to the Bankruptcy Code or applicable non-bankruptcy law or principles of equity or any other applicable domestic or foreign law or regulation by any person or entity; and (vi) the Debtors, each for itself and its estate, irrevocably waive, discharge, and release any right to challenge or contest any of the J. Aron Secured Obligations or J. Aron Liens, the priority of such obligations and liens, and the scope, extent, validity, non-avoidability, priority, enforceability, seniority, perfection, or extent of the J. Aron Liens and J. Aron Secured Obligations.

(g)     <u>Outstanding J. Aron Secured Obligations</u>.   As of the Petition Date, the applicable Debtors were indebted to J. Aron, without objection, defense, counterclaim or offset of any kind, in an amount not less than $24,968,754.95 in principal amount of loans outstanding under the J. Aron Financing Agreement.  In addition, J. Aron has commenced the process of liquidating all IFF Property in accordance with the terms of the Safe Harbor Agreements and the J. Aron Monetization Master Agreement and, if J. Aron is unable to liquidate such IFF Property and/or incurs losses or costs as a result of such liquidation and termination of J. Aron's rights and obligations under the Safe Harbor Agreements (including any Forward Contract Settlement Amount (as defined in the J. Aron Supply and Offtake Agreement)), the Debtors would be liable and owe to J. Aron, without objection, defense, counterclaim or offset of any kind, an aggregate amount of not less than such aggregate losses or costs, taking into account any gains, incurred or realized by J. Aron as a result of such liquidations and terminations with respect to the J. Aron

Transaction Documents.  Given that the liquidation of J. Aron's IFF Property has only recently commenced, the S&O Settlement Amount (as defined in the J. Aron Supply and Offtake Agreement) cannot be determined at this time.  Further, under the J. Aron Transaction Documents, the applicable Debtors are also liable to and owe J. Aron accrued (both before and after the Petition Date) and unpaid interest, fees, expenses and all other obligations under the J. Aron Transaction Documents, including attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the J. Aron Transaction Documents, plus Make-Whole Amounts (as defined in the J. Aron Monetization Master Agreement).

H.    Definitions.  The Revolver Secured Obligations, the Prepetition Term Obligations, and the J. Aron Secured Obligations are referred to collectively herein as the "Prepetition Secured Obligations."  The Prepetition Debt Liens and the J. Aron Liens are referred to collectively herein as the "Prepetition Liens."  The Prepetition Debt Collateral and the Inventory Financing Collateral are referred to collectively herein as the "Prepetition Collateral."  The Revolver Transaction Documents, the Prepetition Term Documents, and the J. Aron Transaction Documents, as those terms are defined herein or in the Motion, are referred to collectively herein as the "Prepetition Secured Documents."   The Prepetition Agents (as defined herein), Prepetition Secured Lenders and J. Aron are referred to collectively herein as the "Prepetition Secured Parties."

I.    Stipulations Regarding Prepetition Secured Documents and the Prepetition Holdco Loan Documents. Upon entry of the Interim Order, subject to paragraphs J and 42, the Debtors acknowledge, represent, stipulate, and agree as follows and make the releases and waivers set forth below:

(a)    No Control.  The Prepetition Secured Parties and the Prepetition Holdco Loan Secured Parties do not control the Debtors or their properties or operations or have the

authority to determine the manner in which the Debtors' operations are conducted, and each of the Prepetition Secured Parties and the Prepetition Holdco Loan Secured Parties is not a control person or insider (as defined in the Bankruptcy Code) of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from any of the Prepetition Secured Documents or the Prepetition Holdco Loan Documents.

(b)     No Claims, Causes of Action.  As of the date hereof, there exist no claims or causes of action against the Prepetition Secured Parties or the Prepetition Holdco Loan Secured Parties arising from, related to or connected with any of the Prepetition Secured Documents or the Prepetition Holdco Loan Documents that may be asserted by the Debtors.

(c)     Release.  The Debtors forever and irrevocably release, waive, discharge, and acquit each of the Prepetition Secured Parties and the Prepetition Holdco Loan Secured Parties and each of their respective officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Prepetition Secured Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened as of the date hereof including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, existing as of the date of this Interim Order, arising out of, in connection with, or relating to any of the Prepetition Secured Documents or the Prepetition Holdco Loan Documents, and ancillary documentation, guarantees, security

4823-3938-9938.1

documentation and collateral documents executed in support of the foregoing, the Prepetition Secured Obligations, the Prepetition Secured Holdco Debt Obligations, the Prepetition Liens, the Prepetition Holdco Financing Liens, J. Aron's title to or ownership of, or other rights in, the IFF Property and rights to setoff and net Margin (as defined in the J. Aron Monetization Master Agreement), and ancillary documentation, guarantees, security documentation and collateral documents executed in support of the foregoing or the transactions contemplated thereunder including, without limitation, (i) any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), so-called "lender liability" claims, counterclaims, cross-claims, recoupment, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Secured Parties or the Prepetition Holdco Loan Secured Parties.

J.    <u>Mezzanine Financing, Subordinated Notes, Prepetition Holdco Loan, and other Insider Obligations</u>. Certain Prepetition Holdco Loan Secured Parties and Lenders are insiders or affiliates of the Debtors. Nothing herein shall constitute a finding or ruling by this Court in favor of any affiliate (as defined in the Bankruptcy Code) or other insider (as defined in the Bankruptcy Code) of any Debtor (an "<u>Insider Creditor</u>") that any obligation of any Debtor to such Insider Creditor ("<u>Insider Obligation</u>"), including any Prepetition Holdco Secured Debt Obligations, LBV Subordinated Notes, or LBRH II Holdco Loan held by an Insider Creditor, is valid, senior, enforceable, prior, perfected, or non-avoidable. Nothing herein shall constitute a finding of fact, admission, or stipulation in favor of, or enforceable by, any Insider Creditor. No Insider Creditor

shall be entitled to any proceeds or other distributions on account of any Insider Obligation or any adequate protection absent further order of the Court. Moreover, nothing shall prejudice the rights of any party-in-interest, including but not limited to the Debtors and the Committee, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Insider Obligation and/or related security interests held by an Insider Creditor. In addition, nothing herein shall be deemed a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, (b) any "equities of the case" under section 552(b) of the Bankruptcy Code, or (c) the equitable doctrine of "marshaling" or any similar doctrine with respect to any Insider Obligations, in each case after payment in full of the DIP Obligations and the Prepetition Secured Obligations. No Insider Creditor shall be entitled to any release described herein. Nothing in this paragraph shall affect or impact the Prepetition Secured Obligations or Prepetition Holdco Secured Debt Obligations that are not owned by any Insider Creditor, any liens securing such obligations, or any adequate protection granted to the Prepetition Secured Creditors.

K.      <u>Necessity of DIP Financing</u>. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan Documents. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without (i) granting the DIP Agent, for the benefit of the DIP Secured Parties, superpriority claims and priming liens and security interests, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents and (ii) providing the Prepetition Secured Parties adequate protection as provided in this Interim Order. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the credit facility

provided under the DIP Loan Documents and the authorization to use Cash Collateral to be provided by the Prepetition Secured Parties represents the best and only working capital financing available to the Debtors at this time.  The Debtors have been unsuccessful in their attempts to find any alternative financing.  Additionally, the terms of the DIP Financing and the use of Cash Collateral are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The Prepetition Secured Parties have consented to the entry of this Interim Order after extensive negotiations and would not have consented to entry of this Interim Order absent each of the bargained for protections for the Prepetition Secured Parties set forth in this Interim Order.

L.      Purpose of DIP Financing.  The Debtors require the DIP Financing described in the Motion and as expressly provided in the DIP Loan Documents and this Interim Order to: (i) pay costs, fees and expenses associated with or payable under the DIP Financing under the terms of this Interim Order; (ii) pay professional fees subject to the Approved Budget (as defined below); (iii) provide ongoing working capital requirements of the Debtors and to pay fees, costs, expenses and other administrative expenses relating to the Chapter 11 Cases (including payments related to Adequate Protection Obligations (as defined below)), in each case, subject to any necessary Court approvals and consistent with the Approved Budget subject to any Budget Variances (defined below); and (iv) make the currently identified capital expenditures and other payments of postpetition payables as permitted under the DIP Loan Documents and this Interim Order, in each case subject to the conditions as set forth herein and in the DIP Loan Documents and this Interim Order and consistent in all material respects with the Approved Budget and any Budget Variances.

M.      Adequate Protection.  The Prepetition Secured Parties are entitled to receive adequate protection to the extent of any diminution in value of their interests in their prepetition

collateral (including Cash Collateral) pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code resulting from the sale, lease, or use by the Debtors (or other decline in value) of the prepetition collateral (including Cash Collateral), the relief granted herein in favor of the DIP Secured Parties, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code from and after the Petition Date (the "Adequate Protection Obligations"). Pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code, as adequate protection, the Prepetition Secured Parties shall receive payment of their reasonable and documented professional fees, postpetition replacement liens, adequate protection payments and superpriority adequate protection claims in accordance with the terms of this Interim Order.  Furthermore, the Prepetition Secured Parties will be entitled to certain reporting from the Debtors (including, among other things, copies of all reporting provided to the DIP Secured Parties) in accordance with the terms of this Interim Order.  The adequate protection provided to the Prepetition Secured Parties herein is consistent with the Bankruptcy Code.  The consent of the Prepetition Secured Parties to the use of Cash Collateral and the consent of the Prepetition Secured Parties to the priming of their liens by the DIP Liens (i) does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Parties that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise, and (ii) is conditioned upon entry of this Interim Order and does not and shall not be deemed to constitute consent other than pursuant to this Interim Order and the terms set forth herein.  The adequate protection provided herein and other benefits and privileges contained herein are necessary (a) in order to protect the Prepetition Secured Parties from any diminution in value of their Prepetition Collateral and (b) to obtain the foregoing consents and agreements.  Nothing herein shall prevent the Prepetition Secured Parties from seeking additional adequate protection to

4823-3938-9938.1

the extent permitted by law or to the extent permitted in the Prepetition Secured Documents, as applicable.  For the avoidance of doubt, this Interim Order shall be deemed to be a request by the Prepetition Secured Parties pursuant to section 363(e) of the Bankruptcy Code.

N.    <u>Approved Budget.</u>  Attached here as **<u>Exhibit B</u>** is a budget setting forth the Debtors' anticipated cash receipts and expenditures for the next three (3) weeks (the "<u>Initial Approved Budget</u>").  The "<u>Approved Budget</u>" shall mean the Initial Approved Budget, together with such modifications and amendments thereto as may be agreed to in form and substance by the DIP Agent and the ad hoc group of lenders under the Term Credit Agreement (the "<u>Ad Hoc Term Lender Group</u>"), the Term Administrative Agent, the Revolving Administrative Agent, and J. Aron (collectively with the Ad Hoc Term Lender Group, the Term Administrative Agent and Revolving Administrative Agent, and the Project Collateral Agent, the "<u>Prepetition Agents</u>"), subject to the conditions set forth in paragraph 26 hereof, which shall reflect the Debtors' good-faith projection of all weekly cash receipts and disbursements in connection with the operation of the Debtors' business during such three-week period, delivered pursuant to the terms of the DIP Loan Documents, delivered by the Debtors to counsel for the DIP Agent, the DIP Lenders and the Prepetition Agents.  The DIP Agent and the Prepetition Agents hereby expressly reserve all of their rights with respect to the approval of any budget covering the period after the expiration of the Initial Approval Budget, and nothing contained herein shall be deemed or construed to constitute the consent of any of the DIP Agent or the Prepetition Agents to any such budget.  The Approved Budget is an integral part of this Interim Order and has been relied upon by the DIP Secured Parties to provide DIP Financing and by the Prepetition Secured Parties to permit the use of Cash Collateral and consent to this Interim Order.

4823-3938-9938.1

O. <u>Good Cause</u>. Based upon the record presented to the Court by the Debtors, it appears that the ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents and to use Cash Collateral is vital to the Debtors and the Debtors' estates and creditors. The Debtors reasonably believe that the liquidity to be provided under the DIP Loan Documents and from the use of Cash Collateral will enable the Debtors to continue to safely and efficiently suspend the operation of their refinery facility, preserve and maximize the value of their businesses, and provide the Debtors with sufficient funding to pursue the necessary proceedings to restructure the Debtor's outstanding obligations. Good cause has, therefore, been shown for the relief sought in the Motion on an interim basis and for scheduling the Final Hearing.

P. <u>Good Faith</u>. The DIP Secured Parties, the Prepetition Secured Parties and each of their respective affiliates, subsidiaries, parents, officers, shareholders, directors, employees, investment advisers and sub-advisers, attorneys, and agents have acted in good faith in negotiating the terms of the DIP Loan Documents and this Interim Order. The DIP Financing, the DIP Loan Documents and the use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties and the Prepetition Secured Parties, and all of the obligations and indebtedness arising under, in respect of or in connection with the DIP Financing, the DIP Loan Documents and this Interim Order shall be deemed to have been extended by each of the DIP Secured Parties in accordance with the DIP Loan Documents, and the Prepetition Secured Parties' shall be deemed to have consented to the use of Cash Collateral, in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the DIP Liens, the DIP Superpriority Claims and the Adequate Protection Obligations shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits,

and privileges of this Interim Order regardless of whether this Interim Order is subsequently reversed, vacated, modified, or otherwise is no longer in full force and effect or the Chapter 11 Cases are subsequently converted or dismissed.

Q.      Consideration.  The Debtors will receive and have received fair consideration and reasonably equivalent value in exchange for access to the DIP Financing, and all other financial accommodations provided under the DIP Financing, the DIP Loan Documents and this Interim Order.

R.      No Liability to Third Parties.  The Debtors stipulate and this Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in accepting the Approved Budget or any future Approved Budget or in taking any other actions permitted by this Interim Order or the DIP Loan Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

S.      Section 552.  Subject to entry of a Final Order, in light of the subordination of their liens and super-priority administrative claims (i) in the case of the DIP Secured Parties, to the Carve Out and the Permitted Prior Liens, and (ii) in the case of the Prepetition Secured Parties, to the Carve Out and the DIP Liens, each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply to any of the DIP Secured Parties or the Prepetition Secured Parties with respect to the proceeds, products, rents, issues or profits of any of the DIP Collateral or the Prepetition Collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in

4823-3938-9938.1

bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral or the Prepetition Collateral under section 552(b) of the Bankruptcy Code.  Subject to entry of the Final Order, the Debtors shall be deemed to have irrevocably waived, and to have agreed not to assert, any claim or right under section 552 of the Bankruptcy Code seeking to avoid the imposition of the DIP Liens, Prepetition Liens or the Prepetition Secured Parties' replacement liens granted under this Interim Order (the "Adequate Protection Liens") on any property acquired by any of the Debtors or any of their estates or, subject to the Carve Out, seeking to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Secured Parties or the Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral, as applicable.

T.      Immediate Entry of Interim Order.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  The permission granted herein to enter into the DIP Loan Documents, obtain funds thereunder and use Cash Collateral on an interim basis in accordance with the Approved Budget is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and loss of valuable assets and rights of the Debtors' estates.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors and the Debtors' estates and creditors as its implementation will, among other things, allow for the continued flow of supplies and services to the Debtors necessary to enable the Debtors to safely and efficiently administer their refinery facility during the pendency of these Chapter 11 Cases.  Based upon the foregoing findings, acknowledgements, and conclusions; and upon the record made before this Court at the Interim Hearing; and good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED:**

1.    <u>Disposition</u>.  The Motion is granted on an interim basis to the extent set forth herein, the DIP Financing described herein is authorized and approved, and the use of Cash Collateral and provision of adequate protection is authorized, in each case subject to the terms of this Interim Order and the DIP Loan Documents.  Any objections to the Motion that have not previously been withdrawn, waived, settled, or resolved and all reservations of rights included therein are hereby denied and overruled on their merits.  This Interim Order shall constitute findings of fact and conclusions of law.

2.    <u>Effectiveness</u>.  Subject to the terms hereof, this Interim Order shall be immediately valid upon signing by the Court and effective and enforceable upon the date entered on the docket in the Chapter 11 Cases (the "<u>Interim Order Entry Date</u>").

3.    <u>Authorization of the DIP Financing and DIP Loan Documents</u>.

    (a)    The Debtors are hereby authorized to execute and enter into the DIP Loan Documents.  The DIP Loan Documents and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders in connection with the DIP Financing.

    (b)    The Borrower is hereby authorized on an interim basis to borrow, and the Guarantors are hereby authorized on an interim basis to guarantee, up to the principal amount of $5.5 million (plus such additional principal amounts due solely to payment of interest in-kind), pursuant to the terms of the DIP Loan Documents and this Interim Order and at the times set forth in the Approved Budget, all of which shall be used by the Debtors as expressly permitted by the DIP Loan Documents, this Interim Order, the Approved Budget and any Budget Variances.  The Debtors are authorized to use proceeds of the DIP Financing in accordance with this Interim Order and the Approved Budget in an amount that would not cause either: (i) all line items other than

Professional Fees from varying from the applicable Approved Budget by more than twenty percent (20%) for each week during any budget period or ten percent (10%) on a cumulative basis for that portion of the budget period then ended; (ii) with respect to Professionals Fees, the Debtors may vary from the applicable budget by no more than ten percent (10%) on a cumulative basis for that portion of the Budget, and (iii) actual cash receipts, if any, received by the Borrower may not be less than ninety percent (90%) of the amounts set forth in the Budget (a "Budget Variance").  The variance reports showing budget to actual and any variance shall be delivered by the Debtors to the DIP Agent and counsel to each of the Prepetition Agents.

(c)     In furtherance of the foregoing and without further approval of this Court, but subject to the terms of this Interim Order, the Debtors are authorized to, and, if so required under the terms of the DIP Loan Documents, directed to perform all acts to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all related fees and expenses, that may be required or necessary for the Debtors' performance of their obligations under the DIP Financing, including, without limitation:

i.     the execution, delivery, and performance of the DIP Loan Documents, including, without limitation, any security and pledge agreements, and any mortgages contemplated thereby;

ii.     subject to paragraph 10 hereof, the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case in such form as agreed among the Debtors and the required other parties as set forth in more detail in paragraph 10 below;

iii.        the non-refundable payment of the fees referred to in the DIP Loan Documents, including the fees of the DIP Agent, and, subject to paragraph 8, costs and expenses payable under the DIP Loan Documents;

iv.        make payments on account of the Adequate Protection Obligations provided for in this Interim Order; and

v.        the performance of all other acts required under or in connection with the DIP Loan Documents.

4.        <u>DIP Obligations</u>.  This Interim Order and the DIP Loan Documents shall evidence the DIP Obligations, which DIP Obligations shall, upon execution of the DIP Loan Documents, be valid, binding and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing, or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.  All obligations incurred, payments made, and transfers or grants of security and liens set forth in this Interim Order and the DIP Loan Documents by any Debtor are granted to or for the benefit of the Debtors for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby.  No obligation, payment, transfer, or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any avoidance, reduction, setoff, recoupment, offset,

recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

5.    Carve-Out.  The Debtors' obligations to the DIP Secured Parties and the liens, security interests and superpriority claims granted herein and/or under the DIP Loan Documents, including the DIP Liens, the DIP Superpriority Claims, and the Adequate Protection Obligations, shall be subject and subordinate to the Carve-Out.  "Carve-Out" shall mean (i) fees and expenses incurred by bankruptcy professionals (x) whose retention has been approved by the Bankruptcy Court which are incurred as of the delivery of the Carve-Out Trigger Notice (as defined below) and (y) provided for in the Approved Budget; (ii) fees and expenses in an amount not to exceed $375,000 incurred from and after the delivery of a Carve-Out Trigger Notice (as defined below) by bankruptcy professionals whose retention has been approved by the Bankruptcy Court (the "Post-Termination Fee Carve-Out"); and (iii) fees owed pursuant to 28 U.S.C. §1930 or fees owed the clerk of the Bankruptcy Court.  "Carve-Out Trigger Notice" shall mean the written notice, including by email, delivered by the DIP Agent (at the direction of the DIP Lenders) or, after the DIP Financing has been indefeasibly paid in full and in cash (a "DIP Repayment Event"), by any of the Prepetition Agents, to the Debtors, their counsel, the U.S. Trustee, and counsel to the Committee, and prior to a DIP Repayment Event, counsel to the Prepetition Agents, which notice may be delivered following the occurrence and during the continuation of an Event of Default or the Termination Date in accordance with the terms of the DIP Loan Documents or, following a DIP Repayment Event, following the occurrence and during the continuation of a Cash Collateral Termination Event (as defined below) or the Cash Collateral Termination Date (as defined below).

4823-3938-9938.1

Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the DIP Secured Parties, the Prepetition Secured Parties or any of their respective officers, directors, employees, agents, advisers and counsel, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the (i) DIP Loan Documents in favor of the DIP Agent, for the benefit of the DIP Secured Parties or (ii) the Prepetition Secured Documents, for the benefit of the Prepetition Secured Parties, as applicable. For the avoidance of doubt, until the delivery of a Carve-Out Trigger Notice, the Borrower shall be permitted to pay fees and expenses incurred by bankruptcy professionals whose retention has been approved by the Bankruptcy Court as the same shall become due and payable, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order (the payment of which shall not reduce the Post-Termination Fee Carve-Out). Notwithstanding anything to the contrary herein, in the DIP Loan Documents, or in any loan or financing documents, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, any prepetition secured obligations, and any and all other forms of adequate protection, liens or claims securing the DIP Obligations or any prepetition secured obligations. For the avoidance of doubt, no IFF Property or proceeds thereof, and, until the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement), no Inventory Financing Collateral or proceeds thereof, shall be used to fund the Carve-Out and the Carve Out shall not be secured by the Inventory Financing Collateral or IFF Property. None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or

disbursements of any professional person whose retention is approved by the Bankruptcy Court in connection with the Chapter 11 Cases or any Successor Cases. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any professional person whose retention is approved by the Bankruptcy Court or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. None of the proceeds of the DIP Collateral or the DIP Loans shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the DIP Financing. In addition, none of the proceeds of the DIP Collateral, the DIP Loans, or the Prepetition Collateral shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the Prepetition Secured Documents (provided that, notwithstanding anything to the contrary herein, the Committee may use proceeds of the DIP Financing and/or the DIP Collateral (including Cash Collateral) to investigate but not to prosecute (i) the claims and liens of the Prepetition Secured Parties, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties up to an aggregate cap of $50,000 (the "Committee Investigation Budget")).

6.      DIP Lender Superpriority Claim. Subject to the Carve-Out and the Aron Rights (as defined below), and effective as of the Interim Order Entry Date, the DIP Secured Parties are hereby granted, pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code, an allowed

superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (the "DIP Superpriority Claims") on account of the DIP Obligations with priority over any and all other administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which allowed claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and their estates and all proceeds thereof, excluding Avoidance Actions (as defined below) but, subject to entry of the Final Order, including, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations, Avoidance Proceeds (as defined below).

   7. <u>DIP Liens</u>.

   (a) As security for the DIP Obligations, effective and perfected as of the Interim Order Entry Date, the following security interests and liens, hereby are granted by the Debtors to the DIP Agent for the benefit of the DIP Lenders on the DIP Collateral as defined herein.  The "<u>DIP Collateral</u>" shall mean all property of the Debtors of any kind or nature whatsoever, including, but not be limited to, (i) all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Debtors, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other

general intangibles, any claims and causes of action of the Debtors, including claims under section

549 of the Bankruptcy Code; (ii) any commercial tort claims and causes of action of any of the

Debtors against any directors or officers of the Debtors as well as including any proceeds of, or

property recovered in connection with, any successful claims and causes of action against any

directors or officers of the Debtors; and (iii) excluding (x) the IFF Property, and (y) any claims

and causes of action of the Debtors under sections 502(d), 544, 545, 547, 548, 550, and 553 of the

Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable

law (collectively, the "Avoidance Actions"), but, subject to entry of the Final Order, including,

solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations

secured by the DIP Liens (as defined below), any proceeds of, or property recovered in connection

with, any successful Avoidance Action (whether by judgment, settlement or otherwise, and

unencumbered or not, the "Avoidance Proceeds").  All such liens on and security interests in the

DIP Collateral granted to the DIP Secured Parties, pursuant to this Interim Order or the DIP Loan

Documents (collectively, the "DIP Liens"), are as follows:

        i.        Priming Lien Pursuant to Section 364(d)(1).   A first priority,

priming security interest in and lien on, pursuant to section 364(d)(1) of the Bankruptcy Code, all

encumbered DIP Collateral (the "Section 364(d)(1) Liens"), which Section 364(d)(1) Liens shall

be senior to any existing liens or claims, including, but not limited to, the Prepetition Liens of the

Prepetition Secured Parties or postpetition liens granted to the Prepetition Secured Parties

(collectively, the "Prepetition Secured Parties Liens"), and subject and junior only to (i) the Carve-

Out, (ii) valid, perfected, and non-avoidable liens on property of a Debtor that are in existence on

the Petition Date and are senior in priority to any of the Prepetition Secured Parties Liens, (iii) all

liens, recoupment and setoff rights held by J. Aron (the "Aron Rights" and collectively with clause (ii), the "Permitted Prior Liens");

           ii.       First Priority Lien on Unencumbered Property Pursuant to Section 364(c)(2).  A first priority security interest in and lien on, pursuant to section 364(c)(2) of the Bankruptcy Code, all unencumbered DIP Collateral (the "Section 364(c)(2) Liens"), which Section 364(c)(2) Liens shall be subject only to the Carve-Out;

           iii.       Junior Lien on Inventory Financing Collateral Pursuant to Section 364(c)(3). A valid, binding, continuing, enforceable, fully-perfected, nonavoidable, automatically and properly perfected junior lien on and security interest in all Inventory Financing Collateral, which lien and security interest shall be subordinate and subject to the Aron Rights and subject to the Carve-Out;

           iv.       Junior Lien on Certain Encumbered Property Pursuant to Section 364(c)(3). A junior security interest in and lien on, pursuant to section 364(c)(3) of the Bankruptcy Code, all other DIP Collateral that is subject to a Permitted Prior Lien (the "Section 364(c)(3) Liens,") which Section 364(c)(3) Liens also shall be subject to the Carve-Out;

           v.       Liens Senior to Certain Other Liens.  The DIP Liens shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) any liens arising after the Petition Date including, without limitation, liens granted under prior orders of the Court, or any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtors.

        (b)       The DIP Liens shall be effective and perfected upon the Petition Date.

(c)     The DIP Liens shall be and hereby are fully perfected liens and security interests, effective and perfected upon the Petition Date without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, or other agreements or documents, such that no additional steps need be taken by the DIP Secured Parties to perfect such liens and security interests.  Subject to entry of the Final Order, and subject to applicable non-bankruptcy law, any provision of any lease, agreement, contract, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors, or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, shall have no force or effect with respect to the transactions granting the DIP Liens in the Debtor's interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof.

(d)     The DIP Liens, DIP Superpriority Claims, and other rights, benefits, and remedies granted under this Interim Order to the DIP Secured Parties shall continue in the Chapter 11 Cases, any Successor Cases, and following any dismissal of the Chapter 11 Cases, and such liens, security interests, and claims shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and all of the commitments thereunder have been terminated in accordance with the DIP Loan Documents.

8.      <u>Fees and Expenses of DIP Agent and Prepetition Secured Parties</u>.

(a)      Upon entry of this Interim Order, the Debtors shall pay any and all prepetition fees, costs, and expenses incurred by the DIP Agent that were outstanding and unpaid as of the Petition Date, in an amount not to exceed $75,000.

(b)      The Debtors shall, no later than ten (10) days after receipt of a summary statement setting forth the applicable timekeepers, as well as the hours worked by and expenses incurred by such timekeepers, in connection with the Chapter 11 Cases whether incurred before or after the Petition Date (with copies provided via electronic mail to the U.S. Trustee, counsel to the Committee, counsel to the DIP Agent, and counsel to each of the Prepetition Secured Parties), indefeasibly pay or reimburse (i) the DIP Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges as provided in the Approved Budget (collectively, the "DIP Agent Professional Fees"), including, but not limited to, the reasonable fees, costs, and expenses of Gray Reed & McGraw LLP as counsel to DIP Agent, and any other advisors or professionals retained by the DIP Agent, (ii) the Project Collateral Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisors or professionals retained by the Project Collateral Agent, (iii) the Revolving Administrative Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisors or professionals retained by the Revolving Administrative Agent, (iv) J. Aron for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisors or professionals retained by J. Aron; (v) the Ad Hoc Term Lender Group for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and

expenses of outside counsel, and any other advisor or professionals retained by the Ad Hoc Term Lender Group; and (vi) the Term Administrative Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs and expenses of outside counsel, and any other advisors or professionals retained by the Term Administrative Agent.  The Debtors, the U.S. Trustee, the Committee, the DIP Agent, and each of the Prepetition Secured Parties may object to the reasonableness of the fees, costs, and expenses included in any such professional fee invoice; *provided* that any such objection shall be barred and deemed waived unless filed with this Court and served on the applicable professional by 12:00 Noon, prevailing Central Time, on the date that is no later than ten (10) days after the objecting party's receipt of the applicable professional fee invoice.  If such objection is timely received, the Debtors shall promptly pay the portion of such invoice not subject to such objection, and this Court shall determine any such objection unless otherwise resolved by the applicable parties.  Any hearing on an objection to payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses which are the subject of such objection and whether the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, or Term Administrative Agent, as the case may be, is entitled to such fees, costs and expenses under this Interim Order.  For the avoidance of doubt, none of the fees, costs, and expenses of the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, or Term Administrative Agent, shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  All fees, costs and expenses payable under the DIP Loan Documents to the DIP Agent shall be included and constitute part of the DIP Obligations and be secured by the DIP Liens.

Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, and Term Administrative Agent, under and in connection with negotiation and preparation of the DIP Loan Documents, including, without limitation, the legal fees and expenses of any professionals retained by them, shall be earned, non-refundable, and payable out of the interim funding under the DIP Financing and shall not be subject to the notice period described in this paragraph and the recipients of such payments shall be fully entitled to all protections of section 364(e) of the Bankruptcy Code.  For the avoidance of doubt, the Debtors shall be responsible to pay, subject to the procedures outlined in this paragraph, all fees and expenses incurred by the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, and Term Administrative Agent, in connection with any action taken in these Chapter 11 Cases including, but not limited to, fees and expenses relating to the DIP Financing and the administration and interpretation of, and the enforcement of remedies under, the DIP Financing and including all due-diligence, including but not limited to printing costs, consultation, travel, and attendance at court hearings, regardless of whether the DIP Financing is consummated.

       9.    <u>Prepetition Secured Parties' Rights and Adequate Protection</u>.

       (a)    <u>Adequate Protection for Prepetition Term Lenders</u>.  As adequate protection for any diminution of the Prepetition Debt Collateral resulting from the subordination of the Term Administrative Agent's Prepetition Debt Liens to the DIP Liens and the other relief granted herein in favor of the DIP Secured Parties, the Debtors' use of Prepetition Collateral (including Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and in exchange for the Term Lenders' consent to the priming of the Prepetition Debt Liens by the DIP Liens pursuant to this Interim Order, the Term Administrative Agent shall receive, for

4823-3938-9938.1

the benefit of Prepetition Term Lenders, adequate protection, including, without limitation, (1) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition, (2) monthly payments to reimburse the reasonable and documented professional fees of the Ad Hoc Term Lender Group, the Term Administrative Agent and Project Collateral Agent in accordance with paragraph 8 of this Interim Order, (3) in lieu of cash payments of interest when and as required under the Prepetition Term Credit Agreement, all accrued and unpaid interest shall, on each applicable date when such interest payments are due under the Prepetition Term Documents, be paid in kind by adding the amount of such accrued interest to the outstanding aggregate principal balance of the term loans, (4) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or any Successor Cases, with priority as provided therein, to the extent of any diminution in the Prepetition Debt Collateral,  (5) upon entry of this Interim Order, payment of all fees and expenses of the professional advisors of the Ad Hoc Term Lender Group, Term Administrative Agent and Project Collateral Agent that were incurred prior to the Petition Date and that remain unpaid, and (6) an acknowledgement of the unconditional right to credit bid the Prepetition Term Obligations under the Prepetition Term Documents in connection with any sale of Prepetition Debt Collateral.

(b)      Adequate Protection for Revolver Lenders.  As adequate protection for any diminution of the Prepetition Debt Collateral resulting from the subordination of the Revolving Administrative Agent's Prepetition Debt Liens to the DIP Liens and the other relief granted herein in favor of the DIP Secured Parties, the Debtors' use of Prepetition Collateral (including Cash

Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and in exchange for the Revolver Lenders' consent to the priming of the Prepetition Debt Liens by the DIP Liens pursuant to this Interim Order, the Revolving Administrative Agent shall receive, for the benefit of the Revolver Lenders, adequate protection, including, without limitation, (1) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition, (2) monthly payments to reimburse the reasonable and documented professional fees of the Revolver Administrative Agent and Project Collateral Agent in accordance with paragraph 8 of this Interim Order, (3) on the last business day of each month, payments in cash to the Revolver Lenders in an amount equal to all interest (other than default interest) accrued under the Revolver Transaction Documents, (4) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or any Successor Cases, with priority as provided therein, to the extent of any diminution in the Prepetition Debt Collateral, (5) upon entry of this Interim Order, payment of all fees and expenses of the professional advisors of the Revolving Administrative Agent and Project Collateral Agent that were incurred prior to the Petition Date and that remain unpaid, and (6) an acknowledgement of the unconditional right to credit bid the prepetition obligations under the Revolver Transaction Documents in connection with any sale of Prepetition Debt Collateral.

(c)     Adequate Protection for J. Aron.  As adequate protection for any diminution of J. Aron's interests in its Inventory Financing Collateral resulting from the relief granted herein in favor of the DIP Secured Parties, the Debtors' use of J. Aron's Prepetition Collateral (including Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the

Bankruptcy Code, J. Aron shall receive adequate protection, including, without limitation, (1) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition, (2) monthly payments to reimburse the reasonable and documented professional fees of J. Aron in accordance with paragraph 8 of this Interim Order, (3) on the last business day of each month payments in cash to J. Aron in an amount equal to all interest (other than default interest) accrued under the J. Aron Transaction Documents, (4) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or any Successor Cases, with priority as provided therein, to the extent of any diminution in the Inventory Financing Collateral, and (5) upon entry of this Interim Order, payment of all fees and expenses of the professional advisors of J. Aron that were incurred prior to the Petition Date and that remain unpaid, and (6) an acknowledgement of the unconditional right to credit bid the prepetition obligations under the J. Aron Transaction Documents in connection with any sale of Inventory Financing Collateral.

(d)     <u>Reservation of Rights</u>.  The rights of all parties with respect to the appropriate characterization (as payments of principal, payments of interest, or otherwise) of any adequate protection payments made (whether in cash or in kind) in accordance with the foregoing are expressly preserved.

(e)     <u>Unconditional Right to Credit Bid</u>.  Each of the Prepetition Secured Parties shall have the unconditional right to credit bid its Prepetition Secured Obligations in connection with the sale of any of its Prepetition Collateral.

(f)     <u>Weekly Meetings</u>. The Debtors shall arrange for weekly (unless waived by the Prepetition Secured Parties in their sole and absolute discretion) status calls with the Prepetition Secured Parties and their advisors, and shall cause the Debtors' advisers and chief restructuring officer to participate to discuss (A) the Approved Budget, any Budget Variances and any other reports or information delivered by the Debtors, (B) the financial operations and performance of the Debtors' business, (C) progress in achieving the Milestones (as defined below) and any wind-down, liquidation, or going concern sale or marketing process or efforts, (D) the status of the Chapter 11 Cases generally, and (E) such other matters relating to the Debtors as the Prepetition Secured Parties (or their respective agents or advisors) shall reasonably request ("<u>Weekly Meetings</u>").  The DIP Agent and its counsel may attend the Weekly Meetings at their discretion.

(g)     <u>Milestones</u>. The Debtors shall have (i) prepared a contingency plan for the wind-down of the Debtors' operations in the event that a going concern sale is not achieved, which plan shall be reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (ii) prepared a 13-week budget that is reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (iii) filed with the Court a motion requesting approval of proposed bidding procedures that are reasonably acceptable to the Prepetition Secured Parties and that adhere to the milestones described in clauses (iv) and (v) below no later than ten (10) business days after the Petition Date, (iv) obtained, within sixty (60) calendar days after the Petition Date, a binding stalking horse bid for the sale of all or substantially all of the Debtors' assets which bid shall be reasonably acceptable to each Prepetition Secured Party, and (v) completed the closing of a sale of all or substantially all of the Debtors' assets that is reasonably acceptable to each Prepetition

Secured Party, within one hundred twenty (120) calendar days after the Petition Date (collectively with (i) through (iv), the "Milestones").

