**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
-------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
LIMETREE BAY SERVICES, LLC, et al.,¹      :        Case No. 21-32351 (DRJ)
                                          :
                                          :        Jointly Administered
                    Debtors.              :
-------------------------------------------------------------x
```

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION
FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(III) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (IV) APPROVING ADEQUATE
PROTECTION TO THE PRE-PETITION SECURED CREDITORS, (V) MODIFYING
THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned

debtors and debtors in possession (together, the "Debtors") under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code") hereby files this objection (the "Objection") to the

*Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to*

*Obtain Post-Petition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III)*

*Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV)*

*Approving Adequate Protection to the Pre-Petition Secured Creditors, (V) Modifying the*

*Automatic Stay, and (VI) Scheduling a Final Hearing* [Docket No. 14] (the "Motion").² In support

of its Objection, the Committee respectfully represents as follows:

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776);
Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining
Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree
Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

² Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

## INTRODUCTION

1.      The Committee objects to the relief requested in the Motion to the extent that the proposed DIP Financing of $25 million and access to cash collateral fails to adequately provide for payment of the projected administrative expenses (*i.e.*, to pay the freight of the case) or a sufficient runway for the Debtors to accomplish a realistic sale process given the complexity of the estates' refinery assets.  The Committee also objects to any further encumbrance of avoidance actions and commercial tort claims at the expense of unsecured creditors.  The Committee is not sure whether the full $25 million under the DIP Facility is even available to the Debtors at this time.  On August 4, 2021, the Debtors filed a further proposed six-week Budget through September 19, 2021, that contemplates up to $21.5 million of total borrowings, but the Committee is informed that even that borrowing has not been approved by the DIP Lenders.  Only $5.5 million of borrowings under the DIP Facility have been approved by the Court to date.

2.      Although the Committee was only appointed last week and has been rapidly working to get itself and its professionals up to speed, most of the purported Prepetition Secured Parties are apparently heavily undersecured (even excluding the Prepetition Holdco Loan Parties), which means that there may be little here in terms of recoveries for unsecured creditors aside from whatever assets may have been unencumbered as of the Petition Date (the "Unencumbered Assets").[3]  The Committee therefore urges the Court to deny any further interim or final approval of the Motion that continues to encumber the estates' avoidance actions, commercial tort claims, or any other Unencumbered Assets.

3.      Under the circumstances here, there is simply no benefit to unsecured creditors from the estates granting liens and superpriority claims in favor of the Debtors' secured creditors

---

[3]  The Committee does not yet know what other assets may be included within the scope of Unencumbered Assets aside from avoidance actions and commercial tort claims.  The Committee's diligence process is ongoing.

on Unencumbered Assets that are the sole possible source of recovery for unsecured creditors. Notably, more than one-half of the interim DIP Facility of $5.5 million was projected to be used for the payment of the Prepetition Secured Parties' professionals, mostly on account of accrued prepetition fees, totaling $2.375 million in the aggregate. If the Prepetition Secured Parties want to fund these estates to protect their collateral, pay their professional fees, and consent to DIP Financing that primes them, then they may do so, but not on the backs of unsecured creditors who stand to receive zero recovery once the Unencumbered Assets are pledged to cover the DIP Financing or potential diminution claims of the Prepetition Secured Parties. At a minimum, any DIP Financing and diminution claims should be marshaled such that Unencumbered Assets are only available to satisfy such claims once all other DIP Collateral is exhausted to the extent that such claims remain unpaid. For this reason, there should be no waivers of marshaling or equities of the case rights in any further interim or final financing orders.

4.      The DIP Secured Parties and the Prepetition Secured Parties also seek a waiver of all potential surcharge claims against them for the duration of these cases. Yet, the DIP Financing of $25 million (even if it were available to the Debtors in full) appears to be deficient in terms of funding an orderly sale process, much less payment of all projected administrative expenses in these cases. The milestones under the DIP Financing require a binding stalking horse bid within 60 days of the Petition Date and a sale closing within 120 days of the Petition Date.[4] As the Court succinctly stated at the first day hearing in these cases with reference to the DIP Financing: "I am very worried that it's not enough money." *See* Transcript of First Day Hearing (July 13, 2021), at p. 22, ln. 5-6. Also: "I have significant liquidity concerns, probably more so than almost any other

---

[4] It is the current understanding of the Committee that the sale milestones are the requirements of the Prepetition Secured Parties and not the DIP Lenders. The primary milestone imposed by the DIP Lenders was the outside date for the maturity of the DIP Facility.

first day that I've ever heard, just simply because I have a lot of practical experience in dealing with this." *Id*. at p. 41, ln. 9-12.  As the Court implied in this comment, the Debtors are a multi-billion dollar refinery operation with substantial environmental and regulatory obligations.  There is no sale – whether going concern or liquidation – that could possibly be accomplished in 120 days and with only $25 million in new money financing.  The Committee is very concerned that the DIP Financing, which the Court characterized as "a day one in order to get to a day two," *id*. at p. 22, ln. 7-8, is effectively ***a road to nowhere***.  If broad-ranging estate waivers of surcharge rights are approved, there would be no way for the estates to even remotely obtain reimbursement from the lenders of unpaid administrative expenses.  Given that administrative solvency hangs in the balance, the Committee requests that any further interim or final financing order not include any surcharge waivers to or for the benefit of the DIP Secured Parties or the Prepetition Secured Parties.

5.      With respect to the Committee's limited challenge rights, the Committee should be granted: (a) more time than 60 days from Committee formation for the challenge period (requesting 120 days), (b) more money than $50,000 to conduct an investigation of the Prepetition Secured Parties' liens and claims (requesting $150,000), and (c) tolling to the extent that a proper motion for standing is filed to pursue any viable claims that may exist against the Prepetition Secured Parties, subject to whatever limitations exist under applicable law governing limited liability companies to allow a proper representative of the estates to assert such claims.  Further, any credit bid rights of the Prepetition Secured Parties must be subject to section 363(k) of the Bankruptcy Code and any challenge rights of the Committee.  Of course, the Committee should also receive concurrent reporting and information from the Debtors at the same time as the DIP Secured Parties and the Prepetition Secured Parties.

4

6.      In sum, the financing in these cases is perilous and very much a work in process. Most of the "secured" lenders are vastly underwater by hundreds of millions of dollars, yet the Debtors are faced with ominous regulatory and environmental burdens.  Under these unique circumstances, the Committee submits that any further interim or final financing orders must be carefully crafted to preserve what Unencumbered Assets may exist for the benefit of these estates and unsecured creditors.  The typical over-reaching waivers and accommodations that lenders routinely demand in many chapter 11 cases are inappropriate in these highly tenuous chapter 11 cases.  For these reasons and those set forth below, the Committee objects to the Motion.  The Committee has also proposed certain revisions to the Interim Order to address the Committee's objections, as reflected in the redline version attached hereto as **Exhibit A**.

**STATEMENT OF FACTS**

**A.**      **General Background**

7.      On July 12, 2021, (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

8.      On July 26, 2021, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of the following nine (9) members: (i) Universal Plant Services (IV), LLC; (ii) Excel Construction & Maintenance VI, Inc.; (iii) InServ Field Services USVI, LLC; (iv) National Industrial Services, LLC; (v) Christiansted Equipment Ltd.; (vi) Pinnacle Services, LLC; (vii) Baker Hughes Oilfield Operations LLC; (viii) Englobal U.S. Inc.; and (ix) Pamela Colon.

9.      The Debtors' prepetition capital structure is set forth in detail on pages 15-24 of the Motion.

**B.      The Proposed DIP Facility**

10.     The Motion was filed on the Petition Date.  Pursuant to the Motion, the Debtors seek authority to (i) enter into the DIP Facility and borrow up to $25 million of new money from third party DIP Lenders with no prior relationship with the Debtors and (ii) use Cash Collateral of the Prepetition Secured Parties in accordance with the Budget and certain Milestones.  As cited above, the Court expressed significant concern at the first day hearing that the DIP Facility may not be enough financing for these estates given the nature and scope of the Debtors' refinery assets. It is not clear whether the full $25 million under the DIP Facility is even be available to the Debtors at this time.  On August 4, 2021, the Debtors filed a further proposed six-week Budget through September 19, 2021, that contemplates up to $21.5 million of total borrowings, but the Committee is informed that even that borrowing has not been approved by the DIP Lenders.

11.     The DIP Facility is memorialized in the *Senior Secured Superpriority Debtor in Possession Credit Agreement* (the "DIP Credit Agreement"), which is attached to the Motion.  The major operative terms, covenants, and conditions of the DIP Facility are set forth on pages 4-13 of the Motion.

12.     Cash interest under the DIP Facility will accrue at 3% per annum and payable in kind (PIK) interest will accrue at 9% per annum.  The default rate of interest is 11% per annum, presumably this amount is in addition to the non-default contract rate of 12% (*e.g.*, 23% per annum total in the event of default).

13.     As further consideration for the DIP Facility, the DIP Secured Parties will receive the following fees (according to the Motion):

- *Delayed Draw Fee*: one and one-half percent (1.50%) of the undrawn amount of the DIP Loan Commitment, payable monthly in arrears.

- *Deferred Commitment Fee*: (A) $110,000, which shall be fully earned and nonrefundable as of the Interim Closing Date, and paid on the earlier of (i) payment in full of the DIP Facility and (ii) the Termination Date; and (B) $390,000, which shall be fully earned and nonrefundable as of the Final Closing Date, and paid on the earlier of (i) payment in full of the DIP Facility and (ii) the Termination Date.[5]

- *DIP Agent Fee*: $62,500 which shall be fully earned and nonrefundable as of the Interim Closing Date, and paid on the Interim Closing Date.

- *Break-Up Fee*: $250,000 in the event that alternative DIP financing is approved before entry of the Final Order, in lieu of the Deferred Commitment fee.

14.     In sum, the Debtors expect to pay the DIP Secured Parties approximately $1 million in various fees in connection with the DIP Facility, exclusive of DIP Lender professional fees. The Debtors project that the DIP Facility will be repaid within the next couple months from proceeds of collateral sales.  By the Committee's calculations, the internal rate of return for the DIP Lenders on an annualized basis is approximately 38% (through the end of October 2021).

15.     The DIP Facility will mature on the earlier of nine (9) months after the date of the Interim Order or the date of a sale of a material portion of the Debtors' assets.  The Debtors' ability to utilize the DIP Facility is at all times subject to an acceptable Budget and Permitted Variances. The Debtors will be obligated to provide periodic financial and operational reporting to the DIP Secured Parties and the Prepetition Secured Parties.

---

[5]  The Committee understands that the DIP Lenders may seek to accelerate the timing of payment of the Deferred Commitment Fee, as the projected borrowings under the DIP Facility continue to change.

7

16.     The DIP Facility will be secured by DIP Liens on the DIP Collateral as defined in the DIP Credit Agreement and the Interim Order and with the priorities set forth therein.  The DIP Collateral consists of all real and personal property of each of the Debtors, other than the IFF Property (*i.e.*, certain J. Aron inventory financing assets), and upon entry of the Final Order and solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations, Avoidance Actions and Avoidance Proceeds.   Hence, the DIP Collateral includes the Unencumbered Assets.

17.     The DIP Liens consensually prime the Prepetition Secured Parties Liens and take a first priority lien on all previously unencumbered DIP Collateral.

18.     Adequate protection is provided to the Prepetition Secured Parties and the Terminal Entities in the form of replacement liens and superpriority administrative expense claims against all real and personal property of the Debtors and their estates.  As additional adequate protection, the reasonable and documented professional fees of the Prepetition Secured Parties will be paid and, as to the Prepetition Term Lenders, all accrued and unpaid interest shall be payable in kind by adding such amounts to the outstanding principal balances.  The Revolver Lenders and J. Aron will receive monthly postpetition non-default interest cash payments.

19.     The DIP Facility and consensual access to cash collateral are subject to various Milestones as defined in the DIP Credit Agreement and the Interim Order.  Under the Milestones, the Debtors must have (i) prepared a contingency plan for the wind-down of the Debtors' operations in the event that a going concern sale is not achieved, which plan shall be reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (ii) prepared a 13-week budget that is reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (iii) filed with

the Court a motion requesting approval of proposed bidding procedures that are reasonably acceptable to the Prepetition Secured Parties and that adhere to the milestones described in clauses (iv) and (v) below no later than ten (10) business days after the Petition Date, (iv) obtained, within sixty (60) calendar days after the Petition Date, a binding stalking horse bid for the sale of all or substantially all of the Debtors' assets which bid shall be reasonably acceptable to each Prepetition Secured Party, and (v) completed the closing of a sale of all or substantially all of the Debtors' assets that is reasonably acceptable to each Prepetition Secured Party, within one hundred twenty (120) calendar days after the Petition Date.

20.     The Court entered an original Interim Order approving the Motion on July 14, 2021 [Docket No. 104], and entered a second Interim Order on August 2, 2021 [Docket No. 271].  The Interim Order authorized the Debtors to borrow up to $5.5 million under the DIP Facility on an interim basis.  More than one-half of that amount was projected to be used for the payment of the Prepetition Secured Parties' professional fees, mostly on account of accrued prepetition fees, totaling $2.375 million in the aggregate.

21.     The Interim Order includes, subject to challenge, broad-ranging admissions, stipulations, and releases with respect to the liens and claims of the Prepetition Secured Parties. The Committee is given only 60 days following formation to assert a challenge and its investigation budget is limited to $50,000.  The Debtors' latest Budget accrues only $369,000 in the aggregate for the Committee's professionals through September 19, 2021.

22.     The Court initially set the Final Hearing on the Motion for August 2, 2021 at 3:30 p.m. CT, with objections due by July 29, 2020 at 10:00 a.m. CT.  The Final Hearing (or a further interim) has now been continued to August 6, 2021, with the Committee's objection due by August 5, 2020 at 6:00 p.m. CT (by agreement of the Debtors).

9

## OBJECTIONS

23.     A court should only approve a proposed debtor in possession financing if such financing "is in the best interest of the general creditor body."  *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (*citing In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983); *see also In re Tenney Village Co., Inc.*, 104 B.R. 562, 569 (Bankr. D. N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries").  Moreover, the proposed financing must be "fair, reasonable, and adequate."  *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

24.     Postpetition financing should not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender.  *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *Tenney Village*, 104 B.R. at 568 (debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the secured creditor").

25.     Indeed, the law has long acknowledged the unequal bargaining power inherent in negotiations leading to proposed postpetition financing, as well as the very significant harm that can befall creditors if the proposed financier is permitted to exploit its leverage position.  *See, e.g., In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").  The DIP Facility should not simply become a tool for the

Prepetition Secured Parties to enhance their collateral position at the expense of unsecured creditors. *In re Ames Dept. Stores*, 115 B.R. at 38-39 ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate").

26.     As of the Petition Date, given the likelihood that the bulk of the Prepetition Secured Parties are heavily undersecured, the Unencumbered Assets are likely the sole source of recovery by unsecured creditors in these cases. Access to the DIP Facility and use of cash collateral therefore stands to benefit primarily the Prepetition Secured Parties themselves by preserving their collateral and paying their professional fees. Unsecured creditors, by contrast, appear to be hundreds of millions of dollars out of the money and the only way to preserve and protect their interests is to treat the Unencumbered Assets as sacrosanct and free and clear of any liens or superpriority claims. As proposed, the DIP Facility would encumber all such previously Unencumbered Assets in favor of the DIP Lenders and, to the extent of any diminution, the Prepetition Secured Parties, without any prospect of a recovery by the unsecured creditors in these cases. Moreover, as the Court recognized at the first day hearing, the DIP Facility appears to be unrealistically small – only $25 million (not all of which may even be available to the Debtors) – in a multi-billion dollar case involving complex and burdensome refinery assets. Before Unencumbered Assets are inextricably pledged, there must be a reasonable strategy for funding the administrative expenses of these cases pending the outcome of a sales process. At a minimum, any lender remedies against the Unencumbered Assets must be marshaled such that the DIP Secured Parties and the Prepetition Secured Parties can only turn to the Unencumbered Assets once all other recoveries on the DIP Obligations and any allowed diminution claims are exhausted.

27.     The DIP Facility and proposed terms of cash collateral use would also impose onerous limitations on the Committee's ability to investigate the liens and claims of the Prepetition Secured Parties and any potential claims that the estates may have against such parties. Finally, a final order would waive the estates' surcharge, equities of the case, and marshaling rights without adequately taking into account potential remedies that should be available to these estates for the benefit of unsecured creditors. Under these circumstances, the DIP Facility is not in the best interests of creditors and should be denied in its present form.

## A.     Unencumbered Assets Should Remain Unencumbered and Free of Any Superpriority Claims For the Benefit of Unsecured Creditors

28.     The Debtors propose to grant liens and superpriority claims in favor of the DIP Secured Parties and Prepetition Secured Parties on every previously Unencumbered Asset of the Debtors' estates, including Avoidance Actions, Avoidance Proceeds, and commercial tort claims. There has been no analysis or assessment to the Committee's knowledge of how much any such causes of actions may be worth, or whether they should be pursued at all. To the extent there is value in such assets, there may be no other possible recovery by the general unsecured creditors in these cases given that most of the Prepetition Secured Parties appear to be heavily underwater.

29.     Avoidance actions (and the proceeds thereof), in particular, are uniquely for the benefit of general creditors of the estate, not secured creditors, and should not be encumbered in favor of secured lenders. Avoidance actions are statutory rights designed to ensure equitable distributions of a debtor's estate. *See, e.g., Cullen Ctr. Bank & Tr. v. Hensley (In re Criswell)*, 102 F.3d 1411, 1414 (5th Cir. 1997) (noting that avoidance powers under the Bankruptcy Code were created to "facilitate[e] the prime bankruptcy policy of equality of distribution among creditors of the debtor"). Indeed, avoidance powers are intended to allow a debtor in possession or other party with standing to gain recoveries for the benefit of all unsecured creditors. *See Buncher Co. v.*

12

*Official Comm. of Unsecured Creditors of GenFarm Ltd. Partn. IV*, 229 F.3d 245, 250 (3d Cir. 2000). Accordingly, bankruptcy courts often restrict a debtor's ability to pledge avoidance actions and their proceeds as collateral. *See, e.g., Gaudet v. Babin (In re Zedda)*, 103 F.3d 1195, 1203 (5th Cir. 1997) ("A trustee's avoidance powers are intended to benefit the debtor's creditors, as such powers facilitate a trustee's recovery of as much property as possible for distribution to the [unsecured] creditors."); *McFarland v. Leyh (In re Tex. Gen. Petrol. Corp.)*, 52 F.3d 1330, 1335– 36 (5th Cir. 1995) ("[T]he proceeds recovered in an avoidance action satisfy the claims of priority and general unsecured creditors before the debtor benefits."); *In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) (Bankr. S.D.N.Y. Aug. 6, 2013) (ECF No. 133) (excluding avoidance actions and proceeds thereof from scope of adequate protection liens and property that could be used to pay super-priority administrative expense claims); *In re Sapolin Paints, Inc.*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) ("[N]either a trustee . . . nor a debtor-in-possession, can assign, sell or otherwise transfer the right to maintain a suit to avoid a preference.").

