IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| LIMETREE BAY SERVICES, LLC, *et al.*,[1] | § § § | Case No. 21-32351 (DRJ) |
| Debtors. | § § § | (Jointly Administered) |

**OMNIBUS OBJECTION OF LIMETREE BAY TERMINALS, LLC TO
DEBTORS' MOTIONS TO REJECT THE TERMINAL SERVICES AGREEMENTS**
[Relates to Docket Nos. 199 & 200]

Limetree Bay Terminals, LLC ("**LBT**")[2] submits this omnibus objection (the "**Objection**") to the *Debtors' Motion to Reject Executory Contract Nunc Pro Tunc* (the "**Included TSA Rejection Motion**") [Docket No. 199] and the *Debtors' Motion to Reject Executory Contract Nunc Pro Tunc* (the "**Non-Included TSA Rejection Motion**" and together with the Included TSA Rejection Motion, the "**Rejection Motions**")[3] [Docket No. 200], and respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      LBT objects to rejection of the TSAs (defined below) *nunc pro tunc* to the Petition Date and the entry of any orders that would improperly prejudice its rights in these Chapter 11 Cases. Retroactive relief is not appropriate for either TSA because the Debtors are continuing to make use of LBT's property and services and continue to receive significant benefits from doing so. The storage capacity and related services provided by LBT under the Included TSA (defined

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2]   LBT, together with Limetree Bay Terminals Holdings, LLC, Limetree Bay Terminals Holdings II, LLC, Limetree Bay Cayman, Ltd., and Limetree Bay Financing, LLC are collectively referred to as the "Terminal Entities."

[3]   Capitalized terms used but defined herein have the meanings given to them in the Rejection Motions.

below) will allow the Debtors' estates to realize, by the Debtors' own estimation in their approved budgets, the return of approximately $38 million from J. Aron & Company, LLC ("**J. Aron**").[4] Through the liquidation of the J. Aron Product (defined below), the Debtors will be entitled to certain refunds of margin funds, lien releases, and potentially additional proceeds pursuant to various agreements between J. Aron and the Debtors (the "**J. Aron Transaction Documents**").[5]

2.  Similarly, under the Non-Included TSA (defined below), LBT stores propane and butane belonging to the Debtors that can be used for on-site power generation or sold. LBT, meanwhile, is being prevented from re-leasing the tanks leased by the Debtors until the Debtors remove all product and then surrender possession of them. In these circumstances, approving rejection of the TSAs *nunc pro tunc* to the Petition Date would inflict substantial harm on LBT while resulting in a windfall for the Debtors. As a result, the Debtors have failed to establish the "exceptional circumstances" required to justify rejection *nunc pro tunc* to the Petition Date. To the contrary, such relief would be inequitable under these circumstances.

3.  LBT further objects to the entry of any orders that would prejudice its rights under the TSAs and the Bankruptcy Code. Any orders granting the Rejection Motions should be without prejudice to the rights of LBT to seek allowance and payment of its administrative expense claims or to pursue any other remedies it may have under the Bankruptcy Code, the TSAs, and applicable law.

4.  Finally, the Debtors' request to reject the TSAs should only be granted upon the Debtors establishing a sufficient evidentiary record supporting such decision at a hearing on the

---

[4] According to the current DIP budget, these are the same funds that appear intended to be used to repay the Debtors' DIP financing, and form the base of collateral on which the DIP loans were made.

[5] Details regarding the Debtors' business relationship with J. Aron and the J. Aron Transaction Documents are set forth in the *Declaration of Mark Shapiro in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 8].

Rejection Motions. While the Rejection Motions make conclusory statements that could potentially support the Debtors' business decision to reject the TSAs, many of the statements concerning the Debtors' use of LBT's storage facilities and the perceived lack of benefits from the TSAs are either misleading or wrong, as set forth in greater detail below. As a result, there is an insufficient evidentiary record for the Court to make an appropriate decision at this stage.

## BACKGROUND

5. The Debtors own and operate a refinery (the "**Refinery**"). The Terminal Entities own and operate a petroleum product storage terminal (the "**Terminal**"). Historically, the Refinery has used the Terminal to store crude oil and other feedstock used in the refining process as well as refined petroleum products produced by the Refinery. The Refinery was the Terminal's largest customer until it shut down in May of this year and subsequently commenced these Chapter 11 Cases.

