**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| LIMETREE BAY SERVICES, LLC, *et al.*,[1] | § § § | Case No. 21-32351 (DRJ) |
| Debtors. | § § § | (Jointly Administered) |

**THE TERMINAL ENTITIES' MOTION TO
ALLOW AND COMPEL PAYMENT OF ADMINISTRATIVE EXPENSES**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The Terminal Entities[2] submit this motion (the "**Motion**") seeking entry of an order, substantially in the form attached hereto (the "**Order**"), to allow an administrative expense claim and compel payment in the amount not less than $7,826,641.61 by the above-captioned debtors and debtors in possession (the "**Debtors**") on account of postpetition storage services provided by LBT under the TSAs (as defined below), and respectfully state as follows:

**PRELIMINARY STATEMENT**

1. LBT has, from the beginning of these cases, provided valuable and necessary storage capacity and related services to the Debtors. However, the Debtors have so far refused to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2] The Terminal Entities are: Limetree Bay Terminals, LLC ("**LBT**"), Limetree Bay Terminals Holdings, LLC, Limetree Bay Terminals Holdings II, LLC, Limetree Bay Cayman, Ltd. and Limetree Bay Financing, LLC.

EMF_US 86167635

pay LBT the full amounts LBT is owed for the storage capacity and services it provides. The budgets approved in these cases have provided a paltry $150,000 per week to LBT, a mere fraction of the value LBT is providing. The Debtors have even suggested that LBT's storage capacity and services provide no benefit to their estates at all. This could not be further from the truth. LBT has provided, and is continuing to provide, valuable services to the Debtors that, by the Debtors' own estimations, will result in the recovery of tens of millions of dollars in value for the Debtors' estates and their stakeholders.

2. Specifically, pursuant to two terminal services agreements (detailed below), LBT provides storage for petroleum products produced and used by the Debtors. LBT's facilities also include an extensive pipeline network, docks, and an offshore single-point mooring buoy that allow these petroleum products to be moved, sold, and transported to customers for the Debtors' benefit. Without the storage capacity and services provided by LBT, the Debtors would not be able to store and receive the benefit of the sale of these products.

3. Indeed, the financing of the Debtors' chapter 11 cases is currently premised on receiving, per the Debtors' approved budgets, an estimated $38 million from J. Aron & Company LLC ("**J. Aron**") upon payment in full of amounts owed to J. Aron pursuant to the various agreements between J. Aron and the Debtors (the "**J. Aron Transaction Documents**").[3] The J. Aron Transaction Documents provide for a complex and interrelated series of transactions among the Debtors, J. Aron, and certain third parties, including the purchase and sale of certain petroleum products, extensions of credit and the grant of liens over the Debtors' property. Under the terms of the Included TSA (defined below), LBT stores certain petroleum products belonging

---

[3] Details regarding the Debtors' business relationship with J. Aron and the J. Aron Transaction Documents are set forth in the *Declaration of Mark Shapiro in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 8].

to J. Aron on behalf of the Debtors (the "**J. Aron Product**") and is currently assisting in the liquidation of the J. Aron Product. The estimated $38 million, the release of liens, or any other funds from J. Aron can only be realized by completing this liquidation process, and the liquidation process cannot be completed without the storage capacity and services provided by LBT. As a result, any value realized by the Debtors from this process will be directly due to the services provided by LBT.

4. In addition to the storage capacity and services provided under the Included TSA, LBT also stores petroleum products belonging to the Debtors, including propane and butane (the "**Debtor Product**" and together with the J. Aron Product, the "**Product**"). Upon information and belief, the Debtors plan to use the Debtor Product for on-site power generation. The Debtors could also sell the Debtor Product to realize additional funds for their estates. Regardless of how the Debtors choose to use the Debtor Product, it remains an asset of their estates, the value of which the Debtors will only be able to realize with LBT's storage capacity and services.

5. There can be no credible dispute that the storage capacity and services provided by LBT described above provide a benefit to the Debtors' estates. The law requires that LBT be compensated for the services provided by LBT.

## JURISDICTION AND VENUE

6. The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory bases for the relief requested herein are sections 105(a), 503(b), and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 9013 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 9013-1 of the Bankruptcy Local

Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the Procedures for Complex Cases in the Southern District of Texas.

