United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 27, 2021
Nathan Ochsner, Clerk

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| **In re:** | **CHAPTER 11** |
| **LIMETREE BAY SERVICES, LLC, *et al.*** [1] | **CASE NO.: 21-32351** |
| **Debtors.** | **Jointly Administered** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF**

(Docket No. 14)

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession (the "Debtors") seeking entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules (the "Local Rules") for the United States Bankruptcy Court for the Southern District of Texas (the "Court"), and the Procedures for Complex Cases in the Southern District of Texas (the "Complex Rules"),[2]

(i)   authorizing the Debtors to (a) obtain postpetition financing up to an aggregate principal amount of $25 million on a final basis (the "DIP Financing") pursuant to that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement attached to the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV)*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement (defined below) as applicable.

*Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 104] (the "First Interim Order") (the "DIP Credit Agreement"), as modified pursuant to the terms of that certain First Amendment to Senior Secured Superpriority Debtor-In-Possession Credit Agreement, a copy of which was attached to the *Amended Third Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 430], and such other agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, including the agreements related to the DIP Financing, (the "DIP Loan Documents"), among the Debtor Limetree Bay Refining, LLC, as borrower ("LBR" or the "Borrower"), Debtors Limetree Bay Services, LLC., Limetree Bay Refining Holdings, LLC, Limetree Bay Refining Holdings II, LLC ("LBRHII"), Limetree Bay Refining Operating, LLC ("LBRO"), and Limetree Bay Refining Marketing, LLC ("LBRM" and each a "Guarantor" and together the "Guarantors"), 405 Sentinel, LLC and the financial institutions from time to time parties thereto as lenders (each individually a "DIP Lender," and collectively, the "DIP Lenders"), and 405 Sentinel, LLC, as administrative and collateral agent for the DIP Lenders (the "DIP Agent" together with the DIP Lenders, the "DIP Secured Parties"); (b) authorizing the Debtors to use the DIP Lenders' and the Prepetition Secured Parties' (as defined in the Motion) (x) "cash collateral" as such term is defined in section 363 of the Bankruptcy Code other than, until such time as the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement defined below) occurs, any such "cash collateral" that constitutes Inventory Financing Collateral (as defined below) and (y) until such time as the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement defined below) occurs, "cash collateral" as such term is defined in section 363 of the Bankruptcy Code that constitutes Inventory Financing Collateral, solely to the extent that the same is (A) cash or amounts on deposit in or credited to any deposit account or securities account or (B) accounts receivable in respect of propane sales contemplated to be received by the Debtors pursuant to the Approved Budget (as defined below) in an aggregate amount not to exceed $1,000,000, in each case that constitutes Inventory Financing Collateral as of the Petition Date (such "cash collateral" as described in this clause (y) and the foregoing clause (x), the "Cash Collateral");

(ii)     granting (y) to the DIP Agent for the benefit of the DIP Secured Parties the DIP Liens on the DIP Collateral (as defined below) to secure all amounts owed under the DIP Loan Documents (the "DIP Obligations") on a first priority priming basis, except as otherwise set forth herein, and (z) to the DIP Secured Parties the DIP Superpriority Claims (as defined below) in respect of the DIP Obligations, in each case subject to the terms and conditions hereof;

(iii)    approving certain stipulations by the Debtors with respect to the Prepetition Secured Documents (as defined below) and the liens and security interests arising therefrom;

(iv)    modifying the automatic stay to the extent provided for herein; and

(v)      granting adequate protection for the liens and security interests granted for the benefit of the Prepetition Secured Parties in connection with the prepetition agreements described in Paragraphs F and G, below.

The Court having considered the Motion, the DIP Loan Documents, and the Declaration of Mark Shapiro in support of the First Day Motions, the pleadings filed with the Court, and the evidence proffered and presented at the prior hearings on the Motion held on July 13, 2021, August 2, 2021, August 9, 2021 and August 11, 2021, as well as the final hearing held on August 27, 2021 (the "Final Hearing"); and notice of the Final Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Rules and Complex Rules; and this Court having entered prior orders approving the Motion on an interim basis [Docket Nos. 104, 271, and 430] (the "Prior Interim Orders"); and all objections, if any, to the final relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the final relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is necessary for the continued operation of the Debtors' businesses; and upon the record of these Chapter 11 Cases; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED:[3]**

A.      Filing Date.   On July 12, 2021 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (these "Chapter 11 Cases").

---

[3]   Where appropriate in this Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      <u>Jurisdiction; Venue</u>.  The Court has exclusive jurisdiction to consider this matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code; Bankruptcy Rules 2002, 4001, 6004, and 9014; and Local Rules 2002-1, 4001-1, 4002-2, and 9013-1.

C.      <u>Committee Formation</u>.  On July 26, 2021, the Office of the United States Trustee (the "<u>U.S. Trustee</u>") appointed the Official Committee of Unsecured Creditors in these Chapter 11 Cases [Docket No. 189] (the "<u>Committee</u>"). No trustee or examiner has been appointed.

D.      <u>Notice</u>.  Due notice of the Final Hearing and the Motion was afforded, whether by facsimile, electronic mail, overnight courier, or hand delivery, to parties in interest, including to: (a) the United States Trustee for the Southern District of Texas; (b) the Committee; (c) all secured creditors of record, including (as defined herein) the DIP Agent, the Revolving Administrative Agent, the Term Administrative Agent, J. Aron, and the Project Collateral Agent; (d) the Offices of the Attorney General of the State of Texas and the United States Virgin Islands; (e) the thirty (30) largest consolidated unsecured creditors for the Debtors; (f) the Debtors' identified, interested taxing authorities, including the Internal Revenue Service; (g) the Debtors' identified, interested government and regulatory entities; (h) other interested parties as identified by the Debtors; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.   Under the circumstances, such notice of the Motion, the relief requested therein and the Final Hearing complies with Bankruptcy Rules 4001 and 9014 and the Local Rules, and no other or further notice of the relief sought at the Final Hearing was required.

E.     <u>Debtors' Stipulations Regarding DIP Loan Documents and DIP Secured Parties</u>.  In requesting the DIP Financing, upon entry of this order (the "<u>Final Order</u>"), the Debtors acknowledge, represent, stipulate, and agree that:

(a)     none of the DIP Secured Parties are control persons or insiders (as defined in the Bankruptcy Code) of the Debtors by virtue of determining to make any loan, providing the DIP Financing or performing obligations under the DIP Loan Documents;

(b)     as of the date hereof, there exist no claims or causes of action against any of the DIP Secured Parties arising from, related to or connected with the DIP Loan Documents that may be asserted by the Debtors;

(c)     the Debtors forever and irrevocably release, discharge, and acquit the DIP Secured Parties and each of their respective officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>DIP Releasees</u>"), in each case in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened as of the date hereof including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, existing as of the date of this Final Order, arising out of, in connection with, or relating to the DIP Financing, the DIP Loan Documents, the DIP Obligations, and ancillary documentation, guarantees, security documentation and collateral documents executed in support of the foregoing

or the transactions contemplated hereunder or thereunder including, without limitation, (i) any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), except as permitted herein, so-called "lender liability" claims, counterclaims, cross-claims, recoupment, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection, or avoidability of the liens or claims of the DIP Secured Parties with respect to the DIP Loan Documents.

F.    <u>Debtors' Stipulations Regarding Prepetition Secured Debt Obligations</u>. Subject to paragraph 42, the Debtors acknowledge, represent, stipulate, and agree as follows and make the releases and waivers set forth below:

(a)    Prior to the Petition Date, pursuant to (i) the Prepetition Term Credit Agreement, the Prepetition Term Lenders extended credit to LBR in the form of term loans, (ii) the Revolver Credit Agreement, the Revolver Lenders extended credit to LBRM in the form of a revolving credit facility and (iii) the Prepetition HoldCo Credit Agreement, the Prepetition HoldCo Lenders[4] extended credit to LBRH in the form of term loans.  Pursuant to the Prepetition Term Credit Agreement, the obligations of LBR under the Prepetition Term Credit Agreement are unconditionally and irrevocably guaranteed on a joint and several basis by LBRO and LBRM. Pursuant to the Revolver Credit Agreement, the obligations of LBRM under the Revolver Credit Agreement are unconditionally and irrevocably guaranteed on a joint and several basis by LBRO

---

[4]    As used in this Final Order, the term "Prepetition HoldCo Lenders" extends only to Prepetition Holdco Lenders to the extent they are, as of the date of this Final Order, a Prepetition Term Lender or an affiliate of a Prepetition Term Lender.  The term specifically does not encompass insiders or affiliates of the Debtors, as such terms are defined in the Bankruptcy Code.

and LBR.  As of the Petition Date, the obligors under the Prepetition Term Documents and Revolver Transaction Documents (such documents, the "Prepetition Secured Debt Documents" and such obligors, the "Prepetition Obligors") were truly and justly indebted to the Prepetition Secured Parties pursuant to the Prepetition Secured Debt Documents, without defense, counterclaim, offset, claim, or cause of action of any kind, in the aggregate amount of not less than (i) $768,956,393 of outstanding principal with respect to term loans under the Prepetition Term Credit Agreement plus accrued and unpaid interest with respect thereto, fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the Prepetition Term Credit Agreement) and all other "Obligations" (as defined in the Prepetition Term Credit Agreement or any security document related thereto) under the Prepetition Secured Debt Documents (the "Prepetition Term Obligations") and (ii) $50 million of outstanding principal under the Revolver Credit Agreement plus accrued and unpaid interest with respect thereto, fees, costs, and expenses (including any attorneys', financial advisors, and other professionals' fees and expenses that are chargeable or reimbursable under the Revolver Credit Agreement) under the Prepetition Secured Debt Documents and all other "Obligations" (as defined in the Revolver Credit Agreement or any security document related thereto) under the Prepetition Secured Debt Documents (the "Revolver Secured Obligations" and, together with the Prepetition Term Obligations, the "Prepetition Term and Revolver Debt Obligations"). As of the Petition Date, the obligors under the Prepetition Holdco Loan Documents (such obligors, the "Prepetition Holdco Loan Parties") were truly and justly indebted to the Prepetition Holdco Lenders pursuant to the Prepetition Holdco Loan Documents, without defense, counterclaim, offset, claim, or cause of action of any kind, for their

share of an aggregate amount of not less than $782,558,090[5] of outstanding principal under the Prepetition Holdco Credit Agreement plus accrued and unpaid interest with respect thereto, fees, costs, and expenses (including any attorneys', financial advisors, and other professionals' fees and expenses that are chargeable or reimbursable under the Prepetition Holdco Credit Agreement) under the Prepetition Holdco Loan Documents and all other "Obligations" (as defined in the Prepetition Holdco Credit Agreement or any security document related thereto) under the Prepetition Holdco Loan Documents (the "Prepetition Secured Holdco Debt Obligations" and, together with the Prepetition Term and Revolver Debt Obligations, the "Prepetition Secured Debt Obligations").

(b)     The Prepetition Secured Debt Obligations constitute legal, valid, and binding obligations of the Prepetition Obligors and the Prepetition Holdco Loan Parties.  No offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or priority of, the Prepetition Secured Debt Obligations exist.  No portion of the Prepetition Secured Debt Obligations is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.  The Prepetition Secured Debt Documents and the Prepetition Holdco Loan Documents are valid and enforceable by each of the Prepetition Term Lenders, Revolver Lenders (together with the Prepetition Term Lenders, the "Prepetition Secured Lenders") and Prepetition Holdco Lenders, as applicable against each of the Prepetition Obligors or the Prepetition Holdco Loan

---

[5]   This amount includes sums related to entities that are not Prepetition Holdco Lenders. The Debtors' acknowledgements, representations, stipulations, and agreements only extend to the share of such claims belonging to the Prepetition Holdco Lenders.

Parties, as applicable.  The Prepetition Secured Debt Obligations constitute allowed claims against the applicable Prepetition Obligors' and the Prepetition Holdco Loan Parties' estates.  As of the Petition Date, the Debtors or their estates have no claim or cause of action against any of the Prepetition Secured Parties, the Prepetition Holdco Loan Secured Parties or their respective agents, in such capacities, whether arising under applicable state, federal, or foreign law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Secured Debt Documents (or the transactions contemplated thereunder), the Prepetition Holdco Financing Loan Documents (or the transactions contemplated thereunder), the Prepetition Secured Debt Obligations, the Prepetition Debt Liens (as defined below) or the Prepetition Holdco Financing Liens (as defined below).

(c)      Pursuant to and as more particularly described in the Prepetition Secured Debt Documents, the Prepetition Term and Revolver Debt Obligations and certain associated hedge obligations are secured by, among other things, first priority liens or mortgages on, security interests in, and assignments or pledges of (the "Prepetition Debt Liens"), (i) substantially all of the assets of the Borrower and the Guarantors, including, without limitation, certain cash collateral, and other "Collateral" as such term is defined in the Prepetition Secured Debt Documents, subject to certain exclusions including Inventory Financing Collateral, as defined in the A&R Depositary and Intercreditor Agreement, and (ii) the equity interests in the Borrower held by LBRHII  and all rights and benefits of LBRHII under the Amended and Restated Operating Agreement, dated as of November 20, 2018 (collectively, the "Prepetition Debt Collateral"). The Collateral Agency and Intercreditor Agreement, dated as of November 20, 2018, by and among LBR, LBRH, LBRO, LBRM, the Prepetition Term Agent, the Revolving Administrative Agent, and the Project

Collateral Agent  (as defined in the A&R Depositary and Intercreditor Agreement (as defined herein)) (amended, amended and restated, supplemented and/or modified from time to time, the "Intercreditor Agreement") sets forth, among other things, the priority of the Revolver Lenders, Prepetition Term Lenders, and certain other parties in respect of the Prepetition Debt Collateral and establishes that (a) prior to the Toll Coverage Threshold Date (as defined therein) (i) the priority of the lien of the Project Collateral Agent in respect of the Project Tolling Collateral (as defined therein) shall be the holders of the Prepetition Term Obligations, any Permitted Refinancing Facility (as defined in the Term Credit Agreement) in respect of the Term Credit Agreement and any Secured Interest Rate Hedge Agreement (as defined in the Term Credit Agreement) entered into in respect of each of the foregoing (the "Term and Associated Holders"),followed by the holders of the Revolver Secured Obligations, any Permitted Refinancing Facility (as defined in the Revolver Credit Agreement) in respect of the Revolver Credit Agreement and any Secured Interest Rate Hedge Agreement (as defined in the Revolver Credit Agreement) entered into in respect of each of the foregoing (the "Revolver and Associated Holders"), and (ii) the priority of the lien of the Project Collateral Agent in respect of all Prepetition Debt Collateral (other than the Project Tolling Collateral, the Account Collateral (as defined therein) and certain Cash Collateral Accounts (as defined therein)), which Prepetition Debt Collateral includes any equipment and fixtures (as those terms are defined in the Uniform Commercial Code as in effect in the State of New York) of the Debtors, shall be the Revolver and Associated Holders followed by the Term and Associated Holders and (b) the Revolver and Associated Holders and the Term and Associated Holders shall share the priority of the lien of the Project Collateral Agent in respect of the Account Collateral (other than the Debt Service Account (as defined therein) and the Account Collateral held therein and credit thereto) Equally and ratably

(as defined in the Intercreditor Agreement).[6]  As of the date hereof, the Toll Coverage Threshold Date has not occurred.  Pursuant to and as more particularly described in the Prepetition Holdco Loan Documents, the Prepetition Secured Holdco Debt Obligations are secured by, among other things, first priority liens or mortgages on, security interests in, and assignments or pledges of (the "Prepetition Holdco Financing Liens") all of the Collateral (as defined in the Prepetition Holdco Credit Agreement) (the "Prepetition Holdco Financing Collateral").

(d)       As of the Petition Date, the Prepetition Debt Liens and the Prepetition Holdco Financing Liens are (i) valid, binding, perfected, and enforceable liens on and security interests in the applicable Prepetition Debt Collateral and Prepetition Holdco Financing Collateral; and (ii) not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind by any person or entity, and each Debtor irrevocably waives, for itself and its estate, any right to challenge or contest in any way the scope, extent, perfection, priority, validity, non-avoidability, and enforceability of the Prepetition Debt Liens or the Prepetition Holdco Financing Liens or the validity, enforceability, or priority of payment of the Prepetition Secured Debt Obligations, the Prepetition Secured Debt Documents and the Prepetition Holdco Loan Documents.  The Prepetition Debt Liens were granted to the respective Prepetition Lenders, and the Prepetition Holdco Financing Liens were granted to the Prepetition Holdco Lenders, for fair consideration and

---

[6]       The description of the relative priorities of the Revolver Lenders, Prepetition Term Lenders, and certain other parties in respect of the Prepetition Debt Collateral set forth herein is qualified in its entirety by reference to the Intercreditor Agreement. In the event of any conflict between the description set forth herein and the terms of the Intercreditor Agreement, the Intercreditor Agreement shall govern. Nothing contained herein shall be construed or deemed to modify or amend the term of the Intercreditor Agreement.

reasonably equivalent value, and were granted contemporaneously with the making of loans, commitments, and/or other financial accommodations under the Prepetition Secured Debt Documents or the Prepetition Holdco Loan Documents.

