IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 21-32351-11 |
| | § JOINTLY ADMINISTERED CASES |
| LIMETREE BAY SERVICES, LLC, | § HOUSTON, TEXAS |
| ET AL, | § MONDAY, |
| | § DECEMBER 6, 2021 |
| DEBTORS. | § 4:32 P.M. TO 6:43 P.M. |

EMERGENCY MOTION HEARING (VIA ZOOM)

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

CASE MANAGER: Mr. Alonzo

(RECORDED VIA COURTSPEAK)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (VIA ZOOM):

| | |
|---|---|
| FOR THE DEBTOR: | BAKER & HOSTETLER, LLP<br>Elizabeth Green, Esq.<br>200 S. Orange Ave.<br>SunTrust Center, Suite 2300<br>Orlando, FL 32801<br>407-649-4000 |
| FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS: | PACHULSKI STANG ZIEHL & Jones, LLP<br>Michael D. Warner, Esq.<br>440 Louisiana Street<br>Suite 900<br>Houston, TX 77002<br>713-691-9385 |
| FOR GOLDMAN SACHS BANK USA: | CLEARY GOTTLIEB<br>Sean A. O'Neal, Esq.<br>One Liberty Plaza<br>New York, NY 10006<br>212-225-2416 |
| FOR THE UNITED STATES OF AMERICA: | US Attorney's Office<br>Richard A. Kincheloe, Esq.<br>1000 Louisiana St., Ste. 2300<br>Houston, TX 77002<br>713-567-9422 |
| FOR ST. CROIX ENERGY, LLLP: | ROPES AND GRAY, LLP<br>Gregg M. Galardi, Esq.<br>1211 Avenue of the Americas<br>New York, NY 10036<br>212-596-9000 |
| FOR JEFFERIES: | JEFFRIES<br>Michael O'Hara<br>Co-head of US Restructuring<br>& Managing Director |

APPEARANCES (CONT'D - VIA ZOOM):

FOR BAY, LTD.:

HAYNES AND BOONE, LLP
Patrick L. Hughes, Esq.
1221 McKinney, Ste. 4000
Houston, TX 77010-2007
713-547-2550

(Please also see Electronic Appearances.)

# INDEX


| WITNESSES: | Direct | Cross | Redirect | Recross | VOIR DIRE |
|---|---|---|---|---|---|
| MICHAEL O'HARA | | | | | |
| By Ms. Green | 26 | . | . | . | . |
| By Mr. Galardi | . | 32 | . | . | . |
| By Mr. Hughes | . | 36 | . | . | . |
| MARK SHAPIRO | | | | | |
| By Mr. Hughes | . | 43 | . | 76 | . |
| By Mr. Galardi | . | 59 | . | . | . |
| By Mr. Brookner | . | 68 | . | . | . |

| EXHIBITS: | Admitted |
|---|---|
| ECF 862-2 | 42 |


. . .

HOUSTON, TEXAS; MONDAY, DECEMBER 6, 2021; 4:32 P.M.

THE COURT: All right. Then officially good afternoon, everyone. This is Judge Jones. The time is 4:32 Central. Today is today is the December the 6th, 2021. This is the Docket for Houston, Texas.

Next on this afternoon's hearing -- or on this afternoon's Docket is a hearing in the jointly administered cases under Case Number 21-32351, Limetree Bay Services.

Folks, please don't forget to record your electronic appearance. That's a quick trip to my website, a couple of mouse clicks. You can do that at any time prior to the conclusion of the hearing.

The first time that you speak, if you would, please state your name and who you represent. It really does help the court reporters do a difficult job.

Finally, we are recording using CourtSpeak. We'll have the audio up on the Docket, available for your download off of CM/ECF, shortly after the conclusion of the hearing.

So, Ms. Green, am I starting with you, or are you deferring?

MS. GREEN: No. Yes, Your Honor, you're starting with me.

THE COURT: All right. Thank you. Good afternoon.

MS. GREEN: Good afternoon. Elizabeth Green on behalf of the Limetree Debtors. I have with me both

Mr. Shapiro and Michael O'Hara. And thank you, Your Honor, for making time to hear us today. I know it was short notice.

THE COURT: No.

MS. GREEN: Would you like me to start?

THE COURT: What I would really like is -- I got a -- just I got a very small idea of what you wanted to discuss in today's conference from Mr. Alonzo. But just so we're all on the same page, I would love for you just to spend a couple of minutes and sort of make sure I'm on the same page as everyone else.

MS. GREEN: Yes, Your Honor. And we did file the emergency motion which sets forth what we'd like to discuss today.

THE COURT: So --

MS. GREEN: Your Honor, the topic is not something, actually, that myself or the Debtors' professionals or, quite frankly, the Debtors take lightly.

THE COURT: Sure. And Ms. Green, if I could -- and I'm so very sorry. I have literally been on the bench since 9:00 o'clock this morning, I haven't stepped off, so I -- if you have filed something, I haven't read it. If you think it would be beneficial, I will -- you know, we'll stop for five minutes and I will go read it. But I didn't want you -- you know, normally, I've read everything, but today, I've read nothing. So I either need for you to educate me or say let's

take a break, so you can go read it.

MS. GREEN: Certainly understandable, Your Honor. I think I can tell you what the issue is and where we are.

THE COURT: Okay.

MS. GREEN: And then we can go from there.

There's case law cited in our memorandum that I'm not going to be able to cite to you off the top of my head. But in terms of what the issue is, I certainly can tell Your Honor what it is.

Your Honor, the issue is, is that the Debtors have filed a motion to reopen the auction. The reason we filed a motion to reopen the auction is that a bidder, who the Debtors professionals, specifically Mr. O'Hara, had been working with prior to the bid deadline had a medical emergency that basically prohibited them from executing the APA and providing the bid deposit.

The individual who was -- basically had this medical emergency is the CEO of the company that's the bidder. He's also a former investment banker. And as the papers state, he was the only one who really had any knowledge of this deal, of the APA, and could -- who could approve the deposit. And unfortunately, due to the medical emergency for which he was hospitalized -- I don't really want to get into his medical condition with 150 people on the --

THE COURT: Agreed.

MS. GREEN: -- Zoom call. But clearly, he was the person who was going to sign the APA and authorize the deposit, and he wasn't able to do so.

We knew that. They were actually the lead bidder at -- before the auction, before the bid deadline. And we knew that he had a medical issue. Unfortunately, because of this case and the fact that we had limited funds available, we went forward with the auction.

Thereafter, the bidder contacted Mr. O'Hara and indicated that they wanted to bid. They did, in fact, do that now. They provided a three-million-dollar deposit, which is their bid deposit, and a thirty-million-dollar bid for substantially all of the Debtors' assets.

This entity intends to operate the refinery. They have a background in bunkering and petrochemicals and they're in the region; they're actually in Jamaica. Their counsel is here, I believe, Jamie Liggets (phonetic), who can shed some more light on that.

But essentially, what the Debtors are asking is to reopen the auction. The bid procedures do provide, in paragraph 24, that the auction can be reopened at any time prior to the sale hearing. However, given the issues in this case and the fact that there's a lot of people involved and, frankly, in having transparency, we felt it was appropriate to come to the Court and ask that the auction be reopened.

Frankly, like I said, it's not something that the Debtors' professionals take lightly. It's not something that the Debtor takes lightly. But Mr. Shapiro believes that, in his business judgment, that this is a better offer for the estate by almost $10 million, and that, essentially, we should go forward and reopen the auction.

We don't want to prohibit anybody from participating in the auction. Clearly, St. Croix, as the bidder, can bid against this bid, which is by the West Indies Group. But that's the relief the Debtor is seeking today.

THE COURT: All right. Thank you.

I at least made it through page 12 of your motion while you were talking.

But let me ask: Does anyone else have a -- what I'll just take as an opening statement with respect to the Debtors' requested relief, as well as the basis for it?

Let me start first, I see both Mr. Pomerantz and Mr. Warner. Either one of you speaking for the Committee?

MR. WARNER: I am, Your Honor.

THE COURT: All right.

MR. WARNER: Good afternoon. Michael Warner, Pachulski Stang. As you see, Mr. Pomerantz is also on.

The Committee, like the Debtor, does not take lightly the motion before the Court. And the Debtors and the Committee has spent some considerable time since this came to

us on Friday, and the Committee is of the belief that the Court should allow the Debtor to proceed as it proposes.

Mr. Shapiro is making, we believe, a good business judgment that will bring to the table two potential going concern bidders, we hope. And obviously, as the Court has said from the beginning of the case, as the Committee has said since the beginning of the case, a going concern transaction makes good sense for this Debtor. This is not a case where creditors are going put lots of money in their pocket from a sale. This is a case where we need a going concern. And we're thrilled to hear that there is a potential other buyer.

Between now and the time the auction is held, assuming the Court agrees with what the Debtor is requesting, we intend to spend some time with West Indies and discuss with them their bid and understand their future and their business model, which is all new to us. And as you can imagine, up until now, St. Croix, the current bidder, has been the only game in town, the only going concern proposal. And as a result, we're going to spend some time with them, as well now, if we have potentially have two.

THE COURT: All right. And anyone else?

Mr. Galardi, I'll get to you in just a second.

Mr. Brookner, I assume that your client is supportive of this? It may actually solve your problem, you hope.

MR. BROOKNER: Your Honor, I -- yeah. I'm sorry. Can you hear me, Your Honor?

THE COURT: I can now. Thank you.

MR. BROOKNER: Sorry about that, Your Honor. I'm having headphone problems today.

Yeah, I have a variety of comments I do want to make. I think they're probably better served for closing. But you know, in the opening given the summary -- allowing this to happen solves a variety of what could be very ugly problems and a morass of nuclear winter litigation that Your Honor would have to be dealing with if the bids don't come in at this level. So we strongly support the motion and the request to reopen the auction, so we can proceed with this potential second bidder at $30 million.

THE COURT: All right. Thank you.

Anyone else who supports the Debtors' motion wish to make what I'll take as opening remarks?

MR. O'NEAL: Your Honor, Sean O'Neal, Cleary Gottlieb, on behalf of Goldman Sachs.

THE COURT: Yes, sir. Good afternoon.

MR. O'NEAL: We just -- we also support this motion. We think it's very important in light of the situation, for all of the reasons that everybody else has talked about.

We also think that the facts of this case are distinguishable enough, where, if you were to grant this

relief and we went forward, it's not as though we're -- it's precedent for other situations, where you have disappointed bidders coming in who missed deadlines. I don't see that just given the specific facts at issue with the medical emergency, we think this is clearly distinguishable from those situations and it's really beneficial for the estate. And you know, maybe there will be another auction with an even higher bid than $30 million, and that would be a fantastic result, as well.

THE COURT: All right. Anyone else that supports?

Mr. Kincheloe?

MR. KINCHELOE: Your Honor, if I could slide in between those who support and those who oppose.

THE COURT: I did not ask for neutrality. I got you. All right. My apologies.

MR. KINCHELOE: Two things from the Government's side:

One, the EPA has had a lot of conversations with St. Croix Energy, and I want to reiterate I really appreciate -- the EPA really appreciates that they have engaged in a very open dialogue for not only what we have today, but we've at least had the dialogue, which has been good.

THE COURT: Sure.

MR. KINCHELOE: One thing that is much different about this new proposal versus the current one we're

discussing is when title transfers. The new bid, as I understand it, does present a much cleaner break point. And regardless of who wins, that results in, you know, this bid or St. Croix Energy providing their bid t be a clean break point, that is something that changes the landscape for the EPA.

On the flip side --

THE COURT: Can you --

MR. KINCHELOE: -- something --

THE COURT: And I'm sorry because I want to make sure I'm following you. How does it change the landscape from the EPA's point of view?

