## Exhibit 1

**Asset Purchase Agreement**

[EXECUTION VERSION]

**ASSET PURCHASE AGREEMENT**

**by and among**

**LIMETREE BAY SERVICES, LLC,**

**LIMETREE BAY REFINING HOLDINGS, LLC,**

**LIMETREE BAY REFINING HOLDINGS II, LLC,**

**LIMETREE BAY REFINING, LLC,**

**LIMETREE BAY REFINING OPERATING, LLC, AND**

**LIMETREE BAY REFINING MARKETING, LLC,**

**as Sellers**

**and**

**WEST INDIES PETROLEUM LIMITED, a Jamaican corporation, AND**
**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP, a Virgin Islands**
**limited liability limited partnership,**

**as Purchaser**

**Dated as of December [__], 2021**

Page

## TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE OF ASSETS ........................................................ 2
    1.1    Agreement to Purchase and Sell ................................................................. 2
    1.2    Description of Purchased Assets................................................................. 2
    1.3    Excluded Assets .......................................................................................... 3
    1.4    Assignment of Assigned Contracts ............................................................. 5

ARTICLE II ASSUMPTION OF LIABILITIES ........................................................... 6
    2.1    Agreement to Assume ................................................................................. 6
    2.2    Assumed Liabilities. ................................................................................... 6
    2.3    Excluded Liabilities ................................................................................... 6

ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT; CLOSING; DEPOSIT ........... 6
    3.1    Purchase Price; Delivery of Funds ............................................................. 6
    3.2    Good Faith Escrow Deposit ........................................................................ 7
    3.3    Time and Place of Closing .......................................................................... 7
    3.4    Closing Deliverables .................................................................................. 7
    3.5    Intentionally deleted ................................................................................... 8

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ............................. 8
    4.1    Due Organization, Good Standing and Limited Liability Company Power .......... 9
    4.2    Authorization; Noncontravention ............................................................... 9
    4.3    Governmental Consents and Approvals..................................................... 10
    4.4    Property..................................................................................................... 10
    4.5    Title to Purchased Assets .......................................................................... 11
    4.6    Affiliate Transactions................................................................................ 11
    4.7    Material Contracts..................................................................................... 12
    4.8    Intellectual Property Rights and Claims. .................................................. 13
    4.9    Tax Matters ............................................................................................... 13
    4.10    Employee Benefits .................................................................................... 14
    4.11    Compliance with Laws ............................................................................. 14
    4.12    Environmental Matters.............................................................................. 14
    4.13    Permits ..................................................................................................... 15
    4.14    Litigation.................................................................................................. 15
    4.15    Finders; Brokers....................................................................................... 15
    4.16    Exclusivity of Representations; Projections, Etc. ..................................... 15

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 16
    5.1    Due Organization, Good Standing and Power.......................................... 16
    5.2    Authorization; Noncontravention ............................................................. 16
    5.3    Governmental Consents and Approvals..................................................... 17
    5.4    Financing.................................................................................................. 17
    5.5    Solvency of Purchaser.............................................................................. 17
    5.6    Adequate Assurances ............................................................................... 17

5.7    Litigation..................................................................................... 18
5.8    Finders; Brokers......................................................................... 18
5.9    Intentionally deleted...........................................**Error! Bookmark not defined.**

ARTICLE VI COVENANTS .................................................................. 19
6.1    Intentionally deleted.................................................................. 19
6.2    Conduct Prior to the Closing Date ............................................ 19
6.3    Efforts to Close ........................................................................ 20
6.4    Public Announcements ............................................................. 21
6.5    Notification of Certain Matters ................................................ 21
6.6    Supplements to Schedules......................................................... 22
6.7    Post-Closing Access to Records and Personnel; Litigation Support ................. 22
6.8    Tax Matters ............................................................................... 23
6.9    Bulk Sales Act........................................................................... 24
6.10   Bankruptcy Action .................................................................... 24
6.11   Sale Order ................................................................................. 25
6.12   Intentionally deleted.................................................................. 26
6.13   Transfer of Permits ................................................................... 26
6.14   Expenses ................................................................................... 26
6.15   Confidentiality .......................................................................... 26

ARTICLE VII CONDITIONS TO CLOSING ........................................ 27
7.1    Conditions to Sellers' Obligations ........................................... 27
7.2    Conditions to Purchaser's Obligations...................................... 27
7.3    Frustration of Closing Conditions ............................................ 28

ARTICLE VIII COMPLIANCE WITH WARN, PLANT CLOSING ACT AND
         SIMILAR STATUTES ............................................................... 28
8.1    Compliance with WARN, Plant Closing Act and Similar Statutes ................. 28

ARTICLE IX TERMINATION.............................................................. 29
9.1    Termination Events.................................................................... 29
9.2    Effect of Termination ................................................................ 30

ARTICLE X SURVIVAL AND RELEASE ............................................ 30
10.1   Survival; Certain Post-Closing Matters .................................... 30
10.2   Intentionally deleted.................................................................. 30

ARTICLE XI MISCELLANEOUS ......................................................... 31
11.1   Notices ...................................................................................... 31
11.2   Entire Agreement ...................................................................... 32
11.3   Severability ............................................................................... 32
11.4   Binding Effect; Benefit ............................................................. 32
11.5   Assignability ............................................................................. 33
11.6   Amendments ............................................................................. 33
11.7   Non-Waiver............................................................................... 33
11.8   Applicable Law ......................................................................... 33

11.9    Consent to Jurisdiction..................................................................................... 33
11.10  WAIVER OF TRIAL BY JURY ..................................................................... 34
11.11  Counterparts..................................................................................................... 34
11.12  Headings ........................................................................................................... 34
11.13  Time of the Essence ......................................................................................... 34
11.14  Rules of Construction ...................................................................................... 34

<u>EXHIBITS AND SCHEDULES</u>

| | |
|---|---|
| Appendix 1 | Defined Terms |
| Exhibit A | Form of Bill of Sale and Assignment and Assumption Agreement |
| Schedule 1.1(g) | Business Permits |
| Schedule 1.2(a) | Business Contracts |
| Schedule 1.2(b) | Purchased Real Property |
| Schedule 1.2(d) | Real Property Leases |
| Schedule 1.2(g) | Business Permits |
| Schedule 3.4 | Assignment, Transfer and Conveyance Instruments |
| Schedule 6.2 | Conduct Prior to the Closing Date |

Sellers Disclosure Letter

**[EXECUTION VERSION]**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is made as of December [__], 2021, by and among Limetree Bay Services, LLC, a Delaware limited liability company ("LBS"), Limetree Bay Refining Holdings, LLC, a United States Virgin Islands limited liability company ("LBRH"), Limetree Bay Refining Holdings II, LLC, a United States Virgin Islands limited liability company ("LBRH II"), Limetree Bay Refining, LLC, a United States Virgin Islands limited liability company ("LBR"), Limetree Bay Refining Operating, LLC, a United States Virgin Islands limited liability company ("LBRO"), Limetree Bay Refining Marketing, LLC, a United States Virgin Islands limited liability company ("LBRM", along with LBS, LBRH, LBRH II, LBR and LBRO, each a "Seller" and collectively, "Sellers"), and West Indies Petroleum Limited ("WIPL"), a Jamaican corporation, and Port Hamilton Refining and Transportation, LLLP, a Virgin Islands limited liability limited partnership, formed by West Indies Petroleum Limited pursuant to the laws of the United States Virgin Islands ("PHRT" and, together with WIPL, "Purchaser"; Purchaser and Sellers, each a "Party" and collectively, the "Parties").  Capitalized terms used but not otherwise defined in the text of this Agreement have the meanings set forth in Appendix 1 attached hereto, which is incorporated herein and made a part of this Agreement.

### R E C I T A L S

A.      Sellers own an oil refinery located on the island of St. Croix in the United States Virgin Islands (collectively, the "Business").

B.      On July 12, 2021 (the "Petition Date"), Sellers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), which cases are jointly administered under *In re Limetree Bay Services, LLC*, Case No. 21-32351.

C.      On the terms and subject to the conditions set forth in this Agreement, Purchaser desires to purchase from Sellers, and Sellers' desire to sell to Purchaser, the Purchased Assets (the "Purchase").

D.      It is intended that the acquisition of the Purchased Assets will be accomplished through the sale, transfer and assignment of the Purchased Assets by Sellers to Purchaser in a sale undertaken pursuant to §363 of the Bankruptcy Code and that certain executory contracts and unexpired leases will be assumed by Sellers and assigned to Purchaser pursuant to §365 of the Bankruptcy Code in connection therewith.

### A G R E E M E N T S

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I
Purchase and Sale of Assets

1.1     Agreement to Purchase and Sell.  On the terms and subject to the conditions contained in this Agreement, Purchaser agrees to purchase from Sellers, and Sellers agree to sell, transfer and convey to Purchaser, with Purchaser taking title in the name of PHRT, all of Sellers' assets, properties, rights and interests as of the Closing Date, wherever situated or located, other than the Excluded Assets.  All of such assets, properties, rights and interests (other than the Excluded Assets) are collectively referred to in this Agreement as the "Purchased Assets".  The Purchased Assets shall be sold, transferred and conveyed to Purchaser as provided herein free and clear of any and all Liens, in each case to the extent resulting from the Sale Order.

1.2     Description of Purchased Assets.  Without limitation of Section 1.1, the Purchased Assets shall include the following assets owned by Sellers as of the Closing Date, except to the extent that any of the following are also enumerated in Section 1.3 as being Excluded Assets:

(a)     each Contract listed or described on Schedule 1.2(a) (collectively, the "Business Contracts"); provided, however, that notwithstanding the generality of Section 1.1 or anything to the contrary in this Section 1.2, Purchaser shall not acquire any rights or interest under the NRI Consignment Agreement;

(b)     the real property described on Schedule 1.2(b), together with all easements, appurtenances, rights and other hereditaments appurtenant to such real property (collectively, the "Purchased Real Property"), including Sellers' easements, use rights, or options to purchase, or such rights with respect to Purchased Real Property as are used or held for use in the Business; provided, that the agreements, if any, establishing such rights are assigned to Purchaser;

(c)     all Improvements;

(d)     Intentionally deleted;

(e)     all Parts Inventory;

(f)     the Files and Records, whether in hard copy or electronic format, except that, with respect to Files and Records that any Seller or any of its Affiliates is required by Law or Order to retain, the Purchased Assets shall include copies of such Files and Records to the extent permitted by any applicable Law or Order (and, with respect to any personnel records which a Seller or Affiliate is required to retain, to the extent permitted by any applicable Law or Order, copies of such personnel records for employees or consultants who, as of the Closing, will become employees or consultants of Purchaser); provided, that any Seller shall be permitted to retain a copy of any such Files and Records that such Seller requires, including any electronically stored information;

(g)     all Permits (and any pending applications for Permits), other than the Excluded Permits, that are owned, utilized, held or maintained by or licensed to a Seller primarily in connection with such Sellers' ownership or operation of the Business to the

other Purchased Assets, including those Permits described on <u>Schedule 1.2(g)</u> (the "<u>Business Permits</u>");

      (h)     the Business Intellectual Property;

      (i)     the Business IT Assets;

      (j)     all Furniture and Equipment owned by Sellers that is located at the Sellers' Facilities or that is otherwise primarily used or held for use in the Business (other than the Excluded Furniture and Equipment);

      (k)     Intentionally deleted;

      (l)     all insurance recoveries under each Seller's or its Affiliates' insurance policies, in each case solely (i) to the extent Purchaser has paid all premiums and costs associated with such coverage from and after the Closing Date, (ii) with respect to any of the Purchased Assets set forth in <u>Sections 1.2(a)-(j)</u>, and (iii) to the extent first arising with respect to incidents, actions or omissions that occur on or after the Closing Date, and any rights to assert claims with respect to any such insurance recoveries (the "Purchased Insurance Recoveries"); *provided*, that for the avoidance of doubt and notwithstanding anything to the contrary herein, recoveries under any of the Seller's business interruption (including, without limitation, any business interruption coverage under any property damage policies), errors and omissions or directors' and officers' liability, or property damage policies relating to incidents, actions or omissions prior to the Closing Date shall not be Purchased Insurance Recoveries; and

      (m)     all of the Sellers' rights, title and interests, in and to the assets specifically identified on <u>Schedule 1.2(m)</u>.

    1.3    <u>Excluded Assets</u>.  The "<u>Excluded Assets</u>" means the following items and assets (whether or not such assets are otherwise described in <u>Section 1.2</u>):

      (a)     all cash, certificates of deposit or other cash equivalents;

      (b)     any real property other than Purchased Real Property;

      (c)     all personal property, equipment and inventory not included in the Purchased Assets, including, without limitation, any such assets or Parts Inventory subject to the NRI Consignment Agreement;

      (d)     all rights, claims, defenses, causes of action, rights of offset and counterclaims (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) of each Seller against any Person, including with respect to any of the Purchased Assets, the Excluded Assets or the Excluded Liabilities, including, without limitation, all Avoidance Actions, and any proceeds of the foregoing; *provided*, *that*, the Purchased Assets include all rights, claims, defenses, causes of action, rights of offset and counterclaims (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or

non-contingent) of each Seller against Purchaser existing or otherwise arising before the Closing Date, including with respect to any of the Purchased Assets, the Excluded Assets or the Excluded Liabilities, including, without limitation, all Avoidance Actions, and any proceeds of the foregoing, but excluding any rights, claims, defenses, causes of action, rights of offset and counterclaims (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) of each Seller against Purchaser (i) arising after the Closing Date or (ii) arising under or related to this Agreement, including, without limitation, Purchaser's performance hereunder;

(e)     Intentionally deleted;

(f)     Intentionally deleted;

(g)     general books of account and books of original entry that comprise a Sellers' permanent Tax records, corporate minute books, stock books and related organizational documents and the books and records that any Seller is required to retain pursuant to any Law or Order and the books and records solely related to the Excluded Assets or Excluded Liabilities;

(h)     personnel records that any Seller is required by Law or Order to retain (provided that the copies of any such personnel records shall be Purchased Assets to the extent permitted by any applicable Law or Order pursuant to Section 1.2(f)) and personnel records of employees, former employees or consultants of each Seller who do not, as of the Closing, become employees of Purchaser;

(i)     all insurance recoveries under each Seller's or its Affiliates' insurance policies with respect to the Purchased Assets or the Business and any rights to assert claims with respect to any such insurance recoveries, *provided*, *however*, that the Purchased Insurance Recoveries shall not constitute Excluded Assets; and *provided, further*, that for the avoidance of doubt and notwithstanding anything to the contrary herein, recoveries under any of the Sellers' business interruption (including, without limitation, any business interruption coverage under any property damage policies), errors and omissions, directors' and officers' liability, or property damage policies relating to incidents, actions or omissions prior to the Closing Date shall be Excluded Assets;

(j)     all claims for refund or credit of (i) income Taxes of each Seller and its Affiliates for any taxable period and (ii) non-income Taxes of each Seller and its Affiliates with respect to a Pre-Closing Period;

(k)     Intentionally deleted;

(l)     Intentionally deleted;

(m)     each Seller's or any of its Affiliates' rights under this Agreement or any Transaction Document or relating to the Excluded Assets or the Excluded Liabilities;

(n)      all deposits (including security deposits, rent, electricity, telephone or otherwise and retainers held by attorneys, accountants, financial advisors and other professional advisors retained by any Seller or by any creditors' committee in the Bankruptcy Case) and other prepaid charges of each Seller, in each case other than with respect to any Purchased Assets;

(o)      any assets of each Seller in a directors and officers liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, retiree medical, stock option or other stock purchase plan or other Employee Benefit Plan;

(p)      Intentionally deleted;

(q)      all accounts receivable and pre-paid assets of each Seller, including, without limitation, any BP Receivables and NRI Receivables;

(r)      Intentionally deleted;

(s)      all attorney client privilege and attorney work product protection of each Seller or associated with the Business (as currently or formerly conducted) as a result of legal counsel representing a Seller or the Business (as currently or formerly conducted), and all Files and Records related thereto subject to such attorney client privilege or work product protection; provided that any privilege or work product that exclusively relates to the Purchased Assets or that is necessary to operate the Business (other than such privileges, protections and related Files and Records related to or in connection with the transactions contemplated by this Agreement or any Transaction Document) shall not be deemed to be an Excluded Asset whether or not in connection with the transactions contemplated by this agreement or any Transaction Document; and

(t)      all shares of capital stock or other equity interests in any Seller or any Affiliate thereof or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in any Seller or any Affiliate thereof.

For clarification purposes and without implication that the contrary would otherwise be true, it is understood and agreed that all rights and remedies with respect to the Excluded Assets or the Excluded Liabilities and which rights or remedies first arise after the Closing shall be retained by Sellers and shall not be transferred to Purchaser hereunder.

1.4      Assignment of Assigned Contracts .  To the maximum extent permitted by the Bankruptcy Code, but subject to applicable Law and the other provisions of this Section 1.4, Sellers shall assume and transfer, sell and assign all Business Contracts and Business Permits to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Business Contract or Business Permit (or any right thereunder) if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (and is not provided for or satisfied by the Sale Order, the Bankruptcy Code or applicable Law), would constitute a breach or in any way adversely affect the rights of Purchaser or Sellers thereunder and the Parties acknowledge and agree that the Closing shall

proceed with respect to the remaining Business Contracts and Business Permits without any reduction in the Purchase Price; provided that the Sellers' acknowledge and agree that the Sellers shall employ its reasonable best efforts to secure any requisite consents to assume any Business Permits, or, if unable to secure such consent, shall use reasonable best efforts, at the cost of the Purchaser, to secure a new business permit in favor of the Purchaser from the issuing party prior to the Closing.

## ARTICLE II
### Assumption of Liabilities

2.1     Agreement to Assume.  Purchaser shall not assume or agree to pay, perform and discharge when due, any liabilities or obligations of Sellers.  As such, all liabilities and obligations of Sellers are collectively referred to herein as "Excluded Liabilities".  Purchaser shall not assume, be deemed to have assumed, or otherwise be responsible for, the Excluded Liabilities.

2.2     Assumed Liabilities.  Purchaser shall not assume or agree to pay, perform and discharge when due, any liabilities or obligations of Sellers; provided, however, that Purchaser shall be obligated to pay Cure Amounts and provide any adequate assurance of performance in connection with the assumption and/or assignment of any Contracts, including, without limitation, any Business Contracts and Business Permit, pursuant to Section 1.4 of this Agreement or Section 365 of the Bankruptcy Code, which amounts shall be in addition to the Purchase Price and shall be paid directly to the subject counterparty by Purchaser pursuant to the terms of the Sale Order.

2.3     Excluded Liabilities.   Except as provided in Section 2.2, all liabilities and obligations of Sellers shall constitute Excluded Liabilities.

2.4     Notwithstanding the provisions of Sections 2.1, 2.2 and 2.3, Purchaser shall assume all obligations arising under any Business Contracts assigned to it to the extent such obligations are attributable to periods of time from and after the effective date of such assignments to Purchaser.

## ARTICLE III
### Purchase Price, Manner of Payment; Closing; Deposit

3.1     Purchase Price; Delivery of Funds.  At the Closing, Purchaser shall in full consideration for the sale and transfer by Sellers of the Purchased Assets (a) pay to Sellers an amount (such amount, the "Closing Payment") equal to (i) the Purchase Price, less (ii) the Good Faith Deposit Amount, by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing to Purchaser at least three Business Days prior to the Closing; and (b) together with Sellers, execute and deliver a joint written instruction to the Escrow Agent instructing it to release from the Escrow Account to Sellers by wire transfer of immediately available funds to an account or accounts designated by Sellers, an amount equal to the Good Faith Deposit Amount.

3.2     Good Faith Escrow Deposit.

(a)     Purchaser has paid to the Escrow Agent the Good Faith Deposit Amount, which funds shall be held in the Escrow Account by the Escrow Agent and invested as provided for in the Escrow Agreement and released by the Escrow Agent only in accordance with the terms of this Agreement and the Escrow Agreement.

(b)     If the Closing occurs, then the Good Faith Deposit Amount, shall be paid to Sellers and the applicable Parties shall submit joint written instructions to the Escrow Agent (in accordance with Section 3.1) to give effect to the same.