(h)    Adequate Protection of Limetree Bay Terminals. To the extent Limetree Bay Terminals, LLC, ("LBT") holds a valid, perfected, and unavoidable lien on any DIP Collateral in existence as of the Petition Date, and solely to the extent of any diminution in value of such lien, if any, LBT shall receive a replacement lien for such diminution to the same extent validity and priority as its pre-petition lien.   Nothing in this Interim Order shall be a determination of the validity, priority, or extent of any lien or claim asserted by LBT, and the rights of all parties as to such issues are preserved.  For the avoidance of doubt, any such replacement lien will not attach to the IFF Property.

(i)    Financial Reporting.  The Debtors shall provide the advisors to the Ad Hoc Term Lender Group, the Revolving Administrative Agent (on behalf of the Revolving Lenders), and J. Aron, with the financial reporting and inspection rights described more fully in paragraph 12 below.

(j)    Right to Seek Additional Adequate Protection.  Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties in this Interim Order is without prejudice to the right of the Prepetition Secured Parties to seek at any time, including, without limitation, in connection with the Final Order, modification of the grant of adequate protection provided hereby so as to provide different or additional forms of adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest such modification.  Nothing herein shall be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Secured Parties under their respective Prepetition Secured Documents or under equity or law, and the Prepetition Secured Parties expressly reserve all of

their respective rights and remedies whether now existing or hereafter arising under their respective Prepetition Secured Documents, equity, and law in connection with all termination events and defaults and events of default under such agreements or hereunder.

10.     <u>Amendments, Consents, Waivers, and Modifications</u>.   The Debtors, with the express written consent of the DIP Agent, may enter into any amendments, consents, waivers, or modifications to the DIP Loan Documents that are not materially adverse to the Debtors without the need for further notice and hearing or any order of this Court; *provided*, *however*, that, without the approval of the Court on notice and a hearing, no such amendments, consents, waivers or modifications shall (i) shorten the maturity of the DIP Financing, (ii) increase the commitments thereunder or the rate of interest payable under the DIP Loan Documents, (iii) require the payment of any new or additional fee, or (iv) amend the Events of Default or covenants in the DIP Loan Documents to be materially more restrictive to the Debtors; *provided, further,* that any amendment, modification, waiver, or consent that adversely affects the rights or economic interest of any Prepetition Secured Party shall require the prior written consent of such Prepetition Secured Party; and *provided, further,* that any amendments, modification, waiver, or consent to or in respect of Section 10.05(b)(v) of the DIP Credit Agreement shall require the prior written consent of each Prepetition Agent.   No consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Secured Parties or any of the Prepetition Secured Parties.

11.     <u>Perfection of DIP Liens and Prepetition Secured Parties' Adequate Protection Liens</u>.

(a)     The DIP Agent, and the Prepetition Secured Parties, as applicable, are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments (subject to Borrower's prior

review and approval, not to be unreasonably withheld, conditioned or delayed) in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, in each case, without the necessity to pay any mortgage recording fee or similar fee or tax.  Whether or not the DIP Agent, on behalf of the DIP Secured Parties, or the Petition Secured Parties, in their respective sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall, to the extent provided in this Interim Order, be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination upon entry of this Interim Order. The Debtors shall, if requested, execute and deliver to the DIP Agent or the Prepetition Secured Parties, as applicable, all such agreements, financing statements, instruments and other documents as the DIP Agent or the Prepetition Secured Parties may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the DIP Liens or the Prepetition Secured Parties' Adequate Protection Liens, as applicable, and all such documents will be deemed to have been recorded and filed as of the Filing Date.

(b)	A certified copy of the Interim Order may be filed by the DIP Agent or the Prepetition Secured Parties with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Order for filing and recording.

12.	<u>Financial Reporting and Inspection Rights</u>. The Debtors shall provide the advisors to the DIP Agent, Ad Hoc Term Lender Group, the Term Administrative Agent, the Revolving

Administrative Agent (on behalf of the Revolving Lenders), the Project Collateral Agent and J. Aron, with the financial and other reporting as described in the DIP Loan Documents and the Prepetition Secured Documents, in addition to (i) any financial reporting given to the U.S. Trustee and (ii) any additional reports reasonably requested by and of the DIP Agent and the Prepetition Secured Parties. The Debtors shall deliver to each of the DIP Agent, the Ad Hoc Term Lender Group, the Term Administrative Agent, the Revolving Administrative Agent (on behalf of the Revolving Lenders), the Project Collateral Agent, and J. Aron, and their respective counsel financial reporting information in a timely manner that is requested by any of them in writing, and shall make personnel available to answer questions concerning such financial reporting and the operations of the Debtors during normal business hours on no less than two (2) business days' advance notice to Debtors' counsel, and within five (5) business days of the request being made to Debtors' counsel unless otherwise agreed to by the parties. The Debtors shall provide the DIP Agent, the Ad Hoc Term Lender Group, the Term Administrative Agent, the Revolving Administrative Agent, the Project Collateral Agent, and J. Aron and their respective agents, representatives, or professionals, with access to, and on-site inspections of, the Debtors' property and company records, as may be reasonably requested, during normal business hours, on no less than two (2) business days' advance notice to Debtors' counsel, and within five (5) business days of the request being made to the Debtors' counsel, unless the parties agree otherwise on the actual inspection date. The Debtors shall promptly provide the DIP Agent with any information or documents that are provided to the Term Administrative Agent, the Revolving Administrative Agent, the Project Collateral Agent and J. Aron and vice versa.

13. <u>Third Parties</u>. Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Secured Parties contained in this Interim

Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, following entry of an order granting a Stay Relief Motion (defined below) as set forth in paragraph 17(c) hereof and solely to the extent the applicable DIP Collateral is not subject to a Permitted Prior Lien, upon three (3) Business Days' written notice to the landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred under the DIP Loan Documents and that the DIP Agent is permitted to exercise remedies, the DIP Agent (i) may, only subject to any separate agreement by and between the applicable landlord or licensor (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) subject to applicable law, shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade-names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien or license of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder.  To the extent applicable law prohibits the forgoing access or use of rights, the DIP Agent shall have the right to an expedited hearing on five (5) Business Days' notice to obtain Court authorization to obtain such access or use of such rights.

14.   <u>Automatic Stay Modified</u>.   The automatic stay provisions of section 362 of the Bankruptcy Code hereby are vacated and modified without the need for any further order of this Court to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to grant the Prepetition Secured Parties' Adequate Protection Liens, and to

perform such acts as the Prepetition Secured Parties may request to assure the perfection and priority of the Prepetition Secured Parties' Adequate Protection Liens; (c) the Debtors to incur all liabilities and obligations, including all of (i) the DIP Obligations, to the DIP Secured Parties and (ii) the Adequate Protection Obligations to the Prepetition Secured Parties, in each case as contemplated under this Interim Order and the DIP Loan Documents; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order, including any Adequate Protection Obligations; (e) the DIP Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order; (f) the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to exercise the rights and remedies set forth in paragraph 17 hereof, upon the occurrence of a Termination Event (as defined below); (g) the Prepetition Secured Parties to exercise the rights and remedies under their respective Prepetition Secured Documents, as applicable, pursuant to paragraph 17(c) hereof; (h) without a determination that the automatic stay applies, but out of an abundance of caution, J. Aron to retain and apply amounts received from the liquidation of its IFF Property to obligations owed by the Debtors to J. Aron under the J. Aron Transaction Documents; (i) upon entry of a Final Order, J. Aron to set off and net any Margin (as defined in the J. Aron Master Monetization Agreement) against any obligations owed by the Debtors to J. Aron under the J. Aron Transaction Documents; (j) the Debtors to perform under the DIP Loan Documents and any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and any transactions contemplated therein or in this Interim Order; and (k) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents, in each case without further notice, motion or application to, or order of, or hearing before, this

Court, subject to the terms of this Interim Order, except that to the extent any Prepetition Secured Party seeks to enforce its respective rights, benefits, privileges, remedies under, or provisions of, this Interim Order and the Prepetition Secured Documents against property of the Debtors' estates (other than any such rights, benefits, privileges, or remedies described in clauses (h) and (i)), such Prepetition Secured Party shall provide the Debtors with ten (10) days written notice prior to any such enforcement. The Debtors and DIP Lenders have consented to the exercise of rights, benefits, privileges, and remedies described in clauses (h) and (i).  Nothing in this Interim Order shall impair or abridge the Debtors' right to seek and, if granted by the Bankruptcy Court, obtain the use of Cash Collateral on a nonconsensual basis, and the rights of the DIP Secured Parties, the holders of the Permitted Prior Liens and the Prepetition Secured Parties to object to such request are fully preserved.

15.     <u>Termination Date</u>.  Each of the following shall constitute a termination event under this Interim Order (each a "<u>Termination Event</u>", and the date upon which such Termination Event occurs, the "<u>Termination Date</u>"), unless waived in writing (delivery by email or other electronic means being sufficient) by the DIP Agent and each Prepetition Agent:

(a)     the occurrence of the "Maturity Date" (as defined in the DIP Loan Documents) of the DIP Financing under the DIP Loan Documents;

(b)     acceleration of the obligations under the DIP Loan Documents upon the occurrence of an "Event of Default" under and as defined by the DIP Loan Documents;

(c)     nine (9) months following entry of the Interim Order;

(d)     failure to obtain entry of the Final Order within 30 days from the entry of this Interim Order;

4823-3938-9938.1

(e)    entry of a Final Order with DIP Lien priorities that differ from the priorities set forth in paragraph 7 above without the express written consent of the DIP Secured Parties;

(f)    entry of an order authorizing the Borrower or any Guarantor to incur DIP financing from any party other than the DIP Secured Parties;

(g)    the closing date of a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code (whether in one transaction or a series of related or unrelated transactions) (a "363 Sale");

(h)    the effective date of a confirmed chapter 11 plan (a "Plan") that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Loan Documents or is otherwise acceptable to the DIP Agent and the DIP Lenders in their sole discretion;

(i)    the failure by the Debtors to timely perform any of the material terms, provisions, conditions, covenants, or other obligations under this Interim Order;

(j)    the filing of a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee, other estate fiduciary or an examiner with special/expanded powers which the Debtors fail to timely oppose without the prior written consent of the DIP Agent and Prepetition Secured Parties;

(k)    an order converting any Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;

(l)    the filing or support by any Debtor of any plan of reorganization that (1) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Loan Documents and (2) is not otherwise acceptable to DIP Agent and the DIP Lenders in their sole discretion; and

(m)     any modifications, amendments, reversal, or extensions of this Interim Order that are adverse to the DIP Secured Parties or the Prepetition Secured Parties.

In addition to the foregoing, each of the following shall constitute Termination Event upon which any Prepetition Secured Party may terminate the Debtors' authorization to use Cash Collateral, but not exercise any other remedies under this Interim Order:

(n)     the failure of the Debtors to use commercially reasonable efforts to pursue collection of the insurance claims or disputed amounts owed to the Debtors by BP or (2) seek the agreement of the Government of the U.S. Virgin Islands (the "USVI") to draw on the letter of credit provided by Limetree Bay Terminals, LLC, as financial assurance under the ROA by and among the USVI and certain of the Debtors; provided, however, that so long as the Debtors have used such commercially reasonable efforts in connection with either of the foregoing, no Cash Collateral Termination Event shall be deemed to arise hereunder this subclause "n" in the event the Debtors fail to collect any amounts or cause the USVI to draw on such letter of credit;

(o)     the filing by the Debtors of a motion for authorization to sell all or substantially all of the Debtors' assets or for approval of any related bidding procedures that is not reasonably acceptable to each of the Prepetition Agents; and

(p)     the failure of the Debtors to comply with any of the Milestones.

Nothing in the preceding paragraphs 14 and 15 of this Interim Order shall constitute or be deemed to constitute an amendment or modification to sections 2.6, 3.7(e), 5.6 or 5.9 of the Intercreditor Agreement, or any other provisions of the Intercreditor Agreement.

16.     Cash Collateral Termination Events.  Following a DIP Repayment Event, each of the following shall constitute a cash collateral termination event under this Interim Order (each a "Cash Collateral Termination Event", and the date upon which such Cash Collateral Termination

Event occurs, the "Cash Collateral Termination Date"), unless waived in writing (delivery by email or other electronic means being sufficient) by each Prepetition Agent:

(a)     if on or before the date of the DIP Repayment Event, the Debtors and the Prepetition Agents have not agreed to the terms and conditions of the Debtors' continued consensual use of Cash Collateral, the adequate protection to be provided to the Prepetition Secured Parties, and the terms of a budget;

(b)     the bringing of a motion, taking of any action or the filing of any plan of reorganization or liquidation or disclosure statement attendant thereto by or on behalf of the Debtors in the Chapter 11 Cases: (a) to obtain postpetition financing, absent the consent of the Prepetition Secured Parties; (b) to grant any lien, absent the consent of each Prepetition Agent; or (c) to use Cash Collateral in manner that is inconsistent with the terms of this Interim Order or the Approved Budget, subject to the approved Budget Variances, and it being further specified that any request for payment, or payment, of professionals fees by any party not limited herein to the projected fees in the Approved Budget in excess of the budgeted amount shall not be deemed a Cash Collateral Termination Event;

(c)     the closing date of a 363 Sale;

(d)     the failure by the Debtors to timely perform any of the material terms, provisions, conditions, covenants, or other obligations under this Interim Order;

(e)     the filing of a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers which the Debtors fail to timely oppose without the prior written consent of the Prepetition Secured Parties;

(f)     an order converting any Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;

(g)     the filing or support by any Debtor of a plan of reorganization or liquidation that is not acceptable to each Prepetition Agent in its sole discretion;

(h)     any modifications, amendments, reversal, or extensions of this Interim Order that are adverse to the Prepetition Secured Parties;

(i)     the failure of the Debtors to use commercially reasonable efforts to pursue collection of the insurance claims or disputed amounts owed to the Debtors by BP or (2) seek the agreement of the Government of the USVI to draw on the letter of credit provided by Limetree Bay Terminals, LLC, as financial assurance under the ROA by and among the USVI and certain of the Debtors; provided, however, that so long as the Debtors have used such commercially reasonable efforts in connection with either of the foregoing, no Cash Collateral Termination Event shall be deemed to arise hereunder this subclause "i" in the event the Debtors fail to collect any amounts or cause the USVI to draw on such letter of credit;

(j)     the filing by the Debtors of a motion for authorization to sell all or substantially all of the Debtors' assets or for approval of any related bidding procedures that is not acceptable to each Prepetition Agent; and

(k)     the failure of the Debtors to comply with any of the Milestones or to hold Weekly Meetings.

Nothing in the preceding paragraph 16 of this Interim Order shall constitute or be deemed to constitute an amendment or modification to sections 2.6, 3.7(e), 5.6 or 5.9 of the Intercreditor Agreement, or any other provisions of the Intercreditor Agreement.

17.     <u>Rights and Remedies Upon Termination Event</u>.

(a)     Upon the occurrence and during the continuation of a Termination Event, the DIP Agent or any Prepetition Secured Party, as applicable, or, following a Cash Collateral Termination Event, any Prepetition Secured Party may (and any automatic stay otherwise applicable to the DIP Secured Parties or the Prepetition Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Secured Parties and the Prepetition Secured Parties, as applicable, to) deliver a written notice (a "<u>Termination Notice</u>") (including by e-mail) to counsel for the Debtors, counsel for each of the Prepetition Agents, counsel for the Ad Hoc Term Lender Group, counsel for J. Aron, counsel to any statutory committee appointed in the Chapter 11 Cases, and the U.S. Trustee (the "<u>Remedies Notice Parties</u>"), declaring and triggering, as applicable:  (i) the immediate termination of the DIP Financing and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (ii) all DIP Obligations to be immediately due and payable; (iii) right to charge interest at the default rate under the DIP Loan Documents; (iv) a termination of the ability of the Debtors to use any Cash Collateral.

(b)     Upon delivery of such Termination Notice by the DIP Agent or any of the Prepetition Secured Parties, without further notice or order of the Court, the Debtors' authorization to use Cash Collateral and to incur the DIP Financing hereunder will, subject to the expiration of the Remedies Notice Period (as defined below), automatically terminate and (i) the DIP Secured Parties will have no obligation to provide any further DIP Financing or other financial accommodations and (ii) no Prepetition Secured Party will have an obligation to permit the

Debtors to continue to use Cash Collateral; *provided that*, during the Remedies Notice Period (as defined below), the Debtors shall be entitled to continue to use Cash Collateral solely in accordance with the terms of this Interim Order and the DIP Loan Documents and to pay items solely as set forth in the Approved Budget (or following a DIP Repayment Event, solely in accordance with the terms of this Interim Order and to pay items solely as set forth in the Approved Budget), without any variance.

(c)     Following a Termination Event or Cash Collateral Termination Event, but prior to exercising the remedies set forth in this sentence below, the DIP Secured Parties or a Prepetition Secured Party, as applicable, shall be required to file a motion with the Court seeking emergency relief (the "Stay Relief Motion") on three(3) business days' notice to the Remedies Notice Parties (the "Remedies Notice Period") for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to:  (i) freeze monies or balances in the Debtors' accounts; (ii) immediately set-off any and all amounts in accounts subject to a control agreement in favor of the DIP Secured Parties against the DIP Obligations, (iii) enforce any and all rights against the DIP Collateral (to the extent such DIP Collateral is not subject to a Permitted Prior Lien), including, without limitation, foreclosure on all or any portion of the DIP Collateral, collection of accounts receivable, occupying the Debtors' premises, and sale or disposition of the DIP Collateral (or following a DIP Repayment Event, enforce any and all rights against the Prepetition Collateral, including, without limitation, foreclosure on all or any portion of the Prepetition Collateral, collection of accounts receivable, occupying the Debtors' premises, and sale or disposition of the Prepetition Collateral); (iv) terminate and revoke the Debtors' right under this Interim Order or the DIP Loan Documents to use any Cash Collateral, except to fund the Carve-Out; and (v) take any other actions or exercise

4823-3938-9938.1

any other rights or remedies permitted under this Interim Order, the DIP Loan Documents, the Prepetition Secured Documents, or applicable law.  The Debtors, the DIP Secured Parties and the Prepetition Secured Parties consent to a hearing on the Stay Relief Motion on an expedited basis. Any order granting a Stay Relief Motion filed by any of the Prepetition Secured Parties shall also modify the automatic stay to the extent necessary to permit (i) the Prepetition Secured Parties to immediately set off and net any and all amounts in accounts subject to a control agreement in their favor, any Margin (as defined in the Monetization Master Agreement) and any amounts owed by them to the Debtors against any obligations under the Secured Financing Documents, (ii) enforce any and all rights against any collateral securing any obligations under the Prepetition Secured Documents, including without limitation foreclosure on all or any portion of such collateral, collection of accounts receivable, occupying the Debtors' premises, and sale or disposition of the DIP Collateral; and (iii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the Secured Financing Documents, or applicable law.

(d)     The rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties have under the DIP Loan Documents, or otherwise or that the Prepetition Secured Parties have under the Prepetition Secured Documents or otherwise.  If any of the DIP Secured Parties or Prepetition Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral, or the Prepetition Secured Parties are permitted by the Court to take any enforcement action with respect to the Prepetition Collateral, following the hearing on the Stay Relief Motion, and subject to relative rights and priorities of the other DIP Secured Parties or Prepetition Secured Parties as provided in or recognized under this Interim Order, the Debtors shall cooperate with such party in its efforts to enforce its security interest in

the DIP Collateral or the Prepetition Collateral, as applicable, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its security interests in the DIP Collateral or the Prepetition Collateral, as applicable.

18. <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to, *inter alia*, section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Secured Parties and Prepetition Secured Parties all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Secured Parties prior to the date of receipt by the DIP Agent of written notice of the effective date of such action, (ii) the payment of any fees required under this Interim Order or the DIP Loan Documents, (iii) the validity and enforceability of any lien, claim, obligation, right, remedy or priority authorized or created under this Interim Order or pursuant to the DIP Loan Documents as of such date, including any Adequate Protection Obligations, and (iv) the validity or enforceability of the Aron Rights.

19. <u>Restriction on Use of DIP Lenders' Funds and Prepetition Collateral</u>.  Notwithstanding anything herein to the contrary, none of the DIP Collateral or proceeds thereof, proceeds of the DIP Financing, the Prepetition Collateral or proceeds thereof, any portion of the Carve-Out may be used by the Debtors, the Debtors' estates, the Committee, any trustee or examiner appointed in the Chapter 11 Cases or any chapter 7 trustee, or any other party in interest, directly or indirectly, to: (a) request authorization to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (i) from the DIP Agent or (ii) if such financing is sufficient to indefeasibly pay all DIP Obligations in full in cash and such financing is immediately so used; (b)

assert, join, commence, support, investigate, or prosecute any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the DIP Releasees or the Prepetition Secured Releasees, with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any action arising under the Bankruptcy Code against a DIP Releasee or a Prepetition Secured Releasee; (ii) any so-called "lender liability" claims and causes of action against a DIP Releasee or Prepetition Secured Releasee; (iii) any action with respect to the legality, enforceability, validity, extent, perfection, and priority of the DIP Obligations, the DIP Superpriority Claims, the DIP Loan Documents, the DIP Liens, or Prepetition Secured Obligations; (iv) any action for avoidance under sections 544, 547, 548, 549, or 550 of the Bankruptcy Code against the DIP Secured Parties or a Prepetition Secured Releasee; (v) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counter claims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against or with respect to the DIP Liens, the DIP Obligations, the DIP Superpriority Claims, or the Prepetition Secured Obligations in whole or in part; (vi) appeal or otherwise challenge this Interim Order, the DIP Loan Documents, or any of the transactions contemplated herein or therein; or (vii) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Secured Parties' or Prepetition Secured Parties' rights in respect of their respective liens on and security interests in the DIP Collateral or Prepetition Collateral, as applicable, or any of their rights, powers, or benefits hereunder or in the DIP Loan Documents or this Interim Order anywhere in the world; (c) seek to modify any of the rights granted to the DIP

61

Secured Parties or the Prepetition Secured Parties hereunder or under the DIP Loan Documents; or (d) pay any claim of a prepetition creditor except as permitted under the DIP Loan Documents in accordance with the Approved Budget.  Notwithstanding the foregoing, the terms and limitations of this paragraph shall not apply to a successful action on the part of the Debtors whereby under paragraph 17 of this Interim Order the Debtors obtain an order of the Court staying or otherwise modifying a Termination Event or a Cash Collateral Termination Event.

20.     <u>Restriction on Use of Proceeds of Inventory Financing Collateral</u>. For the avoidance of doubt, nothing in this Interim Order authorizes the sale or use of Inventory Financing Collateral or proceeds thereof other than Cash Collateral.

21.     <u>Insurance Policies</u>.  Upon entry of this Interim Order, the DIP Lenders are, and are deemed to be, without any further action or notice (including endorsements), named as additional insured and loss payees on each insurance policy maintained by the Debtor which in any way relates to the DIP Collateral.

22.     <u>Collateral Rights</u>.  Except as expressly provided in the Approved Budget or permitted in this Interim Order or the DIP Loan Documents, in the event that any person or entity that holds a lien on or security interest in DIP Collateral of the Debtors' estates, that is junior or otherwise subordinate to the DIP Liens receives or is paid the proceeds of such DIP Collateral, prior to indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Loan Documents, and termination of the commitments under the DIP Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral of the Debtors' estates, in trust for the DIP Lenders, and shall immediately turnover such proceeds to the DIP Agent for application in accordance with the DIP Loan Documents and this Interim Order.  Except as expressly provided in the Approved

Budget or permitted in this Interim Order or the applicable Prepetition Secured Document, in the event that any person or entity that holds a lien on or security interest in any collateral securing the obligations under any Prepetition Secured Document that is junior or otherwise subordinate to the lien in favor of the applicable Prepetition Secured Parties receives or is paid the proceeds of such collateral prior to indefeasible payment in full in cash and the complete satisfaction of all obligations under the applicable Prepetition Secured Document, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such collateral in trust for the applicable Prepetition Secured Parties, and shall immediately turn over such proceeds to the applicable Prepetition Secured Parties or their respective agents for application in accordance with the relevant Prepetition Secured Document and this Interim Order.

23.     <u>Prohibition on Additional Liens</u>.  Except as provided in the DIP Loan Documents, the Prepetition Secured Documents, and this Interim Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases until such time as the DIP Obligations and obligations under the Prepetition Secured Documents have been indefeasibly paid in full, granting liens on or security interests in the DIP Collateral or the collateral securing the obligations under the Prepetition Secured Documents or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are junior to, senior to, or *pari passu* with the DIP Liens, the Prepetition Secured Parties' Adequate Protection Liens, or the liens in favor of the Prepetition Secured Parties.

24.     <u>No Waiver</u>.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that any of the DIP Secured Parties or the Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.

25.   <u>Sale/Conversion/Dismissal/Plan</u>.

(a)      No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, (X) the Prepetition Secured Parties consent to the entry of such order and (Y) (i) the proceeds of any DIP Collateral included in such sale shall, subject to the prior satisfaction of any Permitted Prior Liens encumbering such DIP Collateral, be used to indefeasibly pay in full in cash and completely satisfy the DIP Obligations and the obligations under the Secured Financing Documents, and the commitments under the DIP Loan Documents are terminated; (ii) such sale is expressly permitted under the DIP Loan Documents; or (iii) the DIP Agent and Prepetition Secured Parties otherwise consent.

(b)      If an order dismissing or converting the Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time entered:

i.      Unless otherwise agreed to by the DIP Agent, such order shall provide that the Debtors, in each case subject to the Carve-Out and the Permitted Prior Liens, be subject to (a) the DIP Liens, the liens in favor of the Prepetition Secured Parties, the Aron Rights, the DIP Superpriority Claims, the DIP Obligations, the Adequate Protection Liens, and the DIP Loan Documents, which shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order until all DIP Obligations hereunder and all obligations under the DIP Credit Agreement are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance with the DIP Loan Documents, (b) the Prepetition Liens, Prepetition Secured Parties'

4823-3938-9938.1

Adequate Protection Liens, and any other Adequate Protection Obligations granted or conferred to the Prepetition Secured Parties shall continue in full force and effect, remain binding on all parties-in-interest and maintain their priorities as provided in this Interim Order until all Prepetition Secured Obligations are indefeasibly paid in full in cash and completely satisfied (and that such Prepetition Secured Parties' Adequate Protection Liens, and other Adequate Protection Obligations granted to or conferred on the Prepetition Secured Parties shall, notwithstanding such dismissal or conversion, remain binding on all parties) and (c) all postpetition indebtedness, obligation, or liability incurred by the Debtors to the DIP Secured Parties or the Prepetition Secured Parties prior to the date of such order, including, without limitation, the DIP Obligations and the Adequate Protection Obligations, shall be governed in all respects by the original provisions of this Interim Order unless the Final Order has been entered, in which case the Final Order shall govern, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Loan Documents,; and

ii.      to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens. the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Secured Parties' Adequate Protection Liens, the Aron Rights, and any other Adequate Protection Obligations.

26.      <u>Modifications of the Approved Budget</u>.  Without further Order of the Court, the Debtors are hereby authorized to implement, in accordance with the terms hereof and upon the consent of the DIP Agent and each Prepetition Agent, any modifications to the Approved Budget with such modification being in writing, *provided, however*, that (a) each Prepetition Agent shall be deemed to have consented to any such modification if it has not objected to the proposed modification (i) within the greater of twenty-four (24) hours and one (1) business day after written

email notice of such modification to counsel to such Prepetition Agent, or (ii) in the case of an Emergency Expense (as defined below) in excess of $250,000, within twelve (12) hours after written email notice of such proposed modification to counsel to such Prepetition Agent, and (b) no consent of the Prepetition Agents shall be necessary if each of the following conditions is satisfied: (i) the chief restructuring officer has certified, in writing, to the DIP Agent and the Prepetition Agents that the expense is necessary to (A) prevent irreparable harm to the value of the Prepetition Collateral or DIP Collateral, or (B) protect against an imminent harm to the public safety (any such certified expense described in the foregoing clauses (A) or (B) an "Emergency Expense"), (ii) such Emergency Expense is less than $250,000, and (iii) the aggregate amount of all Emergency Expenses does not exceed $500,000.

27.    Priority of Terms.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Documents or another document or agreement or words of similar import, the terms and provisions of this Interim Order shall govern.

28.    No Third-Party Beneficiary.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

29.    Rights Under Sections 363(k) and 1129(b).  The full amount of the DIP Obligations or the Prepetition Secured Obligations may be used to "credit bid" for the assets and property of the Debtors (other than any collateral in respect of the J. Aron Obligations) on a dollar-for-dollar basis, as provided for in section 363(k) of the Bankruptcy Code, in accordance with the terms of

the DIP Loan Documents and this Interim Order, as applicable, without the need for further Court order authorizing the same and whether such sale is (a) pursuant to section 363, (b) pursuant to a plan of reorganization, or (c) by a chapter 7 trustee because, among other things, the denial of such rights would result in the DIP Secured Parties and the Prepetition Secured Parties not receiving the indubitable equivalent of their claims.

30.    <u>Discharge Waiver/Release</u>. Neither the DIP Obligations nor the Adequate Protection Obligations shall be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, or granted such other treatment as the Debtors and the DIP Secured Parties, in the case of the DIP Obligations, and the Prepetition Secured Parties, in the case of Adequate Protection Obligations, may agree upon, on or before the effective date of such confirmed plan of reorganization.

31.    <u>Preservation of Prepetition Priorities.</u>  Nothing in this Interim Order is intended to change or otherwise modify the prepetition priorities among prepetition secured creditors of the Debtors, including (i) any lien or recoupment rights to the extent such liens or rights are valid, enforceable, nonavoidable and perfected, (ii) any claims of the lienholders or any other mechanic or materialmen to the extent their liens are valid, enforceable, non-avoidable and perfected, including as permitted by section 546(b) of the Bankruptcy Code, or (iii) any relative rights and priorities of the Prepetition Secured Parties in that certain Collateral Agency and Intercreditor Agreement, dated as of November 20, 2018, as it may be amended, modified or supplemented, by and among certain of the Debtors and the Prepetition Agents, and nothing in this Interim Order, including the granting of adequate protection liens or DIP Liens, shall be deemed to have changed or modified such prepetition priorities, all of which are hereby expressly preserved.   The

4823-3938-9938.1

preservation of prepetition priorities expressly includes lien, setoff, recoupment, contract, and other security rights.

32.     <u>Proofs of Claim</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, neither the DIP Agent nor any of the DIP Lenders shall be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein in or otherwise in relation to the DIP Loan Documents.  In addition, the Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein or otherwise in relation to the Prepetition Secured Obligations, and the stipulations contained Section F and G of this Interim Order shall be deemed to constitute a timely-filed proof of claim for the Prepetition Secured Parties in respect of the Prepetition Secured Obligations.

33.     <u>Best Efforts</u>.  If requested to do so by the DIP Agent and consented to by the Prepetition Secured Parties in writing, or by the Prepetition Secured Parties, the Debtors shall use their best efforts (subject to applicable law, including, without limitation, the Debtors' fiduciary duties thereunder) to assist and cooperate with the sale of the DIP Collateral or the collateral securing the obligations under the Prepetition Secured Documents.

34.     <u>No Consent</u>.  No action, inaction, or acquiescence by the DIP Secured Parties, including funding the Debtors' ongoing operations under this Interim Order, or the Prepetition Secured Parties shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Secured Parties or the Prepetition Secured Parties to a charge against the DIP Collateral or the Prepetition Collateral pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code.

35.     <u>No Marshaling; Equities of the Case</u>.  Subject to entry of the Final Order, neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the Prepetition

Collateral or the liens securing the obligations under the Prepetition Secured Documents.  Subject to entry of the Final Order, the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent with respect to the DIP Loan Documents and/or the DIP Collateral or the Prepetition Secured Parties with respect to the Prepetition Secured Documents and/or the Prepetition Collateral.

36.    Section 506(c) Waiver.  Subject to entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment, or claim incurred at any time (including any expenses set forth in the Approved Budget) by any Debtors or any other person or entity shall be imposed against any or all of the DIP Secured Parties or the Prepetition Secured Parties, their respective claims, or their respective collateral under Section 506(c) of the Bankruptcy Code or otherwise, and the Debtors, on behalf of their estates, waive any such rights.

37.    Indemnification.  The indemnification provisions set forth in Section 10.02 of the DIP Credit Agreement are hereby approved.

38.    Break Up Fee.  In the event that alternative DIP financing is approved before entry of the Final Order with a lender other than the DIP Lenders, the Debtors shall pay the DIP Agent a break up fee of $250,000 in lieu of the Deferred Commitment Fees set forth in the DIP Loan Documents.

39.    No Duty to Monitor Compliance.  The DIP Agent, DIP Lenders and the Prepetition Secured Parties may assume the Debtors will comply with this Interim Order and the Approved Budget and shall not (a) have any obligation with respect to the Debtors' use of Cash Collateral or proceeds of the DIP Financing (other than their consent to the use of Cash Collateral or proceeds of the DIP Financing in accordance with and subject to terms of this Interim Order); (b) be obligated to directly pay any expenses incurred or authorized to be incurred pursuant to this Interim

4823-3938-9938.1

Order (including any amounts specified in the Approved Budget); or (c) be obligated to ensure or monitor that sufficient Cash Collateral or proceeds of the DIP Financing exists to pay any expenses incurred or authorized to be incurred pursuant to this Interim Order.

40.     <u>Adequate Notice</u>.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the Bankruptcy Local Rules.  Under the circumstances, no further notice of the request for the relief granted at the Interim Hearing is required.  The Debtors shall promptly serve copies of this Interim Order and notice of the Final Hearing to any person included on the master service list approved or established in this case within two (2) Business Days of the Interim Order Entry Date.

41.     <u>Binding Effect Successors and Assigns</u>.  Except as set forth in paragraph 42 of this Interim Order, the DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties-in-interest in this Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Committee or examiner appointed in these Chapter 11 Cases, and the Debtors, and their respective successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Chapter 11 Cases, in any Successor Cases, or upon any dismissal of any such chapter 11 or chapter 7 case and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties and the Debtors, and their respective successors and assigns, *provided*, *however*, that the agreement of the DIP Secured Parties to extend financing under the DIP Loan Documents and the Prepetition Secured Parties' consent to the use of Cash Collateral, in each case, shall terminate upon the appointment of any chapter 7 or 11 trustee, examiner with expanded powers, or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether pursuant

4823-3938-9938.1

to the DIP Loan Documents, a promissory note, or otherwise), consenting to the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, or their creditors, shareholders, or estates.  Except as set forth in paragraph 42 of this Interim Order, each stipulation, admission, and agreement contained in sections E, F, G and I of this Interim Order shall also be binding upon all persons and entities, including the Debtors, their estates, any Committee, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other person acting on behalf of the Debtors' estates, under all circumstances and for all purposes, subject to the Challenge Period as defined below.