30.     Here, there is no basis for the DIP Secured Parties and Prepetition Secured Parties to take liens and superpriority claims on Unencumbered Assets when the unsecured creditors stand to receive no feasible direct benefit from the DIP Facility or access to cash collateral. The Unencumbered Assets are the only hope that the unsecured creditors have of any possible distribution in these cases. Any further interim or final orders therefore should make clear that no DIP Liens or adequate protection liens shall attach to any Unencumbered Assets and any associated superpriority claims shall not be payable from the proceeds thereof.

**B.     The Full Range of Adequate Protection Proposed for the Prepetition Secured Parties is Excessive Under the Circumstances**

31.     There has been no showing that adequate protection in favor of the Prepetition Secured Parties is needed to the extent proposed in the Motion. The Bankruptcy Code only

requires debtors to provide a secured creditor with adequate protection to the extent that the automatic stay, the debtors' use of property, or a priming lien "results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1).  The purpose is to protect a secured creditor from diminution in the value of its collateral during the use period.  *United Sav. Ass'n v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 368 (1988); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (goal is to "safeguard the secured creditor from diminution in the value of its interest"); *Lincoln Nat'l Life Ins. Co. v. Craddock-Terry Shoe Corp. (In re Craddock-Terry Shoe Corp.)*, 98 B.R. 250, 255 (Bankr. W.D. Va. 1988) (finding that what needs to be adequately protected is the decrease in value attributable to the stay arising on the petition date).

32.     "[T]he initial burden of showing the need for adequate protection [is] upon the creditor having an interest in the property being used by the debtor.  In order to meet this burden, the secured creditor must demonstrate that such relief is required by showing a likelihood that the collateral will decrease in value or establishing some other basis for the relief.  The burden then shifts to the debtor to show that adequate protection is not needed or can be provided in a different manner." *Zink v. Vanmiddlesworth*, 300 B.R. 394, 402-03 (N.D.N.Y. 2003) (citations omitted). *See also In re Gunnison Ctr. Apartments*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005) ("The secured creditor 'must, therefore, prove this decline in value—or the threat of a decline—in order to establish a *prima facie* case.'") (*quoting In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)); *In re Continental Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("Post-Timbers courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.").

14

33.     Absent diminution, no adequate protection is needed.  So, where the lenders'
collateral is not diminishing as a result of its use, nothing further is required for adequate
protection.  *Save Power Ltd. v. Pursuit Athletic Footwear (In re Pursuit Athletic Footwear)*, 193
B.R. 713, 716 (Bankr. D. Del. 1996).  And, diminution is not equivalent to cash collateral use.  A
prepetition lender is "not entitled to an adequate protection claim on a dollar-for-dollar basis for
cash collateral used during the case."  *Official Comm. v. UMB Bank, NA (In re Residential Capital,
LLC)*, 501 B.R. 549, 596-97 (Bankr. S.D.N.Y. 2013).

34.     In the instant case, most of the initial borrowing of $5.5 million under the DIP
Facility was budgeted for the accrued professional fees of the Prepetition Secured Parties
themselves ($2.375 million).   To the extent further adequate protection is appropriate, the
Committee would not oppose adequate protection to the Prepetition Secured Parties in the form of
replacement liens with the same extent, priority, and validity as existed on the Petition Date.  The
Debtors, however, propose to grant the Prepetition Secured Parties much more, including:

- Adequate protection liens to the extent of any diminution on all real and personal
  property of the Debtors' estates, including the Unencumbered Assets;

- Superpriority claims to the extent of any diminution payable from all assets of the
  estate, including the Unencumbered Assets;

- Payment of monthly postpetition interest to the Revolver Lenders and J. Aron;

- Accrual of postpetition interest payable to the Prepetition Term Lenders;

- Payment of the reasonable fees and expenses of various professionals of the
  Prepetition Secured Parties;

- Validation of the liens and claims of the Prepetition Secured Parties and broad-
  ranging releases, subject to a shortened challenge period of 60 days from the date
  of Committee formation and a minimal investigation budget of $50,000;

- Section 506(c) surcharge waivers in favor of the Prepetition Secured Parties for the
  duration of these cases; and

15

- Imposition of various Milestones.

35.    As stated previously, the concept of adequate protection was put into section 361 of the Bankruptcy Code with the goal of "safeguard[ing] the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." *In re 495 Central Park Ave. Corp.*, 136 B.R. at 631.   Determinations regarding adequate protection are fact-specific.  *See In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *see also* S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978).  The focus of the requirement is to protect a secured creditor from diminution in the value of its collateral during the use period.  *United Savings Association of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 368, 108 S.Ct. 626, 629, 98 L.Ed.2d 740 (1988); *see also Matter of Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *Delbridge v. Production Credit Ass'n & Federal Land Bank (In re Delbridge)*, 104 B.R. 824 (E.D. Mich. 1989); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

36.    Section 361 of the Bankruptcy Code provides that periodic cash payments, replacement liens, or relief constituting the "indubitable equivalent" of the creditor's interest may provide adequate protection.  Provision of a replacement lien in property equal to the value of the cash collateral used specifically complies with section 361(2) and provides adequate protection within the meaning of section 363(e) of the Bankruptcy Code.  *See, e.g., In re O'Connor*, 808 F.2d at 1398; *In re Dynaco Corp.*, 162 B.R. 389, 393-95 (Bankr. D. N.H. 1993); *In re T.H.B. Corp.*, 85 B.R. 192, 195 (Bankr. D. Mass. 1988).

37.    The protection offered to the Prepetition Secured Parties in these cases is far more than adequate.  The Committee would not oppose replacement liens for the Prepetition Secured Parties to the same extent, priority, and validity that existed as of the Petition Date.  The proposed

16

adequate protection and other lender protections enhance the Prepetition Secured Parties' collateral position at the expense of unsecured creditors, who do not benefit directly from the DIP Facility or access to cash collateral and stand to lose their only hope of a recovery from Unencumbered Assets. Further, the Prepetition Term Lenders should not be entitled to accrual of postpetition interest given that they are undersecured and any funding of professional fees to them should be subject to reasonable caps. The proposed adequate protection package under the Motion is therefore unbalanced and improper.

## C.   **The Lien Validation and Challenge Provisions are Too Strict**

38.    The Debtors propose to circumscribe the Committee's ability to exercise its statutory duties. The Committee is given a marginal investigation budget of $50,000 and a mere 60 days after formation to investigate the validity of the Prepetition Secured Parties' liens and claims and any possible affirmative claims the estates may have against such lenders. The complexity of the secured debt in these cases requires a thorough investigation, along with a complete understanding of the various transactions that took place prior to the Petition Date. This investigation cannot (and should not) be rushed. The Committee should be permitted to thoroughly investigate the prepetition transactions between the Debtors and the Prepetition Secured Parties, some of whom are insiders, to determine whether any claims exist against them.

39.    Further, given that the Debtors are limited liability companies, any challenge rights must be preserved so that an appropriate estate representative is authorized to assert such claims. Recent caselaw from Delaware bankruptcy courts holds that creditors' committees cannot obtain standing to bring challenges in bankruptcies of certain limited liability companies. *See e.g., Gavin/Solmonese LLC v. Citadel Energy Partners, LLC (In re Citadel Watford City Disposal Partners, L.P.)*, 2019 Bankr. LEXIS 1375 (Bankr. Del. May 2, 2019) (complaint of liquidating

trustee asserting fiduciary duty claims of LLC and limited partnership debtors dismissed due to his lack of standing based on lack of standing of creditors' committee, as assignor under plan, where applicable state laws offered no option for derivative standing for creditors, including of insolvent entities); *Official Comm. v. Comvest Group Holdings (In re HH Liquidation, LLC).*, 590 B.R. 211, 284 (Bankr. D. Del. 2018) ("rights [of a creditors' committee] to assert derivative claims are limited to the derivative standing of its members, none of whom have standing as creditors of a Delaware LLC to assert derivative claims of breach of fiduciary duty on behalf of the company," which standing is limited to holders of membership interests and their assignees). Thus, a challenge provision may be effectively moot, unless adequate safeguards are implemented for a capable estate fiduciary to assert any viable objections or affirmative claims.

40.    The Committee submits that: (i) the Challenge Period should be extended to 120 days after Committee formation, (ii) the Committee's investigation budget should be increased to $150,000, and (iii) the Challenge Period should be tolled in the event that the Committee files a motion seeking standing to assert a Challenge until such motion is determined by the Court, subject to the issue involving limited liability companies noted above. Further, express provision should be added that any successful Challenge could result in the disgorgement of any amounts realized by the Prepetition Secured Parties on a postpetition basis.

**D.    The Proposed Section 506(c), Equities of the Case, and Marshaling Waivers are Inappropriate Without Taking Into Account the Interests of Unsecured Creditors**

41.    The Debtors intend to grant certain waivers of section 506(c) surcharge, marshaling, and equities of the case rights as to the DIP Secured Parties and Prepetition Secured Parties. Through the section 506(c) waiver, the Debtors would irrevocably waive the estates' rights to charge certain costs or expenses incurred in the administration of these cases, yet the DIP Facility appears to be insufficient to fund the anticipated course of these cases. This provision

18

should be stricken from any Final Order unless and until adequate provision has been made for payment of all accrued and unpaid administrative expenses.

42.     The effect of the proposed section 506(c) waiver is to eliminate a further avenue of recovery for the Debtors' estates and to create the risk of administratively insolvency.  This result contravenes the essential purpose of section 506(c).  *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[S]ection 506(c) is designed to prevent a windfall to the secured creditor . . . The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . .") (internal citation omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

43.     Neither the Committee nor this Court has any assurance as yet that there will be sufficient availability under the DIP Facility or access to cash collateral to pay all administrative claims against the Debtors' estates.  As other bankruptcy courts have recognized, DIP financing that contains an inadequate budget coupled with a surcharge waiver should not be approved unless modified to provide for payment of administrative claims.  *See NEC Holdings Corp.*, Case No. 10-11890 (PJW) (Bankr. D. Del. Jul 13, 2010) [Docket No. 223] and Hearing Tr. at 108:1-5 [Docket No. 224] ("I need some evidence that there's a probability that admin claims are going to be paid in full, including 503(b)(9) claims or I won't approve the financing."); *Hartford Fire Ins. Co. v. Northwest Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (8th Cir. B.A.P. 1998) (holding that provision in financing order purporting to immunize the postpetition lender from section

19

506(c) surcharge was unenforceable); *In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506(c)).

44.     The lenders also seek to restrict this Court's ability to implement equitable marshaling as to the DIP Secured Parties and Prepetition Secured Parties.  The waiver of any marshaling requirements is prejudicial because the DIP Secured Parties and Prepetition Secured Parties should be required to exhaust remedies from their prepetition collateral before turning to any other assets, especially in these cases where there is likely no value for unsecured creditors from any other sources aside from the Unencumbered Assets.  Marshaling may be a key remedy in ensuring that unsecured creditors do not bear the brunt of the expense of these cases while having no prospect of any distributions.  *See Official Comm. v. Hudson United Bank (In re America's Hobby Center)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998); *Ramette v. United States (In re Bame)*, 279 B.R. 833 (8th Cir. B.A.P. 2002) (marshaling doctrine invoked against taxing authorities to benefit estate's unsecured creditors).

45.     Finally, the Debtors propose that the "equities of the case" exception under section 552(b) not apply to the DIP Secured Parties and Prepetition Secured Parties.  The "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a debtor, committee, or other party in interest to exclude postpetition proceeds from prepetition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure. "'The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated

value.'"  *In re Muma Servs.*, 322 B.R. 541, 558-559 (Bankr. D. Del. 2005) (quoting *Delbridge* v. *Prod. Credit Ass'n & Fed. Land Bank*, 104 B.R. 824, 826 (E.D. Mich. 1989)).  There is no reason to waive such rights here, especially given that the Prepetition Secured Parties appear to be vastly underwater.  *See, e.g., In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make.  If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lender's rights, the Court will consider it."); *Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (request for section 552(b) waiver was premature because factual record not fully developed).

46.     It is unreasonable to ask unsecured creditors – through the Unencumbered Assets or as administrative advances – to fund any shortfall in the Budget by way of the estates' waiver of important creditor protections.  At least one court has even refused to enforce such waivers. *Hartford Fire Ins. Co. v. Norwest Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (BAP 8th Cir. 1998) (holding that provision in financing order purporting to immunize the postpetition lender from section 506(c) surcharge was unenforceable).  In sum, the waiver of section 506(c), marshaling, and equities of the case rights are inappropriate without adequately taking into account estate remedies and where, as here, there is no certainty that adequate provision has been made for the payment of all administrative expenses against the Debtors.

## E.     Other Objections

47.     The Committee has various additional objections to any proposed further interim or final order:

- **Budgets and Committee Reporting Rights.**  The Committee must be granted notice of any new budgets and provided concurrently with all financial reporting delivered to the DIP Secured Parties and the Prepetition Secured Parties.

- **Lender Remedies.**  The Remedies Notice Period should be extended from three (3) business days to five (5) business days.

- **Carve-Out for Committee Fees.**  The Budget should include a reasonable line item for Committee professional fees confirming that the Debtors have adequate liquidity to fund such Carve-Out.  Additionally, no changes should be made to the Budget with respect to Committee fees without the prior approval of the Committee.

- **Credit Bidding Limitations.**  The right of the Prepetition Secured Parties to credit bid as part of a sales process should be subject to section 363(k) of the Bankruptcy Code and the Committee's challenge rights.

- **Milestones.**  The Milestones requiring a binding stalking horse bid within 60 days of the Petition Date and the closing of a sale of substantially all assets within 120 days of the Petition Date do not appear to be realistic.

- **Default Rate of Interest.**  The default rate of interest of 11% per annum, presumably in addition to the non-default contract rate of 3% per annum of cash interest and 9% per annum of PIK interest, is too high and substantially above market norms.

48.     The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the Motion and the form of final order, and to introduce evidence prior to or at any

hearing regarding the Motion in the event that the Committee's objections are not resolved prior to such hearing.

## **CONCLUSION**

49.     For the foregoing reasons, the Committee respectfully requests that the Court deny the Motion until the Committee's objections set forth herein have been adequately addressed.


*[signature page follows]*

Dated: August 5, 2021       By:   */s/ Michael D. Warner*

Michael D. Warner (TX Bar No. 00792304)
Steven W. Golden (TX Bar No. 24099681)
**PACHULSKI STANG ZIEHL & JONES LLP**
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone:  (713) 691-9385
Facsimile:  (713) 691-9407
Email: mwarner@pszjlaw.com
Email: sgolden@pszjlaw.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Shirley S. Cho (admitted *pro hac vice*)
**PACHULSKI STANG ZIEHL & JONES LLP**
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
Email: scho@pszjlaw.com

-and-

Robert J. Feinstein (admitted *pro hac vice*)
**PACHULSKI STANG ZIEHL & JONES LLP**
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Email: rfeinstein@pszjlaw.com

*Proposed Counsel for the Official Committee of
Unsecured Creditors*

DOCS_SF:105858.3 68700/048

**<u>EXHIBIT A</u>**

**Redline Interim DIP Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:** | **CHAPTER 11** |
| **LIMETREE BAY SERVICES, LLC**, *et al.* [1] | **CASE NO.: 21-32351** |
| **Debtors.** | **Jointly Administered** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession (the "Debtors") seeking entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules (the "Local Rules") for the United States Bankruptcy Court for the Southern District of Texas (the "Court"), and the Procedures for Complex Cases in the Southern District of Texas (the "Complex Rules"),[2]

    (i)       authorizing the Debtors to (a) obtain postpetition financing up to an aggregate principal amount of up to $5.5 million on an interim basis (the "DIP Financing"), with a committed financing facility up to $25 million proposed by the Debtors to be considered at a subsequent hearing, pursuant to that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement attached hereto as **Exhibit A** (the "DIP Credit Agreement"), and such other agreements, documents, certificates and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement (defined below) as applicable.

instruments delivered or executed from time to time in connection therewith, including the agreements related to the DIP Financing, (the "<u>DIP Loan Documents</u>"), among the Debtor Limetree Bay Refining, LLC, as borrower ("<u>LBR</u>" or the "<u>Borrower</u>"), Debtors Limetree Bay Services, LLC., Limetree Bay Refining Holdings, LLC, Limetree Bay Refining Holdings II, LLC ("<u>LBRHII</u>"), Limetree Bay Refining Operating, LLC ("<u>LBRO</u>"), and Limetree Bay Refining Marketing, LLC ("<u>LBRM</u>" and each a "<u>Guarantor</u>" and together the "<u>Guarantors</u>"), 405 Sentinel, LLC and the financial institutions from time to time parties thereto as lenders (each individually a "<u>DIP Lender,</u>" and collectively, the "<u>DIP Lenders</u>"), and 405 Sentinel, LLC, as administrative and collateral agent for the DIP Lenders (the "<u>DIP Agent</u>" together with the DIP Lenders, the "<u>DIP Secured Parties</u>"); (b) authorizing the Debtors to use the DIP Lenders' and the Prepetition Secured Parties' (as defined in the Motion) (x) "cash collateral" as such term is defined in section 363 of the Bankruptcy Code other than, until such time as the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement defined below) occurs, any such "cash collateral" that constitutes Inventory Financing Collateral (as defined below) and (y) until such time as the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement defined below) occurs, "cash collateral" as such term is defined in section 363 of the Bankruptcy Code that constitutes Inventory Financing Collateral, solely to the extent that the same is (A) cash or amounts on deposit in or credited to any deposit account or securities account or (B) accounts receivable in respect of propane sales contemplated to be received by the Debtors pursuant to the Approved Budget (as defined below) in an aggregate amount not to exceed $1,000,000, in each case that constitutes Inventory Financing Collateral as of the Petition Date (such "cash collateral" as described in this clause (y) and the foregoing clause (x), the "<u>Cash Collateral</u>");

(ii)   granting (y) to the DIP Agent for the benefit of the DIP Secured Parties the DIP Liens on the DIP Collateral (as defined below) to secure all amounts owed under the DIP Loan Documents (the "<u>DIP Obligations</u>") on a first priority priming basis, except as otherwise set forth herein, and (z) to the DIP Secured Parties the DIP Superpriority Claims (as defined below) in respect of the DIP Obligations, in each case subject to the terms and conditions hereof;

(iii)  approving certain stipulations by the Debtors with respect to the Prepetition Secured Documents (as defined below) and the liens and security interests arising therefrom;

(iv)  modifying the automatic stay to the extent provided for herein;

(v)   granting adequate protection for the liens and security interests granted for the benefit of the Prepetition Secured Parties in connection with the prepetition agreements described in Paragraphs F and G, below; and

(vi)  scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of a final order (the "<u>Final Order</u>") authorizing the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing, which order shall be in form and substance and on terms satisfactory in all respects to the DIP Secured Parties.