6. The Terminal and the Refinery previously were under common ownership and control of Limetree Bay Energy, LLC. However, the board of managers for the Terminal Entities was reconstituted on August 2, 2021 in connection with the financing agreement between the Terminal Entities and certain entities associated with AMP Capital Investors Ltd. (collectively "**AMP Capital**").

7. The board of managers for Limetree Bay Terminals Holdings II, LLC ("**LBT Holdings II**") now consists of: 2 managers appointed by AMP Capital; 1 independent manager selected by AMP Capital; 1 manager appointed by Limetree Bay Terminals Holdings, LLC (a wholly-owned indirect subsidiary of Limetree Bay Energy, LLC), and 1 non-voting observer appointed by the lenders under LBT's secured first lien term loan facility. The other Terminal Entities are managed by the board of managers of LBT Holdings II, except that Limetree Bay

3

Cayman, Ltd. is managed by 2 directors appointed by AMP Capital (but remains subject to the management of the board of managers of LBT Holdings II).

8.  LBT provides services to the Debtors under 2 terminal services agreements. The first, the Terminal Services Agreement, dated as of March 3, 2020, by and among LBT, debtor Limetree Bay Refining Marketing, LLC ("**LBRM**"), and J. Aron and referred to as the Terminal Services Agreement (Included Locations) (the "**Included TSA**"), covers storage and transfer of petroleum products owned by J. Aron.[6] Under the terms of the Included TSA, LBT stores certain petroleum products that are subject to the J. Aron Transaction Documents with respect to which J. Aron has title (the "**J. Aron Product**") and is currently assisting in the liquidation of the J. Aron Product.[7] The second, the Terminal Services Agreement, dated as of March 3, 2020, by and among LBT and LBRM and referred to as the Terminal Services Agreement (Non-Included Locations) (the "**Non-Included TSA**"[8] and together with the Included TSA, the "**TSAs**"), covers storage and transfer of petroleum products that are owned by the Debtors (the "**Debtor Product**" and together with the J. Aron Product, the "**Product**").

9.  Under the TSAs, the Debtors lease specific tanks in the Terminal to store the Product. The Debtors are responsible for the monthly storage fees for all storage capacity under both TSAs. Under the terms of the Included TSA, the Debtors and J. Aron are entitled to the exclusive use and occupancy of 37 tanks for the storage of the J. Aron Product. Under the Non-Included TSA, the Debtors are entitled to the exclusive use and occupancy of 10 tanks for the storage of the Debtor Product. Pursuant to the TSAs, LBT cannot offer the use of any of the

---

[6] A copy of the Included TSA was filed under seal at Docket No. 326-1 and is incorporated herein by reference.

[7] For the avoidance of doubt, the Terminal Entities do not, by this Objection, dispute J. Aron's rights with respect to the petroleum products subject to the TSAs or seek to alter J. Aron's rights under the TSAs.

[8] A copy of the Non-Included TSA was filed under seal at Docket No. 326-2 and is incorporated herein by reference.

reserved but unused tanks to other customers or co-mingle other customers' products with the J. Aron Product or the Debtor Product. On the Petition Date, 33 tanks were in use for the storage of the J. Aron Product under the Included TSA and 9 tanks were in use for storage of the Debtor Product under the Non-Included TSA. As of the date of this Objection, 31 tanks are currently in use storing approximately 2,999,630 barrels of the J. Aron Product under the Included TSA, and 9 tanks remain in use storing approximately 23,273 barrels of the Debtor Product under the Non-Included TSA.