## BACKGROUND

**I.    Procedural Background**

8.     On July 12, 2021 (the "**Petition Date**"), the above captioned debtors and debtors-in-possession (the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

9.     Also on July 12, 2021, the Debtors filed the DIP Motion, and on July 13, 2021, the Court held a hearing (the "**Interim Hearing**") to consider entry of an order granting the relief requested in the DIP Motion on an interim basis.  After the Interim Hearing, the Debtors uploaded a revised form of proposed interim order consistent with the Court's ruling on the record at the Hearing [Docket No. 97], and the Court entered an order (the "**Interim DIP Order**")[4] [Docket No. 104] granting the DIP Motion on an interim basis and scheduling a further hearing on August 2, 2021 at 3:30 p.m. (CT).

10.    On July 31, 2021, the Terminal Entities filed an objection and reservation of rights (the "**Objection**") [Docket No. 252] to the DIP Motion.

11.    At the August 2 hearing, the Court entered a second interim order (the "**Second Interim DIP Order**") [Docket No. 271] extending the terms of the Interim DIP Order through August 8, 2021 and scheduling a further hearing on August 6, 2021 at 10:30 a.m.  That hearing was subsequently continued to August 11, 2021 at 2:00 p.m.

---

[4]   Capitalized terms used but not defined herein have the meanings given to them in the Interim DIP Order.

4

12.     On August 5, 2021, J. Aron filed a response to the Objection (the "**J. Aron Response**") [Docket No. 315].[5] Also on August 5, 2021, the Debtors filed their response to the Objection (the "**Debtor Response**") [Docket No. 316].

13.     On August 11, 2021, the Court entered a third interim order (the "**Third Interim DIP Order**" and together with the Interim DIP Order and the Second Interim DIP Order, the "**Interim DIP Orders**") extending the terms of the Interim DIP Order through August 29, 2021 and scheduling a final hearing on the DIP Motion on August 31, 2021 at 9:30 a.m.[6]

## II.    The Limetree Bay Facility and the Shared Services Systems Agreement

14.     The Debtors own and operate a refinery (the "**Refinery**"). The Terminal Entities own and operate an adjacent petroleum product storage facility and associated docking facilities (the "**Terminal**"). The Terminal is comprised of 103 storage tanks under lease or available for lease with capacity for more than 30 million barrels of petroleum products, including crude oil, fuel oil, gasoline, and jet fuel. The storage tanks are served by an extensive pipeline network to facilitate product movement throughout the facility as well as component blending options. The Terminal also includes extensive docking facilities with 11 inland docks and an offshore single-point mooring buoy for the loading and unloading of petroleum products and related materials.

15.     The Terminal and the Refinery previously were under common ownership and control of Limetree Bay Energy, LLC. However, the board of managers for the Terminal Entities was reconstituted on August 2, 2021 in connection with the financing agreement between the Terminal Entities and certain entities associated with AMP Capital Investors Ltd. (collectively "**AMP Capital**").

---

[5]    An unredacted version of the J. Aron Response was subsequently filed at Docket No. 320.

[6]    This hearing was subsequently rescheduled to August 27, 2021 at 10:00 a.m. *See Notice of Rescheduled Hearing* [Docket No. 412].

16. The board of managers for Limetree Bay Terminals Holdings II, LLC ("**LBT Holdings II**") now consists of: 2 managers appointed by AMP Capital; 1 independent manager selected by AMP Capital; 1 manager appointed by Limetree Bay Terminals Holdings, LLC (a wholly-owned indirect subsidiary of Limetree Bay Energy, LLC), and 1 non-voting observer appointed by the lenders under LBT's secured first lien term loan facility. The other Terminal Entities are managed by the board of managers of LBT Holdings II, except that Limetree Bay Cayman, Ltd. is managed by 2 directors appointed by AMP Capital (but remains subject to the management of the board of managers of LBT Holdings II).