(e)     All of the Debtors' cash, including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Prepetition Debt Collateral and, following the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement), of the Inventory Financing Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

(f)     None of the Prepetition Secured Parties or the Prepetition Holdco Loan Secured Parties[7] control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted, or are control persons or insiders (as defined in the Bankruptcy Code) of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Prior Interim Orders, this Final Order, the DIP Financing, the DIP Loan Documents, the Prepetition Secured Debt Documents or the Prepetition Holdco Loan Documents.

G.     Stipulations Regarding J. Aron Transaction Documents and Inventory Financing Collateral.  Subject to paragraph 42, the Debtors acknowledge, represent, stipulate, and agree as follows and make the releases and waivers set forth below:

(a)     J. Aron Transaction Documents.  LBRM, LBR, LBRO (collectively, the "Transaction Entities") and J. Aron & Company LLC ("J. Aron"), made and entered into Transaction Documents (as defined in the J. Aron Monetization Master Agreement), each

---

[7]   As used in this Final Order, the term "Prepetition HoldCo Loan Secured Parties" extends only to Prepetition Holdco Loan Secured Parties to the extent they are, as of the date of this Final Order, a Prepetition Term Lender or an affiliate of a Prepetition Term Lender.  The term specifically does not encompass insiders or affiliates of the Debtors as defined under the Bankruptcy Code.

originally dated as of March 3, 2020, consisting of, among others (each as amended, amended and restated, supplemented and/or modified from time to time, collectively, the "J. Aron Transaction Documents"):

     i.    the Supply and Offtake Agreement and the Marketing and Sales Agreement  (the "J. Aron Supply and Offtake Agreement" and the "J. Aron Marketing and Sales Agreement", respectively), by and among LBRM and J. Aron, pursuant to which J. Aron agreed to purchase and sell crude oil, crude oil blends, fuel oil, naphtha, debutanized natural gasoline and certain other feedstocks (each as more fully defined in the J. Aron Monetization Master Agreement (as defined below), the "Feedstock"), and certain refined hydrocarbon products (each as more fully defined in the J. Aron Monetization Master Agreement, the "Product") to LBRM (and LBRM agreed to purchase and sell Feedstock and Product from and to J. Aron, as applicable), and which also governed certain terms of purchases and sales of Feedstock and Product between J. Aron and third parties (including BP Products North America Inc. ("BP")), in each case, subject to additional terms and conditions set forth in the J. Aron Transaction Documents;

     ii.    the Monetization Master Agreement (the "J. Aron Monetization Master Agreement") by and among the Transaction Entities and J. Aron, setting forth the general transaction terms, covenants, events of default and certain termination provisions;

     iii.    the Financing Agreement (the "J. Aron Financing Agreement"), by and among LBRM and J. Aron, providing for a one-time term loan by J. Aron based on certain catalyst units that contain certain base metals and certain catalyst units that contain certain precious metals, which were, in each case, designed for use in refining or processing activities;

iv.     the Amended and Restated Depositary and Intercreditor Agreement, dated as of March 3, 2020, by and among LBR as Term Borrower, LBRM and LBRO as Term Guarantors, Goldman Sachs Bank USA as Term Administrative Agent, Revolving Administrative Agent and Project Collateral Agent, J. Aron as Inventory Financing Facility Agent and Deutsche Bank Trust Company Americas as Depositary, as amended by that certain Amendment No. 1 to Amended and Restated Depositary and Intercreditor Agreement, dated as of March 10, 2021 ("A&R Depositary and Intercreditor Agreement"). The relative rights (including the respective collateral access and cooperation rights) of the Project Secured Parties, on the one hand, and J. Aron as the Inventory Financing Facility Agent and an Inventory Financing Secured Party (as such terms are defined in the A&R Depositary and Intercreditor Agreement), on the other, are set forth in the A&R Depositary and Intercreditor Agreement.   No J. Aron Secured Obligations (as defined below) are secured by any LBR Collateral under and as defined in the A&R Depositary and Intercreditor Agreement;

v.     the Security Agreement ("J. Aron Security Agreement"), by and between LBRM as Grantor and J. Aron, as secured party, pursuant to which LBRM granted J. Aron a first-priority security interest in and continuing lien (the "J. Aron Liens") on the "Collateral" under and as defined in the J. Aron Security Agreement ("Inventory Financing Collateral") which corresponds to the defined term "Inventory Financing Collateral" under and as defined in the A&R Depositary and Intercreditor Agreement.   Under the J. Aron Security Agreement and J. Aron Perfection Documents (as defined below), the Secured Obligations under and as defined in the J. Aron Security Agreement (the "J. Aron Secured

Obligations") are secured by a perfected, first-priority security interest in and continuing lien on the Inventory Financing Collateral;

vi.    that certain UCC financing statement (with LBRM as debtor and J. Aron as secured party) that was filed with the U.S. Virgin Islands Office of the Lieutenant Governor on March 5, 2020 (Filing No. 20200000134) and that certain UCC financing statement (with LBRM as debtor and J. Aron as secured party) that was filed with the Washington, D.C. Record of Deeds on March 4, 2020 (Filing No. 2020030037) (collectively, the "J. Aron Financing Statements");

vii.    that certain Deposit Account Control Agreement, dated as of March 3, 2020, among LBRM as Grantor, Oriental Bank as Depositary Bank and J. Aron as Secured Party  (the "J. Aron DACA", and together with the A&R Depositary and Intercreditor Agreement and the J. Aron Financing Statements, collectively, the "J. Aron Perfection Documents");

viii.    that certain Subordinated Guarantee, made by LBR and LBRO in favor of J. Aron, dated as of March 3, 2020 ("Subordinated Guarantee"), each of LBR and LBRO jointly and severally guaranteed LBRM's payment obligations under the J. Aron Transaction Documents as and when due ("Guaranteed Obligations"), subject to the terms of the "Terms of Subordination" under and as defined therein, which provide that, among other things, the Guaranteed Obligations are subordinated in right of payment to the prior payment in full in cash of all Secured Obligations under and as defined in the A&R Depositary and Intercreditor Agreement; and

ix.    additional agreements related to the supply, marketing, storage, the initial sale of Feedstock and Product by LBRM to J. Aron and other transactions

contemplated by the J. Aron Supply and Offtake Agreement, the J. Aron Marketing and Sales Agreement, the J. Aron Financing Agreement and the J. Aron Monetization Master Agreement.

(b)    <u>J. Aron's IFF Property</u>.  J. Aron owns all right, title and interest in the IFF Property (as defined in the A&R Depositary and Intercreditor Agreement), which consists of Feedstock and Product owned by J. Aron.  No Debtor has any right, title, or interest in the IFF Property, and accordingly, the IFF Property is not property of the estate under section 541 of the Bankruptcy Code.

(c)    <u>J. Aron Termination</u>.  On June 25, 2021 (the "<u>J. Aron Early Termination Date</u>"), as a result of certain events of default that had occurred and were continuing in respect of LBRM, LBR and LBRO, J. Aron properly and validly exercised its right pursuant to the J. Aron Transaction Documents of declaring an early termination date whereby, among other things, all commitments of J. Aron to provide any intermediation or to purchase or sell Feedstock or Products were terminated, all loans under the Financing Agreement became immediately due and payable and all of the obligations of the Transaction Entities under the J. Aron Transaction Documents (other than that certain Terminal Services Agreement (Included Locations), dated as of March 3, 2020, by and among LBT, LBRM and J. Aron) became due and payable on June 25, 2021.  As a result of such early termination, pursuant to the J. Aron Supply and Offtake Agreement and as set forth in certain other of the J. Aron Transaction Documents, J. Aron has the right to liquidate and has commenced the liquidation of its own IFF Property.

(d)    <u>J. Aron Safe Harbor Agreements</u>. J. Aron is a "forward contract merchant" (as such term is defined in the Bankruptcy Code and used in section 556 of the Bankruptcy Code) and each purchase and sale agreed to under the Safe Harbor Agreements (as defined in the J. Aron

Monetization Master Agreement, collectively, the "Safe Harbor Agreements") constitutes a "forward contract" (as such term is defined in the Bankruptcy Code and used in Section 556 of the Bankruptcy Code); (b) J. Aron is a "master netting agreement participant" and each Safe Harbor Agreement constitutes a "master netting agreement" for all purposes as each such term is defined in sections 101(38A) and 101(38B) of the Bankruptcy Code and as used in Section 561 of the Bankruptcy Code; (c) J. Aron's, as the Non-Defaulting Party, right to liquidate, collect, net and set off rights and obligations under the Safe Harbor Agreements, and liquidate the Safe Harbor Agreements is not stayed, avoided, or otherwise limited by the Bankruptcy Code, including sections 362(a), 547, 548 or 553 thereof, and J. Aron is entitled to the rights, remedies and protections afforded by and under, among other sections, sections 362(b)(6), 362(b)(17), 362(b)(27), 546(e), 546(g), 546(j), 548(d), 553, 556, 560, 561 and 562 of the Bankruptcy Code.

(e)     All of the Debtors' cash, including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Inventory Financing Collateral (excluding Margin) constitutes Cash Collateral of J. Aron.

(f)     Enforceability of J. Aron Liens and J. Aron Secured Obligations. (i) The J. Aron Liens on the Inventory Financing Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, J. Aron for fair consideration and reasonably equivalent value, (ii) the J. Aron Transaction Documents are fully enforceable in accordance with their terms; (iii) the J. Aron Liens were senior in priority over any and all other liens on the Inventory Financing Collateral, subject only to liens senior by operation of law or otherwise permitted by the J. Aron Transaction Documents (solely to the extent any such permitted liens were valid, properly perfected, nonavoidable, and senior in priority to the J. Aron Liens as of the Petition Date); (iv) the J. Aron Secured Obligations constitute legal, valid, binding, and non-

avoidable obligations of the applicable Debtors enforceable in accordance with the terms of the applicable J. Aron Transaction Documents; (v) no offsets, setoffs, recoupments, challenges, objections, defenses, "claims" (as defined in the Bankruptcy Code), impairment, cross-claims, counterclaims, or causes of action or any other challenge of any kind or nature by any person or entity to any of the J. Aron Liens or J. Aron Secured Obligations exist, and no portion of the J. Aron Liens or J. Aron Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, attachment, reduction, recovery or subordination (whether equitable, contractual, or otherwise) under or  pursuant to the Bankruptcy Code or applicable non-bankruptcy law or principles of equity or any other applicable domestic or foreign law or regulation by any person or entity; and (vi) the Debtors, each for itself and its estate, irrevocably waive, discharge, and release any right to challenge or contest any of the J. Aron Secured Obligations or J. Aron Liens, the priority of such obligations and liens, and the scope, extent, validity, non-avoidability, priority, enforceability, seniority, perfection, or extent of the J. Aron Liens and J. Aron Secured Obligations.

(g)     <u>Outstanding J. Aron Secured Obligations</u>.  As of the Petition Date, the applicable Debtors were indebted to J. Aron, without objection, defense, counterclaim or offset of any kind, in an amount not less than $24,968,754.95 in principal amount of loans outstanding under the J. Aron Financing Agreement.  In addition, J. Aron has commenced the process of liquidating all IFF Property in accordance with the terms of the Safe Harbor Agreements and the J. Aron Monetization Master Agreement and, if J. Aron is unable to liquidate such IFF Property and/or incurs losses or costs as a result of such liquidation and termination of J. Aron's rights and obligations under the Safe Harbor Agreements (including any Forward Contract Settlement Amount (as defined in the J. Aron Supply and Offtake Agreement)), the Debtors would be liable

and owe to J. Aron, without objection, defense, counterclaim or offset of any kind, an aggregate amount of not less than such aggregate losses or costs, taking into account any gains, incurred or realized by J. Aron as a result of such liquidations and terminations with respect to the J. Aron Transaction Documents.  Given that the liquidation of J. Aron's IFF Property has only recently commenced, the S&O Settlement Amount (as defined in the J. Aron Supply and Offtake Agreement) cannot be determined at this time.  Further, under the J. Aron Transaction Documents, the applicable Debtors are also liable to and owe J. Aron accrued (both before and after the Petition Date) and unpaid interest, fees, expenses and all other obligations under the J. Aron Transaction Documents, including attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the J. Aron Transaction Documents, plus Make-Whole Amounts (as defined in the J. Aron Monetization Master Agreement).

H.     _Definitions_.  The Revolver Secured Obligations, the Prepetition Term Obligations, and the J. Aron Secured Obligations are referred to collectively herein as the "Prepetition Secured Obligations."  The Prepetition Debt Liens and the J. Aron Liens are referred to collectively herein as the "Prepetition Liens."  The Prepetition Debt Collateral and the Inventory Financing Collateral are referred to collectively herein as the "Prepetition Collateral."  The Revolver Transaction Documents, the Prepetition Term Documents, and the J. Aron Transaction Documents, as those terms are defined herein or in the Motion, are referred to collectively herein as the "Prepetition Secured Documents."  The Prepetition Agents (as defined herein), Prepetition Secured Lenders and J. Aron are referred to collectively herein as the "Prepetition Secured Parties."

I.     _Stipulations Regarding Prepetition Secured Documents and the Prepetition Holdco Loan Documents_. Subject to paragraphs J and 42, the Debtors acknowledge, represent, stipulate, and agree as follows and make the releases and waivers set forth below:

(a)      No Control.   The Prepetition Secured Parties and the Prepetition Holdco Loan Secured Parties do not control the Debtors or their properties or operations or have the authority to determine the manner in which the Debtors' operations are conducted, and each of the Prepetition Secured Parties and the Prepetition Holdco Loan Secured Parties is not a control person or insider (as defined in the Bankruptcy Code) of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from any of the Prepetition Secured Documents or the Prepetition Holdco Loan Documents.

(b)      No Claims, Causes of Action.   As of the date hereof, there exist no claims or causes of action against the Prepetition Secured Parties or the Prepetition Holdco Loan Secured Parties arising from, related to or connected with any of the Prepetition Secured Documents or the Prepetition Holdco Loan Documents that may be asserted by the Debtors.

(c)      Release.   The Debtors forever and irrevocably release, waive, discharge, and acquit each of the Prepetition Secured Parties and the Prepetition Holdco Loan Secured Parties and each of their respective officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Prepetition Secured Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened as of the date hereof including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, existing as of the date of this Final

20

Order, arising out of, in connection with, or relating to any of the Prepetition Secured Documents or the Prepetition Holdco Loan Documents, and ancillary documentation, guarantees, security documentation and collateral documents executed in support of the foregoing, the Prepetition Secured Obligations, the Prepetition Secured Holdco Debt Obligations, the Prepetition Liens, the Prepetition Holdco Financing Liens, J. Aron's title to or ownership of, or other rights in, the IFF Property and rights to setoff and net Margin (as defined in the J. Aron Monetization Master Agreement), and ancillary  documentation, guarantees, security documentation and collateral documents executed in support of the foregoing or the transactions contemplated thereunder including, without limitation, (i) any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), so-called "lender liability" claims, counterclaims, cross-claims, recoupment, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Secured Parties or the Prepetition Holdco Loan Secured Parties.

J.      Mezzanine Financing, Subordinated Notes, Prepetition Holdco Loan, and other Insider Obligations.  Certain Prepetition Holdco Loan Secured Parties and Lenders are insiders or affiliates of the Debtors.  Nothing herein shall constitute a finding or ruling by this Court in favor of any affiliate (as defined in the Bankruptcy Code) or other insider (as defined in the Bankruptcy Code) of any Debtor (an "Insider Creditor") that any obligation of any Debtor to such Insider Creditor ("Insider Obligation"), including any Prepetition Holdco Secured Debt Obligations, LBV Subordinated Notes, or LBRH II Holdco Loan held by an Insider Creditor, is valid, senior,

enforceable, prior, perfected, or non-avoidable. Nothing herein shall constitute a finding of fact, admission, or stipulation in favor of, or enforceable by, any Insider Creditor.  No Insider Creditor shall be entitled to any proceeds or other distributions on account of any Insider Obligation or any adequate protection absent further order of the Court.  Moreover, nothing shall prejudice the rights of any party-in-interest, including but not limited to the Debtors and the Committee, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Insider Obligation and/or related security interests held by an Insider Creditor.  In addition, nothing herein shall be deemed a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, (b) any "equities of the case" under section 552(b) of the Bankruptcy Code, or (c) the equitable doctrine of "marshaling" or any similar doctrine with respect to any Insider Obligations, in each case after payment in full of the DIP Obligations and the Prepetition Secured Obligations.  No Insider Creditor shall be entitled to any release described herein.  Nothing in this paragraph shall affect or impact the Prepetition Secured Obligations or Prepetition Holdco Secured Debt Obligations that are not owned by any Insider Creditor, any liens securing such obligations, or any adequate protection granted to the Prepetition Secured Creditors.