MR. KINCHELOE: So, Mr. Galardi, jump on me if I'm saying something wrong. But as I understand the current -- the current leading bid for St. Croix Energy is they will take title to the personal property that is sort of metal at closing in December. And then they have a period of time to seek decisions from EPA. And if they get the decisions they like, then they'll take title to the real property; if they don't get decisions, then it’s left for the ones refining.

The new proposal, as I understand it, is title to everything passes in December. And so that just -- in terms of the consent decree that's out there, the stipulation that's pending before you and the Virgin Islands, it makes it very clear whether the buyer, under a clean break scenario, has to become party because there's no dispute about what's being

transferred and whether that transfer is enough to trigger the obligations under the consent decree for a predecessor to become a party. So that's one consideration.

The second consideration, which Mr. Galardi may point out -- and I apologize for stealing his thunder -- is the Government does have concerns about who owns this facility going forward. If it is a non-U.S. national or a company owned by non-U.S. nationals, there is a review period. If the new bidder insists on closing in December, the Government may not finish its review in that time, and I may come to court and say the statute gives us beyond the closing date. So that is a potential problem we are going to have to address if the Court does reopen the bidding.

But I say those, I mean, from the Government's perspective, there's a little good, there's a little bad. But I wanted the Court to have those data points.

THE COURT: No. Very helpful. Thank you.

Anyone else like to make opening comments that either supports the proposal or is neutral?

(No verbal response)

THE COURT: All right. Mr. Galardi?

MR. GALARDI: You know, I may be supportive, Your Honor, but I won't be.

(Laughter)

MR. GALARDI: So, very basically, look, I don't even

think very much about the evidence. Obviously, we're disappointed about this event. But I think everyone is focusing on reopening the auction. Your Honor, it is not as simple as reopening the auction.

The bid procedures order that Your Honor entered did require somebody to be a qualified bid to even attend the auction, paragraph 4. Paragraph 4 said you had to be a qualified bidder before the auction began. So, even if Your Honor reads this -- and I know this is a technicality, but I'm going to say it -- that this bidder was not qualified at the time.

And quite frankly, we're very disappointed. And I know none of the professionals intended this, but this was actually two weeks. The auction was held on November 18th. They got notice on December 1st that there was a re-auction. I think Your Honor has to decide on an excusable neglect standard whether something happened. I understand the medical emergency, but that party has not come in and given a reason for excusable neglect as to why Your Honor should give them a back-dating of the qualified bid.

I think Mr. O'Hara, in his Declaration and in his statements, has already noted that they knew about this when they commenced the auction. They could have taken the risk. And really, what you're hearing here is they have seller remorse because they could have delayed it and taken the risk,

they didn't do so, and now they have more money.

But we don't think you can open up the qualified bid standard since the auction, under all circumstances, has started and this bidder was not deemed a qualified bidder at the start of the auction and, under Your Honor's order, cannot now be a qualified bidder at -- even if you reopen the auction. A technicality, but I did want to let Your Honor know that that is our position.

THE COURT: No, understood. Thank you.

Let me ask, Ms. Green, just so that there is no ambiguity: What would be -- what would be the proposed time schedule, as well as the structure of the auction, if you will?

(No verbal response.)

THE COURT: So, Ms. Green, we can't hear you.

MS. GREEN: Sorry, Your Honor.

THE COURT: Quite all right.

MS. GREEN: I muted myself, so there wouldn't be any background noise while people were talking, so I apologize.

THE COURT: No. Did you hear --

MS. GREEN: Your Honor --

THE COURT: Did you hear me?

MS. GREEN: I did, Your Honor.

THE COURT: Okay.

MS. GREEN: And the -- we had discussed having an

auction this coming Friday morning, that's Mr. O'Hara's wish time. We, of course, you know, understand that there are other parties involved, and that, you know, that may not be convenient for some of the bidders, so the Debtors are willing to work with the bidders.

What I would foresee is that Mr. Galardi's client would have the highest bid, and it would be overbid by the new bidder. I would anticipate that anybody who previously participated in the auction could participate and -- when we reopen the auction.

THE COURT: So let me tell you, to the extent that I'm inclined to grant the motion, if I were to do this, it would be an auction with only two parties because I think --

MS. GREEN: I --

THE COURT: -- to reopen it up in its entirety, everyone else had the opportunity to make their highest and best, they didn't. It is somewhat prejudicial to Mr. Galardi's client, through no fault of its own. But I also recognize that we live in an interesting time, with, you know, all sorts of issues going on. And I -- at least based upon what I've read -- and we haven't gotten to any evidentiary presentation, and I certainly want to hear from Mr. O'Hara as to his views. But you know, everyone has had their opportunity, with the exception of someone who had an emergency. So, if I'm going to do this, it's going to be a

two-party auction, I'm not starting over. So I just -- I want you --

MS. GREEN: Fair enough, Your Honor.

THE COURT: And again, I'll give everyone an opportunity to argue against that. I'm just -- I'm trying to be as transparent as I can possibly be because I think to totally reopen it up is overly unfair to Mr. Galardi's client.

MR. HUGHES: Your Honor, may I please be heard on this on the opposition side?

THE COURT: I thought you might.

MR. HUGHES: And I apologize, especially after --

THE COURT: No.

MR. HUGHES: -- hearing the others' comment. I want to take a moment, perhaps having to reconsider how this goes forward.

First, Patrick Hughes, Martha Wyrick, Bush Boyd (phonetic), and Jeremy Stone here for Bay, Ltd. I didn't want to tell -- make the announcement.

Your Honor, there's probably some things that Mr. Galardi and I may not agree about, and well, we thought we would be addressing those at tomorrow's hearing at 4:00 on the sale. But there is something that I think we can actually agree with, and that is, at least for Bay, we respectfully oppose this motion to reopen.

And while we would submit the process has not been

perfect, in virtually all respects, the auction itself was well run and brought out a host of bidders. To now have, to their detriment and reliance, a risk of having all of their investment, time, and fulsome bidding basically cast to the side.

Your Honor may have not known this, because I know you've been busy, they filed an objection to the characterization of Bay as the backup bids --

THE COURT: Right.

MR. HUGHES: -- and believe that, on a head-to-head, we were the -- we were the winning bid. And frankly, by the motion today filed by the Debtors, there's admissions made in there that we can get into, if necessary, that seem to confirm exactly what we've been saying, and that is the Bay and Sabin (phonetic) bids are better.

And we appreciate and I respect the professionals involved and not taking this lightly, but lost in this is that this is an extreme hardship on Bay and other bidders. Your Honor, Bay has incurred over $400,000 in outside costs, and they expended thousands of internal time, hours, with their people, working the process and trying to understand things. I'm sure St. Croix has, as well. I suspect Sabin has to a lesser degree becuase they were singularly focused on one asset.

We contend that, you know, reopening the bidding for

a non-participant would be something that would be pretty much unprecedented, in circumstances where, in a situation as complex and significant as this, it's somewhat incredulous that we would be doing this because somebody fell ill, as sympathetic as I might be.

The Court knows and is highly sensitive, from your earlier comments in these hearings -- which we've attended most of them -- this is a problem case and a problem asset. It's an asset that has polluted the Island and done harm to its inhabitants. Bay is part of the solution here. Its bid will restore the site to a usable condition, one that can allow for the Island to move forward. And in that process, which will take up to three years, it will be employing hundreds from the community in that process.

It's a pathway to helping to deal with the chronic environmental problem that exists and that the agency -- that the EPA has been safeguarding by its consent degree, which makes it extremely hard, if not highly unlikely, that a restart will happen. So, by that measure, Bay's bid is better for the Island.

Now I'm pleased that the gentleman's condition has improved, two weeks after the auction, to now come forward, after seeing everybody's hold card, to want to now participate. But what is incredulous in this is that, in the few hours we've had since this was filed, I would note that,

of the five directors of this company, he is only one. There are four others.

This is a company that does bunkering of fuel and has a -- its own -- it owns and operates out of Jamaica. From Zoom info, complete hearsay, but $5 million a year of revenue. So it's going to be important to understand, keying off what Mr. Kincheloe already alluded to, who is behind this bid, what's behind it?

One of the requirements Mr. Kincheloe and the DOJ require is that the bidders who did participate attest to their citizenship because that's an important element of this. And so we did that, we did that within 24 hours, well before based out of Corpus Christi. We assume that the other bidders have, too. We don't know that this bidder has, we don't know who's behind this bidder. We don't know if Venezuela, China, any number of people are behind this bidder. It's a little late in the day to have to go through all this.

We urge the Court to follow Judge Bohm's decision in *Bigler*, at 443 B.R. 101. And Your Honor understands and appreciates what *Bigler* stands for, and you have your own mind on how things should go. But we think *Bigler* is fully aligned with this Court's views that the process has to be respected, and that you don't just simply reopen the bidding because somebody crossed and offers up a little more money, money which will probably be chewed up on all the litigation expense

between now and the time we get done with this process.

You know, *Bigler* observed that, as the auction occurs with rival bidders having a full and fair opportunity to bid, which this auction did, this auction itself should stand. And Judge Bohm actually invoked and cited to the Fifth Circuit's decision in *First National Bank v. M/V Lighting and Power*, at 776 F.2d 1258, that auctions should not be empty exercises. The public policy of inspiring confidence in court-ordered sales favors confirmation of a sale to the highest bidder at the auction that the discovery conducted.

Bay was prepared to present evidence tomorrow, and we're still prepared, on why it and Sabin's bid is better than the St. Croix bid. And I'm sure Mr. Galardi would relish the opportunity to tell me why I'm wrong, and perhaps a whole lot of others would, but we think that the evidence will show that we're the better bid and that we're the better value, and that, in fact, St. Croix's bid is not real at all.

The way this last-minute change, respectfully, is now proffered, cash down and the sanctity of the process here, shouldn't just be about money. It should be about what's fair and right to the parties and the public who are asked to participate in these processes. We relied, to our detriment, at great expense, to engage in a process. We went through 13 rounds of bidding. And incredibly, and to the credit of the auction process here, Judge, the bids for the so-called

"back-up process" actually exceeded the St. Croix process.

And while I don't have the transcript of the auction itself, but I have asked for it for three or four days and cannot get, we expressly objected to the St. Croix bid at the start of the auction because, just as it was made clear to you the Monday before the auction, it was made clear when the auction came to St. Croix, our bid is not real if the TSA is not signed. And they even said, “We reserve the right to lower our bid from what it is if the TSA is not signed.”

I, for Bay, said, “Object.” I wasn't necessarily asked to object, but I said, “I object.” You can't just willy-nilly go to into auction as they ostensibly bid in a process without rules. And as it turned out to capably do an auction by Dee Riley and by Mr. O'Hara, we went through 13 rounds on the backup bid for the liquidation and the demolition of the property. And those bids, on a present value basis, exceed, especially when added to the Sabin bid, which is fourteen or $15 million of the catalyst, by far the bid by St. Croix.

Judge Bohm actually spoke in *Bigler*, and I know how important it is, the sanctity of the process, to this Court. He said: "While the Court certainly appreciates the need to maximize payment of claims" -- in this case, probably only administrative claims, Judge. "The Court must also always keep one eye cocked on promoting and preserving the integrity

of the judicial process. Reneging on clearly established and properly conducted procedures in order to generate some additional dollars for the estate undermines the integrity of the judicial process; indeed, it can undermine the integrity and reputations of the individual litigants and lawyers."

*Bigler*, 443, at 115.

So, with due respect to the other parties involved, this last-minute motion to invite a stranger to the process should be summarily denied, and Your Honor should proceed to the sale hearing tomorrow and give us the opportunity we've asked for in our objection to demonstrate to you why we're a better bid and why, perhaps, business judgment -- which we're not conceding here -- is something that clearly is mistaken. Thank you for hearing us out --

THE COURT: No, and --

MR. HUGHES: -- appreciate it.

THE COURT: Mr. Hughes, do you have an -- or does Bay have an agreement with Sabin to submit a single bid, going -- if they're -- if it had a chance to continue to bid, is -- are you bidding as a single unit?