(c)     If the Closing does not occur as a result of the termination of this Agreement pursuant to Section 9.1(e), then within five Business Days of such termination, the Good Faith Deposit Amount shall be disbursed to Sellers by the Escrow Agent as liquidated damages and the applicable Parties shall submit joint written instructions to the Escrow Agent to give effect to the same.

(d)     If the Closing does not occur as a result of the termination of this Agreement for any reason other than as set forth in Section 3.2(c), then the Good Faith Deposit Amount shall be returned to Purchaser by the Escrow Agent within five Business Days of such termination, and the applicable Parties shall submit joint written instructions to the Escrow Agent to give effect to the same.

(e)     The Parties acknowledge that the agreements contained in this Section 3.2 are an integral part of the transactions contemplated by this Agreement and that without these agreements neither Sellers nor Purchaser would enter into this Agreement.

3.3     Time and Place of Closing.   Subject to the satisfaction or waiver of all of the conditions set forth in Article VII, the closing of the Purchase (the "Closing") shall take place at a time and location acceptable to both parties, as soon as practicable, but in any event the Closing Date (defined hereinafter) shall occur no later than January 21, 2022, at 5:00 p.m. (prevailing Central Time), unless extended by Sellers, with the consent of the DIP Agent and Prepetition Secured Parties. Such date of Closing is herein referred to as the "Closing Date".

3.4     Closing Deliverables.

(a)     At the Closing, Sellers shall deliver or cause to be delivered to Purchaser:

(i)     a certificate in a form reasonably satisfactory to Purchaser signed by an authorized officer of each Seller, dated as of the Closing Date, confirming the matters set forth in Sections 7.2(a) and (b) with respect to each Seller;

(ii)     counterparts to the assignment, transfer and conveyance instruments listed on Schedule 3.4, in each case, duly executed by each Seller (as applicable);

(iii)     a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by each Seller;

(iv)    a properly executed deed in recordable and customary form for conveyances of commercial real property in the United States Virgin Islands conveying the Purchased Real Property, which has the real property legal description approved by the Office of the Public Surveyor of the Government of the Virgin Islands, together with real property tax clearance letters from the Government of the Virgin Islands covering all the tax bills for all of the parcels of real property being conveyed by the deed, as well as a properly executed assignment in recordable and customary form in the United States Virgin Islands assigning any Sellers' easements, use rights or options to purchase or that such rights are used or held for use in the Business; provided, however, that if any such easements, use rights or options to purchase, or rights used or held for use in the Business, are premised upon any Business Contract, such Business Contract is assigned to Purchaser; and

(v)    written instructions from the Sellers and the Purchaser to the Escrow Agent to release the Good Faith Deposit Amount pursuant to Section 3.1.

(b)    At the Closing, Purchaser shall deliver or cause to be delivered to Sellers, and Sellers shall have received:

(i)    the Closing Payment by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing to Purchaser at least three Business Days prior to the Closing;

(ii)    a certificate in a form reasonably satisfactory to Sellers signed by an authorized officer of Purchaser, dated as of the Closing Date, confirming the matters set forth in Sections 7.1(a) and (b);

(iii)    counterparts to the assignment, transfer and conveyance instruments listed on Schedule 3.4, in each case, duly executed by Purchaser (as applicable);

(iv)    a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Purchaser; and

(v)    written instructions from the Sellers and the Purchaser to the Escrow Agent to release the Good Faith Deposit Amount pursuant to Section 3.1.

3.5    Intentionally deleted.

ARTICLE IV
Representations and Warranties of Sellers

Except as set forth in the disclosure letter delivered by Sellers to Purchaser (the "Sellers Disclosure Letter") concurrently with the execution of this Agreement (it being agreed that any matter disclosed pursuant to any section of the Sellers Disclosure Letter shall be deemed disclosed for purposes of any other section of the Sellers Disclosure Letter to the extent the applicability of the disclosure to such other section is reasonably apparent on the face of such

disclosure), Sellers hereby represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date (or as of such other date as may be specified herein):

4.1     Due Organization, Good Standing and Limited Liability Company Power.  Each Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.  Each Seller has all requisite limited liability company power and authority to own, lease and operate its assets and properties and conduct its business as now being conducted.  Each Seller is in good standing under the laws of each jurisdiction where the character of its assets or properties or the conduct of its business requires such qualification.

4.2     Authorization; Noncontravention.

(a)     Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, each Seller has the requisite limited liability company power and authority and has taken all limited liability company action necessary to execute and deliver this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Sellers as contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, the execution, delivery and performance by Sellers of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Sellers as contemplated hereby, the consummation by Sellers of the transactions contemplated hereby and thereby and the performance of its obligations hereunder and thereunder have been, and in the case of documents required to be delivered at the Closing will be, duly authorized and approved by all necessary limited liability company, member or other action.  This Agreement has been, and the Transaction Documents and all other instruments and agreements to be executed and delivered by Sellers as contemplated hereby will be, duly executed and delivered by Sellers.  Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, assuming that this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Purchaser and each other Person (other than any Sellers or any Affiliate thereof) party hereto and thereto, this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Sellers, enforceable against each applicable Seller in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).

(b)     Except as a result of the Bankruptcy Cases and, subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, the execution and delivery by Sellers of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Sellers as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not:

(i)     conflict with any of the provisions of any Seller's certificate of formation or other formational documents;

(ii)     except as provided in <u>Section 4.2(b)(ii)</u> of the Sellers Disclosure Letter and subject to receipt of the Consents set forth in <u>Section 4.3</u> of the Sellers Disclosure Letter, conflict with or result in a breach of, or constitute a default under or give rise to any right of termination, cancellation, modification or acceleration (including any right of first refusal or similar right) or the loss of a benefit under, or require the Consent of or giving of notice to any Person under any Business Contract, Real Property Lease or Business Permit (in each case, with or without notice or lapse or time or both); except, in the case of this clause (ii) for such conflicts or breaches or Consents or notices that (if not received) would not reasonably be expected to materially and adversely affect the Business, the Purchased Assets, taken as a whole, or prevent or materially delay beyond the Termination Date Sellers' ability to consummate the transactions contemplated by this Agreement or the Transaction Documents;

(iii)     subject to the receipt of the Consents referred to in <u>Section 4.3</u> of the Sellers Disclosure Letter, contravene any Law or any Order applicable to Sellers or by which any of their properties or assets are bound except such contraventions that would not reasonably be expected to materially and adversely affect the Business, and the Purchased Assets, taken as a whole, or prevent or materially delay beyond the Termination Date Sellers' ability to consummate the transactions contemplated by this Agreement or the Transaction Documents; or

(iv)     result in the creation or imposition of any Lien on any of the Purchased Assets.

4.3     <u>Governmental Consents and Approvals</u>.  Except as a result of the Bankruptcy Cases and, subject to obtaining Bankruptcy Court approval pursuant to the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), as applicable, except as set forth in <u>Section 4.3</u> of the Sellers Disclosure Letter, no Consent of or filing with any Governmental Entity must be obtained or made by Sellers in connection with the execution and delivery of this Agreement or any Transaction Document by Sellers or the consummation by Sellers of the transactions contemplated by this Agreement or any Transaction Document, except for any Consents that, if not obtained or made, would not reasonably be expected to materially and adversely affect the Business, and the Purchased Assets, taken as a whole, or prevent or materially delay beyond the Termination Date Sellers' ability to consummate the transactions contemplated by this Agreement or the Transaction Documents.

4.4     <u>Property</u>.

(a)     Other than the Real Property, no Seller owns any other real property.  One or more Sellers has good and valid title to the Purchased Real Property (other than any Excluded Asset).  There are no outstanding options, rights of first offer or rights of first refusal to purchase any Purchased Real Property or any portion thereof or interest therein. No Seller has leased or otherwise granted to any Person the right to use or occupy the Purchased Real Property or any material portion thereof, except as set forth in <u>Section 4.4(a)</u> of the Sellers Disclosure Letter.

(b)     <u>Section 4.4(b)</u> of the Sellers Disclosure Letter contains an accurate and complete list as of the date hereof of all Real Property Leases and all other real property

leases and subleases to which a Seller is a party.  With respect to each Real Property Lease pursuant to which a Seller is a lessee or sublessee, such Seller has valid leasehold interests in all leased real property described in such Real Property Lease, free and clear of any and all Liens.  Each Real Property Lease is a valid and binding obligation of the Sellers party thereto and, to the Knowledge of Sellers, is enforceable against the other parties thereto in accordance with the terms thereof, in each case, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium  or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).  Except as set forth in Section 4.4(b) of the Sellers Disclosure Letter, there exists no material default or event of default (with or without notice or lapse of time or both) with respect to any Real Property Lease by a Seller or, to the Knowledge of Sellers, by any other party thereto, and no Seller has received or delivered any notice with respect to any alleged material default that has not been rescinded, completely cured, or will be cured on or before the Closing Date pursuant to §365 of the Bankruptcy Code or otherwise.

(c)     To the Knowledge of Sellers, there is no, and no Seller has received written notice of any, existing or threatened change in the zoning classification of any Business Real Property (or any portion thereof) from that in effect on the date of this Agreement, in each instance, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All water, sewer, gas, electric, telephone and drainage facilities and all other utilities and public or quasi-public improvements related thereto required by Law with respect to, or required for the operation of, the Business at the Business Real Property, are installed and available to serve the Business Real Property.  No condemnation proceeding, lawsuit or administrative action or other matter affecting and adversely impairing the current use or occupancy of the Business Real Property is pending or, to the Knowledge of Sellers, threatened in writing with respect to any Business Real Property which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of Sellers, there has been no material casualty damage at any of the Business Real Property that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, except as disclosed in Schedule 4.11.

4.5     Title to Purchased Assets.  Except as set forth in Section 4.5 of the Sellers Disclosure Letter, and excluding Purchased Real Property (which is governed by Section 4.4(a)), one or more Sellers own and has good and valid title to, or a valid leasehold interest in, all personal property included in the Purchased Assets, free and clear of all Liens.

4.6     Affiliate Transactions.  Except as disclosed in Section 4.6 of the Sellers Disclosure Letter and except for employment and consultant relationships and compensation, benefits, travel advances and employee or consultant loans to any officer, director, employee or consultant of Sellers, in each case, in the ordinary course of business, there is no Contract or Liability relating primarily to the Business, or the Purchased Assets between (a) a Seller, on the one hand, and (b) any Affiliate, equity holder, option holder, officer, member, partner or director of a Seller (in each case that is not also a Seller), on the other hand, that remains in force and provides for obligations of any party from and after the Closing.

4.7     Material Contracts.

(a)     Section 4.7(a) of the Sellers Disclosure Letter sets forth an accurate, correct and complete list of the following Contracts which a Seller is a party and which are currently in effect as of the date hereof:

(i)      each Contract whereby a Seller has created a Lien in respect of any of the Purchased Assets;

(ii)     each Business Contract containing any covenant limiting the freedom of a Seller or any of its Affiliates (A) to compete with any Person, engage in any line of business or exploit the Purchased Assets, in each case, in any geographic territory, (B) which grants to any Person any exclusivity with respect to any geographic territory, any customer or any product or service, or (C) to solicit for employment, hire or employ any Person;

(iii)    each Business Contract that requires capital expenditures or other outstanding payments to be made by a Seller in excess of $100,000, in each case, following the date hereof;

(iv)     each Business Contract involving the sharing of profits, losses, costs or liabilities with any other Person relating to the Business, or the Purchased Assets;

(v)      each Business Contract that requires (or may require in certain circumstances) in accordance with its terms the provision of credit support, collateral, a guarantee or similar financial assurance in respect of the Business, or the Purchased Assets;

(vi)     each Business Contract that (A) provides services for a fixed price or maximum fee, or pursuant to any cap or similar provisions; (B) grants "most favored nation" status (or similar status) to a Person (whether in respect of pricing or otherwise); or (C) provides any performance guarantee, material rebates, discounts, incentive or volume credits; and

(vii)    each Contract with any Governmental Entity relating to the Business, or the Purchased Assets.

(b)     The Contracts required to be listed in Section 4.7(a), together with the Business Contracts and the Real Property Leases are referred to as "Material Contracts". True, correct and complete copies of each Material Contract have been made available to Purchaser prior to the date hereof.  Each Business Contract is a valid and binding obligation of a Seller (except for any breach or default that results from the insolvency of a Seller or the commencement of the Bankruptcy Cases and any breach or default to be cured through the payment of the Cure Amounts) and to the Knowledge of Sellers, enforceable against the other parties thereto in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).  Except as set forth in Section 4.7(b) of the Sellers Disclosure Letter and any breach or default that results from the insolvency of a Seller or the commencement of the Bankruptcy Cases and any breach or default to be cured through

the payment of the Cure Amounts, there exists no material default or event of default (with or without notice or lapse of time or both) with respect to any Business Contract by a Seller or, to the Knowledge of Sellers, by any other party thereto and no Seller has received or delivered any notice with respect to any alleged material default that has not been rescinded or cured.

4.8     Intellectual Property Rights and Claims.

(a)     Except as set forth in Section 4.8(a) of the Sellers Disclosure Letter, one or more Sellers owns all right, title, and interest to or is licensed to use the Business Intellectual Property, free and clear of any Liens.

(b)     No Seller has, within the last 12 months made any written claim of an infringement or misappropriation by any Third Party of its rights to any Business Intellectual Property, which claim is still pending.  To the Knowledge of Sellers, no Third Party is infringing or misappropriating any Business Intellectual Property.

(c)     Except for claims that have since been satisfactorily resolved or for which the statute of limitations has lapsed, no Seller has received any written notice from any Third Party challenging the right of such Seller to use any of the Business Intellectual Property that would reasonably be expected to materially and adversely affect the Business, and the Purchased Assets, taken as a whole.

(d)     There are no pending actions, suits or arbitrations by, or before any Governmental Entity for an infringement or misappropriation by any Seller of any Intellectual Property owned by any Third Party which would reasonably be expected to materially and adversely affect the Business, and the Purchased Assets, taken as a whole.

4.9     Tax Matters.  Except as disclosed in Section 4.9 of the Sellers Disclosure Letter:

(a)     Sellers have timely filed or caused to be timely filed, taking into account any applicable extensions, with the appropriate taxing authorities all income Tax Returns and all material non-income Tax Returns with respect to the Business or the Purchased Assets.  All such Returns are correct and complete in all material respects.  No Seller is currently the beneficiary of any extension of time within which to file any material tax Return with respect to the Business or the Purchased Assets.  Since January 1, 2017, no written claim has been made by a Governmental Entity in a jurisdiction in which a Seller does not file Returns that such Seller is or may be subject to taxation by that jurisdiction with respect to Taxes that would be the subject of such Returns.

(b)     All income Tax Liabilities and all material non-income Tax Liabilities of each Seller due and payable with respect to the Business or the Purchased Assets, in each instance for all Pre-Closing Periods, have been timely paid, taking into account any applicable extensions, to the extent the non-payment of such Taxes could reasonably be expected to result in a Lien on the Purchased Assets.  There are no pending or, to the Knowledge of Sellers threatened in writing, audits, investigations, disputes, notices of deficiency, claims or other similar actions relating to Property Taxes or any other Taxes that are imposed on a periodic basis (which are not based on income) of a Seller with

respect to the Business or the Purchased Assets. No Seller has waived any statute of limitations in respect of non-income Taxes or agreed to any extension of time with respect to a non-income Tax assessment or deficiency.

(c)     The representations and warranties contained in <u>Section 4.9(a)</u> and <u>Section 4.9(b)</u> shall only apply if and to the extent Purchaser would be held liable for the Taxes to which such representations and warranties relate or if the Purchased Assets would become subject to a Lien in respect of such Taxes and, for the avoidance of doubt, such representations and warranties shall not be considered inaccurate or breached to the extent the applicable representation or warranty does not apply as a result of this <u>Section 4.9(c)</u>.

4.10   <u>Employee Benefits</u>.  Set forth in <u>Section 4.10</u> of the Sellers Disclosure Letter is, as of [_____,] 2021, a true and complete list of each material employee benefit plan, within the meaning of Section 3(3) of ERISA, and each material fringe benefit, deferred compensation, severance, stock option, stock appreciation rights, incentive and bonus plan maintained or contributed to, or required to be contributed to, by a Seller or its Affiliates, in each case for the benefit of any Sellers' employees as of such date, but excepting any such plan sponsored in whole or in part by any government, Governmental Entity or union or employee organization or any other Person (collectively, the "<u>Employee Benefit Plans</u>").

4.11   <u>Compliance with Laws</u>.  Except as set forth in <u>Section 4.11</u> of the Sellers Disclosure Letter, to the Knowledge of Seller, (a) no Seller is, and no Seller has been in the past three years, in material violation of any Law or Order applicable to the Business, or the Purchased Assets, and (b) no Seller has received any written notice alleging or, to the Knowledge of Seller, been subject to any investigation by any Governmental Entity concerning, any such material violation of a Law or Order.

4.12   <u>Environmental Matters</u>.  Except as disclosed in <u>Section 4.12</u> of the Sellers Disclosure Letter, with respect to the Business:

(a)     to the Knowledge of Sellers, each Seller is in material compliance with all applicable Environmental Laws;

(b)     there are no Proceedings pending, or to the Knowledge of Sellers threatened in writing, against any Seller that alleges any material violation of Environmental Law and no Seller has received from any Governmental Entity any written notice of material violation or alleged material violation of Environmental Law;

(c)     Sellers possess and are in material compliance with all Permits required under Environmental Laws to operate the Business as currently operated and as the Business is expected to be operated following the Closing as contemplated by the Transaction Documents ("<u>Environmental Permits</u>"), and there are no Proceedings pending, or to the Knowledge of Sellers threatened in writing, to modify, suspend, revoke or rescind any such Environmental Permits; and

(d)     from and after December 1, 2015, to the Knowledge of Sellers, there have been no material releases of any Hazardous Materials (i) at, in, under, on, or from any

Seller Facilities or (ii) at, in, under, on, or, from any third-party location for which a Seller has any material Liability under Environmental Law.

The representations and warranties in this Section 4.12 are the sole and exclusive representations and warranties of Sellers concerning any Environmental Law, Environmental Permits, Hazardous Material or other environmental matters.

4.13    Permits.   Except for matters that are the subject of the representations and warranties in Section 4.12 (Environmental Matters), which matters are covered solely by Section 4.12, Sellers possess all material Permits that are necessary for the lawful operation of the Business as currently conducted by Sellers in the ordinary course.  All such Permits are valid and have not lapsed, been cancelled, terminated or withdrawn.  To the Knowledge of Sellers, Sellers are in compliance in all material respects with all such Permits.

4.14    Litigation.  Except as set forth in Section 4.14 of the Sellers Disclosure Letter: (a) there is no Proceeding pending, or to the Knowledge of Sellers, threatened, against any Seller or its Affiliates in respect of the Business or the Purchased Assets that would, if determined adversely, materially and adversely affect the Business, and the Purchased Assets, taken as a whole, or prevent or materially delay beyond the Termination Date Sellers' ability to consummate the transactions contemplated by this Agreement or any Transaction Document and (b) there are no material Orders outstanding applicable to the Business, or the Purchased Assets that have not been fully satisfied.

4.15    Finders; Brokers.  Except for Jefferies LLC and GlassRatner Advisory & Capital LLC, doing business as B. Riley Advisory Services, (whose fees are payable by Sellers), no agent, broker, Person or firm acting on behalf of Sellers is, or shall be, entitled to any broker's fees, finder's fees or commissions from Purchaser in connection with this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby.