42.    Effect of Stipulations.  The stipulations, waivers and releases contained in sections F, G, and I of this Interim Order with respect to the Prepetition Secured Parties (the "Debtors' Stipulations") shall be binding upon the Debtors and their estates in all circumstances immediately upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon each party in interest (other than the Debtors and their estates), including the Committee, if any, and any chapter 11 trustee (or if any of these Chapter 11 Cases are converted to a case under chapter 7 prior to the expiration of the Challenge Period (defined below), the chapter 7 trustee in such Successor Case), together with each of their respective representatives, subsidiaries, successors and assigns, unless (a) such party (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so), with the requisite standing granted by the Court, has timely and properly filed an adversary proceeding by no later than the date that is the earlier of (i) the effective date of a confirmed chapter 11 plan, and (ii) the day that is sixty (60) days from the date of the entry of this Interim Order (or, in the case of the Committee, sixty (60) days from the date

of the appointment of the Committee (as such date may be extended by the applicable Prepetition Secured Party in writing or by order of the Court)) (the "Challenge Period"), (x) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the debt or liens referenced in the Debtors' Stipulations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code) or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations; or (y) otherwise asserting or prosecuting any cause of action for preferences, fraudulent transfers or conveyances, or any cause of action challenging the actions or inactions of any of the Prepetition Secured Parties, including any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, or any other offsets, setoffs, recoupments, challenges, objections, defenses, claims, counterclaims, or causes of action of any kind or nature, whether in these Chapter 11 Cases or any subsequent chapter 7 cases, against any of the Prepetition Secured Parties on behalf of the Debtors' estates, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law (clauses (x) and (y) collectively, the "Challenges" and, each individually, a "Challenge"); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly filed adversary proceeding; provided, that, as to the Debtors, all such Challenges and proceedings are hereby irrevocably waived and relinquished as of the Petition Date.  Any complaint or motion for standing filed in, or in connection with, any Challenge proceeding shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released, and barred.  If no adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period or the court does not rule in favor of

the plaintiff in any such Challenge proceeding, without further order of the Court: (v) the Debtors' Stipulations, including the releases, shall be binding on all parties in interest including, without limitation, the Committee, if any, and any trustee (including any chapter 7 trustee); (w) any and all Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (x) the claims of the Prepetition Secured Parties shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, offset, any cause of action of any kind, challenge, or defense (including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case; (y) the liens of the Prepetition Secured Parties shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, recharacterization, subordination, or avoidance; and (z) the Prepetition Secured Parties (and their respective agents, affiliates, subsidiaries, directors, officers, manager, representatives, attorneys, and advisors) shall not be subject to any other or further Challenge or investigation in respect of any Challenge by any person.  If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, the Debtors' Stipulations, shall nonetheless remain binding and preclusive on the Committee, if any, and any parties in interest, including any trustee, except as to any such findings and admissions that were expressly challenged in such adversary proceeding (it being understood that any non-challenging parties are bound).  Nothing in this Interim Order vests or confers on any person, including the Committee, if any, standing or authority to pursue any claims or cause of action belonging to the Debtors or their estates, including, without limitation, a Challenge in a Challenge proceeding.  For the avoidance of doubt and notwithstanding the foregoing, (i) the Debtors' stipulations, admissions, and releases contained in Paragraph E of this Interim Order will not be subject to a Challenge or the Challenge

Period, and (ii) the DIP Secured Parties agree they will not file a Challenge and will not join in, fund, solicit, encourage or support any Challenge or request to extend the Challenge Period, *provided, however*, that, subject to entry of the Final Order, in the event of a successful Challenge by a party other than the DIP Secured Parties, any property that would otherwise constitute DIP Collateral pursuant to the terms hereof shall, in fact, become DIP Collateral, and the DIP Liens shall attach thereto in the same order and priority as set forth herein. In the event that there is a timely successful Challenge brought pursuant to this paragraph, the Court shall retain jurisdiction to fashion an appropriate remedy.

43.     <u>Reservation of Rights</u>. Except as expressly authorized in this Interim Order or as otherwise expressly accepted in writing by the Prepetition Secured Parties, the Prepetition Secured Parties' consent to this Interim DIP Order and any action, inaction, or acquiescence by the Prepetition Secured Parties in connection with this Interim DIP Order (collectively, "<u>Prepetition Secured Parties' Actions</u>"), whether preceding or after the date hereof, shall not be deemed to constitute, evidence or imply any consent, acquiescence, or agreement to, waiver, or any course of dealing or course of conduct (collectively, "<u>Consent</u>"), in connection with any future debtor-in-possession financing, any future use of Cash Collateral, any additional priming liens, or other actions, inactions, relief or requests by the Debtors or DIP Lenders in the future (collectively, "<u>Future Actions</u>"). The Prepetition Secured Parties reserve all rights to object to, challenge and contest any Future Action, and no Debtor, DIP Lender, or Prepetition Secured Party shall assert that any Prepetition Secured Parties' Action constitutes any Consent to any Future Action.

44.     <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

4823-3938-9938.1

45.    <u>Final Hearing Date</u>. The Court will conduct the Final Hearing on August 2, 2021 at 3:30 p.m., prevailing Central Time.  Objections and responses to the Motion with respect to entry of the Final Order shall be filed and served according to the Local Bankruptcy Rules on or before July 29, 2021 at 10:00 am, prevailing Central Time.  The Debtors shall promptly serve copies of this Interim Order and notice of the Final Hearing on (i) the Office of the United States Trustee for the Southern District of Texas, (ii) the Revolving Administrative Agent, (iii) the Term Administrative Agent, (iv) J. Aron, (v) the Project Collateral Agent, and (vi) those parties that have filed a notice of appearance requesting notice, which service shall constitute adequate and proper notice of the hearing.

46.    <u>Effect of this Interim Order</u>.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

47.    <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction with respect to all matters arising from or related to the DIP Loan Documents and the implementation of this Interim Order.

48.    <u>Compliance with Law</u>.  Notwithstanding anything to the contrary in the Interim Order or the DIP Loan Documents, nothing in this Interim Order or the DIP Loan Documents shall relieve the Debtors of any obligations under federal, state or local police or regulatory laws or under 28 U.S.C. § 959(b), provided that nothing herein shall limit or impair the Debtors' rights to assert defenses under applicable law and nothing herein shall create new defenses to obligations under police or regulatory laws or 28 U.S.C. § 959(b) .

4823-3938-9938.1

## RESERVATION OF RIGHTS OF TERMINAL ENTITIES

49.     Adequate Protection:  Notwithstanding anything to the contrary in this Interim Order, to the extent any of the Terminal Entities[8] have a valid, perfected and unavoidable lien on any DIP Collateral (the "Terminal Liens"), such interest shall be entitled to adequate protection as follows (i) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition to the extent of any diminution in value of the Terminal Liens, if any  (the "Terminal Replacement Liens"); provided, that, for the avoidance of doubt, the Terminal Replacement Liens shall not attach to the IFF Property; and (ii) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or Successor Cases, with priority as provided therein, to the extent of any diminution in the collateral securing the Terminal Liens, if any (the "Terminal Superpriority Claim").  Nothing in this Order shall be a finding or determination with respect to the extent, validity or priority of any liens or claims of the Terminal Entities, including, without limitation, any warehouseman's or other similar liens, setoff, recoupment, contract and other security rights, and all parties reserve their rights with respect to the forgoing.  The Terminal Entities' right to seek further or additional adequate protection is expressly reserved and preserved.

50.     Administrative Expense:  Within two (2) business days of the entry of this Interim Order, the Debtors shall make a cash payment of $150,000.00 to the Terminal Entities for

---

[8] "Terminal Entities" shall mean, collectively or individually, Limetree Bay Terminals, LLC, Limetree Bay Terminal Holdings, LLC, Limetree Bay Terminal Holdings II, LLC, and Limetree Bay Cayman, Ltd.

4823-3938-9938.1

postpetition services provided by the Terminal Entities under the Terminal Services Agreements.[9] Commencing with the first Monday following the entry of this Interim Order and on each Monday thereafter for the period covered by the Approved Budget, the Debtors shall make a cash payment of $150,000.00 to the Terminal Entities for postpetition services provided by the Terminal Entities under the Terminal Services Agreements for a total payment over the period covered by this Interim Order in the amount of $450,000.  The Terminal Entities reserve all of their rights to assert an administrative expense claim for additional amounts owed under the Terminal Services Agreements for the period after the Petition Date, and the rights of the Debtors and all other parties in interest to contest the amount or validity of any such administrative expense are expressly reserved and fully preserved.  The Debtors shall use good faith efforts to include full payment of all postpetition amounts owed to the Terminal Entities under the Terminal Services Agreements in the Approved Budget in connection with the Final Order, subject to the Debtors rights as to the appropriate amount to be charged for services under the Terminal Services Agreements and without limiting the Debtors rights to seek to reject the Terminal Services Agreements.  All rights with respect to applicability of setoff rights are reserved.

51.    <u>Limitation on DIP Liens</u>:  For the avoidance of doubt, the DIP Collateral shall not include any property to the extent that it does not constitute property of the Debtors' estates within the scope of 11. U.S.C. § 541, and shall not include the Terminal Entities' interest in any property that is jointly owned by the Debtors (or any of them) and Terminal Entities (or any of them) and no liens granted pursuant to this Order shall attach to the Terminal Entities' interest in any property jointly owned with the Debtors.

---

[9] "Terminal Services Agreement" shall mean, collectively, the Terminal Services Agreement (Included Locations) among Limetree Bay Terminals, LLC, Limetree Bay Refining Marketing, LLC and J. Aron dated March 3, 2020 and the Terminal Services Agreement (Non-Included Locations) between Limetree Bay Terminals, LLC and Limetree Bay Refining Marketing, LLC dated March 3, 2020.

4823-3938-9938.1

52.    <u>Reservation of Rights</u>:  Notwithstanding anything in paragraph 42 of this Order, the stipulations, waivers and releases contained in sections F, G, and I of this Interim Order with respect to the Prepetition Secured Parties shall not be binding on the Terminal Entities.  All rights of the Terminal Entities and the Prepetition Secured Parties with respect to entry of the Final Order are expressly reserved and preserved and nothing in this Order shall limit the rights of the Terminal Entities to object to entry of the Final Order for any reason.

**Signed:  July 14, 2021.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

4823-3938-9938.1

## Exhibit A

**DIP Credit Agreement**

SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT

Dated as of July 13, 2021

among
LIMETREE BAY REFINING, LLC,
as Borrower,

LIMETREE BAY REFINING HOLDINGS II, LLC,
LIMETREE BAY REFINING HOLDINGS LLC,
LIMETREE BAY SERVICES, LLC,
LIMETREE BAY REFINING OPERATING LLC and
LIMETREE BAY REFINING MARKETING LLC,
as Guarantors,

THE LENDERS FROM TIME TO TIME PARTY HERETO,

and

405 SENTINEL LLC,
as Administrative Agent

_____

$25,000,000 Senior Secured Superpriority Debtor In Possession Credit Facility
_____

Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ...................................................... 2
SECTION 1.01 .......................................................Certain Defined
Terms .................................................................................... 2
SECTION 1.02    Rules of Interpretation ............................................................... 29
SECTION 1.03    Accounting Terms ...................................................................... 30
SECTION 1.04    Certifications, Etc ...................................................................... 31

ARTICLE II AMOUNTS AND TERMS OF THE ADVANCES .......................................... 31
SECTION 2.01    The Advances ............................................................................ 31
SECTION 2.02    Making the Advances. ............................................................... 31
SECTION 2.03    Repayment of Advances ............................................................ 32
SECTION 2.04    Prepayments ............................................................................. 32
(x)             All prepayments pursuant to this Section 2.04(b) shall be subject to the terms of the
                DIP Order. ................................................................................. 34
SECTION 2.05    Scheduled Interest ..................................................................... 34
SECTION 2.06    Termination or Reduction of the Commitments ........................... 34
SECTION 2.07    Promissory Notes ...................................................................... 34
SECTION 2.08    Collateral Matters ..................................................................... 35

ARTICLE III OTHER PROVISIONS RELATING TO THE DIP FACILITY ...................... 36
SECTION 3.01    Default Interest ......................................................................... 36
SECTION 3.02    Fees........................................................................................... 36
SECTION 3.03    Change of Circumstances .......................................................... 36
SECTION 3.04    Payments and Computations ..................................................... 38
SECTION 3.05    Taxes......................................................................................... 39
SECTION 3.06    Sharing of Payments, Etc. ......................................................... 43
SECTION 3.07    Use of Proceeds ........................................................................ 43
SECTION 3.08    Security ..................................................................................... 44

ARTICLE IV CONDITIONS PRECEDENT ....................................................................... 45
SECTION 4.01    Conditions Precedent to Closing Date........................................ 45
SECTION 4.02    Conditions Precedent to Each Borrowing ................................... 46
SECTION 4.03    Notices...................................................................................... 48

ARTICLE V REPRESENTATIONS AND WARRANTIES ................................................ 48
SECTION 5.01    Representations and Warranties ................................................. 48

ARTICLE VI COVENANTS ............................................................................................... 55
SECTION 6.01    Affirmative Covenants .............................................................. 55
SECTION 6.02    Negative Covenants .................................................................. 62
SECTION 6.03    Reporting Requirements ........................................................... 67
SECTION 6.04    Permitted Activities of Holdings ............................................... 68

ARTICLE VII EVENTS OF DEFAULT .............................................................................. 68
SECTION 7.01    Events of Default ...................................................................... 68
SECTION 7.02    Application of Payments ........................................................... 74

ARTICLE VIII THE AGENTS ............................................................................................ 74
SECTION 8.01    Appointment of Agents ............................................................. 74
SECTION 8.02    Rights of Lenders...................................................................... 75
SECTION 8.03    Exculpatory Provisions ............................................................. 75
SECTION 8.04    Reliance by Administrative Agent.............................................. 76
SECTION 8.05    Delegation of Duties.................................................................. 76
SECTION 8.06    Resignation of Administrative Agent .......................................... 76

Table of Contents

**Page**

SECTION 8.07    Non-Reliance on Administrative Agent and Other Lenders..........................................77
SECTION 8.08    Withholding Taxes .............................................................................................77
SECTION 8.09    Administrative Agent May File Proof of Claim ...............................................78
SECTION 8.10    Collateral Matters .............................................................................................78

ARTICLE IX GUARANTY ..........................................................................................................78
SECTION 9.01    Guarantee of Obligations..................................................................................78
SECTION 9.02    Limitation on Obligations Guaranteed .............................................................79
SECTION 9.03    Nature of Guarantee; Continuing Guarantee; Waivers of Defenses Etc......................79
SECTION 9.04    Rights of Reimbursement, Contribution and Subrogation...............................81
SECTION 9.05    Payments.............................................................................................................82
SECTION 9.06    Bankruptcy, Etc. ................................................................................................82
SECTION 9.07    Duration of Guaranty ........................................................................................83
SECTION 9.08    Reinstatement .....................................................................................................83

ARTICLE X MISCELLANEOUS ................................................................................................83
SECTION 10.01    Notices..............................................................................................................83
SECTION 10.02    Expenses, Indemnity; Damage Waiver............................................................85
SECTION 10.03    Set-Off..............................................................................................................86
SECTION 10.04    Amendments and Waivers................................................................................87
SECTION 10.05    Successors and Assigns; Participations ...........................................................88
SECTION 10.06    Independence of Covenants..............................................................................92
SECTION 10.07    Survival of Representations, Warranties and Agreements ...............................92
SECTION 10.08    No Waiver; Remedies Cumulative...................................................................92
SECTION 10.09    Marshaling; Payments Set Aside .....................................................................92
SECTION 10.10    Severability.......................................................................................................92
SECTION 10.11    Obligations Several; Independent Nature of Lenders' Rights .........................92
SECTION 10.12    Headings...........................................................................................................93
SECTION 10.13    Governing Law; Jurisdiction, Etc. ...................................................................93
SECTION 10.14    Waiver of Jury Trial ........................................................................................93
SECTION 10.15    Confidentiality..................................................................................................94
SECTION 10.16    Usury Savings Clause.......................................................................................95
SECTION 10.17    Counterparts; Integration; Effectiveness; Electronic Execution......................95
SECTION 10.18    Patriot Act.........................................................................................................95
SECTION 10.19    Non-Recourse to Equityholders; Certain Acknowledgements .......................95

(ii)

SCHEDULES

Schedule I     -     Commitments; Applicable Lending Offices

Schedule II     -     Real Estate Documents

Schedule III     -     Disclosed Liens

Schedule IV     -     Disclosed Contractual Obligations

Schedule 1.01(a)     -     Mortgaged Properties

Schedule 5.01(a)     -     Loan Parties

Schedule 5.01(b)     -     Capital Stock

Schedule 5.01(e)     -     Governmental Consents

Schedule 5.01(h)     -     Adverse Proceedings

Schedule 5.01(i)     -     Taxes

Schedule 5.01(j)     -     Environmental Matters

Schedule 5.01(o)     -     Compliance with Statutes, Etc.

Schedule 5.01(s)     -     Property

Schedule 6.01(n)     -     Material Contracts (Affirmative Covenant)

Schedule 6.02(p)     -     Material Contracts (Negative Covenant)

Schedule 10.01(a)     -     Notices

EXHIBITS

Exhibit A     -     Form of Assignment and Assumption

Exhibit B     -     Form of Note

Exhibit C     -     Form of Funding Notice

Exhibit D     -     Form of Prepayment Notice

Exhibit E-1     -     Form of USVI Tax Compliance Certificate

Exhibit E-2     -     Form of USVI Tax Compliance Certificate

Exhibit E-3     -     Form of USVI Tax Compliance Certificate

Exhibit E-4     -     Form of USVI Tax Compliance Certificate

Exhibit F-1     -     Form of USVI Tax Compliance Certificate (Mortgage Interest Exemption)

Exhibit F-2     -     Form of USVI Tax Compliance Certificate (Mortgage Interest Exemption)

Exhibit F-3     -     Form of USVI Tax Compliance Certificate (Mortgage Interest Exemption)

Exhibit F-4      -       Form of USVI Tax Compliance Certificate (Mortgage Interest Exemption)

## DEBTOR IN POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT, dated as of July 13, 2021 (this "***Agreement***"), is entered into by and among LIMETREE BAY REFINING, LLC, a U.S. Virgin Islands limited liability company ("***Borrower***"), LIMETREE BAY REFINING HOLDINGS II, LLC, a U.S. Virgin Islands limited liability company ("***Holdings***"), LIMETREE BAY REFINING SERVICES, LLC, a Delaware limited liability company ("***LBS***"), LIMETREE BAY REFINING HOLDINGS LLC, a U.S. Virgin Islands limited liability company ("***LBRH***"), LIMETREE BAY REFINING MARKETING LLC, a U.S. Virgin Islands limited liability company ("***LBRM***"), LIMETREE BAY REFINING OPERATING LLC, a U.S. Virgin Islands limited liability company ("***LBRO***", and together with LBRM, LBRH, LBS and Holdings, the "***Guarantors***", and together with the Borrower, the "***Borrower Parties***"), THE LENDERS FROM TIME TO TIME PARTY HERETO, 405 SENTINEL LLC, as administrative agent for the Lenders (in such capacity, together with any successor Administrative Agent appointed pursuant to <u>Article VIII</u> in such capacity, the "***Administrative Agent***"), and 405 SENTINEL LLC, as collateral agent for the Lenders (in such capacity, together with any successor Collateral Agent appointed pursuant to <u>Article VIII</u> in such capacity, the "***Collateral Agent***").

### PRELIMINARY STATEMENTS:

WHEREAS, Limetree Bay Terminals, LLC ("***LBT***"), a U.S. Virgin Islands limited liability company and an Affiliate of the Borrower acquired a facility located at Limetree Bay, St. Croix, U.S. Virgin Islands, consisting of (i) storage and blending equipment, docks, tanks, and all other related facilities, equipment, and real property associated with petroleum import, export, mixing, storage, and related activities at the facility, including all marine facilities, but exclusive of the Refinery referred to below (collectively, the "***Terminal***") and (ii) petroleum processing equipment and related facilities, equipment used to refine, all other equipment used primarily in connection with the refinery, and real property associated with petroleum processing and related activities (other than storage, blending, loading, unloading, transporting of such products) at the oil refinery and related facilities (collectively, the "***Refinery***");

WHEREAS, pursuant to a Bill of Sale, dated as of the Pre-Petition First Funding Date (the "***Bill of Sale***"), LBT transferred the Refinery to the Borrower;

WHEREAS, pursuant to a Shared Services Systems Agreement, dated as of the Pre-Petition First Funding Date (the "***Shared Services Systems Agreement***"), by and between LBT and the Borrower, and acknowledged by LBRM, LBT and the Borrower agreed to share certain real estate, personal property, services and permits as and to the extent specified therein;

WHEREAS, on July 12, 2021 (the "***Petition Date***"), the Loan Parties filed voluntary proceedings (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code (as amended, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"), and such Loan Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide a senior secured superpriority debtor in possession term loan facility in an aggregate principal amount of up to $25,000,000 to the Borrower;

WHEREAS, the Guarantors are willing to guarantee all of the Obligations of the Borrower to the Lenders under the Loan Documents;

WHEREAS, the Lenders have agreed to provide the DIP Facility on the terms and subject to the conditions set forth herein and in the DIP Order;

WHEREAS, each Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement; and

WHEREAS, to provide security for the repayment of all obligations of any kind of the Borrower Parties hereunder and under the other Loan Documents, including direct borrowings, each of the Borrower Parties will provide to the Collateral Agent (for the benefit of the Secured Parties) the Liens, status and protection set forth in the DIP Order.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01     Certain Defined Terms.  As used in this Agreement (including the preamble hereto and the preliminary statements hereto), the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Administrative Agent*" has the meaning specified in the preamble hereto.

"*Administrative Agent's Account*" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Borrower and the Lenders from time to time.

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Advances*" has the meaning specified in **Error! Reference source not found.**.

"*Adverse Proceeding*" means any action, written claim, suit, litigation, proceeding, hearing (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Borrower Parties) at law or in equity, or before or by any Governmental Authority or arbitrator, domestic or foreign (including any Environmental Actions) whether pending or, to the knowledge of the Borrower Parties, threatened in writing against the Loan Parties or the Refinery.

"*Affiliate*" means with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"*Affiliated Fund*" in relation to a fund (the "first fund"), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

"*Agent Parties*" has the meaning specified in Section 10.01(d)(ii).

"*Agents*" means, individually or collectively, as the context may require, the Administrative Agent and the Collateral Agent.

2

"**_Agreement_**" has the meaning specified in the preamble hereto.

"**_Anti-Money Laundering Laws_**" means, collectively, (a) the Patriot Act and (b) any other applicable law, regulation, order, decree or directive of any relevant jurisdiction in which any Lender, Agent, Loan Party or Equityholder is located or doing business that has the force of law and relates to anti-money laundering.

"**_Applicable Lending Office_**" means, with respect to each Lender, such Lender's Domestic Lending Office.

"**_Applicable Cash Rate_**" means an interest rate of 3.00% per annum.

"**_Applicable PIK Rate_**" means an interest rate of 9.00% per annum.

"**_Applicable Rate_**" means, collectively, the Applicable Cash Rate and the Applicable PIK Rate.

"**_Approved Fund_**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**_Aron Rights_**" has the meaning given such term in the DIP Order.

"**_Asset Sale_**" means a sale, lease (as lessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor), transfer or other disposition to, or any exchange of Property with, any Person, in one transaction or a series of transactions, of all or any part of any of the Properties of the Borrower Parties or the Refinery, whether now owned or hereafter acquired, leased or licensed, but shall not include any sale, lease (as lessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor), transfer or other disposition of Inventory Financing Collateral (as defined in the DIP Order) until the Discharge of Inventory Financing Obligations (as defined in the Pre-Petition Depositary Agreement) has occurred.

"**_Asset Sale Proceeds_**" means, with respect to any Asset Sale, the Net Cash Proceeds received by the Borrower Parties in connection with such Asset Sale.

"**_Assignment and Assumption_**" means an assignment and assumption entered into by a Lender, on the one hand, and any assignee of such Lender in accordance with this Agreement (with the consent of any Person whose consent is required by Section 10.05), on the other hand, and accepted by the Administrative Agent, in accordance with Section 10.05 and in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"**_Available Commitment_**" means, with respect to any Lender at any time, such Lender's unutilized Commitment.

"**_Avoidance Actions_**" has the meaning given such term in the DIP Order.

"**_Avoidance Proceeds_**" has the meaning given such term in the DIP Order.

 "**_Bankruptcy Code_**" has the meaning specified in the recitals to this Agreement.

"**_Bankruptcy Court_**" has the meaning specified in the recitals to this Agreement.

"**_Beneficial Ownership Regulation_**" means 31 C.F.R. § 1010.230.

"**_Bill of Sale_**" has the meaning set forth in the recitals hereto.

3

"*Board of Governors*" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Borrower*" has the meaning specified in the preamble hereto.

"*Borrower Account*" means that certain deposit account of the Borrower to be established at Oriental Bank or another financial institution reasonably acceptable to the Required Lenders after the Closing Date, and which is to be subject to a Control Agreement, in each case in accordance with Section 6.01(k).

"*Borrower Parties*" has the meaning specified in the preamble hereto.

"*Borrowing*" means the extension of credit and borrowing consisting of Advances made by the Lenders pursuant to Section 2.01.

"*BP*" means BP Products North America Inc., a Maryland company.

"*BP Guaranty*" means that certain Guaranty Agreement, dated as of the Pre-Petition First Funding Date, by BP Corporation North America Inc. in favor of the Borrower and LBRM.

"*Business Day*" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the U.S. Virgin Islands or is a day on which banking institutions located in such state or territory are authorized or required by law or other governmental action to close.

"*Business Interruption Insurance Proceeds*" means any and all proceeds of any insurance, indemnity, warranty or guaranty payable from time to time to any Borrower Party with respect to the partial or complete interruption of the operation of, or delay in the startup of any portion or component of, the business of such Borrower Party.

"*Capital Expenditures*" means, for any period, the aggregate of all expenditures of the Borrower Parties and the Refinery during such period determined on a Consolidated basis and without duplication that, in accordance with GAAP, are or should be included in "*property, plant and equipment*" or similar items reflected in the Consolidated balance sheet of the Borrower Parties or in "*purchase of property and equipment*" or similar items reflected in the Consolidated statement of cash flows of the Borrower Parties.

"*Capital Stock*" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"*Capitalized Leases*" means, as applied to any Person, any lease of any Property by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"*Carry Forward Amount*" shall mean the amount of (i) any projected operating disbursements or professional fees not expended in a given Testing Period or (ii) any total net receipts exceeding projected receipts, each of which shall carry forward into, and be available for use in, future Testing Periods.

"*Carve-Out*" has the meaning specified in the DIP Order.

"*Cash*" means money, currency or a credit balance in any demand account or Deposit Account in Dollars.

4

"*Cash Collateral*" has the meaning specified in the DIP Order.

"*Cash Equivalents*" means any of the following:

(i)     readily marketable direct obligations of the government of the United States or any agency or instrumentality thereof, or obligations unconditionally guaranteed by the full faith and credit of the government of the United States, in each case maturing within one year from the date of acquisition thereof;

(ii)     securities issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof having maturities of not more than one year from the date of acquisition thereof and, at the time of acquisition, having a rating of AA- or higher from S&P or Aa3 or higher from Moody's (or, at any time that neither S&P nor Moody's rates such obligations, an equivalent rating from another nationally recognized rating service);

(iii)     investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, a rating of at least A-1 or P-1 from either S&P or Moody's (or, at any time that neither S&P nor Moody's rates such obligations, an equivalent rating from another nationally recognized rating service);

(iv)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 270 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any of its Affiliates or any domestic office of any commercial bank organized under the laws of the United States of America, any State thereof, any country that is a member of the OECD or any political subdivision thereof, that has a combined capital and surplus and undivided profits of not less than $500,000,000;

(v)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (i) above and entered into with a financial institution satisfying the criteria of clause (iv) above;

(vi)     an interest bearing account maintained by the Pre-Petition Depositary or its Affiliate with earnings based on the daily federal funds effective rate as determined by the Federal Reserve Bank of New York; and

(vii)     investments in "*money market funds*" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (i) through (v) above.

"*Casualty Event*" means a casualty event that causes all or a portion of the Property of any Borrower Party or the Refinery to be damaged, destroyed or rendered unfit for normal use for any reason whatsoever (regardless of whether relating to events that have occurred prior to, on or after the Petition Date) other than ordinary use and wear and tear.

"*Change in Law*" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all

requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"***Change of Control***" has the meaning given to the term "Change of Control" in the Pre-Petition Term Credit Agreement.

"***Chapter 11 Cases***" has the meaning specified in the recitals to this Agreement.

"***Closing Date***" has the meaning specified in Section 4.01.

"***Collateral***" means all "DIP Collateral" as such term is defined in the DIP Order.  For the avoidance of doubt, Collateral shall not include any Avoidance Actions and, until otherwise expressly provided in the Final DIP Order, Avoidance Proceeds.

"***Collateral Agent***" has the meaning specified in the preamble to this Agreement.

"***Commitment***" means with respect to any Lender at any time the amount set forth for such period opposite such Lender's name on Schedule I hereto under the caption "*Commitment*" or, if such Lender has entered into one or more Assignment and Assumptions, set forth for such Lender in the Register maintained by the Administrative Agent as such Lender's "*Commitment*" for such period, as such amount may be reduced at or prior to such time pursuant to Section 2.06 or Section 7.01. The aggregate of the Commitments of all Lenders hereunder shall be (and shall not exceed) $25,000,000 and shall not be reduced by the outstanding amount of any PIK Loans.

"***Commitment Period***" means the period commencing on the Closing Date and ending on the Commitment Termination Date.

"***Commitment Termination Date***" means the earliest to occur of (i) the date on which the Commitment is permanently reduced to zero in accordance with Section 2.06, (ii) the date on which the Commitment is terminated pursuant to Section 7.01, and (iii) the Maturity Date.

"***Connection Income Taxes***" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"***Consent Decree***" shall mean the Consent Decree entered on June 7, 2011 in the United States District Court of the Virgin Islands in the matter of United States of America, and United States Virgin Islands v. Hovensa L.L.C. (Civ. No.:  1:11-cv-00006), as such Consent Decree may be amended or revised.

"***Consolidated***" refers to the consolidation of accounts in accordance with GAAP.

"***Contract Termination Proceeds***" has the meaning specified to the term "Contract Termination Proceeds" in the Pre-Petition Depositary Agreement; provided that, any such proceeds that constitute Inventory Financing Collateral shall be deemed to not be "Contract Termination Proceeds" for all purposes hereof until the Discharge of Inventory Financing Obligations (as defined in the Pre-Petition Depositary Agreement) has occurred.

"***Contractual Obligations***" means, as applied to any Person, any provision of any Capital Stock issued by such Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which such Person is a party or by which it or any of its Properties is bound.

"***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "***Controlling***" and "***Controlled***" have meanings correlative thereto.

"***Control Agreement***" means, with respect to an account of a Borrower Party, an agreement or other arrangement (in each case, in form and substance reasonably satisfactory to the Collateral Agent) which provides for the Collateral Agent to have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts), in each case, as amended, amended and restated, supplemented and/or otherwise modified from time to time.

"***Debt***" means, as applied to any Person and without duplication:

(i)       all Debt for Borrowed Money;

(ii)      that portion of obligations with respect to Capitalized Leases that is properly classified as a liability on a balance sheet in conformity with GAAP;

(iii)     all obligations of such Person evidenced by notes, bonds, debentures, drafts or other similar instruments representing extensions of credit whether or not representing obligations for borrowed money;

(iv)      any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under an Employee Benefit Plan), which purchase price is due more than six months from the date of incurrence of the obligation in respect thereof;

(v)       all indebtedness secured by any Lien on any property or asset owned or held by such Person regardless of whether the indebtedness secured thereby shall have been assumed by such Person or is nonrecourse to the credit of that Person;

(vi)      the amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings;

(vii)     the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another;

(viii)    any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof;

(ix)      any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under sub-clause (a) or (b) of this clause (ix), the primary purpose or intent thereof is as described in clause (viii) above; and

(x)      all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including any Hedge Agreements, whether entered into for hedging or speculative purposes.

"***Debt for Borrowed Money***" means, for any Person, at any date of determination, the sum, without duplication, of (a) all items that, in accordance with GAAP, would be classified as indebtedness on a Consolidated balance sheet of such Person at such date, and (b) all obligations of such Person under acceptance, letter of credit or similar facilities at such date but excluding Debt in respect of Capitalized Leases and purchase money debt.

"***Debt Proceeds***" means, with respect to the incurrence or issuance of any Debt by any Borrower Party (other than Debt permitted to be incurred or issued pursuant to <u>Section 6.02(b)</u>), the Net Cash Proceeds received by any Borrower Party in connection with such incurrence or issuance.

"***Debtor Relief Laws***" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"***Default***" means any Event of Default or a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"***Default Notice***" has the meaning specified in <u>Section 6.03(b)</u>.

"***Defaulting Lender***" means, subject to <u>Section 3.9</u>, any Lender that (a) has failed to (i) fund all or any portion of its Advances within two Business Days of the date such Advances were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund the Advances hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this <u>clause (c)</u> upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with

such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of <u>clauses (a)</u> through <u>(d)</u> above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to <u>Section 3.9</u>) upon delivery of written notice of such determination to the Borrower and each Lender.

"***Deposit Account***" means a demand, time, savings, checking, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"***Designated Jurisdiction***" means any country or territory to the extent that such country or territory itself is the subject of any Sanctions (including, without limitation, Cuba, Iran, North Korea, Syria, and the Crimea region of Ukraine).

"***DIP Budget***" means the "Approved Budget" as such term is defined in the DIP Order.

"***DIP Facility***" means, at any time, the aggregate amount of the Lenders' Commitments or Advances at such time.

"***DIP Lien***" has the meaning specified in the DIP Order.

"***DIP Obligations***" has the meaning specified in the DIP Order.

"***DIP Order***" means the Interim DIP Order or the Final DIP Order, as applicable.

"***DIP Superpriority Claim***" has the meaning given to such term in DIP Order.

"***Disbursement Line Items***" shall mean any disbursement line item in a DIP Budget, unless designated as an immaterial line item by the Administrative Agent and Required Lenders in their approval thereof; provided that, in no event will professionals fees be deemed a "Disbursement Line Item".

"***Disposition***" means any sale, assignment, transfer, conveyance or other disposition.  "***Dispose***" shall have a corollary meaning.

"***Dollars***" and the sign "***$***" mean the lawful currency of the United States of America.

"***Domestic Lending Office***" means, with respect to any Lender, the office of such Lender specified as its "*Domestic Lending Office*" opposite its name on <u>Schedule I</u> hereto or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in <u>clause (a)</u> of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in <u>clause (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Effect of Bankruptcy***" means, with respect to any contractual obligation, contract or agreement to which a Loan Party or a Subsidiary thereof is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Cases (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"***Eminent Domain Proceeds***" means, with respect to any Event of Eminent Domain, the Net Cash Proceeds received by any Borrower Party in connection with such Event of Eminent Domain; provided that any such proceeds that constitute Inventory Financing Collateral shall be deemed to not be "Eminent Domain Proceeds" for all purposes hereof until the Discharge of Inventory Financing Obligations (as defined in the Pre-Petition Depositary Agreement) has occurred.

"***Employee Benefit Plan***" means any "*employee benefit plan*" as defined in Section 3(3) of ERISA (a) which is or was adopted, sponsored, maintained or contributed to by, or required to be contributed to by, any Borrower Party or any of their respective ERISA Affiliates or (b) with respect to or in connection with which any Borrower Party could have any actual or contingent liability.

"***Environmental Action***" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, consent order, consent decree, abatement order or other order or directive (conditional or otherwise) by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with Environmental Law or any actual or alleged violation of Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm from Hazardous Materials to human health, safety or the environment (including natural resources).

"***Environmental Law***" means any and all applicable current or future, international, United States or U.S. Virgin Islands' (or any subdivision of any of them) statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other legally enforceable requirements of Governmental Authorities (including the Consent Decree, to the extent any Borrower Party becomes a party thereto) relating to (i) environmental matters or the protection of the environment (including surface water, groundwater, soils or subsurface strata, or indoor or outdoor air), including those legal requirements relating to any Hazardous Materials Activity; (ii) occupational safety and health (to the extent related to exposure to Hazardous Materials); or (iii) the protection of human, plant or animal health or welfare, in any manner applicable to the Refinery or any Borrower Party or any of their respective Properties.

"***Environmental Response Trust***" means the Environmental Response Trust established in accordance with the Hovensa Confirmation Order.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"***ERISA Affiliate***" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (c) solely for the purpose of the funding requirements of Section 412 of the Internal Revenue Code or Section 302 of ERISA, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"***Equityholder-Related Party***" means each Equityholder and any Affiliate, Affiliated Fund or Related Fund thereof, but shall exclude any Loan Party.

"***Equityholder*** " means the "Preferred Members" as such term is defined in the Pre-Petition Term Loan Credit Agreement.

"***ERISA Event***" means (a) a "*reportable event*" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by any Borrower Party or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors who are not treated as a single employer under Title IV of ERISA or the termination of any such Pension Plan resulting in liability to any Borrower Party or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (f) the imposition of liability on any Borrower Party or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal of any Borrower Party or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 or 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by any Borrower Party or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in insolvency pursuant to Section 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (h) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan; (i) the occurrence of a non-exempt prohibited transaction (within the meaning of Section 4975 of the Internal Revenue Code or Section 406 of ERISA) which could reasonably be expected to result in material liability to any Borrower Party or any of their respective ERISA Affiliates; (j) a Pension Plan is, or is expected to be, in "at risk" status within the meaning of Section 430(i)(4) of the Internal Revenue Code or Section 303(i)(4) of ERISA; or (k) a Multiemployer Plan is in "endangered status" (under Section 432(b)(1) of the Internal Revenue Code or Section 305(b)(1) of ERISA) or "critical status" (under Section 432(b)(2) of the Internal Revenue Code or Section 305(b)(2) of ERISA).