2

DOCS_LA:339202.2 68700/001

The Court having considered the Motion, the DIP Loan Documents, and the Declaration of Mark Shapiro in support of the First Day Motions, the pleadings filed with the Court, and the evidence proffered and presented at the interim hearing held on July 13, 2021 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Rules and Complex Rules; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is necessary for the continued operation of the Debtors' businesses; and upon the record of these Chapter 11 Cases; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED:[3]**

A.    <u>Filing Date</u>.   On July 12, 2021 (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (these "<u>Chapter 11 Cases</u>").

B.    <u>Jurisdiction; Venue</u>.   The Court has exclusive jurisdiction to consider this matter pursuant to 28 U.S.C. §1334.   This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.   The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, and 507 of

---

[3]    Where appropriate in this Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

DOCS_LA:339202.2 68700/001

the Bankruptcy Code; Bankruptcy Rules 2002, 4001, 6004, and 9014; and Local Rules 2002-1, 4001-1, 4002-2, and 9013-1.

C.      <u>Committee Formation</u>.  On July 26, 2021, t̶T̶he Office of the United States Trustee (the "<u>U.S. Trustee</u>") has not yet appointed th̶e̶an O̶o̶fficial C̶c̶ommittee of U̶u̶nsecured C̶c̶reditors in these Chapter 11 Cases [D.I. 189] (if appointed, the "<u>Committee</u>"). No trustee or examiner has been appointed.

D.      <u>Notice</u>.  Due notice of the Interim Hearing and the Motion was afforded, whether by facsimile, electronic mail, overnight courier, or hand delivery, to parties in interest, including to: (a) the United States Trustee for the Southern District of Texas; (b) all secured creditors of record, including (as defined herein) the DIP Agent, the Revolving Administrative Agent, the Term Administrative Agent, J. Aron, and the Project Collateral Agent; (c) the Offices of the Attorney General of the State of Texas and the United States Virgin Islands; (d) the thirty (30) largest consolidated unsecured creditors for the Debtors; (e) the Debtors' identified, interested taxing authorities, including the Internal Revenue Service; (f) the Debtors' identified, interested government and regulatory entities; (g) other interested parties as identified by the Debtors; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Under the circumstances, such notice of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rules 4001 and 9014 and the Local Rules, and no other or further notice of the relief sought at the Interim Hearing was required.

E.      <u>Debtors' Stipulations Regarding DIP Loan Documents and DIP Secured Parties</u>.  In requesting the DIP Financing, upon entry of this order (the "<u>Interim Order</u>"), the Debtors acknowledge, represent, stipulate, and agree that:

4

DOCS_LA:339202.2 68700/001

(a)     as of the date hereof, none of the DIP Secured Parties are control persons or insiders (as defined in the Bankruptcy Code) of the Debtors by virtue of determining to make any loan, providing the DIP Financing or performing obligations under the DIP Loan Documents;

(b)     as of the date hereof, there exist no claims or causes of action against any of the DIP Secured Parties arising from, related to or connected with the DIP Loan Documents that may be asserted by the Debtors;

(c)     as of the date hereof, the Debtors forever and irrevocably release, discharge, and acquit the DIP Secured Parties and each of their respective officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "DIP Releasees"), in each case in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened as of the date hereof including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, existing as of the date of this Interim Order, arising out of, in connection with, or relating to the DIP Financing, the DIP Loan Documents, the DIP Obligations, and ancillary documentation, guarantees, security documentation and collateral documents executed in support of the foregoing or the transactions contemplated hereunder or thereunder including, without limitation, (i) any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), except as permitted herein, so-called "lender liability" claims,

5

DOCS_LA:339202.2 68700/001

counterclaims, cross-claims, recoupment, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Secured Parties with respect to the DIP Loan Documents.

       F.    <u>Debtors' Stipulations Regarding Prepetition Secured Debt Obligations</u>. Upon entry of the Interim Order, subject to paragraph 42, the Debtors acknowledge, represent, stipulate, and agree as follows and make the releases and waivers set forth below:

       (a)    Prior to the Petition Date, pursuant to (i) the Prepetition Term Credit Agreement, the Prepetition Term Lenders extended credit to LBR in the form of term loans, (ii) the Revolver Credit Agreement, the Revolver Lenders extended credit to LBRM in the form of a revolving credit facility and (iii) the Prepetition HoldCo Credit Agreement, the Prepetition HoldCo Lenders[4] extended credit to LBRH in the form of term loans. Pursuant to the Prepetition Term Credit Agreement, the obligations of LBR under the Prepetition Term Credit Agreement are unconditionally and irrevocably guaranteed on a joint and several basis by LBRO and LBRM. Pursuant to the Revolver Credit Agreement, the obligations of LBRM under the Revolver Credit Agreement are unconditionally and irrevocably guaranteed on a joint and several basis by LBRO and LBR. As of the Petition Date, the obligors under the Prepetition Term Documents and Revolver Transaction Documents (such documents, the "<u>Prepetition Secured Debt Documents</u>" and such obligors, the "<u>Prepetition Obligors</u>") were truly and justly indebted to the Prepetition

---

[4] As used in this Interim Order, the term "Prepetition HoldCo Lenders" extends only to Prepetition Holdco Lenders to the extent they are, as of the date of this Interim Order, a Prepetition Term Lender or an affiliate of a Prepetition Term Lender. The term specifically does not encompass insiders or affiliates of the Debtors, as such terms are defined in the Bankruptcy Code.

Secured Parties pursuant to the Prepetition Secured Debt Documents, without defense, counterclaim, offset, claim, or cause of action of any kind, in the aggregate amount of not less than (i) $768,956,393 of outstanding principal with respect to term loans under the Prepetition Term Credit Agreement plus accrued and unpaid interest with respect thereto, fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the Prepetition Term Credit Agreement) and all other "Obligations" (as defined in the Prepetition Term Credit Agreement or any security document related thereto) under the Prepetition Secured Debt Documents (the "<u>Prepetition Term Obligations</u>") and (ii) $50 million of outstanding principal under the Revolver Credit Agreement plus accrued and unpaid interest with respect thereto, fees, costs, and expenses (including any attorneys', financial advisors, and other professionals' fees and expenses that are chargeable or reimbursable under the Revolver Credit Agreement) under the Prepetition Secured Debt Documents and all other "Obligations" (as defined in the Revolver Credit Agreement or any security document related thereto) under the Prepetition Secured Debt Documents (the "<u>Revolver Secured Obligations</u>" and, together with the Prepetition Term Obligations, the "<u>Prepetition Term and Revolver Debt Obligations</u>"). As of the Petition Date, the obligors under the Prepetition Holdco Loan Documents (such obligors, the "<u>Prepetition Holdco Loan Parties</u>") were truly and justly indebted to the Prepetition Holdco Lenders pursuant to the Prepetition Holdco Loan Documents, without defense, counterclaim, offset, claim, or cause of action of any kind, for their share of an aggregate amount of not less than $782,558,090[5] of outstanding principal under the Prepetition Holdco Credit Agreement plus accrued and unpaid interest with respect thereto, fees,

---

[5]   This amount includes sums related to entities that are not Prepetition Holdco Lenders. The Debtors' acknowledgements, representations, stipulations, and agreements only extend to the share of such claims belonging to the Prepetition Holdco Lenders.

DOCS_LA:339202.2 68700/001

costs, and expenses (including any attorneys', financial advisors, and other professionals' fees and expenses that are chargeable or reimbursable under the Prepetition Holdco Credit Agreement) under the Prepetition Holdco Loan Documents and all other "Obligations" (as defined in the Prepetition Holdco Credit Agreement or any security document related thereto) under the Prepetition Holdco Loan Documents (the "Prepetition Secured Holdco Debt Obligations" and, together with the Prepetition Term and Revolver Debt Obligations, the "Prepetition Secured Debt Obligations").

(b)     The Prepetition Secured Debt Obligations constitute legal, valid, and binding obligations of the Prepetition Obligors and the Prepetition Holdco Loan Parties.  No offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or priority of, the Prepetition Secured Debt Obligations exist.  No portion of the Prepetition Secured Debt Obligations is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.  The Prepetition Secured Debt Documents and the Prepetition Holdco Loan Documents are valid and enforceable by each of the Prepetition Term Lenders, Revolver Lenders (together with the Prepetition Term Lenders, the "Prepetition Secured Lenders") and Prepetition Holdco Lenders, as applicable against each of the Prepetition Obligors or the Prepetition Holdco Loan Parties, as applicable.  The Prepetition Secured Debt Obligations constitute allowed claims against the applicable Prepetition Obligors' and the Prepetition Holdco Loan Parties' estates.  As of the Petition Date, the Debtors or their estates have no claim or cause of action against any of the Prepetition Secured Parties, the Prepetition Holdco Loan Secured Parties or their respective agents,

DOCS_LA:339202.2 68700/001

in such capacities, whether arising under applicable state, federal, or foreign law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Secured Debt Documents (or the transactions contemplated thereunder), the Prepetition Holdco Financing Loan Documents (or the transactions contemplated thereunder), the Prepetition Secured Debt Obligations, the Prepetition Debt Liens (as defined below) or the Prepetition Holdco Financing Liens (as defined below).

(c)      Pursuant to and as more particularly described in the Prepetition Secured Debt Documents, the Prepetition Term and Revolver Debt Obligations and certain associated hedge obligations are secured by, among other things, first priority liens or mortgages on, security interests in, and assignments or pledges of (the "Prepetition Debt Liens"), (i) substantially all of the assets of the Borrower and the Guarantors, including, without limitation, certain cash collateral, and other "Collateral" as such term is defined in the Prepetition Secured Debt Documents, subject to certain exclusions including Inventory Financing Collateral, as defined in the A&R Depositary and Intercreditor Agreement, and (ii) the equity interests in the Borrower held by LBRHII  and all rights and benefits of LBRHII under the Amended and Restated Operating Agreement, dated as of November 20, 2018 (collectively, the "Prepetition Debt Collateral"). The Collateral Agency and Intercreditor Agreement, dated as of November 20, 2018, by and among LBR, LBRH, LBRO, LBRM, the Prepetition Term Agent, the Revolving Administrative Agent, and the Project Collateral Agent  (as defined in the A&R Depositary and Intercreditor Agreement (as defined herein)) (amended, amended and restated, supplemented and/or modified from time to time, the "Intercreditor Agreement") sets forth, among other things, the priority of the Revolver Lenders, Prepetition Term Lenders, and certain other parties in respect of the Prepetition Debt Collateral

DOCS_LA:339202.2 68700/001

and establishes that (a) prior to the Toll Coverage Threshold Date (as defined therein) (i) the priority of the lien of the Project Collateral Agent in respect of the Project Tolling Collateral (as defined therein) shall be the holders of the Prepetition Term Obligations, any Permitted Refinancing Facility (as defined in the Term Credit Agreement) in respect of the Term Credit Agreement and any Secured Interest Rate Hedge Agreement (as defined in the Term Credit Agreement) entered into in respect of each of the foregoing (the "Term and Associated Holders"), followed by the holders of the Revolver Secured Obligations, any Permitted Refinancing Facility (as defined in the Revolver Credit Agreement) in respect of the Revolver Credit Agreement and any Secured Interest Rate Hedge Agreement (as defined in the Revolver Credit Agreement) entered into in respect of each of the foregoing (the "Revolver and Associated Holders"), and (ii) the priority of the lien of the Project Collateral Agent in respect of all Prepetition Debt Collateral (other than the Project Tolling Collateral, the Account Collateral (as defined therein) and certain Cash Collateral Accounts (as defined therein)), which Prepetition Debt Collateral includes any equipment and fixtures (as those terms are defined in the Uniform Commercial Code as in effect in the State of New York) of the Debtors, shall be the Revolver and Associated Holders followed by the Term and Associated Holders and (b) the Revolver and Associated Holders and the Term and Associated Holders shall share the priority of the lien of the Project Collateral Agent in respect of the Account Collateral (other than the Debt Service Account (as defined therein) and the Account Collateral held therein and credit thereto) Equally and ratably (as defined in the Intercreditor Agreement).[6]  As of the date hereof, the Toll Coverage Threshold Date has not

---

[6] The description of the relative priorities of the Revolver Lenders, Prepetition Term Lenders, and certain other parties in respect of the Prepetition Debt Collateral set forth herein is qualified in its entirety by reference to the Intercreditor Agreement. In the event of any conflict between the description set forth herein and the terms of the Intercreditor Agreement, the Intercreditor Agreement shall govern. Nothing contained herein shall be construed or deemed to modify or amend the term of the Intercreditor Agreement.

DOCS_LA:339202.2 68700/001

occurred.  Pursuant to and as more particularly described in the Prepetition Holdco Loan Documents, the Prepetition Secured Holdco Debt Obligations are secured by, among other things, first priority liens or mortgages on, security interests in, and assignments or pledges of (the "Prepetition Holdco Financing Liens") all of the Collateral (as defined in the Prepetition Holdco Credit Agreement) (the "Prepetition Holdco Financing Collateral").

(d)     As of the Petition Date, the Prepetition Debt Liens and the Prepetition Holdco Financing Liens are (i) valid, binding, perfected, and enforceable liens on and security interests in the applicable Prepetition Debt Collateral and Prepetition Holdco Financing Collateral; and (ii) not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind by any person or entity, and each Debtor irrevocably waives, for itself and its estate, any right to challenge or contest in any way the scope, extent, perfection, priority, validity, non-avoidability, and enforceability of the Prepetition Debt Liens or the Prepetition Holdco Financing Liens or the validity, enforceability, or priority of payment of the Prepetition Secured Debt Obligations, the Prepetition Secured Debt Documents and the Prepetition Holdco Loan Documents.  The Prepetition Debt Liens were granted to the respective Prepetition Lenders, and the Prepetition Holdco Financing Liens were granted to the Prepetition Holdco Lenders, for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of loans, commitments, and/or other financial accommodations under the Prepetition Secured Debt Documents or the Prepetition Holdco Loan Documents.

DOCS_LA:339202.2 68700/001

(e)     All of the Debtors' cash including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Prepetition Debt Collateral and, following the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement), of the Inventory Financing Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

(f)     None of the Prepetition Secured Parties or the Prepetition Holdco Loan Secured Parties[7] control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted, or are control persons or insiders (as defined in the Bankruptcy Code) of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Financing, the DIP Loan Documents, the Prepetition Secured Debt Documents or the Prepetition Holdco Loan Documents.

G.      <u>Stipulations Regarding J. Aron Transaction Documents and Inventory Financing Collateral</u>.  Upon entry of the Interim Order, subject to paragraph 42, the Debtors acknowledge, represent, stipulate, and agree as follows and make the releases and waivers set forth below:

(a)     <u>J. Aron Transaction Documents</u>.  LBRM, LBR, LBRO (collectively, the "<u>Transaction Entities</u>") and J. Aron & Company LLC ("<u>J. Aron</u>"), made and entered into Transaction Documents (as defined in the J. Aron Monetization Master Agreement), each originally dated as of March 3, 2020, consisting of, among others (each as amended, amended and restated, supplemented and/or modified from time to time, collectively, the "<u>J. Aron Transaction Documents</u>"):

---

[7] As used in this Interim Order, the term "Prepetition HoldCo Loan Secured Parties" extends only to Prepetition Holdco Loan Secured Parties to the extent they are, as of the date of this Interim Order, a Prepetition Term Lender or an affiliate of a Prepetition Term Lender.  The term specifically does not encompass insiders or affiliates of the Debtors as defined under the Bankruptcy Code.

DOCS_LA:339202.2 68700/001

i.  the Supply and Offtake Agreement and the Marketing and Sales Agreement (the "J. Aron Supply and Offtake Agreement" and the "J. Aron Marketing and Sales Agreement", respectively), by and among LBRM and J. Aron, pursuant to which J. Aron agreed to purchase and sell crude oil, crude oil blends, fuel oil, naphtha, debutanized natural gasoline and certain other feedstocks (each as more fully defined in the J. Aron Monetization Master Agreement (as defined below), the "Feedstock"), and certain refined hydrocarbon products (each as more fully defined in the J. Aron Monetization Master Agreement, the "Product") to LBRM (and LBRM agreed to purchase and sell Feedstock and Product from and to J. Aron, as applicable), and which also governed certain terms of purchases and sales of Feedstock and Product between J. Aron and third parties (including BP Products North America Inc. ("BP")), in each case, subject to additional terms and conditions set forth in the J. Aron Transaction Documents;

ii.  the Monetization Master Agreement (the "J. Aron Monetization Master Agreement") by and among the Transaction Entities and J. Aron, setting forth the general transaction terms, covenants, events of default and certain termination provisions;

iii.  the Financing Agreement (the "J. Aron Financing Agreement"), by and among LBRM and J. Aron, providing for a one-time term loan by J. Aron based on certain catalyst units that contain certain base metals and certain catalyst units that contain certain precious metals, which were, in each case, designed for use in refining or processing activities;

iv.  the Amended and Restated Depositary and Intercreditor Agreement, dated as of March 3, 2020, by and among LBR as Term Borrower, LBRM and LBRO as Term Guarantors, Goldman Sachs Bank USA as Term Administrative Agent, Revolving

13

Administrative Agent and Project Collateral Agent, J. Aron as Inventory Financing Facility Agent and Deutsche Bank Trust Company Americas as Depositary, as amended by that certain Amendment No. 1 to Amended and Restated Depositary and Intercreditor Agreement, dated as of March 10, 2021 ("<u>A&R Depositary and Intercreditor Agreement</u>"). The relative rights (including the respective collateral access and cooperation rights) of the Project Secured Parties, on the one hand, and J. Aron as the Inventory Financing Facility Agent and an Inventory Financing Secured Party (as such terms are defined in the A&R Depositary and Intercreditor Agreement), on the other, are set forth in the A&R Depositary and Intercreditor Agreement. No J. Aron Secured Obligations (as defined below) are secured by any LBR Collateral under and as defined in the A&R Depositary and Intercreditor Agreement;

      v.    the Security Agreement ("<u>J. Aron Security Agreement</u>"), by and between LBRM as Grantor and J. Aron, as secured party, pursuant to which LBRM granted J. Aron a first-priority security interest in and continuing lien (the "<u>J. Aron Liens</u>") on the "Collateral" under and as defined in the J. Aron Security Agreement ("<u>Inventory Financing Collateral</u>") which corresponds to the defined term "Inventory Financing Collateral" under and as defined in the A&R Depositary and Intercreditor Agreement. Under the J. Aron Security Agreement and J. Aron Perfection Documents (as defined below), the Secured Obligations under and as defined in the J. Aron Security Agreement (the "<u>J. Aron Secured Obligations</u>") are secured by a perfected, first-priority security interest in and continuing lien on the Inventory Financing Collateral;

      vi.    that certain UCC financing statement (with LBRM as debtor and J. Aron as secured party) that was filed with the U.S. Virgin Islands Office of the Lieutenant

Governor on March 5, 2020 (Filing No. 20200000134) and that certain UCC financing statement (with LBRM as debtor and J. Aron as secured party) that was filed with the Washington, D.C. Record of Deeds on March 4, 2020 (Filing No. 2020030037) (collectively, the "J. Aron Financing Statements");

       vii.    that certain Deposit Account Control Agreement, dated as of March 3, 2020, among LBRM as Grantor, Oriental Bank as Depositary Bank and J. Aron as Secured Party  (the "J. Aron DACA", and together with the A&R Depositary and Intercreditor Agreement and the J. Aron Financing Statements, collectively, the "J. Aron Perfection Documents");

       viii.    that certain Subordinated Guarantee, made by LBR and LBRO in favor of J. Aron, dated as of March 3, 2020 ("Subordinated Guarantee"), each of LBR and LBRO jointly and severally guaranteed LBRM's payment obligations under the J. Aron Transaction Documents as and when due ("Guaranteed Obligations"), subject to the terms of the "Terms of Subordination" under and as defined therein, which provide that, among other things, the Guaranteed Obligations are subordinated in right of payment to the prior payment in full in cash of all Secured Obligations under and as defined in the A&R Depositary and Intercreditor Agreement; and

       ix.    additional agreements related to the supply, marketing, storage, the initial sale of Feedstock and Product by LBRM to J. Aron and other transactions contemplated by the J. Aron Supply and Offtake Agreement, the J. Aron Marketing and Sales Agreement, the J. Aron Financing Agreement and the J. Aron Monetization Master Agreement.