10. Contrary to what the Debtors represented in the Debtor Response, the TSAs do provide for monthly storage fees at set rates.[9] Each month, the Debtors incur approximately $5.5 million in tank storage costs plus additional fees as provided under the TSAs.[10] In addition, the TSAs also require the Debtors to pay costs necessary to clean the tanks and remove any basic sediment and water ("**BS&W**") remaining in the tanks after the Debtors vacate them.[11] Historically, LBT invoices the Debtors monthly for upcoming storage fees and other fees incurred in the prior month. LBT typically submits these invoices to the Debtors on the first day of the month, and the invoices have net 20-day payment terms.[12] As of the date of this Objection, the Debtors owe not less than $7,826,641.61 in unpaid storage fees for the period from the Petition Date through the end of July 2021 and for the month of August 2021 under the TSAs.[13]

---

[9] *Compare* TSAs § 7.1(a) *with Debtors' Response to Objection and Reservation of Rights of Terminal Entities to Debtors'* <u>Emergency</u> *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with* Superpriority *Administrative Expense Status, (IV) Approving Adequate Protection to Pre-Petition Secured Creditors, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing and Joinder of Terminal Lenders' Joinder Therein* (the "**Debtor Response**") [Docket No. 316] ¶ 8.

[10] These additional fees include fees charged for moving the Products through the Terminal, loading and unloading the Products on tanker ships, and other related services. *See* TSAs §§ 7, 8, 9, & 12.

[11] TSAs § 9.

[12] TSAs § 23.1.

[13] Copies of the July 2021 invoices evidencing these amounts were filed under seal at Docket No. 326-5 and are incorporated by reference herein. Copies of the August 2021 invoices will likely be filed under seal in advance

The Debtors also owe LBT approximately $14 million on account of storage costs and related services under the TSAs provided prior to the Petition Date.

11. Prior to the Petition Date, J. Aron delivered a "Trigger Event Notice" under the Included TSA.[14] As a result of that notice and the shutdown of the Refinery, J. Aron is currently liquidating the J. Aron Product.[15] Upon completion of this liquidation process, the Debtors stand to receive, at minimum, "a refund of certain posted margin funds and a release of a lien on the catalyst."[16] Upon information and belief, depending on the amount of proceeds realized from the sale of the J. Aron Product, the Debtors also may be entitled to receive additional payments from J. Aron pursuant to the J. Aron Transaction Documents. The Debtors' own budget estimates that the amount of funds expected to be received or returned from J. Aron will total approximately $38 million. It is only through LBT's continued postpetition provision of storage capacity and services under the Included TSA that the Debtors will be able to realize this substantial additional value.

12. In addition to the storage capacity and services provided under the Included TSA, LBT also provides valuable services to the Debtors under the Non-Included TSA. The Debtors are currently using 9 tanks under the Non-Included TSA to store a significant quantity of

---

of any hearing on the Rejection Motions. This amount takes into account all postpetition payments made by LBR as of the date of this Objection.

[14] *J. Aron & Company LLC's Response and Reservation of Rights With Respect to (A) Objection And Reservation of Rights Filed by Terminal Entities and (B) Joinder Filed by Terminal Lenders to the Debtors' <u>Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing The Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Approving Adequate Protection to Pre-Petition Secured Creditors, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing</u>* ¶ 10. Under the terms of the Included TSA, upon delivery of the Trigger Event Notice, J. Aron becomes responsible for certain costs under the Included TSA, but the Debtors remain liable for all storage costs under section 7.1(a) of the Included TSA. Included TSA § 7.5.

[15] Debtor Response ¶ 9.

[16] *Id.* ¶ 9, n. 6.

the Debtor Product. On information and belief, the Debtors intend to use the Debtor Product for on-site power generation. Such power generation will allow the Debtors to continue their efforts to remove the hydrocarbons from the Refinery, prepare the Refinery to be sold, and otherwise maintain their estates. If the Debtors elect not to use the Debtor Product for power generation, it remains an asset of their estates that may be sold to recover additional funds. Regardless of how the Debtors choose to use the Debtor Product, LBT's storage services provides a benefit to the Debtors' estates. Absent such services, the Debtors will not be able to realize any value from the Debtor Product.

13. On July 27, 2021, fifteen days after the Petition Date, the Debtors filed the Rejection Motions seeking rejection of both TSAs *nunc pro tunc* to the Petition Date despite LBT continuing to hold and store, as of the date of this Objection, over 3 million barrels of the Product.