17. The Terminal and Refinery are located on a 2000-acre site on the southern coast of St. Croix (the "**Limetree Bay Site**"). In addition to the Refinery and the Terminal, the Limetree Bay Site also includes certain associated facilities that are used by both the Refinery and the Terminal, including power generation, wastewater treatment, lab facilities, administration buildings, and employee housing (the "**Shared Facilities**"). To manage and operate the Shared Facilities, certain of the Debtors and LBT entered into that certain Shared Services Systems Agreement dated as of November 30, 2018 (the "**Shared Services Systems Agreement**").[7]

18. Under the terms of the Shared Services Systems Agreement, LBT conveyed an undivided ownership interest to Debtor Limetree Bay Refining, LLC ("**LBR**") in the Shared Facilities it owned, and LBR conveyed an undivided ownership interest to LBT in the Shared Facilities it owned. As a result of these conveyances, LBT and LBR jointly own the Shared Facilities as tenants in common in the percentages set forth in more detail in the Shared Services Systems Agreement. The Shared Services Systems Agreement also provides for the costs of the

---

[7] A copy of the Shared Services Systems Agreement was filed under seal at Docket No. 326-4 and is incorporated herein by reference.

Shared Facilities to be allocated among certain of the Debtors and LBT based on usage by the respective parties or according to certain formulas, as set forth in the Shared Services Systems Agreement.

19. In addition to the Shared Facilities, the Shared Services Systems Agreement also provides for employees of LBR to provide services to the LBT and vice versa (the "**Shared Employees**"). The entity receiving services from a Shared Employee is required to reimburse the entity that employs the Shared Employee for such services under the terms of the Shared Services Systems Agreement.

20. The Terminal Entities will continue to engage with the Debtors on the Shared Facilities, the Shared Employees, and the other terms of the Shared Services Systems Agreement.[8] And while, as of the date of this Motion, the Terminal Entities are still hopeful that constructive engagement with the Debtors on these issues is possible, analysis of a proper delineation of the various costs to properly allocate between the Debtors under the Shared Services Systems Agreement is still ongoing. Because of the current lack of sufficient information, this Motion does not address amounts that might be owed by the Debtors to the Terminal Entities under the Shared Services Systems Agreement. However, the Terminal Entities expressly reserve their rights to supplement this Motion or file a separate motion seeking the allowance of administrative priority claims and payment of amounts that may be owed under the Shared Services Systems Agreement, or to file a motion to compel the production of the requisite information.

---

[8] In addition to the Shared Facilities and Shared Employees, the Shared Services Systems Agreement governs the terms and allocations of other jointly conducted business activities, including applying for and renewing certain governmental licenses, permits, and other authorizations required to operate the Shared Facilities.

EMF_US 86167635

### III.   The Terminal Services Agreements

21.  The Debtors and LBT are party to two separate terminal services agreements. The first, the Terminal Services Agreement, dated as of March 3, 2020, by and among LBT, debtor Limetree Bay Refining Marketing, LLC ("**LBRM**"), and J. Aron and referred to as the Terminal Services Agreement (Included Locations) (the "**Included TSA**"), covers storage and transfer of the J. Aron Product.[9]  The second, the Terminal Services Agreement, dated as of March 3, 2020, by and among LBT and LBRM and referred to as the Terminal Services Agreement (Non-Included Locations) (the "**Non-Included TSA**"[10] and together with the Included TSA, the "**TSAs**"), covers storage and transfer of the Debtor Product.[11]

22.  Under the TSAs, the Debtors lease specific tanks in the Terminal to store the Product. The Debtors are responsible for the monthly storage fees for all storage capacity under both TSAs. Under the terms of the Included TSA, the Debtors and J. Aron are entitled to the exclusive use and occupancy of 37 tanks for the storage of the J. Aron Product. Under the Non-Included TSA, the Debtors are entitled to the exclusive use and occupancy of 10 tanks for the storage of the Debtor Product. Pursuant to the TSAs, LBT cannot offer the use of any of the reserved but unused tanks to other customers or co-mingle other customers' products with the J. Aron Product and the Debtor Product.

23.  On the Petition Date, 33 tanks were reserved for storage of the J. Aron Product under the Included TSA, and 9 tanks were reserved for storage of the Debtor Product under the Non-Included TSA. As of the date of this Motion, 31 tanks remain reserved for the Debtors'

---

[9]  A copy of the Included TSA was filed under seal at Docket No. 326-1 and is incorporated herein by reference.

[10] A copy of the Non-Included TSA was filed under seal at Docket No. 326-2 and is incorporated herein by reference.