K.    <u>Necessity of DIP Financing</u>. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan Documents.  A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without (i) granting the DIP Agent, for the benefit of the DIP Secured Parties, superpriority claims and priming liens and security interests, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code, as provided in this Final Order and the DIP Loan Documents and (ii) providing the Prepetition Secured Parties

adequate protection as provided in this Final Order. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the credit facility provided under the DIP Loan Documents and the authorization to use Cash Collateral to be provided by the Prepetition Secured Parties represents the best and only working capital financing available to the Debtors at this time. The Debtors have been unsuccessful in their attempts to find any alternative financing. Additionally, the terms of the DIP Financing and the use of Cash Collateral are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. The Prepetition Secured Parties have consented to the entry of this Final Order after extensive negotiations and would not have consented to entry of this Final Order absent each of the bargained for protections for the Prepetition Secured Parties set forth in this Final Order.

L.     Purpose of DIP Financing. The Debtors require the DIP Financing described in the Motion and as expressly provided in the DIP Loan Documents and this Final Order to: (i) pay costs, fees and expenses associated with or payable under the DIP Financing under the terms of this Final Order; (ii) pay professional fees subject to the Approved Budget (as defined below); (iii) provide ongoing working capital requirements of the Debtors and to pay fees, costs, expenses and other administrative expenses relating to the Chapter 11 Cases (including payments related to Adequate Protection Obligations (as defined below)), in each case, subject to any necessary Court approvals and consistent with the Approved Budget subject to any Budget Variances (defined below); and (iv) make the currently identified capital expenditures and other payments of postpetition payables as permitted under the DIP Loan Documents and this Final Order, in each case subject to the conditions as set forth herein and in the DIP Loan Documents and this Final Order and consistent in all material respects with the Approved Budget and any Budget Variances.

M.     <u>Adequate Protection</u>.   The Prepetition Secured Parties are entitled to receive adequate protection to the extent of any diminution in value of their interests in their prepetition collateral (including Cash Collateral) pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code resulting from the sale, lease, or use by the Debtors (or other decline in value) of the prepetition collateral (including Cash Collateral), the relief granted herein in favor of the DIP Secured Parties, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code from and after the Petition Date (the "<u>Adequate Protection Obligations</u>"). Pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code, as adequate protection, the Prepetition Secured Parties shall receive payment of their reasonable and documented professional fees, postpetition replacement liens, adequate protection payments and superpriority adequate protection claims in accordance with the terms of this Final Order.   Furthermore, the Prepetition Secured Parties will be entitled to certain reporting from the Debtors (including, among other things, copies of all reporting provided to the DIP Secured Parties) in accordance with the terms of this Final Order.   The adequate protection provided to the Prepetition Secured Parties herein is consistent with the Bankruptcy Code.   The consent of the Prepetition Secured Parties to the use of Cash Collateral and the consent of the Prepetition Secured Parties to the priming of their liens by the DIP Liens (i) does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Parties that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Final Order or otherwise, and (ii) is conditioned upon entry of this Final Order and does not and shall not be deemed to constitute consent other than pursuant to this Final Order and the terms set forth herein.   The adequate protection provided herein and other benefits and privileges contained herein are necessary (a) in order to protect the Prepetition Secured Parties from any diminution in value of their Prepetition

Collateral and (b) to obtain the foregoing consents and agreements.  Nothing herein shall prevent the Prepetition Secured Parties from seeking additional adequate protection to the extent permitted by law or to the extent permitted in the Prepetition Secured Documents, as applicable.  For the avoidance of doubt, this Final Order shall be deemed to be a request by the Prepetition Secured Parties pursuant to section 363(e) of the Bankruptcy Code.

       N.    <u>Approved Budget.</u>  Attached hereto as **<u>Exhibit A</u>** is a budget setting forth the Debtors' anticipated cash receipts and expenditures for the next thirteen (13) weeks (the "<u>Approved Budget</u>").  The "<u>Approved Budget</u>" shall include such modifications and amendments thereto as may be agreed to in form and substance by the DIP Agent and the ad hoc group of lenders under the Term Credit Agreement (the "<u>Ad Hoc Term Lender Group</u>"), the Term Administrative Agent, the Revolving Administrative Agent, and J. Aron (collectively with the Ad Hoc Term Lender Group, the Term Administrative Agent and Revolving Administrative Agent, and the Project Collateral Agent, the "<u>Prepetition Agents</u>"), subject to the conditions set forth in paragraph 26 hereof, which shall reflect the Debtors' good-faith projection of all weekly cash receipts and disbursements in connection with the operation of the Debtors' business during such thirteen-week period, delivered pursuant to the terms of the DIP Loan Documents, delivered by the Debtors to counsel for the DIP Agent, the DIP Lenders and the Prepetition Agents with a copy concurrently to the Committee.  The DIP Agent and the Prepetition Agents hereby expressly reserve all of their rights with respect to the approval of any budget covering the period after the expiration of the Approved Budget, and nothing contained herein shall be deemed or construed to constitute the consent of any of the DIP Agent or the Prepetition Agents to any such budget.  The Approved Budget is an integral part of this Final Order and has been relied upon by the DIP

Secured Parties to provide DIP Financing and by the Prepetition Secured Parties to permit the use of Cash Collateral and consent to this Final Order.

O.      <u>Good Cause</u>.  Based upon the record presented to the Court by the Debtors, it appears that the ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents and to use Cash Collateral is vital to the Debtors and the Debtors' estates and creditors.  The Debtors reasonably believe that the liquidity to be provided under the DIP Loan Documents and from the use of Cash Collateral will enable the Debtors to continue to safely and efficiently suspend the operation of their refinery facility, preserve and maximize the value of their businesses, and provide the Debtors with sufficient funding to pursue the necessary proceedings to restructure the Debtor's outstanding obligations.  Good cause has, therefore, been shown for the relief sought in the Motion on a final basis.

P.      <u>Good Faith</u>.  The DIP Secured Parties, the Prepetition Secured Parties and each of their respective affiliates, subsidiaries, parents, officers, shareholders, directors, employees, investment advisers and sub-advisers, attorneys, and agents have acted in good faith in negotiating the terms of the DIP Loan Documents and this Final Order.  The DIP Financing, the DIP Loan Documents and the use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties and the Prepetition Secured Parties, and all of the obligations and indebtedness arising under, in respect of or in connection with the DIP Financing, the DIP Loan Documents and this Final Order shall be deemed to have been extended by each of the DIP Secured Parties in accordance with the DIP Loan Documents, and the Prepetition Secured Parties' shall be deemed to have consented to the use of Cash Collateral, in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the DIP Liens, the

DIP Superpriority Claims and the Adequate Protection Obligations shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits, and privileges of this Final Order regardless of whether this Final Order is subsequently reversed, vacated, modified, or otherwise is no longer in full force and effect or the Chapter 11 Cases are subsequently converted or dismissed.

Q.     Consideration.  The Debtors will receive and have received fair consideration and reasonably equivalent value in exchange for access to the DIP Financing, and all other financial accommodations provided under the DIP Financing, the DIP Loan Documents and this Final Order.

R.     No Liability to Third Parties.  The Debtors stipulate and this Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in accepting the Approved Budget or any future Approved Budget or in taking any other actions permitted by this Final Order or the DIP Loan Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

S.     Section 552.  In light of the subordination of their liens and super-priority administrative claims (i) in the case of the DIP Secured Parties, to the Carve Out and the Permitted Prior Liens, and (ii) in the case of the Prepetition Secured Parties, to the Carve Out and the DIP Liens, each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply to any of the DIP Secured Parties or the Prepetition Secured Parties with respect to the proceeds, products, rents, issues or profits of any of the DIP Collateral or the

Prepetition Collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral or the Prepetition Collateral under section 552(b) of the Bankruptcy Code.  The Debtors shall be deemed to have irrevocably waived, and to have agreed not to assert, any claim or right under section 552 of the Bankruptcy Code seeking to avoid the imposition of the DIP Liens, Prepetition Liens or the Prepetition Secured Parties' replacement liens granted under this Final Order (the "Adequate Protection Liens") on any property acquired by any of the Debtors or any of their estates or, subject to the Carve Out, seeking to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Secured Parties or the Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral, as applicable.

T.     Immediate Entry.  Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

This Court concludes that entry of this Final Order is in the best interests of the Debtors and the Debtors' estates and creditors as its implementation will, among other things, allow for the continued flow of supplies and services to the Debtors necessary to enable the Debtors to safely and efficiently administer their refinery facility during the pendency of these Chapter 11 Cases. Based upon the foregoing findings, acknowledgements, and conclusions; and upon the record made before this Court at the Final Hearing; and good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED:**

1.     Disposition.  The Motion is granted on a final basis to the extent set forth herein, the DIP Financing described herein is authorized and approved, and the use of Cash Collateral and provision of adequate protection is authorized, in each case subject to the terms of this Final Order

and the DIP Loan Documents.  Any objections to the Motion that have not previously been withdrawn, waived, settled, or resolved and all reservations of rights included therein are hereby denied and overruled on their merits.  This Final Order shall constitute findings of fact and conclusions of law.

2.    <u>Effectiveness</u>.  Subject to the terms hereof, this Final Order shall be immediately valid upon signing by the Court and effective and enforceable upon the date entered on the docket in the Chapter 11 Cases.

3.    <u>Authorization of the DIP Financing and DIP Loan Documents</u>.

(a)    The Debtors are hereby authorized to execute and enter into the DIP Loan Documents.  The DIP Loan Documents and this Final Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders in connection with the DIP Financing.

(b)    The Borrower is hereby authorized on a final basis to borrow, and the Guarantors are hereby authorized on a final basis to guarantee, up to the principal amount of $25 million (plus such additional principal amounts due solely to payment of interest in-kind), pursuant to the terms of the DIP Loan Documents and this Final Order and at the times set forth in the Approved Budget, all of which shall be used by the Debtors as expressly permitted by the DIP Loan Documents, this Final Order, the Approved Budget and any Budget Variances.  The Debtors are authorized to use proceeds of the DIP Financing in accordance with this Final Order and the Approved Budget in an amount that would not cause either: (i) all line items other than Professional Fees from varying from the applicable Approved Budget by more than twenty percent (20%) for each week during any budget period or ten percent (10%) on a cumulative basis for that portion of the budget period then ended; (ii) with respect to Professionals Fees, the Debtors may vary from

29

the applicable budget by no more than ten percent (10%) on a cumulative basis for that portion of the Budget, and (iii) actual cash receipts, if any, received by the Borrower may not be less than ninety percent (90%) of the amounts set forth in the Budget (a "<u>Budget Variance</u>").  The variance reports showing budget to actual and any variance shall be delivered by the Debtors to the DIP Agent and counsel to each of the Prepetition Agents.

    (c)  In furtherance of the foregoing and without further approval of this Court, but subject to the terms of this Final Order, the Debtors are authorized to, and, if so required under the terms of the DIP Loan Documents, directed to perform all acts to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all related fees and expenses, that may be required or necessary for the Debtors' performance of their obligations under the DIP Financing, including, without limitation:

      i.  the execution, delivery, and performance of the DIP Loan Documents, including, without limitation, any security and pledge agreements, and any mortgages contemplated thereby;

      ii.  subject to paragraph 10 hereof, the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case in such form as agreed among the Debtors and the required other parties as set forth in more detail in paragraph 10 below;

      iii.  the non-refundable payment of the fees referred to in the DIP Loan Documents, including the fees of the DIP Agent, and, subject to paragraph 8, costs and expenses payable under the DIP Loan Documents;

iv.        make payments on account of the Adequate Protection Obligations provided for in this Final Order; and

v.        the performance of all other acts required under or in connection with the DIP Loan Documents.

4.        <u>DIP Obligations</u>.  This Final Order and the DIP Loan Documents shall evidence the DIP Obligations, which DIP Obligations shall, upon execution of the DIP Loan Documents, be valid, binding and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing, or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Final Order and the DIP Loan Documents.  All obligations incurred, payments made, and transfers or grants of security and liens set forth in this Final Order and the DIP Loan Documents by any Debtor are granted to or for the benefit of the Debtors for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby.  No obligation, payment, transfer, or grant of security under the DIP Loan Documents or this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance (whether equitable or otherwise), impairment, or any other

challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

5.    <u>Carve-Out</u>.  The Debtors' obligations to the DIP Secured Parties and the liens, security interests and superpriority claims granted herein and/or under the DIP Loan Documents, including the DIP Liens, the DIP Superpriority Claims, and the Adequate Protection Obligations, shall be subject and subordinate to the Carve-Out.  "<u>Carve-Out</u>" shall mean (i) fees and expenses incurred by bankruptcy professionals (x) whose retention has been approved by the Bankruptcy Court which are incurred as of the delivery of the Carve-Out Trigger Notice (as defined below) and (y) provided for in the Approved Budget, including all fees and expenses of bankruptcy professionals reflected as accrued in the Approved Budget; (ii) all accrued and unpaid professional fees and expenses of the Ad Hoc Term Lender Group, the Term Administrative Agent, the Project Collateral Agent, the Revolver Administrative Agent and J. Aron owed by the Debtors under paragraphs 8 and 9(a)-(c) hereof, subject to a total aggregate cap of $2 million for the fees of such Prepetition Secured Parties; (iii) fees and expenses in an amount not to exceed $375,000 incurred from and after the delivery of a Carve-Out Trigger Notice (as defined below) by bankruptcy professionals whose retention has been approved by the Bankruptcy Court (the "<u>Post-Termination Fee Carve-Out</u>"); and (iv) fees owed pursuant to 28 U.S.C. §1930 plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth below) or fees owed the clerk of the Bankruptcy Court; and (iv) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $50,000, incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth below).  "<u>Carve-Out Trigger Notice</u>" shall mean the written notice, including by email, delivered by the DIP Agent (at the direction of the DIP Lenders) or, after the DIP Financing has been indefeasibly paid in full and in cash (a "<u>DIP</u>

Repayment Event"), by any of the Prepetition Agents, to the Debtors, their counsel, the U.S. Trustee, and counsel to the Committee, and prior to a DIP Repayment Event, counsel to the Prepetition Agents, which notice may be delivered following the occurrence and during the continuation of an Event of Default or the Termination Date in accordance with the terms of the DIP Loan Documents or, following a DIP Repayment Event, following the occurrence and during the continuation of a Cash Collateral Termination Event (as defined below) or the Cash Collateral Termination Date (as defined below). Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the DIP Secured Parties, the Prepetition Secured Parties or any of their respective officers, directors, employees, agents, advisers and counsel, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the (i) DIP Loan Documents in favor of the DIP Agent, for the benefit of the DIP Secured Parties or (ii) the Prepetition Secured Documents, for the benefit of the Prepetition Secured Parties, as applicable. For the avoidance of doubt, until the delivery of a Carve-Out Trigger Notice, the Borrower shall be permitted to pay fees and expenses incurred by bankruptcy professionals whose retention has been approved by the Bankruptcy Court as the same shall become due and payable, subject to the terms and conditions set forth in the DIP Loan Documents and this Final Order (the payment of which shall not reduce the Post-Termination Fee Carve-Out). Notwithstanding anything to the contrary herein, in the DIP Loan Documents, or in any loan or financing documents, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, any prepetition secured obligations, and any and all other forms of adequate protection, liens or claims

securing the DIP Obligations or any prepetition secured obligations.  For the avoidance of doubt, no IFF Property or proceeds thereof, and, until the Discharge of Inventory Financing Obligations (as defined in the A&R Depositary and Intercreditor Agreement), no Inventory Financing Collateral or proceeds thereof, shall be used to fund the Carve-Out and the Carve Out shall not be secured by the Inventory Financing Collateral or IFF Property.  None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any professional person whose retention is approved by the Bankruptcy Court in connection with the Chapter 11 Cases or any Successor Cases.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any professional person whose retention is approved by the Bankruptcy Court or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.  None of the proceeds of the DIP Collateral or the DIP Loans shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the DIP Financing.  In addition, none of the proceeds of the DIP Collateral, the DIP Loans, or the Prepetition Collateral shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Secured Parties or their respective officers, directors, employees, agents, advisors and counsel, including with respect to any of the liens created in connection with the Prepetition Secured Documents (provided that, notwithstanding anything to the contrary herein, the Committee may use proceeds of the DIP Financing and/or the DIP Collateral (including Cash Collateral) to investigate but not to prosecute (i) the claims and liens of

the Prepetition Secured Parties, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties up to an aggregate cap of $200,000 (the "Committee Investigation Budget")).  The Debtors will work in good faith with the Committee to establish a professional fee escrow consistent with the Approved Budget and the Debtors' liquidity needs.