MR. HUGHES: No, Your Honor, we're not. And I'll tell you why I don't think that matters. In talking to Sabin -- our bids are not -- they are completely complementary, there's no overlap. Sabin has not taken a position today and I can't speak for them. I can say that their bid is standing

and binding under the terms of the bid procedures for a period of time that lasts past the auction, so they're still bound. And so their bid would be combined with ours, whether they're standing shoulder to shoulder with me or not. And I would certainly welcome that somebody stand with me.

THE COURT: Do we have --

MR. HUGHES: We have people that --

THE COURT: Of course, of course. Do we have counsel for Sabin who is on -- who is on the call or online?

(No verbal response.)

THE COURT: Mr. Hughes, have you dealt with counsel for Sabin?

MR. HUGHES: I have spoken to their in-house general counsel, Your Honor. The name escapes me right now. I can look it up quickly for you?

THE COURT: Could you have somebody -- could you have somebody on your team reach out and see if they can join us?

MR. HUGHES: I will, Judge.

THE COURT: All right.

MR. HUGHES: If you'd just bear with me, I'm going to ask either Mr. Boyd or Ms. Wyrick to please --

THE COURT: Well, they both heard you --

MR. HUGHES: -- please --

THE COURT: -- and Mr. Boyd is on his -- he's

probably still got a BlackBerry. He's on his BlackBerry now.

(Laughter)

MR. BOYD: I've got -- I've just got two tin cans tied by a string, Your Honor.

THE COURT: Of course.

MR. BOYD: Your Honor, we'll reach out right now and start the contact.

THE COURT: All right. Thank you.

MR. HUGHES: It's Mark Payne (phonetic). I can give the number if Your Honor is okay with me doing that.

THE COURT: It would be -- it would be to Mr. Payne's detriment, not mine. If you'd like to go ahead and announce it.

MR. HUGHES: I'll tell you what, Judge. I'll just -- I'll forward this to them, so they can see if he's available.

THE COURT: All right. All right. Thank you.

And I didn't mean to take away anyone's --

MR. HUGHES: Apologies.

THE COURT: -- opportunity to that opposes the motion to speak.

Is there anyone else, other than Mr. Galardi and Mr. Hughes, that wishes to make comments that opposes the Debtors' motion?

(No verbal response.)

THE COURT: All right. Ms. Green, are you deferring to Mr. Rose for the presentation, or who's doing that?

MS. GREEN: No. Actually, I'm doing that, Your Honor.

THE COURT: All right. Thank you. So you're going to put on Mr. O'Hara?

MS. GREEN: I am.

THE COURT: All right. Mr. O'Hara, could you just confirm for me that you can hear me?

MR. O'HARA: Yes, Your Honor.

THE COURT: All right. Good afternoon. If you'd raise your right hand, please?

(Witness sworn.)

THE WITNESS: I do.

THE COURT: All right. Thank you.

Ms. Green, whenever you're ready.

MS. GREEN: Yes, Your Honor. I think there's -- I just need to make this stop making that noise, so it won't bother you.

THE COURT: It's all just fine.

MS. GREEN: Okay.

DIRECT EXAMINATION OF MICHAEL O'HARA

BY MS. GREEN:

Q Mr. O'Hara, can you please state your name for the Record?

A It's Michael Patrick O'Hara.

Q And what is your occupation?

A I'm a Managing Director at Jefferies, LLC.

Q And in connection with your position as Managing Director of Jefferies, LLC, have you had occasion to be retained by the Debtors as their investment banker?

A Yes, I have.

Q And in that position, did you basically run the operating side of the auction?

A It was myself and my team, yes, we ran a lengthy process to bring bidders to the table.

Q And there was a sales process in connection with that, also, right?

A Yes, there was.

Q And when was your initial contact with the West Indies Group?

A The -- the initial contact was in October, it was really with their -- their advisors, their lawyer Tom Eagan (phonetic) and some of their engineering consultants in (indiscernible) Valley and Jack Conas (phonetic), in I want to say like the third week of October, around that time period.

Q And did you continue to have conversations with them?

A Yeah, we had off-and-on conversations. They actually had previously represented a different group, the Virgin Island Group that had made an indication of interest. We

subsequently had learned that the Virgin Island group was very interested in the terminal business, as well. And when that didn't seem like that was going to be a possibility, they dropped out. This West Indies party contacted these representatives, based upon the significant amount of diligence that had already done and started working with them.

Q And can you describe generally what the West Indies Group is?

A Yeah. Yes, I believe it was mentioned earlier. But it's a Jamaican-based company that has a significant bunkering business, which basically provides petrochemicals for cruise ships. They have a fairly sizable terminals business, you know, similar, actually, to what St. Croix's terminals business is here in Jamaica. And they have a transportation business that they provide and ship crew to many of the Carribean and South and Central American countries.

Q And were you negotiating a form of the APA with saint -- I'm sorry -- with West Indies prior to the bid deadline?

A We were. We -- we provided -- we -- we learned of the identity of the West Indies Group the week prior to the qualified bidder deadline and we started doing that, we received an Asset Purchase Agreement markup, I want to say the Monday of the 8th. And then we proceeded to negotiate with their counsel back and forth on the APA.

Q And did the West Indies Group ever provide a bid deposit

or sign that APA?

A They -- they did not.

Q Prior to the auction.

A Correct.

Q And did you learn why?

A We understood that the -- the CEO of the company, who, as you mentioned in your remarks, is a former banker and handled all of the strategic transactions for the business, unfortunately, had a significant medical issue arise the day before bids were -- the qualified bids were due.

Q And what did you do after we did not receive a bid from West Indies?

A We -- we -- we wished them well. You know, I -- obviously, nobody likes to hear news like that. But you know, we didn't know what his status was going to be at any point in time going forward; and, therefore, we went and went forward with the auction, at which point the St. Croix bid was the stalking horse bid that we had negotiated and -- and really the only going concern bid that we received.

Q After the auction, were you contacted by the West Indies Group?

A We were contacted about a week ago, saying that the CEO had gotten better and was interested in potentially bidding. We didn't know whether that was going to be serious or not. We told them that the criteria of what it was to be a

qualified bidder and that, due to the nature of the auction had already proceeded, that it -- they may not be able to. But they moved forward in providing us with the documentation, putting a deposit down, and providing us with financial documents regarding the company and their financial wherewithal.

Q And did they also provide a deposit?

A Yes, that's what -- I had said that, as well.

Q I'm sorry.

And how much --

A No worries.

Q -- was the deposit?

A It -- it was $3 million, which was a 10 percent deposit on their APA purchase price of $30 million.

Q And was, ultimately, an executed APA submitted?

A It was.

Q And did you believe that the Debtors should consider this bid?

A Yes. Obviously, it's -- it's a -- it has a few things going for it. You know, it's a substantially higher purchase price, 50 percent, $10 million than the existing bid. It is based on a relatively seen time frame of closing, the closing date moved from an assumed price bid on 17 to what the West Indies are proposing through to the 22nd, and we feel very comfortable with a short delay.

We've done diligence with respect to the company and believe that they have the financial wherewithal to close, and they are going to close on all of the assets, as was indicated, rather than having to meddle around with the TSA.

And for a variety of those reasons, we thought it was necessary to bring it to the Court and hopefully reopen the auction.

Q Thank you, Mr. O'Hara.

THE COURT: All right. Thank you.

Anyone have any Cross for Mr. O'Hara?

MR. GALARDI: Your Honor, Gregg Galardi. Yes, Cross.

THE COURT: Certainly.

Let me first ask: Anyone that supports the Debtors' request have friendly Cross for Mr. O'Hara?

(Laughter)

THE COURT: All right, Mr. Galardi.

And then, Mr. Hughes, are you going to have questions, as well?

MR. HUGHES: I expect to, but Mr. Galardi may steal my thunder.

THE COURT: All right.

MR. HUGHES: We will see.

THE COURT: Got it.

Mr. Galardi, --

MR. GALARDI: Mr. Hughes, I'm certainly willing to let you go first, if you would like.

MR. HUGHES: You jumped up, so I'll follow your lead, no worries.

CROSS-EXAMINATION OF MICHAEL O'HARA

BY MR. GALARDI:

Q Mr. O'Hara, what was the deadline for bidders to close the transaction, that the Debtors insisted on under the bid procedures?

A I believe the 17th was the date that we were targeting in the last modified bidding procedures time line.

Q Okay. And the date of the auction you had was November 17th. Is that correct? Or November 18th?

A I -- I thought it was the 18th, yes. It would have been Thursday, the 18th.

Q It was Thursday, the 18th. I'm sorry.

And when did you first learn that there was a medical condition that the West Indies' CEO was having?

A The day before the auction.

Q And at that time, did you notify parties to adjourn the auction, to allow this bidder to have ample time, given that the closing did not have to be until December 17th?

A We did not.

Q And was that because you weren't sure whether they would bid?

A I -- I feel a little uncomfortable because I know some of the details of the medical condition that we're talking about. But needless to say, it was quite serious.

Q And was it your understanding -- and I'm not looking for the medical details. But did you make a business judgment at that time not to seek to adjourn the auction?

A Correct. We -- we -- we -- in light of where we were in the discussions and the tight cash flow condition of the company, we felt like we had no choice but to continue with the auction.

Q And that was even because -- even though the closing date was still December 17th, correct?

A That's correct.

Q Okay. And were you concerned that you would never get a bid from the West Indies purchase -- potential purchaser?

A Yes, that could be a concern.

Q And are you aware that the bid procedures provide that you had to be a qualified bidder prior to the auction?

A Yes.

Q And you admit that there was no -- that this West Indies entity was not a qualified bidder when you commenced the auction on November 18th.

A Yes, it had not provided a deposit.

Q And then -- go ahead, I'm sorry.

A Well, I was going to complete the statement and provide

the -- the things that were -- the three things that were necessary: A deposit, the necessary financial wherewithal, and funding, yeah.

Q Okay. So none of the conditions for being qualified bidder prior to the commencement of the auction?

A Correct.

Q And nonetheless, you now want to move them as a qualified bidder and recommence an auction, even though they did not do so by the date of November 18th, correct?

A Yes.

Q And the only reason you want to do so is they've now offered higher consideration, after seeing all of the bids.

A Well, they knew what their bid was already, and they were planning on going higher beforehand, so that's not really the case.

Q Well, when you say they were planning to go higher, did they ever make a request to you on the 17th or 18th to adjourn the bidding, to seek to adjourn the auction?

A I -- they asked if there was any way to do it, and I -- we -- we weren't in a position at that point in time to do so.

Q And why were you not in a position at that time to do so?

A Well, we did not know, for instance, that we were going to be able to get a potential settlement in front of this Court with British Petroleum that would allow for additional monies that now give us a little bit more financial

wherewithal than what we had at that moment in time.

Q So, in essence, the only reason you're prepared to do it is because subsequent events now make it in your -- in the Debtors' interest to do so on a financial basis, correct?

A Well, I don't think five days is going to cause us much pain. But you know, we can talk to Mr. Shapiro about that.

Q No. But what I'm asking you is: On the 17th or 18th of November, you made a business decision not to adjourn the auction, correct?

A Yeah, we -- correct. We did not know what the condition of that individual bidder was going to be and felt that, in light of the position of the company at that point in time, that we needed to just move forward.

Q And so you thought it was in the best interest of moving forward, even though you might have gotten a higher bid had you delayed that auction at that point, correct?

A I -- well, I think you're asking the same question again. But the answer continues to be that the financial wherewithal of the -- of the company, of the Debtor dictated that we needed to continue to meet the timeline that we were proposing, and that included going forward with the auction at that point in time.

MR. GALARDI: No further questions, Your Honor.

THE COURT: All right. Thank you.

Mr. Hughes.

MR. HUGHES: Just a few to follow up on the very nice job done by Mr. Galardi.