4.16    Exclusivity of Representations; Projections, Etc..   The representations and warranties expressly made by Sellers in this Article IV are the exclusive representations and warranties made by Sellers with respect to the Business, and the Purchased Assets.  Except for any representations and warranties expressly set forth in this Article IV (as modified by the Sellers Disclosure Letter), (a) the Purchased Assets are sold "AS IS, WHERE IS," and Sellers expressly disclaim (on each of their own behalf and on behalf of each of their respective Affiliates) any other representations or warranties of any kind or nature, express or implied, as to Liabilities, operations of their businesses (as currently or formerly conducted), the title, condition, value or quality of assets of Sellers, or the prospects (financial and otherwise), risks and other incidents of Sellers and their businesses (as currently or formerly conducted), the Purchased Assets, (b) SELLERS SPECIFICALLY DISCLAIM (ON EACH OF THEIR OWN BEHALF AND ON BEHALF OF EACH OF THEIR RESPECTIVE AFFILIATES), AND PURCHASER HEREBY WAIVES, ANY REPRESENTATION OR WARRANTY OF QUALITY, VALUE, DESIGN, OPERATION, MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, ELIGIBILITY FOR A PARTICULAR TRADE, CONFORMITY TO SAMPLES, OR CONDITION OF THE ASSETS OF SELLERS (INCLUDING THE PURCHASED ASSETS) OR ANY PART THEREOF, WHETHER LATENT OR PATENT, (c) no material or information provided by or communications made by any Seller or any of its

Affiliates, or by any advisor thereof, whether by use of a "data room," or in any information memorandum, or otherwise, or by any broker or investment banker, will cause or create any warranty, express or implied, as to or in respect of any Seller, any Affiliate of any Seller or the title, condition, value or quality of their businesses (as currently or formerly conducted), or the Purchased Assets, and no other Person shall be deemed to have made, or shall be deemed to make, any other express or implied representation or warranty, either written or oral, on behalf of any Seller or any Affiliate thereof with respect to the subject matter contained herein, and (d) no Seller makes any representation or warranty whatsoever with respect to any estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

ARTICLE V
Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date (or as of such other date as may be specified herein):

5.1     Due Organization, Good Standing and Power.   Purchaser is duly organized, validly existing and in good standing under the laws of its jurisdiction of Jamaica.  Purchaser has all requisite corporate power and authority to own, lease and operate its assets and properties and conduct its business as now being conducted.  Purchaser is in good standing under the laws of each jurisdiction where the character of its assets or properties or the conduct of its business requires such qualification, except where the failure to be in good standing would not reasonably be expected to prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement or any Transaction Document.

5.2     Authorization; Noncontravention.

(a)     Purchaser has the requisite corporate power and authority and has taken all corporate or other action necessary to execute and deliver this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Purchaser as contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Purchaser as contemplated hereby, the consummation by it of the transactions contemplated hereby and thereby and the performance of its obligations hereunder and thereunder have been, and in the case of documents required to be delivered at the Closing will be, duly authorized and approved by the stockholders of Purchaser. This Agreement has been, and the Transaction Documents and all other instruments and agreements to be executed and delivered by Purchaser as contemplated hereby will be, duly executed and delivered by Purchaser. Assuming that this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Sellers and each other Person (other than Purchaser) party hereto and thereto, this Agreement and all such other instruments and agreements constitute valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with the terms thereof, except to the extent

that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).

(b)    Except as a result of the Bankruptcy Cases, the execution and delivery by Purchaser of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Purchaser as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with any of the provisions of the certificate of incorporation or by-laws or similar governance documents of Purchaser, in each case, as amended to the date of this Agreement, (ii) conflict with or result in a breach of, or constitute a default under, any Contract or other instrument to which Purchaser is a party or by which Purchaser or any of its properties or assets are bound, or (iii) contravene any Law or any Order applicable to Purchaser or by which any of its properties or assets are bound, except in the case of clauses (ii) and (iii) above, for such conflicts, breaches, defaults, consents, approvals, authorizations, declarations, filings or notices which do not and would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.3    <u>Governmental Consents and Approvals</u>.   Except as a result of the Bankruptcy Cases, no additional Consent of or filing with any Governmental Entity must be obtained or made by Purchaser in connection with the execution and delivery of this Agreement or any Transaction Document by Purchaser or the consummation by Purchaser of the transactions contemplated by this Agreement or any Transaction Document, except for any Consents which have been obtained or made or, if not made or obtained, do not and would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement or any Transaction Document.

5.4    <u>Financing</u>.   Purchaser has sufficient funds to consummate the transactions contemplated hereby, to perform its obligations hereunder (including all payments to be made by it in connection herewith) and to pay its expenses related to this Agreement and the transactions contemplated hereby.  The obligations of Purchaser under this Agreement are not contingent on the availability of any equity or debt financing.

5.5    <u>Solvency of Purchaser</u>.   As of Closing, after giving effect to the transactions contemplated by this Agreement, Purchaser will not: (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair market value of its assets or because the fair saleable value of its assets is less than the amount required to pay its probable liabilities on its existing debts as they mature); (b) have unreasonably small capital with which to engage in its business; or (c) have incurred debts beyond its ability to pay as they become due.

5.6    <u>Adequate Assurances</u>.   Purchaser is and will be capable of satisfying the conditions contained in Section 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Business Contracts and Real Property Leases.

5.7     <u>Litigation</u>.  There is no Proceeding pending against or affecting Purchaser, or any of its properties or rights, except as have not and would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement or any Transaction Document. Purchaser is not subject to any Order which seeks to or would reasonably be expected to, individually or in the aggregate, prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement or any Transaction Document.

5.8     <u>Finders; Brokers</u>.  No agent, broker, Person or firm acting on behalf of Purchaser or any of its Affiliates is or shall be entitled to any broker's fees, finder's fees or commissions from Sellers or any of their respective Affiliates in connection with this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby.

5.9     <u>Investigation by Purchaser</u>.  Purchaser has conducted its own independent investigation, verification, review and analysis of the Business (as currently or formerly conducted) and results of operations, financial condition, technology and prospects, the Purchased Assets and the Assumed Liabilities, which investigation, review and analysis was conducted by Purchaser and its Affiliates and, to the extent Purchaser deemed appropriate, by Purchaser's Representatives, sufficient to proceed with the transaction(s) memorialized herein or otherwise contemplated this Agreement.   In entering into this Agreement, Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of Sellers or any of their respective Affiliates (except the representations and warranties of Sellers set forth in Article IV), and Purchaser acknowledges and agrees, to the fullest extent permitted by Law, that:

(a)     none of Sellers or any of their respective Affiliates, Representatives or any other Person makes or has made any oral or written representation or warranty, either express or implied, as to the accuracy or completeness of any information made available or delivered to Purchaser, or its Affiliates and Representatives, including any information, whether oral or written (including cost estimates, financial information and projections and other projections and forward-looking statements) (i) included in management presentations, "break-out" discussions, responses to questions submitted by or on behalf of Purchaser or its Affiliates and Representatives, or any "data room" or (ii) delivered or made available pursuant to this Agreement or otherwise;

(b)     none of Sellers or any of their respective equity holders, Affiliates, Representatives or any other Person shall have any Liability or responsibility whatsoever to Purchaser or its equity holders, Affiliates or Representatives on any basis (including in contract, tort or equity, under any securities Laws or otherwise) based upon any information described in <u>Section 5.9(a)</u>;

(c)     without limiting the generality of the foregoing, none of Sellers or any of their respective equity holders, Affiliates, Representatives or any other Person makes any representation or warranty regarding (and Purchaser disclaims) any Third Party beneficiary rights or other rights which Purchaser might claim under any studies, reports, tests or analyses prepared by any Third Parties for any of Sellers or any of their

respective Affiliates, even if the same were made available for review by Purchaser or its equity holders, Affiliates or Representatives; and

(d)    without limiting the generality of the foregoing, Purchaser expressly acknowledges and agrees that (i) none of the documents, information or other materials provided to it at any time or in any format by Sellers or any of their respective equity holders, Affiliates or Representatives constitutes legal advice, and Purchaser waives all rights to assert that it received any legal advice from any of Sellers or any of their respective equity holders, Affiliates, or any of their respective Representatives, or that it had any sort of attorney-client relationship with any of such Persons, (ii) any estimates, forecasts, or projections furnished or made available to it concerning Sellers or the Business or their properties, business or assets have not been prepared in accordance with GAAP or standards applicable under any securities laws, and such estimates, forecasts and projections, including any reflected in financial statements, reflect numerous assumptions, and are subject to material risks and uncertainties, and (iii) actual results may vary, perhaps materially, and Purchaser is not relying on any such estimates, forecasts or projections.

## ARTICLE VI
### Covenants

6.1    <u>Intentionally deleted.</u>

6.2    <u>Conduct Prior to the Closing Date</u>.

(a)    Except (i) as set forth on <u>Schedule 6.2(a)</u>, (ii) as may be expressly required by this Agreement, (iii) as required by Law or Order or by a Governmental Entity, (iv) as required by the Bankruptcy Court, or (v) as a consequence of the commencement and continuation of the Bankruptcy Cases, during the period commencing on the date hereof and ending on the earlier of the Closing Date and the termination of this Agreement pursuant to <u>Article IX</u>, Sellers shall use commercially reasonable efforts (x) to comply in all material respects with all Laws, Orders, Contracts, Permits and Environmental Permits applicable thereto and (y) to preserve, maintain and protect in all material respects the Purchased Assets, the current goodwill of the Business and Sellers' present relationships with Governmental Entities and other Persons having significant relationships with Sellers in connection with the Business (as currently conducted).

(b)    Except (i) as set forth <u>Schedule 6.2(b)</u>, (ii) as may be expressly required by this Agreement, (iii) as required by Law or Order or by a Governmental Entity, (iv) as required or approved by the Bankruptcy Court, or (v) as a consequence of the commencement and continuation of the Bankruptcy Cases, during the period commencing on the date hereof and ending on the earlier of the Closing Date and the termination of this Agreement pursuant to <u>Article IX</u>, Sellers shall not effect any of the following (as each pertains to or is related to the Business, or the Purchased Assets) without the prior written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed):

(i)      sell, transfer, lease, license or otherwise dispose of any of its assets or properties that would be Purchased Assets if not sold;

(ii)      except as required by GAAP, make any change in any method of accounting or auditing practice with respect to the Business;

(iii)      Intentionally deleted;

(iv)      create, permit, subject or allow to exist any Lien on any of the Purchased Assets and other than any Lien that will be extinguished at or prior to Closing;

(v)      extend, materially amend or terminate or grant any material waiver under any Business Contract or Real Property Lease or enter into any Contract that would be categorized as a Material Contract if in effect on the date hereof;

(vi)      abandon any rights under, request the rejection under Section 365 of the Bankruptcy Code of, or amend, modify or supplement the terms of, any of the Business Contracts or Real Property Leases;

(vii)      fail to take any reasonable action that would prevent the expiration, lapse, termination or abandonment of any Permit or Environmental Permit, in each case that is material to the Business;

(viii)      settle or compromise any Proceeding, or enter into any consent decree or settlement agreement with any Third Party, against or affecting the Business that, in each case, would constitute an Assumed Liability;

(ix)      waive any material claims or rights of material value that are included in the Purchased Assets;

(x)      incur, assume, or guarantee any Indebtedness or make any material capital expenditures that, in each case, would constitute an Assumed Liability; or

(xi)      authorize any of the foregoing or commit or agree to do any of the foregoing.

6.3     Efforts to Close.

(a)      Except as otherwise provided in this Section 6.3, the Sellers shall, and shall cause their respective controlled Affiliates and Representatives to, and shall use commercially reasonable efforts to direct their respective equity holders to, cooperate and use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to make, or cause to be made, all filings necessary, proper or advisable under applicable Laws and to consummate and make effective the transactions contemplated by this Agreement, including their respective commercially reasonable efforts to obtain, prior to the Closing Date, all Permits, Consents and Orders of Governmental Entities as are necessary for consummation of the transactions contemplated by this Agreement and to fulfill the conditions to consummation of the

transactions set forth in Article VII; *provided*, that, except as set forth in Section 6.3(e), (w) no Party or its Affiliates shall be required to make any concessions that would adversely affect its business or be materially more burdensome to such Party (including to amend any Contract to increase the amount payable thereunder, commence any litigation, settle or compromise any matter, offer or grant any accommodation (financial or otherwise) to any Third Party or Governmental Entity, pay any amount or bear any other incremental economic burden to obtain any such Permit, Consent or Order), (x) no Party or its Affiliates shall incur any expense that would be payable or otherwise borne by the other Party or such other Party's Affiliates without the consent of such other Party, (y) Sellers shall not make any concessions that would purport to bind the Business from and after the Closing, and (z) Purchaser shall not make any concessions that would purport to bind any Seller or any of its Affiliates.

(b)     Notwithstanding anything to the contrary contained in this Agreement, no Seller nor any of its Affiliates or Representatives shall be required to repay any Indebtedness, amend or enter into any Contract or other arrangement, commence any litigation, settle or compromise any matter, offer or grant any accommodation (financial or otherwise) to any Third Party, pay any amount or bear any other incremental economic burden to procure any amendments, modification or termination of any Contract.

6.4     Public Announcements.  Each Party shall (a) consult with each other Party before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement or any Transaction Document, (b) provide to the other Parties for review a copy of any such press release or public statement and (c) not issue any such press release or make any such public statement prior to such consultation and review and the receipt of the prior consent of the other Parties, unless required by Laws or regulations applicable to such Party or its Affiliates, regulations of any stock exchange applicable to such Party or its Affiliates, or the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, in which case, the Party required to issue the press release or make the public statement or filing shall, prior to issuing such press release or making such public statement or filing, use its commercially reasonable efforts to allow the other Parties reasonable time to comment on such release, statement or filing to the extent practicable and permitted by Law.  Notwithstanding anything to the contrary contained in this Agreement, each of the Parties and its legal counsel and other Representatives shall be permitted to make filings on the docket of, or statements on the record before, the Bankruptcy Court relating to this Agreement and the transactions contemplated hereby without prior approval or consultation.

6.5     Notification of Certain Matters.  Sellers, on the one hand, and Purchaser, on the other hand, shall use their respective commercially reasonable efforts to promptly notify each other of any material Proceedings in connection with the transactions contemplated by this Agreement or the Transaction Documents commenced or, to the knowledge of Purchaser or the Knowledge of Sellers, threatened, against Sellers or Purchaser, as the case may be, or any of their respective Affiliates.

6.6     <u>Supplements to Schedules</u>.

(a)     Sellers shall have the right (but not the obligation) to deliver to Purchaser, from time to time but not later than three Business Days prior to the Closing Date, a schedule of changes (each, an "<u>Update Schedule</u>") to disclose any action taken by any Seller, or Event occurring, with respect to the Business, or the Purchased Assets after the date hereof.   Each such Update Schedule shall constitute an amendment to the representation, warranty or statement to which it relates for all purposes of this Agreement and the transactions contemplated hereby, and each Update Schedule shall be deemed to be incorporated into and to supplement and amend the Sellers Disclosure Letter (and all references to the "Sellers Disclosure Letter" in this Agreement shall include each such Update Schedule to the extent applicable).   Except as set forth in <u>Section 6.6(b)</u>, subject to the terms of this Agreement, Purchaser shall have the right to not consummate the transactions contemplated by this Agreement as a result of the failure of the conditions contained in <u>Section 7.1(a)</u> on the basis of the information disclosed in any Update Schedule.

(b)     If any fact or circumstance occurring prior to the date hereof and disclosed on any Update Schedule would, but for this <u>Section 6.6</u>, permit Purchaser to terminate this Agreement in accordance with <u>Section 9.1(d)</u>, but Purchaser does not provide a written termination notice pursuant to <u>Section 9.1(d)</u> within three (3) Business Days after receiving such Update Schedule, Purchaser shall be deemed to have waived, for all purposes of this Agreement and the transactions contemplated hereby, all rights to terminate this Agreement on account of the matters disclosed on such Update Schedule (including their right to not consummate the transactions contemplated hereby due to the failure of any of the conditions set forth in <u>Section 7.1(a)</u>).

6.7     <u>Post-Closing Access to Records and Personnel; Litigation Support</u>.

(a)     Until the later of (i) three (3) years after the Closing Date and (ii) one (1) year after the closing or dismissal of the Bankruptcy Cases and all proceedings related to or arising out of the Bankruptcy Cases, or any of them, Purchaser shall preserve and retain all corporate, accounting, Tax, legal, auditing, human resources and other books and records , as well as all documents and communications, including, without limitation, any electronically-stored information, servers, electronic communications (e.g., e-mail, instant messages, voicemails, etc.), and other digital information or data, relating to the Purchased Assets or the Business, or any other assets of the Sellers, including any Excluded Assets or Excluded Liabilities, with respect to periods prior to the Closing Date (including (i) any documents relating to any Proceeding or other dispute and (ii) all Returns, schedules, work papers and other material records or other documents relating to Taxes relating to the Purchased Assets).   At the end of such period, Purchaser may dispose of any such books and records only after they are first offered to and not accepted by Sellers.

(b)     Following the Closing, Purchaser shall allow Sellers, and their Affiliates successors, including, without limitation, any post-confirmation trustee appointed in the Bankruptcy Cases, and their respective Representatives reasonable access to (i) all books

and records related to the Purchased Assets and the Business, including, without limitation, any electronically-stored information, servers, electronical communications (e.g., e-mail, instant messages, voicemails, etc.), and other digital information or data, and (ii) such personnel having knowledge of the location or contents of such books and records, in each case of the foregoing clauses (i) and (ii), for legitimate business reasons, including, without limitation, any matters arising out of or relating to the Bankruptcy Cases or any related proceedings; *provided*, that no such access shall unreasonably interfere with Purchaser's operation of the Business.

(c)     Following the Closing, Sellers shall allow Purchaser and its Affiliates and their respective Representatives reasonable access to (i) all books and records related to the Purchased Assets and the Business and (ii) such personnel having knowledge of the location or contents of such books and records, in each case of the foregoing clauses (i) and (ii), for legitimate business reasons.

(d)     Following the Closing, Purchaser shall allow Sellers, and their Affiliates and successors, including, without limitation, any post-confirmation trustee appointed in the Bankruptcy Cases, and their respective Representatives reasonable access to (i) all books and records related to the Purchased Assets and the Business, including, without limitation, any electronically-stored information, servers, electronical communications (e.g., e-mail, instant messages, voicemails, etc.), and other digital information or data, and (ii) such personnel having knowledge of the location or contents of such books and records, in each case of the foregoing clauses (i) and (ii), for legitimate business reasons, including, without limitation, any matters arising out of or relating to the Bankruptcy Cases or any related litigation or proceedings; *provided*, that no such access shall unreasonably interfere with Purchaser's operation of the Business.

(e)     The rights and obligations of a Party under this <u>Section 6.7</u> shall inure to the benefit of and be binding upon the successors and assigns of such Party.  If a Party or any of its successors or assigns (i) consolidates with or merges into any other Person or (ii) with respect to Purchaser, transfers all or substantially all of the Purchased Assets to any Person, in each case proper provision shall be made so that the successors and assigns of such Party honor the obligations set forth in this <u>Section 6.7</u>.

6.8     <u>Tax Matters</u>.

(a)     All stamp, transfer, documentary, sales and use, value added, registration and other such taxes and fees (including any penalties, interest and recording and filing fees) incurred in connection with the Purchase or otherwise in connection with this Agreement and not exempted under a Sale Order, whether or not customarily paid by Sellers or purchasers (collectively, the "<u>Transfer Taxes</u>"), shall be borne equally by Sellers and Purchaser.  Purchaser shall properly file on a timely basis all necessary Returns and other documentation with respect to any Transfer Tax and provide to Sellers' evidence of payment of all Transfer Taxes.

(b)     Purchaser and Sellers agree to furnish or cause to be furnished to each other, as promptly as reasonably practicable, such information and assistance relating to

the Purchased Assets as is reasonably necessary for the preparation and filing of any Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer of any governmental or regulatory inquiry relating to Tax matters.

(c)     For purposes of this Agreement, all Property Taxes and any other Taxes that are imposed on a periodic basis (which are not based on income) with respect to the Purchased Assets with respect to any taxable period that begins on or before and ends after the Closing Date shall be apportioned between the portion of such period that falls within the Pre-Closing Period and the portion of such period that falls within the Post-Closing Period proportionally in accordance with the number of days in each such portion of the period.

6.9     Bulk Sales Act.  Purchaser hereby waives compliance by Sellers in all respects with respect to any applicable bulk sale, bulk transfer, successor liability and similar Laws, or with any Laws triggered by a bulk sale or transfer of property, of any jurisdiction in connection with the transactions contemplated by this Agreement or similar Laws of any jurisdiction in connection with the Purchase; *provided*, *that*, the effectiveness of said waiver is subject to the Sale Order waiving compliance by Sellers in all respects with respect to any such Laws.