"*Event of Default*" has the meaning specified in <u>Section 7.01</u>.

"***Event of Eminent Domain***" means any action, series of actions, omissions or series of omissions by any Governmental Authority (a) by which such Governmental Authority appropriates, confiscates, condemns, expropriates, nationalizes, seizes or otherwise takes all or a material portion of the Property of any Borrower Party or the Refinery (including any Capital Stock of any Borrower Party) or (b) by which such Governmental Authority assumes custody or control of the Property (other than immaterial portions of such Property) or business operations of any Borrower Party or the Refinery (or any Capital Stock of any Borrower Party).

"***Excess Cash Flow***" means, as of any date of determination, the amount of funds available in the LBR Revenue Account as of such date after giving effect to the withdrawals, transfers and payments

11

specified in sub-clauses (i) through (x) of Section 3.2(c) of the Pre-Petition Depositary Agreement on or prior to such date.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, branch profits Taxes, U.S. Virgin Islands gross receipts Taxes and U.S. Virgin Islands excise Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Virgin Islands withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Advances or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Advances or Commitment or (ii) such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to Section 3.05, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Applicable Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.05(f) and (d) any Taxes imposed under FATCA.

"*Existing Accounts*" means (i) each "Depositary Account" under and as defined in the Pre-Petition Depositary Agreement and (ii) each other Deposit Account, securities account or other account established and held in the name of any Borrower Party as of the Petition Date.

"*FATCA*" means Sections 1471 through 1474 of the Internal Revenue Code as of the date of this Agreement, or as applicable in the U.S. Virgin Islands (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code or as applicable in the U.S. Virgin Islands, and any applicable intergovernmental agreements entered into in connection with the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement.

"*Fee Letter*" means the letter agreement, dated on or about the date hereof, between the Borrower and the Administrative Agent.

"*Feedstock Supply Agreement*" means that certain Feedstock Supply Agreement, dated as of November 15, 2018, by and between BP and LBRM, as amended by Amendment No. 1 to Feedstock Supply Agreement, dated as of February 22, 2021.

"*Final DIP Order*" means a Final Order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure in form and substance acceptable to the Required Lenders and the Agent authorizing and approving, among other things, the DIP Facility on a final basis, the terms of this Agreement and the other Loan Documents on a final basis, and the granting of the Liens on the Collateral with the priority contemplated in this Agreement, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time with the express consent of the Required Lenders.

"*Final Order*" means an order signed by the Bankruptcy Court as to which no stay has been entered and which has not been reversed, vacated or overturned, and for which no appeal or motion to reconsider has been timely filed or, if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Required Lenders waive such requirement in writing.

"***Final Order Entry Date***" means the date on which the Final DIP Order shall have been entered on the docket of the Bankruptcy Court.

"***Financial Officer***" in respect of any Person means the chief executive officer, chief restructuring officer, president, chief financial officer, chief accounting officer, any vice-president, controller, treasurer or any assistant treasurer of such Person.

"***First DIP Funding Date***" means the date of the Initial Borrowing under the DIP Facility pursuant to **Error! Reference source not found.**.

"***Fiscal Quarter***" means a fiscal quarter of any Fiscal Year.

"***Fiscal Year***" means a fiscal year of the Borrower ending on December 31 of each calendar year.

"***Foreign Lender***" means a Lender that is not a USVI Person.

"***Fund***" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"***Funding Date***" means each date on which an Advance is funded following the satisfaction or waiver of the conditions in Section 4.01 and 4.02.

"***Funding Notice***" has the meaning specified in Section 2.02(a).

"***GAAP***" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, as in effect from time to time.

"***Governmental Authority***" means any federal, territorial, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof, or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, the U.S. Virgin Islands or, to the extent applicable and legally binding, a foreign entity or government (including any supra-national bodies such as the European Union or the European Central Bank).

"***Governmental Authorization***" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, registration, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"***Group***" has the meaning specified in Section 5.01(v)(i).

"***Guarantors***" has the meaning set forth in the preamble hereto.

"***Hazardous Materials***" means (a) any petrochemical or petroleum products, oil, waste oil, asbestos in any form that is or could become friable, urea formaldehyde foam insulations, toxic mold, lead-based paint and polychlorinated biphenyls; (b) any products, mixtures, compounds, materials, wastes or substances, air emissions, toxic substances, wastewater discharges and any chemical, material, waste or substance that may give rise to liability pursuant to, or is listed or regulated under, or the human exposure

13

to which or the Release of which is controlled or limited by Environmental Laws; and (c) any materials, wastes or substances defined in Environmental Laws as "*hazardous*," "*toxic*," "*pollutant*," or "*contaminant*," or words of similar meaning or regulatory effect.

"*Hazardous Materials Activity*" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the generation, use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"*Hedge Agreement*" means (a) any and all interest rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc. or any Master Agreement, including any such obligations or liabilities under any Master Agreement.

"*Highest Lawful Rate*" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"*Holdco Loan Documents*" has the meaning given to the term "Holdco Loan Documents" in the Pre-Petition Term Credit Agreement.

 "*Holdings*"  has the meaning assigned to such term in the preamble hereto.

"*Hovensa Confirmation Order*" means the Order Granting Final Approval of Disclosure Statement and Confirming Chapter 11 Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, Case No. 1:15-bk-10003 (MFW) (Jan. 20, 2016) Docket No. 572 (i) approving the Debtor's Second Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, Case No. 1:15-bk-10003 (MFW) (Jan. 19, 2016) Docket No. 563 and (ii) granting other relief as set forth therein.

"*Indemnified Taxes*" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"*Indemnitee*" has the meaning specified in Section 10.02(b).

"*Initial Borrowing*" means the first Borrowing of Advances on or after the Closing Date.

"*Initial Commitment Period*" means the period commencing on the date of entry of the Interim DIP Order and ending on the date of entry of the Final DIP Order.

"**_Initial Lenders_**" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders.

"**_Insurance Consultant_**" means Marsh Ltd or any other insurance consultant reasonably acceptable to the Administrative Agent engaged by the Borrower.

"**_Insurance Premium Financers_**" means any Person (other than an Affiliate of the Borrower) that advances insurance premiums for one or more of the Borrower Parties pursuant to an Insurance Premium Financing Arrangement.

"**_Insurance Premium Financing Arrangement_**" means any agreement between an Insurance Premium Financer and a Borrower Party that (a) does not provide, for the benefit of such Insurance Premium Financer, any security interest in any property of the Borrower Parties other than gross unearned premiums for the insurance policies and related rights and proceeds therefrom, and (b) does not prohibit the Liens created in favor of Collateral Agent pursuant to the Security Documents.

"**_Insurance Proceeds_**" means, with respect to any Casualty Event, the Net Cash Proceeds received by any of Borrower Parties from time to time with respect to such Casualty Event (regardless of whether such claims or proceeds are relating to events that have occurred prior to, on or after the Petition Date); provided that any such proceeds that constitute Inventory Financing Collateral shall be deemed to not be "Insurance Proceeds" for all purposes hereof until the Discharge of Inventory Financing Obligations (as defined in the Pre-Petition Depositary Agreement) has occurred.

"**_Insurance Report_**" means the Limetree Bay Refinery Final Report on the Insurance, dated as of November 8, 2018, by the Insurance Consultant.

"**_Interest Payment Date_**" has the meaning given such term in Section 2.05(b) hereof.

"**_Interest Rate Hedge_**" means, individually or collectively, as the context may require, each interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure.

"**_Interim DIP Order_**" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing under Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure in form and substance reasonably acceptable to the Required Lenders and the Agent authorizing and approving, among other things, the DIP Facility on an interim basis, the terms of this Agreement and the other Loan Documents on an interim basis, and the granting of the Liens on the Collateral with the priority contemplated in this Agreement, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time with the express consent of the Required Lenders.

"**_Internal Revenue Code_**" means the Internal Revenue Code of 1986, as amended, or with regard to the application of the Internal Revenue Code to the U.S. Virgin Islands, the "mirror" system whereby the "U.S. Virgin Islands" is substituted for the "United States" wherever the latter appears, pursuant to 48 U.S.C. 1397.

"**_Inventory Financing Collateral_**" has the meaning given to the term "Inventory Financing Collateral" in the DIP Order.

"**_Inventory Financing Facility_**" has the meaning given to the term "Inventory Financing Facility" in the Pre-Petition Term Credit Agreement.

"***Investment***" means (a) any direct or indirect purchase or other acquisition by any Borrower Party of, or of a beneficial interest in, any of the Securities of any other Person; (b) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Borrower Party from any Person, of any Capital Stock of such Person; and (c) any direct or indirect loan, advance or capital contributions by any Borrower Party to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment *plus* the cost of all additions thereto, without any adjustments for increases or decreases in value, or write ups, write downs or write offs with respect to such Investment.

"***IRS***" means the United States Internal Revenue Service or, where applicable, the Virgin Islands Bureau of Internal Revenue.

"***J. Aron***" means J. Aron & Company LLC, a limited liability company organized under the laws of the State of New York.

"***J. Aron Transaction Documents***" has the meaning given such term in the DIP Order.

"***Joint Venture***" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; *provided* that in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"***LBE***" means Limetree Bay Energy, LLC, a Delaware limited liability company.

"***LBR Revenue Account***" has the meaning specified in the Pre-Petition Depositary Agreement.

"***LBRH***" has the meaning specified in the preamble hereto.

"***LBRM***" has the meaning specified in the preamble hereto.

"***LBRO***" has the meaning specified in the preamble hereto.

"***LBS***" has the meaning specified in the preamble hereto.

"***LBT***" has the meaning assigned to such term in the recitals.

"***Lender***" means the Initial Lenders and each other person that becomes a Lender hereunder pursuant to an Assignment and Assumption.

"***Lien***" means (a) any lien, mortgage, deed of trust, deed to secure debt, pledge, collateral assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities. For the avoidance of doubt, "***Lien***" shall not include any netting or set-off arrangements under any Contractual Obligation (other than any Contractual Obligation constituting Debt for Borrowed Money or having the effect of Debt for Borrowed Money) otherwise permitted under the terms hereof.

"***Loan Documents***" means this Agreement, each Security Document, the DIP Budget and each other document delivered to the Administrative Agent in connection with this Agreement and/or the credit extended hereunder, including without limitation the Fee Letter, in each case, as amended, amended and restated, supplemented or otherwise modified from time to time.

16

"**Loan Parties**" means the Borrower Parties.

"**Margin Stock**" has the meaning specified in Regulation U.

"**Master Agreement**" means any Master Agreement published by the International Swaps and Derivatives Associations, Inc.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, operations, properties, assets or condition (financial or otherwise) of the Borrower Parties taken as a whole (other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases), (b) the ability of the Borrower Parties, taken as a whole, to fully and timely perform their material Obligations under the Loan Documents or (c) the material rights, remedies or benefits available to the Agents and the Secured Parties, taken as a whole, under the Loan Documents. A "Material Adverse Effect" shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"**Material Contract**" has the meaning given to the term "Material Contract" in the Pre-Petition Term Credit Agreement.

"**Maturity Date**" means earliest to occur of: (a) the date that is nine (9) months after the date of entry of the Interim DIP Order, (b) the date of the closing of a sale of all or a material portion of the Borrower Parties' assets under section 363 of the Bankruptcy Code, (c) the effective date of any confirmed plan in the Chapter 11 Cases, (d) the filing of a motion or other pleading requesting (or the entry of an order approving) the appointment of a trustee, other estate fiduciary or an examiner with special or expanded powers which the Debtors fail to timely oppose without the prior written consent of the Administrative Agent and the Lenders;  (e) the date of acceleration of the Advances or termination of the Commitment by the Required Lenders or the Administrative Agent (at the direction of the Required Lenders) pursuant to Section 7.01 following an Event of Default; and (f) the occurrence of a Termination Event (as defined in the DIP Order).

"**Milestones**" has the meaning specified in Section 6.01(p).

"**Monthly Toll Payments**" means an amount equal to the "Monthly Toll Payments" under and as defined in the Tolling Agreement as calculated pursuant to the Tolling Agreement, without giving effect to any netting or set-off against amounts owed to BP (which amounts shall be deemed paid by BP for purposes of the definition of "Non-Toll Amounts" and Section 2.04(b)(v) hereof and Section 3.07 and Article VI of the Pre-Petition Depositary Agreement if paid by BP, netted or set-off against amounts owed to BP or paid pursuant to the BP Guaranty).

"**Moody's**" means Moody's Investors Service, Inc.

 "**Mortgaged Property**" means any Real Estate Assets then owned in fee by the Borrower that is subject to a Mortgage, as set forth on Schedule 1.01(a).

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA and that is subject to Title IV of ERISA.

"**Net Cash Proceeds**" means:

(i)        with respect to any Asset Sale, the excess, if any, of (a) the sum of Cash and Cash Equivalents received by the Borrower Parties in connection with such Asset Sale (including Business Interruption Insurance Proceeds, or payments in lieu thereof, any Cash or Cash

17

Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and including any proceeds received as a result of unwinding any related Secured Interest Rate Hedge Agreement in connection with such related transaction) minus (b) the sum of (1) the reasonable out of pocket costs, fees, commissions, premiums and expenses (including legal fees and expenses) incurred by the Borrower Parties in connection with such Asset Sale to the extent such amounts were not deducted in determining the amount referred to in sub-clause (a), (2) federal, state, provincial, foreign and local (including U.S. Virgin Islands) Taxes reasonably estimated (on a Consolidated basis) to be payable by the Borrower Parties (or their respective beneficial owner) within the current or the immediately succeeding tax year as a result of any gain recognized in connection therewith to the extent such amounts were not deducted in determining the amount referred to in sub-clause (a); and (3) a reasonable reserve determined by a Financial Officer of the Borrower Parties in its reasonable business judgment and only for so long as and to the extent required under the applicable purchase agreement for any purchase price adjustments (including working capital adjustments or adjustments attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale) expressly contemplated by the purchase agreement relating to such Asset Sale;

(ii)      with respect to the incurrence or issuance of any Debt by the Borrower Parties (other than the DIP Loans), an amount equal to the sum of the Cash and Cash Equivalents received by the Borrower Parties in connection with such incurrence or issuance (including any proceeds received as a result of unwinding any related Secured Interest Rate Hedge Agreement in connection with such related transaction); and

(iii)      with respect to any proceeds of or under any casualty or property insurance, indemnity, condemnation awards, warranty or guaranty (other than Business Interruption Insurance Proceeds) received by the Borrower Parties in connection with the occurrence of any Casualty Event or Event of Eminent Domain, an amount equal to (a) the sum of Cash and Cash Equivalents received by the Borrower Parties in connection with such Casualty Event or Event of Eminent Domain (including any proceeds received as a result of unwinding any related Secured Interest Rate Hedge Agreement in connection with such related transaction) minus (b) the sum of (1) the reasonable out of pocket costs and expenses (including legal fees and expenses) incurred by the Borrower Parties in connection with the collection, enforcement, negotiation, consummation, settlement, proceedings, administration or other activity related to the receipt or collection of the relevant proceeds to the extent such amounts were not deducted in determining the amount referred to in sub-clause (a), and (2) federal, state, provincial, foreign and local (including U.S. Virgin Islands) Taxes reasonably estimated (on a Consolidated basis) to be payable by the Borrower Parties (or their respective beneficial owner) within the current or the immediately succeeding tax year as a result of any gain recognized in connection therewith.

"*Non-Defaulting Lender*" means, at any time, a Lender that is not a Defaulting Lender.

"*Non-Toll Amounts*" means all amounts payable to the Loan Parties under the Tolling Agreement, the Feedstock Supply Agreement and/or the Product Offtake Agreement, other than the Monthly Toll Payment, any Tolling Agreement Prepayments and any other amount the prepayment of which results in reduction of the Toll Balance (as defined in the Tolling Agreement).

"*Note*" means a promissory note of the Borrower payable to any Lender, in substantially the form of Exhibit B, evidencing the indebtedness of the Borrower to such Lender resulting from the Advances made by such Lender, as amended.

"**_Obligations_**" means all obligations of every nature of each Loan Party, including from time to time owed to any Agent (including former Agents) or any Lender from time to time under any Loan Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Loan Party, would have accrued on any Obligation, whether or not a claim is allowed against such Loan Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise fees, yield maintenance, premium, expenses, indemnification or otherwise.

"**_OECD_**" means the Organization for Economic Cooperation and Development.

"**_OFAC_**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**_Operating Agreement_**" means, that certain Refinery Operating Agreement, dated July 2, 2018, by and between the Government of the U.S. Virgin Islands and the Borrower.

"**_Organizational Documents_**" means, with respect to any Person, as applicable, its certificate or articles of incorporation or organization, by laws, certificate of partnership, partnership agreement, certificate of formation, articles of organization, limited liability company agreement and/or operating agreement, and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Person's partnership interests, limited liability company interests or authorized shares of Capital Stock, in each case as amended.

"**_Other Connection Taxes_**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Advance or Loan Document).

"**_Other Taxes_**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**_Participant_**" has the meaning specified in Section 10.05(d).

"**_Participant Register_**" has the meaning specified in Section 10.05(d).

"**_Patriot Act_**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"**_PBGC_**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**_Pension Plan_**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is or was subject to Title IV or ERISA, Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**_Permitted Capital Expenditures_**" means (a) Required Capital Expenditures and (b) other Capital Expenditures to the extent approved by the Required Lenders (and any other party whose approval is required pursuant to the terms of the DIP Order).

"**_Permitted Interim Activities_**" means any activities that the Borrower Parties may undertake or consummate, using its reasonable business judgment, solely to the extent such activities are undertaken or

19

consummated (i) in furtherance of any Required Shutdown Activities, (ii) as permitted by and in accordance with the DIP Budget and the DIP Order, and (ii) in all material respects in accordance with Prudent Industry Practice, Governmental Authorizations and Contractual Obligations binding on it and applicable laws.

"*Permitted Liens*" means:

(i)    "Permitted Liens" as such term is defined in the Pre-Petition Term Credit Agreement;

(ii)    Liens for Taxes, to the extent not required to be paid pursuant to Section 6.01(b);

(iii)    statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens arising in the ordinary course of business which secure amounts not overdue for a period of more than 90 days or if more than 90 days overdue, are unfiled and no other action has been taken to enforce such Lien or which are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP to the extent required by GAAP;

(iv)    Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of statutory obligations, surety and appeal bonds (other than bonds related to judgment or litigation to the extent such judgment or litigation constitutes a Default), leases, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of Debt for Borrowed Money or other Debt), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of Property of the Borrower Parties;

(v)    easements, rights-of-way, restrictions, title imperfections, encroachments, other minor defects or irregularities in title and similar matters if the same do not detract from the Required Shutdown Activities or the operation or use the Refinery in the ordinary conduct of the business of the Borrower Parties (taken as a whole);

(vi)    (i) any interest or title of a licensor, lessor or sublicensor or sublessor under any lease (including a ground lease) or license permitted by this Agreement, (ii) any Lien or restriction that the interest or title of such lessor, licensor, sublessor or sublicensor may be subject to and (iii) to the extent constituting a Lien, leases, licenses, subleases or sublicenses granted to others that do not interfere with the Required Shutdown Activities or the ordinary conduct of the business of the Borrower Parties (taken as a whole);

(vii)    purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(viii)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(ix)    encumbrances on real property in the nature of any zoning restrictions, building and land use laws, ordinances, orders, decrees, restrictions or any other conditions imposed by any Governmental Authority on any Real Estate Asset, if the same does not have an adverse effect on the Required Shutdown Activities or the operation or use the Refinery in the ordinary conduct of the business of the Borrower Parties (taken as a whole);

(x)      non-exclusive licenses or sublicenses of patents, copyrights, trademarks and other intellectual property rights granted by any Borrower Party in the ordinary course of business and not interfering in any material respect with the ordinary conduct of or materially detracting from the value of the business of the Borrower Parties;

(xi)      any exceptions on any mortgage policies, surveys, title reports, title commitments, endorsements or other similar documents related to the Mortgaged Properties listed on Schedule 1.01(a) that (A) are not monetary in nature, (B) do not secure Debt and (C) in the aggregate, do not interfere with the Required Shutdown Activities or the operation or use the Refinery in the ordinary conduct of the business of the Borrower Parties (taken as a whole);

(xii)      junior Liens under the Operating Agreement and the USVI Mortgage and Security Agreement in favor of the Government of the Virgin Islands;

(xiii)      (A) Liens under the Security Documents (including DIP Liens), (B) Liens on the Inventory Financing Collateral pursuant to the J. Aron Transaction Documents, and (C) junior Liens securing Pre-Petition Debt of the Borrower Parties permitted under Section 6.02(b)(ii);

(xiv)      Liens or pledges of deposits of Cash or Cash Equivalents securing letters of credit permitted under Section 6.02(b)(viii);

(xv)      any Lien with respect to the Properties of any Borrower Party that arose under Prudent Industry Practices on or prior to the Closing Date and the foreclosure of which is not material to the operation or use of the Refinery in the ordinary course of business;

(xvi)      Liens securing judgments (or the payment of money not constituting an Event of Default under Section 7.01(g)) or securing appeal or other surety bonds related to such judgments;

(xvii)      Liens arising by virtue of any statutory or common law provision relating to bankers' liens, rights of set-off or similar rights;

(xviii)      Liens or pledges of deposits of Cash or Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions or similar obligations to providers or property, casualty or liability insurance in the ordinary course of business;

(xix)      (A) Liens existing on the Closing Date and listed on Schedule III, and (B) Liens arising under Contractual Obligations listed on Schedule IV; *provided* that the Lien does not extend to any additional property;

(xx)      any easements, rights of way, restrictions, covenants, duties, agreements and other obligations provided for in the Real Estate Documents, as and to the extent contemplated thereunder on the Funding Date;

(xxi)      Liens consisting of an agreement to Dispose of any property in a Disposition permitted hereunder solely to the extent that such investment or Disposition would have been permitted on the date of the creation of such Lien;

(xxii)      obligations under or in connection with management services agreements, the Shared Services Systems Agreement or other agreements relating to any Shared Facilities or any related non-disturbance arrangements to the extent such obligations constitute Liens;

(xxiii)      (A) rights of any Governmental Authority arising by reason of their control over navigable waters in the interest of navigation and commerce and/or the inalienable right of any

21

Governmental Authority in the lands and/or waters of such character, (B) title to any filled in land, littoral rights, and riparian rights, and (C) rights of any Governmental Authority in the public lands lying below the mean high water mark; and

(xxiv)   rights, if any, of the public acquired by virtue of territorial statute with respect to the special nature of seaside beaches to use any part of the subject property which lies within the area defined as running inland a distance of 50 feet from the seaward line of low tide, or to the extreme seaward boundary of natural vegetation which spreads continuously inland, or to the natural barrier, whichever is the shortest distance;

in each case, to the extent such Liens are created, incurred or assumed on or after the Petition Date, solely to the extent such Liens are created, incurred or assumed in connection with the Required Shutdown Activities.

"*Person*" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"*Petition Date*" has the meaning specified in the recitals to this Agreement.

"*PIK Loans*" means the aggregate principal amount of the Obligations which are, during the term of this Agreement, added to the Obligations by payment in kind of PIK Interest.

"*Platform*" has the meaning specified in Section 10.01(d)(i).

"*Pledge Agreement*" means a pledge agreement delivered pursuant to Section 6.01(k)(ii), among Holdings and the Collateral Agent with respect to Holdings' Capital Stock in Borrower.

"*Post-Petition*" means the time period following the Petition Date.

"*Post-Petition Debt*" means Debt incurred after the Petition Date.

"*Pre-Petition*" means the time period prior to the Petition Date.

"*Pre-Petition Agents*" means, individually or collectively, as the context may require, the Pre-Petition Revolving Administrative Agent, the Pre-Petition Term Administrative Agent, the Pre-Petition Collateral Agent and the Pre-Petition Inventory Financing Agent, together with all successors and assigns.

"*Pre-Petition Collateral*" means all properties and assets of the Loan Parties, now owned or hereafter acquired, in which Liens have been granted (or are purported to have been granted) to (i) the Pre-Petition Collateral Agent to secure all the Pre-Petition Project Secured Obligations and (ii) to the Pre-Petition Inventory Financing Agent to secure all the Pre-Petition Inventory Financing Obligations.

"*Pre-Petition Collateral Agent*" means the "Project Collateral Agent" under and as defined in the Pre-Petition Depositary Agreement and all successors and assigns.

"*Pre-Petition Collateral Documents*" has the meaning given to the term "Collateral Documents" in the Pre-Petition Depositary Agreement.

"*Pre-Petition Depositary*" means the "Depositary" under and as defined in the Pre-Petition Depositary Agreement.

"***Pre-Petition Depositary Agreement***" means that certain Amended and Restated Depositary and Intercreditor Agreement, dated as of March 3, 2020, among the Borrower Parties, the Pre-Petition Term Administrative Agent, the Petition Revolving Administrative Agent, the Pre-Petition Collateral Agent, J. Aron as the Inventory Financing Facility Agent, the Pre-Petition Depositary and the other Persons from time to time party thereto, as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof.

"***Pre-Petition Debt***" means the Debt of the Borrower Parties arising before the Petition Date relating to the Borrower Parties' bankruptcy estates, including related to the Pre-Petition operation of the Borrower Parties' business.

"***Pre-Petition Financing Documents***" means, individually or collectively, as the context may require, the Holdco Loan Documents, the Pre-Petition Term Loan Documents, the Pre-Petition Revolving Loan Documents and the Pre-Petition Inventory Financing Documents, and including, without limitation, the Pre-Petition Intercreditor Agreement, all security agreements, notes, guarantees, mortgages and UCC financing statements, in each case, as such documents are in effect on the date hereof.

"***Pre-Petition First Funding Date***" means November 30, 2018.

"***Pre-Petition Intercreditor Agreement***" means that certain Collateral Agency and Intercreditor Agreement dated as of November 20, among the Borrower Parties, the other obligors from time to time party thereto, the Pre-Petition Term Administrative Agent, the Pre-Petition Revolving Administrative Agent, the Pre-Petition Collateral Agent, as amended, restated, modified or supplemented from time to time prior to the date hereof.

"***Pre-Petition Inventory Financing Agent***" means the "Inventory Financing Facility Agent" under and as defined in the Pre-Petition Depositary Agreement and all successors and assigns.

"***Pre-Petition Inventory Financing Documents***" means the Pre-Petition Inventory Financing MMA and each other "Transaction Document" referred to therein.

"***Pre-Petition Inventory Financing MMA***" means that certain Monetization Master Agreement, dated as of March 3, 2020, among J. Aron, Borrower, LBRM and LBRO, as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof.

"***Pre-Petition Payment***" means a direct or indirect payment, redemption, purchase, defeasance or acquisition for value of principal or interest or otherwise on account of any Pre-Petition Debt or other Pre-Petition claims against any Loan Party.

"***Pre-Petition Revolving Administrative Agent***" means the "Administrative Agent" under and as defined in the Pre-Petition Revolving Credit Agreement and all successors and assigns.

"***Pre-Petition Revolving Credit Agreement***" means that certain Credit Agreement, dated as of November 20, 2018, between LBRM, as borrower, the other Borrower Parties, Holdings, the Pre-Petition Revolving Administrative Agent, the lenders party thereto from time to time, as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof.

"***Pre-Petition Revolving Loan Documents***" has the meaning given to the term "Loan Documents" in the Pre-Petition Revolving Credit Agreement.

"***Pre-Petition Secured Hedge Agreement***" has the meaning given to the term "Secured Hedge Agreement" in the Pre-Petition Depositary Agreement.

"***Pre-Petition Project Secured Obligations***" has the meaning given to the term "Secured Obligations" in the Pre-Petition Depositary Agreement.

"***Pre-Petition Secured Obligations***" means, individually or collectively, as the context may require, the Pre-Petition Project Secured Obligations and the Pre-Petition Inventory Financing Obligations.

"***Pre-Petition Inventory Financing Obligations***" has the meaning given to the term "Inventory Financing Secured Obligations" in the Pre-Petition Depositary Agreement.

"***Pre-Petition Project Secured Parties***" means the "Project Secured Parties" under and as defined in the Pre-Petition Depositary Agreement.

"***Pre-Petition Secured Parties***" means, individually or collectively, as the context may require, the Pre-Petition Project Secured Parties and the Pre-Petition Inventory Financing Secured Parties.

"***Pre-Petition Inventory Financing Secured Parties***" means the "Inventory Financing Secured Parties" under and as defined in the Pre-Petition Depositary Agreement.

"***Pre-Petition Security Agreement***" has the meaning given to the term "Security Agreement" in the Pre-Petition Depositary Agreement.

"***Pre-Petition Term Administrative Agent***" means the "Administrative Agent" under and as defined in the Pre-Petition Term Credit Agreement.

"***Pre-Petition Term Credit Agreement***" means that certain Credit Agreement, dated as of December 24, 2020, between the Borrower, as borrower, the other Borrower Parties, Holdings, the Pre-Petition Term Administrative Agent, the lenders party thereto from time to time, as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof.

"***Pre-Petition Term Lenders***" means the "Lenders" under and as defined in the Pre-Petition Term Credit Agreement.

"***Pre-Petition Term Loan Documents***" means the "Loan Documents" as defined in the Pre-Petition Term Credit Agreement.

"***Process Agent***" has the meaning specified in Section 10.13(d).

"***Product Offtake Agreement***" means that certain Product Offtake Agreement, dated as of November 15, 2018, by and between LBRM and BP, as amended by the First Amendment to Product Offtake Agreement dated as of April 15, 2019 and as further amended by the Second Amendment to Product Offtake Agreement, dated as of February 22, 2021.

"***Property***" means any right or interest in or to any asset or property of any kind whatsoever (including Capital Stock, undivided interests and interests as tenants in common), whether real, personal or mixed and whether tangible or intangible.

"***Pro Rata Share***" means, with respect to any amount, with respect to any Lender at any time and with respect to the DIP Facility, the product of such amount multiplied by a fraction the numerator of which is the amount of Advances owed to such Lender under the DIP Facility at such time and the denominator of which is the aggregate amount of the Advances then outstanding and owed to all Lenders under the DIP Facility at such time.

"**Prudent Industry Practice**" means those practices, methods, techniques, specifications and standards of safety and performance, as they may be modified from time to time, that (a) are generally accepted in the large-scale refinery industry as good, safe and prudent engineering practices in connection with the design, construction, operation, maintenance, repair or use of large-scale refinery facilities which are similar to the Refinery and (b) are otherwise in compliance in all material respects with applicable law and Governmental Authorizations.  Prudent Industry Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to be acceptable practices, methods or acts generally accepted in the region or as required by any Governmental Authority or standards setting agency.

"**Real Estate Assets**" means, at any time of determination, any fee or leasehold interest, easement, consent, permit or license, then owned or held by any Borrower Party in any real property.

"**Real Estate Documents**" means, collectively, each agreement, easement, license, lease, permit, revocable consent and other document or instrument specified on Schedule II.

"**Recipient**" means (a) each Agent and (b) any Lender, as applicable.

"**Refinery**" has the meaning assigned to such term in the recitals.

"**Refinery Deconstruction**" has the meaning specified in the Operating Agreement.

"**Register**" has the meaning specified in Section 10.05(c).

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time.

"**Regulation T**" means Regulation T of the Board of Governors, as in effect from time to time.

"**Regulation U**" means Regulation U of the Board of Governors, as in effect from time to time.

"**Regulation X**" means Regulation X of the Board of Governors, as in effect from time to time.

"**Related Fund**" means, with respect to any Equityholder that is an investment fund or holding company wholly owned by one or more investment funds, (a) with respect to any such investment fund, any other investment fund, account or company that is managed, advised or sub-advised by (i) the same investment advisor that manages, advises or subadvises such Equityholder or (ii) an Affiliate of such investment advisor or (b) with respect to any such holding company, any other holding company wholly owned by one or more investment funds, accounts or companies that is managed, advised or sub-advised by (i) the same investment advisor that manages, advises or sub-advises such Equityholder or (ii) an Affiliate of such investment advisor.  With respect to any the Equityholder referenced in clause (i) of the definition thereof or any of its Affiliates or Related Funds, "Related Fund" shall also include any swap, special purpose vehicles purchasing or acquiring security interests in collateralized loan obligations or any other vehicle through which any such Equityholder or any of its Affiliates or Related Funds may leverage its investments from time to time.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"***Remedies Notice Period***" has the meaning specified in the DIP Order.

"***Removal Effective Date***" shall have the meaning specified in Section 8.06(a).

"***Repayment Event***" means the repayment in full in cash of all of the outstanding principal amount of the Advances and all other monetary Obligations (other than contingent obligations) due and payable under the Loan Documents.

"***Required Capital Expenditures***" means all Capital Expenditures that are payable by a Borrower Party and reasonably necessary to permit the Borrower Parties to (a) operate or maintain the Refinery in accordance with Prudent Industry Practices and/or the Material Contracts (including turn-arounds and major maintenance), (b) comply with Governmental Authorizations or applicable law (including any Environmental Laws), (c) satisfy obligations under the Operating Agreement in respect of Refinery Deconstruction and, in any event, would not, if paid, constitute a breach of the DIP Order or cause an unpermitted variance under the DIP Budget, or (d) perform, undertake, or consummate the Required Shutdown Activities.

"***Required Lenders***" means, at any time, the Lender or Lenders holding more than 66.67% of the sum of (without duplication) the aggregate principal amount of the Advances outstanding at such time; *provided* that, if any Lender shall be a Defaulting Lender at such time, there shall be excluded from the determination of Required Lenders at such time the aggregate principal amount of the Advances owing to such Lender (in its capacity as a Lender) and outstanding at such time.

"***Required Shutdown Activities***" means all the activities that Borrower Parties must undertake, consummate and perform on and after the Petition Date in connection with the shutdown of operations at the Refinery and any other facilities owned or operated by such Borrower Parties, and in all cases, in accordance with the DIP Budget and the DIP Order.

"***Resignation Effective Date***" shall have the meaning specified in Section 8.06(a).

"***Responsible Officer***" means, as to any Person, any individual holding the position of chairman of the board (if an officer), president, chief executive officer or one of its vice presidents and such Person's treasurer or chief financial officer.

"***Restricted Payment***" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of a Borrower Party now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of a Borrower Party now or hereafter outstanding; (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of a Borrower Party now or hereafter outstanding; (d) management or similar fees payable to a Borrower Party's Affiliates; and (e) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in substance or legal defeasance), sinking fund or similar payment with respect to, any Debt owed by a Borrower Party to any of its Affiliates (other than any other Borrower Party).

"***S&P***" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"***Sanctions***" has the meaning specified in Section 5.01(v)(i).

26

"*Secured Parties*" means and includes the Administrative Agent, the Collateral Agent and each Lender.

"*Securities*" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "*securities*" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"*Security Documents*" mean the DIP Order and, after the execution and delivery thereof, each additional security document executed pursuant to Section 2.08 (if any).

"*Shared Facilities*" means the Shared Premises, Shared Services Systems and Shared Services Systems Sites, in each case, as defined in the Shared Services Systems Agreement.

"*Shared Services Systems Agreement*" has the meaning specified in the recitals hereto.

"*Solvent*" or "*Solvency*" means, with respect to any Borrower Party or group of Borrower Parties, as the case may be, that as of the date of determination, both (a) (i) the sum of such Persons' Debt (including contingent liabilities) does not exceed the present fair saleable value of such Persons' present assets (taken as a whole); (ii) such Persons' capital (taken as a whole) is not unreasonably small in relation to their business as contemplated on the applicable date of determination; and (iii) such Persons (taken as a whole) have not incurred and do not intend to incur, or believe (nor should they reasonably believe) that they will incur, Debt beyond their ability to pay such Debt as they become due (whether at maturity or otherwise); and (b) such Persons (taken as a whole) are "*solvent*" within the meaning given that term and similar terms under the Bankruptcy Code and applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under GAAP).

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, limited liability company, association, Joint Venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; *provided* that, in determining the percentage of ownership interests of any Person Controlled by another Person, no ownership interest in the nature of a "*qualifying share*" of the former Person shall be deemed to be outstanding. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower Parties.

"*Taxes*" means any present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Terminal*" has the meaning assigned to such term in the recitals.