DOCS_LA:339202.2 68700/001

(b)      J. Aron's IFF Property.  J. Aron owns all right, title and interest in the IFF Property (as defined in the A&R Depositary and Intercreditor Agreement), which consists of Feedstock and Product owned by J. Aron.  No Debtor has any right, title, or interest in the IFF Property, and accordingly, the IFF Property is not property of the estate under section 541 of the Bankruptcy Code.

(c)      J. Aron Termination.  On June 25, 2021 (the "J. Aron Early Termination Date"), as a result of certain events of default that had occurred and were continuing in respect of LBRM, LBR and LBRO, J. Aron properly and validly exercised its right pursuant to the J. Aron Transaction Documents of declaring an early termination date whereby, among other things, all commitments of J. Aron to provide any intermediation or to purchase or sell Feedstock or Products were terminated, all loans under the Financing Agreement became immediately due and payable and all of the obligations of the Transaction Entities under the J. Aron Transaction Documents (other than that certain Terminal Services Agreement (Included Locations), dated as of March 3, 2020, by and among LBT, LBRM and J. Aron) became due and payable on June 25, 2021.  As a result of such early termination, pursuant to the J. Aron Supply and Offtake Agreement and as set forth in certain other of the J. Aron Transaction Documents, J. Aron has the right to liquidate and has commenced the liquidation of its own IFF Property.

(d)      J. Aron Safe Harbor Agreements. J. Aron is a "forward contract merchant" (as such term is defined in the Bankruptcy Code and used in section 556 of the Bankruptcy Code) and each purchase and sale agreed to under the Safe Harbor Agreements (as defined in the J. Aron Monetization Master Agreement, collectively, the "Safe Harbor Agreements") constitutes a "forward contract" (as such term is defined in the Bankruptcy Code and used in Section 556 of the Bankruptcy Code); (b) J. Aron is a "master netting agreement participant" and each Safe Harbor

16

Agreement constitutes a "master netting agreement" for all purposes as each such term is defined in sections 101(38A) and 101(38B) of the Bankruptcy Code and as used in Section 561 of the Bankruptcy Code; (c) J. Aron's, as the Non-Defaulting Party, right to liquidate, collect, net and set off rights and obligations under the Safe Harbor Agreements, and liquidate the Safe Harbor Agreements is not stayed, avoided, or otherwise limited by the Bankruptcy Code, including sections 362(a), 547, 548 or 553 thereof, and J. Aron is entitled to the rights, remedies and protections afforded by and under, among other sections, sections 362(b)(6), 362(b)(17), 362(b)(27), 546(e), 546(g), 546(j), 548(d), 553, 556, 560, 561 and 562 of the Bankruptcy Code.

(e)     All of the Debtors' cash, including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Inventory Financing Collateral (excluding Margin) constitutes Cash Collateral of J. Aron.

(f)     Enforceability of J. Aron Liens and J. Aron Secured Obligations. (i) The J. Aron Liens on the Inventory Financing Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, J. Aron for fair consideration and reasonably equivalent value, (ii) the J. Aron Transaction Documents are fully enforceable in accordance with their terms; (iii) the J. Aron Liens were senior in priority over any and all other liens on the Inventory Financing Collateral, subject only to liens senior by operation of law or otherwise permitted by the J. Aron Transaction Documents (solely to the extent any such permitted liens were valid, properly perfected, nonavoidable, and senior in priority to the J. Aron Liens as of the Petition Date); (iv) the J. Aron Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the applicable Debtors enforceable in accordance with the terms of the applicable J. Aron Transaction Documents; (v) no offsets, setoffs, recoupments, challenges, objections, defenses, "claims" (as defined in the Bankruptcy Code), impairment, cross-claims,

counterclaims, or causes of action or any other challenge of any kind or nature by any person or entity to any of the J. Aron Liens or J. Aron Secured Obligations exist, and no portion of the J. Aron Liens or J. Aron Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, attachment, reduction, recovery or subordination (whether equitable, contractual, or otherwise) under or pursuant to the Bankruptcy Code or applicable non-bankruptcy law or principles of equity or any other applicable domestic or foreign law or regulation by any person or entity; and (vi) the Debtors, each for itself and its estate, irrevocably waive, discharge, and release any right to challenge or contest any of the J. Aron Secured Obligations or J. Aron Liens, the priority of such obligations and liens, and the scope, extent, validity, non-avoidability, priority, enforceability, seniority, perfection, or extent of the J. Aron Liens and J. Aron Secured Obligations.

(g)    Outstanding J. Aron Secured Obligations.   As of the Petition Date, the applicable Debtors were indebted to J. Aron, without objection, defense, counterclaim or offset of any kind, in an amount not less than $24,968,754.95 in principal amount of loans outstanding under the J. Aron Financing Agreement.  In addition, J. Aron has commenced the process of liquidating all IFF Property in accordance with the terms of the Safe Harbor Agreements and the J. Aron Monetization Master Agreement and, if J. Aron is unable to liquidate such IFF Property and/or incurs losses or costs as a result of such liquidation and termination of J. Aron's rights and obligations under the Safe Harbor Agreements (including any Forward Contract Settlement Amount (as defined in the J. Aron Supply and Offtake Agreement)), the Debtors would be liable and owe to J. Aron, without objection, defense, counterclaim or offset of any kind, an aggregate amount of not less than such aggregate losses or costs, taking into account any gains, incurred or realized by J. Aron as a result of such liquidations and terminations with respect to the J. Aron

18

Transaction Documents. Given that the liquidation of J. Aron's IFF Property has only recently commenced, the S&O Settlement Amount (as defined in the J. Aron Supply and Offtake Agreement) cannot be determined at this time. Further, under the J. Aron Transaction Documents, the applicable Debtors are also liable to and owe J. Aron accrued (both before and after the Petition Date) and unpaid interest, fees, expenses and all other obligations under the J. Aron Transaction Documents, including attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the J. Aron Transaction Documents, plus Make-Whole Amounts (as defined in the J. Aron Monetization Master Agreement).

H.    <u>Definitions</u>. The Revolver Secured Obligations, the Prepetition Term Obligations, and the J. Aron Secured Obligations are referred to collectively herein as the "<u>Prepetition Secured Obligations</u>." The Prepetition Debt Liens and the J. Aron Liens are referred to collectively herein as the "<u>Prepetition Liens</u>." The Prepetition Debt Collateral and the Inventory Financing Collateral are referred to collectively herein as the "<u>Prepetition Collateral</u>." The Revolver Transaction Documents, the Prepetition Term Documents, and the J. Aron Transaction Documents, as those terms are defined herein or in the Motion, are referred to collectively herein as the "<u>Prepetition Secured Documents</u>." The Prepetition Agents (as defined herein), Prepetition Secured Lenders and J. Aron are referred to collectively herein as the "<u>Prepetition Secured Parties</u>."

I.    <u>Stipulations Regarding Prepetition Secured Documents and the Prepetition Holdco Loan Documents</u>. Upon entry of the Interim Order, subject to paragraphs J and 42, the Debtors acknowledge, represent, stipulate, and agree as follows and make the releases and waivers set forth below:

(a)    <u>No Control</u>. The Prepetition Secured Parties and the Prepetition Holdco Loan Secured Parties do not control the Debtors or their properties or operations or have the

authority to determine the manner in which the Debtors' operations are conducted, and each of the Prepetition Secured Parties and the Prepetition Holdco Loan Secured Parties is not a control person or insider (as defined in the Bankruptcy Code) of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from any of the Prepetition Secured Documents or the Prepetition Holdco Loan Documents.

(b)   <u>No Claims, Causes of Action</u>.  As of the date hereof, there exist no claims or causes of action against the Prepetition Secured Parties or the Prepetition Holdco Loan Secured Parties arising from, related to or connected with any of the Prepetition Secured Documents or the Prepetition Holdco Loan Documents that may be asserted by the Debtors.

(c)   <u>Release</u>.  The Debtors forever and irrevocably release, waive, discharge, and acquit each of the Prepetition Secured Parties and the Prepetition Holdco Loan Secured Parties and each of their respective officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Prepetition Secured Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened as of the date hereof including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, existing as of the date of this Interim Order, arising out of, in connection with, or relating to any of the Prepetition Secured Documents or the Prepetition Holdco Loan Documents, and ancillary documentation, guarantees, security

20

documentation and collateral documents executed in support of the foregoing, the Prepetition Secured Obligations, the Prepetition Secured Holdco Debt Obligations, the Prepetition Liens, the Prepetition Holdco Financing Liens, J. Aron's title to or ownership of, or other rights in, the IFF Property and rights to setoff and net Margin (as defined in the J. Aron Monetization Master Agreement), and ancillary  documentation, guarantees, security documentation and collateral documents executed in support of the foregoing or the transactions contemplated thereunder including, without limitation, (i) any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), so-called "lender liability" claims, counterclaims, cross-claims, recoupment, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Secured Parties or the Prepetition Holdco Loan Secured Parties.

J.      Mezzanine Financing, Subordinated Notes, Prepetition Holdco Loan, and other Insider Obligations. Certain Prepetition Holdco Loan Secured Parties and Lenders are insiders or affiliates of the Debtors.  Nothing herein shall constitute a finding or ruling by this Court in favor of any affiliate (as defined in the Bankruptcy Code) or other insider (as defined in the Bankruptcy Code) of any Debtor (an "Insider Creditor") that any obligation of any Debtor to such Insider Creditor ("Insider Obligation"), including any Prepetition Holdco Secured Debt Obligations, LBV Subordinated Notes, or LBRH II Holdco Loan held by an Insider Creditor, is valid, senior, enforceable, prior, perfected, or non-avoidable. Nothing herein shall constitute a finding of fact, admission, or stipulation in favor of, or enforceable by, any Insider Creditor.  No Insider Creditor

shall be entitled to any proceeds or other distributions on account of any Insider Obligation or any adequate protection absent further order of the Court.  Moreover, nothing shall prejudice the rights of any party-in-interest, including but not limited to the Debtors and the Committee, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Insider Obligation and/or related security interests held by an Insider Creditor.  In addition, nothing herein shall be deemed a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, (b) any "equities of the case" under section 552(b) of the Bankruptcy Code, or (c) the equitable doctrine of "marshaling" or any similar doctrine with respect to any Insider Obligations, in each case after payment in full of the DIP Obligations and the Prepetition Secured Obligations.  No Insider Creditor shall be entitled to any release described herein.  Nothing in this paragraph shall affect or impact the Prepetition Secured Obligations or Prepetition Holdco Secured Debt Obligations that are not owned by any Insider Creditor, any liens securing such obligations, or any adequate protection granted to the Prepetition Secured Creditors.

K.    <u>Necessity of DIP Financing</u>. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan Documents.  A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without (i) granting the DIP Agent, for the benefit of the DIP Secured Parties, superpriority claims and priming liens and security interests, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents and (ii) providing the Prepetition Secured Parties adequate protection as provided in this Interim Order.  After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the credit facility

provided under the DIP Loan Documents and the authorization to use Cash Collateral to be provided by the Prepetition Secured Parties represents the best and only working capital financing available to the Debtors at this time.  The Debtors have been unsuccessful in their attempts to find any alternative financing.  Additionally, the terms of the DIP Financing and the use of Cash Collateral are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The Prepetition Secured Parties have consented to the entry of this Interim Order after extensive negotiations and would not have consented to entry of this Interim Order absent each of the bargained for protections for the Prepetition Secured Parties set forth in this Interim Order.

L.      Purpose of DIP Financing.  The Debtors require the DIP Financing described in the Motion and as expressly provided in the DIP Loan Documents and this Interim Order to: (i) pay costs, fees and expenses associated with or payable under the DIP Financing under the terms of this Interim Order; (ii) pay professional fees subject to the Approved Budget (as defined below); (iii) provide ongoing working capital requirements of the Debtors and to pay fees, costs, expenses and other administrative expenses relating to the Chapter 11 Cases (including payments related to Adequate Protection Obligations (as defined below)), in each case, subject to any necessary Court approvals and consistent with the Approved Budget subject to any Budget Variances (defined below); and (iv) make the currently identified capital expenditures and other payments of postpetition payables as permitted under the DIP Loan Documents and this Interim Order, in each case subject to the conditions as set forth herein and in the DIP Loan Documents and this Interim Order and consistent in all material respects with the Approved Budget and any Budget Variances.

M.      Adequate Protection.  The Prepetition Secured Parties are entitled to receive adequate protection to the extent of any diminution in value of their interests in their prepetition

23

collateral (including Cash Collateral) pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code resulting from the sale, lease, or use by the Debtors (or other decline in value) of the prepetition collateral (including Cash Collateral), the relief granted herein in favor of the DIP Secured Parties, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code from and after the Petition Date (the "Adequate Protection Obligations"). Pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code, as adequate protection, the Prepetition Secured Parties shall receive payment of their reasonable and documented professional fees, postpetition replacement liens, adequate protection payments and superpriority adequate protection claims in accordance with the terms of this Interim Order.  Furthermore, the Prepetition Secured Parties will be entitled to certain reporting from the Debtors (including, among other things, copies of all reporting provided to the DIP Secured Parties) in accordance with the terms of this Interim Order.  The adequate protection provided to the Prepetition Secured Parties herein is consistent with the Bankruptcy Code.  The consent of the Prepetition Secured Parties to the use of Cash Collateral and the consent of the Prepetition Secured Parties to the priming of their liens by the DIP Liens (i) does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Parties that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise, and (ii) is conditioned upon entry of this Interim Order and does not and shall not be deemed to constitute consent other than pursuant to this Interim Order and the terms set forth herein.  The adequate protection provided herein and other benefits and privileges contained herein are necessary (a) in order to protect the Prepetition Secured Parties from any diminution in value of their Prepetition Collateral and (b) to obtain the foregoing consents and agreements.  Nothing herein shall prevent the Prepetition Secured Parties from seeking additional adequate protection to

the extent permitted by law or to the extent permitted in the Prepetition Secured Documents, as applicable. For the avoidance of doubt, this Interim Order shall be deemed to be a request by the Prepetition Secured Parties pursuant to section 363(e) of the Bankruptcy Code.

N.     Approved Budget. Attached here as **Exhibit B** is a budget setting forth the Debtors' anticipated cash receipts and expenditures for the next three (3) weeks (the "Initial Approved Budget"). The "Approved Budget" shall mean the Initial Approved Budget, together with such modifications and amendments thereto as may be agreed to in form and substance by the DIP Agent and the ad hoc group of lenders under the Term Credit Agreement (the "Ad Hoc Term Lender Group"), the Term Administrative Agent, the Revolving Administrative Agent, and J. Aron (collectively with the Ad Hoc Term Lender Group, the Term Administrative Agent and Revolving Administrative Agent, and the Project Collateral Agent, the "Prepetition Agents"), subject to the conditions set forth in paragraph 26 hereof, which shall reflect the Debtors' good-faith projection of all weekly cash receipts and disbursements in connection with the operation of the Debtors' business during such three-week period, delivered pursuant to the terms of the DIP Loan Documents, delivered by the Debtors to counsel for the DIP Agent, the DIP Lenders and the Prepetition Agents with a copy concurrently to the Committee. The DIP Agent and the Prepetition Agents hereby expressly reserve all of their rights with respect to the approval of any budget covering the period after the expiration of the Initial Approval Budget, and nothing contained herein shall be deemed or construed to constitute the consent of any of the DIP Agent or the Prepetition Agents to any such budget. The Approved Budget is an integral part of this Interim Order and has been relied upon by the DIP Secured Parties to provide DIP Financing and by the Prepetition Secured Parties to permit the use of Cash Collateral and consent to this Interim Order.

DOCS_LA:339202.2 68700/001

O.      Good Cause.  Based upon the record presented to the Court by the Debtors, it appears that the ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents and to use Cash Collateral is vital to the Debtors and the Debtors' estates and creditors.  The Debtors reasonably believe that the liquidity to be provided under the DIP Loan Documents and from the use of Cash Collateral will enable the Debtors to continue to safely and efficiently suspend the operation of their refinery facility, preserve and maximize the value of their businesses, and provide the Debtors with sufficient funding to pursue the necessary proceedings to restructure the Debtor's outstanding obligations.  Good cause has, therefore, been shown for the relief sought in the Motion on an interim basis and for scheduling the Final Hearing.

P.      Good Faith.  The DIP Secured Parties, the Prepetition Secured Parties and each of their respective affiliates, subsidiaries, parents, officers, shareholders, directors, employees, investment advisers and sub-advisers, attorneys, and agents have acted in good faith in negotiating the terms of the DIP Loan Documents and this Interim Order.  The DIP Financing, the DIP Loan Documents and the use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties and the Prepetition Secured Parties, and all of the obligations and indebtedness arising under, in respect of or in connection with the DIP Financing, the DIP Loan Documents and this Interim Order shall be deemed to have been extended by each of the DIP Secured Parties in accordance with the DIP Loan Documents, and the Prepetition Secured Parties' shall be deemed to have consented to the use of Cash Collateral, in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the DIP Liens, the DIP Superpriority Claims and the Adequate Protection Obligations shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits,

DOCS_LA:339202.2 68700/001

and privileges of this Interim Order regardless of whether this Interim Order is subsequently reversed, vacated, modified, or otherwise is no longer in full force and effect or the Chapter 11 Cases are subsequently converted or dismissed.