### OBJECTION

14. "It is well established that 'the question [of] whether a lease should be rejected . . . is one of business judgment.'" *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *see also In re Tex. Health Enters.*, 72 F. App'x. 122 (5th Cir. 2003) (applying the same standard from *Richmond Leasing*). The Debtors seek rejection of the TSAs, *nunc pro tunc* to the Petition Date based on conclusory statements that the Debtors are not using the storage facilities and are not receiving a benefit under the TSAs. Both positions are factually incorrect. Approximately 2,999,630 barrels of the J. Aron Product remain in 31 tanks under the Included TSA. As noted above, upon the liquidation of the J. Aron Product stored under the Included TSA, the Debtors estimate they will receive approximately $38 million. The Debtors will also receive the benefit of the release of certain priority liens held by J. Aron on various assets as well as potentially the proceeds from the sale of the J. Aron Product after J. Aron is paid in full.


15. In addition, approximately 23,273 barrels of the Debtor Product remain in storage in 9 tanks under the Non-Included TSA. As noted above, the Debtor Product may be used for on-site power generation, or sold to generate funds for the Debtors' estates. In light of the ongoing use of the tanks under the Non-Included TSA, it is unjustified and inequitable to authorize the rejection of the Non-Included TSA *nunc pro tunc* to the Petition Date. These facts are not even discussed in the Rejection Motions, and appear to significantly undercut the purported business justifications for the immediate rejection of the TSAs *nunc pro tunc* to the Petition Date.

### I. *Nunc Pro Tunc* Relief Is Not Appropriate

16. Rejection of the TSAs *nunc pro tunc* to the Petition Date is not appropriate in this case. Under the Bankruptcy Code, the general rule is that rejection of an unexpired lease "becomes legally effective only after judicial approval has been obtained."[17] And while nothing precludes a court from granting retroactive relief "based on the equities of the case,"[18] deviating from the general rule requires "exceptional circumstances."[19]

17. The Debtors have failed to establish any legal or factual justifications and certainly have not demonstrated exceptional circumstances. To the contrary, retroactive rejection of the TSAs would inflict substantial harm on LBT while resulting in a windfall for the Debtors. Courts typically grant retroactive rejection of a lease where the debtor has already vacated the property or is not otherwise making use of it. *See, e.g.*, *Pacific Shores Dev., LLC v. At Home Corp. (In re At*

---

[17] *Thinking Machines Corp. v. Mellon Financial Services Corp. # 1 (In re Thinking Machines Corp.)*, 67 F.3d 1021, 1028 (1st Cir. 1995); *In re Romacorp, Inc.*, Case No. 05-86818-BJH-11, 2006 WL 6544088, at *3 (Bankr. N.D. Tex. Feb. 2, 2006) ("This Court follows the rule that rejection of an unexpired lease is generally effective as of the date of the entry of an order of the court approving such rejection."); *In re Cafeteria Operators, L.P.*, 299 B.R. 384, 394 (Bankr. N.D. Tex. 2003) ("The general rule in this Circuit is that the effective date of a rejection is the date of the entry of the bankruptcy court's order approving lease rejection.").

[18] *In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996).

[19] *In re O'Neil Theatres, Inc.*, 257 B.R. 806, 808 (Bankr. E.D. La. 2000) ("[I]n most cases a lease will be considered rejected as of the date of entry of the order approving the rejection, and only in exceptional circumstances ... will the court adopt a retroactive date.").

*Home Corp.)*, 392 F.3d 1064, 1074 (9th Cir. 2004) (affirming order approving retroactive rejection where debtor never occupied property); *Stonebrair Mall Ltd. P'ship v. CCI Wireless, LLC (In re CCI Wireless, LLC)*, 297 B.R. 133, 140 (D. Colo. 2003) (affirming order approving retroactive rejection where debtor was not in possession of property); *Cafeteria Operators*, 299 B.R. at 394 (granting retroactive rejection to earlier of date debtor filed motion or vacated the property); *O'Neil Theatres*, 257 B.R. at 808 (approving retroactive rejection where landlord regained possession prior to petition date); *Amber's Stores*, 193 B.R. at 827 (granting retroactive rejection where debtor vacated prepetition and filed motion to reject "as soon as possible").

18.     However, in cases where the debtor has not yet vacated the property, retroactive rejection is generally not appropriate. *See, e.g.*, *Romancorp*, 2006 WL 6544088 at *5 (denying retroactive rejection where debtor left personal property on premises and landlord could not re-let); *In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004) (denying retroactive rejection where debtor had not surrendered possession).