[11] For the avoidance of doubt, the Terminal Entities do not, by this Motion, dispute J. Aron's rights with respect to the petroleum products subject to the TSAs or seek to alter J. Aron's rights under the TSAs.

exclusive use under the Included TSA, and 21 of those tanks are currently occupied storing approximately 2,999,630 barrels of the J. Aron Product.[12] As of the date of this Motion, 9 tanks remain reserved for the Debtors' exclusive use under the Non-Included TSA, and 5 of those tanks are currently occupied storing approximately 23,273 barrels of the Debtor Product. LBT is currently storing 14 different types of petroleum products on behalf of the Debtors, some of which are of different grades and specifications, and these products must be stored in segregated tanks.

24. Contrary to what the Debtors represented in the Debtor Response, the TSAs do provide for monthly storage fees at set rates.[13] Each month, the Debtors incur approximately $5.5 million in tank storage costs plus additional fees as provided under the TSAs.[14] In addition, the Debtors are also required to pay costs required to clean the tanks and remove any basic sediment and water ("**BS&W**") remaining in the tanks after the Debtors vacate them.[15] Historically, LBT invoices the Debtors monthly for upcoming storage fees and other fees incurred in the prior month. LBT typically submits these invoices to the Debtors on the first day of the month, and the invoices have net 20-day payment terms.[16] As of the date of this motion, the Debtors owe $7,826,641.61 in unpaid storage fees for the period from the Petition Date through the end of July 2021 and for the month of August 2021 under the TSAs.[17] LBT reserves the right

---

[12] As noted above, J. Aron is in the process of liquidating the J. Aron Product. As a result, the quantity of the J. Aron Product stored at the Terminal is decreasing as the liquidation process proceeds.

[13] *Compare* TSAs § 7.1(a) *with* Debtor Response ¶ 8.

[14] These additional fees include fees charged for moving the Product through the Terminal, loading and unloading the Product on tanker ships, and other related services. *See* TSAs §§ 7, 8, 9, & 12. By this Motion, LBT is not seeking payment of any such fees from the Debtors, but reserves its right to supplement this Motion or file an additional motion to seek payment of such fees.

[15] TSAs § 9.

[16] TSAs § 23.1.

[17] Copies of the July 2021 invoices evidencing these amounts were filed under seal at Docket No. 326-5 and are incorporated by reference herein. Copies of the August 2021 invoices will likely be filed under seal in advance of any hearing on this Motion. This amount reflects all postpetition payments made by LBR under the terms of the Interim DIP Order as of the date of this Motion.

to seek payment of the storage fees that will accrue on September 1, 2021. Although not the subject of this Motion, the Debtors also owe LBT approximately $14 million on account of storage costs and related services under the TSAs provided prior to the Petition Date.

25. Prior to the Petition Date, J. Aron delivered a "Trigger Event Notice" under the Included TSA.[18] As a result of that notice and the shutdown of the Refinery, J. Aron is currently liquidating the J. Aron Product.[19] Upon completion of this liquidation process, the Debtors stand to receive, at minimum, "a refund of certain posted margin funds and a release of a lien on the catalyst."[20] Upon information and belief, depending on the amount of proceeds realized from the sale of the J. Aron Product, the Debtors also may be entitled to receive additional payments from J. Aron pursuant to the J. Aron Transaction Documents. The Debtors' own budget estimates that the amount of funds to be received or returned from J. Aron will total approximately $38 million.[21] It is only through LBT's continued provision of services under the Included TSA after the Petition Date that the Debtors will be able to realize this substantial value.

### IV. The Interim DIP Orders

26. Under the terms of the Interim DIP Orders, the Debtors are authorized to pay only $150,000 per week to the Terminal Entities on account of postpetition storage costs provided under the TSAs through September 12, 2021. This amount was reflected in the approved budget of each of the Interim DIP Orders and represents only a fraction of the full amount LBT is owed and the value of the storage services provided by LBT. There is no factual, rational, or legal basis for the

---

[18] J. Aron Response ¶ 10. Under the terms of the Included TSA, upon delivery of the Trigger Event Notice, J. Aron becomes responsible for certain costs under the Included TSA, but the Debtors remain liable for all storage costs under section 7.1(a) of the Included TSA. Included TSA § 7.5.