6.     DIP Lender Superpriority Claim.  Subject to the Carve-Out and the Aron Rights (as defined below), and effective as of the date of the First Interim Order, the DIP Secured Parties are hereby granted, pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (the "DIP Superpriority Claims") on account of the DIP Obligations with priority over any and all other administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which allowed claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and their estates and all proceeds thereof, excluding the Unencumbered Assets (as defined below), but including, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations, the proceeds of, or property recovered in connection with, the Unencumbered Assets.

7.      <u>DIP Liens</u>.

(a)      As security for the DIP Obligations, effective and perfected as of the date of the First Interim Order, the following security interests and liens, hereby are granted by the Debtors to the DIP Agent for the benefit of the DIP Lenders on the DIP Collateral as defined herein.  The "<u>DIP Collateral</u>" shall mean all property of the Debtors of any kind or nature whatsoever, (i) including, but not be limited to, all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Debtors, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, any claims and causes of action of the Debtors, including claims under section 549 of the Bankruptcy Code; and (ii) excluding (x) the IFF Property, (y) any claims and causes of action of the Debtors under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law (collectively, the "<u>Avoidance Actions</u>"), and (z) any commercial tort claims and causes of action of any of the Debtors against any current or former directors or officers of the Debtors (the "<u>Commercial Tort Claims</u>" and together with the Avoidance Actions, the "<u>Unencumbered Assets</u>"); *provided, however* that the DIP Collateral shall include, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations secured by the DIP Liens (as defined below) in full, any proceeds of, or property recovered in connection with (whether by judgment, settlement or otherwise), the Unencumbered Assets.  All such liens on and security interests in the DIP Collateral granted to the DIP Secured Parties, pursuant to this Final Order or the DIP Loan Documents (collectively, the "<u>DIP Liens</u>"), are as follows:

i. <u>Priming Lien Pursuant to Section 364(d)(1).</u>  A first priority, priming security interest in and lien on, pursuant to section 364(d)(1) of the Bankruptcy Code, all encumbered DIP Collateral (the "<u>Section 364(d)(1) Liens</u>"), which Section 364(d)(1) Liens shall be senior to any existing liens or claims, including, but not limited to, the Prepetition Liens of the Prepetition Secured Parties or postpetition liens granted to the Prepetition Secured Parties (collectively, the "<u>Prepetition Secured Parties Liens</u>"), and subject and junior only to (i) the Carve-Out, (ii) valid, perfected, and non-avoidable liens on property of a Debtor that are in existence on the Petition Date and are senior in priority to any of the Prepetition Secured Parties Liens, (iii) all liens, recoupment and setoff rights held by J. Aron (the "<u>Aron Rights</u>" and collectively with clause (ii), the "<u>Permitted Prior Liens</u>");

ii. <u>First Priority Lien on Unencumbered Property Pursuant to Section 364(c)(2).</u>  A first priority security interest in and lien on, pursuant to section 364(c)(2) of the Bankruptcy Code, all unencumbered DIP Collateral (the "<u>Section 364(c)(2) Liens</u>"), which Section 364(c)(2) Liens shall be subject only to the Carve-Out;

iii. <u>Junior Lien on Inventory Financing Collateral Pursuant to Section 364(c)(3).</u> A valid, binding, continuing, enforceable, fully-perfected, nonavoidable, automatically and properly perfected junior lien on and security interest in all Inventory Financing Collateral, which lien and security interest shall be subordinate and subject to the Aron Rights and subject to the Carve-Out;

iv. <u>Junior Lien on Certain Encumbered Property Pursuant to Section 364(c)(3).</u> A junior security interest in and lien on, pursuant to section 364(c)(3) of the Bankruptcy Code, all other DIP Collateral that is subject to a Permitted Prior Lien (the "<u>Section 364(c)(3) Liens,</u>") which Section 364(c)(3) Liens also shall be subject to the Carve-Out;

v.     <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) any liens arising after the Petition Date including, without limitation, liens granted under prior orders of the Court, or any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtors.

(b)     The DIP Liens shall be effective and perfected upon the Petition Date.

(c)     The DIP Liens shall be and hereby are fully perfected liens and security interests, effective and perfected upon the Petition Date without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, or other agreements or documents, such that no additional steps need be taken by the DIP Secured Parties to perfect such liens and security interests.  Subject to applicable non-bankruptcy law, any provision of any lease, agreement, contract, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors, or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, shall have no force or effect with respect to the transactions granting the DIP Liens in the Debtor's interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof.

(d)     The DIP Liens, DIP Superpriority Claims, and other rights, benefits, and remedies granted under this Final Order to the DIP Secured Parties shall continue in the Chapter 11 Cases, any Successor Cases, and following any dismissal of the Chapter 11 Cases, and such liens,

security interests, and claims shall maintain their priority as provided in this Final Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and all of the commitments thereunder have been terminated in accordance with the DIP Loan Documents.

8.  <u>Fees and Expenses of DIP Agent and Prepetition Secured Parties</u>.

The Debtors shall, no later than ten (10) days after receipt of a summary statement setting forth the applicable timekeepers, as well as the hours worked by and expenses incurred by such timekeepers, in connection with the Chapter 11 Cases whether incurred before or after the Petition Date (with copies provided via electronic mail to the U.S. Trustee, counsel to the Committee, counsel to the DIP Agent, and counsel to each of the Prepetition Secured Parties), indefeasibly pay or reimburse (i) the DIP Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges as provided in the Approved Budget (collectively, the "<u>DIP Agent Professional Fees</u>"), including, but not limited to, the reasonable fees, costs, and expenses of Gray Reed & McGraw LLP and Foley & Lardner LLP as counsel to DIP Agent, and any other advisors or professionals retained by the DIP Agent, (ii) the Project Collateral Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisors or professionals retained by the Project Collateral Agent, (iii) the Revolving Administrative Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisors or professionals retained by the Revolving Administrative Agent, (iv) J. Aron for its reasonable and

documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisors or professionals retained by J. Aron; (v) the Ad Hoc Term Lender Group for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs, and expenses of outside counsel, and any other advisor or professionals retained by the Ad Hoc Term Lender Group; and (vi) the Term Administrative Agent for its reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable fees, costs and expenses of outside counsel, and any other advisors or professionals retained by the Term Administrative Agent. The Debtors, the U.S. Trustee, the Committee, the DIP Agent, and each of the Prepetition Secured Parties may object to the reasonableness of the fees, costs, and expenses included in any such professional fee invoice; *provided* that any such objection shall be barred and deemed waived unless filed with this Court and served on the applicable professional by 12:00 Noon, prevailing Central Time, on the date that is no later than ten (10) days after the objecting party's receipt of the applicable professional fee invoice. If such objection is timely received, the Debtors shall promptly pay the portion of such invoice not subject to such objection, and this Court shall determine any such objection unless otherwise resolved by the applicable parties. Any hearing on an objection to payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses which are the subject of such objection and whether the DIP Agent, Revolving

Administrative Agent, J. Aron, Ad Hoc Term Lender Group, or Term Administrative Agent, as the case may be, is entitled to such fees, costs and expenses under this Final Order.  For the avoidance of doubt, none of the fees, costs, and expenses of the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, or Term Administrative Agent, shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  All fees, costs and expenses payable under the DIP Loan Documents to the DIP Agent shall be included and constitute part of the DIP Obligations and be secured by the DIP Liens.  Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, and Term Administrative Agent, under and in connection with negotiation and preparation of the DIP Loan Documents, including, without limitation, the legal fees and expenses of any professionals retained by them, shall be earned, non-refundable, and payable out of the final funding under the DIP Financing and shall not be subject to the notice period described in this paragraph and the recipients of such payments shall be fully entitled to all protections of section 364(e) of the Bankruptcy Code.  For the avoidance of doubt, the Debtors shall be responsible to pay, subject to the procedures outlined in this paragraph, all fees and expenses incurred by the DIP Agent, Revolving Administrative Agent, J. Aron, Ad Hoc Term Lender Group, and Term Administrative Agent, in connection with any action taken in these Chapter 11 Cases including, but not limited to, fees and expenses relating to the DIP

Financing and the administration and interpretation of, and the enforcement of remedies under, the DIP Financing and including all due-diligence, including but not limited to printing costs, consultation, travel, and attendance at court hearings, regardless of whether the DIP Financing is consummated.

9.      Prepetition Secured Parties' Rights and Adequate Protection.

(a)      Adequate Protection for Prepetition Term Lenders.  As adequate protection for any diminution of the Prepetition Debt Collateral resulting from the subordination of the Term Administrative Agent's Prepetition Debt Liens to the DIP Liens and the other relief granted herein in favor of the DIP Secured Parties, the Debtors' use of Prepetition Collateral (including Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and in exchange for the Term Lenders' consent to the priming of the Prepetition Debt Liens by the DIP Liens pursuant to this Final Order, the Term Administrative Agent shall receive, for the benefit of Prepetition Term Lenders, adequate protection, including, without limitation, (1) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition, with the exception of Avoidance Actions and Commercial Tort Claims and the proceeds thereof, (2) subject to the Approved Budget, monthly payments to reimburse the reasonable and documented professional fees of the Ad Hoc Term Lender Group, the Term Administrative Agent and Project Collateral Agent in accordance with paragraph 8 of this Final Order, (3) in lieu of cash payments of interest when and as required under the Prepetition Term Credit Agreement, all accrued and unpaid interest shall, on each applicable date when such interest payments are due under the Prepetition Term Documents, be paid in kind by adding the amount of such accrued interest to the

outstanding aggregate principal balance of the term loans, (4) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or any Successor Cases, with priority as provided therein, to the extent of any diminution in the Prepetition Debt Collateral, (5) upon entry of this Final Order, payment of all fees and expenses of the professional advisors of the Ad Hoc Term Lender Group, Term Administrative Agent and Project Collateral Agent that were incurred prior to the Petition Date and that remain unpaid, and (6) an acknowledgement of the right to credit bid the Prepetition Term Obligations under the Prepetition Term Documents in connection with any sale of Prepetition Debt Collateral subject to section 363(k) of the Bankruptcy Code.

(b)     Adequate Protection for Revolver Lenders.  As adequate protection for any diminution of the Prepetition Debt Collateral resulting from the subordination of the Revolving Administrative Agent's Prepetition Debt Liens to the DIP Liens and the other relief granted herein in favor of the DIP Secured Parties, the Debtors' use of Prepetition Collateral (including Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and in exchange for the Revolver Lenders' consent to the priming of the Prepetition Debt Liens by the DIP Liens pursuant to this Final Order, the Revolving Administrative Agent shall receive, for the benefit of the Revolver Lenders, adequate protection, including, without limitation, (1) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition, with the exception of Avoidance Actions and Commercial Tort Claims and the proceeds thereof, (2) subject to the Approved Budget, monthly payments to reimburse the reasonable and documented professional fees of the Revolver Administrative Agent and Project Collateral Agent in accordance

with paragraph 8 of this Final Order, (3) subject to the Approved Budget, on the last business day of each month, payments in cash to the Revolver Lenders in an amount equal to all interest (other than default interest) accrued under the Revolver Transaction Documents, (4) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or any Successor Cases, with priority as provided therein, to the extent of any diminution in the Prepetition Debt Collateral, (5) upon entry of this Final Order, payment of all fees and expenses of the professional advisors of the Revolving Administrative Agent and Project Collateral Agent that were incurred prior to the Petition Date and that remain unpaid, and (6) an acknowledgement of the right to credit bid the prepetition obligations under the Revolver Transaction Documents in connection with any sale of Prepetition Debt Collateral subject to section 363(k) of the Bankruptcy Code.

(c)     Adequate Protection for J. Aron.  As adequate protection for any diminution of J. Aron's interests in its Inventory Financing Collateral resulting from the relief granted herein in favor of the DIP Secured Parties, the Debtors' use of J. Aron's Prepetition Collateral (including Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, J. Aron shall receive adequate protection, including, without limitation, (1) valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition, with the exception of Avoidance Actions and Commercial Tort Claims and the proceeds thereof, (2) subject to the Approved Budget, monthly payments to reimburse the reasonable and documented professional fees of J. Aron in accordance with paragraph 8 of this Final Order, (3) subject to the Approved Budget, on the last business day of each month payments in cash to J. Aron in an amount

equal to all interest (other than default interest) accrued under the J. Aron Transaction Documents, (4) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases or any Successor Cases, with priority as provided therein, to the extent of any diminution in the Inventory Financing Collateral, and (5) upon entry of this Final Order, payment of all fees and expenses of the professional advisors of J. Aron that were incurred prior to the Petition Date and that remain unpaid, and (6) an acknowledgement of the right to credit bid the prepetition obligations under the J. Aron Transaction Documents in connection with any sale of Inventory Financing Collateral, subject to section 363(k) of the Bankruptcy Code.

(d)      <u>Reservation of Rights</u>.   The rights of all parties with respect to the appropriate characterization (as payments of principal, payments of interest, or otherwise) of any adequate protection payments made (whether in cash or in kind) in accordance with the foregoing are expressly preserved.

(e)      <u>Right to Credit Bid</u>.  Each of the Prepetition Secured Parties shall have the right to credit bid its Prepetition Secured Obligations in connection with the sale of any of its Prepetition Collateral subject to section 363(k) of the Bankruptcy Code and shall give the Committee a non-binding indication of its intention to credit bid by no later than 12:00 noon prevailing Central Time two Business Days prior to the Bid Deadline (as defined below).  The Committee specifically reserves the right to assert a challenge of any lien/claim supporting a Credit Bid (a "<u>Credit Bid Challenge</u>") in accordance with the Bankruptcy Code or other applicable law, and the Committee shall give the Prepetition Secured Parties a non-binding indication of its intention to assert a Credit Bid Challenge as soon as reasonably practicable, but no later than 12:00 noon prevailing Central Time one Business Day prior to the Bid Deadline (as defined below) .

Notwithstanding the foregoing, any Credit Bid Challenge (except for a Challenge under paragraph 42(y) that is covered by an extended Challenge Period) must be asserted on or before 5:00 p.m. CT on September 17, 2021 or such later date that is set as the bid deadline or agreed by the applicable Prepetition Secured Parties (the "Bid Deadline"), and if no such Credit Bid Challenge is asserted by such date, or if such Credit Bid Challenge is only made to a portion of a Prepetition Secured Parties' Credit Bid, then the Debtors' Stipulations (subject to paragraph 42(y)) shall be binding upon each party in interest, including the Committee, with respect to the assets subject to the Credit Bid that are not the subject of a Credit Bid Challenge, and an allowed claim in connection therewith for purposes of the Credit Bid. In the event of a Credit Bid Challenge, then the applicable Prepetition Secured Party or Parties, as applicable, are authorized to withdraw or modify the applicable Credit Bid by notice to the Debtors, and without further order of the Bankruptcy Court. Upon request by the Debtors or the applicable Prepetition Secured Party or Parties, the Court will conduct an emergency hearing prior to the Auction in respect of any issues involving a Credit Bid Challenge or withdrawal/modification of the Credit Bid.

(f) Weekly Meetings. The Debtors shall arrange for weekly (unless waived by the Prepetition Secured Parties in their sole and absolute discretion) status calls with the Prepetition Secured Parties and their advisors, and shall cause the Debtors' advisers and chief restructuring officer to participate to discuss (A) the Approved Budget, any Budget Variances and any other reports or information delivered by the Debtors, (B) the financial operations and performance of the Debtors' business, (C) progress in achieving the Milestones (as defined below) and any wind-down, liquidation, or going concern sale or marketing process or efforts, (D) the status of the Chapter 11 Cases generally, and (E) such other matters relating to the Debtors as the Prepetition Secured Parties (or their respective agents or advisors) shall reasonably request ("Weekly

Meetings"). The DIP Agent and its counsel may attend the Weekly Meetings at their discretion. The Debtors shall arrange Weekly Meetings with the Committee and its advisors (which, for the avoidance of doubt, may be conducted as separate calls for the Prepetition Secured Parties and the Committee). The Committee's professionals may reasonably request topics of discussion at the Weekly Meetings.

(g)  Milestones. The Debtors shall have (i) obtained, within sixty (60) calendar days after the Petition Date, a binding stalking horse bid for the sale of all or substantially all of the Debtors' assets which bid shall be reasonably acceptable to each Prepetition Secured Party, and (ii) completed the closing of a sale of all or substantially all of the Debtors' assets that is reasonably acceptable to each Prepetition Secured Party, within one hundred twenty (120) calendar days after the Petition Date (collectively the "Milestones").