CROSS-EXAMINATION OF MICHAEL O'HARA

BY MR. HUGHES:

Q Mr. O'Hara, in the few hours we've had since this was first revealed to us of the possible bidder, we've been trying to be diligent about looking to see who this party is. In connection with the events that resulted in there being no APA, no deposit, no other qualified bidder requirements being satisfied the day before the auction or even the day of the auction, did you undertake to reach out to the other four of the five directors of this company, West Indies, to see if they would be willing to proceed with the bid?

A We -- we talked to their representation, who had had conversations with other members of the management, including the directors of the business, and were told that Mr. Chambers, who is the CEO that had the healthcare incident was the party responsible for any corporate actions of this particular company.

Q Did you look to see the backgrounds and experience of the other four to see if they might have the ability to react to the idea of complying with the requirements --

A We --

Q -- before the auction started?

A Yeah, we -- we tried. And what was, again, made known to

us through the represent -- representatives is that the way the company's corporate articles worked, Mr. Chambers was the one that was authorized in order to make a potential bid of this nature.

Q And in terms of the scale of this company based on Jamaica, it's hard to be able to figure out if they had significant revenues. But it was reported, at least in one source their revenues were about $5 million a year. Does that sound right to you or not?

A No. They have provided us with audited financial statements for the last three years that show revenues in -- well, in excess of a couple hundred million dollars.

Q Do you know whether they have another backer to support their effort to buy this refinery?

A No. All funds are coming from existing cash on hand or equity from the existing owners of the business.

Q And do you know whether or not they have satisfied the DOJ's requirements for approval of the consent order as of today?

A That -- that is -- I don't know. I would have to go back and double-check.

Q Do you know whether they have satisfied the DOJ's requirements imposed on other bidders who have already participated in the auction to identify the citizenship of their ownership and of those who are acting with them?

A Yeah. No, I don't actually, as we sit here. I heard the comments earlier. I -- I just don't recall. I'd have to go back and check.

Q I was trying to look through the proposed APA that was attached to this afternoon's filings, and I noticed curiously you have missing from some of the representations of the purchaser, including a representation to the Debtors regarding their solvency. Do you know -- did you realized that a solvency representation was deleted from their APA?

A I -- I did not focus on that particular point. As I mentioned, I had received audited financials from a well-respected auditing firm who shows substantial assets available for the company.

Q Did you realize that, in the representations of the purchaser in this APA, that there's no adequate assurance representation regarding their ability to perform contracts, should they choose to assume any? That was in the other bidders' representations, in Section 5.6 of the APA.

A No. I -- I did not focus on that particular point. I have had lengthy conversations with their represent -- representatives over the contracts that they are planning on assuming as part of this particular deal. Again, this is a company that's trying to operate this as a going concern, so it's a little different.

Q In connection with that point of operating as a going

concern and their ability to quickly close, which I think you have indicated seemed to be desirable, in looking at the schedules that were filed, do you realize that there's not a single contract that this company proposes to assume under its APA, at least that's found on the attachments that we're having to rely on a few hours' notice today?

A Right. I believe that there is still some discussion about potentially amending those. But we filed what we thought was necessary, in order to at least have this particular hearing.

Q And do you realize that, in the same schedules where it's advertised that this buyer is somehow going to take all of the assets, that there is absolutely no real property assets described as being purchased by this buyer under their APA, which is no different than the bids being proposed currently by St. Croix and by Bay; did you realize that?

A Again, I understand that to be one of the continuing debate points as it relates to this. But again, in the interest of time, we filed what we needed to at this point to have this particular hearing.

Q And did you realize, also, that, in connection with a going concern or a restart in this case -- of this refinery, it requires a number of permits in order to do certain things, in addition to the EPA consent order and stipulation. You realize that, don't you?

A Well, certainly, we realized it. More importantly, the potential buyer here is well aware of it and is quite knowledgeable with what would be necessary from an EPA perspective.

Q And yet, when you look at the schedule, in particular Schedule 1.1(g) on business permits, there are no permits contemplated by this erstwhile expression of interest that you have come to court today -- not you, but that the Debtors have come to court with today. Did you realize there are no permits listed on that APA?

A Well, I believe that they are planning on assuming all of the permits mentioned before. But perhaps it's gotten into these particular schedules for this particular hearing.

Q I've heard it described that to restart this refinery would be an undertaking that would cost hundreds of millions of dollars in order to restart it. Would you agree that that's the case?

A We have an engineering study done by Turner Mason (phonetic) that suggested that the operations -- the fixes that would be necessary in order to receive EPA permitting would be in the hundred to hundred-and-fifty-million range. Obviously, there would also need to be other contracts that would need to be signed; in particular, you know, such things as a holding contract, in order to have the proper working capital necessary in order to operate the facility. That

would also likely require tens of millions, if not more.

Q And there's nothing in this agreement that requires them to fund that amount of money as part of restarting the refinery, correct?

A Correct. This is an apples-to-apples bid in that respect, with the same credit.

Q And in fact, there's nothing in this agreement that would prevent this buyer, if they were to try to buy, to turn it around and sell to Catalyst for the $20 million the Debtors scheduled it as having a value of in its scheduling the day after closing, correct?

A They are buying all of the assets of the company, so, yes, they would have that ability to do so.

MR. HUGHES: I'll pass the witness, Your Honor.

THE COURT: All right. Thank you.

Anyone else have questions for Mr. O'Hara?

(No verbal response.)

THE COURT: All right. Ms. Green, do you have any Redirect for Mr. O'Hara?

MS. GREEN: No, I do not.

THE COURT: All right. Mr. O'Hara, thank you, sir. Please don't go anywhere, but you are excused as a witness.

All right. Miss --

THE WITNESS: Thank you, Judge.

THE COURT: Thank you.

(Witness excused.)

THE COURT: Ms. Green, did you intend to call any other witnesses?

MS. GREEN: Your Honor, Mr. Shapiro has a Declaration, along with the motion, that basically indicates that, in his business judgment, he believes that we should reopen the auction and consider this bid because it is a higher offer than the bid of St. Croix. With your permission, I'd like to rely on that Declaration, and then Mr. Shapiro can be available for Cross on that issue.

THE COURT: Well, let me check and see if there are any objections.

Any objections to the admission of Mr. Shapiro's Declaration, which is found at 862-2?

(No verbal response)

THE COURT: All right. It's admitted.

MR. HUGHES: Subject to the right of Cross -- subject to the right of Cross, Your Honor, we certainly have no objection.

THE COURT: All right. Then it's admitted.

(ECF 862-2/Shapiro Declaration received in evidence.)

THE COURT: Mr. Shapiro, if you would, please raise your right hand?

(Witness sworn.)

THE WITNESS: I do, Your Honor.

THE COURT: All right. Thank you.

Mr. Galardi, did you have Cross for Mr. Shapiro?

(No verbal response.)

THE COURT: Mr. Galardi, I think you've got me muted.

MR. GALARDI: I'm sorry.

THE COURT: No.

MR. GALARDI: I'm on mute.

THE COURT: Yes, sir.

MR. GALARDI: Yes, I am, Your Honor. I'll let Mr. Hughes go first this time, and then I'll back him up.

THE COURT: All right. Mr. Hughes.

MR. HUGHES: I can only hope I can fill his shoes on this first go-around on Cross.

Is Mr. Shapiro on? I'm trying to see if I can find him anywhere.

THE COURT: Yes, he is --

THE WITNESS: I am kind of hard to see.

MR. HUGHES: Okay. Very good.

CROSS-EXAMINATION OF MARK SHAPIRO

BY MR. HUGHES:

Q Mr. Shapiro, I want to turn first to paragraph 4 of your Declaration. And I believe what I'm understanding from the first clause of paragraph 4 is that, for the reasons set forth in your motion -- and you're representing that all of the

facts set forth in the motion are true and correct. You would swear to that, would you not?
A I would.
Q And you also then go on to say that you relied upon your business judgment, your personal business judgment, as being controlling here. Is that correct?
A That is correct.
Q Now is your business judgment the decider here, or is it the business judgment of the board, if you know?
A As far as what?
Q As far as making the decision to try to materially change the Debtors' decision to reopen the auction.
A We have -- we have approval from the Restructuring Committee to pursue this, yes.
Q Okay. And can you tell me when you sought approval from the Restructuring Committee to -- rather than just having your own personal business judgment decide it was proper to do this?
A We had a Restructuring Committee meeting on --
(Pause in the proceedings.)
A -- on Monday morning.
Q A week ago?
A Yesterday morning.
Q Okay. Losing track of time.
All right. And so was the topic of this expression of

interest raised or not?
A Yes, it was.
THE COURT: So, Mr. Shapiro, I thought Mister --
Q And --
THE COURT: Mr. Hughes, if you could just hold on because I thought you were going to deal with this.
So today is Monday, December the 6th. So was the meeting yesterday, Sunday the 5th, or earlier today, December the 6th, but today is Monday.
(Participants speak simultaneously.)
MR. HUGHES: My days are -- my days are running together. Sorry.
THE WITNESS: Sunday the -- Sunday the 5th, Your Honor.
THE COURT: Sunday the 5th. All right. Thank you.
Sorry, Mr. Hughes. I apologize for interrupting. I just got confused.
MR. HUGHES: No, I appreciate you clarifying, Judge, because I was a bit confused myself.
BY MR. HUGHES:
Q So there was a meeting yesterday of the Restructuring Committee. Who is on the Restructuring Committee?
A It is myself, it is our independent director Steve Pully, and it is another director, Rick Caplan.
Q And were any presentations or decks provided in

connection with this presentation to the board, or was it just talk?

A There was a -- they were provided a copy of the proposal, the APA, and everything else was just discussion.

Q Was it pointed out that there was no solvency rep in the APA with regard to this potential buyer being admitted into the process?

A No.

Q Was there any discussion about there being no adequate assurance of future performance information or rep provided for contract counterparties in this proposal?

A Not that specifically, no.

Q Was there any discussion about the fact that the schedules proposed in this APA included no permits of any kind?

A It was discussed that the schedules were in process and would have to be finalized.

Q So the answer to my question is there were no disclosures to the other Restructuring Committee members that the schedules revealed no permits are going to be acquired by this purchaser, at least in its current form, correct?

A That's correct.

Q And there was -- and there was no discussion about the fact that no contracts had been identified with respect to this purchaser, either, in the schedules, correct?

A Again, the same. It was disclosed that those were in process, but the specific answer to that was no.

Q Okay. And you understand that, under the terms of your appointment order, at Docket 535, you're not vested with the business judgment of the Debtors to make a decision on this. You understand that, correct?

A Correct. I was authorized by the Restructuring Committee.

Q And was there a resolution there to memorialize this meeting, or was this an informal meeting, that there was no formal resolutions taken?

A I'm not sure of that.

Q Was this meeting constituted on notice, under the terms of the governing requirements of the entity?

A I can't speak to specifically what noticing requirements were required, but everybody was in attendance.

Q And let me ask you this, and I'm going to -- Ms. Wyrick has the motion, if we need to look to it, but I think you should be familiar with it.

In paragraph 9 of the motion, at the end, the last sentence, it points out that the SCE transaction is not finalized and the transition services agreement has not been agreed upon. Is that still true now, even several hours after the motion has been filed?

A That is correct.