6.10    Bankruptcy Action.

(a)     The Parties shall comply in all material respects with the Bid Procedures Order and the Sale Order (after the entry of such Orders by the Bankruptcy Court).

(b)     Sellers shall use commercially reasonable efforts to comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement.  Sellers shall serve (i) all Persons who are known to possess or assert a Claim against or Interest in any of the Purchased Assets, (ii) the IRS, (iii) all applicable Governmental Entities, (iv) all applicable state and local Governmental Entities with taxing authority, (v) all other Persons required by any Order of the Bankruptcy Court, (vi) all parties to Business Contracts and Real Property Leases, and (vii) all Persons that request or are entitled to notice under Bankruptcy Rule 2002.

(c)     The Parties shall use their respective commercially reasonable efforts to have the Bankruptcy Court enter the Sale Order as promptly as possible.

(d)     Sellers and Purchaser shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order and shall provide each other with a reasonable opportunity to review and comment on such pleadings, related motions, applications, petitions schedules and supporting papers. Sellers shall promptly provide Purchaser and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that Sellers have in their possession (or receive) pertaining to the Sale Motion, the Bid Procedures Order, the Sale Order, or any other

order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Purchaser and its counsel.

(e)     If the Bid Procedures Order, the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order, the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Sellers and Purchaser shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

6.11    Sale Order.

(a)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Sellers and Purchaser acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken steps to obtain the highest and otherwise best offer possible for the Purchased Assets including giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court and, if necessary, conducting the Auction and (ii) Purchaser must provide adequate assurance of future performance under the Business Contracts included in the Purchased Assets, which consists of the Refinery Operating Agreement, dated as of July 2, 2018, by and between Limetree Bay Refining, LLC (as Refinery Operator) and Government of U.S. Virgin Islands.

(b)     The Sale Order shall, among other things:

(i)     approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the transfer of the Purchased Assets to Purchaser free and clear of all Liens, Claims, and Liabilities of any kind whatsoever, and (C) the timely performance by Sellers of their obligations under this Agreement;

(ii)     authorize and empower Sellers to assume and assign the Business Contracts and Real Property Leases to Purchaser;

(iii)     find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Purchaser the full benefits and protections of Section 363(m) of the Bankruptcy Code;

(iv)     find that this Agreement was negotiated, proposed and entered into by Sellers and Purchaser without collusion, in good faith and from arm's length bargaining positions;

(v)      find that due and adequate notice and an opportunity to be heard in accordance with all applicable Laws were given to the necessary parties in the Bankruptcy Cases;

(vi)      contain findings of fact and conclusions of law that Purchaser (A) is not a successor to, or subject to successor liability for, any Seller, (B) has not, de facto or otherwise, merged with or into any Seller, (C) is not an alter ego or a continuation of any Seller, and (D) does not have any responsibility for any obligations of any Seller based on any theory of successor or similar theories of liability;

(vii)      find that the Purchase Price is fair and reasonable;

(viii)      find that the Bankruptcy Court retains jurisdiction to resolve any claim or dispute arising out of or related to this Agreement; and

(ix)      contain such other terms and conditions as are acceptable to Sellers and Purchaser in their respective sole discretion.

(c)      Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry by the Bankruptcy Court of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (i) demonstrating that Purchaser is a "good faith" purchaser and (ii) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

6.12      Intentionally deleted.

6.13      Transfer of Permits.  Except for those Business Permits that are not transferable to Purchaser by Law, the Parties shall use commercially reasonable efforts to cause the issuance or transfer of all of the Business Permits described on Schedule 1.1(g) and shall give and make all notices and reports that such Party is required to make to the appropriate Governmental Entities and other Persons with respect to such Business Permits.  All costs and expenses associated with the issuance or transfer of the Business Permits shall be borne by Purchaser.

6.14      Expenses.  Except to the extent otherwise specifically provided herein, whether or not the transactions contemplated hereby are consummated, all fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such fees, costs and expenses.

6.15      Confidentiality.  From and after the date of this Agreement, Purchaser and Sellers shall continue to be bound by and comply with the obligations of the Confidentiality Agreement except as otherwise required under or necessary to comply with any provision of the Bankruptcy Code, Bankruptcy Rules, applicable law, any order of the Bankruptcy Court, including, without limitation, the Bid Procedures Order, or the provisions of this Agreement. Except as specifically provided in the proviso to this sentence, unless otherwise agreed to by the Parties, at the later of (i) the Closing or (ii) the end of the remainder of the term set forth in the Confidentiality Agreement, the Confidentiality Agreement shall be deemed to have been terminated by the parties thereto and shall no longer be binding; *provided*, that notwithstanding anything in this Section 6.16 to the contrary, to the extent that Purchaser is in possession of any Information (as

defined in the Confidentiality Agreement) regarding Sellers and their respective Affiliates, or the Excluded Assets or the Excluded Liabilities, Purchaser shall continue to be bound by the Confidentiality Agreement with respect to such Information until the later of (x) the end of the remainder of the term set forth in such Confidentiality Agreement and (y) if the Closing occurs, the date that is two years after the Closing.

ARTICLE VII

Conditions to Closing

7.1     <u>Conditions to Sellers' Obligations</u>.  The obligation of Sellers to consummate the transaction contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date and as of the Closing Date, upon the non-fulfillment of any of which this Agreement may, at Sellers' option, be terminated to the extent permitted pursuant to and with the effect set forth in <u>Article IX</u>:

(a)     The representations and warranties of Purchaser contained in <u>Article V</u> shall be true and correct at and as of the Closing Date as if made at and as of such time, except for such failures as do not prevent Purchaser from consummating the transactions contemplated by this Agreement.

(b)     All obligations of Purchaser to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which Purchaser would be required to perform at the Closing if the transaction contemplated hereby was consummated) shall have been performed in all material respects, unless waived by Sellers.

(c)     Purchaser shall have delivered or caused to be delivered to Sellers each of the items set forth in <u>Section 3.4(b)</u>.

(d)     No Governmental Entity of competent jurisdiction shall have entered a valid Order that is in effect and has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing.

(e)     The Sale Order shall have been entered by the Bankruptcy Court approving the transactions contemplated under this Agreement.

7.2     <u>Conditions to Purchaser's Obligations</u>.   The obligation of Purchaser to consummate the transaction contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date and as of the Closing Date (in each case, so long as Purchaser has complied with its obligations under this Agreement with respect to each of the matters set forth below), upon the non-fulfillment of any of which this Agreement may, at Purchaser's option, be terminated to the extent permitted pursuant to and with the effect set forth in <u>Article IX</u>:

(a)     The representations and warranties of Sellers in <u>Article IV</u> shall be true and correct in all respects as of the time of the Closing as though such representations and warranties were made at and as of such time (or, if made as of a specific date in the text

of such representations and warranties, at and as of such date) except where the failure to be so true and correct would not have a Material Adverse Effect.

(b)     All obligations of Sellers to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which Sellers would be required to perform at the Closing if the transaction contemplated hereby was consummated) shall have been performed in all material respects, unless waived by Purchaser.

(c)     Sellers shall have delivered or caused to be delivered to Purchaser each of the items set forth in <u>Section 3.4(a)</u>.

(d)     No Governmental Entity of competent jurisdiction shall have entered a valid Order that is in effect and has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing.

(e)     The Sale Order shall have each been entered by the Bankruptcy Court approving the transactions contemplated under this Agreement.

7.3     <u>Frustration of Closing Conditions</u>.  No Party may rely on the failure of any condition set forth in this <u>Article VII</u> to be satisfied if such failure was caused by such Party's failure to act in good faith or such Party's failure to comply with <u>Section 6.3</u>.

ARTICLE VIII
Compliance with WARN, Plant Closing Act and Similar Statutes

8.1     <u>Compliance with WARN, Plant Closing Act and Similar Statutes</u>.  Sellers shall be responsible for compliance with any notice or severance obligations under WARN, the Plant Closing Act (and any comparable Law requiring notice or severance to employees) and any Contract (including, for the avoidance of doubt, any Liability for accrued but unused paid time-off and severance), in each case, arising prior to the Closing Date with respect to the termination of any employees or consultants that (a) provide services to any Seller as of the date hereof or at any other time from the date hereof through the Closing Date with respect to the termination of any employees or consultants that provide services to any Seller as of the date hereof or at any time from the date hereof through the Closing Date.  Without limiting the foregoing, pursuant to Section 473(a)(3) of the Plant Closing Act, Sellers assume responsibility and liability as successor employer under the Plant Closing Act for all the prior years of service, along with any years accumulated moving forward.  Sellers shall be responsible for compliance with any notice or severance obligations relating to the Business (as currently or formerly conducted), or the Purchased Assets under WARN and the Plant Closing Act (and any comparable Law requiring notice or severance to employees) arising prior to the Closing Date.  Sellers shall notify Purchaser prior to the Closing of any "employment loss", in the 90-day period immediately prior to the Closing with respect to any such employees or consultants.

ARTICLE IX
Termination

9.1     Termination Events.  This Agreement and the transaction contemplated hereby may only be terminated as follows, at any time prior to the Closing:

(a)     by the mutual written consent of Purchaser and Sellers;

(b)     by either Purchaser or Sellers upon (i) the issuance of a final and non-appealable Order by a Governmental Entity to restrain, enjoin or otherwise prohibit the purchase and sale transaction contemplated hereby, (ii) the appointment of an examiner with expanded powers or a Chapter 11 trustee in the Bankruptcy Cases, or (iii) the Bankruptcy Cases being converted into a case under Chapter 7 of the Bankruptcy Code or dismissed;

(c)     by either Purchaser or Sellers if the Bankruptcy Court has not entered the Sale Order by December 23, 2021, provided that such date may be extended as otherwise agreed to in writing by Purchaser and Sellers; *provided*, *however*, that Purchaser's right to terminate this Agreement under this Section 9.1(c) shall not be available to Purchaser if Purchaser's failure to fulfill any of its obligations under this Agreement has been the cause of, or resulted in, the failure of the Sale Order to have been entered on or prior to the aforesaid date;

(d)     by Purchaser, (i) if any condition set forth in Sections 7.2(a) through (c), inclusive, becomes incapable of being satisfied prior to the Termination Date (other than through the failure of Purchaser to comply with its obligations under this Agreement) and Purchaser has not waived such condition or (ii) if the Closing shall not have occurred at or before 5:00 p.m. (prevailing Central Time) on January 21, 2022, or such later date as extended in accordance with the Bid Procedures Order (such date, as may be extended, the "Termination Date"); *provided*, *however*, that Purchaser's right to terminate this Agreement under this clause (ii) of this Section 9.1(d) shall not be available to Purchaser if Purchaser's failure to fulfill any of its obligations under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or prior to the Termination Date;

(e)     by Sellers, (i) if any condition set forth in Section 7.1(a) through (c), inclusive, becomes incapable of being satisfied prior to the Termination Date (other than through the failure of Sellers to comply with their obligations under this Agreement) and Sellers have not waived such condition, or (ii)  if the Closing shall not have occurred at or before 5:00 p.m. (prevailing Central Time) on the Termination Date through the failure of Purchaser to comply with its obligations under this Agreement;

(f)     by Sellers, (i) if any condition set forth in Sections 7.2(a) through (c), inclusive, becomes incapable of being satisfied prior to the Termination Date (other than through the failure of Sellers to comply with their obligations under this Agreement) and Purchaser has not waived such condition, or (ii) at any time after completion of the

Auction if Purchaser is not declared the Winning Bidder of Back-up Bidder upon completion of the Auction; and

(g)     automatically upon consummation of an Alternative Transaction.

9.2    <u>Effect of Termination</u>.  In the event of the termination of this Agreement pursuant to <u>Section 9.1</u> by Purchaser, on the one hand, or Sellers, on the other hand, written notice thereof shall forthwith be given to the other specifying the provision hereof pursuant to which such termination is made, and this Agreement shall be terminated and become void and have no effect and there shall be no Liability hereunder on the part of any Party, except that <u>Section 3.2</u> (Good Faith Escrow Deposit), <u>Section 6.14</u> (Expense), this <u>Section 9.2</u> and <u>Article XI</u> (Miscellaneous) and the defined terms and rules of construction used therein and set forth on Appendix I shall survive any termination of this Agreement; *provided*, *however*, that (a) subject to the terms and conditions of <u>Section 3.2(c)</u>, no Party shall be relieved of or released from any Liability arising from any material breach by such Party of any provision of this Agreement, and (b) the Confidentiality Agreement shall remain in full force and effect.

## ARTICLE X
## Survival and Release

10.1    <u>Survival; Certain Post-Closing Matters</u>.  Purchaser and Sellers acknowledge and agree that: (a) Sellers' representations and warranties set forth in this Agreement and in the documents and instruments delivered or entered into by Sellers in connection with this Agreement shall not survive the Closing and shall expire immediately upon the Closing; and (b) the covenants and agreements of Sellers set forth in this Agreement and in any documents and instruments delivered or entered into by Sellers in connection with this Agreement, in each case that do not by their terms extend beyond the Closing, shall not survive the Closing and shall expire immediately upon the Closing.  Accordingly, for clarification purposes, it is acknowledged, understood and agreed by the Parties that Sellers shall not have any liability or other obligation following the Closing with respect to any breach by Sellers or claimed breach by Sellers of (x) any representations or warranties contained in this Agreement or any of the documents or instruments delivered or entered into by Sellers in connection with this Agreement or (y) any of Sellers' covenants and agreements contained in this Agreement or any of the documents or instruments delivered or entered into by Sellers in connection with this Agreement that do not by their terms extend beyond the Closing.  Notwithstanding anything expressed or implied herein to the contrary, the Parties acknowledge and agree that (1) Purchaser shall be solely responsible for the ownership of the Purchased Assets from and after the Closing Date, the operation of the Business from and after the Closing Date, and acts or omissions of Purchaser with respect thereto, and (2) Sellers shall have no responsibility or obligation with respect to, or arising out of, any of the foregoing.

10.2    <u>Intentionally deleted</u>.

ARTICLE XI
Miscellaneous

11.1    Notices.    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (a) on the day of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if delivered by electronic mail during regular business hours on a Business Day and, if not, then on the following Business Day; or (c) on the day of delivery (if a Business Day, and if not a Business Day, on the next Business Day) if sent by Federal Express or similar overnight courier or United States mail:

> If to Sellers:
>
> Addressed to:
>
> Limetree Bay Services, LLC et al.
> c/o B. Riley Advisory Services
> 3500 Maple Avenue, Suite 420
> Dallas, Texas  75219
> Attn:   Mark Shapiro
> Email: mshapiro@brileyfin.com
>
>
> with a copy to:
>
> Baker & Hostetler LLP
> 200 South Orange Avenue, Suite 2300
> Orlando, Florida  32801
> Attn:   Elizabeth A. Green
> Email: egreen@bakerlaw.com
>
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York 10011
> Attn:   Jorian L. Rose
> Email: jrose@bakerlaw.com
>
>
> If to Purchaser or Parent:
>
> Addressed to:
>
> St. Croix Refining and Transportation, LLLP
> 2555 Ponce de Leon Boulevard, Suite 600
> Coral Gables, Florida  33134
> Attn:   Thomas V. Eagan
> Email: teagan@rascoklock.com

with a copy to:

Rasco Klock
2555 Ponce de Leon Boulevard, Suite 600
Coral Gables, Florida  33134
Attn:   Thomas V. Eagan
Email: teagan@rascoklock.com

Any Party may change its address for the purpose of this Section 10.2 by giving the other Party written notice of its new address in the manner set forth above.

11.2    Entire Agreement.  This Agreement, the agreements, documents and instruments to be delivered by the Parties pursuant to the provisions hereof, and the Confidentiality Agreement, each as may be amended or supplemented, constitute the entire agreement between the Parties and shall be binding upon and inure to the benefit of the Parties hereto and their respective legal representatives, successors and permitted assigns.  Each Appendix, Exhibit, Schedule and the Sellers Disclosure Letter, each as may be amended or supplemented, shall be considered incorporated into this Agreement.  The inclusion of any item in the Sellers Disclosure Letter is not evidence of the materiality of such item for the purposes of this Agreement. Purchaser acknowledges that any estimates, forecasts, or projections furnished or made available to it concerning Sellers or the Business or their properties, business or assets have not been prepared in accordance with GAAP or standards applicable under any securities laws, and such estimates, forecasts and projections, including any reflected in financial statements, reflect numerous assumptions, and are subject to material risks and uncertainties. Purchaser acknowledges that actual results may vary, perhaps materially, and Purchaser is not relying on any such estimates, forecasts or projections.

11.3    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and, for purposes of such jurisdiction, such provision or portion thereof shall be struck from the remainder of this Agreement, which shall remain in full force and effect.  This Agreement shall be reformed, construed and enforced in such jurisdiction so as to best give effect to the intent of the Parties under this Agreement. Purchaser acknowledges that any estimates, forecasts, or projections furnished or made available to it concerning Sellers or the Business or their properties, business or assets have not been prepared in accordance with GAAP or standards applicable under any securities laws, and such estimates, forecasts and projections, including any reflected in financial statements, reflect numerous assumptions, and are subject to material risks and uncertainties. Purchaser acknowledges that actual results may vary, perhaps materially, and Purchaser is not relying on any such estimates, forecasts or projections.

11.4    Binding Effect; Benefit.  This Agreement shall inure to the benefit of and be binding upon the Parties hereto, and their successors and permitted assigns.  Nothing in this Agreement, express or implied, shall confer on any Person other than the Parties hereto, and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under

or by reason of this Agreement, including, without limitation, third party beneficiary rights. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Sellers or Purchaser.  No provision of this Agreement shall give any third Persons any right of subrogation or action over or against Sellers or Purchaser.

11.5    Assignability.  This Agreement and the various rights and obligations arising hereunder inure to the benefit of and are binding upon Sellers and their respective successors and permitted assigns, and Purchaser and its successors and permitted assigns.   Neither this Agreement nor any of the rights, interests or obligations hereunder may be transferred or assigned (including by operation of law in connection with a merger or sale of stock, or sale of substantially all the assets, of a Person) by any of the Parties hereto without the prior written consent of the other Party or Parties (not to be unreasonably withheld, conditioned or delayed); provided, however, the Purchaser may assign its rights hereunder to a wholly-owned entity and take title in such entity at time of Closing.  No assignment shall relieve a Party of its liability or obligations hereunder.  Notwithstanding anything expressed or implied herein to the contrary, following the Closing, Sellers (or any of them) may assign to any successor in the Bankruptcy Cases all or any portion of their rights hereunder in accordance with an Order of the Bankruptcy Court; provided, however, that any such assignment shall not assign any Purchased Assets.

11.6    Amendments.   Except as otherwise authorized herein with respect to the Schedules and disclosures to this Agreement, this Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the Parties hereto.

11.7    Non-Waiver.  Except as otherwise contemplated herein, the failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by such Party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

11.8    Applicable Law.  This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Texas applicable to contracts made in that state and the applicable provisions of the Bankruptcy Code, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of laws of any other jurisdiction.

11.9    Consent to Jurisdiction.  Purchaser and Sellers agree that the Bankruptcy Court shall retain sole jurisdiction over any legal action or proceeding with respect to this Agreement. Each of Purchaser and Sellers irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.  Purchaser and Sellers consent to the jurisdiction and authority of the Bankruptcy Court, including, without limitation, to the entry of final orders, decrees and judgments with respect to any matters arising under or relating to this Agreement or the transaction(s) contemplated hereby.

11.10  **WAIVER OF TRIAL BY JURY.  EACH OF THE PARTIES HERETO WAIVES THE RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING SEEKING ENFORCEMENT OF SUCH PARTY'S RIGHTS UNDER THIS AGREEMENT.**

11.11  Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.  This Agreement may be executed through the exchange of scanned .pdf signature pages, which shall have the same legal effect as original signatures.