"***Terminal Services Agreement***" means that certain Terminal Services Agreement, dated as of the Pre-Petition First Funding Date, by and between LBT and LBRM.

"***Terminal Services Agreement (Included Locations)***" means that certain Terminal Services Agreement (Included Locations), dated as of March 3, 2020, among J. Aron, LBRM and LBT, as amended, amended and restated, supplemented or otherwise modified from time to time.

"***Terminal Services Consent***" means that certain Collateral Assignment of Terminal Services Agreement, dated as of the Pre-Petition First Funding Date, among the Pre-Petition Collateral Agent and LBT with respect to the Terminal Services Agreement.

"***Testing Period***" has the meaning specified in Section 6.01(o)(vi).

"***Tolling Agreement***" means that certain Amended and Restated Tolling Agreement, dated as of February 22, 2021, by and among, by and among BP, the Borrower and LBRM.

"***Tolling Agreement Prepayment Account***" has the meaning specified in the Pre-Petition Depositary Agreement.

"***Tolling Agreement Prepayments***" means an amount equal to or deemed to be any "Excess Toll Payments" (as defined in the Tolling Agreement), a "Final Toll Payment" (as defined in the Tolling Agreement) or any other termination, cancellation or redemption payments that have the effect of reducing the Toll Balance (as defined in the Tolling Agreement), in each case, as calculated pursuant to the Tolling Agreement, without giving effect to any netting or set-off against amounts owed to BP (which amounts shall be deemed paid by BP for purposes of the definition of "Non-Toll Amounts", Section 2.04(b)(v) hereof and Section 3.07 and Article VI of the Pre-Petition Depositary Agreement if paid by BP, netted or set-off against amounts owed to BP or paid pursuant to the BP Guaranty).

"***Total Credit Exposure***" means, as to any Lender at any time, the outstanding Advances of such Lender at such time.

"***Transaction Documents***" means, individually or collectively, as the context may require, the Loan Documents and the Material Contracts.

"***Transactions***" means, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and, in each case, the other transactions contemplated therein or thereby, (b) the borrowing of the Advances hereunder and the use of proceeds thereof, (c) the payment of fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing, and (d) the other transactions to occur on or prior to the Funding Date pursuant to this Agreement.

"***UCC***" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided* that if, with respect to any filing statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Collateral Agent pursuant to the applicable Security Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any filing statement relating to such perfection or effect of perfection or non-perfection.

"***U.S. Trustee***" means the Office of the United States trustee.

"***USVI Mortgage and Security Agreement***" means that certain Mortgage and Security Agreement, dated as of the Pre-Petition First Funding Date, by and between the Borrower and the Government of the U.S. Virgin Islands.

"***USVI Existing LC***" means that certain irrevocable standby letter of credit no. 69606183, dated January 11, 2016, in the amount of $50,000,000 for the benefit of the Government of the U.S. Virgin Islands, issued by Citibank, N.A. for ArcLight Energy Partners Fund VI, L.P., a Delaware limited partnership, as applicant.

"***USVI Person***" means any Person that is a "U.S. Virgin Islands person" as defined in Section 7701(a)(30) of the Internal Revenue Code (as applicable in the U.S. Virgin Islands).

"***USVI Tax Compliance Certificate***" has the meaning specified in Section 3.05(f)(iii)(C)(1).

"***Voidable Transfer***" has the meaning specified in Section 9.08.

"***Withholding Agent***" means each of the Borrower and the Administrative Agent.


SECTION 1.02    Rules of Interpretation.  Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Loan Documents:

(a)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)    unless the context requires otherwise, (A) any definition of or reference to any agreement, instrument or other document herein (including any Loan Document but excluding any Pre-Petition Financing Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented and/or otherwise modified or replaced from time to time (subject to any restrictions on such amendments, amendments and restatements, supplements and/or other modifications or replacements set forth herein or therein) and shall include any appendices, schedules, exhibits, clarification letters, side letters and disclosure letters executed in connection therewith, and (B) any reference to a Schedule (or Part or any constituent term thereof) (other than Schedule 1 and Schedule 10.01(a)) shall be deemed to be a reference to the Pre-Petition Term Credit Agreement in effect as of the date hereof (without giving effect to any amendments thereunder) except to the extent that any such schedule is amended, restated, supplemented, deleted, or otherwise modified pursuant to the express terms of the Schedule appended hereto. For illustrative purposes only, any reference to Part I of Schedule 5.01(e) shall be deemed a reference to Part I of Schedule 5.01(e) of the Pre-Petition Term Credit Agreement in effect as of the date hereof (without giving effect to any amendments thereunder) except to the extent that the disclosure is amended, restated, supplemented, deleted, or otherwise modified pursuant to the express terms of the Part I of Schedule 5.01(e) appended hereto;

       (f)     any reference herein to any Person (other than any Equityholder) shall be construed to include such Person's successors and assigns to the extent permitted under the Loan Documents and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities;

       (g)     the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

       (h)     all references herein to Articles, Sections, Appendices, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Appendices, Exhibits and Schedules to, this Agreement;

       (i)     the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights;

       (j)     unless the context requires otherwise, any definition of or reference to any law or regulation shall be construed as referring to such law or regulation as from time to time amended, supplemented or otherwise modified;

       (k)     any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, limited partnership or trust, or an allocation of assets to a series of a limited liability company, limited partnership or trust (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person; and

       (l)     any division of a limited liability company, limited partnership or trust shall constitute a separate Person hereunder.

       SECTION 1.03    Accounting Terms; etc.

       (a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, as in effect from time to time, except as otherwise specifically prescribed herein.

       (b)     If at any time any change in GAAP or the application thereof would affect the computation of any requirement set forth in any Loan Document, and either the Borrower or the Required Lenders through the Administrative Agent shall so request, the Administrative Agent and the Borrower shall negotiate in good faith to amend such requirement to preserve the original intent thereof in light of such change in GAAP or the application thereof (subject to the approval of the Administrative Agent not to be unreasonably withheld, conditioned or delayed); *provided* that, until so amended, (i) such requirement shall continue to be computed in accordance with GAAP or the application thereof prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders a written reconciliation in form and substance reasonably satisfactory to the Administrative Agent, between calculations of such ratio or requirement made before and after giving effect to such change in GAAP or the application thereof.

       (c)     Notwithstanding anything to the contrary in this Agreement, for purposes of determining compliance with any basket, test, or condition under any provision of this Agreement or any

other Finance Document, no Loan Party may retroactively divide, classify, re-classify or deem or otherwise treat a historical transaction as having occurred in reliance on a basket or exception that was not available at the time of such historical transaction or if and to the extent that such basket or exception was relied upon for any later transaction.

SECTION 1.04   Certifications, Etc.   All certifications, notices, declarations, representations, warrants and statements made by any officer, director or employee or a Loan Party pursuant to or in connection with this Agreement shall be made in such Person's capacity as officer, director or employee on behalf of such Loan Party and not in such Person's individual capacity.

## ARTICLE II

## AMOUNTS AND TERMS OF THE ADVANCES

SECTION 2.01   The Advances.

(a)   Subject to the terms and conditions set forth herein and in the DIP Order, each Lender severally agrees to make advances of its Commitment (each an "***Advance***" and, collectively, the "***Advances***") from time to time on any Business Day during the Commitment Period to the Borrower in an aggregate principal equal to its Pro Rata Share of the aggregate Borrowing requested in each Funding Notice delivered under Section 2.02; *provided that* the Advance to be made by each Lender shall not exceed, on the date of such Advance, such Lender's Available Commitment at such time (each, a "***Borrowing***" and collectively the "***Borrowings***"); *provided* that, notwithstanding anything to the contrary herein, (x) during the Initial Commitment Period, only one Borrowing of Advances shall be available to the Borrower, and the aggregate principal amount of such Borrowing shall not exceed $5,500,000 and (y) upon and after the entry of the Final DIP Order, one or two additional Borrowings of Advances shall be available to the Borrower and the aggregate principal amount of such additional Borrowings shall not exceed $19,500,000; *provided further* that the aggregate principal amount of Advances to be made by the Lenders shall not exceed $25,000,000; *provided further* that the Lenders shall not be obligated to fund any Borrowing request if such disbursement would result in the Borrower Parties' pro-forma cash balance to exceed the Borrower Parties' cash balance in the DIP Budget at such time by $5,000,000 or more during the thirty (30) day period following the funding of the Borrowing requested in the Funding Notice, after giving pro forma effect to any planned expenditures projected to be made over such period in accordance with the DIP Budget.  Amounts repaid under the DIP Facility may not be reborrowed.

(b)   For purposes of calculating the Commitments, any Available Commitment, and any other provision of this Agreement or the DIP Order that relates to the amount of Advances which are authorized, permitted, and available for Borrowing, PIK Loans shall be disregarded in their entirety.

SECTION 2.02   Making the Advances.

(a)   Whenever the Borrower desires to incur Advances hereunder, the Borrower shall deliver the Funding Notice to the Administrative Agent not later than 12:00 p.m., New York City time (or such later time as may be required by the Administrative Agent or acceptable to the Required Lenders), no less than three (3) Business Days (or such shorter period as agreed by the Administrative Agent in its sole discretion) before the date of the proposed Borrowing.  Each such notice (the "***Funding Notice***") shall be in writing, may be delivered by telecopier or electronic communication, and shall be in substantially the form of Exhibit C, specifying therein the requested (i) Funding Date as the date of such Borrowing and (ii) aggregate amount of such Borrowing. The Funding Notice for the first Advance upon or after the entry of the Interim DIP Order shall be in a principal amount of $5,500,000. Each subsequent Funding Notice for Advances upon or after entry of the Final DIP Order shall be in a principal amount of $5,000,000 or more,

31

unless the aggregate of each Lender's Available Commitment is less than $5,000,000, in which case the request for Advances may be for the aggregate amount of each Lender's Available Commitment. Upon and after the entry of the Final DIP Order, the Borrower may not request more than two (2) Advances in any ten (10) Business Day period.

(b)       Promptly upon receipt by the Administrative Agent of such Funding Notice, the Administrative Agent shall notify each Lender of the proposed Borrowing and its pro rata share of the aggregate amount of Loans requested pursuant to such Funding Notice.

(c)       No later than 4:00 p.m., New York City time on the date specified in each Funding Notice, each Lender shall credit the Borrower Account (or if the Borrower Account is not established, such other account designated by the Borrower and approved by the Administrative Agent) with its Pro Rata Share of the aggregate amount of Advances requested pursuant to the applicable Funding Notice to be made on such date. The failure of any Lender to make any Advances required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Commitment of the Lenders is several and no Lender shall be responsible for any other Lender's failure to make Advances as required; *provided*, *further*, that nothing in this Section 2.02 shall prejudice any rights that the Borrower may have against a Defaulting Lender.

SECTION 2.03       Repayment of Advances.       The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders the outstanding principal amount of the Advances and PIK Loans on the Maturity Date.

SECTION 2.04       Prepayments.

(a)       Optional.

(i)       The Borrower may, so long as it is in compliance with the DIP Budget at such time and upon at least three Business Day's written notice substantially in the form of Exhibit D to the Administrative Agent stating the proposed date and aggregate principal amount of the prepayment, and, if such notice is given, the Borrower shall, prepay the outstanding aggregate principal amount of the Advances composing part of the same Borrowing or PIK Loans, in whole or ratably in part, together with accrued and unpaid interest to the date of such prepayment on the aggregate principal amount prepaid; *provided* that each partial prepayment shall be in an aggregate principal amount of $100,000 or an integral multiple of $50,000 in excess thereof.

(ii)       Each voluntary prepayment of the Advances and/or PIK Loans shall be applied, ratably, to prepay the Advances or PIK Loans until the outstanding Advances and PIK Loans are repaid in full.

(iii)       Notice required to be given under this clause (a) must be given in writing, including by telecopier or electronic communication, to the Administrative Agent by 12:00 noon (New York City time) on the date required (and the Administrative Agent will promptly transmit such notice by telecopier or electronic communication to each Lender).

(b)       Mandatory.

(i)       The Borrower shall, within thirty (30) days after the last day of each Fiscal Quarter, commencing with the first such date occurring after the First DIP Funding Date, prepay, the Advances outstanding on such day in an aggregate amount equal to 100% of Excess Cash Flow.

32

(ii)    Except as expressly permitted by the DIP Budget, within five Business Days of the date of receipt of any Asset Sale Proceeds, Insurance Proceeds, Eminent Domain Proceeds or Contract Termination Proceeds by the Borrower, the Borrower shall (in each case without duplication) prepay an aggregate principal amount of the Advances, in the order of priority set forth in clause (b)(viii) below, in an aggregate amount equal to the amount of such Asset Sale Proceeds, Insurance Proceeds, Eminent Domain Proceeds or Contract Termination Proceeds. No prepayment shall be required pursuant to this Section 2.04(b)(ii) to the extent the Asset Sale Proceeds, Insurance Proceeds, Eminent Domain Proceeds or Contract Termination Proceeds do not exceed $500,000 in a single transaction or related series of transactions (and only such excess shall be required to be prepaid) and to the extent any Asset Sale Proceeds, Insurance Proceeds, Eminent Domain Proceeds or Contract Termination Proceeds remain after the foregoing application to the Obligations, the Commitment shall be permanently reduced dollar for dollar on a pro rata basis by such remaining Asset Sale Proceeds, Insurance Proceeds, Eminent Domain Proceeds or Contract Termination Proceeds. Notwithstanding the foregoing, with respect to Insurance Proceeds and Eminent Domain Proceeds, up to fifty percent (50%) of such Insurance Proceeds and Eminent Domain Proceeds may be reinvested by the Borrower Parties, and used for purposes permitted under and to the extent consistent with the DIP Budget, if the aggregate outstanding principal amount of Advances at such time is less than $5,500,000 and such reinvestment occurs prior to the Maturity Date.

(iii)    The Borrower shall, within five Business Days of the receipt of any Debt Proceeds by any Borrower Party (other than the Advances), prepay, an aggregate principal amount of the Advances in an aggregate amount equal to such Debt Proceeds.

(iv)    Anything contained in this Agreement to the contrary notwithstanding, (i) in no event shall the aggregate principal amount of the Advances at any time outstanding exceed the amount permitted to be outstanding hereunder pursuant to the DIP Order, in each case as the foregoing limits may be in effect from time to time and (ii) the Borrower agrees to immediately prepay the Advances in the amounts and at the times as may be necessary to comply with the foregoing clause (i).

(v)    The Borrower shall, within five Business Days of the receipt of any amounts in the Tolling Agreement Prepayment Account (including, without limitation, any Tolling Agreement Prepayments or Monthly Toll Payments), prepay an aggregate principal amount of the Advances in an aggregate amount equal to such amounts.

(vi)    The Borrower shall, within five Business Days of the receipt of any amounts from J. Aron (whether pursuant to the Pre-Petition Inventory Financing Documents or otherwise), prepay an aggregate principal amount of the Advances in an aggregate amount equal to such amounts.

(vii)    Concurrently with each prepayment made pursuant to clauses (b)(i) through (b)(v), the Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer demonstrating the calculation of the relevant amount.  In the event that the Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Borrower shall promptly make an additional prepayment of the Advances and the Borrower shall concurrently therewith deliver to the Administrative Agent in the amount of such excess a certificate of a Responsible Officer demonstrating the derivation of such excess.

33

(viii)    Each prepayment made pursuant to this <u>Section 2.04(b)</u> shall be applied ratably, to prepay the Advances until all outstanding Advances are paid in full together with all amounts referred to in <u>clause (ix)</u> below.

(ix)    All prepayments under this <u>Section 2.04(b)</u> shall be made together with (A) accrued and unpaid interest to the date of such prepayment on the principal amount prepaid, and (B) any amounts owing pursuant to <u>Section 10.02(g)</u> and, in each case, the amount of principal prepaid shall be correspondingly reduced by the amounts required to be paid pursuant to this <u>clause (ix)</u>.

(x)    All prepayments pursuant to this <u>Section 2.04(b)</u> shall be subject to the terms of the DIP Order.

SECTION 2.05    <u>Scheduled Interest</u>.

(a)    Except as otherwise set forth herein, the Advances and PIK Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof at the Applicable Rate.

(b)    Interest on the Advances and PIK Loans:

(i)    shall accrue on a daily basis at the Applicable Rate and (i) the portion of which accrued pursuant to the Applicable Cash Rate shall be paid in cash in arrears on the last Business Day of each calendar month after the First DIP Funding Date and on the Maturity Date (each such date, an "<u>Interest Payment Date</u>") with respect to interest accrued on and to each such date and (ii) the remaining portion of which accrued pursuant to the Applicable PIK Rate shall be payable in kind on each Interest Payment Date (other than the Maturity Date) unless otherwise paid in cash by the Borrower on such Interest Payment Date ("<u>PIK Interest</u>"); and

(ii)    shall be payable in cash in arrears upon any prepayment of the Advances or PIK Loans, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and

(c)    PIK Interest shall be capitalized, compounded and added to the unpaid principal amount of the Obligations on the applicable Interest Payment Date (other than the Maturity Date). The obligation of the Borrower to pay all such PIK Interest so added shall be automatically evidenced by any Notes issued to the Lenders (without modification or reissuance thereof). Notwithstanding the foregoing, the Borrower may pay any PIK Interest in cash so long as such payment will allow the Borrower to comply with the DIP Budget.

SECTION 2.06    <u>Termination or Reduction of the Commitments</u>. The Commitment shall automatically be permanently reduced on each date of Borrowing of Advances (after giving effect to the Advances incurred on such date) by an amount equal to the aggregate principal amount of the Advances incurred on such Borrowing date.

SECTION 2.07    <u>Promissory Notes</u>.

(a)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from the Advances owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.  The Borrower agrees that upon notice by any Lender to the Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other

evidence of indebtedness is required or appropriate in order for such Lender to evidence (whether for purposes of pledge, enforcement or otherwise) the Advances owing to, or to be made by, such Lender, the Borrower shall promptly execute and deliver to such Lender, with a copy to the Administrative Agent, a Note payable to such Lender in a principal amount equal to the Advances of such Lender.  All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)     The Register maintained by the Administrative Agent pursuant to <u>Section 10.05(c)</u> shall include a control account, and a subsidiary account for each Lender, in which accounts (taken together) shall be recorded (i) the date and amount of each Borrowing made hereunder (ii) the terms of each Assignment and Assumption delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iv) the amount of any sum received by the Administrative Agent from the Borrower hereunder and each Lender's share thereof.  The Borrower and each Lender intend that any obligation under the Note be in registered form as defined in Treas.  Reg. Sections 5(f).103-1(c) and 1.871-14(c).

(c)     Entries made in good faith by the Administrative Agent in the Register pursuant to <u>clause (b)</u> above shall be conclusive evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower, under this Agreement, absent manifest error; *provided* that the failure of the Administrative Agent to make an entry, or any finding that an entry is incorrect, which, in either case, shall be promptly corrected, in the Register shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

SECTION 2.08     <u>Collateral Matters</u>.

(a)     <u>Collateral Security Perfection</u>.  Each of the Borrower Parties agrees to take all actions that the Collateral Agent may reasonably request in its sole and absolute discretion to further secure the Obligations or perfect and protect the Collateral Agent's Liens for the benefit of the Secured Parties upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents (including, without limitation, security documents, mortgages, deeds of trust, subordination and intercreditor agreements), instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental authorizations and providing such other instruments and documents (in all cases without representation or warranty of any kind) in recordable form as the Collateral Agent or any Lender may reasonably request and, in all cases, in form and substance satisfactory to the Collateral Agent. Each Borrower Party hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Borrower Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Borrower Party is an organization, the type of organization and any organization identification number issued to such Borrower Party and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates.  Such Borrower Party agrees to furnish any such information to the Collateral Agent promptly upon request.  Notwithstanding the provisions of this <u>Section 2.08(a)</u>, the Interim DIP Order and Final DIP Order shall be sufficient and conclusive evidence of the validity, perfection, enforceability, non-avoidability and priority of the Liens without the necessity of filing financing statements or amendments, and the Collateral Agent and the Lenders shall have the benefits of the Interim DIP Order, and after the Final Order Entry Date, and the Final DIP Order. Notwithstanding anything to the contrary in the Loan Documents, the parties hereto and all their respective successors and assigns acknowledge and agree that (x) all provisions of the Loan Documents (including,

without limitation, in respect of Collateral and the DIP Lien) are and shall be subject to the terms of the DIP Order, all Aron Rights and all rights and remedies of J. Aron in connection with the Safe Harbor Agreements (as defined in the DIP Order) and (y) any and all actions taken by J. Aron (or permitted by J. Aron) with respect to the Inventory Financing Collateral in connection with the J. Aron Transaction Documents and/or the DIP Order, in each case, shall be permitted for all purposes under the Loan Documents.

(b)     Real Property.  Subject in all respects to the DIP Order and to the Carve-Out (solely upon the occurrence of a Termination Date (as defined in the DIP Order)), the Borrower and the Guarantors shall grant to the Collateral Agent on behalf of the Secured Parties a security interest in, and mortgage on, all of the right, title and interest of the Borrower and the Guarantors in all real property, if any, owned or leased by the Borrower or any of the Guarantors, together in each case with all of the right, title and interest of the Borrower and such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof, in each case to the extent secured pursuant to the Pre-Petition Mortgages, *provided* that, the Borrower Parties shall use best efforts to finalize all mortgages, deeds of trust and other related documents for purposes of granting a security interest in all real property of the Borrower Parties no later than 30 Business Days following the date hereof.  The Borrower and the Guarantors acknowledge that, pursuant to the Interim DIP Order or the Final DIP Order (as applicable), the Liens in favor of the Collateral Agent on behalf of the Secured Parties in all of such real property and leasehold interests shall be perfected without the recordation of any instruments of mortgage or assignment and the Collateral Agent and the Lenders shall have the benefits of the Interim DIP Order and, after the Final DIP Order Entry Date, the Final DIP Order.

## ARTICLE III

## OTHER PROVISIONS RELATING TO THE DIP FACILITY

SECTION 3.01     Default Interest.  Upon the occurrence and during the continuance of an Event of Default under Section 7.01, the Borrower shall pay interest on overdue amounts (a) payable on demand at a rate of 11% *per annum*; and (b) to the fullest extent permitted by applicable law, the amount of any overdue interest, fee or other overdue amount payable under this Agreement or any other Loan Document to any Agent or any Lender that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate *per annum* equal at all times to 11% *per annum*.  Payment or acceptance of the increased rates of interest provided for in this Section 3.01 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

SECTION 3.02     Fees. The Borrower shall pay to each Agent for its own account such fees as may from time to time be separately agreed between the Borrower and such Agent (including those fees set forth in the Fee Letter).

SECTION 3.03     Change of Circumstances.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in <u>clauses (b)</u> through <u>(d)</u> of the definition of "Excluded Taxes" and (C) Connection Income Taxes) on its Advances, Advance principal, Commitments or other obligations under the Loan Documents, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or the Advances made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, continuing or maintaining the Advances or of maintaining its obligation to make the Advances, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) in each case by an amount which such Lender or other Recipient deems to be material, then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered; *provided* that (A) the Borrower shall not be responsible for costs under this <u>clause (a)</u> or <u>clause (b)</u> below if such costs were incurred more than 180 days prior to receipt by the Borrower of the demand from the affected Lender or other Recipient, as the case may be, pursuant to this <u>clause (a)</u> or <u>clause (b)</u> below, unless the requirement resulting in such increased costs became effective during such 180-day period and retroactively applies to a date occurring prior to such 180-day period, in which case the Borrower shall be responsible for all such additional amounts described in this <u>clause (a)</u> or <u>clause (b)</u> below from and after such date of effectiveness and (B) a Lender or other Recipient, as the case may be, claiming additional amounts under this <u>Section 3.03</u> agrees to use commercially reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Lending Office if the making of such a designation would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender or other Recipient, as the case may be, be otherwise disadvantageous to such Lender or other Recipient, as the case may be.  A certificate as to the amount of such increased cost, submitted to the Borrower by such Lender or other Recipient, as the case may be, shall be conclusive and binding for all purposes, absent manifest error.

(b)     <u>Capital Requirements</u>.  If any Change in Law affecting a Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Advance made by such Lender to a level below that which such Lender or such Lender's or holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity) by an amount reasonably deemed by such Lender to be material, then from time to time, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as specified in <u>paragraph (a)</u> or <u>(b)</u> of this Section and delivered to the Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

37

(d)　　Delay in Requests.　Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.03 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section 3.03 for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 3.04　　Payments and Computations.

(a)　　The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off, not later than 12:00 noon (New York City time) on the day when due in Dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time being deemed to have been received on the next succeeding Business Day unless the Administrative Agent otherwise elects in its sole discretion.　The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by, or on behalf of, the Borrower is in respect of principal, interest, commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender, to such Lenders for the account of their respective Applicable Lending Offices ratably in accordance with the amounts of such respective Obligations then payable to such Lenders and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender, to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.　Upon its acceptance of an Assignment and Assumption and recording of the information contained therein in the Register pursuant to Section 10.05(c), from and after the effective date of such Assignment and Assumption, the Administrative Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Assumption shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)　　All payments in respect of the principal amount of the Advances shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of the Advances on a date when interest is due and payable with respect to the Advances) shall be applied to the payment of interest then due and payable before application to principal.

(c)　　All other computations of fees, interest and commissions shall be made on the basis of a 360-day year and actual days elapsed (including the first day but excluding the last day; *provided* that, if the Advance is repaid on the same day on which it is made, one day's interest shall be paid on the Advance).　Each determination by the Administrative Agent of an interest rate, fee or commission hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)　　Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

(e)　　If the Administrative Agent receives funds for application to the Obligations of the Borrower under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the Advance to which, or the manner in which, such funds are to be applied, the

38

Administrative Agent shall distribute such funds to each of the Lenders, in each case in accordance with such Lender's Pro Rata Share of the sum of the aggregate principal amount of the Advances outstanding at such time, in repayment or prepayment of such outstanding Advances or other Obligations then owing to such Lender and, if applicable, for application to such principal repayment installments thereof as the Administrative Agent shall direct.

(f)     The Administrative Agent shall deem any payment by or on behalf of the Borrower under this Agreement that is not made in same day funds prior to 12:00 noon (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the Administrative Agent until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day.  The Administrative Agent shall give prompt telephonic notice to the Borrower and each Lender (confirmed in writing) if any payment is non-conforming.  Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 7.01(a).  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 3.01 from the date such amount was due and payable until the date such amount is paid in full.

SECTION 3.05     Taxes.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.05) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     Payment of Other Taxes by the Borrower.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     Indemnification by the Borrower.  Without duplication of any obligation under Section 3.05(b), the Borrower shall indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.05) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent

for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.05(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e) <u>Evidence of Payments</u>. As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this <u>Section 3.05</u>, the Borrower shall deliver to the Administrative Agent the original or a copy of a receipt issued by such Governmental Authority evidencing such payment and a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f) <u>Status of Lenders</u>. (i) Any Recipient that is entitled to an exemption from or a reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Recipient, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.05(f)(ii)(A), (ii)(B) and (ii)(E) below) shall not be required if in the Recipient's reasonable judgment such completion, execution or submission would subject such Recipient to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Recipient.

(ii) Without limiting the generality of the foregoing,

(A) any Lender that is a USVI Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 for U.S. Virgin Islands tax purposes;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the Borrower or the Administrative Agent, as applicable) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1) executed copies of IRS Form W-8ECI for U.S. Virgin Islands tax purposes;

40

(2)　　in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code (as applicable in the U.S. Virgin Islands), (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code (as applicable in the U.S. Virgin Islands), a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code (as applicable in the U.S. Virgin Islands), or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (as applicable in the U.S. Virgin Islands) (a "***USVI Tax Compliance Certificate***") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, in each case, for U.S. Virgin Islands tax purposes;

(3)　　in the case of a Foreign Lender claiming the benefits of the exemption pursuant to Section 543, Chapter 13, Title 33, of the U.S. Virgin Islands Code, (x) a certificate substantially in the form of Exhibit F-1  and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, in each case, for U.S. Virgin Islands tax purposes;

(4)　　to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a USVI Tax Compliance Certificate substantially in the form of Exhibit E-2, Exhibit E-3, Exhibit F-2, Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable, in each case, for U.S. Virgin Islands tax purposes; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, or the exemption described in the preceding clause (iii), such Foreign Lender may provide a USVI Tax Compliance Certificate substantially in the form of Exhibit E-4 or a certificate substantially in the form of Exhibit F-4, as applicable, on behalf of each such direct and indirect partner; or

(5)　　in the case of a Foreign Lender claiming the benefits of the exemption for a foreign government under Section 892 of the Internal Revenue Code (as applicable in the U.S. Virgin Islands, pursuant to Section 3.05(i)), executed copies of IRS Form W-8EXP for U.S. Virgin Islands tax purposes;

(6)　　any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the Borrower or the Administrative Agent, as applicable) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form or forms prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Virgin Islands withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(C)    if a payment made to a Recipient under any Loan Document would be subject to U.S. federal or U.S. Virgin Islands withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, including as applicable in the U.S. Virgin Islands), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code, including as applicable in the U.S. Virgin Islands) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (E), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)    The Administrative Agent, and any successor or supplemental Administrative Agent that is not a USVI Person, shall deliver to the Borrower, on or prior to the date on which it becomes a party to this Agreement, a duly completed IRS Form W-9 for U.S. Virgin Islands tax purposes (or other appropriate IRS Form) with respect to payments to be received for its own account and shall assume primary responsibility for withholding under Chapters 3 and 4 of the Internal Revenue Code (as applicable in the U.S. Virgin Islands) with respect to payments to be received for the account of other Recipients, with the effect that the Borrower Parties may make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the U.S. Virgin Islands.

Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)    Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.05 (including by the payment of additional amounts pursuant to this Section 3.05), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 3.05 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Defined Terms.  For purposes of this Section 3.05, the term "applicable law" includes FATCA.

(i)    Section 892 of the Internal Revenue Code.  The parties to this Agreement acknowledge that, as of the date of this Agreement, Section 892 of the Internal Revenue Code was in effect for U.S. Virgin Islands tax purposes, by virtue of the "mirror" system by which the Internal Revenue Code is applied to the U.S. Virgin Islands.  The parties to this Agreement further agree, absent a Change in Law, to treat Section 892 of the Internal Revenue Code as being in effect for U.S. Virgin Islands tax purposes by virtue of such "mirror" system, for purposes of determining and applying U.S. Virgin Islands withholding taxes on interest payments pursuant to this Agreement.  The incorrectness of the acknowledgment in the first sentence of this Section 3.05(i) shall not result in any obligation of any Borrower Party to indemnify or pay additional amounts on account of any Excluded Taxes.

(j)    Survival.  Each party's obligations under this Section 3.05 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 3.06    Sharing of Payments, Etc.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on the Advances or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Advances and accrued interest thereon or other such obligations greater than its Pro Rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Advances and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Advances and other amounts owing them; *provided* that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)   the provisions of this Section 3.06 shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in its Advances to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section 3.06 shall apply).

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

SECTION 3.07    Use of Proceeds. The proceeds of the Advances shall be used only for (i) fees, costs, and expenses related to the Chapter 11 Cases (including any fees, costs, and expenses related to the DIP Facility and the professional fees and expenses of the Borrower Parties, the DIP Agent, and the DIP Lenders), (ii) post-petition operating expenses and working capital needs of the Borrower Parties including, but not limited to, those required to remain in, or return to compliance with the laws in accordance with 28 U.S.C. § 959, and such general and administrative expenses as are contained within the

43

DIP Budget, (iii) other disbursements contained within the DIP Budget, including those to pay (a) interest, fees and expenses (including attorneys' fees) to the Lenders in accordance with the DIP Facility; (b) income Taxes, (c) deposits made to utilities pursuant to an order of the Bankruptcy Court, (d) checks outstanding on the Petition Date that are re-issued in accordance with an order of the Bankruptcy Court, and (e) fees due the Office of the United States Trustee, (iv) payments of amounts due under certain settlement agreements entered into between the Loan Parties as described in in the DIP Budget, (v) other expenditures permitted by the DIP Order, and (vi) costs and expenses incurred or to be incurred by the Borrower Parties in connection with the labor required to safely shut-down all operations at the Refinery and other facilities owned or operated by the Loan Parties, in any and all cases, subject to the other limitations set forth in, and to the extent and in amounts not to exceed the amounts expressly set forth for such fees, costs and expenses in, the DIP Budget, this Agreement, and the DIP Order; provided, that no proceeds of the DIP Facility or the DIP Collateral may be used to investigate, initiate, prepare, assert, join, commence, support, or prosecute proceedings or actions on account of any purported offsets, recoupments, challenges, contests, attacks, objections, defenses, claims or counterclaims of any kind against any Agent, the Lenders, or any of their affiliates or to investigate any such purported offsets, recoupments, challenges, contests, attacks, objections, defenses, claims or counterclaims.

SECTION 3.08    Security.  Subject in each case to the entry and the terms of the DIP Order and the terms of the Loan Documents, the DIP Facility and the Obligations shall be entitled to superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of each of the Borrower Parties, and the Obligations shall be and hereby are secured by valid, enforceable and non-avoidable first priority priming Liens, subject and subordinate only to the Carve-Out, the Aron Rights and all rights and remedies of J. Aron in connection with the Safe Harbor Agreements (as defined in the DIP Order), in and to the Collateral.  Such Liens shall be granted pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code (subject to any Permitted Liens) and the DIP Order shall provide that such Liens shall be automatically perfected upon the entry of the Interim DIP Order without the need for any further action by the Administrative Agent, the Lenders or the Borrower, including the filing of any financing statements or the recording of any mortgages.

SECTION 3.9.    Defaulting Lenders.

(a)    Defaulting Lender Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders."

(ii)    Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.03 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of the Advances in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a Deposit Account and released pro rata in order to satisfy such

Defaulting Lender's potential future funding obligations with respect to the Advances under this Agreement; *fourth,* to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth,* to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if such payment is a payment of the principal amount of the Advances in respect of which such Defaulting Lender has not fully funded its appropriate share, such payment shall be applied solely to pay the Advances of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Advances of such Defaulting Lender until such time as the Advances are held by the Lenders pro rata in accordance with the Commitments under the Facility. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 3.10(a) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     Certain Fees. No Defaulting Lender shall be entitled to receive any fee pursuant to Section 3.02 for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)     Defaulting Lender Cure. If the Borrower, the Administrative Agent and Lenders agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of the outstanding Advances of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Advances and funded and unfunded participations in Notes to be held pro rata by the Lenders in accordance with the Commitments under the Facility, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE IV

## CONDITIONS PRECEDENT

SECTION 4.01     Conditions Precedent to Closing Date. Section 2.01 of this Agreement shall become effective on and as of the first date (the "***Closing Date***") on which the Administrative Agent determines in its sole and absolute discretion that the following conditions precedent have been satisfied

(and the obligation of each Lender to make an Advance is subject to the satisfaction of such conditions precedent before or concurrently with the Closing Date):

(a)     The Administrative Agent shall have received on or before the Closing Date the following, each dated as of the Closing Date (unless otherwise specified) and in form and substance reasonably satisfactory to the Administrative Agent:

(i)     This Agreement, duly executed and delivered by the parties hereto.

(ii)     a certificate of a Responsible Officer of the Borrower certifying the satisfaction of the conditions set forth in Section 4.01(b) through (g);

(b)     The representations and warranties of the Loan Parties contained in each Loan Document to which they are a party shall be true and correct in all material respects (or, if qualified by materiality, in all respects after giving effect to such qualification) on and as of such date other than any such representations or warranties that, by their terms, refer to a specific date other than such Funding Date, in which case such representation or warranty shall be true and correct in all material respects as of such specific date.

(c)     The Chapter 11 Cases shall have been filed in the Bankruptcy Court.

(d)     The Bankruptcy Court shall have entered the Interim DIP Order which shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(e)     The Required Lenders and the Administrative Agent shall have received the DIP Budget, in form and substance satisfactory to the Lenders, including as to all assumptions.

(f)     The Administrative Agent and the Lenders shall have received all such agreements, instruments, approvals, and other documents, each reasonably satisfactory to the Administrative Agent in form and substance, as the Administrative Agent may reasonably request.

(g)     The Loan Parties shall be in compliance with the terms of the Interim DIP Order.