Q.      Consideration.  The Debtors will receive and have received fair consideration and reasonably equivalent value in exchange for access to the DIP Financing, and all other financial accommodations provided under the DIP Financing, the DIP Loan Documents and this Interim Order.

R.      No Liability to Third Parties.  The Debtors stipulate and this Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in accepting the Approved Budget or any future Approved Budget or in taking any other actions permitted by this Interim Order or the DIP Loan Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

S.      Section 552.  Subject to the terms hereof and entry of a Final Order, in light of the subordination of their liens and super-priority administrative claims (i) in the case of the DIP Secured Parties, to the Carve Out and the Permitted Prior Liens, and (ii) in the case of the Prepetition Secured Parties, to the Carve Out and the DIP Liens, each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply to any of the DIP Secured Parties or the Prepetition Secured Parties with respect to the proceeds, products, rents, issues or profits of any of the DIP Collateral or the Prepetition Collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom,

27

including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral or the Prepetition Collateral under section 552(b) of the Bankruptcy Code.  Subject to the terms hereof and entry of the Final Order, the Debtors shall be deemed to have irrevocably waived, and to have agreed not to assert, any claim or right under section 552 of the Bankruptcy Code seeking to avoid the imposition of the DIP Liens, Prepetition Liens or the Prepetition Secured Parties' replacement liens granted under this Interim Order (the "Adequate Protection Liens") on any property acquired by any of the Debtors or any of their estates or, subject to the Carve Out, seeking to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Secured Parties or the Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral, as applicable.

T.    Immediate Entry of Interim Order.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  The permission granted herein to enter into the DIP Loan Documents, obtain funds thereunder and use Cash Collateral on an interim basis in accordance with the Approved Budget is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and loss of valuable assets and rights of the Debtors' estates.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors and the Debtors' estates and creditors as its implementation will, among other things, allow for the continued flow of supplies and services to the Debtors necessary to enable the Debtors to safely and efficiently administer their refinery facility during the pendency of these Chapter 11 Cases.  Based upon the foregoing findings, acknowledgements, and conclusions; and upon the record made before this Court at the Interim Hearing; and good and sufficient cause appearing therefor:

DOCS_LA:339202.2 68700/001

**IT IS HEREBY ORDERED:**

1.      <u>Disposition</u>.  The Motion is granted on an interim basis to the extent set forth herein, the DIP Financing described herein is authorized and approved, and the use of Cash Collateral and provision of adequate protection is authorized, in each case subject to the terms of this Interim Order and the DIP Loan Documents.  Any objections to the Motion that have not previously been withdrawn, waived, settled, or resolved and all reservations of rights included therein are hereby denied and overruled on their merits.  This Interim Order shall constitute findings of fact and conclusions of law.

2.      <u>Effectiveness</u>.  Subject to the terms hereof, this Interim Order shall be immediately valid upon signing by the Court and effective and enforceable upon the date entered on the docket in the Chapter 11 Cases (the "<u>Interim Order Entry Date</u>").

3.      <u>Authorization of the DIP Financing and DIP Loan Documents</u>.

        (a)      The Debtors are hereby authorized to execute and enter into the DIP Loan Documents.  The DIP Loan Documents and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders in connection with the DIP Financing.

        (b)      The Borrower is hereby authorized on an interim basis to borrow, and the Guarantors are hereby authorized on an interim basis to guarantee, up to the principal amount of $5.5 million (plus such additional principal amounts due solely to payment of interest in-kind), pursuant to the terms of the DIP Loan Documents and this Interim Order and at the times set forth in the Approved Budget, all of which shall be used by the Debtors as expressly permitted by the DIP Loan Documents, this Interim Order, the Approved Budget and any Budget Variances.  The Debtors are authorized to use proceeds of the DIP Financing in accordance with this Interim Order and the Approved Budget in an amount that would not cause either: (i) all line items other than

29

DOCS_LA:339202.2 68700/001

Professional Fees from varying from the applicable Approved Budget by more than twenty percent (20%) for each week during any budget period or ten percent (10%) on a cumulative basis for that portion of the budget period then ended; (ii) with respect to Professionals Fees, the Debtors may vary from the applicable budget by no more than ten percent (10%) on a cumulative basis for that portion of the Budget, and (iii) actual cash receipts, if any, received by the Borrower may not be less than ninety percent (90%) of the amounts set forth in the Budget (a "Budget Variance").  The variance reports showing budget to actual and any variance shall be delivered by the Debtors to the DIP Agent and counsel to each of the Prepetition Agents.

(c)     In furtherance of the foregoing and without further approval of this Court, but subject to the terms of this Interim Order, the Debtors are authorized to, and, if so required under the terms of the DIP Loan Documents, directed to perform all acts to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all related fees and expenses, that may be required or necessary for the Debtors' performance of their obligations under the DIP Financing, including, without limitation:

i.     the execution, delivery, and performance of the DIP Loan Documents, including, without limitation, any security and pledge agreements, and any mortgages contemplated thereby;

ii.     subject to paragraph 10 hereof, the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case in such form as agreed among the Debtors and the required other parties as set forth in more detail in paragraph 10 below;

DOCS_LA:339202.2 68700/001

iii.       the non-refundable payment of the fees referred to in the DIP Loan Documents, including the fees of the DIP Agent, and, subject to paragraph 8, costs and expenses payable under the DIP Loan Documents;

iv.       make payments on account of the Adequate Protection Obligations provided for in this Interim Order; and

v.       the performance of all other acts required under or in connection with the DIP Loan Documents.

4.       <u>DIP Obligations</u>.  This Interim Order and the DIP Loan Documents shall evidence the DIP Obligations, which DIP Obligations shall, upon execution of the DIP Loan Documents, be valid, binding and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing, or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.  All obligations incurred, payments made, and transfers or grants of security and liens set forth in this Interim Order and the DIP Loan Documents by any Debtor are granted to or for the benefit of the Debtors for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby.  No obligation, payment, transfer, or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any avoidance, reduction, setoff, recoupment, offset,

31

recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

5.    <u>Carve-Out</u>.  The Debtors' obligations to the DIP Secured Parties and the liens, security interests and superpriority claims granted herein and/or under the DIP Loan Documents, including the DIP Liens, the DIP Superpriority Claims, and the Adequate Protection Obligations, shall be subject and subordinate to the Carve-Out.  "<u>Carve-Out</u>" shall mean (i) fees and expenses incurred by bankruptcy professionals_ (x) whose retention has been approved by the Bankruptcy Court which are incurred as of the delivery of the Carve-Out Trigger Notice (as defined below) and (y) provided for in the Approved Budget; (ii) reimburseable expenses of Committee members; (iii) fees and expenses in an amount not to exceed [ $375,000] [TBD] incurred from and after the delivery of a Carve-Out Trigger Notice (as defined below) by bankruptcy professionals whose retention has been approved by the Bankruptcy Court (the "<u>Post-Termination Fee Carve-Out</u>"); and (iv) fees owed pursuant to 28 U.S.C. §1930 or fees owed the clerk of the Bankruptcy Court. "<u>Carve-Out Trigger Notice</u>" shall mean the written notice, including by email, delivered by the DIP Agent (at the direction of the DIP Lenders) or, after the DIP Financing has been indefeasibly paid in full and in cash (a "<u>DIP Repayment Event</u>"), by any of the Prepetition Agents, to the Debtors, their counsel, the U.S. Trustee, and counsel to the Committee, and prior to a DIP Repayment Event, counsel to the Prepetition Agents, which notice may be delivered following the occurrence and during the continuation of an Event of Default or the Termination Date in accordance with the terms of the DIP Loan Documents or, following a DIP Repayment Event, following the occurrence and during the continuation of a Cash Collateral Termination Event (as

DOCS_LA:339202.2 68700/001

defined below) or the Cash Collateral Termination Date (as defined below).  Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the DIP Secured Parties, the Prepetition Secured Parties or any of their respective officers, directors, employees, agents, advisers and counsel, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the (i) DIP Loan Documents in favor of the DIP Agent, for the benefit of the DIP Secured Parties or (ii) the Prepetition Secured Documents, for the benefit of the Prepetition Secured Parties, as applicable.  For the avoidance of doubt, until the delivery of a Carve-Out Trigger Notice, the Borrower shall be permitted to pay fees and expenses incurred by bankruptcy professionals whose retention has been approved by the Bankruptcy Court as the same shall become due and payable, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order (the payment of which shall not reduce the Post-Termination Fee Carve-Out).  Notwithstanding anything to the contrary herein, in the DIP Loan Documents, or in any loan or financing documents, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, any prepetition secured obligations, and any and all other forms of adequate protection, liens or claims securing the DIP Obligations or any prepetition secured obligations.  For the avoidance of doubt, no IFF Property or proceeds thereof, and, until the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement), no Inventory Financing Collateral or proceeds thereof, shall be used to fund the Carve-Out and the Carve Out shall not be secured by the Inventory Financing Collateral or IFF Property.  None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties shall

be responsible for the payment or reimbursement of any fees or disbursements of any professional person whose retention is approved by the Bankruptcy Court in connection with the Chapter 11 Cases or any Successor Cases.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any professional person whose retention is approved by the Bankruptcy Court or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.  None of the proceeds of the DIP Collateral or the DIP Loans shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the DIP Financing.  In addition, none of the proceeds of the DIP Collateral, the DIP Loans, or the Prepetition Collateral shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the Prepetition Secured Documents (provided that, notwithstanding anything to the contrary herein, the Committee may use proceeds of the DIP Financing and/or the DIP Collateral (including Cash Collateral) to investigate but not to prosecute (i) the claims and liens of the Prepetition Secured Parties, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties up to an aggregate cap of [$]50,000] (the "Committee Investigation Budget"))).

6.      DIP Lender Superpriority Claim.  Subject to the Carve-Out and the Aron Rights (as defined below), and effective as of the Interim Order Entry Date, the DIP Secured Parties are hereby granted, pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code, an allowed

superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (the "<u>DIP Superpriority Claims</u>") on account of the DIP Obligations with priority over any and all other administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which allowed claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and their estates and all proceeds thereof, excluding Avoidance Actions (as defined below), Avoidance Proceeds (as defined below), commercial tort claims and proceeds thereof. but, subject to entry of the Final Order, including, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations, Avoidance Proceeds (as defined below).

   7.   <u>DIP Liens</u>.

      (a)   As security for the DIP Obligations, effective and perfected as of the Interim Order Entry Date, the following security interests and liens, hereby are granted by the Debtors to the DIP Agent for the benefit of the DIP Lenders on the DIP Collateral as defined herein.  The "<u>DIP Collateral</u>" shall mean all property of the Debtors of any kind or nature whatsoever, including, but not be limited to, (i) all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Debtors, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments,

DOCS_LA:339202.2 68700/001

chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, any claims and causes of action of the Debtors, including claims under section 549 of the Bankruptcy Code; (ii) any commercial tort claims and causes of action of any of the Debtors against any directors or officers of the Debtors as well as including any proceeds of, or property recovered in connection with, any successful claims and causes of action against any directors or officers of the Debtors; and (iii) excluding (x) the IFF Property, and (y) any claims and causes of action of the Debtors under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law (collectively, the "<u>Avoidance Actions</u>"); but, subject to entry of the Final Order, including, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations secured by the DIP Liens (as defined below) and, any proceeds of, or property recovered in connection with, any successful Avoidance Action (whether by judgment, settlement or otherwise, and unencumbered or not, the "<u>Avoidance Proceeds</u>"); and (z) any commercial tort claims and the proceeds thereof. All such liens on and security interests in the DIP Collateral granted to the DIP Secured Parties, pursuant to this Interim Order or the DIP Loan Documents (collectively, the "<u>DIP Liens</u>"), are as follows:

      i.    <u>Priming Lien Pursuant to Section 364(d)(1).</u>  A first priority, priming security interest in and lien on, pursuant to section 364(d)(1) of the Bankruptcy Code, all encumbered DIP Collateral (the "<u>Section 364(d)(1) Liens</u>"), which Section 364(d)(1) Liens shall be senior to any existing liens or claims, including, but not limited to, the Prepetition Liens of the Prepetition Secured Parties or postpetition liens granted to the Prepetition Secured Parties (collectively, the "<u>Prepetition Secured Parties Liens</u>"), and subject and junior only to (i) the Carve-Out, (ii) valid, perfected, and non-avoidable liens on property of a Debtor that are in existence on

the Petition Date and are senior in priority to any of the Prepetition Secured Parties Liens, (iii) all liens, recoupment and setoff rights held by J. Aron (the "Aron Rights" and collectively with clause (ii), the "Permitted Prior Liens");

        ii.      First Priority Lien on Unencumbered Property Pursuant to Section 364(c)(2).  A first priority security interest in and lien on, pursuant to section 364(c)(2) of the Bankruptcy Code, all unencumbered DIP Collateral (except as noted above) (the "Section 364(c)(2) Liens"), which Section 364(c)(2) Liens shall be subject only to the Carve-Out;

        iii.      Junior Lien on Inventory Financing Collateral Pursuant to Section 364(c)(3). A valid, binding, continuing, enforceable, fully-perfected, nonavoidable, automatically and properly perfected junior lien on and security interest in all Inventory Financing Collateral, which lien and security interest shall be subordinate and subject to the Aron Rights and subject to the Carve-Out;

        iv.      Junior Lien on Certain Encumbered Property Pursuant to Section 364(c)(3). A junior security interest in and lien on, pursuant to section 364(c)(3) of the Bankruptcy Code, all other DIP Collateral that is subject to a Permitted Prior Lien (the "Section 364(c)(3) Liens,") which Section 364(c)(3) Liens also shall be subject to the Carve-Out;

        v.      Liens Senior to Certain Other Liens.  The DIP Liens shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) any liens arising after the Petition Date including, without limitation, liens granted under prior orders of the Court, or any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtors.

        (b)      The DIP Liens shall be effective and perfected upon the Petition Date.

(c)       The DIP Liens shall be and hereby are fully perfected liens and security interests, effective and perfected upon the Petition Date without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, or other agreements or documents, such that no additional steps need be taken by the DIP Secured Parties to perfect such liens and security interests.  Subject to entry of the Final Order, and subject to applicable non-bankruptcy law, any provision of any lease, agreement, contract, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors, or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, shall have no force or effect with respect to the transactions granting the DIP Liens in the Debtor's interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof.

(d)       The DIP Liens, DIP Superpriority Claims, and other rights, benefits, and remedies granted under this Interim Order to the DIP Secured Parties shall continue in the Chapter 11 Cases, any Successor Cases, and following any dismissal of the Chapter 11 Cases, and such liens, security interests, and claims shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and all of the commitments thereunder have been terminated in accordance with the DIP Loan Documents.

8.       <u>Fees and Expenses of DIP Agent and Prepetition Secured Parties</u>.

DOCS_LA:339202.2 68700/001

(a)      Upon entry of this Interim Order, the Debtors shall pay any and all prepetition fees, costs, and expenses incurred by the DIP Agent that were outstanding and unpaid as of the Petition Date, in an amount not to exceed $75,000.

(b)      The Debtors shall, no later than ten (10) days after receipt of a summary statement setting forth the applicable timekeepers, as well as the hours worked by and expenses incurred by such timekeepers, in connection with the Chapter 11 Cases whether incurred before or after the Petition Date (with copies provided via electronic mail to the U.S. Trustee, counsel to the Committee, counsel to the DIP Agent, and counsel to each of the Prepetition Secured Parties), indefeasibly pay or reimburse (i) the DIP Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges as provided in the Approved Budget (collectively, the "DIP Agent Professional Fees"), including, but not limited to, the reasonable fees, costs, and expenses of Gray Reed & McGraw LLP as counsel to DIP Agent, and any other advisors or professionals retained by the DIP Agent, (ii) the Project Collateral Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisors or professionals retained by the Project Collateral Agent, (iii) the Revolving Administrative Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisors or professionals retained by the Revolving Administrative Agent, (iv) [J. Aron for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisors or professionals retained by J. Aron; (v) the Ad Hoc Term Lender Group for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and

39

expenses of outside counsel, and any other advisor or professionals retained by the Ad Hoc Term Lender Group; and (vi) the Term Administrative Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs and expenses of outside counsel, and any other advisors or professionals retained by the Term Administrative Agent.] [TBD]  The Debtors, the U.S. Trustee, the Committee, the DIP Agent, and each of the Prepetition Secured Parties may object to the reasonableness of the fees, costs, and expenses included in any such professional fee invoice; *provided* that any such objection shall be barred and deemed waived unless filed with this Court and served on the applicable professional by 12:00 Noon, prevailing Central Time, on the date that is no later than ten (10) days after the objecting party's receipt of the applicable professional fee invoice.  If such objection is timely received, the Debtors shall promptly pay the portion of such invoice not subject to such objection, and this Court shall determine any such objection unless otherwise resolved by the applicable parties.  Any hearing on an objection to payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses which are the subject of such objection and whether the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, or Term Administrative Agent, as the case may be, is entitled to such fees, costs and expenses under this Interim Order. For the avoidance of doubt, none of the fees, costs, and expenses of the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, or Term Administrative Agent, shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  All fees, costs and expenses payable under the DIP Loan Documents to the DIP Agent shall be included and constitute part of the DIP Obligations and be secured by the DIP Liens.

DOCS_LA:339202.2 68700/001

Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, and Term Administrative Agent, under and in connection with negotiation and preparation of the DIP Loan Documents, including, without limitation, the legal fees and expenses of any professionals retained by them, shall be earned, non-refundable, and payable out of the interim funding under the DIP Financing and shall not be subject to the notice period described in this paragraph and the recipients of such payments shall be fully entitled to all protections of section 364(e) of the Bankruptcy Code.  For the avoidance of doubt, the Debtors shall be responsible to pay, subject to the procedures outlined in this paragraph, all fees and expenses incurred by the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, and Term Administrative Agent, in connection with any action taken in these Chapter 11 Cases including, but not limited to, fees and expenses relating to the DIP Financing and the administration and interpretation of, and the enforcement of remedies under, the DIP Financing and including all due-diligence, including but not limited to printing costs, consultation, travel, and attendance at court hearings, regardless of whether the DIP Financing is consummated.

       9.     <u>Prepetition Secured Parties' Rights and Adequate Protection</u>.