19.     Here, retroactive relief is not appropriate because, as set forth above, the Debtors continue to use LBT's tanks to store the Product. LBT cannot enter into new leases for those tanks so long as the Product remains in the tanks and the Debtors continue to have access to the entire contractual leased capacity.

20.     Further, contrary to the Debtors' assertions, the Debtors' estates are receiving significant benefits from the use of LBT's tanks. The Debtors expect to receive substantial value from the liquidation of the J. Aron Product. As set forth in the Debtors' budget, the Debtors currently project they we will receive approximately $38 million as a result of J. Aron's liquidation process. This estimated $38 million, along with the release of liens J. Aron has on certain of the Debtors assets and the potential for additional proceeds from the sale of the J. Aron Product after

J. Aron is paid in full, or any other funds from J. Aron, can only be realized due to the benefit LBT provides to the Debtors' estates by storing the J. Aron Product and assisting in the liquidation of that product under the Included TSA. The Debtors also receive a benefit from the storage of the Debtor Product, either through having fuel available for on-site power generation or through the eventual sale of the Debtor Product.

21. As a result, any order approving rejection of the TSAs should be effective on the later of (a) the date such order is entered or (b) the date the Product (and any BS&W) is completely removed from the tanks.

## II. Rejection of the TSAs Should Be Without Prejudice to LBT's Rights under the TSAs and the Bankruptcy Code

22. Any orders approving rejection of the TSAs should be without prejudice to LBT's rights under the TSAs and the Bankruptcy Code. This includes LBT's rights to seek payment of administrative expenses, assert claims for rejection damages, and seek payment from J. Aron for any amounts owed under the Included TSA. LBT also cannot be compelled to provide postpetition services to the Debtors without compensation for those postpetition services.

23. Even after a contract has been rejected, the counterparty may be entitled to an administrative expense for services provided post-rejection.[20] This includes both the amounts due under the terms of the tank leases with the Debtors and all other amounts owed to LBT for postpetition services. No orders entered in connection with the Rejection Motions should preclude LBT from seeking full payment of all amounts it is entitled to under the Bankruptcy Code.

24. Any order entered granting the Rejection Motions also should acknowledge that LBT retains its rights under the TSAs. Rejection of an agreement in bankruptcy constitutes a

---

[20] *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.)*, 931 F.3d 432, 442 n.2 (5th Cir. 2019).

EMF_US 86209038

breach of the agreement, not a termination or rescission of the agreement.[21] As a result, "post-rejection, a counterparty retains those contract rights that would survive a breach under applicable non-bankruptcy law."[22]

### CONCLUSION

25. Rejection of the TSAs should only be approved if the Debtors can establish a sufficient evidentiary record demonstrating their business judgment to do so, and any order approving rejection should (a) not allow rejection *nunc pro tunc* to the Petition Date, (b) not approve a rejection date any earlier than the date that the Debtors' surrender use of the tanks, or (c) prejudice the rights of LBT to seek allowance and payment of its administrative expense claims or to pursue any other remedies it may have under the Bankruptcy Code, both TSAs, and applicable law.

Dated: August 17, 2021
       Houston, Texas

Respectfully Submitted,

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II (TX Bar No. 24012503)
Joseph P. Rovira (TX Bar No. 24066008)
Ashley Harper (TX Bar No. 24065272)
Philip M. Guffy (TX Bar No. 24113705)
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, Texas 77002
Tel:   713-220-4200
Fax:   713-220-4285
Email: taddavidson@HuntonAK.com
       josephrovira@HuntonAK.com
       ashleyharper@HuntonAK.com
       pguffy@HuntonAK.com

*Counsel for Limetree Bay Terminals, LLC, Limetree Bay Terminals Holdings, LLC, Limetree Bay Terminals Holdings II, LLC, Limetree Bay Cayman, Ltd., and Limetree Bay Financing, LLC*

---

[21] *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019).

[22] *In re Sanchez Energy Corp.*, No. 19-34508, 2021 WL 1822708, at *8 (Bankr. S.D. Tex. May 6, 2021).

EMF_US 86209038

**CERTIFICATE OF SERVICE**

      I certify that on August 17, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                             */s/ Timothy A. ("Tad") Davidson II*
                                             Timothy A. ("Tad") Davidson II

EMF_US 86209038