[19] Debtor Response ¶ 9.

[20] *Id.* ¶ 9, n. 6.

[21] According to the current DIP budget, these are the same funds that appear intended to be used to repay the DIP Facility, and form the base of collateral on which the DIP loans were made.

$150,000 per week payment beyond the Debtors' position it was all the Debtors' other creditors would permit the Debtors to pay. Notwithstanding the amounts set forth in the DIP Budget, LBT reserved all rights to seek payment of the full amounts it is owed for the necessary and valuable services being proved to the Debtors on a postpetition basis.[22]

## BASIS FOR RELIEF

### I.    LBT Is Entitled to Immediate Payments of Postpetition Rent

27.    The lease of the tanks under the TSAs is an unexpired lease of non-residential real property under the Bankruptcy Code. The Debtors lease certain, specified tanks and are entitled to use the entire capacity of each tank they lease on an exclusive basis. The tanks themselves are fixtures that have been affixed to the Terminal Entities' real property, integrated into the pipeline network of the Terminal, and the Terminal Entities intend for the tanks to remain permanently attached to the land.[23] In addition, unlike a lease of personal property, LBT cannot simply retrieve the tanks from the Debtors and lease them to another customer upon rejection of the TSAs or relief from the automatic stay. The Debtors are currently occupying LBT's property and LBT cannot lease the tanks to another customer until the Debtors have vacated them completely.

28.    Under section 365(d)(3) of the Bankruptcy Code, a debtor in possession is required to "timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title."[24] Courts have routinely held that the statutory language is clear and postpetition rent must be paid by the

---

[22] Interim DIP Order ¶ 50; see Aug. 11, 2021 Hr'g Tr. 15:5-15:6 [Docket No. 407] (stating that LBT and the Terminal Entities were not waiving any rights to come back to the Court regarding the DIP Budget).

[23] See James v. Antilles Gas Corp., 43 V.I. 37, 43 (Terr. Ct. 2000) (a "fixture" is defined as "a chattel attached to the realty which becomes accessory to it and part and parcel of it.").

[24] 11 U.S.C. § 365(d)(3).

EMF_US 86167635

debtor when due under a lease.[25] The lessor is entitled to an allowed administrative expense claim for the unpaid postpetition rent without being required to make a showing that the lease obligations are an "actual necessary" expense of preserving the estate.[26] As of the date of this Motion, the Debtors owe $7,826,641.61 in postpetition rent for the storage space leased from LBT.

29. In addition, the terms of the TSAs require the Debtors to pay costs required to clean the tanks and remove any BS&W when they vacate the tanks. As tanks are vacated under the TSA, the Debtors should pay these costs and, to the extent such costs are not paid, LBT is entitled to an administrative expense claim for such costs.

## II. LBT Is Entitled to an Administrative Claim for Postpetition Services

30. Even if the Court decides that the lease of storage capacity at the Terminal is not a lease of non-residential real property, LBT is still entitled to an administrative priority claim for the postpetition storage and related services provided to the Debtors. Section 503(b) of the Bankruptcy Code provides in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including--
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate[27]

---

[25] *See In re Pudgie's Dev. of NY*, 239 B.R. 688, 694 (S.D.N.Y. 1999) ("This Court agrees with the position taken by the Bankruptcy Court below. The plain meaning of § 365(d)(3) requires that the landlord obtain payment as lease obligations become due."); *In re Telesphere Commc'ns, Inc.*, 148 B.R. 525, 529 (Bankr. N.D.Ill. 1992) ("Indeed, to withhold payment when the debtor may be administratively insolvent would actually reverse legislative intent, because it would require involuntary extensions of credit by lessors in the very circumstances where the debtors are least likely to honor their lease obligations"); *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 882-83 (Bankr. E.D.N.Y. 1986) ("In unmistakable terms, Section 365(d)(3), with certain exceptions not relevant here, requires trustees and debtors-in-possession to timely perform the debtor's obligations, including payment of all rents reserved under the lease until the lease is assumed or rejected . . . The command of Section 365(d)(3) is clear and unambiguous. It means exactly what it says"); *In re C.Q., LLC*, 343 B.R. 915, 918 (Bankr. W.D. Wis 2005) ("Pre-rejection lease payments are required to be timely made.").