(h)  Financial Reporting. The Debtors shall provide the advisors to the Ad Hoc Term Lender Group, the Revolving Administrative Agent (on behalf of the Revolving Lenders), and J. Aron, with the financial reporting and inspection rights described more fully in paragraph 12 below.

(i)  Right to Seek Additional Adequate Protection. Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties in this Final Order is without prejudice to the right of the Prepetition Secured Parties to seek at any time, including, without limitation, in connection with the Final Order, modification of the grant of adequate protection provided hereby so as to provide different or additional forms of adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest such modification. Nothing herein shall be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Secured Parties under their respective Prepetition Secured

Documents or under equity or law, and the Prepetition Secured Parties expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under their respective Prepetition Secured Documents, equity, and law in connection with all termination events and defaults and events of default under such agreements or hereunder.

10.     <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtors, with the express written consent of the DIP Agent, may enter into any amendments, consents, waivers, or modifications to the DIP Loan Documents that are not materially adverse to the Debtors without the need for further notice and hearing or any order of this Court; *provided*, *however*, that, without the approval of the Court on notice and a hearing, no such amendments, consents, waivers or modifications shall (i) shorten the maturity of the DIP Financing, (ii) increase the commitments thereunder or the rate of interest payable under the DIP Loan Documents, (iii) require the payment of any new or additional fee, or (iv) amend the Events of Default or covenants in the DIP Loan Documents to be materially more restrictive to the Debtors; *provided, further,* that any amendment, modification, waiver, or consent that adversely affects the rights or economic interest of any Prepetition Secured Party shall require the prior written consent of such Prepetition Secured Party; and *provided, further,* that any amendments, modification, waiver, or consent to or in respect of Section 10.05(b)(v) of the DIP Credit Agreement shall require the prior written consent of each Prepetition Agent.  No consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Secured Parties or any of the Prepetition Secured Parties.

11.     <u>Perfection of DIP Liens and Prepetition Secured Parties' Adequate Protection Liens</u>.

(a)     The DIP Agent, and the Prepetition Secured Parties, as applicable, are hereby authorized, but not required, to file or record financing statements, trademark filings,

copyright filings, mortgages, notices of lien or similar instruments (subject to Borrower's prior review and approval, not to be unreasonably withheld, conditioned or delayed) in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, in each case, without the necessity to pay any mortgage recording fee or similar fee or tax.  Whether or not the DIP Agent, on behalf of the DIP Secured Parties, or the Petition Secured Parties, in their respective sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall, to the extent provided in this Final Order, be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination upon entry of this Final Order. The Debtors shall, if requested, execute and deliver to the DIP Agent or the Prepetition Secured Parties, as applicable, all such agreements, financing statements, instruments and other documents as the DIP Agent or the Prepetition Secured Parties may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the DIP Liens or the Prepetition Secured Parties' Adequate Protection Liens, as applicable, and all such documents will be deemed to have been recorded and filed as of the Filing Date.

(b)     A certified copy of the Final Order may be filed by the DIP Agent or the Prepetition Secured Parties with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Final Order for filing and recording.

12.     Financial Reporting and Inspection Rights. The Debtors shall provide the advisors to the DIP Agent, Ad Hoc Term Lender Group, the Term Administrative Agent, the Revolving

Administrative Agent (on behalf of the Revolving Lenders), the Project Collateral Agent, J. Aron, and the Committee concurrently with the financial and other reporting as described in the DIP Loan Documents and the Prepetition Secured Documents, in addition to (i) any financial reporting given to the U.S. Trustee and (ii) any additional reports reasonably requested by and of the DIP Agent and the Prepetition Secured Parties. The Debtors shall deliver to each of the DIP Agent, the Ad Hoc Term Lender Group, the Term Administrative Agent, the Revolving Administrative Agent (on behalf of the Revolving Lenders), the Project Collateral Agent, J. Aron, and the Committee concurrently and their respective counsel financial reporting information in a timely manner that is requested by any of them in writing, and shall make personnel available to answer questions concerning such financial reporting and the operations of the Debtors during normal business hours on no less than two (2) business days' advance notice to Debtors' counsel, and within five (5) business days of the request being made to Debtors' counsel unless otherwise agreed to by the parties. The Debtors shall provide the DIP Agent, the Ad Hoc Term Lender Group, the Term Administrative Agent, the Revolving Administrative Agent, the Project Collateral Agent, and J. Aron and their respective agents, representatives, or professionals, with access to, and on-site inspections of, the Debtors' property and company records, as may be reasonably requested, during normal business hours, on no less than two (2) business days' advance notice to Debtors' counsel, and within five (5) business days of the request being made to the Debtors' counsel, unless the parties agree otherwise on the actual inspection date. The Debtors shall promptly provide the DIP Agent with any information or documents that are provided to the Term Administrative Agent, the Revolving Administrative Agent, the Project Collateral Agent and J. Aron and vice versa.

13.     <u>Third Parties</u>.   Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Secured Parties contained in this Final

Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, following entry of an order granting a Stay Relief Motion (defined below) as set forth in paragraph 17(c) hereof and solely to the extent the applicable DIP Collateral is not subject to a Permitted Prior Lien, upon three (3) Business Days' written notice to the landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred under the DIP Loan Documents and that the DIP Agent is permitted to exercise remedies, the DIP Agent (i) may, only subject to any separate agreement by and between the applicable landlord or licensor (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) subject to applicable law, shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade-names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien or license of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder.  To the extent applicable law prohibits the forgoing access or use of rights, the DIP Agent shall have the right to an expedited hearing on five (5) Business Days' notice to obtain Court authorization to obtain such access or use of such rights.

14.    <u>Automatic Stay Modified</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code hereby are vacated and modified without the need for any further order of this Court to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to grant the Prepetition Secured Parties' Adequate Protection Liens, and to

perform such acts as the Prepetition Secured Parties may request to assure the perfection and priority of the Prepetition Secured Parties' Adequate Protection Liens; (c) the Debtors to incur all liabilities and obligations, including all of (i) the DIP Obligations, to the DIP Secured Parties and (ii) the Adequate Protection Obligations to the Prepetition Secured Parties, in each case as contemplated under this Final Order and the DIP Loan Documents; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Final Order, including any Adequate Protection Obligations; (e) the DIP Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Final Order; (f) the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to exercise the rights and remedies set forth in paragraph 17 hereof, upon the occurrence of a Termination Event (as defined below); (g) the Prepetition Secured Parties to exercise the rights and remedies under their respective Prepetition Secured Documents, as applicable, pursuant to paragraph 17(c) hereof; (h) without a determination that the automatic stay applies, but out of an abundance of caution, J. Aron to retain and apply amounts received from the liquidation of its IFF Property to obligations owed by the Debtors to J. Aron under the J. Aron Transaction Documents; (i) J. Aron to set off and net any Margin (as defined in the J. Aron Master Monetization Agreement) against any obligations owed by the Debtors to J. Aron under the J. Aron Transaction Documents; (j) the Debtors to perform under the DIP Loan Documents and any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and any transactions contemplated therein or in this Final Order; and (k) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Final Order and the DIP Loan Documents, in each case without further notice, motion or application to, or order of, or hearing before, this Court, subject to the terms of this Final

Order, except that to the extent any Prepetition Secured Party seeks to enforce its respective rights, benefits, privileges, remedies under, or provisions of, this Final Order and the Prepetition Secured Documents against property of the Debtors' estates (other than any such rights, benefits, privileges, or remedies described in clauses (h) and (i)), such Prepetition Secured Party shall provide the Debtors with ten (10) days written notice prior to any such enforcement. The Debtors and DIP Lenders have consented to the exercise of rights, benefits, privileges, and remedies described in clauses (h) and (i). Nothing in this Final Order shall impair or abridge the Debtors' right to seek and, if granted by the Bankruptcy Court, obtain the use of Cash Collateral on a nonconsensual basis, and the rights of the DIP Secured Parties, the holders of the Permitted Prior Liens and the Prepetition Secured Parties to object to such request are fully preserved.

15.     <u>Termination Date</u>.  Each of the following shall constitute a termination event under this Final Order (each a "<u>Termination Event</u>", and the date upon which such Termination Event occurs, the "<u>Termination Date</u>"), unless waived in writing (delivery by email or other electronic means being sufficient) by the DIP Agent and each Prepetition Agent:

(a)     the occurrence of the "Maturity Date" (as defined in the DIP Loan Documents) of the DIP Financing under the DIP Loan Documents;

(b)     acceleration of the obligations under the DIP Loan Documents upon the occurrence of an "Event of Default" under and as defined by the DIP Loan Documents;

(c)     nine (9) months from the date of the First Interim Order;

(d)     [reserved] ;

(e)     entry of an order authorizing the Borrower or any Guarantor to incur DIP financing from any party other than the DIP Secured Parties;

(f)     the closing date of a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code (whether in one transaction or a series of related or unrelated transactions) (a "363 Sale");

(g)     the effective date of a confirmed chapter 11 plan (a "Plan") that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Loan Documents or is otherwise acceptable to the DIP Agent and the DIP Lenders in their sole discretion;

(h)     the failure by the Debtors to timely perform any of the material terms, provisions, conditions, covenants, or other obligations under this Final Order;

(i)     the filing of a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee, other estate fiduciary or an examiner with special/expanded powers which the Debtors fail to timely oppose without the prior written consent of the DIP Agent and Prepetition Secured Parties;

(j)     an order converting any Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;

(k)     the filing or support by any Debtor of any plan of reorganization that (1) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Loan Documents and (2) is not otherwise acceptable to DIP Agent and the DIP Lenders in their sole discretion; and

(l)     any modifications, amendments, reversal, or extensions of this Final Order that are adverse to the DIP Secured Parties or the Prepetition Secured Parties.

In addition to the foregoing, each of the following shall constitute Termination Event upon which any Prepetition Secured Party may terminate the Debtors' authorization to use Cash Collateral, but not exercise any other remedies under this Final Order:

(m)     the failure of the Debtors to use commercially reasonable efforts to pursue collection of the insurance claims or disputed amounts owed to the Debtors by BP or (2) seek the agreement of the Government of the U.S. Virgin Islands (the "USVI") to draw on the letter of credit provided by Limetree Bay Terminals, LLC, as financial assurance under the ROA by and among the USVI and certain of the Debtors; provided, however, that so long as the Debtors have used such commercially reasonable efforts in connection with either of the foregoing, no Cash Collateral Termination Event shall be deemed to arise hereunder this subclause "n" in the event the Debtors fail to collect any amounts or cause the USVI to draw on such letter of credit;

(n)     the filing by the Debtors of a motion for authorization to sell all or substantially all of the Debtors' assets or for approval of any related bidding procedures that is not reasonably acceptable to each of the Prepetition Agents; and

(o)     the failure of the Debtors to comply with any of the Milestones.

Nothing in the preceding paragraphs 14 and 15 of this Final Order shall constitute or be deemed to constitute an amendment or modification to sections 2.6, 3.7(e), 5.6 or 5.9 of the Intercreditor Agreement, or any other provisions of the Intercreditor Agreement.

16.     <u>Cash Collateral Termination Events</u>.  Following a DIP Repayment Event, each of the following shall constitute a cash collateral termination event under this Final Order (each a "Cash Collateral Termination Event", and the date upon which such Cash Collateral Termination Event occurs, the "Cash Collateral Termination Date"), unless waived in writing (delivery by email or other electronic means being sufficient) by each Prepetition Agent:

(a)     if on or before the date of the DIP Repayment Event, the Debtors and the Prepetition Agents have not agreed to the terms and conditions of the Debtors' continued

consensual use of Cash Collateral, the adequate protection to be provided to the Prepetition Secured Parties, and the terms of a budget;

(b)      the bringing of a motion, taking of any action or the filing of any plan of reorganization or liquidation or disclosure statement attendant thereto by or on behalf of the Debtors in the Chapter 11 Cases: (a) to obtain postpetition financing, absent the consent of the Prepetition Secured Parties; (b) to grant any lien, absent the consent of each Prepetition Agent; or (c) to use Cash Collateral in manner that is inconsistent with the terms of this Final Order or the Approved Budget, subject to the approved Budget Variances, and it being further specified that any request for payment, or payment, of professionals fees by any party not limited herein to the projected fees in the Approved Budget in excess of the budgeted amount shall not be deemed a Cash Collateral Termination Event;

(c)      [reserved];

(d)      the failure by the Debtors to timely perform any of the material terms, provisions, conditions, covenants, or other obligations under this Final Order;

(e)      the filing of a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers which the Debtors fail to timely oppose without the prior written consent of the Prepetition Secured Parties;

(f)      an order converting any Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;

(g)      the filing or support by any Debtor of a plan of reorganization or liquidation that is not acceptable to each Prepetition Agent in its sole discretion;

(h)      any modifications, amendments, reversal, or extensions of this Final Order that are adverse to the Prepetition Secured Parties;

(i)      the failure of the Debtors to use commercially reasonable efforts to pursue collection of the insurance claims or disputed amounts owed to the Debtors by BP or (2) seek the agreement of the Government of the USVI to draw on the letter of credit provided by Limetree Bay Terminals, LLC, as financial assurance under the ROA by and among the USVI and certain of the Debtors; provided, however, that so long as the Debtors have used such commercially reasonable efforts in connection with either of the foregoing, no Cash Collateral Termination Event shall be deemed to arise hereunder this subclause "i" in the event the Debtors fail to collect any amounts or cause the USVI to draw on such letter of credit;

(j)      the filing by the Debtors of a motion for authorization to sell all or substantially all of the Debtors' assets or for approval of any related bidding procedures that is not acceptable to each Prepetition Agent; and

(k)      the failure of the Debtors to comply with any of the Milestones or to hold Weekly Meetings.

Nothing in the preceding paragraph 16 of this Final Order shall constitute or be deemed to constitute an amendment or modification to sections 2.6, 3.7(e), 5.6 or 5.9 of the Intercreditor Agreement, or any other provisions of the Intercreditor Agreement.

17.     Rights and Remedies Upon Termination Event.

(a)      Upon the occurrence and during the continuation of a Termination Event, the DIP Agent or any Prepetition Secured Party, as applicable, or, following a Cash Collateral Termination Event, any Prepetition Secured Party may (and any automatic stay otherwise applicable to the DIP Secured Parties or the Prepetition Secured Parties, whether arising under

sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Final Order (including this paragraph) is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Secured Parties and the Prepetition Secured Parties, as applicable, to) deliver a written notice (a "Termination Notice") (including by e-mail) to counsel for the Debtors, counsel for each of the Prepetition Agents, counsel for the Ad Hoc Term Lender Group, counsel for J. Aron, counsel for the Committee, and the U.S. Trustee (the "Remedies Notice Parties"), declaring and triggering, as applicable:   (i) the immediate termination of the DIP Financing and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (ii) all DIP Obligations to be immediately due and payable; (iii) right to charge interest at the default rate under the DIP Loan Documents; (iv) a termination of the ability of the Debtors to use any Cash Collateral.

(b)     Upon delivery of such Termination Notice by the DIP Agent or any of the Prepetition Secured Parties, without further notice or order of the Court, the Debtors' authorization to use Cash Collateral and to incur the DIP Financing hereunder will, subject to the expiration of the Remedies Notice Period (as defined below), automatically terminate and (i) the DIP Secured Parties will have no obligation to provide any further DIP Financing or other financial accommodations and (ii) no Prepetition Secured Party will have an obligation to permit the Debtors to continue to use Cash Collateral; *provided that*, during the Remedies Notice Period (as defined below), the Debtors shall be entitled to continue to use Cash Collateral solely in accordance with the terms of this Final Order and the DIP Loan Documents and to pay items solely as set forth in the Approved Budget (or following a DIP Repayment Event, solely in accordance with the terms

of this Final Order and to pay items solely as set forth in the Approved Budget), without any variance.