Q Now that was true for St. Croix the Monday before the auction, correct?
A Yes.
Q And that was true for St. Croix the day of the auction, correct?
A Correct.
Q And then it goes on to reveal in that sentence that one of the reasons the Transition Services Agreement has not been agreed to or finalized is, apparently, there were some additional expenses the Debtors were going to incur for the benefit of St. Croix that were not covered by the Transition Services Agreement. Isn't that right?
A I think it's just not fully agreed upon about what expenses were going to be reimbursed.
Q Isn't it true that the Transition Services Agreement is merely the Debtors' promise to do things for St. Croix post-closing, while St. Croix decides about getting itself together on trying to restart? Isn't that what's really involved in the Transition Services Agreement?
A Well, they were guaranteed a certain period of time and certain notice, but it is -- it is -- they do have the option to cancel.
Q Right.
So there's an unsecured promise to pay from St. Croix to the Debtors that the Debtors incur post-bankruptcy services

and goods and whatever else it needed because St. Croix wants it. There's just an expectation under this TSA that's not approved that St. Croix has got to pay for it, right?
A Correct.
Q And that's not finalized yet, right?
A Correct. That is correct.
Q And in fact, later in the motion it says that TSA and the fact that there's holes in it about what has to be reimbursed, means that you have to further discount the St. Croix bid, correct?
A I'm not sure I agree with that.
Q Well, let me come back to that because it's later in the motion and I'll refresh your recollection, and I hear that you're not willing to agree to it. I can accept that for now.
Let me ask you this: In paragraph 2 of your motion, there's this sentence: "The CEO was the only person at WITL who has sufficient knowledge of the proposed refining transaction and sale process and was the only person at WITL who can authorize a deposit or execute an Asset Purchase Agreement."
You've made that statement as true and correct in your Declaration. What is your basis for saying that? Is it something you heard from somebody?
A Well, it's my understanding in dealing with -- Mr. O'Hara was speaking with Mr. Eagan directly and through our counsel

they were having discussions. I was not.
Q I mean certainly this is a complicated situation that warrants involvement of another professionals and insiders to buyers to really understand and comprehend. You'd agree with that, wouldn't you?
A I'd agree.
Q And there's millions of dollars being spent to the Debtors' professionals because of the complexity of this situation to help ensure that it can be presented in the form of an auction, and it's not just something that one person handles, correct?
A Correct.
Q I mean, don't you find it a little incredible, given the other bidders you're dealing with that there's only one person at this company that apparently can make a decision and chose not to in the days leading up to the auction before his unfortunate medical condition?
A I don't think I can opine on that.
Q But certainly you don't disagree with the timeline that Mr. Galardi capably laid out with Mr. O'Hara that the day before the auction, this bidder was no where to be found with a signed APA, correct?
A I can -- I mean, the concept of "can't be found," I don't know if I can agree with that. I know that we are having discussions with these representations.

Q And they didn't supply an APA the day before the auction, correct?
A That is correct.
Q And they didn't supply a good faith deposit before the auction, correct?
A That is correct.
Q They didn't meet the requirements to be a qualified bidder, you'd agree with that, correct?
A I would agree.
Q Did you try to reach out to the other four senior directors of this company, as indicated on their website, to see if any of these other four capable people might have wanted to preserve their rights to participate in this exercise?
A Did I reach out to the other directors? No, I did not.
Q Now you would agree that under the terms of the St. Croix bid, the SCE bid, they've represented that their costs incurred in connection with this process have already exceeded a million dollars and so they're going to get a million dollars as a deduct on the 20 million they've offered. Do you agree with that, right?
A Yes. I do.
Q And you would agree that there's been significant undertakings by Bay, my client, in connection with its efforts in-house and with counsel to try to participate in the auction

process that you've presided over. Can you agree to that?
A I would agree.
Q And so can you agree that allowing all of that work that they did, which, of course, St. Croix is getting paid their million dollars, that is not getting paid anything, all the other bidders that would be kicked to the side of the road, they're not getting anything for all of their out-of-pocket costs, doesn't that sound just a little bit unfair to you?
A I don't know if it's unfair. We're presented with a bid that is significantly higher and better than the existing bids. There are extenuating circumstances and if there's an opportunity to maximize value to the Debtors, I think it's worth opening up the process.
We're trying to be fair, but in the end I think we're trying to also maximize value.
Q And yet you're -- in doing so you're just going to get rid of the process that you had all these other parties technically rely and participate in, simply to grant them a few extra bucks. Is that what this is really about?
A None of us are taking this lightly. I don't agree with that at all.
Q Well, the only difference here is just a few bucks, right?
A It's not just a few bucks. It's 50 percent higher bucks, as you like to call them, and it's a going concern bid from an

experienced buyer in the industry and an opportunity. We're not saying -- we're not casting anybody aside. We're saying that we're going to reopen the auction.

Q And when you say it's an experienced buyer in the industry, they're not an experienced buyer in the refining industry, are they?

A The people that I've talked to that are part of their consortium are very experienced in the refining industry.

Q Well, their website reveals that they're a storage company and a bunkering company. You would agree that they don't do any refining, correct?

A As currently -- they are currently operating, no, they're not refining.

Q And to your knowledge, they have no experience in restarting a refinery, correct?

A I'm unaware.

MR. HUGHES: Sorry, Judge. I'm trying to get through my notes. I was trying to --

THE COURT: Oh, just fine.

MR. HUGHES: -- before the hearing.

BY MR. HUGHES:

Q Now it is true that the bidding closed on November 18, true?

A That is correct.

Q And it's true that there was a deadline after the bidding

closed for the Debtors to identify the lead bids, correct?
A That is correct.
Q And I think the first time that deadline came up was about two days after the auction. Does that sound right to you?
A Sounds right.
Q And that was delayed unilaterally by the Debtors just before that deadline expired. Wasn't that true?
A I believe it was extended to try and come to an agreement on the TSA with the St. Croix Energy.
Q Okay. And that extension of that deadline occurred just before that deadline was to expire, correct?
A Correct.
Q And it was extended again, a second time, correct?
A Correct.
Q And it was even extended a third time, right?
A I don't remember if there was a third time. I know it was extended at least twice.
Q Now under the terms of the St. Croix bid, they made a solemn commitment with the Debtors and before they did anything public, they would consult with the Debtors. Do you recall that provision in their APA?
A No. I don't exactly know what you're talking about.
Q Okay. In connection with the conclusion of the auction, did St. Croix come to you and say, "We want to issue a press

release to show we're the winner." Did they have your consent to do that, even though you were putting off the designation deadline?

A I'm unaware of that discussion.

Q All right. So it's true that you filed November 30, 12 days after St. Croix issued their press release that they won -- which you were not aware of or authorizing -- you were not aware of authorizing. It's true that when that November 30 filing was made to announce St. Croix is the prevailing bidder, you knew at that time that was who you wanted to be your lead dog at the auction -- at the sale hearing, correct?

A We were intended to -- our mere expectation is that we would resolve any issues with the TSA and yes, they would be the high bidder at the sale hearing, yes.

Q And of course, they, on December 1, on learning of this designation, filed their objection to this designation saying we didn't save them together exceed the 20 million less one, less 14 million for the catalyst, St. Croix did. You knew that we had filed that objection, right?

A Yes.

Q And when we filed that objection, we were passing doubt about the binding nature of the St. Croix bid as being no different a week before the auction, the say of the auction or even on the day you filed your designation on November 30.

Didn't we -- we complained about that, correct?

A Yes. You did.

Q And we pointed out that whatever St. Croix was offering up as additional payments to reimburse the Debtors for their extension of credit post-auction or post-closing was not critical to their bid. Do you recall us objecting on that basis?

MS. GREEN: Your Honor, I need to object at this point. I mean, I've let him go with this whole bit between their bid and the St. Croix and now we're getting into what the number are. You know, if it's relevant to whether or not they get to be part of the reopened auction, then fine, but this motion isn't set for hearing today.

THE COURT: Yeah, I was kind of wondering which motion we were trying for some time now.

Mr. Hughes, do you want to respond?

MR. HUGHES: Well, my response was that we're prepared to go forward tomorrow with regard to the St. Croix bid and if they had showed up to the deposition this morning, rather than no-showing, I wouldn't be asking some of these questions. But because some of them are possibly germane to this exercise, we wanted to show why, you know, this entire effort to reopen at the last minute is misplaced.

THE COURT: The objection is sustained.

(Pause in the proceedings.)

MR. HUGHES: Just bear with me one more minute, Judge.

THE COURT: Of course. Take whatever time you need.

MR. HUGHES: I will refer.

(Pause in the proceedings.)

BY MR. HUGHES:

Q Mr. Shapiro, would you agree with me that auctions have an important role in these Chapter 11 cases?

A Yes. I would.

Q And would you agree with me that in order to induce people to come out and want to spend the time and money to participate, they need to have confidence that the system and the rules of the auctions are conducted fairly and equitably? Would you agree with that?

A I would agree.

Q Now would you agree that to the extent parties have expended tens or hundreds of thousands of dollars in reliance upon an auction that was conducted fully and fairly on November 18, it works to their detriment to reopen the auction. You would agree with that, wouldn't you?

A It's awfully specific for me to either agree or disagree. I don't think I can respond to that.

Q So you see no harm to the system in the process that you just freely disregard the rules and reopen the auction after it's already been conducted. Is that what you're telling me?

A I believe it's in the best interest of the estate to reopen the auction right now.

Q So for all future auctions, the message you're wanting to deliver from this auction process is no matter what happens, participants should be aware that the results of the auction and the diligence they take, will not be respected. Is that the message you're trying to send?

A That's now what I'm saying.

MR. GALARDI: Objection, Your Honor.

THE COURT: Overruled.

BY MR. HUGHES:

A That's not what I'm saying. I'm saying there are extenuating interests in circumstances.

Q And the extenuating circumstances here are more money at the last minute from the bidder that could have put in an APA before the auction and that could have put in an deposit before the auction.

Is that what you're saying?

A Those are your words, not mine.

MR. HUGHES: Pass the witness, Your Honor.

THE COURT: All right. Thank you.

Mr. Galardi, did you have questions for Mr. Shapiro?

MR. GALARDI: I do, Your Honor.

THE COURT: Okay.

MR. GALARDI: I do, Your Honor.

CROSS-EXAMINATION OF MARK SHAPIRO

BY MR. GALARDI:

Q First, Mr. Shapiro, wasn't it the case that the auction was itself extended to give West Indies time and the Debtors' time to negotiate an APA before you had the auction on November 18th?

A I don't exactly remember the reasons specifically for the first extension, whether it had to do with West Indies or not.

Q But isn't it the case that you were in discussions -- and I think Mr. O'Hara mentioned in discussions first with counsel of the Virgin Island's entity and then with West Indies entity and that you did not schedule the auction date itself to give those two particular bidders, or one of them, ample time to provide you with an APA?

A I think that's a better question for Mr. O'Hara.

Q You were at the -- you were on the Restructuring Committee. Mr. O'Hara is not, correct?

A I am.

Q And the Restructuring Committee decided to extend -- to not schedule the auction until November 18th, correct?

A That is correct.

Q And so are you testifying that you don't know why that deadline was set after you had set an earlier deadline?

A I mean, we extended the deadline to have more of a marketing period, to get more people to the auction, yes.

Q And -- but you already had bids from St. Croix Energy, correct?
A That is correct.
Q And you already had bids from Bay, correct?
A I don't know the exact timing that we received the firm bid from them. It was around there.
Q And you already had bids with respect to the catalyst, correct?
A Again, I'm not sure if they were in final form, but they were coming together during that period.
Q Okay. But you were also giving time to West Indies to then finalize its bid so you could then have a finalized bid by November 17th and commence the auction by the 18th, correct?
A We were giving time to them and others who were still looking at the assets, yes.
Q And before the 18th, did they ever ask for you to further extend the time?
A I'm unaware if they asked or not. Again, that might be a better question for Mr. O'Hara.
Q Okay. And there's no witness here today from West Indies giving testimony as to the excusable neglect for not meeting that deadline, correct?
A I don't see anybody from West Indies on the phone right now.