11.12  Headings.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

11.13  Time of the Essence.  Time is of the essence of this Agreement.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

11.14  Rules of Construction.  The Parties acknowledge and agree that each has negotiated and reviewed the terms of this Agreement, assisted by such legal and tax counsel as they desired, and has contributed to its revisions, and, as such, each of the Parties shall be deemed drafters of this Agreement and equally responsible for any ambiguities contained herein. The Parties further agree that the rule of construction that any ambiguities are resolved against the drafting party will be subordinated to the principle that the terms and provisions of this Agreement will be construed fairly as to all Parties and not in favor of or against any Party.  The word "including" means "including, without limitation."  The phrase "ordinary course of business" or words of similar import shall mean the ordinary course of business consistent with past custom and practice, subject, in the case of Sellers or the Business, to changes in the business, operations or custom or practice of Sellers to the extent resulting from matters arising as a result of, or in connection with, Sellers' status as filers under Chapter 11 of the Bankruptcy Code.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, the Parties have executed this Asset Purchase Agreement as of the date first above written.

**<u>SELLERS</u>:**

**Limetree Bay Services, LLC**

By:_____
Name:_____
Title:_____

**Limetree Bay Refining Holdings, LLC**

By:_____
Name:_____
Title:_____

**Limetree Bay Refining Holdings II, LLC**

By:_____
Name:_____
Title:_____

**Limetree Bay Refining, LLC**

By:_____
Name:_____
Title:_____

**Limetree Bay Refining Operating, LLC**

By:_____
Name:_____
Title:_____

**Limetree Bay Refining Marketing, LLC**

By:_____
Name:_____
Title:_____

**PURCHASER**:

**West Indies Petroleum Limited, a Jamaican corporation**

By:_____
Name:
Title:

**Port Hamilton Refining and Transportation LLLP, a Virgin Islands limited liability limited partnership**

By:  Virgin Islands Refining Company, LLC, a
     Florida limited liability company

By:_____
                 Manager
Name:
Title:

**APPENDIX 1**

**DEFINED TERMS**

As used in this Agreement, the following terms shall have the following meanings:

"<u>Affiliate</u>" with respect to any Person means any other Person who directly or indirectly Controls, is Controlled by, or is under common Control with such Person including in the case of any Person who is an individual, his or her spouse, any of his or her descendants (lineal or adopted) or ancestors, and any of their spouses.

"<u>Agreement</u>" is defined in the Introduction to this Agreement.

"<u>Alternative Transaction</u>" means one or more sales, assignments, leases, transfers, or other dispositions of all or any material portion of the Purchased Assets to any Person (or group of Persons), whether in one transaction or a series of transactions, whether by merger, asset purchase, equity purchase or other similar transaction, in each case other than to Purchaser or its Affiliates.

"<u>Antitrust Authorities</u>" means the Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction with respect to the transactions contemplated hereby pursuant to applicable Antitrust Laws.

"<u>Antitrust Laws</u>" means the Sherman Act, 15 U.S.C. §§ 1-7, as amended, the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, as amended, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a et seq., as amended, the Federal Trade Commission Act, 15 U.S.C. § 41-58, as amended, and all other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, restraint of trade, or lessening of competition through merger or acquisition.

"<u>Auction</u>" means a sale in which the Purchased Assets shall be offered for sale to a bidder or bidders making the highest or best offer, which will be scheduled by the Bankruptcy Court in the Bankruptcy Cases.

"<u>Avoidance Actions</u>" means any and all claims and causes of action of a Seller arising under the Bankruptcy Code, including, without limitation, Sections 544, 545, 547, 548, 549 and 550 thereof.

"<u>Back-up Bid</u>" shall have the meaning ascribed to such term in the Bid Procedures Order.

"<u>Back-up Bidder</u>" shall have the meaning ascribed to such term in the Bid Procedures Order.

"<u>Bankruptcy Cases</u>" means, individually and collectively, the following chapter 11 bankruptcy cases pending in the Bankruptcy Court: (i) *In re Limetree Bay Services, LLC*, case no. 21-32351; (ii) *In re Limetree Bay Refining Holdings, LLC*, case no. 21-32352; (iii) *In re Limetree Bay Refining Holdings II, LLC*, case no. 21-32353; (iv) *In re Limetree Bay Refining, LLC*, case

no. 21-32354; (v) *In re Limetree Bay Refining Operating, LLC*, case no. 21-32355; and (vi) *In re Limetree Bay Refining Marketing, LLC*, case no. 21-32356.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101, et seq., as in effect on the Petition Date, and as amended effective as of the Petition Date.

"<u>Bankruptcy Court</u>" is defined in Recital B to this Agreement.

"<u>Bankruptcy Rules</u>" is defined in <u>Section 4.3</u>.

"<u>Bid Procedures Order</u>" means the order of the Bankruptcy Court, entered on August 11, 2021 at docket number 392 in the bankruptcy case of *In re Limetree Bay Services, LLC*, case no. 21-32351, authorizing, among other things, the sale of the Purchased Assets and assumption and assignment of the Business Contracts and Real Property Leases pursuant to the bid procedures and bid protections set forth therein.

"<u>Bill of Sale and Assignment and Assumption Agreement</u>" means that certain bill of sale and assignment and assumption agreement substantially in the form attached hereto as Exhibit A.

"<u>BP Receivables</u>" means any and all funds payable by BP Products North America, Inc., or any affiliate or subsidiary thereof, to Sellers, or any of them, arising out of or related to the IFF Property, the J. Aron Transaction Documents, the Tolling Agreement (as such terms are defined and used in the Stipulation by and among Debtors, Committee, J. Aron & Company LLC, and BP Products North America Inc. (appended to Doc. No. 697 filed in the Bankruptcy Cases) (the "<u>BP Stipulation</u>")), or any other agreement by and between Sellers, or any of them, and BP Products North America, Inc., or any affiliate or subsidiary thereof, dated on or before the Closing Date, including, without limitation, the Escrow Funds, Trade Contract Amounts, and Sale Reserve (as such terms are defined and used in the BP Stipulation).

"<u>Business</u>" is defined in Recital A of this Agreement.

"<u>Business Contracts</u>" is defined in <u>Section 1.2(a)</u>.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Houston, Texas are permitted or required to be closed.

"<u>Business Intellectual Property</u>" means all rights to Intellectual Property that are owned by a Sellers, other than the Excluded Intellectual Property.

"<u>Business IT Assets</u>" means all rights to Information Technology that are owned by Sellers, other than the Excluded IT Assets.

"<u>Business Permits</u>" is defined in <u>Section 1.2(g)</u>.

"<u>Business Real Property</u>" means the Purchased Real Property and the real property subject to the Real Property Leases, in each case together with all easements, appurtenances,

rights and leases, and other hereditaments appurtenant to such land and all the estates and rights of Sellers in and to such land.

"Claim" means a claim against any or all of Sellers, whether or not asserted, as defined in Section 101(5) of the Bankruptcy Code.

"Closing" is defined in Section 3.3.

"Closing Date" is defined in Section 3.3.

"Closing Payment" is defined in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means that certain Confidentiality Agreement by and between Purchaser and Sellers relating to the data room established for the Sellers.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through ownership of securities, by contract or otherwise.

"Consent" means any authorization, approval, consent, ratification, negative clearance, waiver, notice or filing, or a Final Order of the Bankruptcy Court that deems, or renders unnecessary, the same.

"Contract" means any note, bond, mortgage, indenture, guaranty, license, franchise, permit, agreement, contract, commitment, lease, purchase order, or other instrument or obligation, and any amendments thereto.

"Cure Amounts" means with respect to any Business Contract or Real Property Lease, the amount of cash required to be paid with respect to such Business Contract or Real Property Lease to cure all defaults under such Business Contract or Real Property Lease to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by a Seller and assignment to Purchaser of such Business Contract or Real Property Lease.

"DIP Agent" shall have the meaning ascribed to such term in the Bid Procedures Order.

"Employee" and "Employees" are defined in Section 8.1.

"Employee Benefit Plans" is defined in Section 4.10.

"Environmental Law" means any law, Order or other requirement of law for the protection of the environment, or for the manufacture, use, transport, treatment, storage, disposal, release or threatened release of Hazardous Materials, petroleum products, asbestos, urea formaldehyde insulation, polychlorinated biphenyls or any substance listed, classified or regulated as "hazardous" or "toxic" or any similar term under such Environmental Law.

"Environmental Liabilities" means all Liabilities (including the costs of any Remedial Action) arising in connection with or in any way relating to the Business (as currently or formerly conducted), the Purchased Assets or any property currently or formerly owned, leased or operated in connection with the Business (as currently or formerly conducted) or the Purchased Assets (including the activities and operations conducted by anyone thereon, offsite disposal therefrom and Hazardous Materials migrating thereto or therefrom), that in each case arise under or relate to any Environmental Law, Environmental Permit or a Hazardous Material, including Liabilities arising from any Third Party claims for personal injury, death, or property damage caused by an actual or alleged release of, or exposure to, a Hazardous Material.

"Environmental Permits" means all environmental, health and safety permits, licenses, registrations, and approvals and authorizations from Governmental Entities.

"EPA" means the United States Environmental Protection Agency.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Account" means the account created by the Escrow Agent in which the Good Faith Deposit Amount was deposited pursuant to Section 3.2.

"Escrow Agent" means B. Riley Advisory Services or, if B. Riley Advisory Services is unable or unwilling to act as the Escrow Agent, such other Person as is mutually agreed upon by Purchaser and Sellers.

"Escrow Agreement" means that certain Escrow Agreement, dated as of [_____   __], 2021, by and among Purchaser, Sellers and the Escrow Agent, as may thereafter be amended from time to time in accordance with the terms thereof.

"Event" means any action, omission, state of facts, condition, occurrence, result, circumstance, event, effect, development or change.

"Excluded Assets" is defined in Section 1.3.

"Excluded Furniture and Equipment" is defined in Section 1.3(p).

"Excluded Intellectual Property" is defined in Section 1.3(k).

"Excluded IT Assets" is defined in Section 1.3(l).

"Excluded Liabilities" is defined in Section 2.1.

"Excluded Permits" is defined in Section 1.3(r).

"Excluded Real Property" means all real property owned by a Seller, other than the Purchased Real Property.

"Files and Records" means all current and historical information, data, databases, reports, plans, schedules, correspondence, files, documents, books and other records and information,

including (a) customer, vendor, supplier, contractor and service provider lists and records, (b) sales, pricing and performance data and records generated from completed or active transactions (including billing, payment and dispute histories, credit information and similar data), (c) business plans, financial statements, corporate, Tax, human resource, legal, regulatory and financial data and records, (d) operating and production records, quality control records, market research reports, technical documentation (drawings, specifications, process instructions, statistics, functional requirements, operating instructions, manual, etc.) and user documentation (installation guides, manuals, training material working paper, etc.), (e) employment and personnel records, (f) all of the plant diagrams and drawings, equipment diagrams and drawings, equipment manuals, "as built" books, operating manuals, maintenance histories and records, civil engineering drawings, PFDs, PI&Ds and other such technical documents relating to the Sellers Facilities and (g) regulatory filings, documents or other information relating to any Proceeding, in each case with respect to clauses (a) through (g), of Sellers, whether in paper, electronic, digital or other form or medium, and that relate primarily to the Business, or the Purchased Assets; *provided*, that Files and Records shall not include (i) any files, documents, books or other records to the extent relating to any existing or anticipated Tax litigations or disputes (to the extent that such litigation or disputes are, or are related to any, Excluded Liabilities hereunder), (ii) any information which, if transferred to Purchaser or its Affiliates, would reasonably be expected to violate any applicable Law or Order or the terms of any Contract and (iii) any items described in clauses (a) through (g) that relate primarily to any Excluded Assets or any Excluded Liabilities.

"Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is and remains in full force and effect, has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, re-argument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, re-argument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, re-argument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, re-argument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"Furniture and Equipment" means all furniture, furnishings, equipment, vehicles, machinery, cranes, forklifts, tools, truck racks, fixtures, consumables and other tangible personal property owned by a Seller, including artwork, desks, chairs, tables, miscellaneous office furnishings, copiers, scanners, printers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and supplies.

"GAAP" means United States generally accepted accounting principles, applied in a manner consistent with the preparation of the Financial Statements.

"Good Faith Deposit Amount" means $3,000,000.00, which amount is to be deposited with the Escrow Agent in accordance with the terms of this Agreement and held and released pursuant to the terms and subject to the conditions set forth in this Agreement and the Escrow Agreement.

"Governmental Entity" means any multinational, United States or non-United States, federal, state, territory, provincial or local court (including, for the avoidance of doubt, the Bankruptcy Court), arbitral tribunal, administrative agency, legislature or commission or other governmental, quasi-governmental or regulatory agency or authority (including any bureau, division or department thereof) or any securities exchange.

"Hazardous Materials" means all explosive or radioactive substances or wastes, and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Improvements" means any and all buildings, structures, fixtures or other improvements owned by or leased to a Seller that are attached or affixed to the Business Real Property (including all construction and work-in-progress), as well as above ground and underground piping and storage tanks, canopies, signage, terminals, fixtures, pumps and appurtenances, equipment, personal property of a permanent nature and other similar facilities, including, without limitation, all of the Sellers' rights, title and interests, in and to the assets specifically identified on Schedule 1.2(m); *provided*, *however*, that the Excluded Furniture and Equipment shall not be considered "Improvements".

"Indebtedness" of any Person means (a) any obligations or indebtedness (i) for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (ii) evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security, (iii) for the deferred purchase price of property or service, (iv) for the reimbursement of any obligor on any letter of credit, banker's acceptance, guarantee or similar credit transaction (but only to the extent drawn upon or if there has been a demand made for reimbursement thereunder) and (v) under any commodity, swap, derivative, currency, interest rate, call, hedge or similar agreement, (b) any obligations of any kind referred to in the foregoing clause (a) above guaranteed or secured, directly or indirectly, in any manner by such Person (including by a Lien on the assets or properties of such Person whether or not such obligations are assumed) ,and (c) any accrued and unpaid principal, interest, premiums, penalties, pre-payment penalties, fees, expenses, "make-whole" or similar payments, indemnities and breakage costs owing by such Person with respect to any indebtedness of a type described in clauses (a) or (b); provided, that Indebtedness of any Seller shall not include accounts payable to trade

creditors or accrued expenses, in each case, arising in the ordinary course of business of any Seller.

"Information Technology" means all computers, computer systems, servers, workstations, databases, and software programs.

"Intellectual Property" means (a) patents and patent applications, (b)trademarks, service marks, trade dress, and all registrations and applications for the same, (c) Internet domain names, (d) registered and unregistered copyrights and applications for the same, and (e) trade secrets.

"IRS" means the United States Internal Revenue Service.

"Knowledge of Sellers" means the actual knowledge of Sellers, without giving effect to imputed knowledge or giving rise to any duty to investigate.

"Law" means any statute, law, ordinance, ruling, policy, rule or regulation of any Governmental Entity and all judicial or administrative interpretations thereof and any common law doctrine.

"Liabilities" means any and all Indebtedness, Taxes, losses, charges, debts, damages, obligations, payments, costs and expenses, bonds, indemnities, liabilities and obligations of any nature, including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability, regardless of whether such claim, debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such claim, debt, obligation, duty or liability is immediately due and payable.

"Liens" means any liens (as defined in Section 101(37) of the Bankruptcy Code), debts (as defined in Section 101(12) of the Bankruptcy Code), security interests, Claims, easements, mortgages, charges, indentures, deeds of trust, rights of way, encroachments, or any other encumbrances and other restrictions or limitations on ownership or use of real or personal property or irregularities in title thereto.

"Loss" or "Losses" means, without duplication, any and all Liabilities, judgments, awards, losses, costs or damages, including reasonable fees and expenses of attorneys, accountants and other professional advisors.

"Material Adverse Effect" means a material adverse effect on the business or financial condition of the Business, taken as a whole, provided that the foregoing shall not include any event, circumstance, change, occurrence, fact or effect resulting from or relating to (A) changes in economic conditions generally or in any region in which Sellers or the Business operate, (B) changes in United States or global financial markets in general, (C) changes, occurrences or developments in or related to the general industry or industries (or portions thereof) in which Sellers or the Business operate or are materially related thereto, (D) changes in law, GAAP or any authoritative interpretations thereof, (E) any action taken or failed to be taken by Sellers or any of their Affiliates or representatives at the request of Purchaser or that is required or contemplated by this Agreement, (F) a failure to meet Sellers' projections, or any changes in the prices or availability of raw materials used in the Business, (G) the identity of, or any action

taken by, Purchaser or any of its Affiliates or representatives, (H) the Bankruptcy Cases, (I) the announcement and performance of this Agreement and the other transactions contemplated by this Agreement, including termination of, reduction in or similar negative impact on relationships, contractual or otherwise, with any customers, suppliers, distributors, partners, officers or employees of the Business, (J) any actions required under this Agreement to obtain any approval or authorization required under applicable antitrust or competition laws for the consummation of the transactions contemplated by this Agreement, (K) acts of war (whether or not declared), armed hostilities, sabotage or terrorism occurring after the date of this Agreement or the continuation, escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement, or (L) earthquakes, hurricanes, floods, or other natural disasters.

"Material Contracts" is defined in Section 4.7(b).

"NRI Consignment Agreement" means that certain Master Consignment Agreement dated as of March 9, 2021 by and between Limetree Bay Refining, LLC and NRI Industrial Sales LLC.

"NRI Receivables" means any and all amounts payable to Sellers under the NRI Consignment Agreement.

"Order" means any judgment, order, injunction, decree, writ, permit or license issued or entered by or with any Governmental Entity or any arbitrator, whether preliminary, interlocutory or final, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"Parts Inventory" means the inventories of supplies, maintenance and capital spares, joints, valves, parts and tools owned by a Seller as of the Closing that are (x) stored in the warehouses located on the Business Real Property or (y) used primarily in connection with the Business.

"Party" and "Parties" are defined in the Introduction to this Agreement.

"Permits" means all licenses, permits, registrations and approvals from or with a Governmental Entity other than the Environmental Permits.

"Person" means and include an individual, a partnership, a limited partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group and a Governmental Entity.

"Petition Date" is defined in Recital B of this Agreement.

"Plant Closing Act" shall mean the Virgin Islands Code Title 24, § 471- 478 (1957).

"Post-Closing Litigation Liabilities" means all Liabilities arising from a new event Proceeding first commenced after the Closing by a Third Party against Purchaser, a Seller or any of their respective Affiliates, in respect of the Business, or the Purchased Assets that is based on any Event first existing, arising or occurring following the Closing; *provided*, that the Parties

agree and acknowledge that Post-Closing Litigation Liabilities shall not include any Environmental Liabilities, which are separately addressed in this Agreement.

"Post-Closing Period" means all taxable years or other taxable periods that begin after the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period beginning on the day after the Closing Date.

"Pre-Closing Period" means all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on the Closing Date.

"Prepetition Secured Parties" shall have the meaning ascribed to such term in the Bid Procedures Order.

"Proceeding" means any claim, demand, action, arbitration, audit, hearing, investigation, litigation, suit or other proceeding (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Third Party (including any Governmental Entity).

"Property Taxes" means all real property Taxes, personal property Taxes and other similar ad valorem Taxes, in each case, that are imposed with respect to the Purchased Assets.

"Purchase" is defined in Recital C of this Agreement.

"Purchase Price" means Sixty-Two Million US Dollars ($62,000,000.00).

"Purchased Assets" is defined in Section 1.1.

"Purchased Real Property" is defined in Section 1.2(b).

"Purchaser" is defined in the Introduction to this Agreement.

"Real Property" means the Purchased Real Property and the Excluded Real Property.

"Real Property Leases" is defined in Section 1.2(d).

"Remedial Action" means any action to investigate, abate, clean up, remove or remediate (or words of similar import), or conduct remedial or corrective actions, including sampling and/or monitoring activities, with respect to Hazardous Materials in the environment.

"Representatives" of any Person means such Person's directors, managers, officers, employees, agents, attorneys, consultants, advisors, financing sources or other Persons acting on behalf of such Person.

"<u>Returns</u>" means all returns, statements, forms, reports and other similar documentation relating to Taxes, including any schedules, exhibits and other attachments thereto and any amendments thereof.

"<u>Sale Motion</u>" means Debtor's Emergency Motion for Entry of Order: (I) Establishing Bidding and Sale Procedures, (II) Approving the Sale of Assets, and (III) Granting Related Relief filed by Sellers in the Bankruptcy Court on July 26, 2021 (Docket No. 191).