(h)     The Administrative Agent and the Lenders shall have received (or each shall have agreed to arrangements for the) payment of all fees, costs and expenses then due and owing to the Administrative Agent and the Lenders (including all accrued and unpaid fees and expenses of the Administrative Agent's and Lenders' counsel and professional advisors at the discretion of the Administrative Agent and other compensation contemplated in connection with this Agreement and the Interim DIP Order payable to the Administrative Agent and the Lenders in respect of the transactions contemplated by this Agreement), in each case, to the extent invoiced at least two (2) Business Days prior to the Closing Date.

SECTION 4.02     Conditions Precedent to Each Borrowing.   The obligation of each Lender to make an Advance on any Funding Date (including the First DIP Funding Date) is subject to the

satisfaction (or waiver by the Lenders) of the following conditions precedent before or concurrently with such Funding Date:

(a)     The Administrative Agent shall have received on or before such Funding Date the following, each dated as of such Funding Date (unless otherwise specified) and in form and substance reasonably satisfactory to the Administrative Agent:

(i)     a certificate of a Responsible Officer of the Borrower certifying the satisfaction of the conditions set forth in Sections 4.02 (b) through (d);

(ii)     one or more Notes payable to the applicable Lender to the extent requested by such Lender pursuant to the terms of Section 2.07;

(iii)     a Funding Notice in respect of the Advances to be funded on such Funding Date.

(b)     The representations and warranties of the Loan Parties contained in each Loan Document to which they are a party shall be true and correct in all material respects (or, if qualified by materiality, in all respects after giving effect to such qualification) on and as of such date, before and after giving effect to the Advances on such Funding Date and to the application of the proceeds therefrom, other than any such representations or warranties that, by their terms, refer to a specific date other than such Funding Date, in which case such representation or warranty shall be true and correct in all material respects as of such specific date.

(c)     No Default or Event of Default shall exist at the time of, or immediately after giving effect to, the making of the Advances.

(d)     At the time of such Borrowing and after giving effect to the use of proceeds thereof, the Borrower Parties shall be in compliance with the DIP Budget, the proposed Advance is contemplated by the DIP Budget and the proceeds of the proposed Advance are to be applied in the manner, and to the extent, contemplated by the DIP Budget.

(e)     At the time of such Borrowing and after giving effect thereto, (i) if such Borrowing has been requested before the Final Order Entry Date, the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect, in each case, without the prior written consent of the Administrative Agent and (ii) if such Borrowing is requested after the Final Order Entry Date, the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect, in each case, without the prior written consent of the Administrative Agent.

(f)     If such Borrowing is requested after the Final Order Entry Date, the Borrower Parties shall be in compliance with the terms of the Final DIP Order.

(g)     If such Borrowing is requested after the Final Order Entry Date, the Administrative Agent and the Lenders shall have received a release agreement executed by each of the Loan Parties in form and substance satisfactory to the Administrative Agent and the Lenders.

(h)     The Administrative Agent and the Lenders shall have received (or each shall have agreed to arrangements for the) payment of all fees, costs and expenses then due and owing to the Administrative Agent and the Lenders (including all accrued and unpaid fees and expenses of the Administrative Agent's and Lenders' counsel and professional advisors at the discretion of the Administrative Agent and other compensation contemplated in connection with this Agreement and the

Interim DIP Order payable to the Administrative Agent and the Lenders in respect of the transactions contemplated by this Agreement), in each case, to the extent invoiced at least two (2) Business Days prior to such Funding Date.

SECTION 4.03    Notices.  Any Funding Notice shall be executed by a Responsible Officer of the applicable Borrower Party or Borrower Parties in a writing (including by telecopier or electronic communication) delivered to the Administrative Agent.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

SECTION 5.01    Representations and Warranties.  In order to induce each Agent and each Lender to enter into this Agreement, each Borrower Party represents and warrants to such Agent and Lender (x) on the Closing Date, (y) on each Funding Date, and (z) on any other date that representations are required to be made by the Borrower Parties herein as follows, all of the items referenced in this Section 5.01:

(a)    Organization; Requisite Power and Authority; Qualification.  Such Loan Party (i) is duly organized or formed, validly existing and, except as set forth in Schedule 5.01(a), in good standing (to the extent such concept exists under applicable law) under the law of the jurisdiction of its incorporation or formation as identified in Schedule 5.01(a), (ii) has all requisite power and authority to own and operate its Properties, to carry on its business as now conducted and as proposed to be conducted except where such failure has not had, and could not reasonably be expected to have, a Material Adverse Effect, (iii) subject to the granting of the Interim DIP Order or Final DIP Order, as applicable, has all requisite power and authority to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby and (iv) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

(b)    Capital Stock and Ownership.  The Capital Stock of each Borrower Party issued to any other Loan Party has been duly authorized and validly issued and is fully paid and non-assessable and is owned by a Loan Party free and clear of all Liens, except those created under the Pre-Petition Collateral Documents, the Loan Documents or other Permitted Liens.   Except as set forth on Schedule 5.01(b), there is no existing option, warrant, call, right, commitment or other agreement to which any Borrower Party is a party requiring, and there is no Capital Stock of any Borrower Party outstanding which upon conversion or exchange would require, the issuance by any Borrower Party of any Capital Stock or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, Capital Stock of any Borrower Party.  Schedule 5.01(b) correctly sets forth the ownership interest of the Loan Parties and the Refinery.

(c)    Due Authorization.  Subject to the granting of the Interim DIP Order or Final DIP Order, as applicable, the execution, delivery and performance of the Loan Documents to which such Loan Party is a party have been duly authorized by all necessary corporate, limited liability company or limited partnership (as applicable) action on the part of such Loan Party.

(d)    No Conflict.  The execution, delivery and performance by such Loan Party of the Loan Documents to which it is a party and the transactions contemplated by the Loan Documents by such Loan Party do not and will not (i) violate (A) any provision of any law or any governmental rule or regulation applicable to any such Loan Party, subject to entry of the DIP Order, (B) any of the

48

Organizational Documents of such Loan Party or (C) any order, judgment or decree of any court or other agency of government binding on such Loan Party except, in the case of sub-clauses (i)(A) and (i)(C) of this clause (d), where such violation could not reasonably be expected to have a Material Adverse Effect; (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation binding on any such Loan Party except to the extent such conflict, breach or default could not reasonably be expected to have a Material Adverse Effect; (iii) result in or require the creation or imposition of any Lien upon any of the Properties of any of such Loan Party (other than any Permitted Liens); or (iv) subject to the granting of the Interim DIP Order or Final DIP Order, as applicable, require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of such Loan Party, except for (A) such approvals or consents which have been obtained and are in full force and effect, and (B) any such approvals or consents the failure of which to obtain could not reasonably be expected to have a Material Adverse Effect.

(e)     Governmental Consents.  (i) Subject to the DIP Order, the execution, delivery and performance by such Borrower Party of the Loan Documents to which it is a party and the consummation of the transactions contemplated by the Loan Documents by such Borrower Party do not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for (A) the registrations, consents, approvals, notices or other actions which have been duly obtained, taken, given or made and, are in full force and effect, (B) registrations, consents, approvals, notices or other actions required by securities, regulatory or applicable law in connection with an exercise of remedies and (C) such registrations, consents, approvals, notices or other actions that if not obtained and maintained in full force and effect could not reasonably be expected to have a Material Adverse Effect.

(i)     Except as otherwise disclosed on Schedule 5.01(e)(i), the Loan Parties are in compliance with all Governmental Authorizations applicable to them and the Refinery (i) as of the Closing Date, in all material respects other than noncompliance caused by nonroutine operations and emissions during the restart period, and (ii) as of any date after the Closing Date on which this representation is made, except for such noncompliance as could not reasonably be expected to have a Material Adverse Effect.

(ii)     All Governmental Authorizations which are required to be obtained by the Closing Date or which have otherwise been obtained in connection with the making of the Advances hereunder and the execution and delivery of, and performance by each Loan Party of its respective obligations under the Loan Documents to which it is a party have been duly obtained, were validly issued, are in full force and effect, are not subject to appeal or all applicable appeal periods have expired or will have expired as of the Closing Date.

(iii)     Except (i) as set forth on Schedule 5.01(e)(i) and/ or (ii) as could not reasonably be expected to have a Material Adverse Effect, as of the Closing Date, there are no proceedings pending or, to the Loan Parties' knowledge, threatened that could reasonably be expected to result in a rescission, termination, adverse modification, or suspension of any such Governmental Authorization set forth on Part I of Schedule 5.01(e)(iii) or in a failure to obtain any Governmental Authorization set forth on Part II of Schedule 5.01(e)(iii). Except as pertains to the matters set forth on Schedule 5.01(e)(i), the Borrower has no reason to believe that any Governmental Authorizations which are required to be obtained in connection with the Required Shutdown Activities not required to be obtained on the date of this Agreement or as of the Closing Date (or amendments, renewals or reissuance of any Governmental Authorizations required after the date of this Agreement) will not be obtained in due course on or before the date such Governmental Authorization, or amendment, renewal or reissuance thereof, is required for the commencement of the appropriate state of construction or operation or to avoid any substantial

delay in, or material impairment to, the consummation and performance of the transactions contemplated by this Agreement, the Loan Documents or the Transaction Documents, or shall contain any condition or requirements, the compliance with which could reasonably be expected to result in a Material Adverse Effect.

(f)      Binding Obligation.  Subject to the granting of the Interim DIP Order or Final DIP Order, as applicable, each Loan Document to which such Loan Party is a party has been duly executed and delivered by such Loan Party and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(g)      Financial Statements.  The financial statements of the Borrower Parties furnished to the Administrative Agent pursuant to Section 6.03(a) fairly present in all material respects the financial condition and the results of operations and cash flows of the Loan Parties as of the date thereof, all in accordance with GAAP (subject to normal year-end adjustments and, in the case of unaudited financial statements, the absence of footnotes).

(h)      Adverse Proceedings, Etc. Except as set forth on Schedule 5.01(h), there are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect. No Borrower Party nor the Refinery is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(i)      Taxes.  Except as otherwise permitted under Section 6.01(b) or set forth on Schedule 5.01(i), all material tax returns and reports of the Borrower Parties required to be filed by any of them have been timely filed, and all material Taxes due and payable by the Borrower Parties and upon their respective properties, assets, income, businesses and franchises have been paid when due and payable. Except as could not reasonably be expected to have a Material Adverse Effect, there is no audit, claim or assessment pending or proposed in writing against the Borrower regarding any Taxes relating to any Borrower Party, which is not being contested by such Borrower Party in good faith and by appropriate proceedings; *provided* that reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.  For U.S. federal and U.S. Virgin Islands income tax purposes, the Borrower is treated as an entity that is disregarded as separate from a U.S. Virgin Islands corporation.

(j)      Environmental Matters.

(i)      Except as disclosed on Schedule 5.01(j), except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, (A) none of the Refinery, the Borrower Parties and their respective Properties or operations is or has been in violation of any Environmental Laws, including, without limitation, any Governmental Authorizations issued pursuant to any Environmental Law, (B) none of the Refinery, the Borrower Parties and their respective Properties or operations is subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Action, or any Hazardous Materials Activity, (C) none of the Borrower Parties and the Refinery has received any letter or request for information relating to the Refinery under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law and (D) none of the Refinery, the Borrower Parties and

50

their respective Properties or operations is subject to any actual or, to the Borrower Parties' knowledge, threatened Environmental Action.

(ii)    No Borrower Party has received any written notice under any Environmental Law indicating past or present treatment, storage or disposal of Hazardous Materials at the Real Estate Assets of the Refinery that could be reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(iii)    Compliance of the Refinery and the Borrower Parties with all current requirements pursuant to or under Environmental Laws, including, without limitation, any Governmental Authorizations issued pursuant to any Environmental Law, would not require actions that could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(iv)    To the Borrower Parties' knowledge, no event or condition has occurred or is occurring with respect to the Refinery or the Borrower Parties or any of their respective Properties or operations relating to any Environmental Law, any Environmental Action, any Release of Hazardous Materials, or any Hazardous Materials Activity, which individually or in the aggregate could reasonably be expected to have, a Material Adverse Effect.

(v)    To the Borrower Parties' knowledge, the Environmental Response Trust is in compliance with all applicable investigative, cleanup, closure, remediation and other corrective or remedial action requirements pursuant to the Hovensa Confirmation Order with respect to any Hazardous Materials located at, in, on or under the Refinery, except for any failure to comply as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(vi)    This Section 5.01(j) and Section 5.01(e)(ii) shall be the sole representations and warranties by the Borrower Parties with respect to environmental matters.

(k)    Governmental Regulation.

(i)    No Borrower Party is subject to regulation under the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Debt or which may otherwise render all or any portion of the Obligations hereunder or under the other Loan Documents unenforceable.

(ii)    No Borrower Party is a "*registered investment company*" or a company "*controlled*" by a "*registered investment company*" or a "*principal underwriter*" of a "*registered investment company*" as such terms are defined in the Investment Company Act of 1940.

(l)    Use of Proceeds; Margin Stock.    The proceeds of the Advances and other extensions of credit hereunder have been or will be used solely in accordance with, and solely for the purposes contemplated by, Section 3.07.  No Borrower Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Advances will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors.

(m)    Employee Benefit Plans.  Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, (i) each Borrower Party and each of their respective

51

ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, (ii) each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the IRS indicating that such Employee Benefit Plan is so qualified and, to the knowledge of the Borrower Parties, nothing has occurred subsequent to the issuance of such determination letter which could cause such Employee Benefit Plan to lose its qualified status, (iii) no liability to the PBGC (other than required premium payments), the IRS, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is reasonably expected to be incurred by any Borrower Party or any of their ERISA Affiliates, (iv) no ERISA Event has occurred or is reasonably expected to occur, and (v) the Borrower Parties and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

(n)     Certain Fees.  No broker's or finder's fee or commission will be payable by any Borrower Party with respect hereto or to any of the transactions contemplated by the Loan Documents, except as payable to the Agents and the Lenders pursuant to the Loan Documents.

(o)     Compliance with Statutes, Etc.  Except as set forth on Schedule 5.01(o), each of the Borrower Parties and the Refinery is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the operation or shutting down of the Refinery, the conduct of its business and the ownership of its property, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(p)     Disclosure.  As of the Closing Date, to the best knowledge of the Borrower Parties, all written information (other than projections, budgets, forecasts, other forward-looking information, historical financial information, reports prepared by third party consultants or information of a general economic nature) provided by or on behalf of the Borrower Parties to any Agent or Lender in connection with the transactions contemplated hereunder is, when taken as a whole and as of the Closing Date, correct in all material respects and does not (as of the Closing Date) contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, when taken as a whole, not materially misleading in light of the circumstances under which such statements were made (giving effect to supplements and updates thereto).

(q)     Patriot Act.  To the extent applicable, each Borrower Party is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Patriot Act.  No part of the proceeds of the Advances will be used, directly or indirectly by the Borrower, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977 or any other applicable anti-bribery or anti-corruption law.

(r)     Security Interests.  The entry of the Interim DIP Order or the Final DIP Order (as applicable) and the entering into of any other Security Documents create in favor of the Collateral Agent for the benefit of the Secured Parties legal, valid, enforceable and perfected Liens in the Collateral, with the priority expressed to be applicable to such Liens in the Interim DIP Order or the Final DIP Order (as applicable) and under Section 2.08(a) of this Agreement, securing the payment of the Obligations.  The

52

Loan Parties are the legal and beneficial owners of the Collateral free and clear of any Lien, except for the liens and security interests created or permitted under the Loan Documents and the Interim DIP Order or the Final DIP Order (as applicable).  On and after the Closing Date and the entry of the Interim DIP Order, such Interim DIP Order and the Loan Documents are sufficient to provide the Superpriority Claims and Liens described in, and with the priority provided in, <u>Section 2.08(a)</u> of this Agreement.

        (s)      <u>Property</u>.  As of the Closing Date:

        (i)      except for any such failure which could not reasonably be expected to have a Material Adverse Effect, the Borrower Parties have valid title to all personal property that such Borrower Party purports to own (including the personal property comprising the Refinery), free and clear of all Liens except Liens created under the Pre-Petition Collateral Documents, the Loan Documents, the Interim DIP Order and the Final DIP Order or other Permitted Liens, and have the rights or interest to or in the Real Estate Assets reasonably required to construct and operate the Refinery in accordance with the Material Contracts, Applicable Law and Prudent Industry Practice. The Borrower Parties have good and marketable title or a valid and subsisting estate or interest to or in the Real Estate Assets (except any such failure which could not reasonably be expected to have a Material Adverse Effect), free and clear of all Liens except Permitted Liens;

        (ii)      the Borrower has good and marketable title or a valid and subsisting estate or interest to or in the Real Estate Assets (except any such failure which could not reasonably be expected to have a Material Adverse Effect), free and clear of all Liens except Permitted Liens;

        (iii)      the Real Estate Documents (A) represent the entire agreement between the respective parties thereto with respect to the interests in real property described therein and use and occupancy thereof, and there are no other agreements or modifications, whether oral or written, with respect thereto, other than as disclosed to the Administrative Agent on or prior to the Closing Date or entered into in accordance with this Agreement, (B) represent all material documents, agreements, and instruments that provide the Borrower with real property interests in furtherance of the Refinery, (C) grant to the Borrower all of the material real property interests necessary for the operation of the Refinery, (D) except as specified in <u>Schedule II</u>, have not been amended, supplemented, modified or assigned in any way by the Borrower, or to the Borrower's knowledge, any other Person and (E) to the Borrower's knowledge, have not been waived, surrendered, canceled, abandoned or terminated by any other party thereto;

        (iv)      except as set forth on <u>Schedule 5.01(s)</u>, no counterparty to any Real Estate Document to the Borrower's knowledge, is in material breach or default of such Real Estate Document;

        (v)      to the Borrower's knowledge, no event has occurred which, with or without notice or lapse of time or both, would constitute a material breach or default thereunder by any counterparty to a Real Estate Document or permit termination or acceleration by any party (other than the Borrower) under such Real Estate Document; and

        (vi)      all material rents, rentals, charges, fees and royalties currently due and payable by the Borrower pursuant to the Real Estate Documents have been paid.

        (t)      <u>Intellectual Property</u>.  Each Borrower Party owns or has the right to use all patents, trademarks, service marks, trade names, domain names, copyrights, licenses and other rights which are necessary for the ownership and operation of the Refinery in accordance with the Loan Documents and Transaction Documents, in each case, as to which the failure of such Borrower Party to so own or have the

right to use would reasonably be expected to have a Material Adverse Effect.  No material product, process, method, substance, part or other material presently contemplated to be sold or employed by a Borrower Party in connection with its business will infringe any patent, trademark, service mark, trade name, domain name, copyright, license or other right owned by any other Person in a manner that could reasonably be expected to have a Material Adverse Effect.

(u)     Insurance.  All insurance policies required to be obtained by or on behalf of any Borrower Party pursuant to Section 6.01(d) have been obtained and are in full force and effect and all premiums then due and payable thereon have been paid in full.  None of the Borrower Parties has received any notice from any insurer that any insurance policy has ceased to be in full force and effect or claiming that the insurer's liability under any such insurance policy can be reduced or avoided.

(v)     OFAC and Related Matters.

(i)     None of the Borrower Parties nor any of their respective Subsidiaries (collectively, the "*Group*") nor any director or officer thereof, nor, to the Group's actual knowledge, any agent acting on its behalf, controlled Affiliate or employee of the Group, is an individual or entity that is, or is owned or controlled by a Person that is:  (A) the subject of any sanctions administered or enforced by OFAC, the United Nations Security Council, the European Union or Her Majesty's Treasury (collectively, "*Sanctions*"), nor (B) located, organized or resident in a country or territory that is the subject of Sanctions (including, without limitation, Cuba, Iran, North Korea, Syria, and the Crimea region of Ukraine).

(ii)     Each Borrower Party represents that it will not (and will cause the Refinery not to), directly or indirectly, use the proceeds of the Advances, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person (A) to fund or facilitate any activities or business of or with any Person or in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions; or (B) in any other manner that will result in a violation of Sanctions by any Person (including any Person participating in the Advances, whether as underwriter, advisor, investor or otherwise).

(iii)     The operations of the Borrower Parties are and have been conducted at all times in compliance, in all material respects, with financial recordkeeping and reporting requirements, including those of the Bank Secrecy Act, as amended by the Patriot Act, and the applicable anti-money laundering statutes of jurisdictions where the Equityholders, the Loan Parties and any of their respective directors, officers and Affiliates conduct business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "*Money Laundering Laws*") and no action, suit or proceeding by or before any court or Governmental Authority or any arbitrator involving the Borrower Parties or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the knowledge of the Borrower Parties, threatened.

(iv)     No Borrower Party, nor, to the actual knowledge of the Borrower Parties, their directors, officers, agents, affiliates or representatives has taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any person while knowing that all or some portion of the money or value will be offered, given or promised to anyone to improperly influence official action, to obtain or retain business or otherwise to secure any improper advantage in each case in violation of any applicable law (including the United States

Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar applicable legislation in other jurisdictions).

(v)  The Borrower Parties and, to the actual knowledge of the Borrower Parties, their Affiliates have conducted their businesses in compliance with applicable anti-corruption laws (including the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar applicable legislation in other jurisdictions) and have instituted and maintained, and will continue to maintain, policies and procedures reasonably designed to promote and achieve compliance with such laws and with the representations and warranties contained herein.

(vi)  No Borrower Party will directly or indirectly use the proceeds of the Advances or lend, contribute or otherwise make available such proceeds to any subsidiary, Affiliate, joint venture partner or other Person for the purpose of financing or facilitating any activity that would violate applicable anti-corruption laws, rules, or regulations (including the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar applicable legislation in other jurisdictions).

(w)  <u>No Material Adverse Effect</u>.  Since the Petition Date, no event or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(x)  <u>DIP Budget</u>.  The Loan Parties have disclosed to the Lenders all material assumptions with respect to the DIP Budget.

## ARTICLE VI

## COVENANTS

SECTION 6.01    <u>Affirmative Covenants</u>.  Except to the extent prohibited by the DIP Budget, the Interim DIP Order and/or the Final DIP Order (as applicable), from and after the Closing Date, until a Repayment Event, each Borrower Party covenants and agrees as follows:

(a)  <u>Compliance with Laws, Etc.</u>  Each Borrower Party will (i) comply with all applicable laws, rules, regulations and orders of any Governmental Authority, such compliance to include compliance with all applicable Environmental Laws, ERISA and any Anti-Money Laundering Laws, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect and (ii) maintain and enforce policies and procedures with respect to itself and its Subsidiaries designed to ensure compliance in all material respects with applicable Sanctions, anti-corruption laws and Anti-Money Laundering Laws.

(b)  <u>Taxes</u>.  Each Borrower Party will file all federal, state, local, foreign and other tax returns and reports required to be filed, and shall pay all federal, state, local, foreign and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those (i) which are being contested in good faith by appropriate proceedings for which adequate reserves in conformity with GAAP have been provided therefor or (ii) with respect to which the failure to make such filing or payment could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)  <u>Hazardous Materials Activities, Etc.</u>  Except as otherwise could not reasonably be expected to have a Material Adverse Effect, each Borrower Party will promptly take any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Borrower Party or with

respect to the Refinery, (ii) make an appropriate response to any Environmental Action against such Borrower Party or with respect to the Refinery and discharge any obligations it may have to any Person thereunder and (iii) respond to any Release of Hazardous Materials by such Borrower Party or with respect to the Refinery to the extent required by applicable Environmental Laws.

(d) <u>Maintenance of Insurance</u>.

(i) The Borrower Parties shall maintain (through either an individual policy or as part of a group policy maintained by any Loan Party or Refinery and so long as the Loan Parties are included as additional "named" insureds on all policies, as applicable), insurance in such amounts and against such losses as are customary for companies of a similar size operating in the same or similar businesses covering their operations and exposures and in accordance in all material respects with their applicable Material Contracts and in accordance in all material respects with the recommendations of the Insurance Consultant in the Insurance Report, by financially sound and responsible insurers or reinsurers which have an A.M. Best policyholders' rating of not less than A-, a financial size rating of IX or better, or an S&P rating of not less than A, or, if the relevant insurance is not available from such insurers, such other insurers as the Administrative Agent may approve in writing, acting reasonably, and which, in the case of any insurance on any Property with respect to which a mortgage has been granted pursuant to the terms of any Security Documents or Pre-Petition Collateral Documents, are licensed to do business in the jurisdictions where the applicable Property is located; *provided* that to the extent that changes in the insurance markets result in a material increase in the cost of such coverage or if insurance against certain risks is not available on commercially reasonable terms, the Borrower Parties may reduce the amount or scope of coverage provided such coverage remains consistent with Prudent Industry Practice.

(ii) All such insurance shall (A) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 10 days (or, to the extent reasonably available, 30 days) after receipt by the Collateral Agent of written notice thereof (the Borrower shall deliver a copy of the policy (and to the extent any such policy is cancelled or renewed, a renewal or replacement policy), insurance certificate with respect thereto or other evidence thereof to the Administrative Agent and Collateral Agent) and (B) within 14 days after the Closing Date name the Collateral Agent as loss payee (in the case of property insurance) or additional insured (in the case of liability insurance) on behalf of the Secured Parties (it being understood that, absent an Event of Default, any proceeds of any such property insurance shall be delivered by the insurer(s) to the Borrower Parties and applied in accordance with this Agreement), as applicable.

(e) <u>Preservation of Corporate Existence, Etc.</u>   Except in connection with the administration of the Borrower Parties in the Chapter 11 Cases in accordance with applicable law, (i) each Borrower Party will preserve and keep in full force and effect its existence and (ii) each Borrower Party will preserve and keep in full force and effect all rights and franchises, licenses and permits material to its business, except with respect to <u>sub-clause (ii)</u> only, where the failure to so preserve and keep in full force and effect such rights, franchises, licenses and permits could not reasonably be expected to have a Material Adverse Effect, *provided* that any Borrower Party may, at the Borrower Parties' expense, change its name upon 15 Business Days' prior written notice to the Administrative Agent (or such shorter period of time reasonably acceptable to the Administrative Agent) and timely delivery to the Administrative Agent of all additional financing statements (executed if necessary for any particular filing jurisdiction) and other instruments and documents reasonably requested by the Administrative Agent to maintain the validity, perfection and priority of the security interests created under the Security Documents.

(f)  <u>Visitation Rights; Lender Calls</u>.  At any reasonable time and from time to time upon reasonable prior notice, each Borrower Party will permit any of the Agents, or any agents or representatives designated by the Lenders, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, any of the Borrower Parties or the Refinery and to discuss the affairs, finances and accounts of any of the Borrower Parties or the Refinery with any of their officers or directors and with their independent certified public accountant*s*. The Borrower shall arrange to have a telephonic conference call with the Lenders, to the extent requested by the Required Lenders, once per calendar month, which shall be coordinated with the Administrative Agent during normal business hours upon reasonable prior notice to the Lenders, to discuss the status of the Refinery and the affairs, finances and accounts of the Borrower.  In addition, each Borrower Party shall continue to (a) grant the Lenders and the Administrative Agent with reasonable access to any other advisers of the Borrower as the Lenders or the Administrative Agent shall reasonably request, (b) reasonably cooperate with the Lenders' financial advisors, auditors, attorneys, appraisers and any other consultants engaged from time to time at the discretion of the Lenders and (c) reimburse reasonable fees and expenses of such financial advisors, auditors, attorneys, appraisers and other consultants in accordance with the DIP Order.

(g)  <u>Keeping of Books</u>.  Each Borrower Party will keep proper books of record and account, in which full, true and correct entries shall be made of all material financial transactions and the material assets and business of such Borrower Party in accordance with GAAP in effect from time to time and otherwise in compliance in all material respects with the regulations of any Governmental Authority having jurisdiction thereof.

(h)  <u>Obtain and Maintain Governmental Authorizations</u>. Each Borrower Party will obtain, maintain in full force and effect, and meet all requirements in respect of any Governmental Authorizations necessary for the Required Shutdown Activities and the transactions contemplated hereby.

(i)  <u>Maintenance of Properties, Etc</u>.  Each Borrower Party (i) will implement the Required Shutdown Activities in all respects in accordance with the DIP Order, the DIP Budget, Prudent Industry Practice, Governmental Authorizations and Contractual Obligations binding on it and applicable laws, (ii) will maintain and preserve in good repair, working order and condition (ordinary wear and tear, casualty and condemnation excepted) its Properties in all material respects in accordance with Prudent Industry Practice, Contractual Obligations binding on it and applicable laws, and (iii) may (but has no obligation to) consummate any Permitted Interim Activities.

(j)  <u>Further Assurances</u>.  Without limiting <u>Section 2.08(a),</u> herein, promptly upon request by any Agent, or any Lender through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, estoppel and consent agreements of lessors, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as any Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents and the Interim DIP Order or the Final DIP Order (as applicable), (ii) without limiting <u>Section 2.08(a)</u>, to the fullest extent permitted by applicable law, subject any Borrower Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Security Documents and (iii) perfect and maintain the validity, effectiveness and priority of any of the Security Documents and any of the Liens intended to be created thereunder.

(k)  <u>Post-Closing Collateral Requirements</u>.

(i)        Within 30 days of the Closing Date, or such later date as may be agreed to by the Required Lenders in their discretion, the Borrower shall use commercially reasonable efforts to(i) establish the Borrower Account and (ii) deliver to the Administrative Agent a fully executed Control Agreement with respect to the Borrower Account.

(ii)        Within 30 days of the Closing Date, or such later date as may be agreed to by the Required Lenders in their discretion, the Borrower shall deliver the Pledge Agreement, in form and substance satisfactory to the Administrative Agent and the Lenders, duly executed by the Persons intended to be party thereto, together with:

(A)        certificates (if any) representing the pledged Capital Stock of the Borrower accompanied by undated stock powers executed in blank;

(B)        appropriately completed UCC financing statements (Form UCC-1), naming Holdings as debtor and the Collateral Agent as secured party, in form appropriate for filing under the Uniform Commercial Code of Delaware, as applicable, covering the "Pledge Collateral" under, and as defined in, the Pledge Agreement;

(C)        completed requests for information or similar search report, listing all effective financing statements filed in the Office of the Secretary of State (or other applicable office) of the jurisdiction of incorporation or formation, as applicable, of Holdings that name such Person as debtor, together with copies of such other financing statements; and

(D)        evidence that all other action that the Lenders may deem necessary in order to perfect and protect the first priority liens and security interests created under the Pledge Agreement has been taken.

(l)        Separateness.  Except in connection with the administration of the Borrower Parties in the Chapter 11 Cases in accordance with applicable law, each Borrower Party shall:

(i)        maintain Deposit Accounts or accounts, separate from those of any Affiliate (other than any other Borrower Party or as permitted by the Pre-Petition Depositary Agreement) with commercial banking institutions and will not commingle their funds with those of any Affiliate (other than any other Borrower Party or as permitted by the Pre-Petition Depositary Agreement);

(ii)        act solely in its name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses;

(iii)        conduct in all material respects its business solely in its own name, in a manner not misleading to other Persons as to its identity (without limiting the generality of the foregoing, all oral and written communications (if any), including invoices, purchase orders, and contracts);

(iv)        obtain proper authorization from member(s), shareholder(s), director(s) and manager(s), as required by its limited partnership agreement, limited liability company agreement, general partnership agreement or bylaws for all of its limited liability company, limited partnership, general partnership or corporate actions; and

(v)        comply in all material respects with the terms of its Organizational Documents.

(m)     <u>Covenant to Give Security</u>. Upon the acquisition of any property by any Borrower Party, and such property, in the reasonable judgment of the Administrative Agent, shall not already be subject to a perfected first priority security interest in favor of the Collateral Agent for the benefit of the Secured Parties pursuant to and as set forth in the applicable DIP Order, then in each case at the Borrower's expense and subject to the DIP Order:

(i)     within 10 days after such acquisition, furnish to the Administrative Agent and the Collateral Agent a description of the real and personal properties so acquired, in each case, in detail satisfactory to the Administrative Agent; and

(ii)     promptly, but in any event within 90 days after such acquisition, take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, estoppel and consent agreements of lessors, documents, instruments, agreements, opinions and certificates with respect to such Property as the Administrative Agent shall reasonably request to create (and provide evidence thereof) a valid and perfected first priority Lien on such Property in favor of the Collateral Agent (for the benefit of the Secured Parties).

(n)     <u>Material Contracts</u>. Solely for so long as any Material Contract remains in force and effect, each Borrower Party will (i) perform and observe all material terms and provisions of each Material Contract to be performed or observed by it and (ii) enforce each such Material Contract in accordance with its material terms except, in the case of <u>clauses (i)</u> and <u>(ii)</u> above, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect (after giving effect to any replacement or substitute agreements entered into in accordance with the terms of the Loan Documents) or as set forth on <u>Schedule 6.01(n)</u>.

(o)     <u>DIP Budget</u>.

(i)     Subject to the terms of the DIP Order, the expenditures authorized in the DIP Budget shall be adhered to by the Borrower Parties on a weekly basis and on a cumulative basis as described below.  The DIP Budget shall be tested on a cumulative basis for a 4-week period then ended, it being understood and agreed that actual amounts of each of the Borrower Parties' expenditures in the aggregate may not exceed the applicable DIP Budget; *provided* that any use by the Borrower Parties of Cash Collateral or the cash proceeds of Pre-Petition Collateral shall be taken account in connection with measuring compliance with the DIP Budget. Cash Collateral, whether the proceeds of Advances or otherwise, shall only be used for purposes set forth in the DIP Budget (regardless of whether such uses are permitted under this Agreement or otherwise).

(ii)     The Borrower shall provide to the Administrative Agent and the Pre-Petition Term Administrative Agent:

(A)     by 12:00 noon (New York time) on the second (2nd) Business Day following the end of each calendar week after the Closing Date (the "***Testing Date***"), a reconciliation (which shall be certified by the Chief Restructuring Officer of the Borrower Parties) of actual cash receipts and disbursements (including, without limitation, all disbursements made with of the proceeds of the Advances), cash balances and loan balances on a line-item basis against such figures set forth in the DIP Budget for (A) such week and (B) the cumulative period since the Closing Date which ended with such week, in each case, with written explanations of any line-item that varies for such line-item; <u>provided</u> that the first such reconciliation shall not be required to be delivered until the Wednesday of the second full week following the Closing Date; and

(B)      such other information or documents (financial or otherwise) with respect to the Borrower Parties as the Lenders (through the Administrative Agent) may reasonably request.

(iii)      No later than three (3) days after the distribution of the report by the Borrower pursuant to Section 6.01(o)(ii)(A) above, the Borrower shall host a conference call with the Administrative Agent and the Lenders to discuss the financial information provided by the Borrower pursuant to Section 6.01(o)(ii)(A), which conference calls shall be conducted during normal business hours at such times as may be mutually agreed between the Borrower, the Administrative Agent and the Required Lenders.

(iv)      No later than five (5) Business Days before the end of each consecutive full four-week period included in the then-effective DIP Budget, the Borrower shall deliver to the Administrative Agent and Lenders a proposed updated DIP Budget for the remaining period covered by the then-effective DIP Budget for the approval of the Administrative Agent and the Required Lenders in their sole discretion, which updated DIP Budget must be approved by the Administrative Agent and the Required Lenders at least two (2) Business Days before the end of such four-week period.  If the Administrative Agent and the Required Lenders reject such updated DIP Budget, the Borrower shall, within twenty-four (24) hours of receipt of such notice of rejection, engage in good faith negotiations with the Administrative Agent in order to develop a proposed updated DIP Budget that is acceptable to the Administrative Agent and Required Lenders in their sole discretion (such revised proposed DIP Budget to be submitted within two (2) Business Days of the Borrower's receipt of a notice of rejection).  Any proposed updated DIP Budget shall, upon approval by the Administrative Agent pursuant to this Section 6.01(o)(iv), become the effective DIP Budget and shall replace and supersede the then-effective DIP Budget.  For clarification purposes, in the event the DIP Budget is not approved by the Administrative Agent and the Required Lenders, the DIP Budget that was last approved by the Administrative Agent and the Required Lenders shall remain in effect.

(v)      Any deviation from the DIP Budget in excess of the Permitted Variances (as defined below in Section 6.01(o)(vi)) shall constitute non-compliance with the DIP Budget and the terms of the Loan Documents and an Event of Default; provided that the Required Lenders shall have the authority to provide written pre-approval for any deviations in excess of the Permitted Variances.