       (a)     <u>Adequate Protection for Prepetition Term Lenders</u>.  As adequate protection for any diminution of the Prepetition Debt Collateral resulting from the subordination of the Term Administrative Agent's Prepetition Debt Liens to the DIP Liens and the other relief granted herein in favor of the DIP Secured Parties, the Debtors' use of Prepetition Collateral (including Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and in exchange for the Term Lenders' consent to the priming of the Prepetition Debt Liens by the DIP Liens pursuant to this Interim Order, the Term Administrative Agent shall receive, for

41

the benefit of Prepetition Term Lenders, adequate protection, including, without limitation, (1) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition (expressly excluding Avoidance Actions, Avoidance Proceeds, commercial tort claims, and the proceeds thereof), (2) monthly payments to reimburse the reasonable and documented professional fees of the Ad Hoc Term Lender Group, the Term Administrative Agent and Project Collateral Agent in accordance with paragraph 8 of this Interim Order, [(3) in lieu of cash payments of interest when and as required under the Prepetition Term Credit Agreement, all accrued and unpaid interest shall, on each applicable date when such interest payments are due under the Prepetition Term Documents, be paid in kind by adding the amount of such accrued interest to the outstanding aggregate principal balance of the term loans,] [TBD] (4) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or any Successor Cases, with priority as provided therein, to the extent of any diminution in the Prepetition Debt Collateral, provided, however, that the superpriority administrative claim shall not attach to or be payable from Avoidance Actions, Avoidance Proceeds, commercial tort claims, or the proceeds thereof, (5) upon entry of this Interim Order, payment of all fees and expenses of the professional advisors of the Ad Hoc Term Lender Group, Term Administrative Agent and Project Collateral Agent that were incurred prior to the Petition Date and that remain unpaid, and (6) an acknowledgement of the unconditional right to credit bid the Prepetition Term Obligations under the Prepetition Term Documents in connection with any sale of Prepetition Debt Collateral subject to section 363(k) of the Bankruptcy Code and paragraph 42 herein.

       (b)    <u>Adequate Protection for Revolver Lenders</u>.  As adequate protection for any diminution of the Prepetition Debt Collateral resulting from the subordination of the Revolving Administrative Agent's Prepetition Debt Liens to the DIP Liens and the other relief granted herein in favor of the DIP Secured Parties, the Debtors' use of Prepetition Collateral (including Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and in exchange for the Revolver Lenders' consent to the priming of the Prepetition Debt Liens by the DIP Liens pursuant to this Interim Order, the Revolving Administrative Agent shall receive, for the benefit of the Revolver Lenders, adequate protection, including, without limitation, (1) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates <u>(expressly excluding Avoidance Actions, Avoidance Proceeds, commercial tort claims and proceeds thereof )</u> in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition, (2) monthly payments to reimburse the reasonable and documented professional fees of the Revolver Administrative Agent and Project Collateral Agent in accordance with paragraph 8 of this Interim Order, (3) on the last business day of each month, payments in cash to the Revolver Lenders in an amount equal to all interest (other than default interest) accrued under the Revolver Transaction Documents, (4) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or any Successor Cases, with priority as provided therein, to the extent of any diminution in the Prepetition Debt Collateral<u>, provided, however, that the superpriority administrative claims shall not attach to or be payable from Avoidance Actions, Avoidance Proceeds, commercial tort claim, and the proceeds thereof</u>, (5) upon entry of this Interim Order, payment of all fees and expenses of the professional advisors of the Revolving Administrative Agent and Project

DOCS_LA:339202.2 68700/001

Collateral Agent that were incurred prior to the Petition Date and that remain unpaid, and (6) an acknowledgement of the ~~unconditional~~ right to credit bid the prepetition obligations under the Revolver Transaction Documents in connection with any sale of Prepetition Debt Collateral subject to section 363(k) of the Bankruptcy Code and paragraph 42 herein.

        (c)      <u>Adequate Protection for J. Aron</u>.  As adequate protection for any diminution of J. Aron's interests in its Inventory Financing Collateral resulting from the relief granted herein in favor of the DIP Secured Parties, the Debtors' use of J. Aron's Prepetition Collateral (including Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, J. Aron shall receive adequate protection, including, without limitation, (1) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates (excluding Avoidance Actions, Avoidance Proceeds, commercial tort claims, and the proceeds thereof), in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition, (2) monthly payments to reimburse the reasonable and documented professional fees of J. Aron in accordance with paragraph 8 of this Interim Order, (3) on the last business day of each month payments in cash to J. Aron in an amount equal to all interest (other than default interest) accrued under the J. Aron Transaction Documents, (4) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or any Successor Cases, with priority as provided therein, to the extent of any diminution in the Inventory Financing Collateral, provided, however, that the superpriority administrative claims shall not attach to or be payable from Avoidance Actions, Avoidance Proceeds, commercial tort claims, or the proceeds thereof, and (5) upon entry of this Interim Order, payment of all fees and expenses of the professional advisors of J. Aron that were incurred

44

prior to the Petition Date and that remain unpaid, and (6) an acknowledgement of the ~~unconditional~~ right to credit bid the prepetition obligations under the J. Aron Transaction Documents in connection with any sale of Inventory Financing Collateral, subject to section 363(k) of the Bankruptcy Code and paragraph 42 herein.

(d)     <u>Reservation of Rights</u>.   The rights of all parties with respect to the appropriate characterization (as payments of principal, payments of interest, or otherwise) of any adequate protection payments made (whether in cash or in kind) in accordance with the foregoing are expressly preserved.

(e)     ~~Unconditional~~ <u>Right to Credit Bid</u>.  Each of the Prepetition Secured Parties shall have the ~~unconditional~~ right to credit bid its Prepetition Secured Obligations in connection with the sale of any of its Prepetition Collateral subject to section 363(k) of the Bankruptcy Code and paragraph 42 herein.

(f)     <u>Weekly Meetings</u>. The Debtors shall arrange for weekly (unless waived by the Prepetition Secured Parties in their sole and absolute discretion) status calls with the Prepetition Secured Parties, the Committee, and their advisors, and shall cause the Debtors' advisers and chief restructuring officer to participate to discuss (A) the Approved Budget, any Budget Variances and any other reports or information delivered by the Debtors, (B) the financial operations and performance of the Debtors' business, (C) progress in achieving the Milestones (as defined below) and any wind-down, liquidation, or going concern sale or marketing process or efforts, (D) the status of the Chapter 11 Cases generally, and (E) such other matters relating to the Debtors as the Prepetition Secured Parties (or their respective agents or advisors) or the Committee's professionals shall reasonably request ("<u>Weekly Meetings</u>").  The DIP Agent and its counsel may attend the Weekly Meetings at their discretion.

DOCS_LA:339202.2 68700/001

(g)    <u>Milestones</u>. The Debtors shall have (i) prepared a contingency plan for the wind-down of the Debtors' operations in the event that a going concern sale is not achieved, which plan shall be reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (ii) prepared a 13-week budget that is reasonably acceptable to the Prepetition Secured Parties no later than July 28, 2021 at 12:00 noon prevailing Central Time, (iii) filed with the Court a motion requesting approval of proposed bidding procedures that are reasonably acceptable to the Prepetition Secured Parties and that adhere to the milestones described in clauses (iv) and (v) below no later than ten (10) business days after the Petition Date, (iv) obtained, within [sixty (60) calendar days] [TBD] after the Petition Date, a binding stalking horse bid for the sale of all or substantially all of the Debtors' assets which bid shall be reasonably acceptable to each Prepetition Secured Party, and (v) completed the closing of a sale of all or substantially all of the Debtors' assets that is reasonably acceptable to each Prepetition Secured Party, within [one hundred twenty (120) calendar days] [TBD] after the Petition Date (collectively with (i) through (iv), the "<u>Milestones</u>").

(h)    <u>Adequate Protection of Limetree Bay Terminals</u>. To the extent Limetree Bay Terminals, LLC, ("LBT") holds a valid, perfected, and unavoidable lien on any DIP Collateral in existence as of the Petition Date, and solely to the extent of any diminution in value of such lien, if any, LBT shall receive a replacement lien for such diminution to the same extent validity and priority as its pre-petition lien.  Nothing in this Interim Order shall be a determination of the validity, priority, or extent of any lien or claim asserted by LBT, and the rights of all parties as to such issues are preserved.  For the avoidance of doubt, any such replacement lien will not attach to the IFF Property.

46

(i)      Financial Reporting.  The Debtors shall provide the advisors to the Ad Hoc Term Lender Group, the Revolving Administrative Agent (on behalf of the Revolving Lenders), and J. Aron, and the Committee concurrently with the financial reporting and inspection rights described more fully in paragraph 12 below.

(j)      Right to Seek Additional Adequate Protection.  Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties in this Interim Order is without prejudice to the right of the Prepetition Secured Parties to seek at any time, including, without limitation, in connection with the Final Order, modification of the grant of adequate protection provided hereby so as to provide different or additional forms of adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest such modification.  Nothing herein shall be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Secured Parties under their respective Prepetition Secured Documents or under equity or law, and the Prepetition Secured Parties expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under their respective Prepetition Secured Documents, equity, and law in connection with all termination events and defaults and events of default under such agreements or hereunder.

10.      Amendments, Consents, Waivers, and Modifications.  The Debtors, with the express written consent of the DIP Agent, may enter into any amendments, consents, waivers, or modifications to the DIP Loan Documents that are not materially adverse to the Debtors without the need for further notice and hearing or any order of this Court upon not less than five business days' notice to the Committee; provided, however, that, without the approval of the Court on notice and a hearing, no such amendments, consents, waivers or modifications shall (i) shorten the maturity of the DIP Financing, (ii) increase the commitments thereunder or the rate of interest

47

payable under the DIP Loan Documents, (iii) require the payment of any new or additional fee, or (iv) amend the Events of Default or covenants in the DIP Loan Documents to be materially more restrictive to the Debtors; *provided, further,* that any amendment, modification, waiver, or consent that adversely affects the rights or economic interest of any Prepetition Secured Party shall require the prior written consent of such Prepetition Secured Party; and *provided, further,* that any amendments, modification, waiver, or consent to or in respect of Section 10.05(b)(v) of the DIP Credit Agreement shall require the prior written consent of each Prepetition Agent.  No consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Secured Parties or any of the Prepetition Secured Parties.

11.     Perfection of DIP Liens and Prepetition Secured Parties' Adequate Protection Liens.

(a)     The DIP Agent, and the Prepetition Secured Parties, as applicable, are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments (subject to Borrower's prior review and approval, not to be unreasonably withheld, conditioned or delayed) in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, in each case, without the necessity to pay any mortgage recording fee or similar fee or tax.  Whether or not the DIP Agent, on behalf of the DIP Secured Parties, or the Petition Secured Parties, in their respective sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall, to the extent provided in this Interim Order, be deemed valid, perfected, allowed, enforceable, non-

avoidable, and not subject to challenge, dispute or subordination upon entry of this Interim Order. The Debtors shall, if requested, execute and deliver to the DIP Agent or the Prepetition Secured Parties, as applicable, all such agreements, financing statements, instruments and other documents as the DIP Agent or the Prepetition Secured Parties may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the DIP Liens or the Prepetition Secured Parties' Adequate Protection Liens, as applicable, and all such documents will be deemed to have been recorded and filed as of the Filing Date.

(b)     A certified copy of the Interim Order may be filed by the DIP Agent or the Prepetition Secured Parties with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Order for filing and recording.

12.     <u>Financial Reporting and Inspection Rights</u>. The Debtors shall provide the advisors to the DIP Agent, Ad Hoc Term Lender Group, the Term Administrative Agent, the Revolving Administrative Agent (on behalf of the Revolving Lenders), the Project Collateral Agent, and J. Aron, and the Committee concurrently with the financial and other reporting as described in the DIP Loan Documents and the Prepetition Secured Documents, in addition to (i) any financial reporting given to the U.S. Trustee and (ii) any additional reports reasonably requested by and of the DIP Agent and the Prepetition Secured Parties. The Debtors shall deliver to each of the DIP Agent, the Ad Hoc Term Lender Group, the Term Administrative Agent, the Revolving Administrative Agent (on behalf of the Revolving Lenders), the Project Collateral Agent, and J. Aron, and the Committee concurrently, and their respective counsel financial reporting information in a timely manner that is requested by any of them in writing, and shall make

49

personnel available to answer questions concerning such financial reporting and the operations of the Debtors during normal business hours on no less than two (2) business days' advance notice to Debtors' counsel, and within five (5) business days of the request being made to Debtors' counsel unless otherwise agreed to by the parties. The Debtors shall provide the DIP Agent, the Ad Hoc Term Lender Group, the Term Administrative Agent, the Revolving Administrative Agent, the Project Collateral Agent, and J. Aron, and the Committee, and their respective agents, representatives, or professionals, with access to, and on-site inspections of, the Debtors' property and company records, as may be reasonably requested, during normal business hours, on no less than two (2) business days' advance notice to Debtors' counsel, and within five (5) business days of the request being made to the Debtors' counsel, unless the parties agree otherwise on the actual inspection date. The Debtors shall promptly provide the DIP Agent with any information or documents that are provided to the Term Administrative Agent, the Revolving Administrative Agent, the Project Collateral Agent and J. Aron and vice versa.

13.    <u>Third Parties</u>.  Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Secured Parties contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, following entry of an order granting a Stay Relief Motion (defined below) as set forth in paragraph 17(c) hereof and solely to the extent the applicable DIP Collateral is not subject to a Permitted Prior Lien, upon five three (5 3) Business Days' written notice to the landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred under the DIP Loan Documents and that the DIP Agent is permitted to exercise remedies, the DIP Agent (i) may, only subject to any the terms of any underlying agreement between the Debtors and the applicable

landlord or licensor and separate agreement by and between the applicable landlord or licensor (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) subject to applicable law, shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade-names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien or license of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder.  To the extent applicable law prohibits the forgoing access or use of rights, the DIP Agent shall have the right to an expedited hearing on five (5) Business Days' notice to obtain Court authorization to obtain such access or use of such rights.

14.    <u>Automatic Stay Modified</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code hereby are vacated and modified without the need for any further order of this Court to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to grant the Prepetition Secured Parties' Adequate Protection Liens, and to perform such acts as the Prepetition Secured Parties may request to assure the perfection and priority of the Prepetition Secured Parties' Adequate Protection Liens; (c) the Debtors to incur all liabilities and obligations, including all of (i) the DIP Obligations, to the DIP Secured Parties and (ii) the Adequate Protection Obligations to the Prepetition Secured Parties, in each case as contemplated under this Interim Order and the DIP Loan Documents; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order, including any Adequate Protection Obligations; (e) the DIP Secured Parties

51

to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order; (f) the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to exercise the rights and remedies set forth in paragraph 17 hereof, upon the occurrence of a Termination Event (as defined below); (g) the Prepetition Secured Parties to exercise the rights and remedies under their respective Prepetition Secured Documents, as applicable, pursuant to paragraph 17(c) hereof; (h) without a determination that the automatic stay applies, but out of an abundance of caution, J. Aron to retain and apply amounts received from the liquidation of its IFF Property to obligations owed by the Debtors to J. Aron under the J. Aron Transaction Documents; (i) upon entry of a Final Order, J. Aron to set off and net any Margin (as defined in the J. Aron Master Monetization Agreement) against any obligations owed by the Debtors to J. Aron under the J. Aron Transaction Documents; (j) the Debtors to perform under the DIP Loan Documents and any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and any transactions contemplated therein or in this Interim Order; and (k) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents, in each case without further notice, motion or application to, or order of, or hearing before, this Court, subject to the terms of this Interim Order, except that to the extent any Prepetition Secured Party seeks to enforce its respective rights, benefits, privileges, remedies under, or provisions of, this Interim Order and the Prepetition Secured Documents against property of the Debtors' estates (other than any such rights, benefits, privileges, or remedies described in clauses (h) and (i)), such Prepetition Secured Party shall provide the Debtors with ten (10) days written notice prior to any such enforcement. The Debtors and DIP Lenders have consented to the exercise of rights, benefits, privileges, and remedies described in clauses (h) and (i).  Nothing in this Interim Order shall impair

or abridge the Debtors' right to seek and, if granted by the Bankruptcy Court, obtain the use of Cash Collateral on a nonconsensual basis, and the rights of the DIP Secured Parties, the holders of the Permitted Prior Liens and the Prepetition Secured Parties to object to such request are fully preserved.

15.    <u>Termination Date</u>.  Each of the following shall constitute a termination event under this Interim Order (each a "<u>Termination Event</u>", and the date upon which such Termination Event occurs, the "<u>Termination Date</u>"), unless waived in writing (delivery by email or other electronic means being sufficient) by the DIP Agent and each Prepetition Agent:

(a)    the occurrence of the "Maturity Date" (as defined in the DIP Loan Documents) of the DIP Financing under the DIP Loan Documents;

(b)    acceleration of the obligations under the DIP Loan Documents upon the occurrence of an "Event of Default" under and as defined by the DIP Loan Documents;

(c)    nine (9) months following entry of the Interim Order;

(d)    failure to obtain entry of the Final Order within 30 days from the entry of this Interim Order;

(e)    entry of a Final Order with DIP Lien priorities that differ from the priorities set forth in paragraph 7 above without the express written consent of the DIP Secured Parties;

(f)    entry of an order authorizing the Borrower or any Guarantor to incur DIP financing from any party other than the DIP Secured Parties;

(g)    the closing date of a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code (whether in one transaction or a series of related or unrelated transactions) (a "<u>363 Sale</u>");

DOCS_LA:339202.2 68700/001

(h)     the effective date of a confirmed chapter 11 plan (a "Plan") that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Loan Documents or is otherwise acceptable to the DIP Agent and the DIP Lenders in their sole discretion;

(i)     the failure by the Debtors to timely perform any of the material terms, provisions, conditions, covenants, or other obligations under this Interim Order;

(j)     the filing of a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee, other estate fiduciary or an examiner with special/expanded powers which the Debtors fail to timely oppose without the prior written consent of the DIP Agent and Prepetition Secured Parties;

(k)     an order converting any Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;

(l)     the filing or support by any Debtor of any plan of reorganization that (1) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Loan Documents and (2) is not otherwise acceptable to DIP Agent and the DIP Lenders in their sole discretion; and

(m)     any modifications, amendments, reversal, or extensions of this Interim Order that are adverse to the DIP Secured Parties or the Prepetition Secured Parties.

In addition to the foregoing, each of the following shall constitute Termination Event upon which any Prepetition Secured Party may terminate the Debtors' authorization to use Cash Collateral, but not exercise any other remedies under this Interim Order:

(n)     the failure of the Debtors to use commercially reasonable efforts to pursue collection of the insurance claims or disputed amounts owed to the Debtors by BP or (2) seek the agreement of the Government of the U.S. Virgin Islands (the "USVI") to draw on the letter of

credit provided by Limetree Bay Terminals, LLC, as financial assurance under the ROA by and among the USVI and certain of the Debtors; provided, however, that so long as the Debtors have used such commercially reasonable efforts in connection with either of the foregoing, no Cash Collateral Termination Event shall be deemed to arise hereunder this subclause "n" in the event the Debtors fail to collect any amounts or cause the USVI to draw on such letter of credit;

(o)     the filing by the Debtors of a motion for authorization to sell all or substantially all of the Debtors' assets or for approval of any related bidding procedures that is not reasonably acceptable to each of the Prepetition Agents; and

(p)     the failure of the Debtors to comply with any of the Milestones.

Nothing in the preceding paragraphs 14 and 15 of this Interim Order shall constitute or be deemed to constitute an amendment or modification to sections 2.6, 3.7(e), 5.6 or 5.9 of the Intercreditor Agreement, or any other provisions of the Intercreditor Agreement.