[26] *See, e.g.*, *In re Schnitz*, 293 B.R. 7, 10 (Bankr. W.D. Mo. 2003).

[27] 11 U.S.C. § 503(b).

The Bankruptcy Code provides administrative priority to certain claims to encourage third parties to provide the goods and services necessary for a debtor to continue operating its business, "thus generating funds from which prepetition creditors can be paid."[28] "[T]o qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefitted the estate."[29] A voluntary transaction with a third party who provides goods and services that enhance the debtor's ability to operate its business generally meets this test.[30]

31. "[I]n the context of commercial transactions for goods and services, a creditor must show some inducement by the debtor-in-possession."[31] To show inducement, it is not necessary that there be a written postpetition agreement for services.[32] The "knowing and voluntary post-petition acceptance of desired goods or services" is sufficient to show inducement.[33] The goods or services provided must have also benefitted the estate.[34] "Benefit" comes in different forms and includes "costs ordinarily incident to operation of a business."[35]

32. "Administrative expense priority is available to contract parties when the debtor enjoys the benefits of the contract pending assumption or rejection."[36] When determining what

---

[28] *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.)*, 931 F.3d 432, 442 (5th Cir. 2019) (quoting *Toma Steel Supply, Inc. v. Transamerican Nat. Gas Co. (TransAmerican Nat. Gas Corp.)*, 978 F.2d 1409, 1420 (5th Cir. 1992)).

[29] *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 387 (5th Cir. 2001).

[30] *Id.*

[31] *In re Whistler Energy*, 931 F. 3d at 442.

[32] *Id.* at 442-43.

[33] *Id.* at 443.

[34] *Id.*

[35] *Id.*

[36] *In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 741 (Bankr. D. Del. 2010).

the reasonable value of such goods and services is, "there is a presumption that the contract rate is reasonable."[37] While the Debtors have filed motions to reject the TSAs, those motions have yet to be granted, and, even after a contract has been rejected, the counterparty may be entitled to an administrative expense for services provided post-rejection.[38]

33. LBT is providing postpetition storage capacity and related services to the Debtors under the terms of the TSAs. The Debtors are knowingly using such storage capacity and accepting (and, in fact, relying upon) the related services. The storage capacity and related services are providing direct and tangible benefits to the Debtors' estates. The storage capacity and related services being provided to the Debtors under the Included TSA will allow the Debtors to fulfill their obligations to J. Aron. This will allow the Debtors to recover for their estates certain refunds of margin funds, lien releases, and potentially additional proceeds under the J. Aron Transaction Documents as a result of the liquidation of the Product, with an estimated value of $38 million.

34. Indeed, the expected recoveries from the conclusion of J. Aron's liquidation process are one of the only expected sources of funds for the Debtors' estates in these Chapter 11 Cases. And the only way the Debtors can realize such recovery is through the storage capacity and services provided by LBT. Because the value of the Debtors' estates is enhanced through the storage capacity and related services provided by LBT, LBT is entitled to an administrative expense claim under the Bankruptcy Code.

35. In addition to the storage capacity and services provided under the Included TSA, LBT also provides valuable services to the Debtors under the Non-Included TSA. The Debtors

---

[37] *Id.*; *In re Washington-St. Tammany Elec. Co-op., Inc.*, 111 B.R. 555, 559 (Bankr. E.D. La. 1989) ("There is an initial assumption that, where a contract exists, the contractual rate is the reasonable value of the goods or services provided to the estate. This presumption is viable unless the debtor introduces *convincing* evidence to the contrary.") (internal citations omitted).

[38] *In re Whistler Energy*, 931 F.3d at 442, n.2.

14

are currently using 5 tanks under the Non-Included TSA to store a significant quantity of the Debtor Product. On information and belief, the Debtors intend to use the Debtor Product for on-site power generation. Such power generation will allow the Debtors to continue their efforts to remove the hydrocarbons from the Refinery, prepare the Refinery to be sold, and otherwise maintain their estates. If the Debtors elect not to use the Debtor Product for power generation, it remains an asset of their estates that may be sold to recover to additional funds. Regardless of how the Debtors choose to use the Debtor Product, LBT's storage services provides a benefit to the Debtors' estates. Absent such services, the Debtors will not be able to realize any value from the Debtor Product.