          (c)      Following a Termination Event or Cash Collateral Termination Event, but prior to exercising the remedies set forth in this sentence below, the DIP Secured Parties or a Prepetition Secured Party, as applicable, shall be required to file a motion with the Court seeking emergency relief (the "Stay Relief Motion") on three (3) business days' notice to the Remedies Notice Parties (the "Remedies Notice Period") for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to: (i) freeze monies or balances in the Debtors' accounts; (ii) immediately set-off any and all amounts in accounts subject to a control agreement in favor of the DIP Secured Parties against the DIP Obligations, (iii) enforce any and all rights against the DIP Collateral (to the extent such DIP Collateral is not subject to a Permitted Prior Lien), including, without limitation, foreclosure on all or any portion of the DIP Collateral, collection of accounts receivable, occupying the Debtors' premises, and sale or disposition of the DIP Collateral (or following a DIP Repayment Event, enforce any and all rights against the Prepetition Collateral, including, without limitation, foreclosure on all or any portion of the Prepetition Collateral, collection of accounts receivable, occupying the Debtors' premises, and sale or disposition of the Prepetition Collateral); (iv) terminate and revoke the Debtors' right under this Final Order or the DIP Loan Documents to use any Cash Collateral, except to fund the Carve-Out; and (v) take any other actions or exercise any other rights or remedies permitted under this Final Order, the DIP Loan Documents, the Prepetition Secured Documents, or applicable law.  The Debtors, the DIP Secured Parties and the Prepetition Secured Parties consent to a hearing on the Stay Relief Motion on an expedited basis. Any order granting a Stay Relief Motion filed by any of the Prepetition Secured Parties shall also

modify the automatic stay to the extent necessary to permit (i) the Prepetition Secured Parties to immediately set off and net any and all amounts in accounts subject to a control agreement in their favor, any Margin (as defined in the Monetization Master Agreement) and any amounts owed by them to the Debtors against any obligations under the Secured Financing Documents, (ii) enforce any and all rights against any collateral securing any obligations under the Prepetition Secured Documents, including without limitation foreclosure on all or any portion of such collateral, collection of accounts receivable, occupying the Debtors' premises, and sale or disposition of the DIP Collateral; and (iii) take any other actions or exercise any other rights or remedies permitted under this Final Order, the Secured Financing Documents, or applicable law.

(d)    The rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties have under the DIP Loan Documents, or otherwise or that the Prepetition Secured Parties have under the Prepetition Secured Documents or otherwise. If any of the DIP Secured Parties or Prepetition Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral, or the Prepetition Secured Parties are permitted by the Court to take any enforcement action with respect to the Prepetition Collateral, following the hearing on the Stay Relief Motion, and subject to relative rights and priorities of the other DIP Secured Parties or Prepetition Secured Parties as provided in or recognized under this Final Order, the Debtors shall cooperate with such party in its efforts to enforce its security interest in the DIP Collateral or the Prepetition Collateral, as applicable, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its security interests in the DIP Collateral or the Prepetition Collateral, as applicable.

18.     <u>Subsequent Reversal or Modification</u>.  This Final Order is entered pursuant to, *inter alia*, section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Secured Parties and Prepetition Secured Parties all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Secured Parties prior to the date of receipt by the DIP Agent of written notice of the effective date of such action, (ii) the payment of any fees required under this Final Order or the DIP Loan Documents, (iii) the validity and enforceability of any lien, claim, obligation, right, remedy or priority authorized or created under this Final Order or pursuant to the DIP Loan Documents as of such date, including any Adequate Protection Obligations, and (iv) the validity or enforceability of the Aron Rights.

19.     <u>Restriction on Use of DIP Lenders' Funds and Prepetition Collateral</u>. Notwithstanding anything herein to the contrary, none of the DIP Collateral or proceeds thereof, proceeds of the DIP Financing, the Prepetition Collateral or proceeds thereof, any portion of the Carve-Out may be used by the Debtors, the Debtors' estates, the Committee, any trustee or examiner appointed in the Chapter 11 Cases or any chapter 7 trustee, or any other party in interest, directly or indirectly, to: (a) request authorization to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (i) from the DIP Agent or (ii) if such financing is sufficient to indefeasibly pay all DIP Obligations in full in cash and such financing is immediately so used; (b) assert, join, commence, investigate (except for the purposes described in, and in a manner consistent with, the terms of paragraph 42) support, or prosecute any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other

contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the DIP Releasees or the Prepetition Secured Releasees, with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any action arising under the Bankruptcy Code against a DIP Releasee or a Prepetition Secured Releasee; (ii) any so-called "lender liability" claims and causes of action against a DIP Releasee or Prepetition Secured Releasee; (iii) any action with respect to the legality, enforceability, validity, extent, perfection, and priority of the DIP Obligations, the DIP Superpriority Claims, the DIP Loan Documents, the DIP Liens, or Prepetition Secured Obligations; (iv) any action for avoidance under sections 544, 547, 548, 549, or 550 of the Bankruptcy Code against the DIP Secured Parties or a Prepetition Secured Releasee; (v) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counter claims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against or with respect to the DIP Liens, the DIP Obligations, the DIP Superpriority Claims, or the Prepetition Secured Obligations in whole or in part; (vi) appeal or otherwise challenge this Final Order, the DIP Loan Documents, or any of the transactions contemplated herein or therein; or (vii) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Secured Parties' or Prepetition Secured Parties' rights in respect of their respective liens on and security interests in the DIP Collateral or Prepetition Collateral, as applicable, or any of their rights, powers, or benefits hereunder or in the DIP Loan Documents or this Final Order anywhere in the world; (c) seek to modify any of the rights granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder or under the DIP Loan Documents; or (d) pay any claim of a prepetition creditor except as permitted under the

DIP Loan Documents in accordance with the Approved Budget. Notwithstanding the foregoing, the terms and limitations of this paragraph shall not apply to a successful action on the part of the Debtors whereby under paragraph 17 of this Final Order the Debtors obtain an order of the Court staying or otherwise modifying a Termination Event or a Cash Collateral Termination Event. Notwithstanding the Committee Investigation Budget and the foregoing, nothing herein shall prevent the Committee from seeking approval of all fees and expenses incurred by its professionals from any unencumbered assets (after taking into account of the DIP Liens, Adequate Protection Liens, Carve-Out, and Permitted Prior Liens and excluding for the avoidance of doubt any IFF Property).

20.     Restriction on Use of Proceeds of Inventory Financing Collateral. For the avoidance of doubt, nothing in this Final Order authorizes the sale or use of Inventory Financing Collateral or proceeds thereof other than Cash Collateral.

21.     Insurance Policies.  Effective as of the date of the First Interim Order, the DIP Lenders are, and are deemed to be, without any further action or notice (including endorsements), named as additional insured and loss payees on each insurance policy maintained by the Debtor which in any way relates to the DIP Collateral.

22.     Collateral Rights.  Except as expressly provided in the Approved Budget or permitted in this Final Order or the DIP Loan Documents, in the event that any person or entity that holds a lien on or security interest in DIP Collateral of the Debtors' estates, that is junior or otherwise subordinate to the DIP Liens receives or is paid the proceeds of such DIP Collateral, prior to indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Loan Documents, and termination of the commitments under the DIP Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold,

the proceeds of any such DIP Collateral of the Debtors' estates, in trust for the DIP Lenders, and shall immediately turnover such proceeds to the DIP Agent for application in accordance with the DIP Loan Documents and this Final Order. Except as expressly provided in the Approved Budget or permitted in this Final Order or the applicable Prepetition Secured Document, in the event that any person or entity that holds a lien on or security interest in any collateral securing the obligations under any Prepetition Secured Document that is junior or otherwise subordinate to the lien in favor of the applicable Prepetition Secured Parties receives or is paid the proceeds of such collateral prior to indefeasible payment in full in cash and the complete satisfaction of all obligations under the applicable Prepetition Secured Document, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such collateral in trust for the applicable Prepetition Secured Parties, and shall immediately turn over such proceeds to the applicable Prepetition Secured Parties or their respective agents for application in accordance with the relevant Prepetition Secured Document and this Final Order.

23.      <u>Prohibition on Additional Liens</u>.  Except as provided in the DIP Loan Documents, the Prepetition Secured Documents, and this Final Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases until such time as the DIP Obligations and obligations under the Prepetition Secured Documents have been indefeasibly paid in full, granting liens on or security interests in the DIP Collateral or the collateral securing the obligations under the Prepetition Secured Documents or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are junior to, senior to, or *pari passu* with the DIP Liens, the Prepetition Secured Parties' Adequate Protection Liens, or the liens in favor of the Prepetition Secured Parties.

24.     <u>No Waiver</u>.  This Final Order shall not be construed in any way as a waiver or relinquishment of any rights that any of the DIP Secured Parties or the Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.

25.     <u>Sale/Conversion/Dismissal/Plan</u>.

(a)     No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, (X) the Prepetition Secured Parties consent to the entry of such order and (Y) (i) the proceeds of any DIP Collateral included in such sale shall, subject to the prior satisfaction of any Permitted Prior Liens encumbering such DIP Collateral, be used to indefeasibly pay in full in cash and completely satisfy the DIP Obligations and the obligations under the Secured Financing Documents, and the commitments under the DIP Loan Documents are terminated; (ii) such sale is expressly permitted under the DIP Loan Documents; or (iii) the DIP Agent and Prepetition Secured Parties otherwise consent.

(b)     If an order dismissing or converting the Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time entered:

i.     Unless otherwise agreed to by the DIP Agent, such order shall provide that the Debtors, in each case subject to the Carve-Out and the Permitted Prior Liens, be subject to (a) the DIP Liens, the liens in favor of the Prepetition Secured Parties, the Aron Rights, the DIP Superpriority Claims, the DIP Obligations, the Adequate Protection Liens, and the DIP Loan Documents, which shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Final Order until all DIP Obligations

hereunder and all obligations under the DIP Credit Agreement are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance with the DIP Loan Documents, (b) the Prepetition Liens, Prepetition Secured Parties' Adequate Protection Liens, and any other Adequate Protection Obligations granted or conferred to the Prepetition Secured Parties shall continue in full force and effect, remain binding on all parties-in-interest and maintain their priorities as provided in this Final Order until all Prepetition Secured Obligations are indefeasibly paid in full in cash and completely satisfied (and that such Prepetition Secured Parties' Adequate Protection Liens, and other Adequate Protection Obligations granted to or conferred on the Prepetition Secured Parties shall, notwithstanding such dismissal or conversion, remain binding on all parties) and (c) all postpetition indebtedness, obligation, or liability incurred by the Debtors to the DIP Secured Parties or the Prepetition Secured Parties prior to the date of such order, including, without limitation, the DIP Obligations and the Adequate Protection Obligations, shall be governed in all respects by the original provisions of this Final Order unless the Final Order has been entered, in which case the Final Order shall govern, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Loan Documents,; and

        ii.      to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Secured Parties' Adequate Protection Liens, the Aron Rights, and any other Adequate Protection Obligations.

26.    <u>Modifications of the Approved Budget</u>.  Without further Order of the Court, the Debtors are hereby authorized to implement, in accordance with the terms hereof and upon the consent of the DIP Agent and each Prepetition Agent (and as to any changes with respect to the

fees and expenses of Committee professionals, with the consent of the Committee, which consent shall not be unreasonably withheld or delayed, or unless such modification is otherwise approved by the Court), any modifications to the Approved Budget with such modification being in writing, *provided, however*, that (a) each Prepetition Agent shall be deemed to have consented to any such modification if it has not objected to the proposed modification (i) within the greater of twenty-four (24) hours and one (1) business day after written email notice of such modification to counsel to such Prepetition Agent, or (ii) in the case of an Emergency Expense (as defined below) in excess of $250,000, within twelve (12) hours after written email notice of such proposed modification to counsel to such Prepetition Agent, and (b) no consent of the Prepetition Agents shall be necessary if each of the following conditions is satisfied:  (i) the chief restructuring officer has certified, in writing, to the DIP Agent and the Prepetition Agents that the expense is necessary to (A) prevent irreparable harm to the value of the Prepetition Collateral or DIP Collateral, or (B) protect against an imminent harm to the public safety (any such certified expense described in the foregoing clauses (A) or (B) an "Emergency Expense"), (ii) such Emergency Expense is less than $250,000, and (iii) the aggregate amount of all Emergency Expenses does not exceed $500,000.

27.   Priority of Terms.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Final Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Documents or another document or agreement or words of similar import, the terms and provisions of this Final Order shall govern.

28.    <u>No Third-Party Beneficiary</u>.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

29.    <u>Rights Under Sections 363(k) and 1129(b)</u>.  The full amount of the DIP Obligations or the Prepetition Secured Obligations may be used to "credit bid" for the assets and property of the Debtors (other than any collateral in respect of the J. Aron Obligations) on a dollar-for-dollar basis, as provided for in section 363(k) of the Bankruptcy Code, in accordance with the terms of the DIP Loan Documents and this Final Order, as applicable, without the need for further Court order authorizing the same and whether such sale is (a) pursuant to section 363, (b) pursuant to a plan of reorganization, or (c) by a chapter 7 trustee because, among other things, the denial of such rights would result in the DIP Secured Parties and the Prepetition Secured Parties not receiving the indubitable equivalent of their claims.

30.    <u>Discharge Waiver/Release</u>. Neither the DIP Obligations nor the Adequate Protection Obligations shall be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, or granted such other treatment as the Debtors and the DIP Secured Parties, in the case of the DIP Obligations, and the Prepetition Secured Parties, in the case of Adequate Protection Obligations, may agree upon, on or before the effective date of such confirmed plan of reorganization.

31.    <u>Preservation of Prepetition Priorities.</u>  Nothing in this Final Order is intended to change or otherwise modify the prepetition priorities among prepetition secured creditors of the Debtors, including (i) any lien or recoupment rights to the extent such liens or rights are valid, enforceable, nonavoidable and perfected, (ii) any claims of the lienholders or any other mechanic

or materialmen to the extent their liens are valid, enforceable, non-avoidable and perfected, including as permitted by section 546(b) of the Bankruptcy Code, or (iii) any relative rights and priorities of the Prepetition Secured Parties in that certain Collateral Agency and Intercreditor Agreement, dated as of November 20, 2018, as it may be amended, modified or supplemented, by and among certain of the Debtors and the Prepetition Agents, and nothing in this Final Order, including the granting of adequate protection liens or DIP Liens, shall be deemed to have changed or modified such prepetition priorities, all of which are hereby expressly preserved.  The preservation of prepetition priorities expressly includes lien, setoff, recoupment, contract, and other security rights.

32.    <u>Proofs of Claim</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, neither the DIP Agent nor any of the DIP Lenders shall be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein in or otherwise in relation to the DIP Loan Documents.  In addition, the Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein or otherwise in relation to the Prepetition Secured Obligations, and the stipulations contained Section F and G of this Final Order shall be deemed to constitute a timely-filed proof of claim for the Prepetition Secured Parties in respect of the Prepetition Secured Obligations.

33.    <u>Best Efforts</u>.  If requested to do so by the DIP Agent and consented to by the Prepetition Secured Parties in writing, or by the Prepetition Secured Parties, the Debtors shall use their best efforts (subject to applicable law, including, without limitation, the Debtors' fiduciary duties thereunder) to assist and cooperate with the sale of the DIP Collateral or the collateral securing the obligations under the Prepetition Secured Documents.

34.     <u>No Consent</u>.  No action, inaction, or acquiescence by the DIP Secured Parties, including funding the Debtors' ongoing operations under this Final Order, or the Prepetition Secured Parties shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Secured Parties or the Prepetition Secured Parties to a charge against the DIP Collateral or the Prepetition Collateral pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code.

35.     <u>No Marshaling; Equities of the Case.</u>  Except as expressly set forth in paragraphs 6 and 7(a) herein with respect to the proceeds of the Unencumbered Assets, neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the Prepetition Collateral or the liens securing the obligations under the Prepetition Secured Documents.  The "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent with respect to the DIP Loan Documents and/or the DIP Collateral, and the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply with respect to the Prepetition Secured Parties with respect to the Prepetition Secured Documents and/or the Prepetition Collateral in relation to any proceeds, products, offspring, or profits acquired by the estate or in respect of any obligations of the estate incurred prior to the date that is the earlier of (x) the end of the Approved Budget, as amended form time to time, and (y) the termination of the Debtors' right to use Cash Collateral following a Cash Collateral Termination Event, unless the Debtors' right to use Cash Collateral is renewed or extended, subject to all parties' rights at such time to seek and/or defend against further waiver.