Q And the only testimony that you're giving today is that you believe that by giving more time, you will get 50 percent more if you simply reopen the auction; is that correct?
A I believe we can get potentially more than 50 percent more. I'm not -- I don't believe that -- I believe that St. Croix Energy has interests. I'm not saying that it could possibly -- it might not be 50 percent. It might be more.
I think we're allowing for a competitive process.
Q Okay. And you said that the Restructuring Committee made a decision on Sunday morning to proceed to seek to reopen the auction, correct?
A Correct.
Q And in deciding and you believe it was in their business judgment to try to come to this Court and reopen the auction, correct?
A Correct.
Q And did the Restructuring Committee determine that this was actually going to be a going concern business?
A Their expectation from the Restructuring Committee is that both the St. Croix Energy bid and the West Indies bid would be going concern bids.
Q Okay. And in determining that there was a going concern bid from West Indies, did you get any plan for the restart of the refinery?
A I have not seen the plan for the restart for the

refinery, no.
Q And do you have any information that West Indies has ever contacted the EPA or the DOJ regarding a restart plan?
A I'm unaware.
Q And do you have any information that the West Indies have identified specific permits that it would acquire on December 22nd to restart the facility?
A I'm unaware.
Q And in making the business judgment of the Restructuring Committee, was this fact -- was the Restructuring Committee aware that there was no such plan or that there had been no such discussions when it determined to restart the auction?
A We may not have been aware of those specifics, but the general discussion was that there was an intent to restart the refinery, that they were in the industry, that they have been in discussions with counsel, Mr. O'Hara, and all the discussions were about a going concern and operating a refinery.
Q But you -- was the Restructuring Committee aware that there is no commitment in the agreement to restart the facility?
A I can't say whether the Restructuring Committee is aware of unaware.
Q But it made it -- but you do say that it exercised business judgment without that information, correct?

A Our expectation is that their -- the intent of the West Indies group -- and we spoke with Mr. Chambers before weekend -- I spoke with Mr. Chambers before the weekend. All in -- all indications are there to going concern bid.

Q But Mr. Chambers is not here to testify and you're not calling him as a witness today, correct?

MS. GREEN: Your Honor, I can clarify. Mr. Chambers, I think, is on the line.

THE COURT: So this is all --

MS. GREEN: He's not on my Witness List because he --

THE COURT: Ms. Green? Ms. Green? This was a very directed question to a specific witness. He can be wrong, but he needs to answer based upon what he knows.

So Mr. Galardi, if I could as you -- and I do apologize -- if you could ask your question again?

MR. GALARDI: Yes.

BY MR. GALARDI:

Q The Debtors did not intend to call Mr. Chambers for this hearing, correct?

A I actually thought we had arranged for Mr. Chambers to be here for the hearing.

Q So you set the hearing, but did you identify him as a witness for this hearing?

A I don't believe he was identified as a witness.

Q Okay. Can do you know, as you sit here today, whether the West Indies entity is going to assume the Operating Agreement with the US Virgin Islands?
A I can't say right now.
Q Okay. And do you believe that that's necessary to operate a going concern?
A Yes.
Q And do you know what your cost would be for assuming that contract?
A For cost, you're assuming the US version -- the operating agreement?
Q Yes.
A I believe there's five million dollars of payments that have not been made at this point. I don't know if the cure costs specifically more than that, or exceed that.
Q And as for the West Indies entities said they are prepared that agrement and pay those costs?
A I am unaware.
Q And with respect to the share services with the terminal, has the West Indies entity identified that as the contract that it is going to assume?
A I don't believe so. They've been discussing --
Q And --
A They've been discussing about renegotiating the agreemetn with terminals.

Q And can they operate the refinery without having a renegotiated contract or an assumption of that agreement as a going concern?

A I don't know what form it will have to take, but they're going to need the cooperation of terminals to operate.

Q So in deciding to go forward with a going concern, when you had the conversation on Sunday morning, did the Restructuring Committee consider that as prt of why they should reopen the auction for this going concern bid?

A Could you say that again?

Q Did the Restructuring Committee in determining to go forward with this as a going concern bid, were they aware that they had not had an assumption of an operating agreement and they had not decided to assume the Shared Services Agreement?

A They were aware that they were going to have to have ongoing discussions with terminals. I can't say specificaly whether they were aware that -- what form it was going to take, whether or not they were going to assume the agreement or not.

Q And did the Restructuring Committee at all instruct any of the professionals to nail down these issues prior to filing the motion to reopen the auction?

A They instructed them to work diligently to try to nail down as much as possible, but everything was moving very quickly and we wanted to reopen the auction before the sale

hearing scheduled for Tuesday.

Q And you were prepared, as you advised us, that you wanted to actually go forward with the sale hearing tomorrow afternoon with this bid, didn't you?

A If we could have an auction tomorrow morning, I think we were prepared to finalize whatever needed to be finalized.

Q And do you have an understanding that West Indies would have idntified all ot the contracts it's going to assume by tomorrow?

A We understand we have to identify the contracts and the schedules before it can be filed.

Q And before you can have the auction, correct?

A Yes.

Q And do you sit here today, have you done that?

A Have finalized? No.

Q And do you have any -- have you -- did the Restructuring Committee have any conversations regarding whether the transaction would end up with a solvent corporation after a sale?

A We talked a lot about the financial health of the company purchasing it. The expectations are that it would be a solvent company with assets and working capital to operate. I can't respond to the cause of the contract with (indiscernible) solvency, but everything that we've seen and discussed, it was a very solvent company.

Q And did you have any conversations with the Restructuring Committee regarding any approvals necessary to close this transaction?
A No.
Q And did anybody on the Restructuring Committee raise any concerns about the fact that you would have a foreign entity owning the refinery?
A I mean, it was discussed, but this is an entity operating in the Carribean. It is very well known to the people at Limetree and it was not -- there wasn't a hurdle that we couldn't overcome -- or they couldn't overcome.
Q And did you have any idea how long that hurdle might take? Was there any discussion about how long that hurdle might take to overcome?
A No.
Q And did the Restructuring Committee have any budget in front of it as to if the sale closed on December 22nd, how much it would cost the Estate to wind down and confirm a Plan, or anything, a budget for wind down of the company?
A Yes. We have a budget -- we've had a budget in place as to what we think it would take to wind down and confirm a Plan.
Q And in looking at the bid, is it your -- was the Restructuring Committee still of the view that even with those costs and expenses, that it should proceed with reopening of

the auction with the West Indies bid?

A Yes.

MR. GALARDI: No further questions, Your Honor.

THE COURT: All right. Thank you.

Anyone else have questions? Mr. Brookner?

MR. BROOKNER: Yes, Your Honor. You didn't ask for any examination before, so I thought I'm come out on asking questions.

THE COURT: I thought I did -- at least I did inside my head. My apologies if I didn't. Then, please, you have your shot at Mr. Shapiro. I did not mean to deny you.

MR. BROOKNER: That's okay, Your Honor. I just wanted to make sure I was part. Thank you.

THE COURT: Sure.

CROSS-EXAMINATION OF MARK SHAPIRO

BY MR. BROOKNER:

Q Ms. Shapiro, there's been a lot of discussion on cross-examination about schedules, et cetera, for Mr. Galardi and Mr. Hughes. Now for the SCE, APA, there are no schedules, are there?

A No.

Q And SCE has the right to continue to designate outside contracts that it wishes to keep or get rid of over a stated period of time; isn't that right?

A Correct.

Q And they haven't identified any contract yet in any of these claims, right?

A No.

Q Now, this new bid, there's no requirement for a TSA, a Termination Services Agreement; is there?

A No.

Q In fact, there isn't a requirement for a TSA with the current high bid that was designated as "CE," correct?

A Correct.

Q And that's in flux and it's incomplete at the present time; isn't that right?

A Correct.

Q And I believe there was some questions about the new potential bidder's experience in restarting and updating a refinery. Now SCE, they're not a refinery operator, are they?

A They are not.

Q And they don't have any experience to your knowledge in restarting a refinery, do they?

A I don't believe they do.

Q Now let's talk about numbers because as you know, I'm not a numbers guy, but Judge Jones very much is a numbers guy, okay?

(Laughter.)

Q Now I believe Mr. Hughes referenced, and I quote: "A few bucks." Now we're not talking about a few bucks. We're

talking about 10 million dollars, right?
A Ten million dollars, yes.
Q And ten million dollars as we sit here today is 50 percent more than the existing bid of 20 million, right?
A Correct.
Q Now, as we sit here today, what is the Debtors' estimate of the accrued and unpaid professional fees in this case, give or take?
A Twelve million dollars.
Q Twelve million, and --
A That's all professionals.
Q All professionals, that's right.
Now from Mr. Galardi's client's 20 million dollar bid, we immediately have to minus out a million dollars for his client's expense reimbursement, right?
A Correct.
Q So that's nineteen million that's left in his bank; is that right?
A That is correct.
Q And if you let me go -- there's a motion set for tomorrow for settlement with BP; did you know that?
A Correct.
Q And what is the aggregate amount of proceeds expected to come to the Estate for the BP?
A 9.5 million dollars.

Q So again, the math might not meet, but you add the 9.5 to the 19 net fund, the SCE bid, what do we get?

A 28.5.

Q And what's your best guess of what the DIP Lender is owed right now? Would you say conservatively speaking it's already close to 22 million?

A Twenty -- I believe it's 22 million, yes.

Q Okay. So let's deduct the 22 million from the 28-1/2 that we just talked about. What are we left with now?

A 6-1/2.

Q Now 6.5 million is less than the approximately 12 million dollars you stated was owing for the professionals, right?

A I believe it is, yes.

Q Okay. Now there is some other cats-and-dog assets out there. That's something about litigation and avoidance actions, but you have some receivables and some other miscellanea, right?

A Correct.

Q And if you add -- what do you expect those -- I'm sorry, can we stop and reset and we try that question and start again.

If you add up all those cats and dogs that are out there still, give-or-take, what do you think that equates to, as an additional value to the 6.5 and cash?

A Anywhere from 2.5 million.

Q Let's go on high -- let's be conservative. Let's be optimistic. Let's call it five.

When you add that five million to the 6-1/2, what do we have?
A 1.5.
Q 11.5, right?
A Oh, you're going the other way. Yes, 11.5.
Q Right. So that means at the end of the day you have 11.5 million less on approximately 12 million dollars of professional fees, right?
A Yes.

MR. WARNER: Your Honor, Michael Warner on behalf of the Committee.

I have to object. First of all, this has really nothing to do with what is before the Court.

Second, Mr. Brookner is already doing something that he is going to argue when we finally get to a hearing on Motion to Sell and what he would like to see the distribution of proceeds. It's irrelevant to today's hearing, number one.

Number two, the Committee completely objects to how Mr. Brookner is characterizing the funds. While the math is very simple, A plus B equals C, 2 minus D equals E. All of that is fine, but Mr. Brookner is trying to demonstrate to the Court a waterfall of how money is dug -- not relevant to today.

THE COURT: So first, let me -- I got the issue on the carveout that's coming. I do. I know it's sitting out there. I do understand his point. My guess is he's getting ready to come to his high point, so I'm going to overrule the objection.

You're not bound by anything that happens today. You don't need to respond to it. The issues that you are concerned about, not before me today.

Mr. Brookner, go ahead, please.

MR. BROOKNER: Thank you.

Mr. Shapiro -- Thank you, Your Honor.

BY MR. BROOKNER:

Q Mr. Shapiro, if we have gone the other way, talk about the potential monies coming in from the existing new bidder -- assuming that they're declared the high bidder at 30 million dollars of the -- if you take out the million dollars that goes to Mr. Galardi's client, how much are you left with?

A 29 million.

Q When you subtract out the 22 million owing to my client, what are we left with?

A Seven million.

Q When you ad the approximately 9.5 million from the DEP settlement, how much are we left with?

A 16-1/2 million.

Q And then you add on some other cats and dogs in there,

right?

Oh, before we go there, 16-1/2 million is more than 12 million of approved professional fees; isn't it?

A Correct.

Q And if you add another two-to-five million (indiscernible) even more money in the kitty, right?

A Correct.