"<u>Sale Order</u>" means an Order of the Bankruptcy Court approving this Agreement, containing the findings and conclusions set forth in Section 6.11, and authorizing and directing Sellers to consummate the transactions contemplated by this Agreement (including, but not limited to, the assumption and assignment of the Business Contracts and Real Property Leases) under Sections 105, 363 and 365 of the Bankruptcy Code, in form and substance acceptable to Sellers and Purchaser in their respective sole discretion.

"<u>Seller</u>" and "<u>Sellers</u>" are defined in the Introduction to this Agreement.

"<u>Seller Access Indemnitees</u>" is defined in <u>Section 6.1(b)</u>.

"<u>Sellers Disclosure Letter</u>" is defined in <u>Article IV</u>.

"<u>Seller Facilities</u>" means the facilities and related equipment owned by a Seller located on the Business Real Property, including all Improvements related thereto; provided, that, for the avoidance of doubt, the Seller Facilities shall not include any Excluded Assets.

"<u>Stalking Horse Bid</u>" shall have the meaning ascribed to such term in the Bid Procedures Order.

"<u>Stalking Horse Bidder</u>" shall have the meaning ascribed to such term in the Bid Procedures Order.

"<u>Taxes</u>" means (a) all taxes, however denominated, and all like charges, levies, duties, imposts, unclaimed property, escheat obligations or other assessments, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, Transaction Taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date and (b) any transferee, successor or other liability in respect of Taxes of another (whether by contract or otherwise) and any liability in respect of any Taxes as a result of any company being a member of any "affiliated group" as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, local or foreign Tax law.

"<u>Termination Date</u>" is defined in <u>Section 9.1(d)</u>.

"Third Party" means any Person other than the Parties and their respective Affiliates (including, for the avoidance of doubt, any Governmental Entity).

"Transaction Documents" means the Escrow Agreement.

"Transfer Taxes" is defined in Section 6.8.

"Update Schedule" is defined in Section 6.6(a).

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101, et seq.

"Winning Bid" shall have the meaning ascribed to such term in the Bid Procedures Order.

"Winning Bidder" shall have the meaning ascribed to such term in the Bid Procedures Order.

# EXHIBIT A
## FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

# BILL OF SALE

December [•], 2021

Each of Limetree Bay Services, LLC, a Delaware limited liability company ("LBS"), Limetree Bay Refining Holdings, LLC, a United States Virgin Islands limited liability company ("LBRH"), Limetree Bay Refining Holdings II, LLC, a United States Virgin Islands limited liability company ("LBRH II"), Limetree Bay Refining, LLC, a United States Virgin Islands limited liability company ("LBR"), Limetree Bay Refining Operating, LLC, a United States Virgin Islands limited liability company ("LBRO"), and Limetree Bay Refining Marketing, LLC, a United States Virgin Islands limited liability company ("LBRM", along with LBS, LBRH, LBRH II, LBR and LBRO, each a "Seller" and collectively, "Sellers"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, dated as of December [•], 2021 (hereinafter referred to as the "Purchase Agreement"), by and among (i) Sellers, and (ii) West Indies Petroleum Limited, a Jamaican corporation, and Port Hamilton Refining and Transportation, LLLP ("PHRT"), a Virgin Islands limited liability limited partnership (collectively, "Purchasers"), by these presents does hereby sell, convey, assign, transfer and deliver unto Purchasers, and their successors and assigns, as of the date hereof under the Purchase Agreement, all of such Seller's right, title and interest in and to the Purchased Assets (as defined in the Purchase Agreement), with title to be held in PHRT.  Notwithstanding anything to the contrary herein, in no event shall Sellers be deemed to sell, convey, assign, transfer or deliver unto Purchasers, or their successors or assigns, and Sellers shall retain all right, title and interest to the Excluded Assets (as defined in the Purchase Agreement).

The provisions of this instrument are subject, in all respects, to the terms and conditions of the Purchase Agreement, including, without limitation, all of the covenants, representations and warranties contained therein, all of which shall survive the execution and delivery of this instrument to the extent indicated in the Purchase Agreement, and Bankruptcy Court (as defined in the Purchase Agreement) approval of the Purchase Agreement and transaction(s) envisioned therein and hereunder.  Nothing contained in this instrument shall be deemed to modify, amend or supersede any of the terms or conditions of the Purchase Agreement.  In the event of any conflict or inconsistency between the terms and conditions of this instrument and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement or Sale Order (as defined in the Purchase Agreement), as applicable, shall prevail.  This instrument shall be binding upon Sellers and their successors and assigns and shall inure to the benefit of Purchasers and their successors and assigns, to the extent provided in the Purchase Agreement or Sale Order.

Capitalized terms used but not otherwise defined in this instrument shall have the meanings assigned to them in the Purchase Agreement.

*[Signature page follows]*

**IN WITNESS WHEREOF**, each Seller has caused this Bill of Sale to be signed by its authorized representative pursuant to the Purchase Agreement to be effective as of the date first set forth above.

<u>**SELLERS:**</u>

**Limetree Bay Services, LLC**

By: _____
Name: _____
Title: _____

**Limetree Bay Refining Holdings, LLC**

By: _____
Name: _____
Title: _____

**Limetree Bay Refining Holdings II, LLC**

By: _____
Name: _____
Title: _____

**Limetree Bay Refining, LLC**

By: _____
Name: _____
Title: _____

**Limetree Bay Refining Operating, LLC**

By:_____

Name:_____

Title:_____


**Limetree Bay Refining Marketing, LLC**

By:_____

Name:_____

Title:_____

**PURCHASERS**:

**West Indies Petroleum Limited, a Jamaican corporation**


By:_____
Name:
Title:


**Port Hamilton Refining and Transportation LLLP, a Virgin Islands limited liability limited partnership**


By:  Virgin Islands Refining Company, LLC, a
     Florida limited liability company

By:_____
                     Manager
Name:
Title:

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Agreement"), effective as of December [__], 2021 (the "Effective Date"), is entered into by and among Limetree Bay Services, LLC, a Delaware limited liability company ("LBS"), Limetree Bay Refining Holdings, LLC, a United States Virgin Islands limited liability company ("LBRH"), Limetree Bay Refining Holdings II, LLC, a United States Virgin Islands limited liability company ("LBRH II"), Limetree Bay Refining, LLC, a United States Virgin Islands limited liability company ("LBR"), Limetree Bay Refining Operating, LLC, a United States Virgin Islands limited liability company ("LBRO"), and Limetree Bay Refining Marketing, LLC, a United States Virgin Islands limited liability company ("LBRM", along with LBS, LBRH, LBRH II, LBR and LBRO, each a "Seller" and collectively, "Sellers"), on the one hand, and West Indies Petroleum Limited, a Jamaican corporation, and Port Hamilton Refining and Transportation, LLLP ("PHRT"), a Virgin Islands limited liability limited partnership ("Purchaser" and together with Sellers, each a "Party" and collectively, the "Parties"), on the other hand.

**WHEREAS**, Sellers and Purchasers have entered into a certain Asset Purchase Agreement, dated as of December [__], 2021 (the "Purchase Agreement"), pursuant to which, among other things, the Sellers have agreed to assign all of their right, title and interest in, and Purchasers have agreed to assume the Sellers' duties and obligations under, the Business Contracts (as defined in the Purchase Agreement) pursuant to Section 365 of the Bankruptcy Code.

**WHEREAS**, on December [__], 2021, the Bankruptcy Court (as defined in the Purchase Agreement) entered an order approving the Purchase Agreement and the transaction(s) envisioned therein, including, without limitation, the assignment and assumption of Sellers' rights, titles and interests as provided herein.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Definitions.  All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.      Assignment and Assumption.  Subject to the terms, conditions and limitations of the Purchase Agreement and applicable law, each Seller hereby sells, conveys, assigns, transfers, and delivers to Purchasers all of such Seller's right, title and interest in and to the Business Contracts and Business Permits, and Purchasers hereby accept such assignment and assume all of the Sellers' duties and obligations under the Business Contracts and Business Permits, and agree to pay, perform and discharge, as and when due, all of the obligations of Sellers under the Business Contracts and Business Permits accruing on and after the Effective Date, with title to the Business Contracts and Business Permits being held in PHRT and PHRT becoming the counterparty to such Business Contracts and Business Permits.  Notwithstanding the foregoing, this Assignment does not sell, convey, assign, transfer or deliver to Purchaser any Excluded Permits or any Business Contracts or Permits that Sellers are unable to transfer under applicable law or pursuant to the terms of the Business Contract or Permit, and Purchaser hereby

acknowledges that Sellers' obligations to sell, convey, assign, transfer and deliver any Permit shall be limited by Section 6.13 of the Purchase Agreement.

3.     Terms of the Purchase Agreement.  The provisions of this Agreement are subject, in all respects, to the terms, conditions and limitations of applicable law, the Purchase Agreement, including, without limitation, all of the covenants, representations and warranties contained therein, all of which shall survive the execution and delivery of this Agreement to the extent indicated in the Purchase Agreement, Bankruptcy Court approval of the Purchase Agreement and transaction(s) envisioned therein and hereunder, and, to the extent applicable, Section 365 of the Bankruptcy Code, including, without limitation, Purchaser's payment of any Cure Amounts.  Nothing contained in this Agreement shall be deemed to modify, amend or supersede any of the terms or conditions of the Purchase Agreement.  In the event of any conflict or inconsistency between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement or Sale Order (as defined in the Purchase Agreement), as applicable, shall prevail.  This Agreement shall be binding upon Purchasers and Sellers and their respective successors and assigns, and shall inure to the benefit of the Purchasers and Sellers and their respective successors and assigns, to the extent provided in the Purchase Agreement or Sale Order.

4.     Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of Texas applicable to contracts executed in and to be performed in that State.

5.     Counterparts.  This Agreement may be executed and delivered (including by facsimile or other electronic transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

### SELLERS:

**Limetree Bay Services, LLC**

By:_____
Name:_____
Title:_____

**Limetree Bay Refining Holdings, LLC**

By:_____
Name:_____
Title:_____

**Limetree Bay Refining Holdings II, LLC**

By:_____
Name:_____
Title:_____

**Limetree Bay Refining, LLC**

By:_____
Name:_____
Title:_____

**Limetree Bay Refining Operating, LLC**

By:_____

Name:_____

Title:_____


**Limetree Bay Refining Marketing, LLC**

By:_____

Name:_____

Title:_____

*Rasco Klock December 5, 2021 Draft*
*CONFIDENTIAL*

**PURCHASERS**:

**West Indies Petroleum Limited, a Jamaican corporation**

By:_____
Name:
Title:


**Port Hamilton Refining and Transportation LLLP, a Virgin Islands limited liability limited partnership**

By:  Virgin Islands Refining Company, LLC, a Florida limited liability company

By:_____
                         Manager
Name:
Title:

## SCHEDULE 1.1(g)
## BUSINESS PERMITS

| Permit Name | Permit Number (if any) | Permit Holder |
|---|---|---|
| Air Pollution Control Program - Authority to Construct and Permit to Operate (MARPOL Project) | STX-924-AC-PO-20 | Limetree Bay Terminals, LLC/Limetree Bay Refining, LLC |
| Air Pollution Control Program - Permit to Construct and Operate | STX-895-AC-PO-18 | Limetree Bay Terminals, LLC |
| GT13-LSF Project PSD Permit | N/A | HOVENSA, L.L.C |
| Modified 1997 PSD Permit (Dated May 9, 2011) | N/A | HOVENSA, L.L.C |
| Title V Permit – Part 70 Permit | STX-TV-003-10 | Limetree Bay Terminals LLC |
| GT No. 10 Prevention of Significant Deterioration (PSD) of Air Quality Permit (Amended in 2007) | N/A | HOVENSA, L.L.C |
| Territorial Pollution Discharge Elimination System (Dated March 1, 2008) | VI0000019 | HOVENSA, L.L.C. |
| RCRA Hazardous Waste Permit | VID 980536080 | HOVENSA, L.L.C. |
| Special Solid Waste Permit to Generate and/or Store, Treat and Dispose Used Oil | STX C-002 | HOVENSA, L.L.C. |

**SCHEDULE 1.2(a)**
**<u>BUSINESS CONTRACTS</u>**

1.  Refinery Operating Agreement, dated as of July 2, 2018, by and between Limetree Bay Refining, LLC (as Refinery Operator) and Government of U.S. Virgin Islands.

**SCHEDULE 1.2(b)**
**PURCHASED REAL PROPERTY**

The real property conveyed to Limetree Bay Refining, LLC pursuant to that certain Quit Claim Deed executed by Project Navigator, Ltd, a California corporation, in favor of Limetree Bay Refining, LLC dated July 14, 2019 and bearing document number 2019003312, as recorded in the Public Records of St. Croix, United States Virgin Islands; and the real property conveyed to Limetree Bay Refining, LLC pursuant to that certain Quit Claim Deed executed by Project Navigator, Ltd, a California corporation, in favor of Limetree Bay Refining, LLC dated November 15, 2018, bearing document number 2018004645, as recorded in the Public Records of St. Croix, United States Virgin Islands; and the right, if any, of Limetree Bay Refining, LLC to exercise any unexercised options to acquire the interest in the Refinery Property and the Refinery Submerged (Reclaimed) Land, as identified in Exhibit A of that certain Option Agreement effective as of January 4, 2016 and bearing document number 2018004472, as well as document number 201800481, recorded in the Public Records of St. Croix, United States Virgin Islands; and any Refinery Property and Refinery Submerged (Reclaimed) Land conveyed to Limetree Bay Refining, LLC, if any;  the assignment of ingress and egress easement as well as any other access easements on the subject refinery/terminal property held by Limetree Bay Refining, LLC, if any; and any other real property in St. Croix, Territory of the United States Virgin Islands, owned by Limetree Bay Refining, LLC, as more particularly described in that certain First American Title Insurance Company ALT  Owner's Policy having an effective date of October 11, 2019 at 2:32 PM, as amended to update the effective date.

**SCHEDULE 1.2(d)**
**<u>REAL PROPERTY LEASES</u>**

None.

### SCHEDULE 1.2(g)
### BUSINESS PERMITS

| Permit Name | Permit Number (if any) | Permit Holder |
|---|---|---|
| Air Pollution Control Program - Authority to Construct and Permit to Operate (MARPOL Project) | STX-924-AC-PO-20 | Limetree Bay Terminals, LLC/Limetree Bay Refining, LLC |
| Air Pollution Control Program - Permit to Construct and Operate | STX-895-AC-PO-18 | Limetree Bay Terminals, LLC |
| GT13-LSF Project PSD Permit | N/A | HOVENSA, L.L.C |
| Modified 1997 PSD Permit (Dated May 9, 2011) | N/A | HOVENSA, L.L.C |
| Title V Permit – Part 70 Permit | STX-TV-003-10 | Limetree Bay Terminals LLC |
| GT No. 10 Prevention of Significant Deterioration (PSD) of Air Quality Permit (Amended in 2007) | N/A | HOVENSA, L.L.C |
| Territorial Pollution Discharge Elimination System (Dated March 1, 2008) | VI0000019 | HOVENSA, L.L.C. |
| RCRA Hazardous Waste Permit | VID 980536080 | HOVENSA, L.L.C. |
| Special Solid Waste Permit to Generate and/or Store, Treat and Dispose Used Oil | STX C-002 | HOVENSA, L.L.C. |

## SCHEDULE 1.2(m)
## MISCELLANEOUS ASSETS

The above ground improvements consisting of a combination of permanent and temporary housing structures known as "Limetree Bay Village" and "Limetree Bay Hotel" being currently situated on Estate Castle Coakley, Plot 53[1] consisting of approximately 489 modular units with dorm wings, numbered consecutively from Dorm 1 through Dorm 40, and temporary dorm wings, numbered consecutively from Temporary Dorm 42 through Temporary Dorm 46, and approximately 40,000 square feet of common areas spaces which include a lounge, recreations rooms, gym, laundry facility, administration office and a full-service commercial kitchen and dining area, together with any and all personal property equipment, accessories and/or components related or attached thereto, as well as the above ground refinery improvements located on: (i) Refinery Plot No. 6, Estate Limetree Bay, Reclaimed Land, consisting of 26.7027 U. S. acres, more or less, King and Queen Quarters, St. Croix, U. S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016; excluding Surface Impound 3 as defined in the Refinery Operating Agreement, (ii) Refinery Plot No. 7, Estate Limetree Bay, Reclaimed Land, consisting of 19.857 U. S. acres,  more or less, King and Queen Quarters, St. Croix, U. S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016, and (iii) Plot No. 12, Estate  Limetree Bay, Reclaimed Land (Flare), consisting of 5.8240 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands, as shown on OLG Drawing No. A9-116-CO16, dated June 24, 2016.

---

[1] The real property described as the "Estate Castle Coakley, Plot 53," is not owned by Sellers and is not included in the Purchased Assets; however, the improvements on "Estate Castle Coakley, Plot 53," to the extent owned by the Sellers, are included in the Purchased Assets.

## SCHEDULE 1.3(k)
## <u>EXCLUDED INTELLECTUAL PROPERTY</u>

None.

## SCHEDULE 1.3(l)
## <u>EXCLUDED IT ASSETS</u>

None.

## SCHEDULE 1.3(p)
## <u>EXCLUDED FURNITURE AND EQUIPMENT</u>

None.

**SCHEDULE 1.3(r)**
**<u>EXCLUDED PERMITS</u>**

None.

### SCHEDULE 3.4
### ASSIGNMENT, TRANSFER AND CONVEYANCE INSTRUMENTS

Bill of sale, assumption and assignment agreement, deed, and all documentation required in connection with the transfer of any motor vehicle included in the Purchased Assets.

Sellers and Purchasers shall work together in good faith to prepare and execute any other assignment, transfer and conveyance instruments reasonably required to effectuate the transactions envisioned under the Agreement; *provided*, that Sellers shall not be obligated to deliver any instruments under Section 3.4(a)(ii) not requested by Purchaser and reasonably required to effectuate the transactions envisioned under the Agreement.

**SCHEDULE 6.2**
**CONDUCT PRIOR TO THE CLOSING DATE**

None.

**SELLERS DISCLOSURE LETTER**

**SELLER DISCLOSURE LETTER**[2]

to

**ASSET PURCHASE AGREEMENT**

by and among

**LIMETREE BAY SERVICES, LLC,**

**LIMETREE BAY REFINING HOLDINGS, LLC,**

**LIMETREE BAY REFINING HOLDINGS II, LLC,**

**LIMETREE BAY REFINING, LLC,**

**LIMETREE BAY REFINING OPERATING, LLC, AND**

**LIMETREE BAY REFINING MARKETING, LLC,**

**as Sellers**

**and**

**WEST INDIES PETROLEUM LIMITED,**

**as Purchaser**

**Dated as of [__], 2021**

---

[2] This Seller Disclosure Letter is subject to review and update by Sellers.

The following Seller Disclosure Letter (the "Disclosure Letter") is hereby delivered by Limetree Bay Services, LLC, a Delaware limited liability company ("LBS"), Limetree Bay Refining Holdings, LLC, a United States Virgin Islands limited liability company ("LBRH"), Limetree Bay Refining Holdings II, LLC, a United States Virgin Islands limited liability company ("LBRH II"), Limetree Bay Refining, LLC, a United States Virgin Islands limited liability company ("LBR"), Limetree Bay Refining Operating, LLC, a United States Virgin Islands limited liability company ("LBRO"), Limetree Bay Refining Marketing, LLC, a United States Virgin Islands limited liability company ("LBRM", along with LBS, LBRH, LBRH II, LBR and LBRO, each a "Seller" and collectively, "Sellers"), in accordance with that certain Asset Purchase Agreement, dated as of [__], 2021 (the "Agreement"), by and among the Sellers and West Indies Petroleum Limited, a Jamaican corporation(the "Purchaser"). All capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in Agreement.

No reference to or disclosure of any item or other matter in the Disclosure Letter shall be construed as an admission or indication that such item or other matter is material (nor shall it establish a standard of materiality for any purpose whatsoever, including as to dollar amount) or that such item or other matter is required to be referred to or disclosed in the Disclosure Letter. The information set forth in the Disclosure Letter is disclosed solely for the purposes of the Agreement, and no information set forth in the Disclosure Letter shall be deemed to be an admission by any party to the Agreement to any third party of any matter whatsoever, including any violation of Law or breach of any Contract.