(vi)      As of any Testing Date, for the one week period ending on such Testing Date ("***Testing Period(s)***"), the Borrower shall not allow (i) any operating disbursements made by the Borrower Parties during such Testing Period (reduced by any applicable accrued and unused Carry Forward Amounts for the applicable Disbursement Line Item with respect to each operating disbursement) to be (x) greater than 120% of the applicable Disbursement Line Item related to such operating disbursements for the Borrower Parties set forth in the DIP Budget for such Testing Period and (y) greater than 110% of the applicable Disbursement Line Item related to such operating disbursements for the Borrower Parties set forth in the DIP Budget on a cumulative basis for that portion of the DIP Budget ending on the Testing Date; (ii) the aggregate operating disbursements made by the Borrower Parties during such Testing Period (reduced by any applicable accrued and unused Carry Forward Amounts) to be (x) greater than 120% of the aggregate operating disbursements for the Borrower Parties set forth in the DIP Budget for such Testing Period and (y) greater than 110% of the aggregate operating disbursements for the Borrower Parties set forth in the DIP Budget on a cumulative basis for that portion of the DIP Budget ending on the Testing Date; (iii) the aggregate receipts received by the Borrower Parties during such Testing

60

Period (increased by any applicable accrued and unused Carry Forward Amounts) to be (x) less than 90% of the aggregate receipts for the Borrower Parties set forth in the DIP Budget for such Testing Period or (y) less than 90% of the aggregate receipts for the Borrower Parties set forth in the DIP Budget on a cumulative basis for that portion of the Budget ending on the Testing Date; (iv) the aggregate professionals fees disbursements made by the Borrower Parties on a cumulative basis over each Testing Period (reduced by any applicable accrued and unused Carry Forward Amounts related to professional fees) to be greater than 110% of the aggregate professional fees set forth in the DIP Budget on a cumulative basis for that portion of the DIP Budget ending on the Testing Periods (the variance in Disbursement Line Items described in the foregoing clause (i), the variance in operating disbursements described in the foregoing clause (ii), the variance in receipts described in the foregoing clause (iii) and the variance in professional fees described in the foregoing clause (iv), the "***Permitted Variances***").

(vii)      For the purposes of the above calculations, it is agreed that to the extent that the professional fees incurred by counsel to the Lenders exceed the amounts for such line items in the DIP Budget, such excess amounts shall be disregarded when calculating the Permitted Variance.

(p)      Milestones. Each Borrower Party hereby covenants and agrees to comply with the following milestones (the "***Milestones***"), unless otherwise agreed to in writing by the Required Lenders:

(i)      on or before the third (3rd) day after the Petition Date, the Interim DIP Order shall have been entered, and such order shall not have been reversed, modified, amended, stayed or vacated; and

(ii)      on or before the thirty-fifth (35th) day after the entry of the Interim DIP Order, the Final DIP Order shall have been entered, and such order shall not have been reversed, modified, amended, stayed or vacated.

(q)      USVI Existing LC.   Each Borrower Party shall use commercially reasonable efforts to procure that the Government of the U.S. Virgin Islands draws on the USVI Existing LC and applies any amounts drawn thereunder towards costs and expenses of the Borrower Parties in connection with the Required Shutdown Activities.  The Borrower Parties shall (i) keep the Lenders apprised of all discussions with the Government of the U.S. Virgin Islands in connection with the foregoing and (ii) promptly following receipt of confirmation that amounts will be drawn under the USVI Existing LC for application towards such expenses, shall deliver to the Lenders a revised DIP Budget reflecting any applicable changes thereto as a result of such application for approval by the Lenders.

(r)      Bankruptcy Matters. Without duplication to Section 6.03 below, the Borrower Parties shall:

(i)      keep the Lenders and the Administrative Agent apprised on a timely basis of all material developments with respect to the business and affairs of the Borrower Parties;

(ii)      provide the Lenders and the Administrative Agent with notice of motions, applications or other filings to be brought or made in the Chapter 11 Cases in accordance with Section 10.01 including to (1) use best efforts to give no less than five (5) days' notice of any material motion, application or other filing to be brought or made by the Borrower or any other Borrower Party in the Chapter 11 Cases or, where it is not practicable to do so, as much notice as is reasonably possible prior to any such filing; and (2) use best efforts to provide drafts of any material materials (including draft material orders) to be served by the Borrower or any other

Borrower Party at least two (2) Business Days prior to any such service to give the Lenders and the Administrative Agent a reasonable opportunity to review and comment on such draft material materials before service of such materials or, where it is not practicable to do so, as much opportunity in the circumstances as is reasonably practicable to do;

(iii)    seek the Required Lenders' prior approval of any material order in the Chapter 11 Cases that affects this Agreement, the DIP Facility or any other Loan Documents and only to seek to obtain such orders as are in form and substance reasonably satisfactory to the Required Lenders;

(iv)    comply with all Bankruptcy Court orders and use all the proceeds of the DIP Facility in a manner consistent with the restrictions set forth in this Agreement and the DIP Order;

(v)    subject to entry of an order by the Bankruptcy Court, maintain the insurance in existence on the date hereof, with respect to the Collateral, except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(vi)    promptly execute and deliver all further instruments and documents (including, without limitation, certificates, declarations, affidavits, reports and opinions) and take all further action that the Required Lenders or the Administrative Agent may require, to give effect to this Agreement, perfect and protect any DIP Lien or to enable the Administrative Agent and the Lenders to exercise and enforce their rights and remedies with respect to the Collateral, subject to the terms and conditions set forth in the DIP Order.

SECTION 6.02    <u>Negative Covenants</u>.    From and after the Closing Date, until a Repayment Event, each Borrower Party covenants and agrees as follows:

(a)    <u>Liens, Etc.</u>    Such Borrower Party will not create, incur, assume or suffer to exist any Lien on or with respect to any of its Properties whether now owned or hereafter acquired, except Permitted Liens.

(b)    <u>Debt</u>.    Such Borrower Party will not create, incur, assume or suffer to exist any Debt, except (without duplication):

(i)    Debt of the Borrower Parties under the Loan Documents;

(ii)    Pre-Petition Debt of the Borrower Parties and other Debt of the Borrower Parties outstanding as of the Closing Date (in each case, without giving effect to any amendment or modification thereto, or any increase, incremental, accordion or similar feature (regardless of whether permitted under any Pre-Petition Financing Document or any document evidencing such Debt or otherwise)); provided that such amounts may increase with respect to any "payment in kind" interest that accrues and is capitalized in accordance with the DIP Order;

(iii)    Debt of any Borrower Party owed to any other Borrower Party; *provided* that all such Debt shall constitute Pledged Debt subject to the Lien created under the DIP Order;

(iv)    to the extent constituting Debt, solely to the extent incurred prior to and outstanding as of the Petition Date, contingent obligations under or in respect of performance bonds, bid bonds, appeal bonds, surety bonds, financial assurances and completion guarantees, indemnification obligations, obligations to pay insurance premiums, take or pay obligations and

similar obligations in each case incurred in the ordinary course of business and not in connection with Debt for Borrowed Money;

(v)    to the extent constituting Debt, Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business; *provided* that such Debt is extinguished within 10 Business Days of its incurrence solely to the extent such Debt is created, incurred or assumed in connection with any Required Shutdown Activities; guaranties by a Borrower Party of Debt of any other Borrower Party with respect to Debt otherwise permitted to be incurred pursuant to this clause (b); *provided* that, if the Debt that is being guaranteed is unsecured and/or subordinated to the Obligations of the Borrower Parties under the Loan Documents, the guaranty shall also be unsecured and/or subordinated to the Obligations of the Borrower Parties under the Loan Documents;

(vi)    loans by any Affiliate of the Borrower Parties (other than a Borrower Party) to a Borrower Party solely to the extent incurred prior to and outstanding as of the Petition Date; *provided* that such loans are subordinated to the Obligations pursuant to subordination terms reasonably acceptable to the Administrative Agent, and in any event, subordinated in right of payment in full to the Obligations;

(vii)    solely to the extent incurred prior to and outstanding as of the Petition Date, trade payables incurred in the ordinary course of business (but not for borrowed money) and (A) not more than 90 days past due or (B) being contested in good faith by appropriate proceedings;

(viii)    to the extent constituting Debt that is outstanding as of the Petition Date, guarantees, contingent obligations or letters of credit issued (including reimbursement obligations in respect thereof) as credit support for commodity swaps, options or futures contracts or other similar contracts in each case permitted under Section 6.02(m); and

(ix)    Debt consisting of obligations under Insurance Premium Financing Arrangements that is outstanding as of the Petition Date.

For purposes of determining compliance under this Section 6.02(b), in the event that any Debt permitted to be incurred hereunder meets the criteria of more than one category of Debt permitted hereunder, the Borrower may not classify or reclassify such transaction or item (or portion thereof).

(c)    Change in Nature of Business.  Subject to any limitations imposed as a result of operation as debtors-in-possession under the Bankruptcy Code, the Borrower Parties will not engage in any business other than Required Shutdown Activities and Permitted Interim Activities.

(d)    Fundamental Changes; Mergers, Etc.  Such Borrower Party will not change its legal form, liquidate or dissolve.  Such Borrower Party will not merge into or consolidate with any Person or permit any Person to merge into it.

(e)    Sales, Etc. of Property. Such Borrower Party will not sell, lease, transfer or otherwise Dispose of any Property, or grant any option or other right to any Person to purchase, lease or otherwise acquire any Property, except:

(i)    sales of (and the granting of any option or other right to purchase or otherwise acquire) Inventory to the extent constituting Permitted Interim Activities;

(ii)      sales, leases or subleases, transfers or other Dispositions of real or personal Property that is obsolete, damaged, worn out surplus or not used or useful in the business of the Borrower Parties or the Refinery; provided that all such sales, transfers or dispositions pursuant to this clause (ii) shall not exceed $1,000,000 in the aggregate since the Closing Date without the prior written consent of the Required Lenders and/or to the extent constituting Permitted Interim Activities;

(iii)     the liquidation, sale or use of Cash and Cash Equivalents;

(iv)     to the extent constituting Dispositions, (A) leases, subleases, licenses or sublicenses of Property and (B) easements, rights-of-way or such other agreements related to real property, in each case, entered into in the ordinary course of business and which do not interfere with the Required Shutdown Activities, including in connection with any management services agreements or other agreements relating to any Shared Facilities;

(v)      Dispositions required by or in accordance with the Material Contracts, the Consent Decree or the Hovensa Confirmation Order;

(vi)     the unwinding of any Pre-Petition Secured Hedge Agreement pursuant to its terms or as a result of the Chapter 11 Cases;

(vii)    the Disposition of inventory, and/or Inventory Financing Collateral pursuant to the terms of the DIP Order and/or any Pre-Petition Inventory Financing Document; and

(viii)   other Dispositions approved by the Bankruptcy Court with the consent of the Required Lenders, or otherwise contemplated as part of any Plan, as defined in the DIP Order.

(f)      Investments.  Such Borrower Party will not make or hold any Investment, except:

(i)       Investments in Cash and Cash Equivalents;

(ii)      Investments owned as of the Closing Date in any Borrower Party or the Refinery;

(iii)     intercompany loans to the extent permitted under clause (b)(iii);

(iv)     to the extent constituting Investments, Debt which is permitted under clause (b);

(v)      Deposit Accounts permitted under Section 6.02(q);

(vi)     to the extent constituting Investments, any Required Shutdown Activities and/or Permitted Interim Activities.

(g)      Restricted Payments.  The Borrower Parties will not declare, order, pay, make or set apart or agree to declare, order, pay, make or set apart or agree to declare, order, pay, make or set apart, through any manner or means or through any other Person, directly or indirectly, any Restricted Payment other than Restricted Payments from one Borrower Party to another Borrower Party.

Notwithstanding the foregoing, any payment in respect of any Obligations (whether for principal, interest, fees, expenses, indemnification or otherwise) made to a Equityholder -Related Party (in its capacity as Lender), in each case, shall not be deemed a Restricted Payment nor constitute a Restricted Payment prohibited by this Section 6.02(g).

(h)      <u>Amendments of Organizational Documents</u>.  Such Borrower Party will not amend any of its Organizational Documents after the Closing Date without the Administrative Agent's prior consent, not to be unreasonably withheld, conditioned or delayed.

(i)      <u>Accounting Changes</u>.  The Borrower Parties will not make or permit any change in its (i) accounting policies or reporting practices, except as required by GAAP, or (ii) Fiscal Year.

(j)      <u>No Further Negative Pledges</u>.  Such Borrower Party will not enter into or permit to exist any agreement prohibiting the creation or assumption of any Lien upon any of its Properties, whether now owned or hereafter acquired, except for (i) (A) the Transaction Documents, and "Transaction Documents" (as defined in the Pre-Petition Revolving Credit Agreement), (B) agreements or documents governing, evidencing and/or securing any Pre-Petition Debt, or (C) other Contractual Obligations in effect as of the Closing Date (without giving effect to any amendments or modifications thereof).

(k)      <u>Sales and Leasebacks</u>.  Such Borrower Party will not, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety, with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Borrower Party (i) has sold or transferred or is to sell or to transfer to any other Person (other than any other Borrower Party), or (ii) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Borrower Party to any Person (other than any other Borrower Party) in connection with such lease.

(l)      <u>Partnerships, Formation of Subsidiaries, Etc.</u>  Such Borrower Party will not (i) become a general partner in any general or limited partnership or Joint Venture or (ii) organize any new Subsidiary.

(m)      <u>Speculative Transactions</u>.  Such Borrower Party will not enter into any Hedge Agreement or engage in any other transaction involving commodity swaps, options or futures contracts or any similar transactions (including take-or-pay contracts, long term fixed price off take contracts and other similar contracts for the sale of oil and refined products on either a financial or physical basis), other than any Hedge Agreements or the Inventory Financing Facility to which such Borrower Party is a party to as of the Closing Date .

(n)      <u>Capital Expenditures</u>.  The Borrower Parties shall not purchase, acquire or lease any assets that, if acquired, would constitute Capital Expenditures or otherwise make Capital Expenditures, other than Capital Expenditures that are contemplated by (and subject to the limitations of) the DIP Budget.

(o)      <u>Transactions with Affiliates</u>.  Such Borrower Party will not enter into any transaction of any kind with any Affiliate of the Borrower Parties, whether or not in the ordinary course of business, other than (i) in connection with any Required Shutdown Activities and/or Permitted Interim Activities, and (ii) on fair and reasonable terms not substantially less favorable to the applicable Borrower Party as would be obtainable by such Borrower Party at the time in a comparable arm's length transaction with a Person other than an Affiliate.

(p)      <u>Material Contracts</u>.

(i)      Except as set forth on <u>Schedule 6.02(p)</u>, for so long as any Material Contract is in force and effect, the Loan Parties shall not cause, consent to, or permit, any amendment to, modification, variance, impairment or assignment of, or waiver of timely compliance with, any terms or conditions of any Material Contract except to the extent the

65

foregoing is consented to by the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed.

(ii)     Other than in connection with any Required Shutdown Activities or Permitted Interim Activities, the Loan Parties shall not enter into, become a party to, or become liable under (or permit any counterparty to enter into, become a party to or become liable under, on behalf of any Borrower Party), any contract or agreement after the Closing Date related to the Refinery.

(q)     Accounts. Such Borrower Party will not open or maintain any deposit accounts or securities accounts, other than the Existing Accounts and the Borrower Account.

(r)     Pre-Petition Payments and Amendments of Pre-Petition Debt Document. Other than as permitted under (i) this Agreement, (ii) the Interim DIP Order or the Final DIP Order, as applicable (including the DIP Budget), or (iii) otherwise with the prior written consent of the Required Lenders, no Borrower Party shall direct or permit to be made (a) any Pre-Petition Payment, or (b) any waiver, amendment, supplement, modification, termination or release of any provision of any Pre-Petition Financing Documents or any provision of any other material Pre-Petition Debt (including, without limitation, the Pre-Petition Financing Documents).

(s)     Sanctions and FCPA, Etc.  No Borrower Party shall directly or indirectly use the proceeds of any Borrowing for any purpose that would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, or other similar applicable legislation in other jurisdictions or directly or indirectly use the proceeds of any Borrowing, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, (i) to fund any activities of or business with any individual or entity that, at the time of such funding, is (A) the subject of Sanctions or (B) in any Designated Jurisdiction, in each case in violation of any Sanctions or (ii) in any other manner that will result in a violation of Sanctions by any Person (including any individual or entity participating in the financing transaction contemplated by this Agreement, whether as Lender, Administrative Agent or otherwise).

(t)     Employment Matters.  No Borrower Party shall increase any termination or severance entitlement whatsoever or pay any termination or severance pay to executives of any Borrower Party or Subsidiary, each without the prior written consent of the Required Lenders and, as may be required by the Bankruptcy Code, an order of the Bankruptcy Court.

(u)     Bankruptcy Matters.  No Borrower Party shall:

(i)     make a public announcement in respect of, enter into any agreement or letter of intent with respect to, attempt to consummate or support any third party's attempt to consummate any transaction or agreement that would materially adversely impact the DIP Facility;

(ii)     at any time, seek or consent to any reversal, modification, amendments, stay or vacation of (i) any "First Day Order", (ii) the Interim DIP Order, or (iii) the Final DIP Order, in each case, without the prior written consent of the Required Lenders;

(iii)     at any time, seek or consent to a priority for any administrative expense against the Borrower Parties (now existing or hereafter arising) of any kind or nature whatsoever (including, without limitation, any administrative expenses of the kind specified in, or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the

Bankruptcy Code) equal to or superior to the priority of the Administrative Agent and the Lenders in respect of the DIP Obligations except as expressly permitted in the DIP Order;

(iv)     seek or consent to a sale of any of the Collateral other than a Disposition permitted under (e) without the prior written consent of the Required Lenders and, as may be required by the Bankruptcy Code, an order of the Bankruptcy Court;

(v)     use Cash Collateral, whether the proceeds of Advances or otherwise, other than for purposes set forth in the DIP Budget (regardless of whether such uses are permitted under this Agreement or otherwise) without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders) or the Required Lenders.

SECTION 6.03     Reporting Requirements.  From and after the Closing Date, until a Repayment Event, each Borrower Party covenants and agrees that it will furnish to the Administrative Agent (for posting to the Lenders)

(a)     Notices under Pre-Petition Term Credit Agreement. Any notice, report, financial statement or other information (written or otherwise) delivered or required to be delivered to the Pre-Petition Term Administrative Agent or the Pre-Petition Term Lenders pursuant to Section 6.03 of the Pre-Petition Term Credit Agreement (as in effect as of the Closing Date, and without giving effect to any amendment or waiver thereto not expressly provided by the Lenders) at the same time as such notice, report, financial statement or other information is delivered to the Pre-Petition Term Administrative Agent or the Pre-Petition Term Lenders, as applicable (unless the DIP Order permits the Borrower Parties to not comply with such Section 6.03).

(b)     Notice of Default and Material Adverse Effect.  As soon as possible and in any event within two Business Days after the occurrence of (i) each Default, (ii) each Event of Default or (iii) any event, development or occurrence which, in the Borrower Parties' reasonable judgment, has had, or would reasonably be expected to have, a Material Adverse Effect continuing on the date of such statement, a statement of the Financial Officer of the Borrower Parties setting forth details of such Default, event, development or occurrence and the action that the Borrower Parties has taken and proposes to take with respect thereto (each such notice, a "***Default Notice***").

(c)     Information Regarding Collateral.  Prompt written notice of any change in a Borrower Party's (i) corporate name, (ii) identity or corporate structure or (iii) jurisdiction of organization. The Borrower Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are reasonably required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral to the extent contemplated in the Security Documents.

(d)     Other Information.  Such other information respecting the business, condition (financial or otherwise), operations, performance or Properties (including information on insurance coverage) of any Borrower Party or the Refinery as any Agent, or any Lender through the Administrative Agent, may from time to time reasonably request, other than any proprietary or confidential information of counterparties to Contractual Obligations of the Borrower Parties, to the extent the Borrower Parties have utilized commercially reasonable efforts to permit the disclosure of such information subject to Section 10.15 and such counterparty has not provided its consent (in which case such information shall be provided in redacted form).

Notwithstanding anything to the contrary in this Section 6.03 or elsewhere in any Loan Document, none of the Loan Parties shall be required to disclose, permit the inspection, examination or making copies

67

or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to any Agent or any Lender (or their respective representatives or contractors) is prohibited by law or is restricted by Contractual Obligation or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

SECTION 6.04    Permitted Activities of Holdings.  Holdings shall not directly operate any material business; *provided* that, for the avoidance of doubt, the following (and activities incidental thereto) shall not constitute the operation of a business and shall in all cases be permitted:  (a) its direct or indirect ownership of the Capital Stock of the Borrower and the Borrower's Subsidiaries, (b) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance and performance of activities relating to its officers, directors, managers and employees), (c) the entering into, and performance of its obligations with respect to, the Loan Documents, and the consummation of the Transactions, (d) payment of tax distributions and other dividends, (e) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Borrower, including compliance with applicable law and legal, tax and accounting matters related thereto and activities relating to its officers, directors, managers and employees, (f) holding any Cash and Cash Equivalents, (g) holding any other property (but not operating such property) received by it as a distribution from any of its Subsidiaries and making further distributions with such property, (h) providing indemnification to officers, managers and directors, (i) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable law, (j) filing tax reports and paying taxes and other customary obligations related thereto in the ordinary course (and contesting any taxes), (k) entering into and performance of obligations with respect to contracts and other arrangements in connection with the activities contemplated by this Section 6.04, (l) the preparation of reports to Governmental Authorities and to its shareholders, (m) making Investments in the Borrower, (n) the performance of obligations under and compliance with its Organizational Documents, any demands or requests from or requirements of a Governmental Authority or any applicable law, ordinance, regulation, rule, order, judgment, decree or permit, including as a result of or in connection with the activities of its Subsidiaries, (o) the entering into, and performance of its obligations with respect to, the Holdco Loan Documents and the Pre-Petition Financing Documents, and the consummation of the transactions contemplated thereby (p) Holdings' participation in Chapter 11 Cases, and (q) any activities incidental to the foregoing or customary for passive holding companies.  Holdings shall not consent to the granting of any Liens on the Capital Stock of the Borrower other than those for the benefit of the Collateral Agent (including as a result of entering into this Agreement) or those for the benefit of the Pre-Petition Secured Parties and in effect as of the Closing Date. Holdings shall not directly own any Capital Stock other than the Borrower.

## ARTICLE VII

## EVENTS OF DEFAULT

SECTION 7.01    Events of Default.  From and after the First DIP Funding Date, each of the following events or occurrences shall constitute an "***Event of Default***":

(a)     the Borrower shall fail to pay any principal when due and payable or fail to pay any interest or any other payment under any Loan Document; or

(b)     any certification, representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document to which it is a party (including in any certificate delivered pursuant to Article IV or Section 6.03) shall prove to have been incorrect in any material respect

when made; *provided* that, if (i) such Loan Party was not aware that such certification, representation or warranty was false or incorrect at the time such certification, representation or warranty was made, (ii) the fact, event or circumstance resulting in such false or incorrect certification, representation or warranty is capable of being cured, corrected or otherwise remedied, and (iii) such fact, event or circumstance resulting in such false or incorrect certification, representation or warranty shall have been cured, corrected or otherwise remedied within 30 days (or if such incorrect certification, representation or warranty is not susceptible to cure within 30 days, and such Loan Party is proceeding with diligence and in good faith to cure such default and such default is susceptible to cure, such 30 day cure period shall be extended as may be necessary to cure such incorrect certification, representation or warranty, such extended period not to exceed 90 days in the aggregate (inclusive of the original 30-day period)) from the date a Responsible Officer of such Borrower Party obtains knowledge thereof, such false or incorrect certification, representation or warranty shall not constitute a Default or an Event of Default for purposes of the Loan Documents; or

(c)      any Borrower Party shall fail to perform or observe any term, covenant or agreement contained <u>Section 2.08</u>, <u>Section 3.07</u>, <u>Section 6.01(e)(i)</u>, Section <u>6.01(o)</u>, Section 6.01(p), <u>Section 6.01(r)(iv)</u>, Section <u>6.02</u> or <u>Section 6.03(b)(ii)</u>; or

(d)      any Borrower Party shall fail to perform or observe any term, covenant or agreement contained in (i) Section <u>6.01(d)</u> or <u>Section 6.03(a)</u>(i) or <u>(a)(iii)</u> and such failure shall remain unremedied for five days after the earlier of the date on which (x) any Responsible Officer of a Borrower Party becomes aware of such failure or (y) written notice thereof shall have been given to the Borrower Parties by the Administrative Agent or any Lender or (ii) Section <u>6.01(m)</u> or <u>Section 6.03(b)</u> (as a result of any failure to comply with Sections 6.03(b), (c) or (d) of the Pre-Petition Term Credit Agreement) and such failure shall remain unremedied for five days after the earlier of the date on which (x) any Responsible Officer of a Borrower Party becomes aware of such failure or (y) written notice thereof shall have been given to the Borrower Parties by the Administrative Agent or any Lender; or

(e)      any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed and such failure shall remain unremedied for 15 days after the earlier of the date on which (i) any Responsible Officer of such Person becomes aware of such failure or (ii) written notice thereof shall have been given to the Loan Parties by the Administrative Agent or any Lender; or

(f)      (i) any Borrower Party shall fail to pay any principal of, premium or interest on or any other amount payable in respect of any Post-Petition Debt of such Loan Party that is outstanding in a principal amount of at least $2,500,000 individually or $5,000,000 in the aggregate for all such Borrower Parties (but excluding Debt outstanding hereunder) in each case, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, early termination, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature; or (iii) any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof except to the extent such "Event of Default" is caused by the commencement of the Chapter 11 Cases, any failure of any of the Loan Parties to be Solvent or by complying with an inconsistent obligation under this Agreement; or

69

(g)	any final Post-Petition judgments or Post-Petition orders, either individually or in the aggregate, for the payment of money in excess of (i) $1,000,000, in the case of judgments or orders that are superior in right of payment to any Obligation under this Agreement, or (ii) $1,000,000, in the case of any other judgment or order, in each case (to the extent not stayed pursuant to Section 362 of the Bankruptcy Code), shall be rendered against any Borrower Party or Refinery and either (x) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (y) there shall be any period of sixty (60) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect or such judgment or order has not been otherwise discharged or satisfied within such sixty (60) day period; or

(h)	any non-monetary Post-Petition judgment or order shall be rendered against any Borrower Party or Refinery that could reasonably be expected to have a Material Adverse Effect, and there shall be any period of sixty (60) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(i)	any provision of any Loan Document after delivery thereof shall for any reason (except as the result of act or omission of the Agents or any other Secured Party) cease to be valid and binding on or enforceable against any Loan Party to it, or any such Loan Party shall so state in writing; or

(j)	any Security Document or financing statement after delivery thereof shall for any reason (other than pursuant to the terms thereof or as a result of action taken by any Agent or any other Secured Party) cease to create a valid and perfected first (or second with respect to the Inventory Financing Collateral) priority lien on and security interest in the Collateral, to the extent contemplated hereby or thereby; or

(k)	a Change of Control shall occur; or

(l)	(i) there shall occur one or more ERISA Events which individually or in the aggregate results in liability of any Borrower Party and if such liability, together with all other such liabilities, is reasonably likely to result in a Material Adverse Effect; or (ii) a Lien or security interest under Section 430(k) of the Internal Revenue Code or under ERISA has been imposed on the Collateral, any Borrower Party, or any Employee Benefit Plan, and such Lien, together with all other such Liens, would reasonably be likely to result in a Material Adverse Effect; or

(m)	the Bankruptcy Court shall have entered an order (i) directing the appointment of an examiner with expanded powers, (ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases; or

(n)	except as provided in the DIP Order or with respect to the Aron Rights or all rights and remedies of J. Aron in connection with the Safe Harbor Agreements (as defined in the DIP Order), the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties that have a value in excess of $5,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect; or

(o)	any debtor in possession financing is entered into by any Borrower Party other than the DIP Facility or any Borrower Party seeks authorization from the Bankruptcy Court to enter into such facility without the prior written consent of the Required Lenders that, in each instance, does not provide for indefeasible payment in full in cash of all Obligations under this Agreement; or

(p)       any of the following shall occur:

(i)       the Final DIP Order shall not have been entered on or prior to the date that is forty-five (45) days after the Petition Date;

(ii)      entry of any order by the Bankruptcy Court reversing, amending, supplementing, staying for a period of ten (10) days or more, vacating or otherwise amending, supplementing or modifying the DIP Order without the prior written consent of the Required Lenders;

(iii)     one or more judgments, orders or decrees for the payment of money required to be satisfied as an administrative expense claim in the Chapter 11 Cases shall be allowed by the Bankruptcy Court in an aggregate amount (to the extent not paid or covered by insurance) that is reasonably expected to have a Material Adverse Effect;

(iv)      the Bankruptcy Court enters an order or orders (i) to sell, transfer, lease, exchange, alienate or otherwise dispose of any of the Collateral other than the Inventory Financing Collateral pursuant to Section 363 of the Bankruptcy Code, (ii) avoiding or requiring disgorgement by the Administrative Agent or the Lenders of any amounts received in respect of the DIP Obligations, (iii) permitting the grant of a Lien on the Collateral other than the Permitted Liens or (iv) extinguishing the Obligations as a result of the Lenders' credit bid and/or assumption by the Lenders in their acquisition of the Borrower Parties pursuant to such order;

(v)       the Interim DIP Order or the Final DIP Order, as applicable, shall cease to purport to create valid, enforceable, and perfected Liens on the Collateral with the priority set forth therein or otherwise cease to be valid and binding and in full force and effect;

(vi)      non-compliance by any Borrower Party in any material respect with the terms of the DIP Order or any other order entered in the Chapter 11 Cases;

(vii)     any Borrower Party shall seek any modification of the Interim DIP Order or the Final DIP Order (as applicable) without the prior express written consent of the Required Lenders, or assert in any pleading filed in any court that any material provision of the Interim DIP Order or the Final DIP Order (as applicable) is not valid and binding for any reason;

(viii)    termination by the Bankruptcy Court of, or the expiration of, the exclusive period for the Borrower Parties to file a plan of reorganization in the Chapter 11 Cases as set forth in Section 1121 of the Bankruptcy Code;

(ix)      if any Borrower Party is enjoined, restrained or in any way prevented by order of a court of competent jurisdiction that has not been stayed from continuing or conducting all or any material part of its business or affairs;

(x)       any final, non-appealable order is entered in any of the Chapter 11 Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders (or any Borrower Party shall apply for authority to do so), or any other action is commenced by the Borrower Parties challenging the rights and remedies of any of Secured Party under, or in a manner that is inconsistent with, the DIP Order or any of the other Loan Documents, in any of the Chapter 11 Cases;

(xi)      without the prior written consent of the Required Lenders, any Borrower Party shall file a motion seeking, or take any action supporting a motion seeking, or the Bankruptcy

Court shall enter an order in any of the Chapter 11 Cases authorizing the Borrower Parties to obtain post-petition financing under Section 364 of the Bankruptcy Code, other than the DIP Facility;

          (xii)     any Borrower Party (or any direct or indirect parent of any Borrower Party) or any person claiming by or through any of the foregoing, shall (1) obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Agent or any of the Lenders regarding the Loan Documents or (2) seek to, or support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Borrower Party or by oral argument) any other person's motion to: (i) disallow in whole or in part any of the Obligations arising under this Agreement or any other Loan Document (or any such order is entered), or (ii) challenge the validity and enforceability of the Liens or security interests granted or confirmed herein or in the Interim DIP Order or the Final DIP Order in favor of the Secured Parties;

          (xiii)     an application shall be filed by the Borrower Parties for the approval of any other administrative expense claim, including any superpriority administrative expense claim, in the Chapter 11 Cases which is equal to or senior to the claims of the Lenders against the Borrower Parties hereunder or under the DIP Order or any of the other Loan Documents (other than the Carve-Out (solely upon the occurrence of a Termination Date (as defined in the DIP Order)), which shall be paid by the Borrower Parties at the times and in the amounts permitted by the DIP Order), or an order shall be entered by the Bankruptcy Court granting any such senior administrative expense claim, including any superpriority administrative expense claim in the Chapter 11 Cases which is equal to or senior to the claims of the Lenders against the Borrower Parties hereunder or under the DIP Order or any of the other Loan Documents; an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (or any of the Borrower Parties shall file an application or motion or pleading for entry of or in support of an order) dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise to a case under chapter 7 of the Bankruptcy Code;

          (q)     the Borrower or any other Borrower Party shall make (or shall have made) (A) any payment (as adequate protection or otherwise), or application for authority to pay, on account of any Pre-Petition Debt, other than (i) Pre-Petition Payments authorized by the Bankruptcy Court in the DIP Order (including the DIP Budget), any "first day" orders entered in the Chapter 11 Cases or any other orders of the Bankruptcy Court entered with the consent of (or non-objection by) the Administrative Agent in amounts consistent with the DIP Budget (and not otherwise prohibited by this Agreement or the DIP Order), or (ii) otherwise with the prior written consent of the Administrative Agent or (B) any other payment or disbursement (with the proceeds of the Advances or otherwise) other than in accordance with the DIP Budget; or

          (r)     the appointment by the Bankruptcy Court of a receiver and manager, receiver, interim receiver, trustee in bankruptcy or similar official in respect of any of the Borrower Parties; or

          (s)     any Borrower Party files, amends or modifies, or files a pleading seeking approval of, any order or document approved in the Chapter 11 Cases in a manner that is inconsistent with the Required Lenders' consent and approval rights under this Agreement and the other Loan Documents; or

          (t)     any of the Borrower Parties shall take any action in support of any matter set forth in Sections 7.01(m), (p)(ii), (p)(iv), (p)(viii), (r)(p)(xiii) or Section 7.01(s) or any other Person shall do so and such application is not contested in good faith by the Borrower Parties; or

(u)       any Borrower Party shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Administrative Agent or the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment; or

(v)       the failure of any Milestone to be timely satisfied; or

(w)      an order shall be entered by the Bankruptcy Court or any other court of competent jurisdiction confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases (or an order shall be entered by the Bankruptcy Court approving a disclosure statement related to such plan) other than a plan of reorganization that satisfies the Obligations in full in cash when due or any Borrower Party (or any direct or indirect parent of a Borrower Party) shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan.

Upon the occurrence and continuance of any Event of Default, the Administrative Agent (acting on the instructions of the Required Lenders) or the Required Lenders may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court), subject to the terms, conditions and provisions of the DIP Order, by written notice to the Borrower and the U.S. Trustee, declare the Commitment to be terminated forthwith, whereupon the Commitment shall immediately terminate, and/or, by notice to the Borrower, declare its Loans hereunder, with accrued interest thereon, and all other Obligations owed to it under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this Section 7.01, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

Upon the occurrence and during the continuance of any Event of Default and subject to the terms of the DIP Order, the Administrative Agent and each of the Lenders may (i) exercise all of its rights and remedies set forth in any of the Loan Documents and the DIP Order, in addition to all rights and remedies allowed under any applicable law, including the UCC, and (ii) revoke the rights of the Borrower and the other Loan Parties to use Cash Collateral in which the Administrative Agent and the Lenders have an interest. None of the Administrative Agent or the Lenders shall have any obligation of any kind to make a motion or application to the Bankruptcy Court to exercise their rights and remedies set forth or referred to in this Agreement or in the other Loan Documents. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative and not alternative.

The Borrower Parties waive (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties or other property at any time held by the Administrative Agent or the Lenders on which the Loan Parties may in any way be liable and hereby ratify and confirm whatever the Lenders may lawfully do in this regard, (ii) subject to the terms of the DIP Order, all rights to notice and hearing prior to the Administrative Agent or the Lenders taking possession or control of the Collateral, or any bond or security which might be required by any court prior to allowing the Administrative Agent or the Lenders to exercise any of their remedies subject to the terms of the DIP Order, and (iii) the benefit of all valuation, appraisal and exemption laws.  The Loan Parties acknowledge that they have been advised by counsel of their choice with respect to the effect of the foregoing waivers and this Agreement, the other Loan Documents and the transactions evidenced by this Agreement and the other Loan Documents.

Notwithstanding any other provision of any Loan Document to the contrary, during the Remedies Notice Period, (i) the Borrower Parties shall be permitted to continue to use Cash Collateral and proceeds of the Advances solely in the ordinary course of business in accordance with the DIP Budget and to satisfy the Carve-Out, and (ii) the Borrower Parties may seek emergency relief from the Bankruptcy Court during the Remedies Notice Period solely to seek a finding that no Event of Default has occurred.