16.     <u>Cash Collateral Termination Events</u>.  Following a DIP Repayment Event, each of the following shall constitute a cash collateral termination event under this Interim Order (each a "<u>Cash Collateral Termination Event</u>", and the date upon which such Cash Collateral Termination Event occurs, the "<u>Cash Collateral Termination Date</u>"), unless waived in writing (delivery by email or other electronic means being sufficient) by each Prepetition Agent:

(a)     if on or before the date of the DIP Repayment Event, the Debtors and the Prepetition Agents have not agreed to the terms and conditions of the Debtors' continued consensual use of Cash Collateral, the adequate protection to be provided to the Prepetition Secured Parties, and the terms of a budget;

(b)     the bringing of a motion, taking of any action or the filing of any plan of reorganization or liquidation or disclosure statement attendant thereto by or on behalf of the

Debtors in the Chapter 11 Cases: (a) to obtain postpetition financing, absent the consent of the Prepetition Secured Parties; (b) to grant any lien, absent the consent of each Prepetition Agent; or (c) to use Cash Collateral in manner that is inconsistent with the terms of this Interim Order or the Approved Budget, subject to the approved Budget Variances, and it being further specified that any request for payment, or payment, of professionals fees by any party not limited herein to the projected fees in the Approved Budget in excess of the budgeted amount shall not be deemed a Cash Collateral Termination Event;

(c) the closing date of a 363 Sale;

(d)(c) the failure by the Debtors to timely perform any of the material terms, provisions, conditions, covenants, or other obligations under this Interim Order;

(e)(d) the filing of a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers which the Debtors fail to timely oppose without the prior written consent of the Prepetition Secured Parties;

(f)(e) an order converting any Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;

(g)(f) the filing or support by any Debtor of a plan of reorganization or liquidation that is not acceptable to each Prepetition Agent in its sole discretion;

(h)(g) any modifications, amendments, reversal, or extensions of this Interim Order that are adverse to the Prepetition Secured Parties;

(i)(h) the failure of the Debtors to use commercially reasonable efforts to pursue collection of the insurance claims or disputed amounts owed to the Debtors by BP or (2) seek the agreement of the Government of the USVI to draw on the letter of credit provided by Limetree

56

DOCS_LA:339202.2 68700/001

Bay Terminals, LLC, as financial assurance under the ROA by and among the USVI and certain of the Debtors; provided, however, that so long as the Debtors have used such commercially reasonable efforts in connection with either of the foregoing, no Cash Collateral Termination Event shall be deemed to arise hereunder this subclause "i" in the event the Debtors fail to collect any amounts or cause the USVI to draw on such letter of credit;

(i)(i)    the filing by the Debtors of a motion for authorization to sell all or substantially all of the Debtors' assets or for approval of any related bidding procedures that is not acceptable to each Prepetition Agent; and

(k)(j)    the failure of the Debtors to comply with any of the Milestones or to hold Weekly Meetings.

Nothing in the preceding paragraph 16 of this Interim Order shall constitute or be deemed to constitute an amendment or modification to sections 2.6, 3.7(e), 5.6 or 5.9 of the Intercreditor Agreement, or any other provisions of the Intercreditor Agreement.

17.    <u>Rights and Remedies Upon Termination Event.</u>

(a)    Upon the occurrence and during the continuation of a Termination Event, the DIP Agent or any Prepetition Secured Party, as applicable, or, following a Cash Collateral Termination Event, any Prepetition Secured Party may (and any automatic stay otherwise applicable to the DIP Secured Parties or the Prepetition Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Secured Parties and the Prepetition Secured Parties, as applicable, to) deliver a written notice (a "<u>Termination Notice</u>") (including by e-mail) to counsel for the Debtors, counsel for each of the Prepetition Agents, counsel for the Ad

Hoc Term Lender Group, counsel for J. Aron, counsel to any statutory committee appointed in the Chapter 11 Cases, and the U.S. Trustee (the "Remedies Notice Parties"), declaring and triggering, as applicable:  (i) the immediate termination of the DIP Financing and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (ii) all DIP Obligations to be immediately due and payable; (iii) right to charge interest at the default rate under the DIP Loan Documents; (iv) a termination of the ability of the Debtors to use any Cash Collateral.

(b)        Upon delivery of such Termination Notice by the DIP Agent or any of the Prepetition Secured Parties, without further notice or order of the Court, the Debtors' authorization to use Cash Collateral and to incur the DIP Financing hereunder will, subject to the expiration of the Remedies Notice Period (as defined below), automatically terminate and (i) the DIP Secured Parties will have no obligation to provide any further DIP Financing or other financial accommodations and (ii) no Prepetition Secured Party will have an obligation to permit the Debtors to continue to use Cash Collateral; *provided that*, during the Remedies Notice Period (as defined below), the Debtors shall be entitled to continue to use Cash Collateral solely in accordance with the terms of this Interim Order and the DIP Loan Documents and to pay items solely as set forth in the Approved Budget (or following a DIP Repayment Event, solely in accordance with the terms of this Interim Order and to pay items solely as set forth in the Approved Budget), without any variance.

(c)        Following a Termination Event or Cash Collateral Termination Event, but prior to exercising the remedies set forth in this sentence below, the DIP Secured Parties or a Prepetition Secured Party, as applicable, shall be required to file a motion with the Court seeking emergency relief (the "Stay Relief Motion") on five three(53) business days' notice to the

58

Remedies Notice Parties (the "<u>Remedies Notice Period</u>") for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to:  (i) freeze monies or balances in the Debtors' accounts; (ii) immediately set-off any and all amounts in accounts subject to a control agreement in favor of the DIP Secured Parties against the DIP Obligations, (iii) enforce any and all rights against the DIP Collateral (to the extent such DIP Collateral is not subject to a Permitted Prior Lien), including, without limitation, foreclosure on all or any portion of the DIP Collateral, collection of accounts receivable, occupying the Debtors' premises, and sale or disposition of the DIP Collateral (or following a DIP Repayment Event, enforce any and all rights against the Prepetition Collateral, including, without limitation, foreclosure on all or any portion of the Prepetition Collateral, collection of accounts receivable, occupying the Debtors' premises, and sale or disposition of the Prepetition Collateral); (iv) terminate and revoke the Debtors' right under this Interim Order or the DIP Loan Documents to use any Cash Collateral, except to fund the Carve-Out; and (v) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents, the Prepetition Secured Documents, or applicable law.  The Debtors, the DIP Secured Parties and the Prepetition Secured Parties consent to a hearing on the Stay Relief Motion on an expedited basis.  Any order granting a Stay Relief Motion filed by any of the Prepetition Secured Parties shall also modify the automatic stay to the extent necessary to permit (i) the Prepetition Secured Parties to immediately set off and net any and all amounts in accounts subject to a control agreement in their favor, any Margin (as defined in the Monetization Master Agreement) and any amounts owed by them to the Debtors against any obligations under the Secured Financing Documents, (ii) enforce any and all rights against any collateral securing any obligations under the Prepetition Secured Documents, including without limitation foreclosure on

DOCS_LA:339202.2 68700/001

all or any portion of such collateral, collection of accounts receivable, occupying the Debtors' premises, and sale or disposition of the DIP Collateral; and (iii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the Secured Financing Documents, or applicable law.

(d)     The rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties have under the DIP Loan Documents, or otherwise or that the Prepetition Secured Parties have under the Prepetition Secured Documents or otherwise.  If any of the DIP Secured Parties or Prepetition Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral, or the Prepetition Secured Parties are permitted by the Court to take any enforcement action with respect to the Prepetition Collateral, following the hearing on the Stay Relief Motion, and subject to relative rights and priorities of the other DIP Secured Parties or Prepetition Secured Parties as provided in or recognized under this Interim Order, the Debtors shall cooperate with such party in its efforts to enforce its security interest in the DIP Collateral or the Prepetition Collateral, as applicable, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its security interests in the DIP Collateral or the Prepetition Collateral, as applicable.

18.     <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to, *inter alia*, section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Secured Parties and Prepetition Secured Parties all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Secured Parties prior to the

60

date of receipt by the DIP Agent of written notice of the effective date of such action, (ii) the payment of any fees required under this Interim Order or the DIP Loan Documents, (iii) the validity and enforceability of any lien, claim, obligation, right, remedy or priority authorized or created under this Interim Order or pursuant to the DIP Loan Documents as of such date, including any Adequate Protection Obligations, and (iv) the validity or enforceability of the Aron Rights.

19.    <u>Restriction on Use of DIP Lenders' Funds and Prepetition Collateral</u>. Notwithstanding anything herein to the contrary, none of the DIP Collateral or proceeds thereof, proceeds of the DIP Financing, the Prepetition Collateral or proceeds thereof, any portion of the Carve-Out may be used by the Debtors, the Debtors' estates, the Committee, any trustee or examiner appointed in the Chapter 11 Cases or any chapter 7 trustee, or any other party in interest, directly or indirectly, to: (a) request authorization to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (i) from the DIP Agent or (ii) if such financing is sufficient to indefeasibly pay all DIP Obligations in full in cash and such financing is immediately so used; (b) assert, join, commence, support, ~~investigate,~~ or prosecute any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the DIP Releasees or the Prepetition Secured Releasees, with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any action arising under the Bankruptcy Code against a DIP Releasee or a Prepetition Secured Releasee; (ii) any so-called "lender liability" claims and causes of action against a DIP Releasee or Prepetition Secured Releasee; (iii) any action with respect to the legality, enforceability, validity, extent, perfection, and priority of the DIP Obligations, the DIP Superpriority Claims, the DIP Loan

61

Documents, the DIP Liens, or Prepetition Secured Obligations; (iv) any action for avoidance under sections 544, 547, 548, 549, or 550 of the Bankruptcy Code against the DIP Secured Parties or a Prepetition Secured Releasee; (v) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counter claims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against or with respect to the DIP Liens, the DIP Obligations, the DIP Superpriority Claims, or the Prepetition Secured Obligations in whole or in part; (vi) appeal or otherwise challenge this Interim Order, the DIP Loan Documents, or any of the transactions contemplated herein or therein; or (vii) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Secured Parties' or Prepetition Secured Parties' rights in respect of their respective liens on and security interests in the DIP Collateral or Prepetition Collateral, as applicable, or any of their rights, powers, or benefits hereunder or in the DIP Loan Documents or this Interim Order anywhere in the world; (c) seek to modify any of the rights granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder or under the DIP Loan Documents; or (d) pay any claim of a prepetition creditor except as permitted under the DIP Loan Documents in accordance with the Approved Budget.   Notwithstanding the foregoing, the terms and limitations of this paragraph shall not apply to a successful action on the part of the Debtors whereby under paragraph 17 of this Interim Order the Debtors obtain an order of the Court staying or otherwise modifying a Termination Event or a Cash Collateral Termination Event. Notwithstanding the Committee Investigation Budget and the foregoing, nothing herein shall prevent the Committee from seeking approval of all fees incurred or from the Court for approving

such fees incurred and from the Committee to be reimbursed from Unencumbered Assets (as defined below).

20.    <u>Restriction on Use of Proceeds of Inventory Financing Collateral</u>. For the avoidance of doubt, nothing in this Interim Order authorizes the sale or use of Inventory Financing Collateral or proceeds thereof other than Cash Collateral.

21.    <u>Insurance Policies</u>.  Upon entry of this Interim Order, the DIP Lenders are, and are deemed to be, without any further action or notice (including endorsements), named as additional insured and loss payees on each insurance policy maintained by the Debtor which in any way relates to the DIP Collateral.

22.    <u>Collateral Rights</u>.  Except as expressly provided in the Approved Budget or permitted in this Interim Order or the DIP Loan Documents, in the event that any person or entity that holds a lien on or security interest in DIP Collateral of the Debtors' estates, that is junior or otherwise subordinate to the DIP Liens receives or is paid the proceeds of such DIP Collateral, prior to indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Loan Documents, and termination of the commitments under the DIP Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral of the Debtors' estates, in trust for the DIP Lenders, and shall immediately turnover such proceeds to the DIP Agent for application in accordance with the DIP Loan Documents and this Interim Order.  Except as expressly provided in the Approved Budget or permitted in this Interim Order or the applicable Prepetition Secured Document, in the event that any person or entity that holds a lien on or security interest in any collateral securing the obligations under any Prepetition Secured Document that is junior or otherwise subordinate to the lien in favor of the applicable Prepetition Secured Parties receives or is paid the proceeds of such

63

collateral prior to indefeasible payment in full in cash and the complete satisfaction of all obligations under the applicable Prepetition Secured Document, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such collateral in trust for the applicable Prepetition Secured Parties, and shall immediately turn over such proceeds to the applicable Prepetition Secured Parties or their respective agents for application in accordance with the relevant Prepetition Secured Document and this Interim Order.

23.     Prohibition on Additional Liens.  Except as provided in the DIP Loan Documents, the Prepetition Secured Documents, and this Interim Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases until such time as the DIP Obligations and obligations under the Prepetition Secured Documents have been indefeasibly paid in full, granting liens on or security interests in the DIP Collateral or the collateral securing the obligations under the Prepetition Secured Documents or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are junior to, senior to, or *pari passu* with the DIP Liens, the Prepetition Secured Parties' Adequate Protection Liens, or the liens in favor of the Prepetition Secured Parties.

24.     No Waiver.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that any of the DIP Secured Parties or the Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.

25.     Sale/Conversion/Dismissal/Plan.

(a)     No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, (X) the Prepetition Secured Parties consent to the entry of such order and (Y) (i) the

proceeds of any DIP Collateral included in such sale shall, subject to the prior satisfaction of any Permitted Prior Liens encumbering such DIP Collateral, be used to indefeasibly pay in full in cash and completely satisfy the DIP Obligations and the obligations under the Secured Financing Documents, and the commitments under the DIP Loan Documents are terminated; (ii) such sale is expressly permitted under the DIP Loan Documents; or (iii) the DIP Agent and Prepetition Secured Parties otherwise consent.

(b)     If an order dismissing or converting the Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time entered:

i.     Unless otherwise agreed to by the DIP Agent, such order shall provide that the Debtors, in each case subject to the Carve-Out and the Permitted Prior Liens, be subject to (a) the DIP Liens, the liens in favor of the Prepetition Secured Parties, the Aron Rights, the DIP Superpriority Claims, the DIP Obligations, the Adequate Protection Liens, and the DIP Loan Documents, which shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order until all DIP Obligations hereunder and all obligations under the DIP Credit Agreement are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance with the DIP Loan Documents, (b) the Prepetition Liens, Prepetition Secured Parties' Adequate Protection Liens, and any other Adequate Protection Obligations granted or conferred to the Prepetition Secured Parties shall continue in full force and effect, remain binding on all parties-in-interest and maintain their priorities as provided in this Interim Order until all Prepetition Secured Obligations are indefeasibly paid in full in cash and completely satisfied (and that such Prepetition Secured Parties' Adequate Protection Liens, and other Adequate Protection

65

Obligations granted to or conferred on the Prepetition Secured Parties shall, notwithstanding such dismissal or conversion, remain binding on all parties) and (c) all postpetition indebtedness, obligation, or liability incurred by the Debtors to the DIP Secured Parties or the Prepetition Secured Parties prior to the date of such order, including, without limitation, the DIP Obligations and the Adequate Protection Obligations, shall be governed in all respects by the original provisions of this Interim Order unless the Final Order has been entered, in which case the Final Order shall govern, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Loan Documents,; and

    ii.  to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens. the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Secured Parties' Adequate Protection Liens, the Aron Rights, and any other Adequate Protection Obligations.

   26. <u>Modifications of the Approved Budget</u>.  Without further Order of the Court, the Debtors are hereby authorized to implement, in accordance with the terms hereof and upon the consent of the DIP Agent and each Prepetition Agent <u>and not less than three days' notice to the Committee (and as to any changes with respect to the fees and expenses of Committee professionals, with the consent of the Committee)</u>, any modifications to the Approved Budget with such modification being in writing, *provided, however,* that (a) each Prepetition Agent shall be deemed to have consented to any such modification if it has not objected to the proposed modification (i) within the greater of twenty-four (24) hours and one (1) business day after written email notice of such modification to counsel to such Prepetition Agent, or (ii) in the case of an Emergency Expense (as defined below) in excess of $250,000, within twelve (12) hours after written email notice of such proposed modification to counsel to such Prepetition Agent, and (b)

DOCS_LA:339202.2 68700/001

no consent of the Prepetition Agents shall be necessary if each of the following conditions is satisfied: (i) the chief restructuring officer has certified, in writing, to the DIP Agent and the Prepetition Agents that the expense is necessary to (A) prevent irreparable harm to the value of the Prepetition Collateral or DIP Collateral, or (B) protect against an imminent harm to the public safety (any such certified expense described in the foregoing clauses (A) or (B) an "Emergency Expense"), (ii) such Emergency Expense is less than $250,000, and (iii) the aggregate amount of all Emergency Expenses does not exceed $500,000.

27.     Priority of Terms.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Documents or another document or agreement or words of similar import, the terms and provisions of this Interim Order shall govern.

28.     No Third-Party Beneficiary.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

29.     Rights Under Sections 363(k) and 1129(b).  Subject to paragraph 42 herein, tThe full amount of the DIP Obligations or the Prepetition Secured Obligations may be used to "credit bid" for the assets and property of the Debtors (other than any collateral in respect of the J. Aron Obligations) on a dollar-for-dollar basis, as provided for in section 363(k) of the Bankruptcy Code, in accordance with the terms of the DIP Loan Documents and this Interim Order, as applicable, without the need for further Court order authorizing the same and whether such sale is (a) pursuant to section 363, (b) pursuant to a plan of reorganization, or (c) by a chapter 7 trustee because, among

other things, the denial of such rights would result in the DIP Secured Parties and the Prepetition Secured Parties not receiving the indubitable equivalent of their claims.

30.      Discharge Waiver/Release.  Neither the DIP Obligations nor the Adequate Protection Obligations shall be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, or granted such other treatment as the Debtors and the DIP Secured Parties, in the case of the DIP Obligations, and the Prepetition Secured Parties, in the case of Adequate Protection Obligations, may agree upon, on or before the effective date of such confirmed plan of reorganization.

31.      Preservation of Prepetition Priorities.  Nothing in this Interim Order is intended to change or otherwise modify the prepetition priorities among prepetition secured creditors of the Debtors, including (i) any lien or recoupment rights to the extent such liens or rights are valid, enforceable, nonavoidable and perfected, (ii) any claims of the lienholders or any other mechanic or materialmen to the extent their liens are valid, enforceable, non-avoidable and perfected, including as permitted by section 546(b) of the Bankruptcy Code, or (iii) any relative rights and priorities of the Prepetition Secured Parties in that certain Collateral Agency and Intercreditor Agreement, dated as of November 20, 2018, as it may be amended, modified or supplemented, by and among certain of the Debtors and the Prepetition Agents, and nothing in this Interim Order, including the granting of adequate protection liens or DIP Liens, shall be deemed to have changed or modified such prepetition priorities, all of which are hereby expressly preserved.   The preservation of prepetition priorities expressly includes lien, setoff, recoupment, contract, and other security rights.