36. With respect to the value of LBT services, as noted above, "[t]here is an initial assumption that, where a contract exists, the contractual rate is the reasonable value of the goods or services provided to the estate."[39] This "presumption in favor of the contract price is viable unless the debtor introduces convincing evidence to the contrary."[40] The burden is on the Debtors to "refute the presumption that the contract rate is the reasonable value of the services provided."[41] The rates under the TSAs were negotiated between the parties as part of the broader transaction documents with J. Aron and represent the reasonable value of the services provided to the Debtors.

### III. LBT Is Entitled to Adequate Protection

37. To the extent the lease of the tanks under the TSAs is determined to be a lease of personal property rather than real property, LBT is entitled to adequate protection of its interests. Section 363(e) of the Bankruptcy Code requires the Court to condition the use, sale, or lease of property by a debtor in possession as necessary to provide adequate protection to a party that has

---

[39] *In re Bethlehem Steel Corp.*, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003).
[40] *Id.* (citing *In re Washington–St. Tammany Electric Cooperative, Inc.*, 111 B.R. at 559).
[41] *In re Smurfit-Stone Container*, 425 B.R. at 742.

an interest in such property.[42] The section specifically applies to a lessor of personal property.[43] Section 361(3) is clear that adequate protection may not take the form of a deferred administrative claim.[44] When determining what form adequate protection should take, the Court should consider "[t]he nature of the creditor's interest in the property, the potential harm to the creditor as a result of the property's decline in value and the method of protection. . . . Periodic rental payments compensating a creditor for use and occupancy of his premises may serve as adequate protection."[45]

38. Here, LBT is entitled to adequate protection of its interest in the tanks leased by the Debtors. The Debtors have proposed to use these tanks in the administration of their estates. Use of the tanks will result in additional wear and tear of the tanks reducing their operational lifespan. Further, the Debtors lease the tanks exclusively; LBT is not able to seek new customers for those tanks so long as the Debtors continue to lease and store Product in them. As a result, under section 363(e), the Court must condition the use of the tanks on adequate protection of the LBT's interests.

39. Such adequate protection should take the form of immediate cash payments for postpetition use of the tanks leased under the TSAs. As set forth above, LBT is providing postpetition services that benefit the Debtors' estates and are entitled to an administrative expense claim for the value of those services. Immediate cash payments in the amounts required under the TSAs for the valuable storage capacity provided by LBT is the appropriate form of adequate protection in these cases.

---

[42] 11 U.S.C. § 363(e).

[43] *Id.*

[44] See 11 U.S.C. § 361.

[45] *Memphis Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1286 (5th Cir. 1986)

EMF_US 86167635

**WHEREFORE**, the Terminal Entities respectfully request that the Court enter an order (i) allowing LBT an administrative expense claim in an amount no less than $7,826,641.61 plus any other amounts due and owing, (ii) authorizing and directing the Debtors to pay such claim and amounts owed going forward pursuant to the terms of the TSAs; and (iii) granting such other and further relief as may be just and proper.

Dated:  August 18, 2021
       Houston, Texas

Respectfully Submitted,

/s/  Timothy A. ("Tad") Davidson II
Timothy A. ("Tad") Davidson II (TX Bar No. 24012503)
Joseph P. Rovira (TX Bar No. 24066008)
Ashley Harper (TX Bar No. 24065272)
Philip M. Guffy (TX Bar No. 24113705)
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, Texas  77002
Tel:     713-220-4200
Fax:    713-220-4285
Email:  taddavidson@HuntonAK.com
       josephrovira@HuntonAK.com
       ashleyharper@HuntonAK.com
       pguffy@HuntonAK.com

*Counsel for Limetree Bay Terminals, LLC, Limetree Bay Terminals Holdings, LLC, Limetree Bay Terminals Holdings II, LLC, Limetree Bay Cayman, Ltd., and Limetree Bay Financing, LLC*

### CERTIFICATE OF SERVICE

I certify that on August 18, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Timothy A. ("Tad") Davidson II
Timothy A. ("Tad") Davidson II

EMF_US 86167635