36.     <u>Section 506(c) Waiver.</u>  No costs or expenses of administration or other charge, lien, assessment, or claim incurred at any time (including any expenses set forth in the Approved Budget) by any Debtors or any other person or entity shall be imposed against any or all of the

DIP Secured Parties or the Prepetition Secured Parties, their respective claims, or their respective collateral under Section 506(c) of the Bankruptcy Code or otherwise, and the Debtors, on behalf of their estates, waive any such rights; provided, that, notwithstanding the foregoing, the foregoing waiver shall only apply to costs and expenses of administration (including, without limitation, any professional fees, commissions, transactional, success or similar fees), which have been or may be incurred or accrued in these Chapter 11 Cases or any successor case at any time, or costs and expenses incurred in connection with the preservation, protection, disposal or enhancement of, or realization by the Prepetition Secured Parties upon the Collateral in each case prior to the date that is the earlier of (x) the end of the Approved Budget, as amended form time to time, and (y) the termination of the Debtors' right to use Cash Collateral following a Cash Collateral Termination Event, unless the Debtors' right to use Cash Collateral is renewed or extended, subject to all parties' rights at such time to seek and/or defend against further waiver.  Notwithstanding anything contained herein to the contrary, (i) nothing contained herein shall enlarge the scope of the costs or expenses that may be surcharged pursuant to section 506(c) of the Bankruptcy Code, and (ii) nothing contained herein or the transactions contemplated hereby (including, without limitation, the approval of any Budget or the consent to the terms of this Final Order) shall constitute an admission or be deemed an admission, and no action, inaction or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (including, without limitation, the approval of any Budget or consent to the terms of this Final Order) shall be deemed to be or shall constitute an admission (nor shall any consent be implied from any action, inaction or acquiescence by, either with or without notice to, the Prepetition Secured Parties) to any charge, lien, assessment or claim (excluding the Carve Out) against any of the DIP Agent, DIP Lenders or Prepetition Secured Parties or to any of their respective claims, the Carve Out, the DIP Collateral (including Prepetition

Collateral), whether pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise. The Prepetition Secured Parties reserve all rights to challenge or assert any defense in relation to any attempt to surcharge pursuant to section 506(c) or otherwise.

37.     <u>Indemnification</u>.  The indemnification provisions set forth in Section 10.02 of the DIP Credit Agreement are hereby approved.

38.     [reserved]

39.     <u>No Duty to Monitor Compliance</u>.  The DIP Agent, DIP Lenders and the Prepetition Secured Parties may assume the Debtors will comply with this Final Order and the Approved Budget and shall not (a) have any obligation with respect to the Debtors' use of Cash Collateral or proceeds of the DIP Financing (other than their consent to the use of Cash Collateral or proceeds of the DIP Financing in accordance with and subject to terms of this Final Order); (b) be obligated to directly pay any expenses incurred or authorized to be incurred pursuant to this Final Order (including any amounts specified in the Approved Budget); or (c) be obligated to ensure or monitor that sufficient Cash Collateral or proceeds of the DIP Financing exists to pay any expenses incurred or authorized to be incurred pursuant to this Final Order.

40.     <u>Adequate Notice</u>.  The notice given by the Debtors of the Final Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the Bankruptcy Local Rules.  Under the circumstances, no further notice of the request for the relief granted at the Final Hearing is required.

41.     <u>Binding Effect Successors and Assigns</u>.  Except as set forth in paragraph 42 of this Final Order, the DIP Loan Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties-in-interest in this Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Committee or examiner

appointed in these Chapter 11 Cases, and the Debtors, and their respective successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Chapter 11 Cases, in any Successor Cases, or upon any dismissal of any such chapter 11 or chapter 7 case and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties and the Debtors, and their respective successors and assigns, *provided*, *however*, that the agreement of the DIP Secured Parties to extend financing under the DIP Loan Documents and the Prepetition Secured Parties' consent to the use of Cash Collateral, in each case, shall terminate upon the appointment of any chapter 7 or 11 trustee, examiner with expanded powers, or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether pursuant to the DIP Loan Documents, a promissory note, or otherwise), consenting to the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, or their creditors, shareholders, or estates.  Except as set forth in paragraph 42 of this Final Order, each stipulation, admission, and agreement contained in sections E, F, G and I of this Final Order shall also be binding upon all persons and entities, including the Debtors, their estates, any Committee, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other person acting on behalf of the Debtors' estates, under all circumstances and for all purposes, subject to the Challenge Period as defined below.

42.    <u>Effect of Stipulations</u>.  The stipulations, waivers and releases contained in sections F, G, and I of this Final Order with respect to the Prepetition Secured Parties (the "<u>Debtors'</u> <u>Stipulations</u>") shall be binding upon the Debtors and their estates in all circumstances immediately

upon the date of the First Interim Order.  The Debtors' Stipulations shall be binding upon each party in interest (other than the Debtors and their estates), including the Committee, and any chapter 11 trustee (or if any of these Chapter 11 Cases are converted to a case under chapter 7 prior to the expiration of the Challenge Period (defined below), the chapter 7 trustee in such Successor Case), together with each of their respective representatives, subsidiaries, successors and assigns, unless (a) such party (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so), with the requisite standing granted by the Court, has timely and properly filed an adversary proceeding by no later than the date that is the earlier of (i) the effective date of a confirmed chapter 11 plan, and (ii) subject to paragraph 9(e), the day that is sixty (60) days from the date of the entry of the First Interim Order (or, in the case of the Committee, sixty (60) days from the date of the appointment of the Committee (as such date may be extended by the applicable Prepetition Secured Party in writing or by order of the Court)) (the "Challenge Period"), provided that: (1) to the extent a movant files and serves a request to extend the Challenge Period prior to its expiration, the Challenge Period shall be extended solely with respect to that movant until the Court rules on such motion (which any party may seek to have resolved on an emergency or expedited basis), provided that the Challenge Period shall not be so extended with respect to any Credit Bid Challenge, and (2) if the Chapter 11 Cases are converted to chapter 7 or a chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Period, the Challenge Period shall be automatically extended if necessary to provide such Trustee with a Challenge Period of twenty (20) days from the date of his appointment;  (x) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the debt or liens referenced in the Debtors' Stipulations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code) or otherwise objecting to the admissions, stipulations,

findings, or releases included in the Debtors' Stipulations; or (y) otherwise asserting or prosecuting any cause of action for preferences, fraudulent transfers or conveyances, or any cause of action challenging the actions or inactions of any of the Prepetition Secured Parties, including any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, or any other offsets, setoffs, recoupments, challenges, objections, defenses, claims, counterclaims, or causes of action of any kind or nature, whether in these Chapter 11 Cases or any subsequent chapter 7 cases, against any of the Prepetition Secured Parties on behalf of the Debtors' estates, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law (clauses (x) and (y) collectively, the "Challenges" and, each individually, a "Challenge"); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly filed adversary proceeding; provided, that, as to the Debtors, all such Challenges and proceedings are hereby irrevocably waived and relinquished as of the Petition Date.  Notwithstanding the foregoing, in the case of the Committee, the Challenge Period with respect to (i) any Challenge concerning the Prepetition Secured Holdco Debt Obligations or against the Prepetition Holdco Loan Parties and (ii) any Challenge described in clause (y) above against any of the Prepetition Secured Parties other than J. Aron shall be extended to November 30, 2021. Any complaint or motion for standing filed in, or in connection with, any Challenge proceeding shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released, and barred.  If no adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period or the court does not rule in favor of the plaintiff in any such Challenge proceeding, without further order of the Court: (v) the Debtors'

Stipulations, including the releases, shall be binding on all parties in interest including, without limitation, the Committee, and any trustee (including any chapter 7 trustee); (w) any and all Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (x) the claims of the Prepetition Secured Parties shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, offset, any cause of action of any kind, challenge, or defense (including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case; (y) the liens of the Prepetition Secured Parties shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, recharacterization, subordination, or avoidance; and (z) the Prepetition Secured Parties (and their respective agents, affiliates, subsidiaries, directors, officers, manager, representatives, attorneys, and advisors) shall not be subject to any other or further Challenge or investigation in respect of any Challenge by any person.  If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, the Debtors' Stipulations, shall nonetheless remain binding and preclusive on the Committee, and any parties in interest, including any trustee, except as to any such findings and admissions that were expressly challenged in such adversary proceeding (it being understood that any non-challenging parties are bound).  Nothing in this Final Order vests or confers on any person, including the Committee, standing or authority to pursue any claims or cause of action belonging to the Debtors or their estates, including, without limitation, a Challenge in a Challenge proceeding.  For the avoidance of doubt and notwithstanding the foregoing, (i) the Debtors' stipulations, admissions, and releases contained in Paragraph E of this Final Order will not be subject to a Challenge or the Challenge Period, and (ii) the DIP Secured Parties agree they will not file a Challenge and will not join in, fund, solicit, encourage or support

any Challenge or request to extend the Challenge Period, *provided, however*, that, in the event of a successful Challenge by a party other than the DIP Secured Parties, any property that would otherwise constitute DIP Collateral pursuant to the terms hereof shall, in fact, become DIP Collateral, and the DIP Liens shall attach thereto in the same order and priority as set forth herein. In the event that there is a timely successful Challenge brought pursuant to this paragraph, the Court shall retain jurisdiction to fashion an appropriate remedy.

(a)      For the avoidance of doubt, the Challenge and Challenge Period shall not apply to any claims or causes of the Debtors with respect to the Insider Creditors.

(b)      The Challenge Period will be tolled for the Committee if it formally moves for an order of this Court conferring standing or authority (the "Standing Motion") prior to the Challenge Period, from the date the Committee so moves until five (5) business days from the date that the Standing Motion is granted or the date when the Standing Motion is denied pursuant to an Order of the Court; *provided*, that the Challenge Period: (a) will only be tolled if such Standing Motion attaches a proposed complaint identifying the specific Challenge(s) that the Committee proposes to assert and the defendant(s) against whom such Challenge(s) are proposed to be asserted, and (b) will only be tolled with respect to such Challenge(s) and defendant(s) specifically identified therein.  Nothing in the Prior Interim Orders or herein shall limit the Committee's ability to (x) file a timely Standing Motion in respect of any timely Challenge for which it cannot obtain standing as a matter of law because the applicable Debtor is a limited liability company (an "LLC Challenge Motion"), and (y) seek pursuant to such LLC Challenge Motion a mechanism by which to prosecute such Challenge, provided that the Committee otherwise satisfies the requirements set forth in this paragraph 42.  In the event the Committee files a timely LLC Challenge Motion for which it cannot obtain standing, and provided that the Committee otherwise satisfies the

requirements set forth in this paragraph 42, the expiration of the Challenge Deadline solely for the specific Challenge set forth in the LLC Challenge Motion, and solely as to the defendant(s) named therein, shall be tolled pending further order of the Court, and applicable parties shall meet and confer with respect to an appropriate process (if any) for the prosecution of any such Challenge. If timely notified of a Challenge for which the Committee cannot gain standing because the applicable Debtor is a limited liability company, the Debtors (or a designated representative) shall, to the extent permitted by applicable law, retain the authority to prosecute such Challenge in the exercise of their business judgment and subject to any applicable further order of the Court.

(c)     Any Challenge, Standing Motion, or LLC Standing Motion commenced by the Committee (the "Committee Action") may be pursued by any chapter 7 trustee in these Cases (a "Chapter 7 Trustee"), appointed subsequent to the filing of the Committee Action, in the Trustee's sole and exclusive discretion.  The filing of a *Notice of Substitution of Trustee* for and in the stead of the Committee in the Committee Action, shall be automatically effective upon filing, without further Order of the Court, and the Chapter 7 Trustee shall be deemed automatically substituted for the Committee, which substitution shall be deemed retroactive to the date of the filing of the Committee Action.

43.     Terminal Entities.

(a)     To the extent any of the Terminal Entities[8] have Permitted Prior Liens on Product or goods (as defined under the Uniform Commercial Code) or the proceeds thereof under

---

[8]     "Terminal Entities" shall mean, collectively or individually, Limetree Bay Terminals, LLC, Limetree Bay Terminal Holdings, LLC, Limetree Bay Terminal Holdings II, LLC, and Limetree Bay Cayman, Ltd.

the Non-Included Locations TSA[9] (the "Terminal Liens"), the Section 364(d)(1) Liens shall be junior to the Terminal Liens on such property.

(b)       To the extent any of the Terminals Entities hold a valid, perfected, and unavoidable liens on any DIP Collateral in existence as of the Petition Date, and solely to the extent of any diminution in value of such liens, if any, the Terminals Entities shall receive replacement liens for such diminution to the same extent validity and priority as their prepetition liens.   Nothing in this Final Order shall be a determination of the validity, priority, or extent of any lien or claim asserted by the Terminals Entities, and the rights of all parties as to such issues are preserved.  For the avoidance of doubt, any such replacement liens will not attach to the IFF Property, the Unencumbered Assets, or any proceeds thereof.

(c)       Administrative Expense: The Debtors shall make cash payments as set forth in the Approved Budget to the Terminal Entities for post-petition services provided by the Terminal Entities under the Terminal Services Agreements, subject to any further order of this Court with respect to rejection of the Terminal Services Agreements.[10]  Such weekly payments shall be due on Mondays.   The Terminal Entities reserve all of their rights to assert an administrative expense claim for additional amounts owed under the Terminal Services Agreements for the period after the Petition Date, and the rights of the Debtors and all other parties

---

[9]    As that term is defined in the Objection and Reservation of Rights of Terminal Entities to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Approving Adequate Protection to Pre-Petition Secured Creditors, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing [Docket No. 252].

[10]   "Terminal Services Agreement" shall mean, collectively, the Terminal Services Agreement (Included Locations) among Limetree Bay Terminals, LLC, Limetree Bay Refining Marketing, LLC and J. Aron dated March 3, 2020 and the Terminal Services Agreement (Non-Included Locations) between Limetree Bay Terminals, LLC and Limetree Bay Refining Marketing, LLC dated March 3, 2020.

in interest to contest the amount or validity of any such administrative expense are expressly reserved and fully preserved.   All rights with respect to applicability of setoff rights are reserved.

(d)       Limitation on DIP Liens:  For the avoidance of doubt, the DIP Collateral shall not include any property to the extent that it does not constitute property of the Debtors' estates within the scope of 11. U.S.C. § 541, and shall not include the Terminal Entities' interest in any property that is jointly owned by the Debtors (or any of them) and Terminal Entities (or any of them) and no liens granted pursuant to this Order shall attach to the Terminal Entities' interest in any property jointly owned with the Debtors.

44.       <u>Resolution of Objection by the United States of America</u>.

(a)       Notwithstanding anything to the contrary in the Prior Interim Orders, this Final Order or the DIP Loan Documents, nothing in this Final Order, the Prior Interim Orders or the DIP Loan Documents shall relieve the Debtors of any obligations under federal, state, territorial, or local police or regulatory laws or under 28 U.S.C. § 959(b), provided that nothing herein shall limit or impair the Debtors' rights to assert defenses under applicable law and nothing herein shall create new defenses to obligations under police or regulatory laws or 28 U.S.C. § 959(b).

(b)       Notwithstanding anything to the contrary in the Prior Interim Orders, this Final Order, or the DIP Loan Documents, nothing in this Final Order, the Prior Interim Orders or the DIP Loan Documents shall impair or adversely affect the United States of America's rights, claims and defenses of set-off and recoupment, if any, or any of its agencies, departments or agents, if any, and all such rights, claims and defenses, if any (the "<u>Setoff/Recoupment Rights</u>") shall be preserved in their entirety; *provided, however*, that the exercise of any such Setoff/Recoupment Rights must be in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules;

*provided further, however*, that (a) exercise of such Setoff/Recoupment Rights shall not impair or adversely affect the rights of the DIP Secured Parties and the Prepetition Secured Parties, as applicable, to assert remedies (if any) with respect to any Event of Default or Cash Collateral Termination Event, as applicable, in the event any such governmental unit exercises any such Setoff/Recoupment Rights, (b) nothing in this paragraph shall limit the right of any party in interest to challenge the Setoff/Recoupment Rights of any such governmental unit, and (c) nothing in the Prior Interim Orders, this Final Order, or the DIP Loan Documents shall modify or determine the rights or priority of any governmental unit's Setoff/Recoupment Rights vis-à-vis the rights and liens of the DIP Secured Parties and the Prepetition Secured Parties, as applicable, and all rights of the governmental units and the DIP Secured Parties and Prepetition Secured Parties with respect to the determination of such rights or priority (to the extent such priority is a disputed issue) are preserved.

(c)     With respect to environmental liabilities to any governmental unit, to the extent that the actions of the DIP Secured Parties or Prepetition Secured Parties constitute, within the meaning of 42 U.S.C. § 9601(20)(F) and (G), actual participation in the management or operational functions of a vessel or facility owned or operated by the Debtors, the rights of such governmental unit under applicable laws are preserved, and all rights of the DIP Secured Parties and the Prepetition Secured Parties to contest such liability or status under applicable law are preserved.  For the avoidance of doubt, in determining to make any loan or other extension of credit under the DIP Credit Agreement, permitting the use of Cash Collateral, performing under the Prior Interim Orders, the Final Order and the DIP Loan Documents in the ordinary course, no DIP Secured Party or Prepetition Secured Party shall be deemed to have participated in the management or operational functions of a vessel or facility owned or operated by the Debtors, or

to have otherwise caused lender liability to arise or assumed the status of control, responsible person, owner, or operator provided, however, that participating in management within the meaning of 42 U.S.C. § 9601(20)(F) and (G) would not be ordinary course performance.