Q Now as Mr. Warner just referenced, you expect, do you not, that if the current bid is accepted there is going to be significant litigation about the carveout?

A Significant.

Q And in fact, there's a provision in the proposed sale order -- I believe it's paragraph 16 -- that's bracketed and footnoted. Are you familiar with that provision?

A I believe I am.

Q And that footnote, in fact, states that that provision was included in my specific demand but that both the Debtors and the Creditors Committee disagree with the inclusion of that provision, correct?

A Yes.

Q So the sale hearing isn't going to be so simple, is it?

A No.

Q And in fact, if we have to litigate over the caught up provision, that number is going to increase perhaps dramatically over where it is right now?

A Special fees.
Q Of the Estate professionals, correct?
A That is correct.
Q Someone is going to have to pay for that, right?
A Debtor pays for all.
Q And it would appear that that problem is not gone in its entirety, when we're talking about a 29 million dollar net cash in the Estate, right?
A Correct.

MR. BROOKNER: Nothing further, Your Honor. I'll pass the witness.

THE COURT: All right. Thank you.

Anyone else that I inadvertently omitted have questions for Mr. Shapiro before I make the circle again?

(No audible response.)

THE COURT: All right. Ms. Green, do you have any Redirect for Mr. Shapiro?

MS. GREEN: No, Your Honor.

THE COURT: All right. Thank you.

Let me -- Mr. Hughes, I want to -- since I took Mr. Brookner out of order, do you have any additional questions for Mr. Shapiro?

MR. HUGHES: I just want to cover one other thing, if you don't mind, Your Honor?

THE COURT: Sure.

RECROSS-EXAMINATION OF MARK SHAPIRO

BY MR. HUGHES:

Q Mr. Shapiro, in addition to the other provisions, such as representation of solvency and the like, and I talked about it earlier, an omission from this bidder's APA that other bidders have stepped up to, I've noticed the curious omission in this bidder's APA of Section 5.9, which is a warranty from the purchaser that the purchaser has conducted its own investigation of everything that it's stepping into, and so therefore, you know, it would be repping and warranting it's not going to come back and claim buyer's remorse, or sue later on that it decided it might have been misled, do you know why that provision is missing from this purchaser's proposed APA?

A I do not.

Q So a corollary would be that if this purchaser is unhappy with this buy, later on they could sue and join the litigation party to come, couldn't it?

A I'm familiar with the clause. I'm not looking at it either.

MR. HUGHES: Pass the witness, Your Honor.

THE COURT: All right. Thank you.

Mr. Galardi, anything else?

MR. GALARDI: Nothing further. Nothing further from me, Your Honor.

THE COURT: All right. Thank you, Mr. Shapiro.

Please don't go anywhere, but you are excused as a witness.

(Witness excused.)

THE COURT: Ms. Green, anyone else you intended to call?

MS. GREEN: No, Your Honor. I wanted to tell Your Honor that Ms. Taro Shameless, who is the CEO, is on the telephone. I didn't put him on my Witness List because I didn't think it was appropriate with his medical condition to subject him this and in this forum.

He is available to meet with a small group if Your Honor wants to just talk to him, but I just didn't think it was appropriate for him to be a witness. I was afraid to put him on my Witness List and he would be called by somebody else.

THE COURT: I got it, and I appreciate that, but I have never and will never conduct a chambers conference, so.

We'll just proceed ahead.

Let me ask, with that, Mr. Hughes, did you intend on calling any additional witnesses?

MR. HUGHES: No, Your Honor.

THE COURT: Mr. Galardi, same question.

MR. GALARDI: No, Your Honor.

THE COURT: And Mr. Warner, not to leave you out. The Committee intend on calling anyone?

MR. WARNER: No, Your Honor. Thank you for asking.

THE COURT: All right. Thank you.

Anyone else wish to adduce any evidence?

(No audible response.)

THE COURT: All right. We'll consider the evidence closed.

Ms. Green, would you like to make closing remarks?

MS. GREEN: Yes, Your Honor.

MR. BOYD: Your Honor?

THE COURT: Oh, I'm sorry. Yes. Yes, Mr. Boyd.

MR. BOYD: Butch Boyd for Bay Limited. I just wanted to circle back and alert you that Mr. Payne is on the line.

THE COURT: Terrific. Is there anyway -- just because it's so hard to talk to people on the telephone, any way he can connect up by video? All he's got to do is clink on the link that's on my website, if that's possible?

MR. HUGHES: Your Honor, I can forward him in by Lake if Mr. Payne is --

THE COURT: That's even better. Terrific. Thank you.

MR. HUGHES: I will -- I am doing that now.

THE COURT: All right. And I see Mr. Chambers, as well.

(Pause in the proceedings.)

THE COURT: All right. Thank you, Mr. Boyd.

Ms. Green?

MS. GREEN: Yes, Your Honor. I'd like to clarify something in terms of the APA that's been discussed by both Mr. Hughes and myself and everyone else.

There are two versions of the APA. There's a signed APA attached and thre's an unsigned. And the reason for that is because some of the provisions were obscured when we scanned it, so we wanted to make sure that everybody could read all the provisions.

And second, 5.5 and -- 5.4 and 5.5 were obscured. 5.5 is the solvency rep and it is, in fact, in the agreement. It's a little blurry, but if you look at the exhibits at 862-7, it's page 22, the insolvency rep is, in fact, in there.

In addition, Section 5.9 also is at page 22 to 23, so those provisions were not deleted by the West Indies.

THE COURT: All right. Thank you for the clarification.

MS. GREEN: Yes, Your Honor. Your Honor, as I told you at the beginning of the hearing, we didn't take lightly filing this motion. I think all the professionals here believe in the sanctity of an auction from the Bankruptcy Court perspective. You have people who have years andyears of experience in the insolvency field. And it was obviously the subject of much discussion.

In fact, you know, looking at the case law, the

*Bigler* case, that case actually took the procedures in that case foreclosed reopening an auction. It didn't provide for a fiduciary out and the revised offer was only slightly higher and it fully participated in the auction.

That isn't the case here. What we have here is an unusual circumstance. We have the circumstance of the CEO who was an investment banker who was basically doing this deal, who had a serious -- very serious medical event occur prior to the bid deadline and it was him, Mr. O'Hara testified, who had the ability to make a decision about whether to provide the bid deposit and to sign the APA, then unfortunately, he wasn't able to do that. It was completely beyond his control. It was a circumstance that no one could have envisioned, particularly Mr. O'Hara.

And in deciding to go forward with the auction, we were looking at a situation where the Debtor was going to be out of money and so really we had no choice but to go forward, not knowing whether Mr. Chambers was going to get better or not, now knowing what was going to happen. And so the Debtor did, in fact, decide to go forward with the auction because at the time it seemed to be the prudent course of action.

Once we were contacted by the West Indies Group, we determined that we had to look at it because I think in our business judgment the offer is so much better than the St. Croix offer. There's no real prejudice to St. Croix. I

mean, they had to pay more money, but they got a really good deal because somebody -- there was a circumstance where somebody just wasn't able to participate. It wasn't their fault. He didn't have anything to do with that.

And so the whole idea of that, every auction is going to be reopened and all these terrible things are going to happen, I think is unfair. Clearly this is a circumstance that is unusual, in an unusual case, it's on an unusual timeline with basically no cash. And so as a result it's Debtors' business judgment and the professionals' business judgment that it's in the best interest of the Estate to reopen the auction and limit it to whatever parties Your Honor believes should take part in the auction, but clearly we won't prejudice the parties from overbidding and we would ask Your Honor to prevent the reopening of the auction.

THE COURT: All right. Thank you.

Mr. Warner, do you have any closing comments?

MR. WARNER: A few, Your Honor. I'll try and be brief. I appreciate the hour.

First, this is not about dollars and cents. Although there's a lot of talk about ten million dollars maybe being smaller, maybe being 50 percent, it's not about dollars and cents. What it's about is a going concern. What's important to remember is as a buyer spends more hard dollars a day, the likelihood of a future going concern goes up, as

opposed to a buyer buying it at a price that may ultimately liquidates. And so the logic here is we have a buyer that's now ready to spend potentially 10 million dollars more to try and get to a going concern.

Why is a going concern important? It employs people. It has vendors. It has a tax base increase for the Island. It deals with a lot of things that you don't have otherwise.

This Court can modify the timing. This Court can modify the procedures. This Court can modify what makes someone qualified and when. That's what the Debtor is asking this Court to do and this Court, if it does that, will force the parties to get to a higher number, which forces the potential for a real going concern.

People don't spend money just to liquidate when they're spending this kind of more money. So the Committee would urge the Court to approve the motion.

THE COURT: All right. Thank you.

Mr. Brookner?

MR. BROOKNER: Thank you, Your Honor.

Mr. O'Neal actually inadvertently stole one of my lines at the beginning when he gave his opening, so I'll thank Your Honor. I'll follow up with what he said and it's a very important point. He said, "This is not a precedent-setting situation." And that's because, as Judge Jernigan often says,

Your Honor, "Facts matter." Okay?

And the facts here are such and they matter such that the Court should exercise its discretion at this juncture and reopen the bidding. This is not a usual situation. It's not $200 more, $3 million more, a couple more, it's 50 percent more, number one.

Number two, we have the testimony we talked about. You heard the testimony about an unfortunate medical situation the befell the bidder's key person.

In addition -- and I need to take issue with Mr. Warner, who's a brother of mine from another mother, obviously. This is about dollars and cents. This is about what's coming in the door, whether there's going to be sufficient funds to take out the DIP Lender and leave money behind to pay Mr. Warner's firm and Mr. Shapiro's firm, and Mr. Rosen's and Ms. Green's firm, and the other law firms. And to even leave something over for the other pre-petition lenders, if not also for Mr. Warner's constituents.

So I do take issue with Mr. Warner. I think money is very important here. And I think that with ten million dollars floating out there, it's a bid deal, it's a real number. I think, Your Honor, you do have the discretion here to reopen this. There is, I don't want to say a plethora of case law, but a variety of cases that not only establish that you have the discretion, but that have actually reopened

auctions when people have come in over the top at the last minute, with significant increases to the last bid that was made, and just to put it out there, you have the *Watertech Holdings* case. It's 619 BR 324 from the Bankruptcy Court in -- I think it's South Dakata, but I think maybe South Carolina.

Now in 2020 we have the *Sunland* case at 507 BR 753 from the Bankruptcy Court in the District of New Mexico in 2014 and each of those cases cite a variety of other cases that not only give Your Honor the discretion to do this and the authority, but also provide factual bases that are very similar to those that are presented here.

We understand the issue from the integrity of your Order that as Your Honor knows, I've litigated that several times in front of you in the process of an appeal on one of your other cases. We get the integrity of your Order situation. But this, as I said earlier, is a little bit different situation, not a situation you normally see. And because facts matter, we would respectfully submit to Your Honor that this is not an issue -- it's not a case that impugns or impinges upon the integrity of the process with the integrity of Your Honor's Order.

Thank you, Your Honor.

THE COURT: All right. Thank you.

Mr. O'Neal?

MR. O'NEAL: Your Honor, I have no further comments. It's late and I think everybody has said what I would say. I mean, obviously we're very supportive. This situation is distinguishable from the situations where kind of a normal disgruntled bidder comes in after having participated in the auction process and asks for an extension.

THE COURT: All right.

MR. O'NEAL: In addition, we have an Order that by its terms says that the auction can be reopened, so you're dealing with the best.

So thank you, Your Honor.

THE COURT: All right. Thank you.

Let me go to the middle, Mr. Kincheloe?

(No audible response.)

THE COURT: Ah, got it, okay. With that, there we go. Hold on.

MR. KINCHELOE: Sorry about that, Your Honor.

Like I said at the beginning, I don't have a position in terms of what's critical. From the Government's perspective they're queued up, good aspects and bad aspects, you know. Certainly the timeline of (indiscernible) is something that the Court reopened the auction, we're going to have to discuss.