The Disclosure Letter is qualified in their entirety by reference to the specific provisions of the Agreement referenced therein and do not constitute, and shall not be construed as constituting, representations or warranties of the Company. Any item or other matter disclosed pursuant to any Schedule hereto shall be deemed to be disclosed in response to each other representation and warranty in the Agreement so long as it is reasonably apparent that such item or other matter is applicable to such other representation or warranty.

The Disclosure Letter and the information and disclosures contained therein are intended only to qualify and limit the representations, warranties and covenants of the Company contained in the Agreement. Nothing in the Disclosure Letter is intended to broaden the scope of any representation or warranty contained in the Agreement or create any covenant. Matters reflected in the Disclosure Letter are not necessarily limited to matters required by the Agreement to be disclosed in the Disclosure Letter. Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature. References to any documents contained in the Disclosure Letter is not intended to summarize or describe such documents, but rather are for the existence of such documents only. All Contracts listed in the Disclosure Letter shall be deemed to include all written appendices, exhibits, schedules, modifications, amendments to, and all written orders, purchase orders, implementation, statements of work, program descriptions and other documents issued under, or executed in connection with, such Contracts.

Headings have been inserted on the separate sections of the Disclosure Letter for convenience of reference only and shall not have the effect of amending or changing the content or meaning of the corresponding sections as set forth in the Agreement, limiting the effect of the disclosures contained in the Disclosure Letter or expanding the scope of the information required to be disclosed in the Disclosure Letter.

**Schedule 4.2(b)(ii)**

**No Conflicts**

The following Business Contracts, Real Property Leases and Permits require Consent or the giving of notice to another Person:

Business Contract:

1.  Refinery Operating Agreement, dated as of July 2, 2018, by and between the Government of the U.S. Virgin Islands and Limetree Bay Refining, LLC.

Permits:

1.  Air Pollution Control Program - Authority to Construct and Permit to Operate (MARPOL Project), Permit No. STX-924-AC-PO-20.

2.  Air Pollution Control Program - Permit to Construct and Operate, Permit No. STX-895-AC-PO-18.

3.  RCRA Hazardous Waste Permit, Permit No. VID 980536080.

4.  Special Solid Waste Permit to Generate and/or Store, Treat and Dispose Used Oil, Permit No. STX C-002.

5.  Territorial Pollution Discharge Elimination System (Dated March 1, 2008), Permit No. VI0000019.

6.  Title V Permit (Part 70 Permit), Permit No. STX-TV-003-10.

**Schedule 4.3**

**<u>Consents</u>**

1. Air Pollution Control Program - Authority to Construct and Permit to Operate (MARPOL Project), Permit No. STX-924-AC-PO-20.

2. Air Pollution Control Program - Permit to Construct and Operate, Permit No. STX-895-AC-PO-18.

3. RCRA Hazardous Waste Permit, Permit No. VID 980536080.

4. Refinery Operating Agreement, dated as of July 2, 2018, by and between the Government of the U.S. Virgin Islands and Limetree Bay Refining, LLC.

5. Territorial Pollution Discharge Elimination System (Dated March 1, 2008), Permit No. VI0000019.

6. Title V Permit (Part 70 Operating Permit), Permit No. STX-TV-003-10.

7. CFIUS approval may be required in connection with the consummation of the transaction contemplated by the Agreement, which approval is being jointly pursued by Purchaser and Sellers.

**Schedule 4.4**

**Property**

(a)

Liens on Real Property

Mortgage and Security Agreement dated November 30, 2018, between Limetree Bay Refining, LLC and Goldman Sachs Bank USA, as collateral agent.

Mortgage and Security Agreement dated November 30, 2018, between Limetree Bay Refining, LLC and The Government of the Virgin Islands.

Construction lien
Document Number: 2021002208, Office of Lieutenant Governor, USVI
Filing Date: 6/22/2021
Name of Filer:  Cust-O-Fab Specialty Services, LLC

Construction lien
Document Number: 2021002207, Office of Lieutenant Governor, USVI
Filing Date: 6/22/2021
Name of Filer:  Cust-O-Fab, LLC

Construction lien
Document Number: 2021002215, Office of Lieutenant Governor, USVI
Filing Date: 6/23/2021
Name of Filer:  Worley Pan-American Corporation f/k/a Jacobs Pan-American Corporation

Construction lien
Document Number: 2021002096, Office of Lieutenant Governor, USVI
Filing Date: 6/15/2021
Name of Filer:  Universal Plan Services (VI), LLC

Construction lien
Document Number: 2021001673, Office of Lieutenant Governor, USVI
Filing Date: 5/12/2021
Name of Filer:  Inserv Field Services USVI, LLC

Construction lien
Document Number: 2021002169, Office of Lieutenant Governor, USVI
Filing Date: 5/12/2021
Name of Filer:  Vivot Equipment Corporation

Construction lien
Document Number: 2021000707, Office of Lieutenant Governor, USVI
Filing Date: 3/2/21
Name of Filer:  Altair Strickland V.I., LLC

Construction lien
Document Number: 2021002175, Office of Lieutenant Governor, USVI
Filing Date: 6/21/2021
Name of Filer:  Computer Solutions, Inc. dba Costrack Project Controls

Construction lien
Document Number: 2021001674, Office of Lieutenant Governor, USVI
Filing Date: 5/12/2021
Name of Filer:  Great Southern Technologies, LLC

Construction lien
Document Number: 2021002221, Office of Lieutenant Governor, USVI
Filing Date: 6/23/2021
Name of Filer:  Panametrics LLC


Construction lien

Filing Date: 6/22/2021

Name of Filer: Enermech Mechanical Services, Inc.


Construction lien

Filing Date: February 3, 2021

Name of Filer: Cleaver-Brooks Sales and Service, Inc.


Construction lien

Name of Filer: Christiansted Equipment Ltd.


Construction lien

Name of Filer: Excel Construction & Maintenance VI


Construction lien

Name of Filer: HKA Enterprises, LLC Construction lien


Construction lien

Name of Filer: Strategic Contract Resources, LLC


Construction lien

Name of Filer: V.I. Industrial Services, LLC


Limetree Bay Terminal LLC is granted certain rights, including, without limitation, the right to access the Refinery Facilities and a non-exclusive access and easement on, over, under and across the refinery site and the certain shares premises owned by Limetree Bay Refining, LLC,  pursuant to Shared Services Systems Agreement, dated as of November 30, 2018, by and between Limetree Bay Terminals, LLC, and Limetree Bay Refining, LLC and Limetree Bay Refining Marketing, LLC.


(b)

| Lease Name | Location |
|---|---|
| Sublease Agreement dated September 1, 2019, between Gulfmark Offshore, Inc. and Limetree Bay Services, LLC[3] | 842 West Sam Houston Parkway North Houston, Texas 77024 |
| Consent to Sublease, dated as of September 1, 2019, by and among CityCentre Three Partners, L.P., Gulfmark Offshore, Inc. and Limetree Bay Services, LLC [4] | 842 West Sam Houston Parkway North Houston, Texas 77024 |

---

[3]  This Sublease Agreement is subject to the terms and conditions of the Office Lease Agreement dated December 13, 2012, between CityCentre Three Partners, L.P. and Gulfmark Offshore, Inc., as amended by First Amendment to Office Lease Agreement dated October 25, 2017.  The Sublease Agreement and the Office Lease Agreement were rejected by order of the Bankruptcy Court on August 9, 2021 [Doc. No. 347].

[4] See prior footnote.

**Schedule 4.5**

**Title to Purchased Assets**

UCC Financing Statement
Filing Date: November 30, 2018
File Number: 20180000859E, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining Holdings II, LLC
Secured Party: Goldman Sachs Bank USA, as Project Manager

UCC Financing Statement
Filing Date:  February 27, 2021
File Number: 20210000109, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining Holdings, LLC
Secured Party: Wilmington Trust, National Association, as Project Collateral Agent

UCC Financing Statement
Filing Date:  March 5, 2020
File Number: 20200000133, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining Marketing, LLC
Secured Party: J. Aron & Company LLC

UCC Financing Statement
Filing Date:  March 5, 2020
File Number: 20200000134, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining Marketing, LLC
Secured Party: J. Aron & Company LLC

UCC Financing Statement
Filing Date:  November 30, 2018
File Number: 20180000865A, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining Marketing, LLC
Secured Party: Goldman Sachs Bank USA, as Project Collateral Agent

UCC Financing Statement
Filing Date:  November 30, 2018
File Number: 20180000858C, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining Operating, LLC
Secured Party: Goldman Sachs Bank USA, as Project Collateral Agent

UCC Financing Statement
Filing Date:  July 21, 2020
File Number: 20200000905, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining, LLC
Secured Party: Honeywell Enraf Americas, Inc.

UCC Financing Statement
Filing Date:  November 30, 2018
File Number: 20180000857B, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining, LLC

Secured Party: Goldman Sachs Bank USA, as Project Collateral Agent
UCC Financing Statement
Filing Date:  July 21, 2020
File Number: 20200000904, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining, LLC
Secured Party: Honeywell Enraf Americas, Inc.

UCC Financing Statement
Filing Date:  July 21, 2020
File Number: 20200000906, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining, LLC
Secured Party: Honeywell International Inc.

UCC Financing Statement
Filing Date:  November 30, 2018
File Number: 20180000860G, Filed with the United States Virgin Islands, Office of Lieutenant Governor
Debtor:  Limetree Bay Refining, LLC
Secured Party: The Government of the Virgin Islands

UCC Financing Statement
Filing Date: March 3, 2020
File Number: 20201564378, Delaware Department of State
Debtor: Limetree Bay Ventures, LLC
Secured Party: FS Energy and Power Fund
Amendments:
    -   File Number 20204378826, Delaware Department of State; Amended to restate covered collateral
    -   File Number 20204835429, Delaware Department of State; Amended to restate covered collateral
Assignment:  File Number 20204379097, Delaware Department of State; *Assigned to Wilmington Trust, National Association, as Collateral Agent*
*Termination Statement filed April 21, 2021, File Number 20213098622, Delaware Department of State
(NOTE: No termination by Wilmington Trust, National Association, as Collateral Agent)

UCC Financing Statement
Filing Date:  March 3, 2020
File Number: 20201564543, Filed with Delaware Department of State
Debtor:  Limetree Bay Ventures, LLC
Secured Party:  Al Warda Investments RSC Limited
Amendment:
    -   File Number 20204378727, Delaware Department of State; Amended to restate covered collateral
    -   File Number 20204835361, Delaware Department of State; Amended to restate covered collateral
Assignment:  File Number 20204379303, Delaware Department of State; *Assigned to Wilmington Trust, National Association, as Collateral Agent*
* Termination Statement filed April 21, 2021, File Number 20213098721, Delaware Department of State
(NOTE: No termination by Wilmington Trust, National Association, as Collateral Agent)

UCC Financing Statement
Filing Date:  March 3, 2020
File Number: 20201564881, Filed with Delaware Department of State
Debtor:  Limetree Bay Ventures, LLC
Secured Party:  EIG Limetree Debt Aggregator, L.P.
Amendment:
- File Number 20204378909, Delaware Department of State; Amended to restate covered collateral
- File Number 20204835312, Delaware Department of State; Amended to restate covered collateral
Assignment:  File Number 20204378990, Delaware Department of State; *Assigned to Wilmington Trust, National Association, as Collateral Agent*
\* Termination Statement filed April 21, 2021, File Number 20213098770, Delaware Department of State
(NOTE: No termination Wilmington Trust, National Association, as Collateral Agent.)

UCC Financing Statement
Filing Date:  March 3, 2020
File Number: 20201565078, Delaware Department of State
Debtor:  Limetree Bay Ventures, LLC
Secured Party: Barclays Bank PLC
Amendment:
- File Number 20204378867, Delaware Department of State; Amended to restate covered collateral
- File Number 20204835262, Delaware Department of State; Amended to restate covered collateral
Assignment:  File Number 20204379261, Delaware Department of State; *Assigned to Wilmington Trust, National Association, as Collateral Agent*
\* Termination Statement filed April 21, 2021, File Number 20213098820, Delaware Department of State
(NOTE: No termination by Wilmington Trust, National Association, as Collateral Agent.)

Mortgage and Security Agreement dated November 30, 2018, between Limetree Bay Refining, LLC and Goldman Sachs Bank USA, as collateral agent (includes real property and personal property collateral)
Mortgage and Security Agreement dated November 30, 2018, between Limetree Bay Refining, LLC and The Government of the Virgin Islands (includes real and personal property collateral)

Revolver Debt [5]

Debtor:  Limetree Bay Refining Marketing, LLC

Creditor: Goldman Sachs Bank USA, as Administrative Agent

Revolver Debt Guarantee[6]

Debtors:  Limetree Bay Refining, LLC; Limetree Bay Refining Operating, LLC

Creditor: Goldman Sachs Bank USA, as Administrative Agent.

---

[5] See Bankruptcy Schedules for additional information.

[6] See Bankruptcy Schedules for additional information.

Term Debt[7]

Debtor:  Limetree Bay Refining Marketing, LLC

Creditor: J. Aron & Company, LLC

Term Debt Guarantee

Debtor: Limetree Bay Refining, LLC; Limetree Bay Refining Operating, LLC

Creditor: J. Aron & Company, LLC

Estimate Safe Harbor Agreement [8]

Debtor: Limetree Bay Refining Marketing, LLC

Creditor: J. Aron & Company, LLC

Estimate Safe Harbor Agreement Guarantee[9]

Debtor: Limetree Bay Refining, LLC; Limetree Bay Refining Operating, LLC

Creditor: J. Aron & Company, LLC

Term Debt[10]

Debtors: Limetree Bay Refining, LLC; Limetree Bay Refining Holdings II, LLC

Creditor: Wilmington Bank, N.A.

---

[7] See Bankruptcy Schedules for additional information.

[8] See Bankruptcy Schedules for additional information.

[9] See Bankruptcy Schedules for additional information.

[10] See Bankruptcy Schedules for additional information.

Term Debt Guarantee [11]

Debtors: Limetree Bay Refining Marketing, LLC; Limetree Bay Refining Operating, LLC

Creditor: Wilmington Bank, N.A.


Term Debt[12]

Debtor: Limetree Bay Refining Holdings II, LLC

Creditor:   Limetree Bay Cayman II, Ltd.

---

[11] See Bankruptcy Schedules for additional information.

[12] See Bankruptcy Schedules for additional information.

**Schedule 4.6**

**Affiliate Transactions**

1. Catalyst Purchase and Sale Agreement, dated as of March 3, 2020, by and between Limetree Bay Refining Marketing, LLC and Limetree Bay Refining, LLC.

2. Shared Catalyst Agreement, dated as of March 3, 2020, by and between Limetree Bay Marketing Refining, LLC and Limetree Bay Refining, LLC.

3. Shared Services Systems Agreement, dated as of November 30, 2018, by and between Limetree Bay Terminals, LLC, and Limetree Bay Refining, LLC and Limetree Bay Refining Marketing, LLC.

4. Subordinated Note, by and between Limetree Bay Refining, LLC and Limetree Bay Ventures, LLC issued September 17, 2020.

5. Terminal Services Agreement (Included Locations), dated as of March 3, 2020, by and among Limetree Bay Terminals, LLC, Limetree Bay Refining Marketing, LLC, and J. Aron & Company LLC.

6. Terminal Services Agreement (Not Included Locations), dated as of March 3, 2020, by and among Limetree Bay Terminals, LLC, and Limetree Bay Refining Marketing, LLC.

7. Term Debt, Debtor: Limetree Bay Refining Holdings II, LLC, Creditor:  Limetree Bay Cayman II, Ltd.[13]

---

[13] See Bankruptcy Schedules for additional information.

**Schedule 4.7**

**Material Contracts**

(a)

(i)

1. Agreement for Sale of Products, Parts and/or Services, dated as of April 12, 2019, by and between Limetree Bay Refining, LLC and GE Oil & Gas LLC.

2. Amended and Restated Pledge Agreement, dated as of June 24, 2020, by and between Limetree Bay Ventures, LLC, Wilmington Trust, National Association and Additional Noteholders.

3. Credit Agreement, dated as of November 20, 2018, by and between Limetree Bay Refining Marketing, LLC, Limetree Bay Refining Holdings II, LLC, Limetree Bay Refining Operating, LLC, Limetree Bay Refining, LLC, and Goldman Sachs Bank USA, as amended by Amendment Omnibus Amendment and Waiver, dated as of November 27, 2019, as further amended by Second Omnibus Amendment and Waiver, dated as of February 20, 2020, as further amended by Amendment No. 3, dated as of March 3, 2020, as further amended by Amendment No. 4, dated as of September 30, 2020, as further amended by Amendment No. 5, dated as of December 31, 2020, and as further amended by the Sixth Omnibus Amendment, dated as of April 16, 2021.

4. Engagement Letter, dated as of January 9, 2020, by and between Quinn Emanuel Urquhart & Sullivan, LLP and Limetree Bay Ventures, LLC, as amended by Addendum, dated as of January 28, 2020.

5. Financing Agreement, dated as of March 3, 2020, by and between J. Aron & Company, LLC, and Limetree Bay Refining Marketing, LLC.

6. Letter Agreement by and between Jacobs Field Services North America, Inc., Jacobs Pan-American Corporation, and Limetree Bay Terminals, LLC, dated as of January 25, 2018.

7. Letter of Contract, dated as of December 21, 2018, by and between Limetree Bay Refining, LLC, and Honeywell International, Inc.

8. Marketing and Sales Agreement, dated as of March 3, 2020, by and between J. Aron & Company LLC, and Limetree Bay Refining Marketing, LLC.

9. Master Purchase and Sale Agreement for Equipment or Material by and between Cust-O-Fab, LLC and Limetree Bay Refining, LLC, dated as of March 27, 2019.

10. Mortgage and Security Agreement dated November 30, 2018, between Limetree Bay Refining, LLC and Goldman Sachs Bank USA, as collateral agent.

11. Mortgage and Security Agreement dated November 30, 2018, between Limetree Bay Refining, LLC and The Government of the Virgin Islands.

12. Professional Services Agreement, dated as of August 6, 2018, by and between Limetree Bay Refining Operating, LLC, and Strategic Contract Resources, LLC.

13. Professional Services Agreement, dated as of May 23, 2018, by and between Limetree Bay Refining Operating, LLC, and Computer Solutions, Inc. dba CoStrack Project Controls, as amended by Addendum No. 1, dated as of October 1, 2018.

14. Project Agreement, dated as of June 22, 2020, by and between Limetree Bay Refining, LLC, and Honeywell Enraf Americas, Inc.

15. Purchase and Sale Agreement for Equipment or Material by and between Cust-O-Fab, LLC and Limetree Bay Refining, LLC, dated as of January 15, 2019.

16. Purchase and Sale Agreement for Equipment or Material by and between Cust-O-Fab, LLC and Limetree Bay Refining, LLC, dated as of December 3, 2018.

17. Purchase and Sale Agreement for Equipment or Material by and between Cust-O-Fab, LLC and Limetree Bay Refining, LLC, dated as of January 15, 2019.

18. Purchase and Sale of Equipment and Support Services by and between Great Southern Technologies, LLC and Limetree Bay Refining, LLC, dated as of September 19, 2018.

19. Refinery Facilities Agreement, dated as of March 3, 2020, by and among J. Aron & Company LLC, Limetree Bay Refining Marketing, LLC, Limetree Bay Refining, and Limetree Bay Refining Operating, LLC.

20. Refinery Start-up Project Agreement, dated as of July 31, 2018, by and between Limetree Bay Refining, LLC, and Honeywell International, Inc., as amended by Amendment No. 1, dated as of September 10, 2018.

21. Refinery Operating Agreement, dated as of July 2, 2018, by Limetree Bay Refining, LLC (as Refinery Operator); and Government of U.S. Virgin Islands.

22. Pledge Agreement, dated as of November 20, 2018, among Limetree Bay Refining Holdings II, LLC, limited liability company, and Goldman Sachs Bank USA LLC, in its capacity as collateral agent for the Project Secured Parties.