The Required Lenders by written notice to the Administrative Agent may on behalf of the Lenders waive an existing Default or Event of Default and its consequences hereunder.  Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Agreement; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  The Required Lenders, by written notice to the Administrative Agent, may on behalf of all of the Lenders rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal or interest that has become due solely because of the acceleration) have been cured or waived.

SECTION 7.02     Application of Payments.  Subject to the DIP Order, any payments and any proceeds of Collateral shall be applied in the following order:

(a)     *First*, to pay the incurred and unpaid fees, costs and expenses of the Lenders, the Administrative Agent and the Collateral Agent required to be reimbursed under the Loan Documents;

(b)     *Second*, to the Lenders to pay accrued and unpaid interest on the Advances;

(c)     *Third*, to the Lenders to pay all outstanding principal amounts in respect of the Advances;

(d)     *Fourth*, to the Administrative Agent or the Lenders in payment of any remaining Obligations;

(e)     *Fifth*, any balance remaining after the Obligations shall have been paid in full, in payment to the Pre-Petition Agents for distribution to the holders of Pre-Petition Debt, or to whomever may be lawfully entitled; and

(f)     *Sixth*, in payment to the Borrower.

## ARTICLE VIII

## THE AGENTS

SECTION 8.01     Appointment of Agents.  Each of the Lenders hereby irrevocably appoints 405 Sentinel LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. The Administrative Agent shall also act as the Collateral Agent under the Loan Documents, and

74

each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Borrower Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as Collateral Agent, and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to this Article VIII for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article VIII and Article X (including Section 10.02, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

SECTION 8.02    Rights of Lenders.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 8.03    Exculpatory Provisions.

(a)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.04 and 7.01), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and

nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Borrower or a Lender.

(c)     The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

SECTION 8.04     Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of the Advances that by their terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of the Advances.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 8.05     Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

SECTION 8.06     Resignation of Administrative Agent.

(a)     The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower and, so long as no Event of Default has occurred and is continuing, subject to the Borrower's written consent (not to be unreasonably withheld or delayed), to appoint a successor, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank with an office in New York, New York.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**_Resignation Effective Date_**"), then the retiring Administrative Agent may (but shall not be

obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above and, so long as no Event of Default has occurred and is continuing, subject to the Borrower's written consent (not to be unreasonably withheld or delayed).   Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date. If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "***Removal Effective Date***"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(b)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) except for any indemnity payments owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.   Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring or removed Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.   The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.   After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 10.02 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

SECTION 8.07     Non-Reliance on Administrative Agent and Other Lenders.   Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.   Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

SECTION 8.08     Withholding Taxes.   To the extent required by applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.   Without limiting or expanding the provisions of Section 3.05, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 15 days after demand therefor, any and all Taxes and related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred

by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Taxes from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of applicable withholding Taxes ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts owing to such Lender under the Loan Documents against any amount due to the Administrative Agent under this **Error! Reference source not found.**. The agreements in this **Error! Reference source not found.** shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all other Obligations. This **Error! Reference source not found.** shall not impose any additional responsibility on the Borrower.

SECTION 8.09    <u>Administrative Agent May File Proof of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to the Borrower, the Administrative Agent (irrespective of whether the principal of the Advances shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Advances and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 10.02) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 4.02.

SECTION 8.10    <u>Collateral Matters</u>. The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Borrower Party in connection therewith, nor shall the

Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

## ARTICLE IX

## GUARANTY

SECTION 9.01    <u>Guarantee of Obligations</u>.  Each of the Guarantors hereby, jointly and severally, absolutely, unconditionally and irrevocably, guarantees, as primary obligor and not merely as surety, to the Administrative Agent, for the benefit of the Agent Parties and Lenders and their respective successors, indorsees, transferees and assigns, the prompt and complete payment in full in cash and performance by the Borrower and each other Loan Party when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.  Each of the Guarantors shall be liable under its guarantee set forth in this Section 3.01, without any limitation as to amount, for all present and future Obligations, including specifically all future increases in the outstanding amount of the Advances or other Obligations and other future increases in the Obligations.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all Obligations (including, without limitation, interest, fees, costs and expenses) that would be owed by any other obligor on the Obligations but for the fact that they are unenforceable or not allowable due to the existence of a proceeding under any Debtor Relief Law involving such other obligor because it is the intention of each Guarantor and the Secured Parties that the Obligations which are guaranteed by such Guarantor pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower or any other Loan Party or any Guarantor of any portion of such Obligations.

SECTION 9.02    <u>Limitation on Obligations Guaranteed</u>.

(a)    Notwithstanding any other provision hereof, the right of recovery against each Guarantor under this Article IX shall not exceed $1.00 less than the lowest amount which would render such Guarantor's obligations under this Article IX void or voidable under applicable law, including, without limitation, the Uniform Fraudulent Conveyance Act, Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to the guaranty set forth herein and the obligations of each Guarantor hereunder.  To effectuate the foregoing, the Administrative Agent and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor in respect of the guarantee set forth in this Article IX at any time shall be limited to the maximum amount as will result in the Obligations of such Guarantor with respect thereto hereof not constituting a fraudulent transfer or conveyance after giving full effect to the liability under such guarantee set forth in this Article IX and its related contribution rights but before taking into account any liabilities under any other guarantee by such Guarantor.  For purposes of the foregoing, all guarantees of such Guarantor other than the guarantee under this Article IX will be deemed to be enforceable and payable after the guaranty under this Article IX.  To the fullest extent permitted by applicable law, this **Error! Reference source not found.** shall be for the benefit solely of creditors and representatives of creditors of each Guarantor and not for the benefit of such Guarantor or the holders of any Capital Stock in such Guarantor.

(b)    Each Guarantor agrees that Obligations may at any time and from time to time be incurred or permitted in an amount exceeding the maximum liability of such Guarantor under **Error! Reference source not found.** without impairing the guarantee contained in this Article IX or affecting the rights and remedies of any Agent Party or Lender hereunder.

SECTION 9.03    Nature of Guarantee; Continuing Guarantee; Waivers of Defenses Etc.

(a)    Each Guarantor understands and agrees that the guarantee contained in this Article IX shall be construed as a continuing guarantee of payment and performance and not merely of collectability.  Each Guarantor waives diligence, presentment, protest, marshaling, demand for payment, notice of dishonor, notice of default and notice of nonpayment to or upon the Borrower or any of the other Guarantors with respect to the Obligations.  Without limiting the generality of the foregoing, this guarantee and the obligations of each Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, set-off, defense, counterclaim, discharge or termination for any reason unless and until all of the Commitments shall have expired or been terminated and all Obligations and all other amounts payable under this Agreement shall have been paid in full in Cash.

(b)    Each Guarantor agrees that the Obligations of each Guarantor hereunder are independent of the Obligations of each other Guarantor and of any other guarantee of the Obligations and when making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, any Agent Party or Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrower, any other Guarantor or any other Person or against any collateral security or other guarantee for the Obligations or any right of offset with respect thereto, and any failure by any Agent Party or Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of any Agent Party or Lender against any Guarantor.  For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

(c)    No payment made by the Borrower, any of the Guarantors, any other guarantor or any other Person or received or collected by any Agent Party or Lender from the Borrower, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment, remain liable for the Obligations unless and until all of the Commitments shall have expired or been terminated and all Obligations and all other amounts payable under this Agreement shall have been paid in full in Cash.

(d)    Without limiting the generality of the foregoing, each Guarantor agrees that its obligations under and in respect of the guarantee contained in this Article IX and any security interest securing the Obligations shall not be affected by, and shall remain in full force and effect without regard to, and hereby waives all rights, claims or defenses that it might otherwise have (now or in the future) with respect to each of the following (whether or not such Guarantor has knowledge thereof):

(i)    the validity or enforceability of this Agreement or any other Loan Document, any of the Obligations or any guarantee or right of offset with respect thereto at any time or from time to time held by any Agent Party or Lender;

(ii)    any renewal, extension or acceleration of, or any increase in the amount of the Obligations, or any amendment, supplement, modification or waiver of, or any consent to departure from, the Loan Documents;

(iii)    any failure or omission to assert or enforce or agreement or election not to assert or enforce, delay in enforcement, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under any Loan Document, at law, in equity or otherwise) with respect to the Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Obligations;

(iv)    any change, reorganization or termination of the corporate structure or existence of the Borrower or any Guarantor or any of their Subsidiaries and any corresponding restructuring of the Obligations;

(v)    any settlement, compromise, release, or discharge of, or acceptance or refusal of any offer of payment or performance with respect to, or any substitution for, the Obligations, or any subordination of the Obligations to any other obligations;

(vi)    the validity, perfection, non-perfection or lapse in perfection, priority or avoidance of any security interest or lien, the release of any or all collateral securing, or purporting to secure, the Obligations or any other impairment of such collateral;

(vii)    any exercise of remedies with respect to any security for the Obligations (including, without limitation, any collateral, including the Collateral securing or purporting to secure any of the Obligations) at such time and in such order and in such manner as the Administrative Agent and the Agent Parties and/or Lenders may decide and whether or not every aspect thereof is commercially reasonable and whether or not such action constitutes an election of remedies and even if such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy that any Guarantor would otherwise have, and without limiting the generality of the foregoing or any other provisions hereof, each Guarantor hereby expressly waives any and all benefits which might otherwise be available to such Guarantor under applicable law; and

(viii)    any other circumstance whatsoever which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Obligations or which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower or any Guarantor for the Obligations, or of such Guarantor under the guarantee contained in this Article IX or of any security interest granted by any Guarantor, whether in a proceeding under any Debtor Relief Law or in any other instance.

(e)    In addition each Guarantor further waives any and all other defenses, set-offs or counterclaims (other than a defense of payment or performance in full hereunder) which may at any time be available to or be asserted by it, the Borrower, or any other Guarantor or Person against any Agent Party or Lender, including, without limitation, failure of consideration, breach of warranty, statute of frauds, statute of limitations, accord and satisfaction and usury, other than following a Repayment Event.

SECTION 9.04    Rights of Reimbursement, Contribution and Subrogation.

In case any payment is made on account of the Obligations by any Guarantor or is received or collected on account of the Obligations from any Guarantor or its property:

(a)    If such payment is made by a Guarantor or the Borrower or from its property in respect of the Obligations of another Guarantor, such Guarantor shall be entitled, subject to and upon (but not before) a Repayment Event, (A) to demand and enforce reimbursement for the full amount of such

payment from such other Guarantor and (B) to demand and enforce contribution in respect of such payment from each other Guarantor which has not paid its fair share of such payment, as necessary to ensure that (after giving effect to any enforcement of reimbursement rights provided hereby) each Guarantor pays its fair share of the unreimbursed portion of such payment. For this purpose, the fair share of each Guarantor as to any unreimbursed payment shall be determined based on an equitable apportionment of such unreimbursed payment among all Guarantors (other than the Guarantor whose primary obligations were so guaranteed by the other Guarantors) based on the relative value of their assets and any other equitable considerations deemed appropriate by the court. For purposes of the foregoing, all guarantees of such Guarantor other than the guaranty under this Article IX will be deemed to be enforceable and payable after the guaranty under this Article IX.

(b)       Any right of subrogation of any Guarantor or the Borrower shall be enforceable solely after a Repayment Event and solely against the Guarantors or the Borrower, and not against the Agent Parties and/or Lenders, and neither the Administrative Agent nor any other Agent Party or Lender shall have any duty whatsoever to warrant, ensure or protect any such right of subrogation or to obtain, perfect, maintain, hold, enforce or retain any collateral securing or purporting to secure any of the Obligations for any purpose related to any such right of subrogation. If subrogation is demanded by any Guarantor, then, after a Repayment Event, the Administrative Agent shall deliver to the Guarantors making such demand, or to a representative of such Guarantors or of the Guarantors generally, an instrument satisfactory to the Administrative Agent transferring, on a quitclaim basis without any recourse, representation, warranty or any other obligation whatsoever, whatever security interest the Administrative Agent then may hold in whatever collateral securing or purporting to secure any of the Obligations that may then exist that was not previously released or disposed of or acquired by the Administrative Agent.

(c)       All rights and claims arising under this Section 9.04 or based upon or relating to any other right of reimbursement, indemnification, contribution or subrogation that may at any time arise or exist in favor of any Guarantor or the Borrower as to any payment on account of either (x) the Obligations or (y) any other obligation that is secured by any collateral that also secures or purports to secure any of the Obligations, in each case made by it or received or collected from its property, shall be fully subordinated to the Obligations in all respects prior to a Repayment Event. Until a Repayment Event, no Guarantor may demand or receive any collateral security, payment or distribution whatsoever (whether in cash, property or securities or otherwise) on account of any such right or claim. If any such payment or distribution is made or becomes available to any Guarantor in any bankruptcy case, receivership, or any proceeding under any Debtor Relief Laws, such payment or distribution shall be delivered by the person making such payment or distribution directly to the Administrative Agent, for application to the payment of the Obligations. If any such payment or distribution is received by any Guarantor, it shall be held by such Guarantor in trust, as trustee of an express trust for the benefit of the Agent Parties and Lenders, and shall forthwith be transferred and delivered by such Guarantor to the Administrative Agent, in the exact form received and, if necessary, duly endorsed.

(d)       The obligations of the Guarantors under this Agreement and the other Loan Documents, including their liability for the Obligations and the enforceability of the security interests granted thereby, are not contingent upon the validity, legality, enforceability, collectability or sufficiency of any right of reimbursement, contribution or subrogation arising under this Section 9.04 or otherwise. The invalidity, insufficiency, unenforceability or uncollectability of any such right shall not in any respect diminish, affect or impair any such obligation or any other claim, interest, right or remedy at any time held by any Agent Party or Lender against any Guarantor or its property. The Agent Parties and Lenders make no representations or warranties in respect of any such right and shall have no duty to assure, protect, enforce or ensure any such right or otherwise relating to any such right.

SECTION 9.05     Payments.    Each Guarantor hereby guarantees that payments hereunder will be paid to the Administrative Agent without set-off or counterclaim in Dollars in immediately available funds at the Administrative Agent's office.

SECTION 9.06     Bankruptcy, Etc. The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding under any Debtor Relief Law, voluntary or involuntary, involving the Borrower or any Guarantor or by any defense which the Borrower or any Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.  To the fullest extent permitted by law, the Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any interest, fees, costs, expenses or other Obligations accruing or arising after the date on which such case or proceeding is commenced.

SECTION 9.07     Duration of Guaranty.  The guarantee contained in this Article IX shall remain in full force and effect until a Repayment Event.

SECTION 9.08     Reinstatement.  If at any time payment of any of the Obligations or any portion thereof is rescinded, disgorged or must otherwise be restored or returned by any Agent Party or Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, or if any Agent Party or Lender repays, restores, or returns, in whole or in part, any payment or property previously paid or transferred to such Agent Party or Lender in full or partial satisfaction of any Obligation, because the payment or transfer or the incurrence of the obligation is so satisfied, or is declared to be void, voidable, or otherwise recoverable under any state or federal law (collectively a "***Voidable Transfer***"), or because such Agent Party or Lender elects to do so on the reasonable advice of its counsel in connection with an assertion that the payment, transfer or incurrence is a Voidable Transfer, then, as to any such Voidable Transfer and as to all reasonable costs, expenses and attorney's fees of such Agent Party or Lender related thereto, the liability of each Guarantor hereunder will automatically and immediately be revived, reinstated, and restored and will exist as though the Voidable Transfer had never been made.

**ARTICLE X**

**MISCELLANEOUS**

SECTION 10.01     Notices.

(a)     Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be faxed or delivered by an internationally recognized courier service to the applicable address, facsimile number or electronic mail address delivered as follows:

(i)     if to the Borrower, to it at Limetree Bay Refining, LLC, 1 Estate Hope, Christiansted, St. Croix VI 00820-5652, Attention:  Stephan Tompsett, Email: stompsett@lbenergy.com with a copy to 1 Estate Hope Christiansted, St. Croix VI 00820-5652, Attention:  Mark Chavez, Email:  mchavez@lbenergy.com   with a copy to 1 Estate Hope Christiansted, St. Croix VI 00820-5652, Attention:  Jim Vanderwel, Tel No. (832) 553-1190, Email:  jvanderwel@lbenergy.com;

(ii)        if to the Administrative Agent, to it as its address (or facsimile number) set forth in Schedule 10.01(a);

(iii)       if to a Lender, to it at its address (or facsimile number) set forth in its Administrative Questionnaire.

Notices sent by hand or internationally recognized courier service shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)        Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or any Borrower Party may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)        Change of Address, etc.  Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)        Platform.

(i)        The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "***Platform***").

(ii)        The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "***Agent Parties***") have any liability to the Borrower,

any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's, or the Administrative Agent's transmission of communications through the Platform. "*Communications*" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Borrower pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section 10.01, including through the Platform.

SECTION 10.02     Expenses, Indemnity; Damage Waiver.

(a)     Costs and Expenses.  The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (limited in the case of legal fees to the reasonable and documented out-of-pocket fees, charges and disbursements of one financing counsel for the Administrative Agent plus one local counsel in the U.S. Virgin Islands), in connection with the preparation, negotiation, execution, delivery and administration (including, without limitation, monitoring the Collateral and due diligence on the Borrower Parties and their assets) of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof, (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the reasonable and documented out-of-pocket legal expenses of one firm of counsel for the Administrative Agent and one firm of counsel for the Lenders collectively, plus (if applicable) one local counsel in the U.S. Virgin Islands for all such persons and, in the case of a conflict of interest between such persons, one additional counsel in each relevant jurisdiction to each group of such affected persons similarly situated taken as a whole), in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.02.

(b)     Indemnification by the Borrower Parties.  The Borrower Parties shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "*Indemnitee*") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable and documented costs, expenses (including the reasonable and documented fees, charges and disbursements of any one firm of counsel for the Administrative Agent and one firm of counsel for the Lenders collectively, (if applicable) one local counsel in each appropriate jurisdiction for all such persons and, in the case of a conflict of interest between such persons, one additional counsel in each relevant jurisdiction to each group of such affected persons similarly situated taken as a whole), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower), other than by such Indemnitee and its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) the Advances or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials with respect to the Refinery or otherwise on or from any Real Estate Asset, any actual or alleged Hazardous Materials Activity related in any way to the Refinery or the Borrower Parties or any of their respective Subsidiaries or any actual or alleged violation of Environmental Law or Environmental Action related in any way to the Refinery or the Borrower Parties or any of their respective Subsidiaries  (except to the extent caused, contributed to or exacerbated by any Indemnitee), or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower Parties, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such

losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower Parties against an Indemnitee for a material breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower Parties have obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  This Section 10.02 shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(c)    Reimbursement by Lenders.  To the extent that any of the Borrower Parties for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent).  .

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, the Borrower Parties shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Advances, or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)    Payments.  All amounts due under this Section 4.02 shall be payable promptly, but in any event, not later than 10 days after demand therefor.

(f)    Survival.  Each party's obligations under this Section 4.02 shall survive the termination of the Loan Documents and payment of the obligations hereunder.

SECTION 10.03    Set-Off.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender or any such Affiliate, to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender or their respective Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the

Administrative Agent for further application in accordance with the provisions of <u>Section 3.9</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 10.04    <u>Amendments and Waivers</u>.

(a)    <u>Required Lenders' Consent</u>.  Subject to the terms of <u>Section 2.04(b)(ix)</u> and <u>Section 10.04(c)</u>, no amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Loan Party therefrom, shall in any event be effective without the written concurrence of the Required Lenders.

(b)    <u>Affected Lenders Consent</u>.  Without the written consent of each Lender (other than, in the case of (ix) below, a Defaulting Lender) that would be directly affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)    extend the scheduled final maturity of the Advances or Note;

(ii)    waive, reduce or postpone any scheduled mandatory repayment pursuant to <u>Section 2.03</u> (but not prepayment);

(iii)    reduce the rate of interest on the Advances or any fee or any premium payable to such Lender hereunder (other than, in each case, any waiver of any increase in the interest rate applicable to the Advances pursuant to <u>Section 3.01</u> or any other amount hereunder);

(iv)    extend the time for payment of any such interest or fees to such Lender;

(v)    increase or extend the Commitment of any Lender under this Agreement;

(vi)    amend, modify, terminate or waive any provision in any Loan Document relating to the priority of payments;

(vii)    amend, modify, terminate or waive any provision of this <u>Section 10.04(b)</u>, <u>Section 10.04(c)</u> or any other provision of this Agreement that expressly provides that the consent of all Lenders is required;

(viii)    amend the definition of "*Required Lenders*" or "*Pro Rata Share*"; *provided* that, with the consent of the Required Lenders, additional extensions of credit pursuant hereto may be included in the definition of "*Required Lenders*" or "*Pro Rata Share*";

(ix)    consent to the assignment or transfer by any Loan Party of any of its rights and obligations under any Loan Document;

(x)    waive any of the conditions specified in Section 4.01 or 4.02 without the consent of each Lender;

(xi)    amend <u>Section 2.04</u> or <u>Section 7.02</u> in any manner that would alter the sharing of payments thereunder;

(xii)     amend, modify or waive any provision of this Agreement in a manner that would directly and adversely affect the rights and obligations of the Lenders disproportionately to any other class of Lenders without the consent of the Lenders of the adversely affected class.

(c)     <u>Other Consents</u>.  No amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Loan Party therefrom, shall:

(i)     release any material portion of the Collateral except as expressly provided in the Loan Documents (including <u>Section 6.02(e)</u> and <u>Section 2.10(b)</u>);

(ii)     without the consent of the Required Lenders and the consent of Lenders holding a majority of the Commitments or the Advances outstanding, (A) change the order of application of any reduction in the Commitments or prepayment of the Advances among the DIP Facility from the application thereof set forth in the applicable provisions of <u>Section 2.04</u> of this Agreement, in any manner that disproportionately affects any of the Lenders differently from the other Lenders or other Secured Parties or (B) otherwise disproportionately affect the obligation of the Borrower to make any payment of the Advances to the Lenders from other Secured Parties; or

(iii)     amend, modify, terminate or waive any provision of <u>Article II</u> as the same applies to any Agent, or any other provision hereof of any Loan Document as the same applies to the rights, powers, privileges or obligations of any such Agent, in each case without the consent of such Agent;

(iv)     subordinate the DIP Liens of the Lenders with the consent of each of the Lenders

(d)     <u>Amendments to Cure Ambiguities, Defects, etc.</u>  Notwithstanding the other provisions of this <u>Section 10.04</u>, the Borrower, the Collateral Agent (at the direction of the Administrative Agent) and the Administrative Agent may (but shall have no obligation to) amend or supplement the Loan Documents without the consent of any Lender:  (i) to cure any ambiguity, defect or inconsistency, (ii) to make any change that would provide any additional rights or benefits to the Lenders or the Secured Parties, or (iii) to make, complete or confirm any grant of Collateral permitted or required by this Agreement or any of the Security Documents or any release of any Collateral that is otherwise permitted under the terms of this Agreement and the Security Documents.

(e)     <u>Execution of Amendments, etc.</u>  The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.04 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Loan Party, on such Loan Party.

SECTION 10.05     <u>Successors and Assigns; Participations</u>.

(a)     <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an

88

assignee in accordance with the provisions of <u>paragraph (b)</u> of this Section, (ii) by way of participation in accordance with the provisions of <u>paragraph (d)</u> of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>paragraph **Error! Reference source not found.**</u> of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>paragraph (d)</u> of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Advances at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)     <u>Minimum Amounts</u>.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Advances at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in <u>paragraph (b)(i)(B)</u> of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in <u>paragraph (b)(i)(A)</u> of this Section, the aggregate amount of the Commitment (which for this purpose includes the Advances outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Advances of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000, in the case of any assignment in respect of the DIP Facility, unless each of the Administrative Agent otherwise consents (such consent not to be unreasonably withheld, conditioned or delayed).

(ii)     <u>Proportionate Amounts</u>.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Advances or the Commitment assigned.

(iii)     <u>Required Consents</u>.  No consent shall be required for any assignment except to the extent required by <u>paragraph (b)(i)(B)</u> of this Section.

(iv)     <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 paid by the assigning Lender (or the assignee); *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; *provided*, *further*, that only one such fee shall be payable in the event of simultaneous assignments to or from two or more Approved Funds.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

89

(v)     No Assignment to Certain Persons.   Notwithstanding anything to the contrary herein, no Lender may assign or transfer (including by participation) any of its Advances or any of rights or obligations hereunder or under the Loan Documents to any natural Person, any Defaulting Lender or any of its Subsidiaries, or any Affiliate of the Borrower Parties.

(vi)     Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable Pro Rata Share of the Advances previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), and to pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each other Lender hereunder (and interest accrued thereon). Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof (including with respect to principal and interest) by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 3.04 and 4.02 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)     Register.   The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of and principal amounts (and stated interest) of the Advances owing to, each Lender pursuant to the terms hereof from time to time and the amount of any interest owing from time to time (the "*Register*").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  The Register in intended to comply with Treas.  Reg. Sections 5(f).103-1(c) and 1.871-14(c) and any obligation or Note issued under this Agreement is intended to be in "registered form" pursuant to such Treasury Regulations.

(d)      Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Advances owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) no Lender shall sell any participation that, when taken together with all other participations, if any, sold by such Lender, covers all of such Lender's rights and obligations under this Agreement, (iv) such Lender has caused its Participants to agree in writing to be bound by the provisions of Section 10.15 as of such Participant was a party hereto as a Lender and (v) the Borrower, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, (x) each Lender shall be responsible for the indemnity under Section 3.05(d) with respect to any payments made by such Lender to its Participant(s) and (y) no Participant shall have any rights under this Agreement or any of the other Loan Documents except as expressly set forth herein and each Participant's rights against the granting Lender in respect of any participation shall be limited to those set forth in the participation agreement (which shall not be in contravention of this Agreement).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement.  Notwithstanding anything to the contrary herein, no Lender shall permit any Participant to have any voting rights or any right to control the vote of such Lender with respect to any amendment, modification, waiver, consent or other action hereunder or under any other Loan Document (except as to actions that would (1) reduce or forgive the principal amount of the Advances of such Lender, reduce the rate of or forgive any interest or premium thereon, or reduce or forgive any fees or other Obligations owed to such Lender or (2) extend the Maturity Date, with respect to such Lender's Advances).  The Borrower agrees that each Participant shall be entitled to the benefits of Section 3.04, **Error! Reference source not found.** and 3.06 (subject to the requirements and limitations therein, as well as the requirements under Section 3.05(f) (it being understood that the documentation required under Section 3.05(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; *provided* that such Participant shall not be entitled to receive any greater payment under Section 3.03 or 3.05, with respect to any participation, than its participating Lender would have been entitled to receive.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of 0 with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.03 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 3.06 and Section 10.15 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Advances or other obligations under the Loan Documents and the amount of any interest owing from time to time (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, the Advances or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Advance or other obligation is in registered form for U.S. Virgin Islands tax purposes.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the

Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. The Participant Register in intended to comply with Treas. Reg. Sections 5(f).103-1(c) and 1.871-14(c) and any participation or Note under this Agreement is intended to be in "registered form" pursuant to such Treasury Regulations.

(e)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 10.06    Independence of Covenants.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

SECTION 10.07    Survival of Representations, Warranties and Agreements.    All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of the Advances.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Loan Party set forth in Section 3.04, Section 3.06, Section 10.02 and Section 10.04 and the agreements of Lenders set forth in Section 3.05(d), 8.03, and 10.02(c) shall survive the payment of the Advances and the reimbursement of any amounts drawn thereunder, and the termination hereof.

SECTION 10.08    No Waiver; Remedies Cumulative.  No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Loan Documents.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

SECTION 10.09    Marshaling; Payments Set Aside.  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of the Borrower or any other Person or against or in payment of any or all of the Obligations.  To the extent that the Borrower makes a payment or payments to the Administrative Agent or the Lenders (or to the Administrative Agent, on behalf of the Lenders), or any Agent or Lender enforces any security interests or exercise its rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

SECTION 10.10    Severability.  In case any provision in or obligation hereunder or under any other Loan Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality

and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

SECTION 10.11    Obligations Several; Independent Nature of Lenders' Rights.    The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Loan Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a Joint Venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

SECTION 10.12    Headings.    Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

SECTION 10.13    Governing Law; Jurisdiction, Etc.

(a)    Governing Law.  This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York.

(b)    Jurisdiction.  Each Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)    Waiver of Venue.  Each Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section 10.13.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 4.01.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.  As an alternative method of service, each of the Borrower, LBRM and LBRO also irrevocably consents to the service of any and all

process in any such action or proceeding by the air mailing of copies of such process to such Borrower Party at its then-effective notice address pursuant to Section 10.01.

SECTION 10.14    Waiver of Jury Trial.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 10.15    Confidentiality.    Each of the Administrative Agent and the Lenders agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being acknowledged and agreed by the Administrative Agent and the Lenders that any Affiliate or Related Party of such Person that is principally involved in the trading or hedging of commodities does not need to know, and will not be provided with, such information (other than a limited number of senior employees who are required, in accordance with industry regulations or such Person's internal policies and procedures, to act in a supervisory capacity and such Person's internal legal, compliance, risk management, credit or investment committee members, *provided* that no such persons will use such disclosed confidential information in connection with any trading or hedging of commodities of such Person or its Affiliates)) who are informed of the confidential nature of such Information and instructed to keep such Information confidential; (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (g) on a confidential basis to (i) any rating agency in connection with rating the Borrower or its Subsidiaries or the DIP Facility or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the DIP Facility; (h) with the consent of the Borrower; or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.  In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Advances; *provided* that such Persons receiving such information are subject to confidentiality obligations substantially similar to this Section 10.15 or as may be reasonably acceptable to the Borrower.

For purposes of this Section, "*__Information__*" means all information received from the Borrower relating to Holdings, the Borrower or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower; *provided* that, in the case of information received from the Borrower after the date of this Agreement, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 10.16    <u>Usury Savings Clause</u>. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Advances made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Advances made hereunder is repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of the Lenders and the Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Advances made hereunder or be refunded to the Borrower.

SECTION 10.17    <u>Counterparts; Integration; Effectiveness; Electronic Execution</u>.

(a)    <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective on the Closing Date.

(b)    <u>Electronic Execution of Assignments</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 10.18    <u>Patriot Act</u>. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the Patriot Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that

identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or Administrative Agent, as applicable, to identify the Borrower in accordance with the Patriot Act and the Beneficial Ownership Regulation.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the Beneficial Ownership Regulation.

SECTION 10.19   <u>Non-Recourse to Equityholders; Certain Acknowledgements</u>. Anything herein or in the other Loan Documents to the contrary notwithstanding, the obligations of the Loan Parties under this Agreement and the other Loan Documents are obligations of the Loan Parties and do not constitute a debt or obligation of (and no recourse shall be had with respect thereto to) any of the direct or indirect holders of the Capital Stock of the Loan Parties or any of their respective Affiliates (in each case, other than the Loan Parties) or any shareholder, partner, member, officer, director, controlling Person, agent, representative, executive or employee of any such Person (collectively, other than the Loan Parties, the "**Non-Recourse Parties**"), except to the extent of the obligations of any such Non-Recourse Party expressly provided for in any of the Loan Documents to which it may become a party, if ever.  Except in respect of any obligation of a Non-Recourse Party expressly provided in any Loan Document to which it may become a party (if ever), no action shall be brought against the Non-Recourse Parties, and no judgment for any deficiency upon the Obligations shall be obtainable, by any Secured Party against the Non-Recourse Parties and the Secured Parties shall look solely to the Loan Parties (but not to any Non-Recourse Party) in enforcing its rights and obligations under and in connection with the Obligations; *provided* that nothing contained in this <u>Section 10.19</u> shall be deemed to release any Non-Recourse Party from liability for its own fraudulent actions, bad faith or willful misconduct or from any other obligation of such Non-Recourse Party contained in any other agreement to which such Non-Recourse Party is a party or to bar any counterclaim against any Person.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

**BORROWER**:

LIMETREE BAY REFINING, LLC,
a U.S. Virgin Islands limited liability company


By:_____
Name: Mark Shapiro
Title: Chief Restructuring Officer

**GUARANTORS**:

LIMETREE BAY REFINING HOLDINGS II, LLC,
a U.S. Virgin Islands limited liability company


By:_____
Name: Mark Shapiro
Title: Chief Restructuring Officer

LIMETREE BAY SERVICES, LLC,
a Delaware limited liability company


By:_____
Name: Mark Shapiro
Title: Chief Restructuring Officer

LIMETREE BAY REFINING HOLDINGS LLC,
a U.S. Virgin Islands limited liability company


By:_____
Name: Mark Shapiro
Title: Chief Restructuring Officer

LIMETREE BAY REFINING MARKETING LLC,
a U.S. Virgin Islands limited liability company


By:_____
Name: Mark Shapiro
Title: Chief Restructuring Officer

LIMETREE BAY REFINING OPERATING LLC,
a U.S. Virgin Islands limited liability company


By:_____
Name: Mark Shapiro
Title: Chief Restructuring Officer

[Signature page to Senior Secured Superpriority Debtor in Possession Credit Agreement]

**ADMINISTRATIVE AGENT**:

405 SENTINEL LLC,
a Delaware limited liability company


By:_____
Name: Lawrence Cutler
Title: Authorized Signatory


**LENDER**:

405 SENTINEL LLC,
a Delaware limited liability company


By:_____
Name: Lawrence Cutler
Title: Authorized Signatory

[Signature page to Senior Secured Superpriority Debtor in Possession Credit Agreement]

**<u>Exhibit B</u>**

**Approved Budget**

4823-3938-9938.1

# Limetree Bay Refinery

**Forecasted Results of Operations and Cash Flows**

Wks Beginning  *7/12/21*  *thru*  *7/26/21*

| | Week -----> 1 | 2 | 3 | TOTAL |
|---|---|---|---|---|
| Beginning of Week | 7/12/21 | 7/19/21 | 7/26/21 | |
| End of Week | 7/18/21 | 7/25/21 | 8/1/21 | |
| **Cash Receipts** | $ 900 | $ 3,400 | $ 450 | $ 4,750 |
| **Cash Disbursements** | | | | |
| Payroll / Benefits | $ 1,220 | $ - | $ 1,197 | $ 2,417 |
| Fuel | 470 | 470 | 470 | 1,410 |
| Maintenance and Other Outside Services | 298 | 298 | 298 | 893 |
| Insurance | - | 514 | - | 514 |
| Admin / Site Services | - | 221 | 221 | 442 |
| Limetree Bay Terminal Services | 150 | 150 | 150 | 450 |
| Utility Adequate Assurance Payment | - | - | 483 | 483 |
| Critical Vendor Payments | - | - | 750 | 750 |
| Flare Repair | - | 221 | 58 | 279 |
| Hydrocarbon Removal | - | 310 | 310 | 620 |
| **Total   Cash Disbursements** | $ 2,138 | $ 2,184 | $ 3,938 | $ 8,259 |
| **Operating Cash Flow** | $ (1,238) | $ 1,216 | $ (3,488) | $ (3,509) |
| **Other (Sources) / Uses** | | | | |
| DIP Financing Costs | $ 63 | $ - | $ - | $ 63 |
| Revolver Interest Payments | 321 | | - | 321 |
| J Aron Interest Payment | - | - | 150 | 150 |
| Insurance Claims Professionals | 10 | - | - | 10 |
| **Total   Other (Sources) / Uses** | 393 | - | 150 | 543 |
| **Net Cash Flow Before Professional Fees** | (1,631) | 1,216 | (3,638) | $ (4,053) |
| **Professional Fees** | | | | |
| Debtor Legal | $ 150 | $ - | $ - | $ 150 |
| DIP Lender Counsel | 120 | - | - | 120 |
| Term Lender Professionals | 1,100 | - | - | 1,100 |
| J Aron Counsel (Pre-Petition Fee Estimate) | 575 | - | - | 575 |
| Revolver Counsel (Pre-Petition Fee Estimate) | 600 | - | 100 | 700 |
| **Total   Professional Fees** | $ 2,545 | $ - | $ 100 | $ 2,645 |
| **Net Cash Flow** | $ (4,176) | $ 1,216 | $ (3,738) | $ (6,698) |
| *Accumulated* | $ (4,176) | $ (2,960) | $ (6,698) | |
| **Beginning Cash Balance** | $ 2,517 | $ 3,841 | $ 5,057 | |
| **Net Cash Flow** | (4,176) | 1,216 | (3,738) | |
| **DIP Draw** | 5,500 | - | - | |
| **DIP (Paydown)** | - | - | - | |
| **Ending Book Cash Balance** | $ 3,841 | $ 5,057 | $ 1,319 | $ 1,319 |
| **Ending DIP Balance** | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 |