68

32. <u>Proofs of Claim</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, neither the DIP Agent nor any of the DIP Lenders shall be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein in or otherwise in relation to the DIP Loan Documents.  In addition, the Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein or otherwise in relation to the Prepetition Secured Obligations, and the stipulations contained Section F and G of this Interim Order shall be deemed to constitute a timely-filed proof of claim for the Prepetition Secured Parties in respect of the Prepetition Secured Obligations.

33. <u>Best Efforts</u>.  If requested to do so by the DIP Agent and consented to by the Prepetition Secured Parties in writing, or by the Prepetition Secured Parties, the Debtors shall use their best efforts (subject to applicable law, including, without limitation, the Debtors' fiduciary duties thereunder) to assist and cooperate with the sale of the DIP Collateral or the collateral securing the obligations under the Prepetition Secured Documents.

34. <u>No Consent</u>.  No action, inaction, or acquiescence by the DIP Secured Parties, including funding the Debtors' ongoing operations under this Interim Order, or the Prepetition Secured Parties shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Secured Parties or the Prepetition Secured Parties to a charge against the DIP Collateral or the Prepetition Collateral pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code.

35. <u>No Marshaling; Equities of the Case.</u>  Subject to entry of the Final Order, neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the Prepetition Collateral or the liens securing the obligations under the Prepetition Secured Documents, provided, however, that the DIP Secured Parties agree to satisfy the DIP Obligations from any assets of the

69

Debtors constituting DIP Collateral that were unencumbered as of the Petition Date ("Unencumbered Assets") only to the extent that DIP Obligations cannot be satisfied first from other DIP Collateral and the Prepetition Secured Parties agree to satisfy Prepetition Secured Debt Obligations first from Prepetition Collateral and look to Unencumbered Assets last and only to the extent that such obligations cannot be satisfied in full from all other Prepetition Collateral.  Subject to entry of the Final Order, the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent with respect to the DIP Loan Documents and/or the DIP Collateral or the Prepetition Secured Parties with respect to the Prepetition Secured Documents and/or the Prepetition Collateral.

36.     Section 506(c) Waiver.  Subject to entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment, or claim incurred prior to the Termination Date or the Cash Collateral Termination Date, as applicable, at any time (including any expenses set forth in the Approved Budget) by any Debtors or any other person or entity shall be imposed against any or all of the DIP Secured Parties or the Prepetition Secured Parties, their respective claims, or their respective collateral under Section 506(c) of the Bankruptcy Code or otherwise, and the Debtors, on behalf of their estates, waive any such rights.

37.     Indemnification.  The indemnification provisions set forth in Section 10.02 of the DIP Credit Agreement are hereby approved.

38.     Break Up Fee.  In the event that alternative DIP financing is approved before entry of the Final Order with a lender other than the DIP Lenders, the Debtors shall pay the DIP Agent a break up fee of $250,000 in lieu of the Deferred Commitment Fees set forth in the DIP Loan Documents.

39.     No Duty to Monitor Compliance.  The DIP Agent, DIP Lenders and the Prepetition Secured Parties may assume the Debtors will comply with this Interim Order and the Approved Budget and shall not (a) have any obligation with respect to the Debtors' use of Cash Collateral or proceeds of the DIP Financing (other than their consent to the use of Cash Collateral or proceeds of the DIP Financing in accordance with and subject to terms of this Interim Order); (b) be obligated to directly pay any expenses incurred or authorized to be incurred pursuant to this Interim Order (including any amounts specified in the Approved Budget); or (c) be obligated to ensure or monitor that sufficient Cash Collateral or proceeds of the DIP Financing exists to pay any expenses incurred or authorized to be incurred pursuant to this Interim Order.

40.     Adequate Notice.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the Bankruptcy Local Rules.  Under the circumstances, no further notice of the request for the relief granted at the Interim Hearing is required.  The Debtors shall promptly serve copies of this Interim Order and notice of the Final Hearing to any person included on the master service list approved or established in this case within two (2) Business Days of the Interim Order Entry Date.

41.     Binding Effect Successors and Assigns.  Except as set forth in paragraph 42 of this Interim Order, the DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties-in-interest in this Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Committee or examiner appointed in these Chapter 11 Cases, and the Debtors, and their respective successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Chapter 11 Cases, in any Successor Cases, or upon any dismissal of any such chapter 11 or chapter 7 case and

71

shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties and the Debtors, and their respective successors and assigns, *provided*, *however*, that the agreement of the DIP Secured Parties to extend financing under the DIP Loan Documents and the Prepetition Secured Parties' consent to the use of Cash Collateral, in each case, shall terminate upon the appointment of any chapter 7 or 11 trustee, examiner with expanded powers, or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether pursuant to the DIP Loan Documents, a promissory note, or otherwise), consenting to the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, or their creditors, shareholders, or estates.  Except as set forth in paragraph 42 of this Interim Order, each stipulation, admission, and agreement contained in sections E, F, G and I of this Interim Order shall also be binding upon all persons and entities, including the Debtors, their estates, any Committee, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other person acting on behalf of the Debtors' estates, under all circumstances and for all purposes, subject to the Challenge Period as defined below.

42. Effect of Stipulations.  The stipulations, waivers and releases contained in sections F, G, and I of this Interim Order with respect to the Prepetition Secured Parties (the "Debtors' Stipulations") shall be binding upon the Debtors and their estates in all circumstances immediately upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon each party in interest (other than the Debtors and their estates), including the Committee, if any, and any chapter 11 trustee (or if any of these Chapter 11 Cases are converted to a case under chapter 7 prior to the expiration of the Challenge Period (defined below), the chapter 7 trustee in such Successor Case),

DOCS_LA:339202.2 68700/001

together with each of their respective representatives, subsidiaries, successors and assigns, unless (a) such party (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so), with the requisite standing granted by the Court, has timely and properly filed an adversary proceeding by no later than the date that is the earlier of (i) the effective date of a confirmed chapter 11 plan, and (ii) the day that is sixty (60) days from the date of the entry of this Interim Order (or, in the case of the Committee, ~~sixty~~ one hundred twenty (120~~60~~) days from the date of the appointment of the Committee (as such date may be extended by the applicable Prepetition Secured Party in writing or by order of the Court)) (the "Challenge Period"), (x) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the debt or liens referenced in the Debtors' Stipulations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code) or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations; or (y) otherwise asserting or prosecuting any cause of action for preferences, fraudulent transfers or conveyances, or any cause of action challenging the actions or inactions of any of the Prepetition Secured Parties, including any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, or any other offsets, setoffs, recoupments, challenges, objections, defenses, claims, counterclaims, or causes of action of any kind or nature, whether in these Chapter 11 Cases or any subsequent chapter 7 cases, against any of the Prepetition Secured Parties on behalf of the Debtors' estates, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law (clauses (x) and (y) collectively, the "Challenges" and, each individually, a "Challenge"); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any

DOCS_LA:339202.2 68700/001

such duly filed adversary proceeding; provided, that, as to the Debtors, all such Challenges and proceedings are hereby irrevocably waived and relinquished as of the Petition Date. Any complaint or motion for standing filed in, or in connection with, any Challenge proceeding shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released, and barred. If no adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period or the court does not rule in favor of the plaintiff in any such Challenge proceeding, without further order of the Court: (v) the Debtors' Stipulations, including the releases, shall be binding on all parties in interest including, without limitation, the Committee, if any, and any trustee (including any chapter 7 trustee); (w) any and all Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (x) the claims of the Prepetition Secured Parties shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, offset, any cause of action of any kind, challenge, or defense (including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case; (y) the liens of the Prepetition Secured Parties shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, recharacterization, subordination, or avoidance; and (z) the Prepetition Secured Parties (and their respective agents, affiliates, subsidiaries, directors, officers, manager, representatives, attorneys, and advisors) shall not be subject to any other or further Challenge or investigation in respect of any Challenge by any person. If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, the Debtors' Stipulations, shall nonetheless remain binding and preclusive on the Committee, if any, and any parties in interest, including any trustee, except as to any such findings and admissions that were

74

expressly challenged in such adversary proceeding (it being understood that any non-challenging parties are bound).  Nothing in this Interim Order vests or confers on any person, including the Committee, if any, standing or authority to pursue any claims or cause of action belonging to the Debtors or their estates, including, without limitation, a Challenge in a Challenge proceeding.  For the avoidance of doubt and notwithstanding the foregoing, (i) the Debtors' stipulations, admissions, and releases contained in Paragraph E of this Interim Order will not be subject to a Challenge or the Challenge Period, and (ii) the DIP Secured Parties agree they will not file a Challenge and will not join in, fund, solicit, encourage or support any Challenge or request to extend the Challenge Period, *provided, however*, that, subject to entry of the Final Order, in the event of a successful Challenge by a party other than the DIP Secured Parties, any property that would otherwise constitute DIP Collateral pursuant to the terms hereof shall, in fact, become DIP Collateral, and the DIP Liens shall attach thereto in the same order and priority as set forth herein. In the event that there is a timely successful Challenge brought pursuant to this paragraph, the Court shall retain jurisdiction to fashion an appropriate remedy.  For the avoidance of doubt, the Challenge and Challenge Period shall not apply to any claims or causes of the Debtors with respect to the Insider Creditors.

(a)     Notwithstanding anything contained herein to the contrary, the Challenge Period in paragraph 42 above will be tolled for the Committee if it formally moves for an order of this Court conferring standing or authority (the "Standing Motion") prior to the Challenge Period, from the date the Committee so moves until five (5) business days from the date that the Standing Motion is granted or the date when the Standing Motion is denied pursuant to an Order of the Court; *provided*, that the Challenge Period: (a) will only be tolled if such Standing Motion attaches a proposed complaint identifying the specific Challenge(s) that the Committee

DOCS_LA:339202.2 68700/001

proposes to assert and the defendant(s) against whom such Challenge(s) are proposed to be asserted, and (b) will only be tolled with respect to such Challenge(s) and defendant(s) specifically identified therein.  Nothing herein shall limit the Committee's ability to (x) file a timely Standing Motion in respect of any timely Challenge for which it cannot obtain standing as a matter of law because the applicable Debtor is a limited liability company (an "LLC Challenge Motion"), and (y) seek pursuant to such LLC Challenge Motion a mechanism by which to prosecute such Challenge, provided that the Committee otherwise satisfies the requirements set forth in this paragraph 42(a).  In the event the Committee files a timely LLC Challenge Motion for which it cannot obtain standing, and provided that the Committee otherwise satisfies the requirements set forth in this paragraph 42(a), the expiration of the Challenge Deadline solely for the specific Challenge set forth in the LLC Challenge Motion, and solely as to the defendant(s) named therein, shall be tolled pending further order of the Court, and applicable parties shall meet and confer with respect to an appropriate process (if any) for the prosecution of any such Challenge.  If timely notified of a Challenge for which the Committee cannot gain standing because the applicable Debtor is a limited liability company, the Debtors (or a designated representative) shall, to the extent permitted by applicable law, retain the authority to prosecute such Challenge in the exercise of their business judgment and subject to any applicable further order of the Court.

(b)     Any Challenge, Standing Motion, or LLC Standing Motion commenced by the Committee (the "**Committee Action**") may be pursued by any chapter 7 trustee in these Cases (a "**Chapter 7 Trustee**"), appointed subsequent to the filing of the Committee Action, in the Trustee's sole and exclusive discretion.  The filing of a *Notice of Substitution of Trustee* for and in the stead of the Committee in the Committee Action, shall be automatically effective upon filing, without further Order of the Court, and the Chapter 7 Trustee shall be deemed

**Formatted**

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

76

automatically substituted for the Committee, which substitution shall be deemed retroactive to the date of the filing of the Committee Action.

Formatted

       (c)    Any successful Challenge could result in the disgorgement of any amounts realized by the Prepetition Secured Parties on a postpetition basis.

42.

Formatted: Heading 5, Indent: Left: 1"

43.    <u>Reservation of Rights</u>.  Except as expressly authorized in this Interim Order or as otherwise expressly accepted in writing by the Prepetition Secured Parties, the Prepetition Secured Parties' consent to this Interim DIP Order and any action, inaction, or acquiescence by the Prepetition Secured Parties in connection with this Interim DIP Order (collectively, "<u>Prepetition Secured Parties' Actions</u>"), whether preceding or after the date hereof, shall not be deemed to constitute, evidence or imply any consent, acquiescence, or agreement to, waiver, or any course of dealing or course of conduct (collectively, "<u>Consent</u>"), in connection with any future debtor-in-possession financing, any future use of Cash Collateral, any additional priming liens, or other actions, inactions, relief or requests by the Debtors or DIP Lenders in the future (collectively, "<u>Future Actions</u>"). The Prepetition Secured Parties reserve all rights to object to, challenge and contest any Future Action, and no Debtor, DIP Lender, or Prepetition Secured Party shall assert that any Prepetition Secured Parties' Action constitutes any Consent to any Future Action.

44.    <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

45.    <u>Final Hearing Date</u>. The Court will conduct the Final Hearing on August 2, 2021[TBD] at 3:30[TBD] p.m., prevailing Central Time.  Objections and responses to the Motion with respect to entry of the Final Order shall be filed and served according to the Local Bankruptcy Rules on or before July 29, 2021[TBD] at 10:00[TBD] am, prevailing Central Time.  The Debtors

DOCS_LA:339202.2 68700/001

shall promptly serve copies of this Interim Order and notice of the Final Hearing on (i) the Office of the United States Trustee for the Southern District of Texas, (ii) the Revolving Administrative Agent, (iii) the Term Administrative Agent, (iv) J. Aron, (v) the Project Collateral Agent, and (vi) those parties that have filed a notice of appearance requesting notice, which service shall constitute adequate and proper notice of the hearing.

46.     Effect of this Interim Order.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

47.     Retention of Jurisdiction.   This Court retains jurisdiction with respect to all matters arising from or related to the DIP Loan Documents and the implementation of this Interim Order.

48.     Compliance with Law.   Notwithstanding anything to the contrary in the Interim Order or the DIP Loan Documents, nothing in this Interim Order or the DIP Loan Documents shall relieve the Debtors of any obligations under federal, state or local police or regulatory laws or under 28 U.S.C. § 959(b), provided that nothing herein shall limit or impair the Debtors' rights to assert defenses under applicable law and nothing herein shall create new defenses to obligations under police or regulatory laws or 28 U.S.C. § 959(b) .

**RESERVATION OF RIGHTS OF TERMINAL ENTITIES**

49.     Adequate Protection:   Notwithstanding anything to the contrary in this Interim Order, to the extent any of the Terminal Entities[8] have a valid, perfected and unavoidable lien on any DIP Collateral (the "Terminal Liens"), such interest shall be entitled to adequate protection as follows (i) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition to the extent of any diminution in value of the Terminal Liens, if any  (the "Terminal Replacement Liens"); provided, that, for the avoidance of doubt, the Terminal Replacement Liens shall not attach to the IFF Property or any Unencumbered Assets or any proceeds thereof; and (ii) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or Successor Cases, with priority as provided therein, to the extent of any diminution in the collateral securing the Terminal Liens, if any (the "Terminal Superpriority Claim"), but shall not attach to or be payable from Unencumbered Assets or proceeds thereof.   Nothing in this Order shall be a finding or determination with respect to the extent, validity or priority of any liens or claims of the Terminal Entities, including, without limitation, any warehouseman's or other similar liens, setoff, recoupment, contract and other security rights, and all parties reserve their rights with respect to the forgoing.  The Terminal Entities' right to seek further or additional adequate protection is expressly reserved and preserved.

50.     Administrative Expense:  Within two (2) business days of the entry of this Interim Order, the Debtors shall make a cash payment of $150,000.00 to the Terminal Entities for

---

[8] "Terminal Entities" shall mean, collectively or individually, Limetree Bay Terminals, LLC, Limetree Bay Terminal Holdings, LLC, Limetree Bay Terminal Holdings II, LLC, and Limetree Bay Cayman, Ltd.

postpetition services provided by the Terminal Entities under the Terminal Services Agreements.[9] Commencing with the first Monday following the entry of this Interim Order and on each Monday thereafter for the period covered by the Approved Budget, the Debtors shall make a cash payment of $150,000.00 to the Terminal Entities for postpetition services provided by the Terminal Entities under the Terminal Services Agreements for a total payment over the period covered by this Interim Order in the amount of $450,000.  The Terminal Entities reserve all of their rights to assert an administrative expense claim for additional amounts owed under the Terminal Services Agreements for the period after the Petition Date, and the rights of the Debtors and all other parties in interest to contest the amount or validity of any such administrative expense are expressly reserved and fully preserved.  The Debtors shall use good faith efforts to include full payment of all postpetition amounts owed to the Terminal Entities under the Terminal Services Agreements in the Approved Budget in connection with the Final Order, subject to the Debtors rights as to the appropriate amount to be charged for services under the Terminal Services Agreements and without limiting the Debtors rights to seek to reject the Terminal Services Agreements.  All rights with respect to applicability of setoff rights are reserved.

51.     <u>Limitation on DIP Liens</u>:  For the avoidance of doubt, the DIP Collateral shall not include any property to the extent that it does not constitute property of the Debtors' estates within the scope of 11. U.S.C. § 541, and shall not include the Terminal Entities' interest in any property that is jointly owned by the Debtors (or any of them) and Terminal Entities (or any of them) and no liens granted pursuant to this Order shall attach to the Terminal Entities' interest in any property jointly owned with the Debtors.

---

[9] "Terminal Services Agreement" shall mean, collectively, the Terminal Services Agreement (Included Locations) among Limetree Bay Terminals, LLC, Limetree Bay Refining Marketing, LLC and J. Aron dated March 3, 2020 and the Terminal Services Agreement (Non-Included Locations) between Limetree Bay Terminals, LLC and Limetree Bay Refining Marketing, LLC dated March 3, 2020.

80

DOCS_LA:339202.2 68700/001

52.     Reservation of Rights:  Notwithstanding anything in paragraph 42 of this Order, the stipulations, waivers and releases contained in sections F, G, and I of this Interim Order with respect to the Prepetition Secured Parties shall not be binding on the Terminal Entities.  All rights of the Terminal Entities and the Prepetition Secured Parties with respect to entry of the Final Order are expressly reserved and preserved and nothing in this Order shall limit the rights of the Terminal Entities to object to entry of the Final Order for any reason.

52.

**Formatted:** Indent: Left:  0.5",  No bullets or numbering

**Signed on July __, 2021.**

_____

**David R. Jones**
**UNITED STATES BANKRUPTCY JUDGE**

81

**Exhibit A**

**DIP Credit Agreement**

**<u>Exhibit B</u>**

**Approved Budget**