(d)     Within one business day of any modification to the Approved Budget, the Debtors must provide notice of the modified budget to the United States by e-mail through its counsel.

45.     <u>Reservation of Rights of Universal Plant Services (VI), LLC AltairStrickland V.I., LLC, Vivot Equipment Corporation and Virgin Islands Industrial Services, LLC</u>.  Notwithstanding anything in the Prior Interim Orders or this Final Order indicating to the contrary, nothing in the Prior Interim Orders or this Final Order will change or otherwise modify the prepetition priority of (i) any statutory liens, and (ii) any other rights and/or claims of Universal Plant Services (VI), LLC ("<u>UPS</u>"), AltairStrickland V.I. LLC ("<u>AltairStrickland</u>"), Vivot Equipment Corporation ("<u>Vivot</u>") and Virgin Islands Industrial Services, LLC ("<u>VIIS</u>") (collectively, the "<u>Construction Lien Objectors</u>"), whose rights, if any, are hereby expressly preserved, except with respect to the DIP Liens granted to the DIP Secured Parties under the circumstances set forth in this paragraph. To the extent that a Construction Lien Objector has a lien on any DIP Collateral as of the Petition Date that is valid, enforceable, nonavoidable, and perfected, including as permitted by section 546(b) of the Bankruptcy Code, and such lien (or any amount owed associated with such lien) was senior in priority to any of the Prepetition Secured Parties Liens, such lien shall be treated as a Permitted Prior Lien and shall not be junior in priority to the DIP Liens or subordinated to any other liens created under this Order, including adequate protection liens granted to any party. The Construction Lien Objectors reserve their rights and nothing in this Final Order limits their rights, if any, to request adequate protection equal to the diminution in value of their interest in collateral,

if any, or seek other legal and equitable remedies with respect to the Debtors' assets. Each of the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties' rights to contest or otherwise object to such request or exercise of legal or equitable remedies or to any assertion of liens, interest or other claims of the Construction Lien Objectors are hereby reserved.

46.     <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

47.     <u>Effect of this Final Order</u>.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

48.     <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction with respect to all matters arising from or related to the DIP Loan Documents and the implementation of this Final Order.


**Signed:  August 27, 2021.**


**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit A

## Approved Budget

**Limetree Bay Refinery**

**Proposed 8.20 Budget Forecasted Results of Operations and Cash Flows**

Wks Beginning _8/9/21_ thru _10/25/21_

| | | Actuals | | Budgeted | | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week -----> | | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | |
| Beginning of Week | | 8/9/21 | 8/16/21 | 8/23/21 | 8/30/21 | 9/6/21 | 9/13/21 | 9/20/21 | 9/27/21 | 10/4/21 | 10/11/21 | 10/18/21 | 10/25/21 | |
| End of Week | | 8/15/21 | 8/22/21 | 8/29/21 | 9/5/21 | 9/12/21 | 9/19/21 | 9/26/21 | 10/3/21 | 10/10/21 | 10/17/21 | 10/24/21 | 10/31/21 | |
| **Cash Receipts** | | | | | | | | | | | | | | |
| BP | [1] | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Excess Construction Material | [2] | 62 | - | 100 | - | 600 | - | 100 | 500 | - | - | 100 | 500 | 1,962 |
| Est. J. Aron Proceeds/Lien Release | | - | - | - | - | - | - | - | - | 18,008 | - | 20,000 | - | 38,008 |
| Resale of Flushing Oil | | - | - | - | - | - | - | 840 | - | - | - | - | - | 840 |
| Insurance Proceeds - TBD | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sale of Spare Parts | | - | - | - | - | - | - | - | - | - | - | - | 2,500 | 2,500 |
| Asset Sale - TBD | [3] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total    Cash Receipts** | | $ 62 | $ - | $ 100 | $ - | $ 600 | $ - | $ 940 | $ 500 | $18,008 | $ - | $20,100 | $ 3,000 | $ 43,311 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Payroll / Benefits | | $ 1,384 | $ 134 | $ 1,268 | $ 324 | $ 1,259 | $ - | $ 1,234 | $ - | $ 201 | $ - | $ - | $ - | $ 5,804 |
| Fuel | | 365 | 349 | 390 | 390 | 390 | 390 | 390 | 195 | 195 | 195 | 195 | 195 | 3,639 |
| Maintenance and Other Outside Services | | 430 | 218 | 298 | 298 | 298 | 298 | 30 | 30 | 30 | 30 | 30 | 30 | 2,018 |
| Insurance | [4] | - | - | 571 | - | - | - | - | - | 353 | - | - | 311 | 1,235 |
| Utilities / Water | | - | - | 403 | - | - | - | 403 | - | - | - | 403 | - | 1,208 |
| IT Support / Software / Hardware | | - | 121 | 159 | 141 | 8 | 16 | 64 | 141 | 8 | 2 | 50 | - | 709 |
| Environmental / Safety | | - | - | 184 | - | - | 184 | - | - | - | 184 | - | - | 552 |
| Building / Site Maintenance | | - | - | 79 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 435 |
| Limetree Village Costs | | - | - | 54 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 144 |
| Admin Services | | 167 | 78 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 797 |
| Misc | | 0 | - | 81 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 448 |
| Relocation Costs | | - | 544 | - | 1,392 | - | - | - | 617 | - | - | - | - | 2,554 |
| Community Incident Response | [5] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Limetree Bay Terminal Services | | 150 | 150 | 150 | 150 | 150 | - | - | - | - | - | - | - | 750 |
| EPA Mandated Equipment Purchase | | 89 | - | - | - | - | - | - | - | - | - | - | - | 89 |
| EPA Mandated Independent Observer | | - | - | 30 | - | 30 | - | 30 | - | 30 | - | 30 | - | 150 |
| Utility Adequate Assurance Payment | | - | - | 403 | - | - | - | - | - | - | - | - | - | 403 |
| Flare Repair | | 78 | 50 | - | - | - | - | - | - | - | - | - | - | 128 |
| Hydrocarbon Removal | [6] | 344 | 849 | 310 | 310 | 1,010 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 4,994 |
| **Total    Cash Disbursements** | | $ 3,006 | $ 2,493 | $ 4,435 | $ 3,151 | $ 3,290 | $ 1,343 | $ 2,606 | $ 822 | $ 1,890 | $ 866 | $ 1,164 | $ 992 | $ 26,056 |
| **Operating Cash Flow** | | $ (2,944) | $ (2,493) | $ (4,335) | $ (3,151) | $ (2,690) | $ (1,343) | $ (1,666) | $ (322) | $16,118 | $ (866) | $18,936 | $ 2,008 | $ 17,255 |

## Limetree Bay Refinery

**Proposed 8.20 Budget Forecasted Results of Operations and Cash Flows**

Wks Beginning   8/9/21   thru   10/25/21

|  |  | | Actuals | | Budgeted | | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week -----> | | | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | |
| Beginning of Week | | | 8/9/21 | 8/16/21 | 8/23/21 | 8/30/21 | 9/6/21 | 9/13/21 | 9/20/21 | 9/27/21 | 10/4/21 | 10/11/21 | 10/18/21 | 10/25/21 | |
| End of Week | | | 8/15/21 | 8/22/21 | 8/29/21 | 9/5/21 | 9/12/21 | 9/19/21 | 9/26/21 | 10/3/21 | 10/10/21 | 10/17/21 | 10/24/21 | 10/31/21 | |
| **Other (Sources) / Uses** | | | | | | | | | | | | | | | |
| DIP Financing Costs | [7] | | $ 50 | $ - | $ - | $ - | $ 51 | $ - | $ - | $ - | $ 42 | $ 500 | $ - | $ 500 | $ 1,143 |
| Insurance Claims Professionals | | | - | - | - | 50 | - | - | - | - | 50 | - | - | 50 | 150 |
| Term Lender Agent Fee | | | - | - | 50 | - | - | - | - | - | - | - | - | - | 50 |
| Engineering Professionals (Turner Mason) | | | - | - | 150 | - | - | - | - | - | - | - | - | - | 150 |
| *Total*   Other (Sources) / Uses | | | 50 | - | 200 | 50 | 51 | - | - | - | 92 | 500 | - | 550 | 1,493 |
| **Net Cash Flow Before Professional Fees** | | | (2,994) | (2,493) | (4,535) | (3,201) | (2,741) | (1,343) | (1,666) | (322) | 16,026 | (1,366) | 18,936 | 1,458 | $ 15,761 |
| **Professional Fees** | | | | | | | | | | | | | | | |
| Debtor Legal | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 800 | $ - | $ - | $ 800 | $ 1,600 |
| DIP Lender Counsel | | | - | - | 50 | - | 200 | - | - | - | 200 | - | - | 200 | 650 |
| Debtor Chief Restructuring Officer | | | - | - | - | - | - | - | - | - | 280 | - | - | 280 | 560 |
| UCC Legal and Financial Advisor | | | - | - | - | - | - | - | - | - | 600 | 350 | - | - | 950 |
| Term Lender Professionals | | | - | - | - | - | - | - | - | - | 250 | - | - | - | 250 |
| Independent Director | | | - | - | - | - | - | - | - | - | 15 | - | - | - | 15 |
| Revolver Counsel | | | - | - | - | - | - | - | - | - | 100 | - | - | - | 100 |
| US Trustee Fees | | | - | - | - | - | - | - | - | - | - | - | 250 | - | 250 |
| Investment Banker | | | - | - | - | 100 | - | - | - | - | 100 | - | - | - | 200 |
| BMC - Claims Agent | | | - | - | - | - | - | - | - | - | 50 | - | - | - | 50 |
| *Total* | | | $ - | $ - | $ 50 | $ 100 | $ 200 | $ - | $ - | $ - | $ 2,395 | $ 350 | $ 250 | $ 1,280 | $ 4,625 |
| **Net Cash Flow** | | | $ (2,994) | $ (2,493) | $ (4,585) | $ (3,301) | $ (2,941) | $ (1,343) | $ (1,666) | $ (322) | $13,631 | $ (1,716) | $18,686 | $ 178 | $ 11,136 |
| *Accumulated* | | | $ (2,994) | $ (5,487) | $ (10,071) | $ (13,372) | $ (16,313) | $ (17,656) | $ (19,321) | $ (19,643) | $ (6,012) | $ (7,728) | $ 10,958 | $ 11,136 | |
| **Beginning Cash Balance** | | | $ 956 | $ 7,962 | $ 5,469 | $ 884 | $ 5,583 | $ 2,642 | $ 1,300 | $ 1,134 | $ 813 | $14,443 | $ 7,727 | $18,914 | |
| **Net Cash Flow** | | | (2,994) | (2,493) | (4,585) | (3,301) | (2,941) | (1,343) | (1,666) | (322) | 13,631 | (1,716) | 18,686 | 178 | |
| **DIP Draw** | | | 10,000 | - | - | 8,000 | - | - | 1,500 | - | - | - | - | - | |
| **DIP (Paydown)** | | | - | - | - | - | - | - | - | - | - | (5,000) | (7,500) | (12,500) | |
| **Ending Book Cash Balance** | | | $ 7,962 | $ 5,469 | $ 884 | $ 5,583 | $ 2,642 | $ 1,300 | $ 1,134 | $ 813 | $14,443 | $ 7,727 | $18,914 | $ 6,592 | $ 6,592 |
| **Ending DIP Balance** | | | $15,500 | $15,500 | $15,500 | $23,500 | $23,500 | $23,500 | $25,000 | $25,000 | $25,000 | $20,000 | $12,500 | $ - | $ - |
| | | | | | | | | | | | | | | | | |
| *Debtor Professional Fees Accrued (Cumulative)* | | | $ 1,558 | $ 1,869 | $ 2,181 | $ 2,492 | $ 2,804 | $ 3,115 | $ 3,427 | $ 3,738 | $ 2,970 | $ 3,282 | $ 3,593 | $ 2,825 | |
| *UCC Professional Fees Accrued (Cumulative)* | | | $ 279 | $ 371 | $ 464 | $ 557 | $ 650 | $ 743 | $ 836 | $ 929 | $ 421 | $ 164 | $ 257 | $ 350 | |

[1] - The Debtors have outstanding invoices to BP in the amount of approximately $32 million in respect of operational expenses incurred during the months of August 2020 through the present, under the Tolling Agreement. Such invoices are disputed by BP. These amounts are not included in the 12-week projection period as the CRO is currently investigating the validity of these outstanding amounts as well as the validity of any set-off claims.

[2] - Additional $2.0 million in collections are projected after the 13-week period.

[3] - USVI holds a letter of credit in the amount of $50 million split 50/50 between LB Terminals and LB Refining. Under the Operating Agreement such amounts can be used for payment defaults and environmental assurances.

[4] - Existing premiums; coverages are currently under review with agents.

[5] - Subject to mediation.

[6] - More spend after this period anticipated in order to complete hydrocarbon removal. Budgeting currently in process.

[7] - Assumes DIP Draws of $5.5 million on 7/12/2021, $10.0 million on 8/9/2021, $8.0 million on 8/30/2021, and $1.5 million on 9/20/2021, and DIP Repayments of $5.0 million on 10/11/2021, $7.5 million on 10/18/2021, and $12.5 million on 10/25/2021. Assumes an annual cash interest rate of 3.0%, annual PIK interest rate of 9.0%, annual delayed draw interest of 1.5%, and an agent fee of 0.25% on the total commitment amount.

**Limetree Bay Services LLC** *et al.*

**Cash Budget Assumptions - 12 weeks through October 31, 2021**

| Budget Line Item | 12 Wk Totals | Assumption |
|---|---|---|
| **Cash Receipts** | | |
| Excess Construction Material | $  1,962 | Net proceeds on sale of surplus materials previously purchased for refinery restart. |
| Est. J. Aron Proceeds/Lien Release | 38,008 | Week 13 receipt estimates net proceeds to be released from J. Aron inventory less amounts owed; Week 15 receipt projects catalyst sale proceeds. |
| Resale of Flushing Oil | 840 | Proceeds on sale of flushing oil used in hydrocarbon removal process; assumes realization of 80% of cost. |
| Sale of Spare Parts | 2,500 | Estimate of proceeds from sale of spare parts; installment as part of liquidation scenerio only. |
| **Operating Cash Disbursements** | | |
| Payroll / Benefits | 5,804 | Wages, benefits, 1099 contractors (including shared employees with LBT).  Current run rate less 10% attrition per bi-weekly pay period.  Conversion to contractors at 9/18 (end of WARN notice period). |
| Fuel | 3,639 | 540 barrels of diesel fuel at $95/barrel used through week 11 (approximately 42% of total LBR + LBT use).  Reduced by half from weeks 12-16 aligned with labor reductions. |
| Maintenance and Other Outside Services | 2,018 | Current run rates through mid-September with significant reductions thereafter aligned with wind-down.  Remainder focused on health and safety. |
| Insurance | 1,235 | Existing coverages |
| Utilities / Water | 1,208 | Current run rate costs of approximately $400k per month. |
| IT Support / Software / Hardware | 709 | Payments for ongoing and necessary software and hardware maintenance costs. |
| Environmental / Safety | 552 | Emergency response supplies and equipment, waste disposal, environmental licenses. |
| Building / Site Maintenance | 435 | Gasoline/diesel fuel for maintenance department, fleet garage costs. |
| Limetree Village Costs | 144 | Costs to wind down onsite meals and lodging facility.  Assume reduction to basic maintenance effective week ending 9/5. |
| Admin Services | 797 | Pinnacle and shared services costs assumed to ramp down aligned with wind down of refinery. |
| Misc | 448 | Freight, office supplies, security, and misc costs. |
| Relocation Costs | 2,554 | Assumes relocation for 80 employees and families to mainland. |
| Limetree Bay Terminal Services | 750 | Storage payments to Terminals of $150k per week through week ended 9/12. |
| EPA Mandated Equipment Purchase | 89 | Requried equpment purchased week ended 8/15. |
| EPA Mandated Independent Observer | 150 | $30k bi-weekly for monitoring. |
| Utility Adequate Assurance Payment | 403 | One month adequate assurance deposit for waste water, internet, telephone, internet and gas |
| Flare Repair | 128 | Required repairs completed as of 8/22. |
| Hydrocarbon Removal | 4,994 | Assumes six month process. $310k per week plus 5,000 barrel flush in week ended 8/22 and 10,000 barrel flush in week ended 9/12. |
| **Other Sources/Uses** | | |
| DIP Financing Costs | 1,143 | DIP Lender fees and interest |
| Insurance Claims Professionals | 150 | Claro Group engaged to review insurance coverages and claims  Retention application to follow. |
| Term Lender Agent Fee | 50 | Per agreement. |
| Engineering Professionals (Turner Mason) | 150 | Remaining budgeted payments to Turner Mason for engineering study - re-start costs and alternative uses for sale process. |