THE COURT: All right. Thank you.

Mr. Hughes?

MR. HUGHES: Your Honor, I'll be brief.

As we indicated at the outset, the Island will benefit from the outcome of the auction already conducted. That auction was conducted after months of preparation and attention by a number of different actively interested parties, and that, as what Judge Bohm outlined in *Bigler*, the parties had an option to bid to the full potential at the auction, including this newcomer who decided not to participate before the auction occurred, and had several weeks, maybe even a month, to actually put in a bid and they didn't do it. They didn't put in the deposit. The bidding was robust and among several different parties. Thirteen rounds we went with a -- it went from, you know, a small amount to an amount that exceeded the amount of the St. Croix numbers.

The purchase price on balance is adequate for the value of the assets here. That was tested in an auction process that itself ran well, and the parties had ample time to conduct due diligence. That satisfies what the auction should provide for and we would ask Your Honor not to reopen the auction.

THE COURT: All right. Thank you.

Mr. Payne, I see that you have gotten on video. If I could ask you to hit five star -- are you dialed in, as well?

(No audible response.)

THE COURT: Ah, could you hit five star on your phone for me, please, so I can hear you?

Thank you, Mr. Payne.

MR. PAYNE: Can you hear me?

THE COURT: Loud and clear. Thank you, sir. And I appreciate your dialing in at this point. So let me finish. I'm going to come back to you, but let me hear the rest of the closing arguments.

Mr. Galardi?

MR. GALARDI: Thank you, Your Honor, very briefly. I do think this goes to the integrity of the process. There is an Order. The party was involved in the process. The process was, in fact, such that they had to put in to be a qualified bidder by the deadline. There was not actually a running out of cash because the Debtors had already determined that -- and this is the testimony -- that they would have to close by December 17th. The Debtors made a conscious decision not to adjourn the auction. I understand the gentleman's condition, but they could have adjourned the auction, waited to see, and come back. And could do so now.

So we think it goes to the integrity process. I applaud Mr. Brookner because he's quite honest. It's all about the money and that's not the way that an auction process, when you have a Court Order should be. There is a

process to set deadlines to have people come in and do their due diligence. So it does go fundamentally to the integrity of the process and we would ask Your Honor not to reopen the auction and start litigation over appeals on whether you could do so or not to do so, but rather whether this was the highest and best bid and obviously Mr. Hughes and I will be prepared for a sale hearing tomorrow on that issue, if Your Honor does not reopen the auction.

THE COURT: All right. Thank you.

Anyone else wish to make closing comments?

MR. LEGGIT: Your Honor, if I might be heard briefly, very briefly?

THE COURT: Of course.

MR. LEGGIT: Your Honor, this is -- thank you, Your Honor. This is Jaime Leggit (phonetic). I also have Tom Eagan (phonetic). We're counsel to the bidders, Swift and Petroleum Limited in St. Croix, refining and transportation involved. We haven't said much because we have been relying on counsel as Debtors' counsel on the screen. We just want to very quickly inform Your Honor that we have the utmost respect for this process. And for the Court's Orders. And we would not be before Your Honor in this posture, but for the extraordinary and unexpected, a medical situation that the bidders (indiscernible) before the bidding deadline.

THE COURT: All right. Thank you.

All right. Then with that, I've got before me the Debtors' Emergency Motion to Reopen the Auction pursuant to the bidding procedures that were previously approved. I do find that I have jurisdiction over the matter, pursuant to 28 USC Section 1334. I do find the matter constitutes a core proceeding under 28 USC Section 157. I further find that I have the requisite constitutional authority to enter a Final Order with respect to the motion.

I want to first start, Mr. Hughes referenced to *Bigler*. To most of you, *Bigler* doesn't mean much. I had an awful lot to do with forming Judge Bohm's opinion that led to the *Bigler* decision. And it is something that I have advocated as a lawyer for a 20-plus years and as a judge for ten. I do believe in the sanctity of the auction process. I do believe that absent unusual circumstances, the auction process is absolute and I have never before varied from that.

At the core of auction process, though, is that everyone is given an opportunity that the process is fair and open and that my job, when there are disputes, is to balance that. I accept at face value that West Indies was an interested purchaser and incurred a situation that it could not reasonably anticipate. And the fact that there is a single person at the helm that makes the decision and spends the money doesn't offend me at all. And it happens every day. I see it every day.

I am confident that this was not a strategic maneuver. I am confident that there has been effectively no bid chilling on the process and that I have a compelling reason to vary from my past practice and to grant relief. It is also not lost on me that everyone who read the bid procedures could see that there was the opportunity that the bidding could be reopened. And perhaps that provision shouldn't have been in the Order, perhaps I ought to be more insistent in the future, but that is for another case and another day. The Order that I entered is what it is.

I see very little harm in granting what the Debtor has asked for, with the following provisos.

Mr. Hughes has convinced me that there is a real dispute as to the difference between highest and highest and best. And that, I should recognize and do recognize. And so what I am going to do is I'm going to accept -- and hopefully Mr. Payne will come back because I have a question for him.

What I am going to do is I'm going to accept the West Indies bid. The Bid Order going forward is that to the extent that a party wishes to submit future bids, it will go St. Croix, Bay/Sabin, and West Indies.

And Mr. Payne, the question that I have for you is you are not required to participate. You are not required to change your bid, unless you decide you want to, but I am going to consider Bay and Sabin as one bid going forward, so you do

need to communicate. If you -- like, again, if you choose not to participate, perfectly fine. You suffer no consequences from that.

Your objections that you may wish to raise at a sale hearing, if you wish, are still preserved.

And Mr. Hughes, same for Bay. If Bay chooses not to participate and wants to continue to assert that its proposal is the highest and best, it is absolutely entitled to do so whether or not it chooses to participate.

To the extent that I had standing concerns about your ability to object, I am going to set those aside and I do want to hear, if you choose to make them, any arguments about highest and best at a proposed sale hearing.

Mr. Galardi, obviously same by you, you have a different basket of rights, if you will, but all of those rights are preserved whether or not you choose to participate any further in the auction process.

Ms. Green, what I am going to require -- because parties should not be made to wait, is that I am going to require that the auction be conducted no later than Friday, December the 10th. I am going to give you a sale hearing on Monday, December the 13th, 2021, at 11:30 Central.

Now if that conflicts with other issues, please do bring them up. I'm not trying to -- obviously I'm not trying to punish anybody. I'm just trying to push the process

forward.

MR. GALARDI: Your Honor, it's Gregg Galardi. May I address the schedule issue?

THE COURT: Of course.

MR. GALARDI: In light of these changes and in light of the closing date and I think West Indies said that they would close even if there is an appeal, I would at least like time and maybe we have a greater burden with the contract issues that they've changed in the structure, I would have preferred to have the auction the week of -- again, preferably the week of Friday that ends in the 17th and --

THE COURT: Okay.

MR. GALARDI: -- a hearing, the sale hearing before, but that's just to give us the opportunity to actually understand they filed the Schedules, what they're doing with the contracts, because I think that will be a big issue for us. And again, if we are going to bid, everyone has complained about our TSA, but I will complain about their having a definite list of contracts so that we can actually bid either a different structure, or the same structure and have that information.

THE COURT: So Mr. Galardi, --

MR. GALARDI: But moving forward and closing.

THE COURT: Yeah, you have -- sure. Mr. Galardi, you actually don't need to say anymore because I thought I was

helping you. I wasn't trying -- again, I wasn't trying to punish you at all.

I am perfectly happy to require that the auction be conducted on December the 17th. I think that's what you asked for, correct?

MR. GALARDI: Correct.

THE COURT: And let me ask -- again, I'm not trying to put -- I'm not trying to put stop watches on anybody. How much time do I need to have for the sale hearing?

(No audible response.)

THE COURT: All day?

(No audible response.)

THE COURT: Okay. 10:00 o'clock on the 21st. And I'll clear the day.

(Pause in the proceedings.)

THE COURT: All right?

MR. GALARDI: Thank you, Your Honor.

THE COURT: Yes, sir.

Anyone else have a concern?

Mr. Kincheloe?

MR. KINCHELOE: Your Honor, just in the event we do need to raise an objection about the sale to potentially form an entity, would the Court extend the sale objection deadline to either midnight on Sunday night, or 5:00 o'clock on Monday -- that'll be the 19th or 20th?

THE COURT: So let's go 5:00 o'clock -- and I hate to do this. But 5:00 o'clock on Sunday, the 19th.

MR. KINCHELOE: Thank you, Your Honor.

THE COURT: And everybody knows what your objection is going to be if you choose to make it anyway, so it shouldn't be a problem.

MR. KINCHELOE: Yes, Your Honor.

THE COURT: All right. So Mr. Payne, let me ask you -- first of all, and I made the assumption and I should never make assumptions. Are you a lawyer?

MR. PAYNE: I am, yes, in New York.

THE COURT: All right. And do you have bankruptcy experience?

MR. PAYNE: I do not, no, Your Honor.

THE COURT: All right. So what -- do you have any questions for me so that you can communicate with your client?

MR. PAYNE: I have no questions. I would simply say that, you know, I would need to confirm this with our board tomorrow, but we probably most likely would be interested in exactly the same terms that we did previously. So I have no objection to our bid being treated in conjunction with Bay's.

The only thing I would point out, which was noted in the Court's relevant court filings, was that the exact value of our bid will fluctuate depending due to the nature of our business, which is your (indiscernible), precious metals,

finer or precious metals, so if the metal value goes up or down, we're a lot more able to retrieve or cycle from the panelist the value of that will go up or down.

So it is not a fixed figure, but our team did their best to provide an estimate in the middle of the upper and lower ranges, that we can expect.

THE COURT: And Mr. Payne, you're not going to surprise me and in a former life, I represented some of the same types of people that you do. I understand how it works, so I'm going to be just okay when you -- you know, if you choose to participate.

I do think that it's probably worth having a conversation or conversations with Mr. Hughes, but my guess is Mr. Hughes already knew that and he's probably already send you an email, so probably makes sense to have that conversation and you-all can strategize and figure our where you want to go. Okay?

MR. PAYNE: Okay.

THE COURT: All right. Thank you, sir.

Anyone else?

(No audible response.)

THE COURT: All right. Ms. Green, can you -- can you have your team work on this overnight, get me an Order first thing in the morning? Let Mr. Alonzo know -- or that's probably too fast. If you can get it circulated tonight and

just, you know, sometime early afternoon get it filed? Because you're going to need to get comments and that sort of thing.

MS. GREEN: Yes, Your Honor.

THE COURT: And you'll let Mr. Alonzo know?

MS. GREEN: We have a draft Order that we submitted with the -- so we'll mark that up and to reflect your ruling and circulate that.

THE COURT: All right. Thank you.

Anyone else have anything we need to address?

MALE SPEAKER: Your Honor, if I might speak up very briefly. I probably should have spoke up a little earlier.

With the December 21st sale hearing, our closing date is December 22nd.

THE COURT: Yeah, obviously you're going to need to change that and that makes -- there's going to be a conversation that going to occur over the next couple of days that involves Ms. Green, you, Mr. Galardi, and quite frankly Mr. Hughes, as well, if he chooses to play. And that's, again, fully anticipated. Not going to bother me a bit.

MALE SPEAKER: Thank you, Your Honor.

THE COURT: All right.

All right. Folks, anything else?

(No audible response.)

THE COURT: All right. Then have a good evening. I

appreciate the presentations. Everyone be well, get your booster. Be safe. Stay away from Greek letters and I'll see you soon.

We'll be adjourned.

MS. GREEN: Thank you for your time.

MR. HUGHES: Thank you, Judge.

(Proceedings adjourned at 6:43 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

/S./ MARY D. HENRY

*CERTIFIED BY THE AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #64908*

*DATE FILED: DECEMBER 8, 2021*