23. Pledge Agreement dated as of February 22, 2021, by and between Limetree Bay Refining Holdings, LLC and Wilmington Trust, National Association.

24. Security Agreement, dated as of November 20, 2018, among Limetree Bay Refining, LLC, a U.S. Virgin Islands limited liability company, Limetree Bay Refining Marketing, LLC, Limetree Bay Refining Operating, LLC and Goldman Sachs Bank USA, in its capacity as collateral agent under the Intercreditor Agreement referred to in the agreement.

25. Security Agreement, dated as of March 3, 2020, by and between J. Aron & Company LLC and Limetree Bay Refining Marketing, LLC (Relates to Monetization Master Agreement and Financing Agreement, dated as of March 3, 2020, between J. Aron & Company LLC; and Limetree Bay Refining Marketing, LLC.

26. Supply and Offtake Agreement, dated as of March 3, 2020, by and between J. Aron & Company LLC, and Limetree Bay Refining Marketing, LLC.

27. Term Services Agreement, dated as of April 30, 2019, by and between Limetree Bay Refining, LLC, and Cust-O-Fab Specialty Services, LLC.

28. Term Services Agreement, dated as of July 2, 2018, by and between Limetree Bay Refining, LLC, and Elite Turnaround Specialists, Ltd., as amended by Addendum No. 1, dated as of October 1, 2018, as further amended by Addendum No. 2, dated as of January 1, 2019, as further amended by Addendum No. 3, dated as of July 1, 2019, and as further amended by Addendum No. 4, dated as of January 1, 2021.

29. Term Services Agreement, dated as of June 20, 2018, by and between Limetree Bay Refining, LLC, and InServ Field Services USVI, LLC, amended by Addendum No. 1, dated as of October 1, 2018, as further amended by Addendum 1a, dated as of February 11, 2019, as further amended by Addendum No. 2, dated as of October 31, 2019, as further amended by Addendum No. 3, dated as of October 31, 2019, and as further amended by Addendum No. 5, dated as of January 1, 2021.

30. Term Services Agreement, dated as of June 11, 2018, by and between Limetree Bay Refining Operating, LLC, and Vivot Equipment Corporation, Inc., as amended by Addendum No. 1, dated as of October 1, 2018, as further amended by Addendum Attachment No. 1, dated as of August 22, 2018, as further amended by Addendum No. 2, dated as of June 11, 2018, as further amended by Addendum No. 3, dated as of April 2, 2019, as further amended by Addendum No. 4, dated as of July 26, 2019, as further amended by Addendum No. 5, dated as of September 5, 2019 (not signed by either party), as further amended by Addendum No. 6, dated as of November 7, 2019, as further amended by Addendum No. 7, dated as of January 29, 2020, as further amended by Addendum No. 8, dated as of December 23, 2019, as further amended by Addendum No. 9, dated as of September 21, 2020, and as further amended by Addendum No. 10, dated as of February 1, 2020.

31. Term Services Agreement, dated as of July 16, 2018, by and between Limetree Bay Refining, LLC, and AltairStrickland V.I., LLC, as amended by Addendum No. 1, dated as of October 1, 2018, and as further amended by Addendum No. 2, as dated of December 5, 2018.

32. Term Services Agreement, dated as of June 15, 2019, by and between EnerMech Mechanical Services, Inc.

33. Term Services Agreement, dated as of August 9, 2018, by and between Limetree Bay Refining, LLC, and Christiansted Equipment, Ltd., as amended by Addendum No. 1, dated as of October 1, 2018, and as further amended by Addendum No. 2, dated as of April 1, 2020.

34. Term Services Agreement, dated as of February 21, 2019, by and between Limetree Bay Refining, LLC, and Universal Plant Services (VI), LLC, as amended by Addendum 1, dated April 30, 2019, and further amended by Addendum 2, dated as of August 4, 2019, and further amended by Amendment and Joinder, dated as of September 16, 2019.

(ii)

    None.

(iii)

None.

(iv)

None.

(v)

1. Refinery Operating Agreement, dated as of July 2, 2018, by Limetree Bay Refining, LLC (as Refinery Operator) and Government of U.S. Virgin Islands.

(vi)

None.

(vii)

1. Air Pollution Control Program - Authority to Construct and Permit to Operate (MARPOL Project), Permit No. STX-924-AC-PO-20.

2. Air Pollution Control Program - Permit to Construct and Operate, Permit No. STX-895-AC-PO-18.

3. GT13-LSF Project PSD Permit.

4. GT No. 10 Prevention of Significant Deterioration PSD) of Air Quality Permit.

5. Mortgage and Security Agreement dated November 30, 2018, between Limetree Bay Refining, LLC and The Government of the Virgin Islands.

6. RCRA Hazardous Waste Permit, Permit No. VID 980536080.

7. Refinery Operating Agreement, dated as of July 2, 2018, by and between The Government of the U.S. Virgin Islands and Limetree Bay Refining, LLC.

8. Special Solid Waste Permit to Generate and/or Store, Treat and Dispose Used Oil, Permit No. STX C-002.

9. Title V Permit (Part 70 Operating Permit), Permit No. STX-TV-003-10.

10. Territorial Pollution Discharge Elimination System (Dated March 1, 2008), Permit No. VI0000019.

11. Modified 1997 PSD Permit (Dated May 9, 2011).

(b)

None.

**Schedule 4.8(a)**

**<u>Intellectual Property Rights</u>**

None.

**Schedule 4.9**

**<u>Tax Matters</u>**

1.  Limetree Bay Terminals, LLC received a Tax Assessment Notice on November 23, 2021 from the Commonwealth of Massachusetts in the amount of $20,685.44.

**Schedule 4.10**

**Employee Benefits**

1.  Limetree Bay HDHP– UnitedHealthcare

2.  Limetree Bay PPO – UnitedHealthcare

3.  Health Savings Account (HSA) – Optum Bank

4.  Emergency Air Medical Service – AeroMD

5.  Dental Plan- UnitedHealthcare

6.  Vision Plan – UnitedHealthcare

7.  Wellness Program (Rally) – UnitedHealthcare

8.  Life and Accidental Death and Dismemberment (AD&D Insurance) – MetLife

9.  Disability Insurance – MetLife

10. Employee Assistance Program (EAP) – MetLife

11. Limetree Bay 401(k) Savings Plan – Vanguard

12. Paid Vacation, depending on years of credited service

13. Company Holidays

14. Personal Business/ Sick Leave

15. Housing, vehicle, and bonus program – provided to certain employees through their employment offer letter

**Schedule 4.11**

**Compliance with Laws**

1. The U.S. Department of Justice, Environmental Crimes Section is conducting an investigation into possible violations of the federal Clean Air Act in connection with certain emissions occurring at the Limetree Bay refinery.  The DOJ's investigation, which is ongoing, has included a voluntary document request, a voluntary tour of the Limetree Bay refinery, external digital images of the refinery taken pursuant to a warrant, and a request for voluntary interviews.

2. On or about November 11, 2021, the Occupational Safety and Health Administration issued citations to Limetree Bay Refining, LLC indicating that it had completed its investigation into alleged violations of the Occupational Safety and Health Act in connection with certain refinery operations occurring on or around May 12, 2021.  OSHA issued citations which alleged "Serious" safety violations and fines totaling $259,407.   Limetree Bay Refining, LLC's review of the alleged violations and proposed fines is just underway, but we anticipate that the Company will formally or informally contest certain of the alleged violations and fines in meetings with OSHA in an effort to reduce the number of violations and total penalties.

3. The disclosures in <u>Schedule 4.12</u> are incorporated herein by reference.

**Schedule 4.12**

**Environmental Matters**

1.  On June 7, 2011, HOVENSA L.L.C. entered into a consent decree (the "<u>Consent Decree</u>") with the United States Environmental Protection Agency ("<u>EPA</u>") and the U.S. Virgin Islands ("<u>Virgin Islands</u>") resolving alleged Clean Air Act violations at the refinery when operated by HOVENSA. On August 25, 2020, Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC entered into a modification of the 2011 Consent Decree with EPA and the Virgin Islands ("<u>First Modification</u>").  On April 8, 2021, EPA and the Virgin Islands moved for entry of the modified consent decree.

    a.  On January 31, 2021, Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC submitted to EPA and the Virgin Islands a semi-annual progress report pursuant to Paragraph 143 of the First Modification for the period between July 1, 2020 and December 31, 2021.

    b.  On January 31, 2021, Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC submitted to EPA and the Virgin Islands a semi-annual report pursuant to the consent decree relating to equipment leaks for the period between July 1, 2020 and December 31, 2020.

    c.  On July 30, 2021, Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC submitted to EPA and the Virgin Islands a semi-annual report pursuant to the consent decree relating to equipment leaks for the period between January 1, 2021 and June 30, 2021.

    d.  On July 30, 2021, Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC submitted to EPA and the Virgin Islands a semi-annual progress report pursuant to Paragraph 143 of the First Modification for the period between January 1, 2021 and June 30, 2021.

    e.  On August 30, 2021, Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC reported to EPA pursuant to Paragraph 92 of the First Modification of the Consent Decree.

    f.  On October 14, 2021, Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC reported to EPA pursuant to Subparagraph 50.C.b of the First Modification of the Consent Decree.

2.  On January 11, 2021, Limetree Bay Refining, LLC reported under the Emergency Planning and Community Right to Know Act ("<u>EPCRA</u>") to the Department of Planning & Natural Resources for the Virgin Islands ("<u>DPNR</u>") and EPA emissions from the refinery between December 27, 2020 and January 1, 2021.

3.  On January 22, 2021, Limetree Bay Refining, LLC reported under EPCRA to DPNR and EPA emissions from the refinery between January 6-21, 2021.

4.  On January 29, 2021, Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC submitted a Continuous Emissions Monitoring Systems ("<u>CEMS</u>") semi-annual report relating to the gasoline loading rack for the period between July 1, 2020 and December 31, 2021.

5.  On January 29, 2021, Limetree Bay Refining, LLC submitted an annual report for benzene waste operations under NESHAPS Subpart FF, 40 CFR 61.357(d)(8) for 2020.

6.     On January 29, 2021, Limetree Bay Refining, LLC submitted a quarterly report for benzene waste operations under NESHAPS Subpart FF and the First Modification for the period October 1, 2020 through December 31, 2020.

7.     On January 30, 2021, Limetree Bay Refining, LLC reported under Clean Air Act NSPS 40 CFR 60, Subparts D, Db, J, Ja, GG, and KKKK for the refinery between July 1, 2020 and December 31, 2020.

8.     On February 12, 2021, Limetree Bay Refining, LLC reported under EPCRA to DPNR and EPA emissions from the refinery between January 22, 2021 and February 10, 2021.

9.     On February 23, 2021, Limetree Bay Refining, LLC reported under EPCRA to DPNR and EPA emissions from the refinery between February 12-19, 2021.

10. On February 26, 2021, Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC submitted a report to DPNR and EPA identifying deviations from Title V Permit No. STX-TV-003-10 for the period July 1, 2020 through December 31, 2020.

11. On March 17, 2021, Limetree Bay Refining, LLC reported under EPCRA to the DPNR and EPA emissions from the refinery between February 28, 2021 and March 4, 2021.

12.     On April 1, 2021, EPA sent an information request to Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC under Section 114 of the Clean Air Act requesting information regarding operations at the refinery.

13. On April 8, 2021, Limetree Bay Refining, LLC reported under EPCRA to the DPNR and EPA emissions from the refinery between March 18, 2021 and March 30, 2021.

14.     On April 30, 2021, EPA sent an information request to Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC under Section 114 of the Clean Air Act requesting additional information regarding operations at the refinery.

15. On May 14, 2021, Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC received a Clean Air Act Section 303 Emergency Order from EPA requesting information pursuant to the Clean Air Act, 42 U.S.C. §§ 7401 et seq. and a Notice of Violation from EPA (CAA-02-2021-1306). Pursuant to the Order, EPA required four separate audits of the refinery by independent consultants, which were completed and submitted on June 25, 2021 to Limetree Bay Refining, LLC and EPA. On July 12, 2021, EPA filed a complaint against Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC concerning these alleged violations.

16. The United States Department of Justice and EPA have been conducting a criminal investigation of Limetree Bay Refining relating to the incidents described in the Section 303 Order, events related to the shutdown of the refinery, and procedures, training, and operations of the refinery.

17.     In letters dated April 12, 2021; May 18, 2021; and August 31, 2021; EPA identified alleged deficiencies in Limetree Bay Terminals' and Limetree Bay Refining's Spill Prevention, Control, and Countermeasure ("SPCC") Plan and Facility Response Plan ("FRP") requirements.

18.     On June 10, 2021, the U.S. Chemical Safety and Hazard Investigation Board sent Limetree Bay Refining, LLC letters regarding incidents at the refinery on February 4, 2021 and May 12, 2021.

19.     On June 14, 2021, Limetree Bay Refining, LLC reported under EPCRA to DPNR and EPA emissions from the refinery between April 19-24, 2021

20.     On June 16, 2021, EPA sent Limetree Bay Refining, LLC a notice of violation under Section 113(a) of the Clean Air Act regarding monitoring of sulfur dioxide at the refinery.

21.     On July 2, 2021, Limetree Bay Refining, LLC reported under EPCRA to DPNR and EPA emissions from the refinery between December 31, 2020 and May 9, 2021.

22.     On July 30, 2021, Limetree Bay Refining, LLC submitted a Refinery MACT II Semi-Annual Compliance Report under the Clean Air Act for the period between January 1, 2021 through June 30, 2021.

23.     On July 30, 2021, Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC submitted a Continuous Emissions Monitoring Systems ("CEMS") quarterly report under its Title V Permit No. STX-TV-003-10 for the period between April 1, 2021 and June 30, 2021.

24.     On August 13, 2021, EPA sent Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC a notice of potential violations of Sections 301(a), 308 and 402 of the Clean Water Act under TPDES Permit No. VI 0000019.

25.     On August 30, 2021, Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC submitted a report to DPNR and EPA identifying deviations from Title V Permit No. STX-TV-003-10 for the period January 1, 2021 through June 30, 2021.

26.     On December 2, 2021, Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC submitted a report to EPA regarding a root cause analysis of benzene emissions at the facility.

27.     Limetree Bay Refining, LLC may have released or caused to be released tar, coke, sulfides, oil, or other petroleum products, derivatives, or waste products into the environment as the result of its operations between October 2020 and May 2021.

**Schedule 4.14**

**Litigation**

Pending Actions:

| Plaintiff's Name | Defendant | Style of Case | Complaint Date |
|---|---|---|---|
| Ducreay, Isaiah | Inserv Field Services USVI, LLC and Limetree Bay Refining, LLC | SX-20-CV-637, Superior Court of the Virgin Islands | July 8, 2020 |
| Hendricks, Vanessa | Pinnacle Services, LLC, et al. | Case No. 01-20-0003-8191, American Arbitration Association | March 16, 2020 |
| Perales, Jose L. | Limetree Bay Ventures, LLC | Charge No. 515-2021-0004 EEOC San Juan, PR<br><br>Charge No. 515-2021-00151 EEOC San Juan, PR | September 2019 |
| Williams, Kleaton | Limetree Bay Terminals, LLC | SX-2020-CV-00776 Superior Court U.S. Virgin Islands | November 6, 2020 |
| Randolph, Marius | Limetree Bay Terminals, LLC, et al. | SX-18-CV-047 Superior Court of U.S. Virgin Islands | November 18, 2017 (Date of Alleged Incident) |
| McKowen, Thomas A. | Limetree Bay Ventures, LLC | EEOC Charge No. 515-2021-00060 | November 16, 2020 |
| Magras, Luis | National Industrial Services, LLC, Pinnacle Services, LLC and | SX-2017-CV-00435 Superior Court of U.S. Virgin Islands | December 8, 2017 (Complaint)<br><br>March 4, 2021 (Amended Complaint) |

| Plaintiff's Name | Defendant | Style of Case | Complaint Date |
|---|---|---|---|
| | Limetree Bay Terminals, LLC | | |
| Naiasha John | Limetree Bay Terminal, LLC | Charge No. 16:-2018-0021 EEOC | August 29, 2018 |
| Incident Report | Limetree Bay Refining, LLC | QBE Policy Contract # B0509BOWCN1800772 | December 7, 2020 |
| Flare Incident | *[Limetree Refining]* | Incident at Flare Unit #8 | February 4, 2021 |
| Unipec Arbitration | | | |
| Altair Strickland V.I., LLC | Limetree Bay Refining, LLC | Cause No. 2021-CV-00415 | May 21, 2021 |
| Director of the Enforcement and Compliance Assurance Division (ECAD) for the United States Environmental Protection Agency (EPA) – Issued a Notice of Violation | Limetree Bay Refining, LLC | CAA-02-2021-1307 | June 16, 2021 |

Threatened Actions:

1. The disclosures in Schedule 4.12 are incorporated herein by reference.

2. Demand Notice, dated as of November 19, 2018 sent by Dooling Machine Products VI LLC demanding a total of $2,016,286.46 pursuant to the Term Services Agreement, dated as of June 7, 2018, by and between Limetree Bay Refining, LLC, and Dooling Machine Products VI LLC, as amended by Addendum 1, dated as of October 1, 2018.

3.  Demand Letter Demanding Written Assurances for outstanding payments, dated as of July 1, 2021, sent by Axens North America, Inc. pursuant to amounts owed under the License Agreement, dated as of November 21, 2018, by and between Limetree Bay Refining, LLC and Axens North America, Inc.

4.  Demand Letter, dated as of June 10, 2021, from Elite Turnaround Specialists, Ltd regarding amounts owed by Limetree Bay Refining, LLC for work performed under The Term Services Agreement, dated as of July 2, 2018. As of June 10, 2021, the total amount currently invoiced and not yet paid by Limetree under the Agreement was $15,865,444.60.

5.  Correspondence from Stanton Chase International dated June 16, 2021, regarding outstanding invoices in the amounts of $372,000.

6.  Demand letter, dated as of June 3, 2021, on behalf of Acuren Inspection, Inc., demanding outstanding amount of $208,109.82 pursuant to the Terms Services Agreement, dated as of January 22, 2016, by and among Acuren Inspection, Inc., Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, as amended by Amendment and Joinder, dated as of January 1, 2019.

7.  Letters dated May 20, 2021 and June 2, 2021, from InServ Field Services USVI, LLC, regarding dispute resolution for failure to abide by the terms of the Term Services Agreement, dated as of June 20, 2018, by and between Limetree Bay Refining, LLC, and InServ Field Services USVI, LLC, amended by Addendum No. 1, dated as of October 1, 2018, as further amended by Addendum 1a, dated as of February 11, 2019, as further amended by Addendum No. 2, dated as of October 31, 2019, as further amended by Addendum No. 3, dated as of October 31, 2019, and as further amended by Addendum No. 5, dated as of January 1, 2021.

8.  Letter dated June 9, 2021, from Savage Services Corporation, regarding notice of failure to pay and intent to suspend services in connection with Petroleum Coke and Sulphur Services Agreement, dated July 10, 2019, by and between Savage St. Croix, LLC and LimeTree Bay Refining, LLC.  As of June 8, 2021, the outstanding invoices due to Savage is $3,064,819.54.

Pending Investigations:

1.  The U.S. Department of Justice, Environmental Crimes Section is conducting an investigation into possible violations of the federal Clean Air Act in connection with certain emissions occurring at the Limetree Bay refinery.  The DOJ's investigation, which is ongoing, has included a voluntary document request, a voluntary tour of the Limetree Bay refinery, external digital images of the refinery taken pursuant to a warrant, and a request for voluntary interviews.

2.  On or about November 11, 2021, the Occupational Safety and Health Administration issued citations to Limetree Bay Refining, LLC indicating that it had completed its investigation into alleged violations of the Occupational Safety and Health Act in connection with certain refinery operations occurring on or around May 12, 2021.  OSHA issued citations which alleged "Serious" safety violations and fines totaling $259,407.   Limetree Bay Refining, LLC's review of the alleged violations and proposed fines is just underway, but we anticipate that the Company will formally or informally contest certain of the alleged violations and fines in meetings with OSHA in an effort to reduce the number of violations and total penalties.