IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-32351-11 |
| | § | JOINTLY ADMINISTERED |
| LIMETREE BAY SERVICES LLC, ET AL, | § | HOUSTON, TEXAS |
| | § | TUESDAY, |
| | § | DECEMBER 21, 2021 |
| DEBTORS. | § | 10:00 A.M. TO 5:45 P.M. |

SALE HEARING

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| FOR THE DEBTOR: | BAKER AND HOSTETLER, LLP<br>Elizabeth Green, Esq.<br>Jorina Rose, Esq.<br>200 S. Orange Ave<br>Sun Trust Center, Suite 2300<br>Orlando, Fl 32801<br>407-649-4000 |
| FOR THE UNITED STATES OF AMERICA: | U.S. ATTORNEY'S OFFICE<br>Rich Kincheloe, Esq.<br>1000 Louisiana St. Suite 2300<br>Houston, TX 77002<br>713-567-9422 |
| FOR THE COMMITTEE OF UNSECURED CREDITORS: | PACHULSKI STANG ZIEHL AND JONES<br>Michael Warner, Esq.<br>440 Louisiana Street, Suite 900<br>Houston, TX 77002<br>713-691-9385 |
| FOR LIMETREE BAY TERMINALS, LLC: | ANDREWS KURTH, LLP<br>Tad Davidson, Esq.<br>600 Travis, Ste 4200<br>Houston, TX 77002<br>713-220-3810 |
| FOR ST. CROIX REFINING AND TRANSPORTATION, LLLP: | BAST AMRON, LLP<br>Jeffery Bast, Esq.<br>One Southeast third Avenue<br>Suite 1400<br>Miami, FL 33131<br>305-379-7904 |
| FOR 405 SENTINEL LLC | GRAY REED AND MCGRAW, LLP<br>Jason Brookner, Esq.<br>1601 Elm Street, Suite 4600<br>Dallas, TX 75201<br>469-320-6132 |
| FOR GOLDMAN SACHS BANK USA: | CLEARY GOTTLIEB<br>Jane VanLare, Esq.<br>One Liberty Plaza<br>New York, NY 10006<br>212-225-2000 |

APPEARANCES (CONT'D):

| | |
|---|---|
| LIMETREE BAY REFINING HOLDINGS II, LLC: | AKIN GUMP STRAUS HAUER AND FELD<br>Scott Alberino, Esq.<br>Marty Brimmage, Esq.<br>2300 N Field Street<br>Suite 1800<br>Dallas, TX 75201 |
| FOR ST. CROIX ENERGY, LLLP: | ROPES AND GRAY, LLP<br>Greg Galardi, Esq.<br>1211 Avenue of the Americas<br>New York, NY 10036<br>212-596-9000 |

(Please also see Electronic Appearances.)

INDEX


| WITNESSES: | Direct | Cross | Redirect | Recross | VOIR DIRE |
|---|---|---|---|---|---|
| MICHAEL O'HARA | | | | | |
| By Mr. Rose | 31 | . | 110 | . | . |
| By Mr. Galardi | . | 46 | . | . | . |
| By Mr. Hughes | . | 96 | . | . | . |
| MARK SHAPIRO | | | | | |
| By Ms. Green | 124 | . | 148 | . | . |
| By Mr. Galardi | . | 132 | . | 151 | . |
| CHARLES CHAMBERS | | | | | |
| By Mr. Galardi | 159 | . | . | . | . |
| By Mr. Hughes | . | 193 | . | . | . |
| By Mr. Bast | . | 196 | . | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|

(Some received under seal.)

. . .

**HOUSTON, TEXAS; TUESDAY, DECEMBER 21, 2021; 10:00 A.M.**

THE COURT: All right. That takes us to 10:00 o'clock. Officially, good morning, everyone. This is Judge Jones. The time is 10:00 o'clock Central. Today is December the 21st, 2021. This is the docket for Houston, Texas.

On the 10:00 o'clock docket we have the jointly administered cases under Case No. 21-32351 Limetree Bay Services, LLC.

Folks, please don't forget to record your electronic appearance that's a quick trip to the website, a couple of mouse clicks, you can do that any time prior to the conclusion of the hearing.

The first time that you do speak, please, state your name and who you represent. That really does help the court reporters if a transcript is requested.

Finally, we are recording using CourtSpeak, hopefully you've had the opportunity to use it, but the audio will be up on the docket shortly after the conclusion of the hearing.

All right. So who is taking the lead this morning for the Debtors?

MS. GREEN: Your Honor, Elizabeth Green on behalf of the Debtors. I'm going to take lead for this, and then Mr. Rose is going to take the lead, and Mr. Delaney may

address some of the objections.

THE COURT: Oh. Just fine. Ms. Green, you just may know this already, but I do not see your video.

MS. GREEN: It will not come on and I am trying to connect with my iPad and it's telling me that there's an error. So I just restarted the iPad. I tried restarting the computer and doing the, you know, turn off all apps and I did all of that, so I don't know what's going on.

THE COURT: Hmm. Okay. I want you to just take just a minute and focus on that and see if that works, then we can get started.

MS. GREEN: Okay. I apologize.

THE COURT: No apologies necessary. We'll get ski reports from around the country.

MS. GREEN: We can only dream, right.

MR. GALARDI: Your Honor, this is Greg Galardi on the ski report. I heard Vail was late on snow as well. I apologize for any background of my hotel room. It's also late here as well.

THE COURT: I'm sorry to hear that. And I'm sorry you're having to spend time with me while you're in a hotel room in Colorado.

MR. GALARDI: We've spent a lot of quality time with Mr. Hughes and Mr. O'Hara over the last four days, so it's not that ski opportunity anyway, Your Honor, so you understand and

I guess we are all have the good graces to be able to go to these places but sometimes not enjoy them.

THE COURT: Well that's certainly true.

Let's see, Mr. Rose, was that you?

MR. ROSE: Yeah. Your Honor, we're cold enough in New York, but no snow yet. Working on it.

MS. GREEN: Your Honor, I don't seem to be able to fix this. My iPad is telling me that the address is invalid for the meeting and on my computer it won't let me use the camera.

THE COURT: Interesting. And so when you try to do it from your iPad did you -- you typed in Judge Jones for the meeting or how did you get there?

MS. GREEN: I went on and hit the link.

THE COURT: Okay.

MS. GREEN: Where it says Judge Jones, join my meeting, and I hit that. And then once I do that, it said -- hold on maybe -- aha. Might have --

THE COURT: Yeah. This works hundreds of times a day, so there's generally an aha moment somewhere.

MS. GREEN: I think I got it.

THE COURT: There you are. Just always easier --

MS. GREEN: I apologize

THE COURT: No, no, no. It's just always easier to be able to see you.

MS. GREEN: I agree. Okay.

THE COURT: All right. So as a --

MS. GREEN: No.

THE COURT: -- as a point of reference, I have read all of the pleadings that have been filed, so you can make that assumption. And if you want to take a couple minutes and tell me where you are and what you intend on doing today and, you know, have all of the prerequisites been met, have people made their deposits, all sorts of those things, and it would be really helpful to me.

MS. GREEN: Yes, Your Honor. Well why don't we start with that. As you know we filed a designation of winning bidder late on Saturday after two days of an auction and $62 million which was the West Indies Group. And they delivered a $9.8 million deposit today, and so -- well the total of their deposit is $9.8 million so they topped it off --

THE COURT: They had 3.

MS. GREEN: -- approximately $9.8 million that's been received. Mr. Shapiro is here, he can testify to the fact that it's been received.

THE COURT: All right.

MS. GREEN: So we are ready to go forward.

THE COURT: Okay. All right. And could you just give me just a brief overview of what I'm going to see and

what objections you've been able to resolve and which ones you haven't been?

MS. GREEN: Yes, Your Honor. Most of the limited objections have been resolved. I think we are still working on some language related to some of them. I know I can go through this. Docket No. 823 has been resolved, which is the SNM Nasco (phonetic) objection.

THE COURT: Okay.

MS. GREEN: 824 Universal Plant and Services.

THE COURT: Okay.

MS. GREEN: 825 Analytics Stress Relieving.

THE COURT: All right.

MS. GREEN: I think Harris County is -- or I'm sorry, the Galinda Park Independent School District at 838 is in process.

851 HKA Enterprises -- and Mr. Delaney may have a better handle on this -- I think we're awaiting language related to the sale order.

THE COURT: Okay.

MS. GREEN: The same for 854 and 871 which is Axens.

THE COURT: Okay.

MS. GREEN: 863 SAP America we have proposed sale orders language pending approval.

869 Harris County the same.

870 Slow serve and objection to proposed cure amount

is resolved.

822 and 875 are the Terminals' objections. I know there's been some back and forth on that language in the order and the last e-mail I saw, about five minutes before the hearing, was that there's one issue related to language in the order.

THE COURT: Okay.

MS. GREEN: 895 objection to proposed cure amount is resolved.

850 I believe Mr. Kincheloe will confirm that, that's been resolved with the sale order language.

THE COURT: Yeah. That shouldn't be hard. All right.

MS. GREEN: And then 869 Harris County that's a pending language approval. So most of those --

UNIDENTIFIED MALE: Ms. Green?

MS. GREEN: Yes.

UNIDENTIFIED MALE: I believe that's been agreed to for the purposes of the hearing, so Harris County has been confirmed.

MS. GREEN: Okay. Perfect. So the real outstanding objections are at 835 and 952 for Bay Limited, and 856 and 957 for the St. Croix Energy Groups those of whom you know were bidders at the auction.

THE COURT: All right.

Then Ms. Green, do you want to make any opening remarks before we proceed ahead with the evidentiary presentation?

MS. GREEN: I do, Your Honor. And I want to start with the request for the St. Croix group for a continuance if they're still seeking such continuance.

THE COURT: So Mr. Galardi, I assume that, that motion remains pending, correct?

MR. GALARDI: Yes, Your Honor. And I think that will part of the evidentiary presentation today. So I think it should not be dealt with separately, but we can go through the evidence.

THE COURT: That's certainly fine with me.

So, Ms. Green, if you want to address any comments to that, perfectly fine. And if you want to just do it through the evidence, that is fine as well.

MS. GREEN: Sure. Sure, Your Honor. So the St. Croix Group indicates that the hearing should be continued for a myriad of reasons including that they would have time to raise additional funds. However, the auction was held on the day that the St. Croix Group chose, they've been part of the process for months and months.

And the closing on a refinery isn't exactly like buying a blank piece of real estate, there are a lot of issues related to the closing. Including dealing with the terminals

issues, the EPA agreements, et cetera. I think the debtor here has put approximately $10 million at risk, and has committed to close, and I think they need to be selected as the highest and best offer and the winning bidder today, so that they can do everything that's required to close. In fact, Mr. Galardi, told the EPA that they wouldn't deal with any consent decrees until they were chosen as the winning bidder. So we all know that there are things that need to be dealt with in order for a closing on this refinery.

The debtor has exercised its business judgment. I know there are objections by competing bidders, but it's not their business judgment that's at issue today, it's the debtor's business judgment. The Debtor is considered the voice of -- it's advice of it's professionals, it's chosen the offer that's the highest and best offer for the Debtors, the estate will benefit from this, there's proper notice of the hearing, and there's been due consideration to all of the bidders.

The process was run by Michael O'Hara of Jefferies and Mark Shapiro of the Riley (phonetic), two respected professional firms who conducted the auction in a manner that was most fair to all concerned I believe. The auctions took place over an extended period of time. And we believe that with $10 million at risk, the St. -- the West Indies Group has every reason to close, 10 million of them in fact. And we

believe that the Debtor's business judgement should be upheld and that it should be -- the sales to the West Indies Group should be approved today.

THE COURT: All right. Thank you.

Anyone else that supports the Debtor's motion wish to make any opening remarks?

MR. WARNER: Your Honor, Michael Warner with Pachulski Stang on behalf of the Committee. Good morning, Your Honor.

THE COURT: Good morning.

MR. WARNER: On the phone with me are two of my partners, as you'll see, and Mr. Feinstein and Mr. Pomerantz (phonetic). I'm not going to make any opening remarks we want to hear the evidence and I will reserve for basically closing, but I didn't want the Court to take my silence as anything other than I want to hear the evidence.

THE COURT: Certainly. Has the Committee made it's decision whether they support the Debtor's business judgement or has it not made a decision yet?

MR. WARNER: The Committee has made a decision which predates the information that came out last night and so we really would like to hear the evidence about that information. I can't tell you it will change the Committee's decision, nor can I tell you that we will be able to get a new discussion with the Committee given that we're going to hear the

evidence, all of us, at the same time.

THE COURT: Well so that was going to be my -- that was going to be my inquiry. Are you going to need a break at the conclusion of the evidence to reconvene for a short Committee meeting?

MR. WARNER: I think it depends on the evidence that we hear, and how the professionals assess that evidence, and what we may want to say to the Committee if anything.

THE COURT: Got it.

MR. WARNER: It's a plea, but the answer could be absolutely yes.

THE COURT: I got it. And obviously -- and I know you know this, but I'll just put this in the back of your mind, I mean your Committee members are certainly welcome to watch and listen so that they are educated should a further discussion be needed.

MR. WARNER: At the risk of being presumptuous --

THE COURT: You already are.

MR. WARNER: -- knowing that the Court would say that. The Committee was told last night that this was going to be a spirited hearing and we'd encourage everybody to listen.

THE COURT: Fair enough. That's all you can ask. All right. Thank you, Mr. Warner.

Anyone else that supports the Debtor's motion wish

to make any opening comments?

MR. KINCHELOE: Rich Kincheloe for the United States, Your Honor. I neither support nor oppose, but I do want to slide in the middle if this is the right time?

THE COURT: Sir, go ahead.

And Mr. Bast, I saw you and I'll get to you in just a moment.

MR. KINCHELOE: Your Honor, I can confirm that the objection at 950 is resolved. The sale order language resolved the objection appears starting on page 127 at document 967. So assuming that sale order is approved or something substantially similar we're fine.

I also want to say on the record that regardless of the outcome of today's hearing all of the professionals for all three bidders, the Debtor or Committee have been a pleasure to work with. And I know there have been a lot of difficult Federal Government issues and it is appreciated and the diligence they've shown to getting issues resolved.

THE COURT: I appreciate you saying that.

Mr. Bast? Ah. Hold on, I just saw you pop up. How about now?

MR. DAVIDSON: Yes, Your Honor. This is Tad Davidson.

THE COURT: Let me get Mr. Bast.

Mr. Bast, I have activated all of the hand raises

that I've seen. Any chance you have me muted from your side? So you can -- so I can -- Mr. Bast I know you're talking, we can't hear you. So have you hit five-star on your phone your going to have to shake your head yes or no. Oh. You had not hit five-star.

So if you'll hit five-star. Have not see that pop up yet. So Mr. Bast, I'll keep watching but it's five-star on your phone. Let me just check and see if there's anyone else. I will -- we'll figure out how to have you be heard.

Mr. Davidson, I know I unmuted you, did you want to make any comments with respect to your client's position?

MR. DAVIDSON: We do, Your Honor. Good morning, this is Tad Davidson from Andrews Kurth for the Limetree Bay Terminals, LLC. We're supportive of the Debtor's decision to sell to the West Indies Group. We've worked with the top lawyers, as well as the Debtors, on language in the sale order, we're waiting for final approval from my client, we should be there.

The one point I want to make Your Honor, is we're going to try to work through a direct agreement with the West Indies Group between Terminals and them to deal with some of the assurance services that we complained about in the past and we fully expect to be able to work through that prior to closing. But I just wanted to make clear we reserve all our rights regarding that agreement if we can't come to some sort

of agreement today, Your Honor.

THE COURT: Got it, thank you.

Mr. Bast, I unmuted someone else.

MR. BAST: (Indiscernible).

THE COURT: Oh. We got you. Okay good.

MR. BAST: I think you can hear me now. Yes. Thank you, Your Honor. And I appreciate your patience.

THE COURT: Yeah.

MR. BAST: So Jeffery Bast for West Indies Petroleum Limited and Port Hamilton Refining and Transportation. Obviously, we support the Debtor's sale motion and would oppose any continuance of this hearing. As Ms. Green indicated, our clients have put nearly $10 million at issue. We have worked around the clock for the last several days, I've lost count, and we are working diligently and prepared to close. However, many of the closing negotiations cannot take place until the sale is approved and so we are urging the Court to continue -- proceed with the hearing today not continue it. Proceed with the hearing today and hopefully approve the sale and enter an order so we can commence negotiations.

Our client needs to work with among others the EPA, you just heard from the terminal entities, the US Virgin Islands, negotiating new contracts with virtually all of the vendors for goods and services, and so we have a lot of work

to do, in addition to business permits, utilization agreement, and handling certificates of titles. So we are raring to go. And we hope the Court will proceed with this hearing today and approve it.

THE COURT: All right. Thank you.

Anyone else?

Mr. Brookner?

MR. BROOKNER: Yes, Your Honor. On behalf of the DIP lender I just wanted to say we attended the auction every solitary moment of it. We think the Debtor's professionals did a great job handling what was arguably an unnecessary variety of issues -- unnecessarily difficult auction. We support the Debtors business judgment and the motion.

THE COURT: All right. Thank you.

Anyone else that supports the Debtor's motion wish to make opening comments?

All right. Any parties that oppose -- I'm sorry. Yes, ma’am.

MS. VANLARE: -- Your Honor. Good morning, Your Honor. Jane VanLare, Cleary Gottlieb Steen and Hamilton on behalf of Goldman Sachs agent for the revolvers.

Your Honor, we also speak in support of the Debtor's motion. We urge you to enter the sale order and approve the sale. We too agree that the Debtors ran a full and robust process after Your Honor reopened the auction. It was a

two-day auction, it was a fair and transparent process where bidders had an opportunity to bid. We think that the opening bid did bid the highest but in support of the Debtor's business judgment in finding it to be the winning bid. And we think that continuing the hearing is going to unnecessarily increase cost for the estate and for their reduced recoveries. And in light of all that, we urge, Your Honor, to approve the sale.

THE COURT: All right. Thank you, Ms. VanLare.

All right. Anyone --

Yes.

Your Honor?

THE COURT: Yes, sir.

MR. ALBERINO: One more. And I don't speak much in court. Good morning, Your Honor. Scott Alberino from Nathan Jones joined here by my partner Marty Brimmage who is letting me take the lectern for once.

Your Honor, we represent the Ad Hoc term lender group in this case and we haven't spoken a lot, because there hasn't been a lot for us to say in this case, but I do want to remind, Your Honor, that we are the largest creditor in this case. Our client's own over a billion dollars of debt issued at the operating company and holding company levels. Arguably the largest unsecured creditor as well for Mr. Warner's creditors Committee in this case.

Your Honor we rise to support the debtors business judgement here. The company has run a complex auction. We were hoping the auction would be reopened, this is one of the few things in the case that actually has gone right so far and I think the results speaks for itself.

The auction was run professionally, the Debtors did a very good job consulting with all the stakeholders including our group throughout all the zigs and zags of the auctions. All the different issues that came up, all the issues that were presented by both bidders, and the Debtors did the best they could under the circumstances. And we certainly felt that this was a professionally run auction where both sides were given a fair shot, on an apples to apples basis, to put their best foot forward on the bid.

Now frankly, we're disappointed that we're sitting here today spending -- well maybe millions maybe not millions, but a lot of money on a contested sale hearing run by a loser of the auction. There's a lot of enthusiasm here for the asset and frankly we were hoping St. Croix's enthusiasm would be translated into another bid, it didn't. It seems like it translated into objections and litigation that we're going to face today.

So we'll see what the evidence presents, I'm sure Mr. Galardi has a few things up his sleeve that he would like to show the Court and other parties as to why the Debtor's

business judgement should not be respected here today. But I do want to remind Your Honor, heading into the evidence today, that Mr. Galardi's client was given the chance just like WIPL to put their best foot forward at the auction which started on Friday and continued through the weekend.

So ultimately Your Honor, we certainly support the Debtor's request to approve the sale today. We stand in opposition to the adjournment request as well. We're not sure what will happen, and what the benefit to the estate is in that regard. So Your Honor, that's all we have to say in that respect and, you know, we hope Your Honor, could give the company an opportunity to make their case today.

THE COURT: You know, you should stand up and speak for Mr. Brimmage more often.

MR. ALBERINO: He's a hard act to follow, Your Honor.

THE COURT: All right. Anyone else that supports the Debtor's request.

All right. Mr. Hughes, do you want to start us off on opposition?

MR. HUGHES: Well sure, Your Honor I was actually going to defer to Mr. Galardi who I always like to follow. But I think in a nutshell, I'll reserve a lot of my remarks for the end of the hearing. I think there's been some stuff that's come up over the last 24 hours that are going to merit

further proceedings, and I would like to defer a lot of my comments other than just a general reservation of rights that the first auction should be considered the final auction until after the evidence, if that's okay with Your Honor.

THE COURT: Of course. All right. I was going to let Mr. Galardi go last. So let me just run through again. Anyone else that opposes the sale wish to make opening remarks?

All right. Then, Mr. Galardi, lectern is all yours.

MR. GALARDI: Thank you, Your Honor. First let me say that I do not dispute that the Debtor's and their professionals ran a very good auction during the 17th and 18th. So please don't take any of the comments or the cross-examination that I will do later on to that effect. What I do believe and what you've heard a few people comment upon, Your Honor, is a few things.

First, Your Honor, let's go back to reopening the auction and I do think that the recovery of the information of the Court which Your Honor reopened the auction on was a bid for $30 million to close on December 22nd. At no time on the December 6th hearing, did anyone say this was a complicated transaction and it could not be closed by December 22nd. The fact of the matter is the game changed again when the Debtors revealed on December 15th the outside closing date was now January 21st. That is not in our mind and we will show you

facts as to why that occurred. That is not in our mind, the basis on which Your Honor, reopened the auction.

Your Honor, in addition Mr. Hughes tried to obtain discovery prior to the reopening, we have only finished the auction on Saturday. We have obtained some documents that will be subject to confidentiality and we may ask Your Honor, to review those in camera, but the documents we revealed believe that the basis for the reopening of the auction and the financial wherewithal of the bidder can be seriously questioned. And Your Honor, we would like an adjournment for the purpose of giving that evidence, which we will do today as well, but we have not had an opportunity to take full discovery after the Financial wherewithal and the determination.

And I think what you've heard from a few people being very cautious with the documents we obtained and with WIPL's request that we return those documents, because they are confidential, raises serious questions as to whether the reopening auction was based upon a representation that they could close on December 22nd, when they simply could not close on December 22nd, did not have the financing even for a $30 million bid, and Your Honor, is now being asked to have a sale hearing to approve a transaction.

And the Debtors and every professional here knows that once that sale order is entered, the auction could not be

reopened even if a higher and better bid came in. Now we as St. Croix Energy have had exactly that issue happen. It happened days before we were prepared to go to the sale hearing, and what we think in fairness to St. Croix Energy is there is no reason, as the testimony will show, that, that sale order has to be entered today.

Indeed if we go back to the December 6th date, they were to close the transaction by December 22nd, that was all of 16 days. No one testified, and in fact there was no closing condition no final order condition in that agreement. So we believe that simply that we've been changing the playing field for all parties, and we believe we've been prejudiced, and we believe the evidence will show that prejudice. And that our beliefs as to the financial wherewithwall of WIPL and the basis on which this Court reopened the auction and the basis for approval of the sale and the bona fides of the purchaser can be put into question today.

And we would prefer not to do that, but we do think that it is important to do that. And although we did participate in the auction, at the very beginning of that auction, as the evidence will show, we requested an adjournment, which was denied and we decided to participate subject to our rights to come today to court to say it should not have been reopened and then we found out facts over the weekend that we've been unable to, you know, -- that we need

to bring to the Court's attention whether in camera or in public. Thank you, Your Honor.

THE COURT: So Mr. Galardi, let me -- I just want to make sure I understand if you were -- if you were dictating the outcome of this hearing is that, do you want to be the buyer at 20 or do you want to be the buyer at 52 or 57, excuse me?

MR. GALARDI: Well that's a fairly easy question, Your Honor, I would prefer the auction to have never been reopened at 20. We believe that it should never had been. We think that there was a very material change in what was presented to Your Honor, on December 6th before we got the bid on December 15th.

THE COURT: Right.

MR. GALARDI: The bidders actually changed, Your Honor --

THE COURT: Right.

MR. GALARDI: -- and the timing changed.

THE COURT: Right.

MR. GALARDI: So we would love to have you say that was wrong.

THE COURT: So what if, what if I -- because you know, let's assume that I conclude that -- and you're telling me I'm going to -- is that the closing date was changed without my approval, that it was something I relied on, and I

said okay, I'm going to take that as an issue of good faith. And no one get excited about this, I'm just creating an example. And I say, all right, but you participated in, you made your bid, you can close at 57 are you ready to go?

MR. GALARDI: I believe we are prepared to close at 57 on the 21st, that is correct. That's what our last bid was and we were prepared to close at a lower number on December 22nd consistent with the rules. We made both bids and we would be prepared to go forward and do the exact same ATA on those terms for either one. And we gave the Debtor's that option.

THE COURT: Right. And when you said the 21st you mean January 21st?

MR. GALARDI: I'm sorry. January 21st or December 22nd. We made a series of bids to both of that.

THE COURT: I got it. I just want the record to be clear, that was all I was after. Okay. All right. Thank you for indulging me. All right. Last call, anyone else that opposes the sale wish to make opening remarks?

All right. Ms. Green, are you conducting examinations or are you going to have one of your colleagues do that?

MS. GREEN: Your Honor, Mr. Rose is going to conduct the examination of Mr. O'Hara, I'm going to conduct the examination of Mr. Shapiro and Mr. Bast is going to conduct

the examination of his client Mr. Chambers.

THE COURT: Terrific. All right. Thank you. So are we leading off with Mr. Rose?

MR. ROSE: Yes, Your Honor.

MR. GALARDI: Your Honor, it's Greg Galardi again to interrupt.

THE COURT: Yes, sir.

MR. GALARDI: I would ask that the witnesses be sequestered pursuant to federal rules 615.

THE COURT: All right. So the rule has been invoked. Let's see -- we've got three witnesses, Mr. O'Hara is going to go first so that's largely irrelevant with respect to Mr. O'Hara.

And Ms. Green I assume that Mr. Shapiro is your corporate rep?

MS. GREEN: He is.

THE COURT: All right. So the rule won't apply to him.

And then we've got Mr. Bast -- who is -- you said your client, I actually don't know which person that is as I'm looking on the screen.

MR. BAST: That would be Mr. Chambers and he is the corporate rep.

THE COURT: Well he's not the corporate rep for the Debtor?

MR. BAST: For the purchaser.

THE COURT: Yeah. But that's -- the rule isn't going to apply to you or that exception is not going to apply to you.

So what I'm going to ask that you do, I don't see Mr. Chambers on the screen, if he's listening -- and I'll give you a moment if you want to step off and confirm --

MR. BAST: Okay.

THE COURT: -- I need for him to hang up the phone and not participate and you will contact him by phone and e-mail when it's his -- when it's his time and he's not to talk to anyone about the hearing until we get his testimony, understood?

MR. BAST: Yes, Your Honor. And I will tell -- I would like to inform the Court that he is in my office not in the office that I am sitting -- he's here in another office in my office suite. And so I will walk over and tell him that and we will certainly comply with the Court's directive.

THE COURT: All right. Thank you. Because I don't know if he's on now or not and Mr. Brimmage --

MR. BAST: I believe he is.

THE COURT: Why don't you just take a minute and walk next door and make sure things are disconnected and you can give everyone the representation that he has been virtually excluded from the hearing.

MR. BAST: I will do that.

THE COURT: All right. Thank you. We'll just wait for you here.

Mr. Brimmage?

MR. BRIMMAGE: Good morning, Your Honor.

THE COURT: Good morning.

MR. BRIMMAGE: I just wanted to have my line unmuted for the evidentiary portion.

THE COURT: Oh.

MR. BRIMMAGE: Not that I intend to say anything, but just in case.

THE COURT: Fair enough.

MR. BRIMMAGE: And Your Honor, just for the record it is also not snowing in Dallas.

THE COURT: Fair enough.

All right. Mr. Bast, you comfortable that we can proceed forward now with the rule invoked?

MR. BAST: Yes, Your Honor.

THE COURT: All right. Thank you.

Mr. O'Hara, if you would please sir, if you would raise your hand?

WHEREUPON,

MICHAEL O'HARA

was duly sworn.

THE COURT: All right. Thank you. And Mr. O'Hara I

just noticed there's a little bit of a lag, is this -- this is going to be really important -- any chance you have a set of earphones or anything available to you?

THE WITNESS: I do. Hold on a second.

THE COURT: All right. Thank you.

MR. WARNER: Your Honor, Michael Warner on behalf of the Committee?

THE COURT: Yes, sir.

MR. WARNER: Mr. Galardi invoked the rule and I would asusme the rule applies to all witness in this hearing other than obviously the exception of Mr. Shapiro as corporate rep. And I thought some other parties might be introducing witnesses and I'm just sort of throwing it out there.

THE COURT: No. I'm glad that you did that. I just had understood there were only these three. If there are others, folks need to tell me and thank you for -- thank you for reminding me.

Mr. Galardi, did you intend to call any witnesses?

MR. GALARDI: I did not, Your Honor. I did file a notice that we might and named two people as rebuttal witnesses, one was Mr. Courtney Wilkinson, we will not be calling Mr. Wilkinson.

THE COURT: Okay.

MR. GALARDI: The second was Mr. Roberts and I was advised that Mr. Roberts is not going to attend today's

hearing, and I would have called him in rebuttal, but if he's not attending the hearing I don't think we have an issue --

THE COURT: All right.

MR. GALARDI: -- he's someone that I intend to call at this point.

THE COURT: Thank you, Mr. Galardi.

Mr. Hughes, did you intend on calling anyone?

MR. HUGHES: No, sir.

THE COURT: All right. Thank you. Any other party intending on calling any witnesses today?

All right. Thank you.

All right. Mr. Rose, whenever you're ready to proceed.

MR. ROSE: Thank you, Your Honor.

DIRECT EXAMINATION OF MICHAEL O'HARA

BY MR. ROSE:

Q Mr. O'Hara, can you state your name for the record?

A Michael Patrick O'Hara.

Q And your position with Jefferies?

A I'm a managing director and coed of the US Debt Advisory Restructuring Group.

Q I know you've testified before, but for the Record at this hearing can you please describe your professional experience?

A I've been an investment banker for more than 23 years,

over 15 years of that in restructuring. I've started my restructuring career at Blackstone and then PJT and I've now been at Jeffries for the last year-and-a-half.

Q How long have you been -- or have you been engaged by the Debtor?

A We were engaged by the Debtor, I believe, on July 16th earlier this year.

Q And can you please generally describe the tasks and challenges for your engagement at the beginning of the sale process?

A We were tasked with the MNE process for Limetree Bay Refinery as has been stated earlier this is an extremely complex asset. You know, it's a refinery located on St. Croix. It's been -- it had had it's own issue namely a previous restructuring when it was Havensa (phonetic) five or six years ago. That in itself was fairly complicated. It's a tough asset. I mean there's no way around it.

And probably the main reason associated with that is that, and the reason why it was in bankruptcy, is they had a series of incidents -- environmental incidents that occurred, the EPA had shut down the refinery, and it was under EPA mandate to not be able to restart at this point in time, and therefore EPA permissions were going to be a key aspect to any potential buyer taking on the risk associated with purchasing the asset.

Q And did you have all the time in the world to sell the asset?
A Unfortunately, no. As the Court is aware, liquidity was tight to begin with and getting tighter. Frankly, we thought we were going to run out of money this week. Fortunately, due to the company and the Riley assistance, we've been able to kind of stretch things along. We also got a little bit of money in from settlement from BP that enabled us to elongate the process as best we could and create a competitive environment for the ending process.
Q And how many parties did you contact in NDA process?
A I think it was approximately 185.
Q And how many NDAs were signed?
A I believe 35 were signed.
Q In the process, how many parties submitted LOIs?
A We were getting -- you know, we ended up getting six or seven I think it was seven LOIs, ultimately in various forms. Some more detailed than others. I think three parties in particular were ones that we were focused on particularly after the first bid deadline.
Q And then in the first bid deadline, how many parties submitted going concern bids?
A Those six or seven did were again different flavors of going concern bids. I should have noted the B. Reilly who was running the liquidation process also received, you know,

multiple bids at that point in time as well. But we on the Jefferies side were focused on, you know, parties that were going to be submitting bids on a going concern basis.

Q And how many going concern bids did we receive at the first auction?

A We received one bid on a going concern basis.

Q Oh. Thank you. Were there liquidation bids also submitted?

A There were -- there were -- it was in various parts, but ultimately it was two competitive parties on the liquidation and two competitive parties on liquidating the catalyst. And when we went to auction it was those -- it was a competitive process on the liquidation side. Unfortunately, with only one buyer on the going concern side, it was not a competitive process.

Q And for the going concern buyer, did you qualify them financially to make their bid?

A We did.

Q And was there in fact a first auction?

A There was.

Q And approximately when was that?

A I believe it was November 17th or 18th?

Q Okay. And can you just briefly describe what happened at the first auction?

A We opened the bidding, the competitive bidding for

parties on a going concern basis. St. Croix Energy who was the only party that submitted and was deemed a qualified bidder, submitted their bid. No other qualified bidder, of which there were several, again they were more on a liquidation basis, chose to compete with St. Croix's bid. We then closed that portion of the auction and went to the catalyst. We had a competitive auction there the winning bidder was savings, we then went to the rest of the assets. Again, it was a competitive auction of which they, ultimately after multiple rounds of bidding, became the lead buyer on a liquidation basis.

Q And was a winning bidder and back up bidder selected at the conclusion of that auction?

A Yes. St. Croix was deemed the winning bidder and they -- and saving, based upon their liquidation bids, were deemed to be the back up bidder.

Q And at the conclusion of the auction was the St. Croix transaction fully documented?

A No. Well we had received an executable EPA, it was contingent upon reaching agreement on a transition services agreement, which was in process, but we knew was going to take a little while in order to reach agreement on terms and ultimately document.

Q And then did the sale hearing happen right after the first auction?

A No it was pushed to several weeks later.

Q Okay. And then why was that?

A Well we knew we had to reach agreement on this transition services agreement. It was also coming up on the Thanksgiving holiday, and so it was pushed to I believe the Tuesday after the Thanksgiving holiday.

Q Were you contacted by another bidder after the conclusion of the first auction?

A I was. I'm sorry, I got my timing wrong. It was actually a week after the Thanksgiving holiday that the sale hearing was scheduled for. And it was after the Thanksgiving break that I was contacted by another party.

Q And what happened?

A It was the representative for the West Indies Group. West Indies had been one of the parties, leading into the initial auction, that we felt could be one of the three parties that I had mentioned earlier, you know, a potential bidder in the initial auction.

I had been informed prior to that auction that unfortunately the CEO had a medical incident that was going to preclude them from being able to bid. They contacted me after the Thanksgiving holiday saying that the medical incident was successful and that they still had a desire to bid. We said the auction was closed, they continued discussions, and ultimately put forth an assigned EPA at a pretty significant

uptick in value, a $30 million bid. They provided a deposit and with that we took that information to the Court.

Q And did you qualify this bidder to financially for their bid?

A Yes. We received two years of audited financials from PWOC (phonetic) regarding West Indies Petroleum Limited which is a private company that was making the bid. It showed a fairly substantial operations. It's a wandering business in the petrochemical space, they had you know, hundreds of millions of revenue, granted small margins. They had a balance sheet with reasonable amount of liquid assets, in the 25 million range between cash and short term investments, and we understood that the shareholders behind it all had individual wealth themselves.

Q Were you satisfied that they had the financial wherewithal to close the transaction they proposed?

A We did.

Q And after receiving all this information, did the Debtors reopen -- seek to reopen the auction? Yeah. Seek to reopen the auction?

A We did. We thought that in light of the bid that was made and the circumstances surrounding it, that it merited a reopening of the auction and with that information we went to the Court to seek approval.

Q And the Court reopenend the auction?

A They did.

Q In prepration for the second auction, can you briefly describe what the Debtor's did to compare the bids?

A Yes. We -- there was a variety of differences between the bid from West Indies and the bid from St. Croix. So some of which was timing, so we had a timing element of the potential closing be associated with the St. Croix bid of December 22nd, versus what eventually became a closing date that the West Indies Group was prepared to move forward on which was January 21st. We had the transition services agreement, which we're still an important component of the St. Croix energies bid, that was not a component involved in the bid from West Indies. We had a land component of the initial bid from the St. Croix group that did include the taking of the land until some future point in time that they would designate, versus the West Indies bid was taking the land. And all of those components were put into calculations in order to create an apples to apples scorecard so to speak that each of the bidding parties as well as the representatives in the case could understand how we were stacking up each of the bids. Ultimately, it came down to timing and the operational costs associted with the bidder continuing to operate the business and who was picking up what expenses both operations and professional fees.

Q And did you describe these proposed adjustments --

financial adjustments to the bidders?

A Yes. We actually spent several hours with each of the bidders as well as all of the professionals involved in each -- you know, each of the key constituents. And so that everyone had a fair understanding -- and I apologize I'm sorry we also did the same of course with the Bay and Stevens Groups as well as liquidating bidders, so that they understood how they stacked up to the two going concern bids.

Q And you said you described that the process of adjustments to was it the UCC?

A Yes, sir, that is -- yes. We did to all key constituents. So the UCC Arena, Goldman, and the term lenders.

Q And then can you describe the bidding that took place after the auction?

A It was -- as was suggested before -- it was a complicated process because of again the different variables that were at stake here. We started the process -- per the bidding procedures, the increments and bid were five percent of the purchase price using the initial bid from St. Croix, at $20 million, I meant those were million dollar increments. We had again provided scorecards that everyone understood how their bids were going to b stacked up.

We announced the West Indies Group, which had improved it's bid from 30 million to 31.5 million to account

for some of the adjustments that I had outlined in regards to timing for their later closing dates, which we thought was a key improvement to their respective bid. And with that we opened the auction with St. Croix Energy to bid, which they did. We then asked the Steven and Bay teams if they were going to bid and be competitive with the going concerns. They reserved their rights, but did not bid at that point in time. And with that the auction proceeded with the two parties for multiple rounds.

Q And throughout the auction did you consult with not only the bidders but each of the key constituents?

A Yes. We had several structural changes in the bids that occurred within the auction, and the taking of the land by the St. Croix group was a key aspect and the timing associated with how they were prepared to do that. There was concerns about, you know, making sure that parties had the proper amount of deposits in order to ensure that this wasn't you know, just an optionality per the bidding procedures, it was 15 percent of the final purchase price. You know, there were debates as to whether that was enough. We had changes in the structure. We had additional securities, or different types of take back securities that were ultimately introduced and debated. Again all of these were consulted with the UCC, Arena, Goldman, and term lender representatives.

Q And how many rounds occurred at the auction?

A We ended up having eight rounds between the two bidders, West Indies and St. Croix.
Q And approximately how many hours did you conduct the auction -- for how many hours did you conduct the auction? Approximately. We won't -- stopwatch.
A Yeah. I'm going to say it was 14 to 15 hours in total.
Q I think that's right.
A Yeah.
Q And how did the auction end?
A In the last round the St. Croix Energy team once again adjsuted their structure so that it was close to -- not exact but close to the structure adopted by West Indies Petroleum including moving their closing date to January 21st and bidding 57 million. WIPL -- I'm sorry, West Indies Petroleum bid 62 milion, and at that point in time, St. Croix Energy reserved all it's rights but agreed to be the backup bidder.
Q And was a winning bidder and a backup bidder selected at the conclusion of the auction?
A Yes. With that conclusion WIPL was assigned as the winnig bidder and St. Croix Energy was assigned as backup bidder.
Q And since the auction, have you had any calls with the winning bidder to confirm their ability to close?
A Yes. We had a call yesterday.
Q And what did you discuss with the West Indies Group?

A Well the West Indies Group had always suggested that they would be using cash on hand, that they had on the books, as well as raising equity capital from their stakeholders, which they confirmed. They also confirmed that they had brought on a partner Dave Roberts who had previously been -- well to be clear Dave Roberts had been an unsecured creditor, he was on the Committee, he had dropped off before the -- between the first bid deadline and the second bid deadline and had been potentially proposed as a bidder in the auction with another party. We understood that he had now become a partner with West Indies Petroleum and was also providing capital on the case.
Q Is there a substantial difference between qualifying the St. Croix Group and qualifiying WIPL in terms of other guarantees from both, you know, do they both back their bids with LTs?
A No. And that was always one of the difficult parts of this case. It's not like you know, when Shell was bidding here and you see the cash and balance sheet -- you know, both parties had put forth financial information. You know, WIPL with, again audited financials from PWC, and you know, assurances of what they were doing from an equity capital raise. The St. Croix group we had received a what I'll call a financial scorecard from their lead financial investor Dave Johnson that showed, you know, a series of liquid and no

liquid assets that amounted frankly very close to the existing purchase price. But we understood that they would probably have to be raising financing as well.

Q Yeah. I just want to clarify one thing. Was Mr. Roberts a member of the Creditor's Committee? I think you said --

A He, he, he, he was and when it became apparent that he was potentially going to be a bidder, he dropped out. This was again before the first auction. We knew that he had been working with another party and had been preparing to bid with that party. Within the auction he was one of the parties, frankly, that we had hoped would be competing in the case. We understood that ultimately they weren't able to get the support necessary to make the bid.

Q Was the Creditor Committee member Mr. Roberts or a company?

A No. It was Excel USA which is the business which Mr. Roberts is CEO.

Q And do you believe the sale process with all it's complications resulted in the estate getting the highest and best offer and value given the amount of time the Debtor's had to run this process?

A Yes. It was very consuming but worthwhile endeavor in qualifying all the bidders including the liquidating bidders in this case. And we ultimately were able to create a competitive auction that I think maximized the value of what

we were able to get for the auction to ultimately and hopefully restart operations for this refinery.

Q And did you recommend to the CRO and the Debtor's board to approve the WIPL bid as the winning bid and SCE as the backup bid?

A Yes. I did.

Q And why?

A Again it was as competitive of an auction you're going to get. Both parties had transparency as to -- at least the Debtor's viewpoint. And again it's the Debtor's viewpoint but with consultation from all of the key parties that were in the estate. And ultimately we landed on what we think was the highest and best offer.

Q And did you believe the process was an arms length process with both bidders?

A We had as much full transparency as we possibly could in this case.

Q And do you believe that a delay in the sale hearing would create any potential issues?

A We worry in light of the estates liquidity position that if we don't have certainty that it could become problematic and hence the reason why we thought it worthwhile and the right thing to do in going forward with the case today.

Q Thank you.

MR. ROSE: Your Honor, that's -- those are the only

questions, I just reserve the right to recall Mr. O'Hara depending on what happens today and I know that may mean he may be sequestered based on this morning's rulings. But I turn it over for cross.

THE COURT: So Mr. Rose, I want to make sure. So you are passing the witness, but what are you reserving?

MR. ROSE: Just the right for Redirect?

THE COURT: Oh. Certainly for Redirect.

Coleen

THE COURT: All right. Anyone else have questions for Mr. O'Hara that supports the debtors' request?

(No verbal response)

THE COURT: All right. Let me ask, Mr. Galardi and Mr. Hughes, have you all talked -- I'm not trying to -- I'll -- if you tell me what you all have discussed, I'll try and honor that. Is that -- Mr. Hughes, are you going first? Mr. Galardi, going first?

MR. HUGHES: I always like to follow Mr. Galardi, and I think he probably has more pertinent questions, but I'll try to follow up --

THE COURT: All right.

MR. HUGHES: -- if he doesn't cover anything.

THE COURT: All right. Mr. Galardi.

MR. GALARDI: Thank you. Thank you, Your Honor.

CROSS-EXAMINATION OF MICHAEL O'HARA

BY MR. GALARDI:

Q Mr. O'Hara, when is the first time that you heard that Dave Roberts was part of the bidding group?

A I believe it was -- I believe it was after the auction had been reopened, the end of that week. So I believe it was December 10th, is when I --

Q (Indiscernible)

A -- (indiscernible)

Q And at that time, had Mr. Roberts been qualified as a

qualified bidder by you as of the bid deadline?
A Mr. Roberts, no, he -- he did not submit a deposit before the bid deadline.
Q Okay. And when you reopened the auction, were you aware that Mr. Roberts might be providing financing to WIPL in connection with the WIPL bid of $30 million.
A That's -- my understanding from WIPL's representatives is that there had been no agreement as to Mr. Roberts' participation -- actually, I don't even know if it's been formalized as we sit here today. There were discussions about his participation within the bid. I had been told that it was unnecessary for the thirty-million-dollar bid for Mr. Roberts' participation.
Q Okay. So Mr. O'Hara, did you understand that Mr. Roberts, or at least his company, was a member of the creditors' Committee at the time the initial bids were made?
A If you don't mind clarifying which bids you're referring to because -- are you talking about indications of interest or are you talking about qualified bids?
Q Qualified bids.
A He already left the Committee before qualified bids.
Q Do you remember if he was a member of the Committee when SCE or St. Croix Energy submitted its initial bid?
A I -- I will say I don't -- I don't know the timing of when he left the Committee versus the timing of when he

submitted the bid. I -- it was -- frankly, it was around the same time.

Q Okay. And do you think it was important for the Court to know that a member of the Committee might be a financial sponsor in a reopened auction?

A I wasn't aware that they were going to be until after the fact.

Q Okay. So you didn't find out about his being a financial sponsor of this bid until after the Court reopened the auction with respect to the thirty-million-dollar bid, correct?

A Well -- well, no. I -- as I testified, I don't believe it was (indiscernible) participation was in regards to the thirty-million-dollar. We found out after the fact that he may be a part -- become a partner within the case. And frankly, we viewed that as a positive.

Q Okay. Well, Mr. O'Hara, you testified in support of reopening the auction, correct?

A I did.

Q And your request to reopen the auction was based on your understanding that WIPL's CEO had suffered a medical emergency. Is that correct?

A Yes, that was my understanding. Yeah.

Q Okay. And by -- from where did you get that understanding?

A From the representative for West Indies Petroleum.
Q And what representative was -- who was the representative of West Indies Petroleum that gave you that information?
A It was their legal representative, Tom Eagan.
Q Okay. And did Mr. Eagan advise you that this was an unscheduled surgery for Mr. Chambers?
A No. Again, I just want to be cautious of any disclosure of any medical information. But our understanding was, is that he had a scheduled medical issue on Monday, the day before the auction, but that he suffered a medical incident the Thursday night, the day before qualified bids were due.
Q And do you know if he suffered this incident while he was in St. Thomas, was it when he was in Jamaica, or was in the United States?
A I -- my understanding is that he was in the United States.
Q Okay. And do you know if he was there for the scheduled procedure that had been scheduled well in advance of the bid deadline?
A Yes, my understanding is that he had been at the medical hospital that he was prepared to have that surgery. Frankly, we understand that that was one of the things that (indiscernible)
Q Okay. And Mr. O'Hara, in your declaration, you stated

that WIPL -- you had determined that WIPL had the potential wherewithal to consummate the proposed -- I'm going to call it the "thirty-million-dollar transaction," within the time frame provided by the APA. Is that correct?

A Yes.

Q And that's the -- and just for the record, it's Paragraph 6 of your declaration that you support -- you put in support of that declaration -- in support of reopening the auction, correct?

A Yes.

Q And with respect to the APA submitted by WIPL, there was a joint bidder at that time called "St. Croix Refining and Transportation Company," correct?

A I believe that was the special purpose vehicle that they were using to participate, yes.

Q Well, when you understand it was the special purpose entity it was using, did you do a finance -- an independent investigation of that company's financial wherewithal, to determine whether it had access to sufficient resources to close the transaction?

A My understanding that -- was that it was just a legal shell that was going to be utilized as part of the bid.

Q Okay. And Mr. O'Hara, you testified at the reopening of the auction that you were provided audited financials with respect to -- I'll call it "WIPL." Is that correct?

A Yes, we received two years of audited financials from PWC.

Q And did you -- and was one of those years 2020?

A It was, yes.

Q And do you recall in those financial statements saying that WIPL had breached its covenants and all of its debt was reclassified to current liabilities?

A I don't recall. I'd have to go back and look.

MR. GALARDI: Your Honor, one of the questions we will have -- and I'm sure Mr. Bast will -- there is confidential information. I have the 2020 audit and would like to have Mr. O'Hara, at some point, review it. I don't know how Your Honor wants to deal here with respect to confidential information. I'll continue for now. But before I finish my cross, I'll come back to that. There's probably a couple of documents.

THE COURT: Got it. And let me ask you this, Mr. Galardi: Do I have them?

MR. GALARDI: I think -- I'm going to say my colleague (indiscernible) we had submitted documents to your clerk in -- for an in camera review. We've noted that there is an issue as to confidentiality. There is a long story that I think many of the parties on the call know. So I believe you do have those documents, given to you under seal. If not -- we didn't file a motion under seal. We provided it

just in case we need to get to the in camera today.

THE COURT: All right.

MR. GALARDI: But I think those are there or they can be on their way shortly, if not. She is on the call today.

THE COURT: Got it. Just let me -- just let me check one second.

(Court and court personnel confer)

THE COURT: Okay. We're looking.

MR. GALARDI: Thank you.

BY MR. GALARDI:

Q Now what I'd like to know --

MR. GALARDI: and I'm going to ask if the Court may allow (indiscernible) I can't pronounce her name very well, I apologize, she should pronounce it for all of us -- to be able to share screens with documents that I can share --

THE COURT: Certainly. Could I --

MR. GALARDI: -- and show Mr. O'Hara.

THE COURT: Of course. Can I ask her to turn on her camera very quickly? It will save me from going through a hundred and some-odd names.

MR. GALARDI: She's got -- yeah, I see her scrambling to do it.

THE COURT: All right.

MR. BAST: Your Honor, this is Jeffrey Bast again.

I just wanted to clarify that Mr. Galardi is not showing the contested document now. Is that correct?

THE COURT: Yeah, he just -- he's showing --

MR. GALARDI: That's correct.

THE COURT: Yeah, he's going to wait until he gets to that point and we also -- I want to make sure that I have that, so that I understand what the issues are and we have a much better conversation.

MR. BAST: Understood. Thank you.

MR. GALARDI: Your Honor, I would like to have put up on the screen the APA that was submitted December 5th, 2021.

(Court and court personnel confer)

MR. GALARDI: It would be the APA that was submitted in connection with reopening the auction; that is, the executed version. And that's the page. Thank you.

BY MR. GALARDI:

Q Mr. O'Hara, I could show you the entire document. But is it your understanding that, on December 5th, in support of reopening the auction, there was a signed APA between the debtors and West Indies Petroleum, a Jamaican corporation, and St. Croix Refining and Transportation, that was excuted?

A Yes.

Q Okay. And you see who executed it on behalf of West Indies Petroleum, right? That's Mr. Chambers, correct?

A Yes.
Q And the other bidder at that time was this St. Croix Refining and Transportation, LLLP, correct?
A I believe it's a joint bidder, but yes.
Q It's a joint bidder, correct.
And that was signed on behalf of another company called "Virgin Islands Refining Company, LLC," correct?
A It is, yes.
Q And did you do any financial diligence with respect to the west -- the Virgin Islands Refining Company, in determining whether these bidders could close the thirty-million-dollar transaction?
A I -- I hesitate only because I -- Virgin Islands -- I -- I -- I'm not sure that this was the entity that had previously made a letter of intent. And the reason I hesitate is becuase I do know that Edward De La Valle (phonetic), who was -- you know, he's the refining operator and has been involved in the case for a very long period of time -- was involved with a previous bidder that has a Virgin Islands name. I don't know if that was the same company. If it -- if it was the same company, then we did do financial due diligence on that respective company, you know, that was made up of some wealthy individuals we were aware of. So (indiscernible) we had. But as it relates to this particular bid, we were most focused on the West Indies Petroleum

Limited.
Q Okay. But was Virgin Islands Refining Company ever determined to be a qualified bidder by the bid deadline?
A No.
Q Okay. And do you know if Dave Roberts have any membership interest in west -- in the Virgin Islands Refining Company, LLC?
A I -- I do not know.
Q And do you know what other parties have interests in St. Croix Refining and Transportation, LLLP, other than the Virgin Islands Refining Company, LLC?
A I -- I'm not aware of any.
Q And do you know what West Indies Petroleum's interest in St. Croix Refining and Transportation, LLLP is?
A I -- I do not know.
Q And did you do any inquiry regarding that matter?
A No. Well, our understanding was that the St. Croix Refining and Transportation, LLLP was the St. Croix vehicle, you know, legal vehicle that was being used in order to purchase the asset with the backing of the West Indies -- West Indies Petroleum Limited. And again, that was where our focus of our diligence was.
Q But you did --
MR. ROSE: Not to interrupt Mr. Galardi, not to interrupt Mr. Galardi, per se. I just wanted to make sure

that we're on the record with our objection to Mr. Galardi's standing to ask these questions. So, Your Honor, we object to Mr. Galardi's standing as just a bidder to ask about the financial wherewithal of the other bidders.

THE COURT: Understood. And I think that we --

MR. GALARDI: I would give --

THE COURT: -- addressed --

MR. GALARDI: -- two responses, Your Honor.

THE COURT: So I don't want them.

Given the circumstances by which we got here, under ordinary circumstances, I would absolutely agree that a disgruntled bidder has absolutely no standing to participate in a hearing to approve a sale. But this has been unusual, and I told Mr. Hughes, as well as Mr. Galardi, I'm going to hear them out. I want to make sure.

There have been some things -- again, I'm not saying that anything is right or wrong or anything. But this has not gone exactly the way I had in my head, so I'm going to hear it out to make sure that --

MR. ROSE: Okay.

THE COURT: -- I understand what actually happened.

But Mr. Rose, your objection --

MR. ROSE: Understood.

THE COURT: -- is duly noted. And I -- you know, I may be in error by doing it, but I'm going to -- I'm going to

hear them out.

Mr. Galardi, go ahead.

(Participants speak simultaneously)

BY MR. GALARDI:

Q (Indiscernible) do have an expense reimbursement, as well.

MR. BAST: Judge, just for purposes of the record -- this is Jeffrey Bast -- I would also support and adopt the objection to the standing, not only the standing to be heard, which I understand the Court's ruling, but also the standing to inquire as to the financial wherewithal of a competing bidder.

THE COURT: Right. Well, I don't take --

MR. BAST: I (indiscernible)

THE COURT: -- take -- I don't take this -- fair enough. I don't take this as testimony genuinely about financial wherewithal. This all has to do with was I given all of the information, was this really done in a transparent and straightforward manner, as it has been represented to be.

But your objection is certainly noticed. I'm not sure you have standing to participate, either, in this. But we will -- we are going to let everyone have their say today.

Mr. Galardi, go ahead, please.

MR. GALARDI: Thank you, Your Honor. Let me see where I am. If we could just move to the first recital of

this asset purchase agreement, just to finish out this thought.

THE COURT: And Mr. Galardi, since I've been interrupting you -- and my apologies -- I have checked my chambers. I don't have copies of documents. Can you sort of have somebody on your team sort of run back through there and figure out where things are?

MR. GALARDI: Sure thing. The person who's probably best to do that has just moved the screen to Page 1. But hopefully, we can handle that.

If you would just -- not the recitals. But if you would move to the first introductory sentence. And if people's eyes are like mine, you may want to make it a little bit larger. Right there.

BY MR. GALARDI:

Q Mr. O'Hara, your understanding, based on this introduction, was that St. Croix Refining and Transportation, LLLP, a Virgin Islands Limited Liability Partnership (indiscernible) was actually formed by West Indies Petroleum. Was that your understanding?

A Yes, I -- I believe that to be the case. I think -- again, my understanding was that the St. Croix legal entity was formed in order to be the purchaser with West Indies Petroleum, you know, backing it.

Q And let me ask, under (indiscernible) with that, was it

your understanding that this was the entity that was actually going to take title to the assets?
A That is correct.
Q And was this the entity that was actually going to seek the transfer and the permits from the EPA?
A That was my understanding.
Q And was this the entity that you understand would be actually entering into a shared services agreement with the terminals?
A Yes.
Q And did you investigate the financial backing of WIPL to this entity and its commitment to provide them the financial wherewithal to close the transaction, assume the operating agreement with (indiscernible) to be able to get the EPA approval?
A Yes, that's what we did for them (indiscernible)
Q And you made an independent determination that SCRT had the ability to take a transfer and would pursue the permits required by the EPA.
A That -- that is correct. That's what we were advised was going to be (indiscernible) to -- as that was also the same way that SCE was doing it, we thought that was fine.
Q Well, actually, that's not correct, correct? Isn't SCE taking the assets itself?
A Through a -- through a similarly situated St. Croix

entity, yes.

Q But did you disclose to the terminals that it was SCRT, as opposed to WIPL, that would actually be the party to the contract?

A I did not have any conversations with terminals.

Q And did you disclose to the U.S. Virgin Islands that it would be SCRT and not WIPL that would soon be operating (indiscernible)

A I did -- I did not. I -- perhaps some of the -- the debtors' advisors had (indiscernible) those conversations, but I was not aware.

Q And did you disclose to the EPA or the other government regulatory agencies that it would be SCRT that would, in fact, be taking a transfer of the permits or entering into the consent agreement?

A I -- again, I did not have any direct conversations with the U.S. Government in relation to those (indiscernible) again, some of the other debtors' advisors may have been (indiscernible) to those discussions.

Q Okay. Now, Mr. O'Hara, you were at the hearing to reopen the auction, correct?

A Yes. And I read the discussions and the opening remarks.

Q And do you recall that Judge Jones had concerns about who would actually be able to bid at a reopened auction?

A I understood that, yes.

Q Okay. And you understood that, at first, he was reluctant to even let Bay and Sabin bid at that auction, correct?

A I don't -- actually, I don't think there was any indication about any (indiscernible) bid, but I -- I could have been work --

Q Do you recall, at the -- do you recall, at the end of the auction, he did, in fact, allow Bay and Sabin to rebid?

A He did, yes.

Q Okay. And do you recall that he didn't open up the bidding for any other entity that was not a qualified bidder, other than the entity that submitted -- the entities that submitted this asset purchase agreement on December 5th?

A I -- he -- the Judge did say that the auction was going forth with WIPL, SCE, and Bay and Sabin.

Q Okay. And when it -- but with WIPL, it was this particular bid, submitted on December 5th, that was to be the first overbid at the reopened auction, correct?

A Yes, that's what I believe the Judge stipulated.

Q Okay. And that was a bid submitted by WIPL and SCRT, correct?

A Yes, that -- that's (indiscernible)

Q Okay. Now, at the reopened auction, was SCRT still a joint bidder?

A My -- my understanding is that they needed to change the legal name of the entity due to the fact that there was a conflicting name already registered with St. Croix, but it was, in essence, the same entity, with a different name.
Q Do you understand that there was actually a name change or was the new entity a newly formed entity?
A My understanding is that it was a name change that was required because, again, there was a duplicate name already registered.
Q Okay. And if I showed you a document that showed that it was a newly formed entity that was not actually formed until after the auction, would that surprise you?
A I -- it -- whether it was a newly formed entity or it was a renaming of an existing entity, I -- again, you know, our understanding is that it was still a special purpose entity listed in St. Croix, in order to be backed by the West Indies assets, so (indiscernible)
Q Sir, you had --
A I'm a little bit surprised. I thought it was a renaming. I could have been wrong.
Q Okay. But your understanding is this new entity was needed to provide financing with respect to, not only the thirty-one-million-dollar bid or -- strike that.
Was it your understanding that this new entity was required to provide additional financing going into the

auction?
A That was not -- it -- it -- it -- I only hesitate because, again, the financial wherewithal that we undertook in determining whether the West Indies Group was a -- had the ability to complete a transaction was done with West Indies. The other legal entity, as I testified previously, I would have to -- there would be -- we would have to do an investigation to see if -- but you know, as you know, they (indiscernible) it may be similar to that, the other Virgin Island name had been participating all along in the process. Whether they were considered (indiscernible) financial wherewithal to this particular bid, I -- that is unclear from our perspective. We were focused on West Indies Petroleum.
Q Okay. But at no time did you disclose to the Court in the motion to reopen that this other entity, the Virgin Islands Refining entity, might be a party and may have financial wherewithal or be a joint bidder, did you?
A I -- other than what was in the APA, which was disclosed to the Court, we -- we did not discuss with them their participation in contributing funds to the bid.
Q Okay. And Mr. O'Hara, when is the first time that you heard the state -- that WIPL is not (indiscernible) to have the December 22nd closing date?
A Well, I -- I -- I actually had already thought that it was more like the end of December. I -- I think your -- this

document is blank. I don't know what the final document was. But my understanding is that they -- they were planning on closing by year end, and then that was moved subsequently, and I don't know if it was ahead of the actual hearing or soon thereafter, to January 5th. And then, as I testified earlier, they -- they moved the date to January 21st, but they upped their bid from thirty to 31.5 million.

Q But Mr. O'Hara, do you recall at the hearing the testimony that the WIPL bid was 50 percent more than the St. Croix Energy bid?

UNIDENTIFIED: Objection, Your Honor. I think we're getting into (indiscernible) from the last hearing.

THE COURT: Overruled. Go ahead.

THE COURT: Mr. Galardi.

THE WITNESS: I --

THE COURT: Mr. Galardi, could I ask you --

MR. GALARDI: Yes.

THE COURT: -- to re-ask the question again for Mr. O'Hara.

MR. GALARDI: Sure. Surely.

BY MR. GALARDI:

Q Mr. O'Hara, do you recall that the testimony at the December 6th hearing was that the WIPL bid would provide the estates 50 percent more value or $10 million more than the St. Croix Energy bid?

A Yes.
Q And do you recall that that was an apples-to-apples closing of December 22nd, which the St. Croix bid had as the outside closing date?
A I -- I don't recall.
Q Okay. And at any time, once the closing date by WIPL was changed, did Jefferies do an analysis of what the difference in value would be between the St. Croix Energy bid and the WIPL bid?
A We -- leading up to the actual auction, we provided a -- what I'll call a "financial scorecard" on each of the bids, in order to create an apples-to-apples perspective of how St. Croix's bid stacked up to West Indies Petroleum's bid.
Q And based on that analysis, was it Jefferies' view and had it conveyed prior to the commencement of the auction, is the difference in the closing date between December 22nd and January 21st was approximately $4.8 million?
A Yes. I -- we -- after discussing with each of the parties that -- what they were prepared to take from operating expenses and professional fees and what was -- you know, based on their -- the closing date, I mean, there were other factors, as well. But you know, it was under the assumption that the St. Croix Energy team was prepared to take the land, which wasn't done until actually after the auction started. So it was a hypothetical scorecard,

depending upon how St. Croix was (indiscernible) bid.
Q Correct.
And when you calculated the 4.8, after conversations with the financial advisor and Greenhill to SCE, you agreed that the actual difference was about $5.8 million. Isn't that correct?
A I actually think it was the other way around. It -- we initially thought it was 5.8, and then the attorney met -- St. Croix was actually (indiscernible) an additional million dollars of professional fees that hadn't been anticipated, which is why (indiscernible) changed to 4.8.
Q And (indiscernible) but we'll go back to the transcript.
A (Indiscernible)
Q We'll have to go back to the transcript of the auction. I think it would be exactly the opposite.
A (Indiscernible)
Q But that was done at the beginning of the auction and took about -- a fairly significant period at the beginning of that auction, correct?
A Yeah. I think (indiscernible) there was -- as I said, there was discussions with all of the bidders as with respect to their -- their bid and where they -- ensuring that everyone had their say, to make sure that we understood all of the asset purchase agreements and the financial association with that, as well as consulting with each of the

various parties (indiscernible) the UCC, Goldman, and the term lenders, so everyone agreed that the start of the auction could commence with everybody understanding the (indiscernible)

Q Okay. And Mr. O'Hara, you testified that you believed -- well, let me strike that and let's go back to level set.

To the best of your knowledge, did WIPL have $30 million of cash on its balance sheet on December 6th, for which it could close a transaction for $30 million on December 22nd, 2021?

A Again, our understanding is that they -- WIPL was preparing to use cash and equity contributions from their shareholders, in order to have the $30 million necessary to close the transaction.

Q Okay. But I'd ask you to just answer my very specific question.

Did -- was it your understanding that WIPL had $30 million of cash on its balance sheet on December 6th, 2021, which it could use to close the transaction on December 22nd, 2021?

MR. BAST: Your Honor?

THE COURT: Yes, sir.

MR. BAST: Jeffrey Bast for West Indies.

I'm going to object to this question, and this is what we were concerned about. This line of questioning is

now going to call for this witness to reveal confidential financial information which was provided to the debtors exclusively for the purposes of assessing their wherewithal and ability to close. And this is the -- I challenge the standing of the -- of this disgruntled bidder from inquiring into that financial wherewithal, but also we don't want -- we're concerned about the confidentiality of WIPL's financial information being disclosed publicly at this hearing.

THE COURT: All right. Mr. Galardi, do you want to respond?

MR. GALARDI: Yeah. Yes, Your Honor. I -- again, all the basis for reopening the auction, that there was a financial wherewithal to close. Mr. O'Hara testified that he looked at the audited financials. Unfortunately, no one had those audited financials. We subsequently found those audited financials and we question that. We think we are entitled, one, even as a, quote, "disgruntled bidder," to challenge the bona fides of another bidder. I believe the case law (indiscernible) understanding. And as a creditor, we're entitled to, in fact, question the bona fides of the purchaser.

Now, Your Honor, I find it striking that the financial information is -- that it should be restricted when Your Honor made a ruling based upon testimony that they had the financial wherewithal. And unfortunately (indiscernible)

where St. Croix Energy had access to information to challenge that because it was an emergency one-day hearing.

THE COURT: Right. So, Mr. Galardi --

MR. BAST: Judge --

THE COURT: -- ask the question again that you want Mr. O'Hara to ask. And Mr. O'Hara, don't answer. I just want to hear the question one more time.

BY MR. GALARDI:

Q Mr. O'Hara, do you know whether WIPL had $30 million of cash on its balance sheet as of December 6th, 2021, that it could have used a thirty-million-dollar transaction on December 22nd, 2021?

THE COURT: All right. I'm going to overrule the objection. Mr. O'Hara, that was a very specific question of "do you know," so that's yes or now.

THE WITNESS: I do not know.

THE COURT: Okay.

BY MR. GALARDI:

Q Okay. Well, Mr. O'Hara, you've testified that it was your understanding that, to the extent WIPL did not have cash, it was going to do an equity raise from its shareholders. Is that correct?

A Yes, that was my understanding.

Q And do you know whether WIPL actually had the ability to do an equity raise from its shareholders?

A I'm not sure I understand the question.
Q Do you know whether, under its articles of association -- strike that.
Did anyone at Jefferies or from the debtors' representatives ever review WIPL's articles of association to determine whether it could do an equity raise from its shareholders?
A My understanding is it was a private company. We didn't understand there to be any issue of them being able to raise additional additional capital from their equity holders.
Q But did you make any inquiry into that fact or do any investigation as to their ability to do so?
A I did not.
Q Okay. And did you assess the financial wherewithal of their shareholders?
A I did review public information regarding the (indiscernible) company, he's -- again, from public information, he seemed to be quite a wealthy individual within -- within (indiscernible) substantial private companies (indiscernible) and you know (indiscernible) we understood, at least between him and the other equity holders, that they had been capable of raising money.
Q And did they -- did you ask them to provide any commitment from that shareholder or any other shareholder to ensure that the transaction could close on December 22nd,

2021?

A Again, I don't know about the December 22nd date. Again, I -- I understood it was going to be the end of the year. But no, no, we did not ask for additional information beyond the audited financials.

MR. GALARDI: Your Honor, there is a document that I wanted to ask if there is an objection to our submission. It is a notice of shareholder meeting at West Indies Petroleum Limited St. Lucia. I don't believe there's any counsel on here for them, but while -- I do believe Mr. Bast may have an objection. Before I enter it, I just wanted to see if there is an objection.

THE COURT: Mr. Bast?

MR. BAST: Your Honor, I do have an objection, and B-a-s-t, no L, although I am (indiscernible)

MR. GALARDI: I apologize, Your Honor. And I'm not sure what basis he can object based upon it being a document from a company of which he is not a -- not an attorney of record.

MR. BAST: And Your Honor, if I may, this speaks to the broader question of whether or not this bidder should be entitled to ask these questions.

But more importantly, all of this line of questions are premised upon documents which Mr. Galardi -- I think he said he came upon them. But they were improperly provided to

him in violation of confidentiality restrictions and an injunction entered by a court in Jamaica. I've informed him of those concerns, I told him that he should not have these documents at all, much less use them. And I'm happy to speak to more specifics about that, Your Honor, if I may.

THE COURT: So let me ask --

MR. GALARDI: Your Honor, can I just --

THE COURT: So --

MR. GALARDI: Can I just -- sorry, Your Honor.

THE COURT: All right. So, Mr. O'Hara -- and I am looking at this notice of general meeting, indicating a meeting for December 13, 2021. Mr. O'Hara, have you seen that document?

THE WITNESS: It was provided to me yesterday.

THE COURT: So you hadn't seen it, in terms of before -- in terms of making your statements to the Court, in terms of giving advice as a professional to the debtor, you had not previously seen that document at the time you gave the advice, correct?

THE WITNESS: That is correct.

THE COURT: All right. Mr. Galardi, under the circumstances, I'm going to prohibit you from using this document. I don't see how you can lay a foundation. He hadn't seen it prior to the relevant time period. Your objection is noted, though, and is preserved.

MR. GALARDI: That's fine, Your Honor. And I would just simply (indiscernible) for the record that this is only with respect to Mr. O'Hara. I think Mr. Chambers will be a different matter, and we can ask the same questions for foundation with Mr. Chambers.

THE COURT: We'll deal with it if, as, and when.

MR. GALARDI: Thank you, Your Honor.

I'm going to check my ...

(Pause in proceedings)

BY MR. GALARDI:

Q Mr. O'Hara, I may have asked this question, so I will apologize.

Do you know who the members of the PHRT entity are?

A I'm not sure I understand who the "PHRT entity" is.

Q I'm sorry. Why don't I bring up the asset purchase agreement that you are seeking court approval for today?

(Pause in proceedings)

MR. GALARDI: And again, eyes will strain.

BY MR. GALARDI:

Q So let's start with that page right there. That's the original one; that is, the St. Croix Energy. There is an asset purchase agreement that is attached to -- that is being sought, attached to the APA that the debtors seek to have approved today.

(Participants confer)

MR. GALARDI: No, don't show any of those documents. Oh, that's the same one.

Your Honor, this may take a minute. I think it will be easier to find the docket number, or if the debtors have that, I think it was submitted as one of the documents that they submitted. I just want to make sure we have the right document.

THE COURT: Fair enough. Mr. O'Hara can probably use a break. Why don't we -- it's -- I've got 11:44. Why don't we take -- why don't we take until 11:50 Central? That will give -- Mr. O'Hara, it will give you a chance to walk around a bit. Mr. Galardi, hopefully you can resolve your issues.

MR. GALARDI: And we did find it, but that's fine. We've got the document now. But let's take the break anyway for Mr. O'Hara.

THE COURT: All right. Thank you. Then I'll see you --

MR. GALARDI: (Indiscernible)

THE COURT: I'll see everybody back at 11:50 Central.

COUNSEL: Thank you. Thank you.

(Recess taken from 11:44 a.m. to 11:51 a.m.)

AFTER RECESS

THE COURT: All right. Mr. Galardi and Mr. O'Hara,

hopefully you're on your way back.

MR. GALARDI: Your Honor, we're just trying to -- is Mr. O'Hara ready?

THE COURT: I don't yet see him. Hopefully, it's momentarily. Ah, there he is.

Mr. O'Hara, are you back with us?

(No verbal response)

THE COURT: So, Mr. O'Hara, I haven't heard you say anything. Ah, there you are, I think. How about now?

THE WITNESS: Yes, can you -- yes, can you hear me now?

THE COURT: Yes, sir.

All right. And we are back on the record. Albert, do we have CourtSpeak back up?

THE CLERK: We do, Judge.

THE COURT: All right. All right. Mr. Galardi, when you're ready.

MR. GALARDI: Thank you.

BY MR. GALARDI:

Q Mr. O'Hara, we'll put in front of you the asset purchase agreement between Limetree and West Indies Petroleum Limited, a Jamaican corporation, and St. Croix Refining and Transportation, LLLP.

Have you seen this document before?

A Yes, I have.

Q And this is the asset purchase agreement that the debtors are seeking to have approved today, correct?
A Yes.
Q Okay. And when I refer to "PHRT," I'm using that as shorthand for P -- Port Hamilton Refining and Transport, LLLP. Is that -- can that be understood?
A Yes, I understand.
Q Okay. And as we -- as you testified before, you believed that this was simply a name change as what I refer to as "SCRT" or "St. Croix Refining and Transportation, LLLP," correct?

UNIDENTIFIED: Objection, Your Honor. I think he corrected his testimony prior to that, that he wasn't sure if it was this or that, but just --

THE COURT: I agree. Mr. Galardi, just re-ask the question, if you would please, sir.

MR. GALARDI: That's fine. It's not relevant to what I'll ask.

BY MR. GALARDI:
Q Mr. O'Hara, did you ever look into the financial wherewithal of the Port Hamilton Refining and Transportation, LLLP?
A No, I have not.
Q And is it your understanding that West Indies Petroleum Limited had (indiscernible) someone named Dave Roberts be

able to close the transaction, whether it's the sixty-two -- for the sixty-two-million-dollar transaction. Is that correct?

A No, that's not my understanding.

Q What is your understanding of why Mr. Roberts was brought into the (indiscernible) for an arrangement with West Indies Petroleum?

A I don't know (indiscernible) Mr. Galardi (indiscernible)

Q I'm sorry. I hear a background noise and that's not me. Let me try it again.

UNIDENTIFIED: (Indiscernible) Judge, if you don't mind, just give me one second. I just need to tell somebody that they've got to stop.

THE COURT: Of course.

UNIDENTIFIED: (Indiscernible)

THE COURT: Just when you think you've seen it all.

UNIDENTIFIED: Does the Court's contempt power go all the way out to (indiscernible) Valley?

(Laughter)

UNIDENTIFIED: I apologize. It was a one-time thing, and we're all set now.

THE COURT: And it's just fine.

Mr. Galardi, go ahead, please.

MR. GALARDI: Sure.

BY MR. GALARDI:

Case 21-32351 Document 1001 Filed in TXSB on 12/30/21 Page 78 of 247



Q I just want to know: Mr. O'Hara, when was the first time that you learned that Port Hamilton Refining and Transportation, LLLP would be a joint bidder?
A Well, it was unclear until I -- I just said earlier that the first time that I heard that Dave Roberts could be involved with the West Indies Petroleum bid was on December 10th. Even leading into the auction, my understanding is that it was unclear what relationship Mr. Roberts would have within the bid (indiscernible) Dave Roberts (indiscernible) and around the -- the Limetree Bay Refinery (indiscernible) provider and has instant knowledge of the refining plant. It was unclear to me whether they were being involved as potential operation and support or any other capacity.
Q Okay. But let me ask you: Do you know if Mr. Roberts has any role or interest in Port Hamilton Refining and Transportation, LLLP?
A I -- I don't know (indiscernible)
Q Okay. Do you know if Mr. Roberts is a shareholder of West Indies Petroleum Limited?
A I -- I don't believe that to be the case.
Q Okay. And your testimony earlier was that Port Hamilton Refining and Transportation, LLLP was never qualified as a qualified bidder by the bid deadline. Isn't that correct?
A Well, I -- I don't believe Port Hamilton existed on the bid deadline. It was another special purpose entity that

they switched -- switched accordingly.
Q Okay. And did you do any investigation of the assets of Port Hamilton Refining and Transportation, LLLP?
A Again, you know, I understood that, whether it was the previous entity St. Croix -- I forget the exact name, but St. Croix Energy or -- or Port Hamilton, and both of them were acting as a special purpose entity for purposes of acquiring the assets.
UNIDENTIFIED: Your Honor, my -- just objection. I think that's the third time that question has been asked and answered.
THE COURT: Understood. I'll --
MR. GALARDI: I now will move on.
THE COURT: All right.
BY MR. GALARDI:
Q Is it your understanding that Port Hamilton Refining and Transportation, LLP is the special purpose entity that will be entering into or assuming the agreement with the U.S. Virgin Islands operating -- the U.S. Virgin Islands operating agreement?
A Yes. Yes, that is my understanding.
Q And is it also your understanding that Port Hamilton Refining and Transportation, LLP will be the company that negotiates a new shared services agreement with the terminal?
A I believe that to be the case, yes.

Q And is it also your understanding that Port Hamilton Refining and Transportation, LLP will be the entity that will have a transfer of the permits and be seeking approval from the EPA and other regulatory agencies to restart the refinery?

A Yes, I believe that to be the case.

Q And have you determined whether West Indies Petroleum Limited has financially guaranteed the obligations of Porte Hamilton Refining and Transportation, LLP, with respect to that -- the assumption of those agreements?

A I don't know about financially guarantee. Our understanding is that West Indies Petroleum Ltd. is providing the funds to Porte Hamilton Refining and Transportation for the purchase of Limetree Bay Refinery.

Q And you understand or do you have any understanding of what percentage West Indies Petroleum Ltd. owns of Porte Hamilton Refining and Transportation, LLP.

A I do not.

Q Did -- do you -- and you do agree that Porte Hamilton Refining -- strike that -- Mr. O'Hara, do you know if the asset purchase agreement between Limetree and West Indies Petroleum and Porte Hamilton Refining and Transportation has an express requirement that the sale order be entered today?

A I do not know.

Q And do you have any understanding that there is any

deadline by which the sale order has to be entered prior to the January 21st, 2022 closing date?
A I thought the closing date was January 20 -- oh, 21st -- I'm sorry. You said that. I do not know.
Q And you said or testified that a deposit of approximately $10 million was received by the Debtors today, correct?
A Yes.
Q And do you know what entity submitted that deposit for $10 million?
A (Indiscernible).
Q Well, you said there were several. What were the names of the several entities that submitted the deposit?
A I actually don't recall. I saw an email earlier today that the money came in. I believe Mr. Shapiro can give that answer.
Q Okay. Thank you. But was it entities other than West Indies Petroleum, Ltd. and Porte Hamilton Refining Transportation, LLP?
A Yes. I believe so.
Q Okay. And were those qualified bidders at the auction?
A I'm not sure I understand the question. The qualified bidder here is West Indies Petroleum, Ltd.
Q Okay. And that's the sole qualified bidder in here. Am I correct?

A I don't know what -- I'm not sure I understand that either. I know both parties --
Q Well, did you --
A -- were -- I don't -- I know all the parties involved here have been raising finances. So --
Q But I guess that's not my question. You had a bid deadline by which people had to submit a bid to be a qualified bidder, correct?
A Yeah. And West Indies Petroleum Limited.
Q And West Indies Petroleum did not do so, but you had that taken care of on December 6th, correct?
A (Indiscernible) we, again, I'm not sure I understand the question.
Q I -- it was ill-formed question. So I will take the objection and reform it. It was the order to reopen the auction that, then, permitted West Indies Petroleum, Ltd. to become a qualified bidder for the purposes of the reopening -- reopened auction, correct?
A Yes.
Q Okay. Yeah. If it should turn out that the West Indies Petroleum and Porte Hamilton Refining Transportation Company do not close the transaction on January 21st is the exclusive remedy of the Debtors that the nearly $10 million deposit?
A Well, we have the ability to sue the legal entities involved and request specific performance, but (speakers talk

at the same time).

Q (Speakers talk at the same time) expressly in the agreement? If you know.

A I -- you know, I do not know. That is my understanding of our recourse is the deposit and the ability to sue.

Q And the entities that you can sue on West Indies Petroleum, Ltd. and Porte Hamilton Refining and Transportation, LLP, correct?

A Those are the entities on the asset purchase agreement, yes.

Q And in order to assess those remedies, did you also look at the financial wherewithal of whether they could pay any damage (indiscernible)?

A I believe it's similar to, you know, qualifying them as bidders, so you can sue the legal entity that -- I saw the financial, you know, audit and financial statements on.

Q But you cannot sue their shareholders, correct?

MR. GILARDI: Objection. Calls for a legal conclusion.

THE COURT: Yeah. As phrased, I agree.

Mr. Gilardi, you can ask a different question.

BY MR. GILARDI:

Q Do you have an understanding of whether you could share -- sue the shareholders of WIP if they (indiscernible) to close on January 21st, 2022?

A I do not.

MR. GILARDI: No further questions, Your Honor.

THE COURT: All right. Thank you.

MR. GILARDI: It kept (indiscernible) up to deal with the in-camera issue and the audit financials.

THE COURT: So do you want to do that now?

MR. GILARDI: I would, Your Honor. I think it's important while Mr. O'Hara is still on the stand to address that issue. I just don't know with the number of people on this call how we exactly do that.

THE COURT: So tell me -- and I got it -- I don't want you to reference any specific number or any of the content of the '19 and '20 financials. What is it that you seek to do with those documents?

MR. GILARDI: I seek to -- I don't mean this impolitely to the professionals -- but I believe that the financial wherewithal and the basis for reopening the auction is shown to be in question. I can also do this with Mr. Chambers (phonetic) if we want to punt that for a period of time, but I do believe that because the Debtors had a responsibility to assess the financial wherewithal, should the financial wherewithal was based, in part, for Mr. O'Hara's testimony on audited financials.

I do believe I should be entitled to go through those audited financials with Mr. O'Hara and ask questions

specifically how he waited and came to the conclusion that (indiscernible) had the financial wherewithal to first, close the 30 million transaction and (indiscernible) facts and circumstance you may now know that would enable them to close the $62 million transaction.

THE COURT: All right. Here's what I'm going do, Mr. Gilardi. We will include the -- we will include the financials as a sealed exhibit. I am not going to permit you to ask any questions. Quite frankly, you know my belief that I read a balance sheet better than anybody else. I know that that's probably not true, but that's what I believe anyway. You can certainly argue -- I have -- I have had the opportunity to review the financials.

You will -- you can -- in closing, you can argue that there wasn't a legitimate basis for making that argument if you believe that's the case. I will know what you are referencing, but I'm not going to permit you to ask Mr. O'Hara line-by-line issues under the circumstances.

Does that clear enough so that you have preserved your -- you have preserved any error?

MR. GILARDI: Yes, Your Honor. And I know you are very sophistocated in this, and I am sure you (indiscernible) because there is lots in the notes if there (indiscernible).

THE COURT: So I -- as I said, I understand how you're going to -- I understand what you're going to argue.

I got it. But we're -- I think the right balance is, again, given that I'm comfortable with the exhibit. It will -- again, it will be a sealed exhibit made part of the hearing, and I think you've put enough on the record that to the extent that you believe that there is reversible error, it is -- you've preserved it.

MR. GILARDI: Thank you, Your Honor.

THE COURT: All right.

MR. GILARDI: (Speakers talk at the same time).

THE WITNESS: Your Honor, this is Mr. O'Hara.

MR. BAST: Your Honor --

THE COURT: Sir, I'm sorry. Mr. --

MR. BAST: Jeffrey Bast.

THE COURT: -- Bast.

MR. BAST: If I also may make a statement just for purposes of the record. I'm not challenging the Court's ruling.

THE COURT: Sure.

MR. BAST: I just want the record to note how it is that Mr. Gilardi came to be in possession of these documents. (Indiscernible) not only his use of them or submission to the Court, but even his continued possession of the documents. Our client has been involved in litigation with a minority shareholder in Jamaica with two minority shareholders who were ousted from the company February of this year.

In July, the Supreme Court of Jamaica dismissed the claims and ordered those directors to pay the attorneys' fees of the -- of (indiscernible) and its directors and the Court in Jamaica also entered numerous injunctions including one on September 28th barring these Plaintiffs from disclosing any confidential information related to wit: to any person or using it for any purpose, and we learned late last night that Mr. Gilardi received these documents from one of these Plaintiffs, Mr. Wilkinson, who contacted him, offered to testify in this case. He was on the witness list, and I understand he's not being called now, but we promptly informed Mr. Galardi that these are confidential business records, that he received them from a party who is bound by confidentiality restrictions and an injunction.

I advised him that -- of these concerns and his response was that he would be entitled to seek them in discovery, but we do want the record -- which we dispute -- we do want the record to note that he knowingly obtained this document from a source provided -- who provided them to him in violation of an injunction.

I'm not suggesting that Mr. Gilardi has done anything wrong because he asked me to preserve the confidentiality other than his continued possession of this document. But I just want the record to be clear on that point and -- thank you.

THE COURT: No. So I got it. And so I want to make it clear. I don't think that there is any evidence that he knowingly went and got them. Now, once you found out that he had them, if you made demand for their return, have -- after having read the injunction, you know, maybe, he made a bad decision with that, but that is certainly -- that certainly -- you can take up in another court. I -- the reason I'm doing what I'm doing is with respect to having them as sealed exhibits is because I've now read them, and I can't unread them. And so to the --

MR. BAST: I understand.

THE COURT: Okay. But that -- I will -- they will be sealed, and they -- yeah -- to the extent that there is a record that it needs to go up on appeal -- we will figure out how to handle this exhibit. They will not be paid -- they will not be made part of the general record. All right?

MR. BAST: And I appreciate that, Your Honor, and I hope you can appreciate that I wanted to make our concerns part of the record, so I have to preserve them --

THE COURT: Uh-huh.

MR. BAST: -- and we will communicate with Mr. Gilardi separately.

THE COURT: No. Absolutely. In fact, I'm --

MR. BAST: (Speakers talk at the same time) and --

THE COURT: -- going to go one step further. I'm

going to ask you to submit whatever document it is that you believe prohibits Mr. Gilardi from being able to use the documents. Not suggesting that anybody's done anything, or that you're right, or that you're not right, but so that any court that wants to look at this has a full picture. I think it's appropriate that whatever the order is --

MR. BAST: (Indiscernible).

THE COURT: -- that you are relying on that that's made part of the record. So if you just have a member of your team just -- I assume the court order can't possibly be confidential or is it?

MR. BAST: No. The order is not confidential, and we have provided it to Mr. Gilardi and all the various counsel in the case.

THE COURT: Sure.

MR. BAST: Would you -- how would you like us to submit it?

THE COURT: Just file it on the docket.

MR. BAST: On --

THE COURT: And --

MR. BAST: -- due notice of filing?

THE COURT: Yeah.

MR. BAST: Okay. Fair enough.

THE COURT: And that way --

MR. BAST: Thank you.

THE COURT: -- that way, I can see it.

MR. BAST: Understood.

MR. GILARDI: And Your Honor, just quickly, and again, I think everybody has been professional in all of this and made the request. We did, in fact, get the information and let people know we got this on (indiscernible) as well as another document (indiscernible) -- two other documents that will be controversial. Again, our position is, yes, there is an argument that the injunction precluded it, but yes, we also believe that all of these documents -- if this wasn't an expedited hearing, a simple discovery request, we're agreeing to keep it confidential; and if we have to go that route, I didn't want to delay the hearing for (indiscernible), and that's partly why we decided to submit it on the way in and advise all the parties that this was what we were going to do. We've told everyone not to disseminate the information any further (indiscernible). Your Honor ruled on that request.

THE COURT: Oh, I got it. I'm just -- but I want to make sure we've got all the pieces together.

All right.

MR. BRIMMAGE: Your Honor?

THE COURT: Yes, Mr. Brimmage.

MR. BRIMMAGE: Your Honor, Marty Brimmage with Akin Gump here on behalf of the Ad Hoc Term Lender Group.

I just want to, if I could, get clarification on exactly what your ruling with regard to these documents and make sure the record is clear that I'm clear.

My understanding is they haven't been authenticated, and they're not self-authenticating. I know you've read them, and we can't unring the bell, but are you admitting them for -- as evidence, and the record is sealed, or are you just -- I'm just unclear; and if I could get clarification, that would be helpful.

THE COURT: Yeah. Mr. Brimmage, I'm -- as I was listening to what I said, I have the same issue myself. So here's what I'm doing is, that I am -- what was sent to me which are the financials-- and just identify them. They are the West Indies Petroleum Ltd. financial statements dated December 31, 2020. I am sealing that document. I -- it is -- I'm not going to permit any questions about it; although, what I am having read it, I'm going to permit Mr. Gilardi to make argument to suggest that the basis for reopening the auction was not -- was not made in good faith, but I'm not going to permit any questions about them, and I wish I hadn't read it, because then I -- then I wouldn't have to deal with them.

But having read it, I want to -- I want a reviewing court to be able to say, "All right. Well, Jones read this. It had to have factored some way into his thought process."

But that's about the best I can give you. I'm not going to allow you -- and I'm not going to allow anyone to ask questions about the line items.

MR. BAST: And Your Honor, are they admitted for the purposes of the record. In other words, have you found the evidentiary hurdles have been met to admit them as part of the record for this case?

THE COURT: No. I am simply making them part of the record as something that I read.

MR. BAST: Thank you, Your Honor.

THE COURT: Uh-huh.

MR. BAST: Your Honor, may I establish that record because I think I did provide -- I don't think I have to do anything more than ask Mr. O'Hara if he has reviewed this 2020 audited financials. In his testimony with respect to reopening the hearing, he did say he reviewed the audited financials of West Indies Petroleum, Ltd.

THE COURT: So --

MR. BAST: Isn't that correct, Mr. O'Hara?

THE COURT: Well, so let's hold on just a second because Mr. Brimmage is going to say this is the wrong witness to authenticate this exhibit. The fact --

MR. BAST: Yeah.

THE COURT: -- that he looked at it, and he can read the cover page doesn't make it authentic.

MR. BAST: No. I a hundred percent agree on authenticity, but I wanted to be clear that in Mr. O'Hara's testimony, he did rely on this document to --

MR. GILARDI: (Speakers talk at the same time), Your Honor, (indiscernible).

THE COURT: So hold on --

MR. GILARDI: Objection.

THE COURT: So gentlemen, just hold --

MR. GILARDI: All right.

THE COURT: -- on a second. So you want -- you want to establish that Mr. O'Hara reviewed this document and acted on it?

MR. GILARDI: Correct, Your Honor, and that was his prior testimony in the motion to reopen. (Indiscernible) I just want to confirm that it's this document.

THE COURT: So Mr. O'Hara -- well, that's problematic because he doesn't have it sitting in front of him. But let me -- let me try it this way.

Mr. O'Hara, I am looking at a PWC or drafted financial statement for West Indies Petroleum, Ltd. It is dated December 31, 2020. Did you look at such a document in forming your opinion?

THE WITNESS: I will be as precise as I can.

THE COURT: Sure.

THE WITNESS: I received two documents from West

Indies Petroleum that was audited financials for 2020 and 2019. I will just be up front. I quickly reviewed what was sent to me last night. It actually looked different.

THE COURT: Okay.

THE WITNESS: So I don't -- I don't know -- I don't know the document that you have versus the documents that I reviewed.

THE COURT: So the only one I have looked at, and I got a -- I got an email from Mr. Gilardi's team, which I asked him to send, that had the documents on it. What I have looked at is -- let me be more descriptive -- is only a December 31, 2020. Now, it does have obviously statement of change in financial position, so you've got 19 numbers, but it is one document that is 47 pages long. So when you say -- when we say, "two documents," I don't know if that's pieces of the same document, but the one that I opened and the one that I read was the December 31, 2020 document.

And Mr. O'Hara, you're saying that when you looked at this last night, assuming that you're looking -- that you looked at the document that I have, that it looked different than what you remembered?

THE WITNESS: It did. And I didn't know how this was going to play out, Judge, so I didn't go back and compare documents. All that I can tell you is what I recall and --

THE COURT: No.

THE WITNESS: -- you know, from what I had previously reviewed, it looked different.

THE COURT: All just fine. And again, this is all my fault. I wish I hadn't have read it. If I hadn't have read it, then, this would be really easy. So I'm not going to vary from what I did, and that's -- we're -- that's just how we're going to leave it.

Mr. Brimmage, you want to disagree with that?

MR. BRIMMAGE: No, Your Honor. I do want to remind the Court of a very famous quote from Judge Smith who once told me, "I believe (glitch in audio) the Court of a minute. He can unring the bell (indiscernible)."

THE COURT: I --

MR. BRIMMAGE: So to the extent you want to -- you want to exercise that right, Your Honor, you go right ahead.

THE COURT: No. I was there the day that he said that. I, quite frankly, to this day, still am trying to figure out how to do that, and especially given that I'm, you know, you -- as you know -- I'm so much more comfortable with numbers than I am anything else that -- if -- it's -- it just is what it is, and I have read it. It wouldn't be fair for anybody to look at what I've done --

MR. BRIMMAGE: I understand.

THE COURT: -- and not know that. So I think we've adequately done that.

All right. Mr. Hughes, do you have questions for Mr. O'Hara?

MR. HUGHES: Yes, sir, but I anticipate I'll be substantially shorter than Mr. Gilardi.

THE COURT: Whenever you're ready.

MR. HUGHES: Would Your Honor mind giving Ms. Martha Wyrick control? I don't know that I'll need access to some documents, but -- because I'm trying to establish a timeline, and I want to make sure I can refresh Mr. O'Hara's memory if he is not able to pin some stuff down.

THE COURT: Ms. Wyrick is in control.

MR. HUGHES: Thank you very much.

CROSS-EXAMINATION OF MICHAEL O'HARA

BY MR. HUGHES:

Q Mr. O'Hara, I had some follow-up questions that related to your cross-examination and your direct surrounding the reasons for the reopening of the case, and I want go first to page 7 of the transcript of the last hearing on December 6th on the emergency motion to reopen, and I want to make sure that you agree with a statement, which I have no reason to think you won't, but I want to just pin it down.

Starting on line 11, Debtors' counsel indicated "The reason we filed a motion to reopen the auction is that a bidder through the Debtors professionals, specifically, Mr. O'Hara, had been working with, prior to bid deadline, had

a medical emergency that basically prohibited them from executing the APA and providing the bid deposit." Would -- you would agree that's a true statement, correct?

A Yes.

Q And that is the foundation upon which auction number 1 was canceled that was conducted November 18, and that auction number 2 was conducted on the 17th and 18th of December, true?

MR. BAST: Objection, Your Honor. Foundation.

THE COURT: Mr. Hughes --

UNIDENTIFIED SPEAKER: I know.

THE COURT: -- you want to respond?

MR. HUGHES: I don't know why he would have a problem answering that question.

MR. BAST: Your Honor, I think it's a legal question with a foundation of the -- it's the Court's decision to reopen the action, and I think it's just a -- if Mr. -- if it's a factor, just help Mr. --

THE COURT: So Mr. Hughes, I --

MR. BAST: -- (speakers talk at the same time).

THE COURT: -- I'll do it this way. I'll raise my own form objection. I think you can get to where you want to get to with perhaps just a little more thought and try again. So I'll sustain the Court's objection.

MR. HUGHES: Sure.

BY MR. HUGHES:

Q Okay. Mr. O'Hara, but for the Court reopening the auction, you would not have reopened it, true? That's an easy one.

A I don't believe we would.

Q And when the Court reopened the auction, it did so on the basis that a bidder had appeared who was prohibited previously from participating. Is that true?

MR. BRIMMAGE: Your Honor, Marty Brimmage. I'll object to that. That -- the lack of foundation about the Court's --

THE COURT: Yeah.

MR. BRIMMAGE: -- basis for doing it.

THE COURT: Sustained.

BY MR. HUGHES:

Q Well, let me just try to establish the timeline here, Mr. O'Hara. On November 17, would you agree that was the bid deadline for people to put up deposits and to provide qualified bids before auction number 1?

A It -- I just want to be sure I heard you. It was November 17th?

Q Yes, sir.

A Yes, I believe that was the correct date.

Q And auction number 1 was conducted on November 18th, correct?

A (Indiscernible). I -- it -- if it -- and I'm just trying to be sure I'm okay. Is it -- is there any way that I can just open up my calendar because I feel like the dates are a little off if you don't mind?

Q Sure. Or maybe I can help refresh your recollection. If the emergency motion to reopen in paragraph 14 drafted and filed by the Debtors stated -- well --

(Speakers talk at the same time).

MR. HUGHES: -- on paragraph 13 --

THE WITNESS: -- give or take a day? I think -- you know, I think --

MR. HUGHES: Well, no. I'd like to establish --

THE WITNESS: -- answer --

MR. HUGHES: -- the timeline. I'd like to establish a timeline.

So Ms. Wirerick, would you mind putting up document 862, the Debtors' Emergency Motion to Reopen, paragraph 13 on page 7?

BY MR. HUGHES:

Q It states in the first sentence of the Debtors' motion filed December 6th that on November 18, 2021, the Debtors commenced the auction. Does that help refresh your recollection that, that was the day auction number 1 was conducted?

A Yes. Thank you.

Q Okay. And then on November 30, at docket number 829, the Debtors filed a notice to publicize the results of the auction. Do you recall that occurring?

A Yes.

Q And do you recall that as part of the filing that was made at docket 829 the Debtors reveal publicly that SEC -- SCE -- excuse me -- was the winning bid at 20 million plus some TSA benefits, and that they (indiscernible) with the packet?

A Yes.

Q And do you recall that as part of the motion to reopen it was revealed that West Indies -- I'll just call them WIP -- West Indies appeared on December 1 after seeing the notice of auction and asked to revisit interest in the auction? Do you recall that occurring then?

A Yes.

Q And would you agree that in connection with that results of the auction that they in particular filed an objection to the characterization of who is the winning bid and who was not the winning bid or the accurate bid in the filing they also made December 1 of 2021?

A Yes.

Q And do you recall that West Indies put up their deposit on December 3, 2021?

A Yes.

Q And do you -- can you confirm that, until the filing on December 6th, 2021, neither SCE nor Bay was informed of the appearance of WIP as a new qualified bidder after auction number 1 had been closed out?
A I'm -- apologize. Can you repeat the question?
Q Do you know whether before the December 6th motion to reopen filing, if anyone bothered to contact SCE or Bay to inform them that WIP was being promoted as a new bidder to do a second auction?
A I believe we contacted SCE on Sunday, the 5th.
Q But no one bothered to contact Bay? You do understand that, correct?
A I do not know.
Q Now, I think your testimony at the December 6th emergency motion hearing was you first learned that it was a medical condition of the West Indies CEO that prevented them from participating before, and you learned of that the day before the auction; is that correct?
A No. I learned about it the day before qualified bids were (indiscernible).
Q Okay.
MR. HUGHES: Ms. Wirerick, could you turn to page 33 of the transcript for the December 6 hearing to help Mr. O'Hara refresh his recollection? Now, looking at (speakers talk at the same time) --

MR. ROSE: Objection, Your Honor. I just -- we -- there is a sort of limit to the -- I think we're going well beyond, you know, the direct, and we're going back into rearguing the motion to reopen.

THE COURT: So Mr. Hughes, the objection is beyond the scope of direct. Any response?

MR. HUGHES: Certainly, Your Honor. On direct, there was a discussion about the motion to reopen. It was also subject to cross and how and when and why the decision was made to reopen and to have auction number 2 goes to the (indiscernible) to auction number 2, and of West Indies being a qualified bidder to participate, and I'm just trying to establish the timeline. I think his answer was the day before -- the day qualified bids were due, which I think he earlier testified was the day before the auction on November 18. I'm simply trying to establish the timeline and refresh his recollection of what he said before.

THE COURT: So Mr. Rose, with respect to this question, I think the question to what you wanted to make the objection was the prior one. He answered it, and this is either refreshing memory or impeachment. I don't know which yet, so I'm going to overrule the objection.

MR. ROSE: It -- yeah.

MR. HUGHES: Mr. O'Hara -- (speakers talk at the same time) --

BY MR. HUGHES:

Q I'm sorry. I just -- so and if I misspoken on any of this, I apologize. It was not my intent, but the point was is that -- which is why I'm looking at a calendar -- that the qualified bid didn't (indiscernible) with the Friday before the (indiscernible) of the auction. The original auction I believe was either (indiscernible) on the 16th or 17th. It ended up getting pushed to the 18th is my recollection. The qualified bids were due the Friday before, which I believe was the 12th, and I learned the day before of the West Indies group CEO's medical condition.

So just so I have the timeline down on the calendar -- I appreciate you having a calendar on there -- we've established that the first auction was December -- I'm sorry -- November 18, and that you learned of the medical condition on the Thursday before that auction?

A Yes, that's correct. I learned on the 11th. The 12th was the date for qualified bids to be made. I believe the original auction date was the 16th, but it got -- it ended up getting pushed to the 18th.

Q So -- and your testimony on page 33 was you learned of the medical condition the day before the auction, November 17. You're now correcting it that you learned of the medical condition a week before the auction?

A No, no.

Q Plus or minus (speakers talk at the same time) --

A I believe it was the day before -- it was the day before qualified bids were due. I thought that's the question I was answering.

THE COURT: So Mr. O'Hara, if you would look down and read the question at line 17, that's what Mr. Hughes is focused on. He's trying to understand why the answers are different.

THE WITNESS: Yeah. And I responded the day before the auction. I should have responded the day before qualified bids were due.

MR. HUGHES: Got it.

BY MR. HUGHES:

Q Okay. Just trying to understand the timeline. Now, I think you testified on direct or cross or both that you were aware that the medical condition that was the subject of the emergency involved a procedure that had actually been planned several months before. Did I hear that right?

A With the information that I was provided, yes, that was my understanding.

Q And did you also understand that the medical procedure that had been planned months before also involved the CEO flying from Jamaica to Miami in order to have that procedure? (Speakers talk at the same time), correct?

UNIDENTIFIED SPEAKER: Objection, Your Honor.

We're just testifying through questions at this point. And also, I don't believe Mr. O'Hara testified that he knew the timeframe for the -- for the -- when the procedures were scheduled. I think we're -- it's just beyond.

THE COURT: So --

UNIDENTIFIED SPEAKER: It's making fast into the --

THE COURT: Well, I do think Mr. --

UNIDENTIFIED SPEAKER: I --

THE COURT: -- Hughes can ask leading questions. Mr. O'Hara certainly can say, you know, he can listen closely to what he says and answer yes or no.

Mr. Hughes, could I ask you to repeat the question please?

BY MR. HUGHES:

Q I'll do my best, Your Honor, and I did try to emphasize "did you know." So I'll ask it again. Did you know, Mr. O'Hara, that the procedure planned months in advance for the medical condition involved actually involved the CEO traveling from Jamaica to Florida to conduct the procedure?

A No.

Q And I think you earlier testified though that you knew that the CEO was in Miami at the time of the bid deadline by which would have had to put up their bid and their deposit. Is that true?

A That's not my understanding.

THE COURT: So Mr. Hughes, the testimony --

MR. HUGHES: I thought you test --

THE COURT: -- was -- he testified that he was in the United States. He never gave anything more than that.

MR. HUGHES: Thank you, Your Honor. I thought I heard him say, "He was actually in Florida."

BY MR. HUGHES:

Q So Mr. O'Hara, do you know if he was actually in Florida at the time of the bid deadline being due?

A I do not.

Q Okay. Let me ask you this. Can you understand, given the way bankruptcy auctions work and the transparency of the way the auctions work, why it is that the successful bidders from auction number 1 would have a view that the timing in which we have expressed this interest following the publication of the results of this auction number 1 would be troubling to those bidders?

A I'm not sure I understand the question.

Q Well, I would stipulate, and I think you would certainly accept, that you're a very accomplished investment banker who has done auctions in the past and is familiar with the bankruptcy sales process. Is that true?

A Yes.

Q And you would agree you're an expert in this area. Would that be true as well?

A I try my best but, yes.

Q And would you agree that to the extent that somebody who is interested in the outcome of a bankruptcy sale is able to see the results of auction number 1, it would be extremely helpful to them on whether to continue or to participate -- in trying to participate -- in trying to do an auction number 2?

A Yeah. I understand the question. I would just say that it was made -- noticed to all parties that we were receiving and had received only one going concerning. So I'm not sure it really matters in this particular case. It -- the stalking horse was already out I believe. So everybody knew what the bid was, and we -- all parties knew that there was only one party that came forward as a going concerned bidder. So in this particular case, I'm just not sure that really matters.

Q Was it true before the bid deadline that you referenced earlier that WIP had already provided financial bonafides to satisfy your need for financial capability to be a qualified bidder?

A They did not.

Q So they waited until after December 1 when they first approached to reopen the bidding. Is that when you first learned about their financial qualifications?

A I learned about their financial qualifications on

December -- Friday, December 3rd when they provided audited financials, and they made a deposit into the DIP account.

Q Let me ask you this. Mr. Brookner, I believe, for the (indiscernible) lender, had gone through some extensive questions and the December 6 hearing about the amount owed on the DIP loan and the amount owed to the various professionals (indiscernible), and I have this question. Is it true that under the results of auction number 1, the results cleared the DIP in terms of paying it off, but did not clear the carve out?

A I think there was going to be a discussion about how the proceeds were split up as it relates to that. I -- but as far as the sums did not clear both the DIP and the professional fee carve out. Correct.

Q So then, to the extent the carve out parties had an interest that would not be cleared, they would have a financial interest in reopening the auction. Is that true?

A I --

UNIDENTIFIED SPEAKER: Objection, Your Honor.

THE COURT: Sustained.

UNIDENTIFIED SPEAKER: We're beyond. I mean -- thank you.

MR. HUGHES: Do I need to respond, Judge? I didn't know if there was an objection or not?

THE COURT: There was an objection. I was waiting

for it. I sustained it.

MR. HUGHES: Okay. Can I respond respectfully, Judge --

THE COURT: I've --

MR. HUGHES: -- on why I think it's relevant?

THE COURT: Of course you can, and it wasn't a relevance objection, but go ahead.

MR. HUGHES: I think it does go to the business judgment standard in whether or not it applies here.

THE COURT: How could it go to the business -- to the Debtors' business judgment? But it doesn't matter. That wasn't the objection that was raised. My prior ruling stands.

MR. HUGHES: Okay. I'm sorry. I did not hear the explanation of the ruling. There was a glitch in the feed. I'll pass the witness, Your Honor.

THE COURT: All right. Is there anyone else that opposes the Debtors' motion that wanted to ask questions?

All right. Mr. Rose, did you want -- did you have any redirect for Mr. O'Hara?

MR. ROSE: Your Honor, very limited redirect.

THE COURT: Uh-huh.

MR. ROSE: And I think it will be -- I don't know if the Court (indiscernible), but I would expect it's going to be, you know, maybe just a few minutes.

THE COURT: No. Go ahead.

REDIRECT EXAMINATION OF MICHAEL O'HARA

BY MR. ROSE:

Q Okay. Mr. O'Hara, is it common to -- for bidders to designate entities to receive assets on -- under an APA?

A Yes.

Q And whose financial wherewithal were you looking at from the Debtors' perspective in assessing WIP's ability to close?

A It was --

Q West Indies --

A -- (speakers talk at the same time) -- yeah. It was the West Indies Petroleum, Ltd and their shareholders.

Q And do you view their financial wherewithal as being behind or being at issue with respect to their ability to close? Let me ask the question more clearly. Just strike that. Your Honor, do you believe that West Indies' financial wherewithal is fully behind the asset purchase agreement that they find?

A Well, I think you said, "Your Honor," but I'll answer the question.

Q You're (indiscernible) and honorable.

A Thank you. Yes. I -- as I testified earlier, (indiscernible) looked at the West Indies Petroleum, Ltd group as being the group, you know, that was ultimately going to be responsible for the payment and buying the Limetree Bay

Refinery.

Q Is it the St. Croix group a special purpose entity?

A It is.

Q Did you look at -- what information did you look at to qualify the St. Croix group to -- as financially able to close?

A We received what I'll call the financial score card in regards to their lead investor, David Roberts -- excuse me -- Dave Johnson -- I apologize. Dave Johnson, and you know, that showed a listing of -- with, you know, cash, liquid securities, and illiquid investments that they had, and that was what -- and that was what was provided to attest to their financial (glitch in audio).

Q And were those assets located within the St. Croix group entity?

A (Speakers talk at the same time) --

Q (Speakers talk at the same time) the St. Croix -- thank you. Is it you understanding that both the St. Croix group and the West Indies group would each have to raise money in connection with the closing of the potential transaction?

A Yes, that was my understanding.

MR. ROSE: That's all the questions we have, Your Honor.

THE COURT: All right. Thank you. Any recross on that limited redirect, Mr. Gilardi?

MR. GILARDI: Yes, Your Honor. And I also do want to make -- and Mr. Rose does not object to my testimony -- and maybe I should have made this clear. We also identified Mr. O'Hara and Mr. Shapiro and Mr. Chambers as witnesses. So I would call them in my case in chief. So I think I can go outside direct, but I don't have to do that with Mr. O'Hara. I can limit my questions here, but I did want that on the record.

THE COURT: So I do think that you can go outside the scope if you agree that you will not call them in your case in chief. Otherwise, I think you are limited.

MR. GILARDI: That's fine. I will call them in my case. That's why I'm trying to facilitate this right now and go outside the scope, and I don't anticipate except -- I anticipate some issue with Mr. Chambers, but we'll deal with that when we get to it, and I think so far, we've been very successful with Mr. O'Hara on the scope and the questions. So just a few questions.

RECROSS-EXAMINATION

BY MR. GILARDI:

Q Mr. O'Hara, when you produced the financials with respect to St. Croix, did you have any question or concern that there was $20 million of cash committed to close the transaction on December 22nd?

A I'm sorry. Can you just repeat the question because I

think I may have heard something a little different, and I just want to make sure that I got it correct?

Q Okay. I'm going to try to (indiscernible). I may not (indiscernible) is better. Mr. O'Hara, when you reviewed the financials, including Mr. Johnson's financials, did you have any dispute -- doubt -- that there was $20 million of liquidated cash assets available to close the transaction with St. Croix on December 22nd?

A No. I believe that he had the financial wherewithal to close the -- on the 29th.

Q Okay. And when you looked at the financials of West Indies Petroleum, did you come to the conclusion that they had $30 million of cash able to close their proposed transaction on December 22nd, 2021?

A Well, I -- again, I do not recall them saying that they were prepared to close on December 22nd. I thought it was year-end, but that said, they had liquid investments in the -- call it 25 (indiscernible) in context -- and it was my understanding from conversations with the representatives that they had access to additional funds that were going to provide the difference.

Q And so did you assess the ability to liquidate the assets that were readily liquidated -- able to be liquidated -- before year-end?

A The only thing I assessed was the fact that their

shareholders, and in particularly, the chairman of the company, seemingly had significant assets -- relevant access to be able to provide and contribute to the situation. My understanding was he was well-informed and involved in the process.

Q Okay. And you were asked a question by Mr. Rose that it is common for entities to designate special purpose entities to take the assets (indiscernible) bankruptcy 363 sales, correct?

A Yes. That's my understanding.

Q Okay. And you've been in many sales where such entities are designated, correct?

A Yes.

Q And parties to contracts often ask for guarantees, financial backing, and other financial commitments in light of the fact that those special-purpose entities are not usually adequately capitalized, correct?

A In most processes, yes. I -- that would be (indiscernible).

Q Okay. And here, you have the government of the West -- the government and the Virgin Islands entering into an operating agreement with this special-purpose entity, correct?

A Well, I believe that the buyer has the ability to, you know, take the existing contract; and therefore,

(indiscernible).

Q Yeah. And it's been represented that they, in fact, are going to assume the Virgin Islands operating agreement on the closing. Isn't that correct?

UNIDENTIFIED SPEAK: Objection, Your Honor.

THE WITNESS: Yes.

UNIDENTIFIED SPEAKER: I think we're outside the redirect.

THE COURT: Well, I think that we're to this issue that Mr. Gilardi raised that he says, "Look, I can either do it now" --

UNIDENTIFIED SPEAKER: Oh, okay.

THE COURT: -- "or" --

UNIDENTIFIED SPEAKER: If we're doing it now, that's great. (Speakers talk at the same time).

THE COURT: Yeah. No. He's not going to recall Mr. O'Hara --

UNIDENTIFIED SPEAKER: Okay. Thank you --

THE COURT: -- having gone down --

UNIDENTIFIED SPEAKER: -- Your Honor.

THE COURT: -- this path.

MR. GILARDI: Yep. Exactly, Your Honor.

THE COURT: Though --

UNIDENTIFIED SPEAKER: Yes. (Speakers talk at the same time) withdraw.

THE WITNESS: Yes. So yes. My understanding is the -- that the special-purpose entity will -- is assuming the contract with the Virgin Islands and I believe that, though I have not had direct conversations (indiscernible) advisors who had conversations with the (indiscernible) the Virgin -- U.S. Virgin Islands, and they're aware of that fact.

BY MR. GILARDI:

Q Okay. And as you sit here today, you know of no -- well, strike that. Mr. O'Hara, as you sit here today, do you know if any equity at WIP (indiscernible) has been raised from its shareholders?

A No. I -- I'm not aware of where -- the status of where they are in raising equity.

Q (Speakers talk at the same time).

A I -- if I can clarify. I did have a conversation yesterday where it was represented to me from the WIP -- West Indies Petroleum team -- that, that process has commenced. You know, they are prepared to do so.

Q Okay. And when you said, "by the West Indies Petroleum team," could you please just identify who you actually had those conversations or who participated in those conversations from the West Indies Petroleum group?

A Yeah. It was the management team and their legal representation -- legal representatives.

Q So the management team, was Mr. Chambers involved in that conversation?
A Yes. Mr. Chambers, Mr. Delvalley (phonetic). There may have been others on -- and their legal team.
Q Thank you. And when they described that, that process hadn't been commenced, did they give you any details about what actually was happening with the shareholders of the West Indies Petroleum group, Jamaica, to raise the capital?
A They -- it is my understanding that the shareholders that make up a majority of the outstanding ownership of the West Indies legal -- or the West Indies entity -- and West Indies Petroleum entity had -- I would say that they -- there is a very specific thing for it. Hopefully, Mr. Chambers can describe it in better detail, but you know, in essence, they've -- it's not a backstop, like, you know, we would traditionally call the backstop, but it was a, you know, a guarantee that the money would be raised.
Q So let me ask you, do you have an understanding of whether the shareholders or the majority shareholder is going to provide equity financing to the West Indies Jamaica company?
A Yes. That's my understanding.
Q Okay. So it's not a loan; it is an actual equity investment into West Indies Petroleum, Ltd, the Jamaican company?

A Yes. The -- it was specifically stated that the -- that the 62 million cash consideration did -- was going to be raised as all equity.

Q Okay. And was it going to be all equity from its existing shareholder West Indies Petroleum a St. Lucia entity? If you know.

A I -- I'm not -- I -- yeah. The details of what the equity in and all or where was coming from, I don't know all the details. I do -- the only details I'm aware of is that there was a -- a raise from the West Indies Petroleum that had been launched, and again, because of the nature of how it works within Jamaica, it was, you know, quote/unquote "guaranteed by the majority equity holders," and that they anticipated raising all of the capital necessary to close on the 62 million cash consideration bid as all equity using cash on hand and equity raises.

Q And let me ask (indiscernible) to use a couple of phrases; and if you don't know, please, you may -- I may have exhausted your knowledge. Was it going to be a (indiscernible) offering to all of the shareholders of West Indies Petroleum, Ltd?

A Yeah. You're already exhausting -- I -- all I -- all that was understood by me was that as majority holders that they were obligated in order to raise the capital. Whether that meant that the -- they was again, a true rights offering

what we normally see in the U.S. here, as (indiscernible). I actually kind of raised the question that way, and it was -- it was communicated back to me that, in Jamaica law, that once the majority equity holders raised the capital (indiscernible) that they're obligated in order to commit the funds that are required.

Q Do they happen to use the phrase, "a rights issue"? Do you recall?

A They -- I -- it -- they may have, but I don't recall specifically.

MR. GILARDI: I have no further questions for the witness. Mr. O'Hara, thank you.

THE COURT: All right. And thank you.

Mr. Hughes, anything else?

MR. HUGHES: Nothing else for me, Your Honor.

THE COURT: All right. Thank you.

MR. Rose, anything else?

MR. ROSE: No, thank you, Your Honor.

THE COURT: All right. Thank you, Mr. O'Hara. Obviously, I want to you hang around, but you are excused as a witness.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

THE COURT: Thank you.

All right. Let me ask, do folks want a break? Do

we want to continue on? I've canceled my afternoon, so you have all -- you have my attention the rest of the afternoon and into the evening.

So what would you like to do?

MS. GREEN: Your Honor, Elizabeth Green on behalf of the Debtors. I could use a break.

THE COURT: Okay. What makes sense? I'd like to --you know, can we -- can we -- it's five of one. Could we reconvene at two? Would that work for everybody? That's Central Time obviously. Shorter? Longer?

MS. GREEN: Shorter, maybe.

THE COURT: Okay.

MS. GREEN: (Speakers talk at the same time).

THE COURT: Okay. So 30 minutes is fine by me. Anyone have an issue with breaking -- Mr. Brookner?

MR. BROOKNER: Your Honor, I'm sorry to be the squeaky wheel here, but I have a hearing with Ms. Webb (phonetic) with Judge (indiscernible) -- excuse me -- at 1:30 on a pretty significant (indiscernible).

THE COURT: Okay.

MR. BROOKNER: And if there is any conceivable way that I can be able to attend that, (indiscernible).

THE COURT: So then we'll break until two. Look, folks, we're going to -- we're going to finish today however long that takes. We're going to finish today. So just plan

your -- plan your calendars accordingly. I'll see everybody back at two o'clock Central.

(Recess taken from 12:56 p.m. until 2:00 p.m.)

AFTER RECESS

THE COURT: All right, the time is 2:00 o'clock Central. We are back on the Record in the jointly administered cases under Case No. 21-32351, Limetree Bay Services.

Folks, I did terminate the phone call over the lunch hour. If you're going to be speaking, haven't already done so, I do need for you to hit five star for the afternoon session.

All right. Oops, lost Ms. Green.

(Pause in the proceeding.)

THE COURT: Ms. Green, good afternoon. Are you -- I assume that you are calling Mr. Shapiro next; is that correct?

MS. GREEN: I am, Your Honor. If I can with the request -- with the indulgence of the Court, if I can have Mr. Delaney go through the final resolved objections so that various parties who are sitting through this hearing --

THE COURT: Oh, don't have to wait.

MS. GREEN: -- don't have to do that?

THE COURT: Sure. Absolutely. Mr. Delaney, lectern is yours. Thank you, sir.

MR. DELANEY: Good afternoon, Your Honor. Michael Delaney, Baker Hostetler on behalf of the Debtors. I just wanted to run quickly through the pending objections, to give you an idea of what's transpired during the hearing and what's been resolved.

THE COURT: All right, thank you.

MR. DELANEY: So, this may be duplicative of what Ms. Green spoke on earlier, but I just want to make sure we cover everything.

So, starting at the top. ECF No. 823 is F&M Manufacturing. We've resolved their objection. There's no additional language in the order. But they've reserved rights with respect to cure amounts if we decide to designate a contract for assumption.

THE COURT: Right.

MR. DELANEY: 824, Universal Plant Services. We've reached out to them. They asserted an objection regarding cure amounts. Their contract is not being assumed. We informed them that we believe their objection is mute and we did not receive a response. 825, is the same as Universal Plant Services.

Then there's 838, Galena Park Independent School District, among others. We've resolved their objection by the including of language in the proposed sale order.

851, HKA Enterprises, LLC. We've resolved their

objection by agreed upon language be included in the sale order.

854 and 874, that's Axens North America. We've resolved their objection upon the agreement of language being included in the sale order.

863 and 951, SAP America. We've resolved their objections through agreement on language be included in the sale order.

867, Intertek USA, Incorporated. We've resolved their objection through the included language in the proposed sale order.

869, Harris County Texas. We've resolved their objection through the agreement to include certain language in the sale order.

870, Load Service, US. And this is the same as Universal Claim Services. We believe their claim is mute because they're not taking a contract. We contacted them. And as of yet, received no response.

822 and 875. The Limetree Bay Terminal entities. That -- their objections have been resolved pursuant to certain agreed upon language in the sale order.

895, this is pronounced Wunderlich-Malec Engineering. We have resolved their objection without inclusion of language and received confirmation from their counsel that we agree that their objection is mute because

it's a cure claim objection.

950, the US. There is agreed upon language included in the sale order resolving their objection.

The last few are the objections of Bane and St. Croix Energy LLLP and which are not resolved.

THE COURT: Got it. Thank you, Mr. Delaney.

Let me just ask, is there anyone who is on the call that wants to respond to the announcements made by Mr. Delaney such as you thought you were included, missed one, the announcement wasn't quite what you were expecting. Any complaints?

(No audible response.)

THE COURT: All right. Then, Ms. Green, are we ready to proceed ahead with Mr. Shapiro?

MS. GREEN: We are.

THE COURT: All right, thank you.

Mr. Shapiro, if you'd raise your right hand, please, sir.

(Witness sworn.)

THE COURT: All right, thank you. Ms. Green, whenever you're ready.

MS. GREEN: Sure.

DIRECT EXAMINATION OF MARK SHAPIRO

BY MS. GREEN:

Q Good afternoon, Mr. Shapiro. Can you tell me what your

position is with the Debtors?

A I'm the chief restructuring officer for the Debtors and have been since June 17th, 2021.

Q And I know you've testified before this Court before about your background. But for the record, can you please give a short description of your position with B. Riley and your background?

A So, I'm a senior managing director with B. Riley Roger Services in Dallas. Majority of my practice is in company side work. I've been CRO for more than a dozen companies in my career.

When you look at total companies side disarments including FAA companies, FAA to debtors, interim works, receivership, things like that, I've been in those rolls for more than 30 companies.

I've been with B. Riley for more than five years and before that I did similar type advisory work for a small boutique in Dallas for 11 years. And prior to that I was the CFO for both public and private companies.

To the larger public CFO roles I had was with -- one was with Big Lots in Columbus, Ohio. The other one was with Central Parking in Nashville. Both of those were multi-billion dollar public companies.

In addition, I co-head the firms diligence practice and transaction support, assessing and evaluating targeting

credit and acquisition opportunities for -- mostly for lenders and private equity firms.

Q Thank you. In connection with your duties as CRO, did you have occasion to be appointed by the board of directors as a member of the restructuring Committee?

A I have.

Q And does the restructuring Committee approve the CRO's ability to conduct the auction and pick a winner and a backup winner?

A They did.

Q And once the auction was reopened by this Court, did your authority remain to do that?

A It did.

Q And did you attend the auction which was held on the 17th and 18th of this month?

A I did.

Q And were you there for the entire auction?

A Yes. A private auction.

Q Trick question. And did you ultimately select the bidder, the highest bidder?

A I did.

Q And who did you select as the highest bidder?

A The Joint Venture of West Indies Petroleum or I should say joint venture, West Indies Petroleum Limited and Port Hamilton Oil and Transportation, the acquisition vehicle.

Q And what was the purchase price?

A $62 million. It was an all cash bid.

Q And who did you select as the backup bidder?

A St. Croix Energy.

Q And at what price?

A They were at $57 million, also an all cash bid.

Q And were the bids apples to apples so to speak?

A Initially they were not, but during the auction, St. Croix agreed to purchase the real estate. And then they also adopted similar closing dates to West Indies.

Also there were differences, though. St. Croix bid was not going to close on the real estate until February 22nd. And also they were requiring the Debtor to provide services to support a transition services agreement that was to be entered post closing.

Q So the Debtor was going to provide employees to St. Croix for some period of time?

A The Debtor was going to supply employees, but the Debtor only has nine employees. A lot of those consultants and one of the issues was that a lot of the employees that they were going to rely upon are actually employees of terminals. And they're not our employees, so.

Q And was that the subject of the terminals objection to this previous sale?

A Yes.

Q Can you tell the Court what you considered when you selected the winning bidder?
A Well, the ultimate purchase price is foremost. The winning bid was $5 million more. There was almost a $10 million deposit that was put up by the winning bidder.
Q And, in fact, has deposit been put up?
A It has been received, yes, $9.8 million.
Q And you've confirmed that?
A I have.
Q Did you consider anything else in determining that West Indies was the highest and best offer for the Debtor?
A To some extent the fact that the land was not going to transfer for an extra month. There was an additional period of holding, an additional month of liability for the estate.
And then ultimately the issue surrounding the fact that terminals employees and debtor employees were going to be involved in the transition services.
Q Do you believe that the consideration of $62 million is fair and reasonable for these assets?
A I do.
Q And was notice provided to creditors of the sale and of the sale hearing?
A It was.
Q What benefit does the sale have to the Debtors?
A Well, as I said, the Debtors will be receiving $62

million, all of the real estate will be transferred at closing and there will be no need for additional support from any of the debtor employees.

Q What benefit does it have for the estate and the creditors?

A The DIP facility will get paid in full. All administrative expenses, from what we know right now administrative claims will be paid. And there should be additional funds left over for other creditors.

Q Is it your business judgment that the sale to West Indies is the highest and best offer for the assets?

A It is.

Q Did you make this recommendation to the board of directors?

A I did.

Q And was there a meeting of the full board conducted?

A There was.

Q And when was that?

A The board meeting was -- I'm trying to remember the date of the board meeting. My dates are getting conflated here. The approval of the board date -- I'll look at my notes. The date is escaping me right now.

Q Was it shortly before this hearing?

A I lost you. Can't hear you.

THE COURT: So, Mr. Shapiro, we lost your mic there

for a second.

THE WITNESS: There we are. Okay. Sorry about that.

BY MS. GREEN:

Q Was it actually just yesterday, Mr. Shapiro?

A This is Tuesday. Yes, Monday -- Monday morning. The last time I did the same thing. I thought I missed my Mondays and Sundays. They all run into each other.

Q I think when you work 24 hours a day, the days all seem to be the same. So were you in attendance at that meeting?

A I was.

Q And did the board ask any questions about the bid?

A Yes. They -- we talked a lot about the qualifications of the bidders; the ability to close; the financial wherewithal. All those things were discussed at the board -- with the board.

Q And after the discussions, did the board approve the West Indies bidder, as the highest and best offer for the Debtor's assets?

A They did.

Q Did you come to know late last night that there were some allegations related to the financial wherewithal of West Indies Group to close the transaction?

A Yes, I was made aware of those.

Q And what were those new allegations?

A Other allegations that were discussed earlier. The fact that essentially that the winning bidder does not have the financial wherewithal to close. And that the first auction was -- auction was reopened based on false premises.
Q Did you do anything to follow-up on those allegations?
A Yes with counsel and Jefferies -- Michael O'Hara from Jefferies last night, we had a call with the buyer and their legal representative last night.
Q And with representatives of the buyer?
A Correct.
Q And what did you learn from that call?
A What we gathered from the call was there's a lot of explanations for a lot of the noise that's been in the press. I think myself and Mr. O'Hara felt comfortable that the representations for the financial wherewithal that we were relying upon.

We opened the auction where it was still -- there was no change and that we were still comfortable with the winning bidders ability to close.
Q And do you still believe that the winning bidder, West Indies, is the highest and best offer for the assets after that conversation?
A I do.

MS. GREEN: Your Honor, I have nothing further.

THE COURT: All right, thank you. Is there anyone

else that supports the proposed sale, have any questions for Mr. Shapiro?

(No audible response.)

THE COURT: All right. Then Mr. Galardi?

MR. GALARDI: Thank you, Your Honor.

CROSS-EXAMINATION OF MARK SHAPIRO

BY MR. GALARDI:

Q Mr. Shapiro, you said you received a deposit today of approximately $10 million; is that correct?

A We received 6.8 million today. The first three million was before the first auction.

Q Okay. And when you -- when you received the deposit, did you receive all of the funds from West Indies Petroleum, Limited or from other entities?

A We received partial from West Indies and partially from Dave Roberts.

Q And what is your understanding of Mr. Roberts relationship to the bidders?

A My understanding is that he's going to be an equity partner in the bidders.

Q And do you know exactly where he will be an equity partner? Will he be an equity partner at West Indies Petroleum, Limited?

A I believe he's going to be a partner in the acquisition vehicle. But I could be wrong there.

Q And prior to -- when was the first time you heard that Mr. Roberts was going to be involved on behalf of the bidder?
A Not until after -- not until the auction was reopened. Until after that. I didn't hear his name before then.
Q And do you know that Mr. Roberts is the CEO of a company that served on the creditors Committee?
A I understand Excel was previously on the creditors Committee. They resigned and Dave Roberts is the CEO of Excel, yes.
Q Okay. And do you know whether Mr. Roberts, in his capacity as a Committee member ever received confidential information regarding the bidding process or even with respect to St. Croix Energy initial bid?
A Dave Roberts was -- we had heard about Dave Roberts interest in Limetree Refining, I think it was back in October. We had a call of the Committee. Mr. Warner, I believe Mr. Power may have been on the call as well, were notified.
They immediately went back and wanted to understand the situation. I believe he resigned even before that call, but I'm not sure of that. But that was to the extent I heard long before West Indies, that Mr. Roberts was interested in the company.
Q Okay. And was Mr. Roberts or any entity with which he was affiliated ever determined to be a qualified bidder by

the bid deadline of -- I think it was either November 17th or 16th?

A I'm unaware if that former -- the former interested party ever got qualified. I'm not sure if they ever were.

Q And so in the conversations that you and Mr. O'Hara had last night regarding the financial wherewithal of West Indies to close the transaction, was Mr. Roberts on that phone call?

A No, he was not.

Q Okay. And was it represented to you that West Indies Petroleum would need Mr. Roberts financing to close this transaction?

A We never asked that question specifically. He's a partner and the combined funds were going to be used to close the transactions. I don't know if one was mutually --

Q When you say he's a partner, he's a partner in what?

A He's an -- my understanding is he's going to be an equity partner in the acquisition. I believe Port Hamilton, most likely.

Q But do you have any documents --

A No, I don't.

Q Sorry, go ahead finish you answer. And have you seen any documents that commit Mr. Roberts to become an equity partner in -- I guess it is the Port Howard Refinery and Transportation LLLP Company?

A Port Hamilton. No I have not seen documents.

Q Okay. And when you say you would be -- so exactly what have -- what is your understanding that he investing in with respect to closing this transaction?

A My understanding is that he's going to be an equity partner in the company that ends up investing or ends up closing in this transaction. That is my understanding.

Q Okay. And what is your understanding of the company that ends up investing in and closing on this transaction? What company is that?

A I believe it's Port Hamilton Refining and Transportation.

Q So you believe that he will be a partial owner of Port Hamilton Refining Transportation LLP?

A Yes.

Q Okay. And do you have any understanding of what percentage of Port Hamilton Refining and Transportation, LLP Mr. Roberts will own?

A My current understanding is 30 percent. But that may change.

Q Okay. And do you have an understanding of what interest West Indies Petroleum Limited will own?

A I guess my understanding is 70 percent, but again those numbers could change between now and closing.

Q And when doing the investigation of the financial wherewithal to close the $62 million transaction, were you

aware of this at the time of the auction that that would be the financing for the closing of that transaction?
A No.
Q And at any time prior to the auction, did you know that Mr. Roberts would be contributing capital going into the December 17th auction?
A Going into the auction, yes, we did know that he would --
Q Did you know how much capital he would invest?
A No, I did not.
Q Did you know -- did you take any effort to try to qualify Mr. Roberts as a partner or as a joint payer with respect to this transaction?
A No. The Debtors really were relying on Jefferies for the qualifying.
Q Now, when -- you testified in connection with the reopening of the auction, correct Mr. Shapiro?
A I did.
Q And in your declaration in support of that you submitted that you believed that reopening the auction for the West Indies Group would be in the best interest in the estate, correct?
A Correct.
Q And do you recall the entity that West Indies -- that was the joint bidder with West Indies Petroleum on the date

December 5th, 2021?

A Just from hearing the prior testimony of Mr. O'Hara.

Q And hearing the prior testimony of Mr. O'Hara, you understand that to be St. Croix Refining and Transportation LLP, right?

A I do, yes.

Q And did you know or did you have any reason to believe that Mr. Roberts was affiliated with St. Croix Refining and Transportation, LLP on December 5th?

A No, I did not

Q And when the Court re-opened the bidding for the bidder, do you recall any concern of the Court that the bidding would only be confined to St. Croix Energy, the WIPL bidders and possibly Bay and Savin; do you recall that occurring on December 5th?

A Yes, I do. Yes.

Q And when it came time to know that there would be this additional joint bidder and Mr. Roberts would be involved in that, did you at all make any effort to advise the Court and get -- to get whether that could possibly be done under the revised procedures?

A I did not. I always considered the bidder to be essentially West Indies Petroleum and just like even with St. Croix Energy, they have equity partners. I don't know everything about the equity partners.

I really did not do anything more once -- again same as I heard that it was a name change due to a related or party that was registered and then had to change the name of the co-bidding entity.

Q Okay. And you do understand that St. Croix is only a single entity and it had no joint bidders, correct?

A I did. I understand.

Q And you do understand that there was specific authority to have joint bidders with respect to West Indies Petroleum and St. Croix Refining and Transportation, correct?

A Yes.

Q And you do understand that the bid that's now being put before the Court is with a different joint bidder, West Indies Petroleum Transportation and Port Hamilton Refining and Transportation, correct?

A Yes. But as I said, I was told it was simply a name change.

Q And did you do anything to confirm that, that was, in fact a name change?

A I did not.

Q And you also testified that you didn't believe that Mr. Roberts was associated with St. Croix Refining and Transportation; isn't that correct?

A That is correct.

Q And if you knew that Mr. Roberts was related to St.

Croix Refining and Transportation at the time of the December period, would you advise -- would you have advised the Court that former member -- former member associated with a member of the Committee was involved in the bidding?
A That's a good question. I'm not sure if -- I can't say whether we would have advised or not. It was a known -- at least I believe, a known fact amongst many of the parties that Mr. Roberts was interested in the -- a bidder on the company.
Q But Mr. Roberts was also aware of the November 17th bid deadline for anybody to become a qualified bidder, wasn't he?
A Yes.
Q And Mr. Roberts did not submit a bid to qualify to bid as November 17th deadline; isn't that correct?
A Correct.
Q And Mr. Roberts didn't have any health emergency that would have precluded from meeting that deadline; isn't that correct?
A That is correct.
Q Okay. Now, when the name change -- when Port Hamilton Refinery Transportation was added, did you ask any questions as to why that change was made?
A I didn't ask -- I'm not sure if I asked or if I was told during one of the update sessions with counsel. But that's when I heard about the name change.

Q Okay. And let me ask you, after the motion to reopen the auction was granted, when did you first become aware that West Indies Petroleum wanted to extend the closing date from December 22nd to a later date?

A You know, I don't know the exact date of when that was done. It was a short time thereafter that it was extended out. It might have been a week or so after I. Again, I'm not exactly sure of the date.

Q Do you believe that that was a material consideration for the Debtor's -- strike that.

With respect to the closing on the December 22nd, 2021 date, did you get assurances that West Indies Petroleum Limited could in fact close on December 22nd, before seeking to reopen the auction?

A I'm not aware of any representations about the December 22nd closing. After everything was extended I also had the belief that the closing was going to take place sometime after the first of the year. I think --

Q That's not my question, Mr. Shapiro. Let me ask my question again very precisely. As of December 5th, when the restructuring Committee authorized the company to file a motion to reopen the auction, was it your understanding that when West Indies Petroleum Limited was prepared to close a $30 million cash transaction on December 22nd, 2021?

A Yes.

Q Okay. And that was the representation made to the Court on December -- at the December 6th hearing, correct?
A Yes.
Q And do you believe that that was a material representation made to the Court at the December 6th hearing?
A I don't know -- I can't say whether it was --
MS. GREEN: Objection.
THE WITNESS: -- a material representation.
THE COURT: What's the objection?
BY MR. GALARDI:
Q Do you believe that was --
THE COURT: I'm sorry, Mr. Galardi there's an objection. Ms. Green, what's the objection?
MS. GREEN: It calls for a legal conclusion whether it's material or not.
THE COURT: I think Mr. Shapiro's answer was he doesn't begin to have any clue. Nor would he guess what's material, to me. So I'll overrule the objection as mute.
Mr. Galardi, go ahead, please.
BY MR. GALARDI:
Q Did you believe that that was a material consideration to the restructuring Committee to move forward in moving to reopen the auction?
A Again, I don't know if it was material or not material. It was the representation.

Q Was it significant to you as the CRO of the company?
A Yes.
Q Was it significant to you as a member of the restructuring Committee of the company?
A Yes.
Q Now, Mr. Shapiro when the date of December -- when West Indies Petroleum Limited reached out and asked to extend the closing date, how long of an extension did they initially request?
A I believe the original request was to the first week in January.
Q And how did it come to be the case that the extended closing date was January 21st, 2022?
A I don't know. I wasn't involved in those discussions.
Q Were you involved in any discussions regarding the financial impact on the Debtor's estate for extending the closing date from December 22nd to January 21st, 2022?
A Yes.
Q And what is your understanding of the cost to the estate that would have been incurred by the estate with the extended time?
A About a $5 million cost to the estate for extending the time.
Q Is it $5.8 million?
A I think that was the number that we came up with in the

auction.

Q Okay. And, Mr. Shapiro, when the auction -- when the hearing on the auction to reopen the auction was held, do you recall the representations made that the West Indies Petroleum transaction was 50 percent more than the St. Croix Energy transaction?

A Yes.

Q And that was approximately $10 million, correct?

A Correct.

Q And it turns out by extending the date, it was only about $4.2 million greater, correct?

A Correct. On the opening bid, that's the differential we came up with, yes.

Q Correct. And was it an important decision when you made when you went to the Court and asked to reopen the auction that you believed you were getting $10 million more consideration?

A Yes.

Q And was it an important and material decision to the restructuring Committee that by reopening the auction, it could possibly obtain $10 million more in a transaction that would close December 22nd, 2021?

A It was two fold. It was a $10 million difference in price and also the ability to have a competitive auction foregoing concern which we didn't have the first time.

Q Okay. And when you learned that the West Indies Petroleum would not close on December 22nd, was there any discussion with the restructuring Committee that -- you going back to the Court to make clear that it was now going to extend the closing date and that it would put the company at risk for up to $5.8 million of the additional consideration that was presented to the Court on December 6th?
A No.
Q Okay. So, let me get back to summarize your testimony. There was a change in the bidder, you didn't go back --
MS. GREEN: Objection. Is there a question?
MR. GALARDI: Yeah, I will.
THE COURT: Mr. Galardi, --
BY MR. GALARDI:
Q Mr. Shapiro, --
MR. GALARDI: I'm sorry.
THE COURT: No, go ahead.
BY MR. GALARDI:
Q Mr. Shapiro, so isn't it correct that there was a change in one of the bidders and you determined not to go back to the Court to have approval of that new bidder as a qualified bidder?
A I didn't view that the change in the -- that bidding entity as a change in the bidder. Again, I believe it was a change in the name and they were still being backed by the

money source West Indies Petroleum and the principals behind it.

Q Both the entities are listed as bidders, correct?

A That's correct.

Q And those are different -- and one of those bidders is different than the bidder that was a bidder at that -- was a bidder at December 5th, 2021, correct?

A Correct.

Q And you did not go back to the Court despite the fact that one of the joint bidders name changed or different entity changed, correct?

A I did not, no.

Q And you did not go back to the Court even though you knew this former member -- a person associated with a member of the creditor's Committee was now going to provide financing for the new bidder, correct?

A Correct. We did not go back -- I'm not sure if I agree with the representation of Mr. Roberts, but no we did not go back when we understood he was part of the new team, no.

Q Okay. And you did not go back when West Indies Petroleum asked for an extended closing date, correct?

A Correct.

Q Now, Mr. Shapiro, in the event that West Indies Petroleum does not close the transaction on December 21st, what remedy does -- do the Debtors have with respect to West

Indies Petroleum and with respect to Port Hamilton Refining and Transportation, LLP?

MS. GREEN: Objection, calls for a legal conclusion.

THE COURT: Overruled. Mr. Shapiro?

THE WITNESS: We would retain the $10 million deposit and we would litigate against the bidders.

BY MR. GALARDI:

Q Litigate against the bidders, that is the two bidders West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLP?

A Correct.

Q And is it your understanding that the deposit is not the exclusive remedy of the Debtors?

A Yes.

Q And as you subsequent to getting the $62 million bid, done anything to determine whether any such damage could be recovered from West Indies Petroleum Limited?

A We have not, no.

Q And have you done any diligence regarding whether any such damage claim could be received from Port Hamilton Refining and Transportation, LLP?

A We have not, no.

Q And has Mr. Roberts provided any sort of guarantee or other financial assurances that he would stand ready to pay

the damages if the transaction does not close on January 21st, 2022?

A He has not.

MR. GALARDI: No further questions, Your Honor.

THE COURT: All right, thank you.

Mr. Hughes, did you have questions? Mr. Hughes, oh there you are. Sorry. Thank you.

(No audible response.)

THE COURT: So Mr. Hughes, I haven't heard you. Could you just say something?

(No audible response.)

THE COURT: So have you hit five star when you came back in or do you have me muted from your side perhaps?

(No audible response.)

THE COURT: There you are. How about now?

MR. HUGHES: Sorry about that, Judge. I was having connection problems. I have no other questions.

THE COURT: All right, thank you.

Is there any other party that objects to the Debtor's motion that has any questions for Mr. Shapiro?

(No audible response.)

THE COURT: All right. Ms. Green, did you have any -- hold on there was Mr. Brimmage.

Mr. Brimmage?

MR. BRIMMAGE: Not in line with the questioners.

I'm just getting prepared for after Ms. Green, maybe.

THE COURT: Fair enough. Then Ms. Green, did you have any redirect for Mr. Shapiro?

MS. GREEN: I do.

THE COURT: All right.

MS. GREEN: I do.

REDIRECT EXAMINATION OF MARK SHAPIRO

BY MS. GREEN:

Q Mr. Shapiro, do you know when Excel resigned from the Creditors Committee approximately?

A I believe it was back in October.

Q Was that before the bid deadline for the first auction?

A Yes.

Q And can you tell me about the West Indies bid that was before the Court on the Motion to Reopen on the 6th. Did that include buying the land?

A Yes, it did.

Q And was that a significant factor in your determination related to whether or not the bid was highest and best?

A Yes, it was. There was a significant -- there was going to be a significant deduct from the St. Croix Energy bid leading into the auction.

Through some good negotiations, we were able to get them to change their ABA and they agreed to take the land and we didn't have to deal with that deduct once the auction

started.
Q But that wasn't the case on December the 6th, was it?
A It was not, no.
Q And so was that a material consideration in whether or not that was the highest and best bid at the time?
A It was a very large part of highest and best.
Q Did this West Indies bid require a transition agreement that used the Debtors and terminals employees?
A It did.
Q West Indies did?
A Oh the West Indies one, no it did not.
Q And did the St. Croix bid include that TSA?
A Yes, it did.
Q And did you consider that to be an issue?
A Yes.
Q How come?
A Well there was an additional risk on the part of the Debtors where we were holding real estate not knowing what was going to happen. Because if it was put back to the Debtors there was a lot of liability that could come back on the Debtors if they did not take the land.

From the transition services agreement, as I mentioned before, not only were they relying on the Debtors employees, but they were also relying on terminal employees and that has been an issue with terminals all along.

Q Is the St. Croix entity an SPE?
A Yes, it is.
Q And did Mr. Johnson provide a personal guarantee for that SP's then?
A No, he did not.

MS. GREEN: I don't have anything further, Your Honor.

THE COURT: All right, thank you.

Mr. Galardi, anything else?

MR. GALARDI: Oh, yes, I do want to ask a few questions on what Ms. Green asked, but I don't (indiscernible).

THE COURT: Mr. Galardi, and I am sorry. Whatever, for whatever reason I hear about every third word. And so I have no idea what you just said.

MR. GALARDI: Your Honor, can you hear me now?

THE COURT: I can now thank you. Whatever you did was perfect.

MR. GALARDI: I do have some limited recross, but I do believe Mr. Bast might have had some questions after Ms. Green, so I would first want to have those.

MR. BAST: No questions, Your Honor.

THE COURT: All right, thank you.

Then Mr. Galardi, go ahead, please.

MR. GALARDI: Surely.

Case 21-32351 Document 1001 Filed in TXSB on 12/30/21 Page 151 of 247



RECROSS-EXAMINATION OF MARK SHAPIRO

BY MR. GALARDI:

Q Mr. Shapiro, Ms. Green just asked you a lot of questions about how you valued the new bid from West Indies Petroleum on December 5th and that was the basis for your seeking to reopen the auction because you got a higher -- what you believed to be a higher and better bid, correct?

A Correct.

Q But isn't the reason that you were even able to do that, the basis for that was because there was a medical emergency and not simply because there was additional consideration to the offered to the estate?

A I'm not sure -- I mean. I'm not sure at this point what was -- it was the main consideration of what -- why the bid was not put in or why it was not qualified before hand, yes.

Q But there was no -- there was no financial wherewithal as of the bid deadline, correct?

A Correct. That was done once the bid was received.

Q Okay. And today, Mr. Shapiro, if the West Indies Petroleum -- if the Court does not enter a sale order today with respect to West Indies Petroleum, isn't it possible that there may be another higher and better bid for January 21st, 2022?

A Are you saying you want to -- we're going to reopen the auction between now and January?

Q No, I'm just simply asking that there is some other bidders possible if there's no sale order today, that somebody could come in and offer you higher and better consideration than the West Indies Petroleum Limited deal, couldn't they?
A It's possible, yes.
Q Okay and yet is there reason that you know of that West Indies Petroleum Limited has insisted on having the sale order today? Is that a condition to their APA?
A Yes.
Q Okay and when was that added as a condition to it's APA?
A Wait, what -- can you say that question again?
Q I'm sorry. Is there a condition president to their proceeding with their bid that a sale order approving them as the highest and best bid be entered today or tomorrow?
A No, I don't believe there is.
Q And is there any deadline by which the sale order approving them as the highest or otherwise best bid needs to be entered as a condition to their closing?
A In their APA, no.

MR. GALARDI: I have no further questions, Your Honor.

THE COURT: All right. Thank you.

And Mr. Hughes, did you have anything?

MR. HUGHES: No, sir.

THE COURT: All right, Mr. Shapiro, you've -- or have you had the opportunity to read all of the objections that have been filed?

THE WITNESS: Yes.

THE COURT: And you've heard the arguments made today by counsel for the various parties, correct?

THE WITNESS: I have.

THE COURT: Have you had an opportunity to process all of those objections and all the statements that you've heard today?

THE WITNESS: I have.

THE COURT: Is it your -- still your recommendation that proceeding with the West Indies proposal is in the best interest of the estate and constitutes the highest and best proposal?

THE WITNESS: I still do, Your Honor.

THE COURT: All right, thank you. Let me just make that circle one more time.

Ms. Green, any questions related solely to the question -- the couple of questions I asked?

MS. GREEN: No, Your Honor.

THE COURT: Mr. Galardi, same question.

MR. GALARDI: No, Your Honor.

THE COURT: All right, thank you. Mr. Hughes?

MR. HUGHES: No, sir. No questions.

THE COURT: All right, thank you.

Then Mr. Shapiro I do want you to hang around, but you are excused as a witness. Thank you, sir.

THE WITNESS: Thank you, Your Honor.

(Witness steps down.)

THE COURT: All right, Ms. Green, I know that you told me that there would be a third one of your colleagues that would do the next witness and I've forgotten who it was you told me.

MS. GREEN: Actually, it's Mr. Bast and he --

THE COURT: Oh, it's Mr. Bast, that's right.

MS. GREEN: -- is counsel for --.

THE COURT: Then that's --

MS. GREEN: He's counsel for --

THE COURT: -- no, I got it. Now I understand why I couldn't remember.

All right. Mr. Bast, so you're going to put on your client rep, correct?

MR. BAST: That is correct, Your Honor.

THE COURT: And what --

MR. BAST: You'll recall that the rule was invoked, so he's not on this if you'd allow me to go call him in.

THE COURT: So I want to understand what -- I want to understand why.

MR. BAST: Well primarily to make a record in

support of the good faith finding that is required as a condition to closing the sale order include a good faith finding under 360(3)(m).

THE COURT: So, you're testimony is limited solely to -- solely to good faith, correct?

MR. BAST: I would say it's a little broader than that, but yes that is the primary objective.

THE COURT: Okay, so let's try this again. So you're examination is going to be limited to good faith, correct?

MR. BAST: I was intending to cover given the broad scope of objections asserted by Mr. Galardi and the other parties. I don't believe their objections are limited to their good faith, but I think there are objections related to the qualifications for reopening the sale could -- I'm not saying I agree with this -- but could be asserted as obstacles to good faith.

And so we did expect to cover some of those topics that have been covered by the other witness and Mr. Galardi related to, you know, Mr. Roberts participation, the reasons they didn't bid the original auction and matters of that sort.

THE COURT: All right. Then.

MR. BAST: If the Court directs me not to do that, I'm prepared to --

THE COURT: I'm going to let you make your own mistakes. But go ahead and get your witness on.

MR. BAST: Sure. May I, Your Honor, maybe take a five minute break? Because I'm going to need to go over, to get my client logged back in anyway.

THE COURT: No, absolutely. We're all going to stay right here. But yes, if you'd go get him situated, that's just fine.

MR. BAST: I was just going to ask if we could have a bio-break too.

THE COURT: Oh, of course. No absolutely. So, sorry. I should have read between the lines. Then let's do this. Let's come back -- let's just come back at 3:00 o'clock Central. That would be 4:00 o'clock east coast time.

We'll be adjourned.

MR. BAST: Thank you, Judge.

(Recess taken from 2:49 p.m. to 2:59 p.m.)

AFTER RECESS

MR. ROSE: It's Jorian Rose. If we could have 10 more minutes, if it's possible?

THE COURT: Mr. Rose, I think I heard you is that you asked for 10 minutes before we resume; is that correct?

MR. ROSE: Yes, Your Honor. If we could have just 10 more minutes.

THE COURT: Absolutely. So it is now -- it's roughly 3:00 o'clock Central. We'll adjourn until 3:10 Central.

(Recess taken from 3:00 p.m. to 3:10 p.m.)

AFTER RECESS

THE COURT: All right. The time is 3:10, we are back on the Record. Before we begin, Mr. Bast, I disconnected Mr. Eagan simply because he was having a conversation and I could read his lips and I don't want to be able to read his lips, I don't want anyone else to be able to read his lips. So I simply turned him off, and I haven't seen him come back. But if he isn't coming back, that's fine. I did not intend to be discourteous. I was simply just trying to protect any attorney-client issues that might be present.

MR. BAST: All right. Thank you, Your Honor. I appreciate that. I will -- I haven't heard from him so I'm guessing he is back.

THE COURT: Okay.

MR. BAST: I believe he would otherwise communicate with us. Thank you --

THE COURT: That's all right.

MR. BAST: -- for letting me know.

THE COURT: Certainly.

And are we ready to proceed with Mr. Chambers?

MS. GREEN: Your Honor, the Debtor is going to rest and we're not going to call Mr. Chambers.

THE COURT: All right. Thank you. Then with that we'll simply -- we'll note that the Debtor's completed its case in chief.

Mr. Galardi, did you intend on calling any additional witnesses?

MR. GALARDI: Yes, we would call Mr. Chambers as a hostile witness.

THE COURT: All right. Thank you.

Then, Mr. Chambers, I am going to ask you, I -- we're watching you communicate on your phone, I want you, just so that you don't get yourself in trouble and you're not subject to these questions, if you'd just put your phone in your pocket, sir, or someplace out of the way where it's not in eyeshot.

Thank you, sir.

And if you would, please, sir, if you would raise your right hand.

(Witness sworn.)

THE COURT: All right. Thank you, sir.

All right. And let's see, I think -- let's see, let me make sure I did this. Ah, then your colleague, Mr. Galardi, has control, so whenever you're ready.

MR. GALARDI: Okay. Thank you, Your Honor.

DIRECT EXAMINATION OF CHARLES CHAMBERS

BY MR. GALARDI:

Q Mr. Chambers, you're the CEO of West Indies Petroleum Limited. Correct?

A Yes, sir.

Q And you are also a shareholder of West Indies Petroleum. Correct?

A Yes, sir.

Q Okay. And what I would like to put before you as an exhibit right now is the company's office document for Jamaica for the West Indies Petroleum Limited, please. And I butchered Ms. (indiscernible)'s name. I'm trying to better. She told me that was very good for an American.

(Laughter.)

BY MR. GALARDI:

Q So I apologize and she's brilliant so I want to make sure I get it right, so give her credit where credit is due.

If you would go down in this document you'll see the list of shareholders. This is the company's office in Jamaica, that's where West Indies Petroleum Limited is registered. Is that correct, Mr. Chambers?

A West Indies Petroleum is registered in Jamaica and it's also registered in Saint Lucia. So, yes --

Q Okay. So if you would look, if you would look at the bottom of your screen, and hopefully you have better eyesight

than I do, you'll see a company called West Indies Petroleum (Saint Lucia) Limited. Oh --
A Yes, sir.
Q -- we're going to get it back. And that is the majority shareholder, a very significant shareholder of West Indies Petroleum Limited Jamaica. Correct?
A Yes, sir.
Q And are you an officer of West Indies Petroleum Saint Lucia Limited?
A I'm a director of that company, sir.
Q Okay. Are you a shareholder? You're a secretary and a director. And are you a shareholder?
A Yes, sir, I am.
Q Okay. And do you know what aspect of West Indies Petroleum Saint Lucia they had other than its equity interest in West Indies Petroleum Jamaica?
A That's its only asset, sir.
Q Okay. And how long has West Indies Petroleum Saint Lucia been in business?
A About -- could you define when you say in business. Do you mean when was it incorporated?
Q Yeah, let's asked that, when was it formed?
A I believe 2014, sir.
Q Okay. And have you been a director of that company since its formation?

A Yes, sir.
Q Okay. And does Mr. Roberts have any financial interest in West Indies Petroleum Saint Lucia Limited?
A Does that work, sir?
Q Yes.
A No, sir.
Q And how did you come to meet Mr. Rogers -- Mr. Roberts, I'm so sorry. How did you come to meet Mr. Dave Roberts?
A I met Mr. Roberts when I became aware -- after I became aware of this transaction in -- I became aware of the transaction in November of 2021, sir.
Q So when you say this transaction, you were unaware that the Limetree Refinery was for sale prior to November of 2021?
A No, I was aware of it -- I was aware that it was for sale before but our interests in it became active in November 2021.
Q And when exactly after 2021 did Mr. Rogers -- Roberts reach out to you?
A I don't recall the exact date, sir, but I would say it was some time in November of 2021.
Q Okay. Was it -- well, let me ask you this, did you commence negotiating an asset purchase agreement with the Debtors regarding a purchase of the Limetree Refinery on behalf of West Indies Petroleum Limited Jamaica in the month of November?

A I don't think it was -- it was on behalf of West Indies Petroleum Jamaica, sir.
Q You don't believe that you were negotiating on behalf of West Indies Petroleum Limited in November?
A Jamaica?
Q Jamaica, the Jamaica entity, yes.
A No, sir. I think it was West Indies Petroleum Saint Lucia, sir.
Q Oh, so when you first approached the Debtors it was West Indies Petroleum Saint Lucia Limited that you were acting on behalf of. Is that correct?
A Yes, sir.
Q And when you were doing -- when you were negotiating on behalf of West Indies Petroleum Limited in November did you provide financial information to the Debtors regarding the financial wherewithal of West Indies Petroleum Limited Saint Lucia?
A I provided the financial statements for West Indies Petroleum Jamaica.
Q So I'm a little bit confused. Who were you negotiating on behalf of when negotiating in the month of November?
A West Indies Petroleum Jamaica, sir -- West Indies Petroleum Saint Lucia.
Q Okay. And maybe I can sum up the pieces. And so you provided West Indies Petroleum Jamaica's financials because

that was really the sole asset of West Indies Petroleum Saint Lucia Limited. Correct?

A Yes, sir.

Q Okay. Now did you have a joint bidder when you were -- let me -- strike that. Do you have an understanding of what the company St. Croix Refining and Transportation, LLLP is?

A Yes, sir, I believe that was a name that we tried to have for a special purpose for the acquisition. But I think that name is then too close to another company with a similar name and so I believe the name of that company was changed.

Q Okay. Is it your understanding it's West Indies Petroleum Limited, a Jamaica company, formed St. Croix Refining and Transportation, LLLP?

A I'm not sure to be honest. It should be probably noted that the name of the two companies are actually identical and it's West Indies Petroleum Limited in both Saint Lucia and Jamaica, sir.

Q But I understand that the West Indies Petroleum's official name is West Indies Petroleum (Saint Lucia) Limited. That's its actual name on the registry of companies in Saint Lucia. Am I incorrect about that?

A I believe you are, sir.

Q Okay. So you believe I am incorrect. So you think that there are two West Indies Petroleum Limited, one that's registered in Saint Lucia and one is registered in Jamaica?

A I believe that's the case, sir.
Q Okay.
MR. GALARDI: I would ask to put up the APA that was submitted on December 5, please. And if you would go to what I refer to as the first recital.
BY MR. GALARDI:
Q Now, Mr. Chambers, it's been represented to the Court that you are the sole person available with signing authority and the ability to authorize a deposit on behalf of St. Croix -- I'm sorry, on behalf of West Indies Petroleum Limited. Is that correct?
MR. BAST: Objection, Your Honor, lack of foundation, I don't believe that was anyone's testimony.
THE COURT: So, Mr. Galardi, I'm going to take it as a form objection. I don't think that you've laid the appropriate foundation, but I think you can with another question or two.
MR. GALARDI: Surely.
BY MR. GALARDI:
Q Mr. Chambers, who has the authority to approve a transaction to purchase the Limetree Refinery on behalf of West Indies Petroleum Limited Jamaica?
A Jamaica, sir?
Q Yes.
A I'd have to -- I mean I'm the CEO of West Indies

Case 21-32351 Document 1001 Filed in TXSB on 12/30/21 Page 165 of 247



Petroleum Jamaica.

Q I understand. And are you the only person on behalf of West Indies Petroleum Limited Jamaica who could have signed an APA on behalf of West Indies Petroleum Limited Jamaica?

A I would say so, yes, sir.

Q Okay. And are you the only person on behalf of West Indies Petroleum Limited Jamaica that could have authorized West Indies Petroleum Limited Jamaica to post a deposit with respect to any transaction on the -- for the Limetree Refinery?

A I'm not sure that the deposit came from West Indies Petroleum Jamaica.

Q That's not my question. My question is, let me put the date, on November 16 of 2021 are you the only person who could have authorized West Indies Petroleum Limited Jamaica to post a deposit in the support of the West Indies Petroleum Limited bid for the Limetree Refinery?

A Yes, sir.

Q And would you have been the only person on behalf of West Indies Petroleum Limited St. Croix to have posted that deposit on November 16 or 17, 2021?

A Please forgive me, sir, I'm not sure if I heard the question correctly. Did you say West Indies Petroleum St. Croix?

Q Yes.

A Could you repeat the question? I'm not -- West Indies Petroleum St. Croix, I don't know of any -- I don't have any association, sir, with a company called West Indies Petroleum St. Croix.

Q I'm sorry. I'm sorry. You're correct and thank you for correcting me. I didn't try to trick you. West Indies Petroleum Limited Saint Lucia, are you the only person that could have authorized a security deposit in connection with a West Indies Petroleum Limited Saint Lucia proposal or bid for the Limetree Refinery?

A Yes, sir.

Q Okay. Now if you read the first recital that is in front of you, it's right above the word Recital, I call it a recital. It says that St. Croix Refining and Transportation, LLLP was formed by West Indies Petroleum Limited pursuant to the laws of the Virgin Islands. Did I read that correctly, sir?

A Yes, sir. Yes, sir --

Q And that was a joint -- and did you have sole authority for making a deposit on behalf of St. Croix Refining and Transportation, LLLP as of November 16 or 17, 2021?

A I believe that's the case, sir.

Q And are you an officer of St. Croix Refining and Transportation, LLLP?

MR. BAST: Objection, asked and -- he already --

the witness has already testified that this entity changed its name.

THE COURT: Well, Mr. Galardi, I think there's an issue of confusing -- or confusion going on. Perhaps if you could re-word that, you'll make some progress.

BY MR. GALARDI:

Q Okay. Mr. Chambers, is West Indies Petroleum Limited, the Jamaica company, the manager of St. Croix Refining and Transportation, LLLP?

A I think I'd have to defer to my attorneys to answer that question, sir.

Q So you don't know.

A Well, I'm not sure. The manager, is that a -- I mean what is -- and, you know, and I'm not sure exactly what the question is. If -- yeah, I'm not sure. I'm not sure if I understand. The manager of the entity?

Q And that's fine if you don't understand. I'm not asking you to guess.

A Okay, sir. I don't think I understand the question, sir. Forgive me.

Q Okay. Thank you.

MR. GALARDI: If we would -- if we could put up the APA that's been submitted in support of this hearing today, please.

BY MR. GALARDI:

Q Mr. Chambers, have you seen this asset purchase agreement? And again, I understand it’s the first page, but have you seen the asset purchase agreement proposed by West Indies Petroleum Limited, a Jamaica company, and Port Hamilton Refining and Transportation, LLLP with the Limetree entities? Have you seen this document before?

A I believe so, sir, yes.

Q And are you the person that authorized West Indies Petroleum Limited, a Jamaica company, to enter into this asset purchase agreement?

A I believe that the asset purchase agreement would have been authorized by me, sir.

Q Okay. And --

A Sure. Like I said I think my understanding is the Saint Lucia company is contemplating (indiscernible) purchase.

Q Well, just you look at this document and the purchase agreement was -- is with West Indies Petroleum Limited, a Jamaica corporation. Is that correct?

A Looking at the (indiscernible), sir.

Q But it’s your understanding that it’s West Indies Petroleum, the Saint Lucia company, that’s actually the party to the contract?

A Yes, sir, that is the Saint Lucia entity that is the one that would be buying the refinery, sir.

Q Well, again, I want to make sure I’m clear. So let’s go

to Port Hamilton Refining and Transportation, LLLP, a Virgin Islands company. Is that the company that ultimately take title to the assets purchased pursuant to this asset purchase agreement?

A That's my understanding, sir, yes.

Q And is it your understanding that West Indies Petroleum Limited, a Jamaica corporation, should, in fact, instead be West Indies Petroleum, a Saint Lucia corporation in this document?

MR. BAST: Objection, it calls for a legal conclusion. It's apparent the witness is confused about this.

THE COURT: Well, I agree he's potentially confused, but it doesn't require a legal conclusion. So I'll overrule the objection.

Mr. Chambers, your answer, sir?

THE WITNESS: The entity that is -- my understanding is that the Saint Lucia parent company is -- intended to purchase.

THE COURT: And where did you get that understanding from?

THE WITNESS: Well, it's a function of where the capital is coming from to purchase -- to purchase the entity, sir.

THE COURT: Okay. Thanks.

Mr. Galardi, my apologies for the interruption.

MR. GALARDI: No, Your Honor, it's helpful.

BY MR. GALARDI:

Q Your understanding was that the actual capital to fund the transaction is coming from West Indies Petroleum Limited, a Saint Lucia corporation. Correct?

A Primarily, sir, yes.

Q Okay. Well, let's take it apart. Is that West Indies Petroleum Saint Lucia company making an equity investment in West Indies Petroleum Limited, a Jamaica corporation for the purpose of consummating the transaction contemplated by the APA?

A No, sir, the entity, the acquiring entity would be the Saint Lucia company.

Q Okay. So when you appeared at the auction, and which was a long auction, I think it was 14 to 15 hours, you were appearing on behalf of West Indies Petroleum Limited, the Saint Lucia corporation, not on behalf of West Indies Petroleum Limited, a Jamaica corporation. Is that what I'm to understand?

A Yes, sir. The Saint Lucia entity with its sole asset being the Jamaica entity, sir. Yes, sir.

Q Okay. And what are the assets -- and you've already testified that the only asset of West Indies Petroleum Limited, a Jamaica -- a Saint Lucia company is its equity

interest in West Indies Petroleum Limited, a Jamaica corporation. Correct?
A Yes, sir.
Q And does West Indies Petroleum Limited, a Saint Lucia company, have any cash currently on its balance sheet?
A It may have cash, correctly, in -- on its balance sheet. I mean we -- you know, it may have cash in accounts, but the funding came from the founding shareholders of West Indies Petroleum.
Q And let's please be careful. It was the founding shareholders of West Indies Petroleum Limited, Saint Lucia. Correct?
A Okay. The directors, the current directors of West Indies Petroleum, Saint Lucia.
Q Okay. And can you please name for me the current directors of Saint -- West Indies Petroleum Limited, Saint Lucia?
A Gordon Shirley, Tarik Felix and myself.
Q Okay. And how much of the purchase price of $762 million are the three of you providing in connection with closing the proposed transaction?
A Approximately 70 percent.
Q And who's providing the other percent?
A Mr. Dave Roberts, sir.
Q And has Dave Roberts ever been disclosed to this Court

to the best of your knowledge as a potential bidder or acquirer of the Limetree assets in connection with the West Indies Petroleum bid prior to today?

A I don't know, sir.

Q Now do you know if Mr. Roberts is putting his money in through West Indies Petroleum Limited, Saint Lucia, or is he putting his money in through Port Hamilton Refining and Transportation, LLLP?

A The details of the structure I think are still being finalized, sir.

Q Okay. And is the reason that West Indies Petroleum Limited, Saint Lucia providing the financing is because West Indies Petroleum Limited, Jamaica is unable to secure financing for the deal?

A Not necessarily, sir, but the -- not necessarily, sir.

Q Did there come a time in which Saint -- did there come a time when West Indies Petroleum Limited -- strike that. Is West Indies Petroleum Limited Jamaica currently in default under all of its debt instruments?

A No, sir.

Q Was it -- was West Indies Petroleum Limited Jamaica in default under its existing debt documents as of the end of -- as of December 31, 2020?

MR. BAST: Judge, I'm going to assert the same objection I asserted earlier and that is that these -- this

question inquires into the confidential financial information of the purchaser entities and the information -- these questions are derived solely from information which Mr. Galardi has in his possession by virtue of a third-party's violation of an injunction and confidentiality restriction.

We have since filed a copy of that injunction and it appears at Docket entry 973, and I would invite the Court to review, it's on Page 30 of 32, it's 31 of the ECF and it's specifically Paragraph 3C that contains the confidentiality language. As indicated, Mr. Galardi received this information, the financial statements and the other information from a plaintiff in that lawsuit who is bound by that injunction.

THE COURT: Understood. And I, as we go question-by-question my views of this may change, but a general question about were you in default as of December 31 on your loan instruments in 2020 is entirely appropriate. I would ask that not knowing anything. So with that one I'll overrule it. But that doesn't mean you shouldn't make it with respect to the next one, depending upon what that might be.

MR. BAST: Understood.

MR. GALARDI: And, Your Honor, I just wanted to add one thing.

THE COURT: Sure.

MR. GALARDI: I guess I've been a little bit confused, but my understanding now is that -- it's not quite clear to me that West Indies Petroleum Limited Jamaica is actually the purchaser.

THE COURT: So let me ask you this, Mr. Bast, and I certainly am not asking you to divulge any attorney-client communications, and clearly I understand the clients depend upon their professionals to implement the most advantageous structure from a liability tax and other standpoints, I got all that. I did that for many, many years.

But it would help if you could just add some clarity as to who the purchaser actually is. Are you in a position to be able to make that representation?

MR. BAST: I believe I can, Your Honor. The purchaser as set forth in the asset purchase agreement is West Indies Petroleum Limited. The vehicle, the entity which will be -- will take title to the assets is Port Hamilton Refining and Transportation. I believe where the confusion may be coming is that, and I might need clarification from Mr. Eagan or Mr. Leggett on it, but that Port Hamilton Refining is a subsidiary of the Saint Lucia entity. And that is where -- I believe that is correct and that may be where the confusion -- from where the confusion stems.

THE COURT: It would make sense -- let's do this,

Mr. Galardi, because I assume it would help make your questions more pointed if you actually had a starting place. Is that a safe assumption?

MR. GALARDI: Your Honor, I'm --

THE COURT: Or do you not care?

MR. GALARDI: -- going to -- well, Your Honor, I obviously do care and I don't want to sound callous about this --

THE COURT: All right.

MR. GALARDI: -- but I do believe this is the gentleman that should be having the information. He was in control of the process. And his confusion concerns me based upon the entities. And I would assume it does concern Your Honor because there were representations made in the reopening, there were made concessions here.

And as we'll go through -- and I understand there are confidential documents. Again, I'll go that I'm not trying to violate confidentiality. I don't believe the documents of West Indies, and if you read the injunction, it doesn't go to documents of West Indies Petroleum Limited, Saint Lucia. It goes to the documents at most of the Jamaica company.

THE COURT: Okay.

MR. GALARDI: And I'm not asking questions about the Saint Lucia company. So this is what's concerning me

about the broad brush confidentiality. And I don't want to breach confidentiality which is why I said let's go to Your Honor.

THE COURT: Okay.

MR. GALARDI: I don't want to be in complicity with an injunction, although I have my difference of opinion about it and I don't think it binds us.

And my third is, we can all just adjourn this and I could make the discovery requests and I'll get the same documents by discovery requests. This can't be withheld on account of privilege.

THE COURT: Right.

MR. GALARDI: Then we'll be back here on a confidentiality basis.

THE COURT: All right. So --

MR. GALARDI: And this is the witness that can -- I'm sorry.

THE COURT: No, no. My inquiry was really very simple, was did you want to understand from the legal advisors that are doing the structure what the structure is. If you want to continue to press and show me what Mr. Chambers either does to does not know, I'm happy for you to do that. I was genuinely trying to help. Why don't you just go ahead and --

MR. GALARDI: I understand.

THE COURT: -- go ahead and ask your questions, and I am going to read -- I do see that the document's been filed at 973 and I'm going to read Paragraph 3 as well as potentially others. So go right on ahead.

MR. GALARDI: Thank you, Your Honor.

BY MR. GALARDI:

Q Let me to go back to where I was. So, Mr. Chambers, are you familiar with the financial wherewithal of West Indies Petroleum Limited Jamaica?

A Yes, sir.

Q And --

A Yes. Yes, sir

Q Okay. And I don't mean to interrupt you. It's very difficult on Zoom, so I do apologize. So I'll try to be more patient with my next questions as I go. Mr. Chambers, as you -- as of December 5, 2021 did West Indies Petroleum Limited Jamaica have $30 million of cash on its balance sheet?

A No, sir, I don't believe so.

Q Okay. And, Mr. Chambers, as of December 5, 2021 did West Indies Petroleum Limited Jamaica have commitments for any of its shareholders to fund $30 million and to close the transaction by December 22, 2021?

A Yes, sir.

Q So it is your testimony that as of December 5, 2021 the

shareholders of West Indies Petroleum Limited, Saint Lucia, had authorized making an equity investment into West Indies Petroleum Limited Jamaica company.

A No, sir.

Q Okay. So let me ask my question again. Did West Indies Petroleum Limited, a Jamaica company, have commitments from its shareholders to fund a transaction with Limetree Refinery in the amount of $30 million, or whatever was short from the cash, so that that transaction could close on December 22, 2021?

A No, sir. The -- no, sir.

Q Thank you.

MR. GALARDI: What I would ask is that we pull up the document called the Articles of -- I forget what they're called -- the Articles of Incorporation for West Indies Petroleum Limited Jamaica. Are you there?

UNIDENTIFIED SPEAKER: Your Honor, can I share my screen?

THE COURT: I thought -- ah, yes, ma'am. My apologies. I thought I had given to you when we started.

BY MR. GALARDI:

Q Now, Mr. Chambers, West Indies Petroleum Limited, the Jamaica company, is a private company. Correct?

A Yes, sir.

Q Okay. Now is West Indies -- and again, just to the

extent you understand, if this is a legal question, you can say you don't know. Now is West Indies Petroleum Limited able to sell more shares to its shareholders to raise capital?

A West Indies Petroleum Jamaica?

Q Yes, Jamaica.

A I don't know, I'm not sure to answer that question.

Q Okay.

MR. GALARDI: So let me just ask to please go to Item 5 in the certificate.

BY MR. GALARDI:

Q Do you see Item 5 here on your screen, restrictions, if any, on share transfers, Mr. Chambers?

A Yes, sir.

Q Okay. And it says that a sale or transfer of shares to be first offered to the existing shareholders. Is that -- did I read that correctly?

A Yes, sir.

Q Okay. And so in order for West Indies Petroleum Limited Jamaica to actually raise capital by selling shares, it would have to make the sale of those shares offered to either all shareholders or to all existing -- to all existing shareholders. Is that correct?

A Yes, it -- yes, it would appear so, sir. Yes, sir.

Q Okay.

MR. GALARDI: And let's go down to, I believe it's Article 146. A little bit further. There we go.

BY MR. GALARDI:

Q And Article 146 actually says no share or class of shares may be issued unless the shares have been first offered to the shareholders of the company holding shares of that class. Did I read that correctly?

A Yes, sir.

Q And did West Indies Petroleum Limited Jamaica ever seek to raise capital for the Limetree transaction by selling its shares or increasing its shares?

A No, sir.

Q So no offer has been made to any of the West Indies Limited Jamaica shareholders as West Indies Petroleum Limited Jamaica shareholders. Isn't that correct?

A I'm sorry, sir, can you repeat the question?

Q So there has been no offering, no rights offering or no offering of shares in West Indies Petroleum Limited, the Jamaica company, to the shareholders of that Jamaica company. Correct?

A Correct, yes, sir.

Q Now why has that not happened?

MR. BAST: Objection, calls for -- calls for the witness to reveal attorney-client privileged communications.

THE COURT: So, Mr. Chambers, if you know why that

hasn't been done or if, in fact, there's a misunderstanding of the structure, I want you to say that. If your answer would come from advice given to you in your capacity as the director of the entity, then I want you to say that would come from my lawyer. First of all, is that clear?

THE WITNESS: I'm not -- no, Your Honor, can you please repeat whatever --

THE COURT: Certainly.

THE WITNESS: -- that you just said?

THE COURT: All right. So if the answer to Mr. Galardi's question would involve you repeating something that you received from a lawyer, in other words your lawyer said, We're going to do it this way, or here's when we're going to do it, or here's how we're going to it, then I want you to tell me, The answer would come from my lawyer, and I'll take it from there. If, on the other hand --

MR. GALARDI: Judge --

THE COURT: -- if on the other hand you know why this hasn't been done, or perhaps Mr. Galardi doesn't understand the structure, then I want you to go ahead and answer the question. Okay?

THE WITNESS: Yes, sir.

THE COURT: Okay. So with that, Mr. Galardi, I hate to put this on you, could you re-ask your question?

MR. GALARDI: (No audible response.)

THE COURT: And, Mr. Galardi, I think you muted me perhaps inadvertently.

MR. GALARDI: I did, Your Honor. I was taking a deep breath. So I apologize.

BY MR. GALARDI:

Q Mr. Chambers, to the extent it does not reveal an attorney-client communication do you have any understanding of why West Indies Petroleum Limited, a Jamaica company, has not sought to raise capital from the Jamaica shareholders to consummate the purchase of the Limetree Refinery?

A Yes, sir, because the funding for the purchase would be coming from the Saint Lucia entity which would be funded by the current directors of the Saint Lucia entity.

Q Okay. And in your conversations -- were you party to a conversation with Mr. O'Hara last week about the financial wherewithal of the company to close the transaction?

A Yes, sir.

Q And in that conversation did you make it absolutely clear to Mr. O'Hara and Mr. Shapiro that it was not West Indies Petroleum Limited Jamaica that was providing the financing, but that it was West Indies Petroleum Limited Saint Lucia that was providing the financing?

A I don't recall if in that conversation, you know, that I made that clear, sir, that it was the Saint Lucia entity versus the Jamaica entity.

Q So let me understand something. Is West Indies Petroleum Limited, the Jamaica company, contributing any money to consummate the transaction for the Limetree Refinery?

A At this moment in time it's not contemplated that money for the consummation of the transaction would come from West Indies Petroleum, the Jamaica company.

Q So isn't it fair to say that regardless of whether West Indies Petroleum Limited Jamaica had financial wherewithal or not, that that is irrelevant to whether this transaction can be consummated?

MR. BAST: Objection, calls for a legal conclusion.

THE COURT: Overruled.

THE WITNESS: Does that mean I should answer, sir?

THE COURT: Mr. Chambers, I am so sorry. You're not used to this. My apologies. Yes, sir, if you would go ahead and answer.

THE WITNESS: Okay. Thank you.

Could you repeat the question, please, sir?

BY MR. GALARDI:

Q Does that mean in your -- is it your understanding -- strike that. Dos that mean that the financial wherewithal of West Indies Petroleum Limited Jamaica is irrelevant to the ability to close the purchase of the Limetree Refinery?

A I don't know if that would be my conclusion, to be

honest. It's just that, you know, we're not contemplating funding the acquisition through West Indies Petroleum Jamaica.
Q Okay. It's not contributing any consideration whatsoever in the form of cash. Correct?
A At this moment in time that's not -- that's not being contemplated.
Q Correct. And at the time of the auction that was not contemplated. Correct?
A No, sir, it wasn't contemplated at the time of the auction.
Q So it is correct that it was not contemplated when you were bidding at the auction.
A The auction on December 17 that I --
Q Yes, sir, the 18th.
A Yes, sir.
Q Okay. And at the time that the auction was reopened December 6 was West Indies Petroleum Limited, the Jamaica company, providing or expected to provide the cash to consummate the $30 million transaction on December 22, 2021?
A No, sir, the cash -- no, sir, the deposit came from the shareholders -- from the directors.
Q So if Mr. O'Hara understood that there was some cash on the balance sheet of West Indies Petroleum Limited, a Jamaica company, that would be provided in connection with the sale

of the company on December 22, 2021, that was a misunderstanding. Correct?

A Well, I mean I'm not sure -- I am sure there were conversations that we had with Mr. O'Hara outside of, you know, my discussions with him, and like I said before, I don't think it's an accurate conclusion that West Indies Petroleum did not -- the Jamaica company did not participate in the transaction. But the contemplation is and was that West Indies Petroleum, the parent company, Saint Lucia, would be the one that would do the transaction, the funds to which would come from and have been identified to come from the shareholders of that -- the directors of that company.

MR. GALARDI: Your Honor, I may go dangerously close, I'm giving warning, on the question I'm going to ask.

THE COURT: Okay.

MR. GALARDI: But I'll ask it and -- of the argument.

BY MR. GALARDI:

Q You are a director of West Indies Petroleum Limited Saint Lucia. Correct?

A Yes, sir.

Q And as the director are you aware of any meeting that was called of the stockholders of West Indies Petroleum Limited, the Saint Lucia entity, to authorize a capital raise?

MR. BAST: Your Honor --

THE WITNESS: Forgive me I --

MR. BAST: -- yeah, Your Honor, this is the same objection, the information that Mr. Galardi is utilizing to inquire into this is derived from documents that we believe he has in violation of an injunction, and they are confidential documents which would otherwise not be in the purview of one bidder for purposes of scrutinizing another bidder's financial wherewithal.

And it is here where I understand the Court has given Mr. Galardi latitude on standing here, but that latitude should end here. One bidder does not have the authority to challenge the financial wherewithal of another. That is within the purview of the Debtor and the Debtor's business judgment with its -- in consultation with its advisors and the numerous, numerous consultation parties in this case.

THE COURT: All right. Thank you.

MR. GALARDI: Your Honor --

THE COURT: With --

MR. GALARDI: -- if I may respond to two things.

THE COURT: Okay.

MR. GALARDI: One is I don't believe, if you read the injunction language, it's Claimant 2 as I recall, and that is not the Saint Lucia entity. Second, Your Honor, with

respect to the testimony about business judgment, I think what we've heard all day is the business judgment was based on West Indies Petroleum Limited, the Jamaica company's, financial wherewithal. So I don't know what the business judgment was exercised if that entity is not putting in cash or other considerations.

THE COURT: So I --

MR. BAST: Your Honor --

THE COURT: No, we're going to stop this right here. This artificial distinction that's being drawn in a corporate structure is not particularly persuasive. I'm just trying to be as transparent as I can be. I think the question that's being asked is one that doesn't require any specialized knowledge. It is something that if you were on cross you're going to carefully craft just to understand the process.

So with respect to this question, and that is, has the process started, that's a fair question. But again, as I said, Mr. Bast, if it goes much further, I will begin to understand more the basis of the objection.

Mr. Chambers?

MR. BAST: Understood.

THE WITNESS: Yes, sir.

THE COURT: So do you remember the question?

THE WITNESS: Forgive me, Your Honor, I'm not -- I

do not remember the question.

THE COURT: All right. Mr. Galardi, if I could indulge you to ask that again, please.

MR. GALARDI: Absolutely, Your Honor. I may go back two questions because I have to get my train of thought back, but I will do my best.

BY MR. GALARDI:

Q Mr. Chambers, as a director of West Indies Petroleum Limited, the Saint Lucia company, was there a call for a meeting of stockholders to determine whether the stockholders would be prepared to provide financing to West Indies Petroleum Limited, the Jamaica company, in order to consummate this transaction?

A No, sir.

Q Okay. Was any information provided to the stockholders of West Indies Petroleum Limited Saint Lucia that West Indies Petroleum Limited Jamaica did not have the financial wherewithal to provide the financing to close the Limetree transaction?

A No, sir.

THE COURT: So, Mr. Chambers, let me ask you, I'm not near as smart as Mr. Galardi, so I'm going to ask you sort of some more simplistic questions. Is this the first time you've raised money at the Saint Lucia level?

THE WITNESS: Yes, sir.

THE COURT: Okay. So how are you going about it? You just send out an email that says, Everybody write a check? How are you doing it?

THE WITNESS: No, Your Honor, we're doing a capital raise through a rights issue from the shareholders in West Indies Petroleum Saint Lucia, sir.

THE COURT: All right. And you said this is the first time you've done that?

THE WITNESS: Yes, sir.

THE COURT: Okay.

THE WITNESS: And there was a meeting to authorize to change certain things in the rules of the company to the memorandum articles of the company which would give the company the latitude to go ahead and do so, sir.

THE COURT: All right. Is that just to increase the number of authorized but unissued shares? And I may not understand Jamaican law, but --

THE WITNESS: It's Saint Lucia law, sir, but --

THE COURT: Or Saint Lucia.

THE WITNESS: -- forgive me, Your Honor, but, yes, to do that as well as other things to facilitate that process. And I don't remember all what those things were, we were obviously advised by legal counsel on how to achieve those things. But effectively we've agreed to latitude to do so.

THE COURT: All right. Mr. Galardi, again, my apologies for the interruption. Go ahead, please.

MR. GALARDI: No, it was very helpful to simplify.

BY MR. GALARDI:

Q When actually was the rights issues begun?

A I'm not trying to be difficult, I'm just trying to answer the question, the exact question asked.

Q Well, let me ask you two questions. I may understand why you're having difficulty with my question. When did the company authorize proceeding with the rights issues?

A It has not done so as yet.

Q And, Mr. Chambers, would you have had to use the same mechanism to close the $30 million transaction on December 22, 2021?

A Which mechanism?

Q The mechanism of the rights issuance.

A (Indiscernible).

Q I'm sorry, I didn't hear your answer, and maybe it was sound in the background.

A That's correct, yes, sir.

Q Okay. And how long does the rights issuance have to -- how long does the rights issuance have to take or normally take, do you know?

A How long does one normally take?

Q Or how long do you expect it to take in this situation?

A I mean it's a legal question, sir, but my understanding is that it's in the rules of Saint Lucia that it can be done very, very quickly, in a matter of days.

Q Okay. Thank you. Mr. Chambers, are you a US citizen?

A No, sir.

Q And, Mr. Chambers, when you come to the United States do you need to have a visa to do so?

A I'm sorry, sir, could you repeat the question?

Q When you travel to the United States do you need a visa for your travel to the United States?

A Oh, sorry. Yes, sir, I do.

Q Okay. And how long does it take for you normally to get a visa to travel to the United States, is it days, weeks, months?

A I have a 10-year visa, I believe it expires in -- I forget when, but if I'd like to come to the United States, I just buy a ticket and fly here, sir, or travel private.

Q That's fine enough. Now again, I don't want to delve into the health issues, but I do want to ask some questions. My understanding is that you had a surgery on or about November 17, 2021. Is that correct?

A I believe that it was November 15, sir.

Q Okay. November 15. My apologies again. And was that surgery scheduled a week, a month, two months or even earlier before the November 15 date?

A I believe it was scheduled three days before, or two days before.

Q Two days before. And so did -- were you already in Florida at that point in time? I'm sorry, I put in a question I know. Was that surgery in Florida of the United States?

A No, sir.

Q Where was it in the United States, if I may ask?

A Minnesota, sir.

Q Okay. And did you anticipate in your trip to the United States to have that surgery, or is that something that happened while you were in the United States?

A I had a very serious surgery, and two days before it was expressed to me that I should absolutely go ahead with it, despite the fact that in coming to the United States, which I've done about like four days before that, it was still something that was being explored.

Q Okay.

MR. GALARDI: I have no more questions for Mr. Chambers.

THE COURT: All right. Thank you.

Mr. Hughes, did you have questions for Mr. Chambers?

MR. HUGHES: Your Honor, only a couple.

THE COURT: Okay.

MR. HUGHES: If you don't mind.

THE COURT: Not at all. Go ahead, please.

CROSS-EXAMINATION OF CHARLES CHAMBERS

BY MR. HUGHES:

Q Good afternoon, Mr. Chambers.

THE COURT: Actually, Mr. Hughes --

BY MR. HUGHES:

Q A good question for you --

THE COURT: -- Mr. Hughes, my apologies for the interruption. I should be more sensitive to this.

Mr. Chambers, I just want to make sure that you are feeling okay, that you don't need to take a break. Are you okay?

THE WITNESS: I'm fine, sir. Thank you.

THE COURT: All right. Mr. Hughes, my apologies again.

MR. HUGHES: No, of course, Your Honor. I probably should have asked myself.

BY MR. HUGHES:

Q Mr. Chambers, just a couple of questions. I believe you indicated that your surgery in Minnesota was on November 15. Is that true?

A Yes, sir.

Q And I think you indicated that it was scheduled a couple of days before that, on November 13. Is that correct?

A I think November 13 is the day, sir, yes.
Q And before November 13 were you having -- sorry, go ahead. Apologies.
A I may have -- well, I can't remember if it was 12 or 13, but somewhere around there.
Q Okay. So you had it scheduled to be done on the 15th either on the 12th or on the 13th. Is that right?
A Yes, sir.
Q And before the 12th or the 13th when you had it scheduled were you dealing with some medical problems before that that prevented you from working or communicating?
A I mean I had a -- I had to have open heart surgery because of actually pretty severe complications related to my heart, and it was being, you know, essential that I do it on November 12, sir.
Q And I understand.

MR. BRIMMAGE: Your Honor --

THE COURT: Mr. Brimmage.

MR. BRIMMAGE: Marty Brimmage, I'm just going to give the Court the heads up that I'm going to probably object from this point forward on any medical issues. I think he's gone into enough, I don't see the relevance in the issues before the Court, and I think the requirement of having him to answer more of these questions is inappropriate.

THE COURT: Yeah, Mr. Brimmage, I totally agree

with the exception that Mr. Hughes is going to ask him was he having difficulty in performing his job prior to November 12. I think that's an appropriate question.

If I got that right, Mr. Hughes.

MR. HUGHES: You did, Your Honor. And I wasn't looking for, you know, a download of his -- the details, I just --

THE COURT: I got it.

MR. HUGHES: -- want to understand if he was still working before then.

THE COURT: So, Mr. Chambers, the issue is were you still functioning in your normal role prior to the 12th or were you having issues before then?

And I don't --

THE WITNESS: Yes, sir.

THE COURT: Okay.

THE WITNESS: Well, I was feeling pretty much normal.

THE COURT: Okay.

MR. HUGHES: Your Honor, that's all I have.

THE COURT: All right. Thank you.

And let's see, Mr. Bast, did you want to -- did you want to cross Mr. Chambers, friendly cross obviously?

MR. BAST: Yes, Your Honor, please.

THE COURT: All right. Go ahead, please.

CROSS-EXAMINATION OF CHARLES CHAMBERS

BY MR. BAST:

Q Mr. Chambers, where did you have the medical -- I'm only going to ask a couple of questions to clarify, where did you have the medical procedure conducted?

A The Mayo Clinic --

Q (Indiscernible) --

THE COURT: Yeah, if that wasn't obvious from his first question, we all knew that, so.

BY MR. BAST:

Q I'm sorry, did you --

A The Mayo Clinic in Rochester, Minnesota, sir.

Q And you flew there for tests. Right?

A Yes, sir.

Q And the results of those tests led to the surgery. Is that correct?

A Yes, sir.

Q And that surgery took place on a Monday. Is that correct?

A Yes, sir.

Q And the test results came back that previous Friday. Is that correct?

A The conclusion that we needed to go ahead and do it was provided on Friday, sir.

Q So on Friday they told you you had to have surgery on

Monday. Is that accurate?
A Yes, sir.
Q Okay. Mr. Galardi asked you a question about where the money was coming from and you indicated that it was not coming from the Jamaican entity. But could the Jamaican entity fund any of the purchase price?
A Yes, sir, absolutely. I mean the Jamaican entity is controlled by the Saint Lucia entity which is controlled by the directors and the majority shareholders, and it could come from the Jamaican entity, sir.
Q Okay. And Mr. Galardi also asked you about a rights offering at the Saint Lucia level, and hasn't that process already started, the rights offering?
A Yes, sir. So the constitution documents of the company, the rules which govern it, has, you know, has been adjusted through a shareholders meeting which took place, you know, which -- for that purpose. It's already commenced.
Q And that already took place. Is that correct?
A Yes, sir.
Q And who are the -- who is the shareholder of -- with West Indies Jamaica?
A West Indies Petroleum, the Saint Lucia entity, owns four billion nine hundred and -- five billion minus 50,000 shares and five individuals own 50,000 shares, including myself, Mr. Shirley and Mr. Felix.

Q And is that why the funds are coming from the shareholders of the Saint Lucia entity as opposed to the Jamaica entity?
A Yes, sir.
Q And did those entities report their financial information on a consolidated basis?
A No, sir.
Q They don't. You're saying that the financial statements of West Indies Saint Lucia and Jamaica are not reported on a consolidated basis?
A I said physical and Jamaica is reported on a consolidated basis, but it was the -- but Saint Lucia is not reported on a consolidated basis. There's no reporting for Saint Lucia.
Q Okay. I may be done here, I just want to make sure. Oh, and when you spoke with Mr. O'Hara about the ability of the purchasers to fund the closing, did he also inquire about the individual shareholders, not just the entities?
A I believe so, yes, sir.
MR. BAST: I have no further questions.
THE COURT: All right.
MR. BAST: Oh, wait, I'm sorry, Your Honor. I did -- I have one more, I apologize.
THE COURT: It's just -- it's okay. Go ahead.
MR. BAST: If I may can we -- is it possible to

have Mr. Leggett control the screen share so he can pull up the asset purchase agreement?

THE COURT: Certainly.

MR. BAST: That is the --

THE COURT: What is Mr. --

MR. BAST: -- current asset purchase agreement.

THE COURT: What is Mr. Leggett's first name?

MR. BAST: Jaime Leggett.

THE COURT: Jaime. Okay. Hold on. Got you, Mr. Leggett.

MR. BAST: There it is.

THE COURT: Thank you. You should have it.

MR. BAST: I'm going to ask Mr. Leggett to bring up the asset purchase agreement and specifically the signature pages just to verify. Do we have an executed copy? No? Okay.

BY MR. BAST:

Q All right. Well, Mr. Chambers, this is the signature page for the asset purchase agreement that has been presented to the Court for approval today?

A Yes, sir.

Q And have you -- are you aware whether you have executed this document yet? I recognize that this is not an executed copy. If you recall.

A I believe I did, sir, yes.

Q And do you see who the purchaser entity is?
A Yes, West Indies Petroleum Limited, Port Hamilton Refining and Transportation, LLP, Virgin Islands.
Q Okay. And does this clarify for you which West Indies Petroleum entity is a purchaser under this asset purchase agreement?
A Yes, it does, sir.
Q And which entity is that?
A It would be the Jamaican corporation, sir.
Q And which entity is anticipated to take title to the asset upon the closing of the sale?
A The Saint Lucia entity, sir.
Q Is it the FPE that was formed in --
A Yes.
Q -- (indiscernible)?
A Yes, sir. That's a third entity, sir.
Q Port Hamilton?
A Port Hamilton is the name, sir. Port Hamilton.

MR. BAST: I have no further questions.

THE COURT: All right. Thank you.

And let me ask, Mr. Galardi, did you have any follow up?

MR. GALARDI: Your Honor, I think I asked all my questions that I will. I'll rely on argument at this point.

THE COURT: All right. Thank you.

Mr. Hughes, did you have any --

MR. GALARDI: I --

THE COURT: I'm sorry, Mr. Galardi.

MR. GALARDI: Your Honor, I would like to before the Record closes move a certain number of documents into the Record for (indiscernible) the hearing and then (indiscernible).

THE COURT: All right. Thank you.

MR. GALARDI: But I do want to move a few.

THE COURT: Certainly. Can you do whatever it is you did the last time to make it clear again, because we've gone back to -- I hear about every second word. And you did something the last time that fixed it. Actually so, Mr. Galardi, now you're mute -- muted, excuse me.

MR. GALARDI: Of course.

THE COURT: That may have fixed it though.

MR. GALARDI: I'm going to pick up the phone this time, Your Honor. Does that work better?

THE COURT: It works perfect. It just goes to prove you got to have a backup set.

MR. GALARDI: I'm glad that my frame, at least on my computer is frozen, so you don't see me holding on to my phone, but maybe you do, so --

THE COURT: No, we actually -- we actually see you just fine, and we see you holding your phone, all just fine.

So --

MR. GALARDI: Okay. Well --

THE COURT: -- let me do this first. Mr. Hughes, did you have any follow up for Mr. Chambers?

MR. HUGHES: No, sir, no follow up.

THE COURT: All right. Thank you.

Then, Mr. Chambers, you are excused as a witness, sir. Thank you. I would like for you just to hang around though.

THE WITNESS: Thank you. Thank you, Your Honor.

THE COURT: Thank you, sir.

(Witness excused.)

THE COURT: All right. So, Mr. Galardi, with that you are -- you are seeking to introduce certain exhibits.

MR. GALARDI: Yes, Your Honor. I'm putting away my headphone so we cut out a little bit. But let me sort of go through with the contested -- uncontested documents. The first would be the declaration that Mr. O'Hara put in in support of the motion to reopen the auction. The second would be the declaration of Mr. Shapiro to reopen the auction. The third would be the APA, and I know we need to get you docket numbers and I apologize for this, but I'll give the list.

The third would be the actual signed APA submitted in connection, I think it's the December 5 APA submitted in

connection with reopening the auction submitted by West Indies Petroleum Limited, Jamaica company, along with St. Croix Refining and Transportation, LLLP. The next document that I would submit, and I think again we're going to go to uncontroversial documents, is the West Indies Petroleum Jamaica company articles of association.

THE COURT: Okay.

MR. GALARDI: And I think that's the -- again, I'm going to assume that everything else is in the Record that is the notice of the hearings that we all need to follow. So those are the documents that I would like to submit in support of our objection,

THE COURT: All right.

MR. GALARDI: The controversial documents I will --

THE COURT: So let me, if we could, Mr. Galardi, let's do one small step at a time.

Mr. Rose, again, we don't have docket numbers and we'll need to do that, but any objection to the one, two, three, four, five documents identified by Mr. Galardi?

MR. ROSE: No, Your Honor.

THE COURT: All right. Then they are admitted without objection. Mr. Galardi, what I would like for you to do is have a member of your team simply file a notice of admitted exhibits and just if you'll go through and just list them by title and docket entry number, I think that will

suffice for the Record. Unless you want something different.

MR. GALARDI: No, I think that's perfectly fine for us, Your Honor. Thank you.

THE COURT: All right. Thank you. So and then now the what you believe will be contested exhibits.

MR. GALARDI: Well, Your Honor, the other one -- the only one that I think we actually discussed and had an issue with, and I can rest on -- well, there are two -- one is the audited financials of West Indies Petroleum Limited, a Jamaica company, the 2020 TWC documents. Again, I understand and I will not dispute that there is an issue as to whether the individual that provided that to us unsolicited is subject to an injunction.

THE COURT: Sure. It's --

MR. GALARDI: I believe it was submitted to the Debtor.

THE COURT: Got it. So, Mr. Galardi, I think I missed one. So with respect to the audited financials I'm not going to admit it as an exhibit, but I am going to make it part of the Record since I've looked at it. Did you identify another document? I just didn't hear you.

MR. GALARDI: Yes, there was one other that we skated around but I would like to admit it, and I believe it was one of the documents that was provided to Your Honor. Now if Your Honor hasn't looked at it, I don't want you to

un-ring the bell.

THE COURT: Sure

MR. GALARDI: But there was a notice of general meeting of the shareholders of the Saint Lucia entity which had resolutions attached. I would like that admitted. Again, my view is that document is not subject to the injunction, subject to the order under any circumstance, and we would ask that Your Honor put that, again, on a confidential basis, don't want to destroy any confidence, that that be made part of the Record for this hearing.

THE COURT: Mr. Bast, any objection to the inclusion of that document under the same conditions as the audited financials?

MR. BAST: So that is, Your Honor, that you would be making it part of the Record under seal but not admitted into evidence. Is that correct?

THE COURT: Correct. And I haven't looked at it.

MR. BAST: On that basis -- on that basis and with the same reservations as set forth earlier then that's fine.

THE COURT: All right. Then that's what we'll do, Mr. Galardi.

MR. GALARDI: Thank you, Your Honor. That was fairly easy, and I thank Mr. Bast.

THE COURT: All right. Thank you.

All right. Anything else before we proceed to

closing arguments?

(No audible response.)

THE COURT: All right. Then we'll consider the evidence closed.

Mr. Warner, let me ask you, because I am going to want a position from the Committee, do you believe that you have instructions going forward or do you need a short -- do you need a short recess?

MR. WARNER: I have instructions going forward, I do not need a short recess. Thank you, Your Honor.

THE COURT: All right. Thank you.

Ms. Green, are you providing closing comments or is Mr. Rose doing that?

MS. GREEN: I am, Your Honor, but could I have about 10 minutes?

THE COURT: Of course. So you want to just come back at 4:45 Central?

MS. GREEN: That works.

THE COURT: All right. Then we'll be adjourned until 4:45 Central.

(Recess taken from 4:30 p.m. to 4:45 p.m.)

AFTER RECESS

THE COURT: All right. The time is 4:45. We are back on the Record.

Ms. Green, are you ready to proceed with your

closing comments?

MS. GREEN: I am, Your Honor.

THE COURT: All right. Whenever you're ready.

MS. GREEN: Yes, Your Honor. Your Honor, I just reiterate the standing argument that's set forth in our papers. And I understand Your Honor's position related to that, but I just wanted to bring up that we disagree that the jilted bidders have standing to contest the financial wherewithal or any -- most of the other issues that were raised today.

But to start with some of the issues that were raised, first the Mr. Roberts issue. There was testimony that -- actually I was on the Committee, Excel withdrew from the Committee prior to the St. Croix bid being submitted. In fact, it was probably at least two and a half weeks before that bid was submitted because it was in October as testified by Mr. Shapiro. Mr. Roberts is part of this group on his own and not as Excel.

And there was no evidence that there was any improper information used, confidential information or otherwise. I'm assuming that the Committee would have issues related to that and would bring that up if they had a problem with it. But Mr. Roberts' company did resign. They were not a member of the Committee and I don't think that that's relevant really to what we're talking about today.

In addition, the issues related to which entity is which, the only real testimony before the Court is that there was an entity formed and that entity had a name change because of the issues related companies in St. Croix. And although Mr. Galardi kept calling them a co-bidder, I don't really think that that entity was a co-bidder in that sense.

And finally, the issues related to the timing. Mr. Leggett actually, at the conclusion of the hearing on the motion to reopen, indicated to the Court that due to the timing changes there would have to be some sort of push on the closing date. And then when the actual date came out the investment bankers, the Riley and the professionals were very careful to wait the bids considering that.

And considering that, the actual West Indies bid included acquisition of the land and that the St. Croix bid didn't, it was the Debtor's business judgment that waiting that extra period of time and waiting the bids was actually better because as Mr. Shapiro testified, taking the land was really very important to the Debtors because of the issues of receiving the land back and creating environmental liabilities for the estate in the form of administrative expenses.

And therefore it was the business judgment of the Debtors that waiting the bids was far better than having a bid that allowed Mr. Galardi to put the land back on the

Debtors after some period of time.

You heard testimony that there was bidding, that there was arms length negotiations from Mr. O'Hara. Where the money's coming from, Mr. O'Hara did see financials, he saw that the Jamaican entity had $26 million on its balance sheet, that there were other shareholders that had significant wealth and that he believed, in his business judgment and his experience as an investment banker, that there was sufficient assets to close the transaction.

And in terms of who's on the APA, I know there was some confusing testimony from Mr. Chambers, I think his counsel cleared up some of that. Essentially there was testimony that the Jamaican company is the entity on the APA and that the Saint Lucia company has an interest in the other entity. So looking to the Jamaican company, Mr. Chambers did, in fact, testify that they could have paid it, but they're not going to. And so just because the money's coming from elsewhere doesn't mean that the Jamaican entity didn't have the financial wherewithal at the time to enter into the transaction.

Essentially Mr. Shapiro testified that he used his business judgment, he was designated that business judgment by the Restructuring Committee. He reported that business judgment to the board, the board approved the transaction. As you know, the Court gives great deference to the Debtors'

business judgment, and it's a flexible standard and it's at the discretion of the Debtors.

And therefore the elements of business judgment in the 5th Circuit are the sale enhances the estate. Well, clearly the sale here enhances the estate. It's a $62 million bid. There's a $10 million deposit that's been put up. We at one point were wondering what was going to happen to these assets, and if anybody was going to bid. So clearly the sale enhances the estate.

Clearly if the sale is fair and reasonable, there's evidence that the parties acted in good faith, Mr. O'Hara testified that there was arms length negotiations. I don't believe that the Mr. Roberts issues is intended to go to good faith, that like I said, Excel withdrew from the Committee and that does not impact the good faith findings that this Court can make under 363(m).

In addition there was notice to all parties as required by the 5th Circuit. The business justification, essentially the Debtors, the estate and the creditors, everybody in this case is better off with this bid. This bid will bring significant assets to the estate. And there is no contrary evidence that the Debtor -- to the Debtors' business judgment. It's not the business judgment of the jilted bidders, it's the business judgment of the Debtors. And here there's no contradicted testimony whatsoever that the

business judgment of the Debtors should be not considered. And so as a result, Your Honor, we request that the Court would approve the sale to the West Indies entity.

I'd like to just address for a minute the issue related to reopening the auction. Mr. Chambers testified that on that Friday when the bids were due, when the money was due that he was told that he needed to have open heart surgery on Monday. He clearly was at the Mayo Clinic being tested prior to that period of time, and once you're told you have open heart surgery, I don't think the first thing you do is go say, Let's go finish and APA and wire some money so that we can acquire a refinery in St. Croix.

And so I don't believe that there is anything nefarious about Mr. Chambers' surgery, and it clearly -- there's no evidence that it was pre-scheduled, and as a result reopening the auction not only was the right thing to do, but it yielded a significant benefit to the estate.

THE COURT: All right. Thank you.

Mr. Warner?

MR. WARNER: Thank you, Your Honor. Michael Warner, Pachulski Stang, on behalf of the Committee. I'll try to make this concise and short.

The Committee really looked at three issues, and I'm going to start by saying apparently there's some kind of music video that says it's all about the Benjamins. It's not

all about the Benjamins. What really is relevant here is no sale proceeds will (indiscernible) the benefit of the unsecured creditors. That's clear. So it's not about the money.

What it is about is the most important point and that is the sale results in a possibility of a going concern. Not for sure, but a possibility. And as the process went on, the more spent, the more likelihood there would be a possibility of a going concern, we hope.

We're looking at the going concern as a Committee from day one for the benefit of vendors, employees, the island of St. Croix, the environment, the tax base on the island, the business opportunities for the island. All of those things were very important for the Committee. And therefore a going concern was the first and foremost issue.

We supported the reopening of the auction. Now I have to comment on this because it's very important, and I believe I said it when we had -- when we were asked to be supportive of a reopen. We don't take lightly changing the rules. Rules are made for a reason. But as this Court said, this is the unusual circumstance and this Committee recognized this is the unusual circumstance. And it (indiscernible) reopening and we supported it. It's not something I as a professional and my partners as professionals would do normally. But we wanted to make sure

in this instance, as the Court recognized, it was unusual.

All of that, and the upshot of all of that is that the Committee supports the auction, it supports the results of the auction, and it supports the process undertaken by the Debtor. We'd ask the Court to approve the sale transaction. If the Court approves the sale transaction, we have a few minor comments with respect to the order, but that's for another time later today hopefully. Thank you.

THE COURT: All right. Thank you.

Mr. Brookner?

MR. BROOKNER: Thank you, Your Honor. I did not obviously five star when we came back on earlier.

THE COURT: Ah. I just assumed that you had comments. My apologies.

MR. BROOKNER: No, that's fine. We do. It's very simply we support the Debtors' business judgment, we think it maximizes value, I think you can do some quick math to figure that out. And, you know, if this deal doesn't close for whatever reason, there is a substantial backup bid that will also bring significant value to the estate. So we are very comfortable with (indiscernible).

THE COURT: All right. Thank you.

And which fine advocate from Akin Gump is going to make closing remarks?

MR. ALBERINO: Your Honor, this is Scott Alberino

from Akin again, I guess it falls to me.

THE COURT: All right.

MR. ALBERINO: I'd ask Mr. Brimmage to keep his phone on mute.

Your Honor, I'll be brief here. I really just wanted to address two issues which I imagine Your Honor is, you know, thinking about, the first of which is whether the reopening of the auction should be revisited, and what I would submit, Your Honor, is that I don't believe there's anything in the Record that was established today that would submit a finding that the Debtor made any misrepresentations to the Court when they requested the reopening of the auction.

WIPL was engaged extensively in the pre-auction due diligence process, but unfortunately was sidetracked due to Mr. Chambers' health issues. Mr. O'Hara and others determined that the buyers were real and could meet their financial obligations. I think we're all in agreement today that perhaps the evidence was imperfect, but it's also not unusual given the type of bidders that the company was dealing with. We were not dealing with large multinationals. No, we were dealing with high net worth individuals who are forming partnerships, raising money and relying upon their advisors to help them structure the deals.

Your Honor, with respect to the sale itself, again,

I just go to the case law, and at the end of the day the company I believe has met its burden to establish that the sale meets the standards for approval under Section 363 of the Code, and I also believe that, you know, that they -- that the buyer here should be entitled to a good faith finding here, you know, despite some of the issues that have been thrown about in court today.

The sale is the highest and best bid by more than $5 million, or close to 10 percent of the purchase price. It's also better for the estate in that it takes the real property and did not require the use of a complex TSA, all of which were issues from many of the stakeholders in this case.

Nothing in the Record suggested the auction was run improperly or the Debtors made any mistakes (indiscernible) value bids or compared bids to one another. We've heard a lot of arguments but we haven't heard any facts that support those arguments.

And finally, Your Honor, the evidence here does not support any evidence of collusion, fraud or misconduct on the part of WIPL or any of their perspective investors. While there's a lot of commentary about Mr. Roberts and his role on the Committee, Mr. Galardi did not establish that, you know, that he used his position on the Committee to benefit himself or benefit this bidding group in any way.

So for those reasons, Your Honor, we would support

the Debtors' request for approval of the sale, and we hope Your Honor's inclined to agree with us. Thank you.

THE COURT: All right. Thank you.

Ms. VanLare?

MS. VANLARE: Yes, Your Honor. I'll keep my remarks brief. Jane VanLare, Cleary Gottlieb, on behalf of Goldman as agent for the revolvers. We reiterate our support for the process and for the sale. We also agree that nothing in the Record today has come out to taint the process, so the outcome of the process we believe maximizes value for the estate.

We think that the estate here is protected from -- with both the deposit and the presence of a backup bid. And we agree with (indiscernible) to the scheduling in making the determination that this is the best foot forward.

We also urge Your Honor, again, not to delay. We think it's important, and to be heard today, it's important to have the sale be approved today so that parties can move forward and make those arrangements to -- in time for closing hopefully in January. And we think that prolonging the (indiscernible) again will substantially increase costs which I think will further erode recovery.

So with that, Your Honor, thank you, and hope you enter the sale order.

THE COURT: All right. Thank you.

Mr. Bast, do you have any comments?

MR. BAST: I mean, Your Honor, only that we support the Debtors' sale motion and ask the Court to approve it. We believe the Record's clear that the Debtors' business judgment, as supported by -- virtually every creditor constituent in the case supports approval of the sale. The Record is clear that our client is a good faith buyer as required under 363(m).

There is no evidence of any bad faith, collusion, impropriety, or any other misconduct on the part of the buyer or any participant in the buyer group. And we ask that the Court approve it and enter the sale order today, so that our client can proceed with the preparations for closing.

THE COURT: All right. Thank you.

Mr. Kincheloe?

MR. KINCHELOE: Thank you, Your Honor. I don't have anything to say beyond what I said in opening.

THE COURT: All right. Thank you.

Mr. Galardi.

MR. GALARDI: First, Your Honor, can you hear me? I've gone back to my headphones. Does that work?

THE COURT: Loud and clear.

MR. GALARDI: Okay. Good. I had to recharge them. It's been a long day and they're getting old, so I apologize.

First, Your Honor, let me thank everybody for

taking the time. I actually (indiscernible) Your Honor, from one of your comments (indiscernible) but I do think rules matter and I do think technicalities matter and I do think the evidentiary bases on which the auction was reopened do all matter. And in particular, I do want to highlight a couple of pieces of evidence that I find significant, and hopefully Your Honor does.

First, Your Honor, Mr. Chambers testified that he was able to conduct business through and including November 12th. Your Honor, that was the bid deadline set forth in the order. And it was only on November 14th, at Docket Number 32351, after the 12th, that the debtors filed a notice to extend that. So there was simply no reason that Mr. Chambers couldn't file the APA, sign off. I understand it was under those circumstances, but (indiscernible) those circumstances, and there was no reason.

I also, Your Honor, the record will show, it was exactly that weekend that, after they had walked away from the transaction, that we were engaged and got the expense reimbursement the following week. So it was -- we do believe that the record is clear that it should not have been reopened, Your Honor.

And again, you and I (indiscernible) through the testimony. The (indiscernible) closing, there was conditions to closing. The closing was going to be December 22nd.

There was going to be a thirty-million-dollar cash bid, and it was going to be by two -- and they are represented in the APAs as purchasers, whether you call them co-bidders or co-purchasers, they are both named purchasers.

Your Honor was very (indiscernible) concerned (indiscernible) to St. Croix Energy, which Your Honor was concerned that would be opened to just one bidder, the bidder that had submitted the 30 million, or whether it was going to be Bay and Sabin. And I think, at the end of the hearing, you said, well, we're going to let Bay and Sabin come in, and it was those three bidders.

(Indiscernible) contend and I just want to be clear that we are not contending that Mr. Roberts used Committee information. We do believe it's a material fact that should have been disclosed to Your Honor, whether it was in connection with reopening, if that was the case, or whether it was subsequent. We do also think that Mr. Roberts' participation (indiscernible) deadline, not being a qualified bid, and now participating (indiscernible) reason why that is not a basis to reopen the auction. And Your Honor, we think that, for those reasons, that it is simply improper to reopen the auction.

Your Honor, given that you've reopened the auction, given that there are other days, obviously, we did (indiscernible) participate in the auction. We did want to

preserve our rights. We are not complaining and I think we were very clear we have not complained about the way the auction was actually conducted by the professionals. But I don't think we can all look at the gold and the gold makes the rules here.

The question is -- and I think is really fundamentally (indiscernible) Your Honor: Had you known the facts that you now know today, would you still reopen the auction? We would say you shouldn't. There was more material changes: One, the date; two, the purchaser; three, the ability to close that transaction; and four, Mr. Chambers was able to conduct business up to the date that the auction -- that the bid was required and a deposit was supposed to be made. For those reasons, we think that was improper and we think the auction should not have gone forward. And we would ask Your Honor to not permit the sale to go forward.

I think we've also established there is a financial wherewithal issue. I think it was confusing at best that the financials upon which the professionals relied with the West Indies Petroleum Limited Jamaican entities, and that entity is not the entity that's actually purchasing the asset. It's not clear who's purchasing the asset. I know who's putting some money in. But again, you can't (indiscernible) those equity distributions or equity capitalizations into an entity (indiscernible) it's not permitted by the operating

agreement.

So, Your Honor, we would, again, you know, object to the sale. We do believe that there is nothing about what the debtors did, they just simply didn't know all the facts about the West Indies entities. But we do believe that there is a question as to the good faith and the tactics used by West Indies Petroleum to not bid by the deadline, to reopen, to see that the bid had come in at 20 million, then to reopen. We do believe that that raises a good faith issue.

And I would have a comment on the order when the time comes, if Your Honor is inclined to enter that order.

THE COURT: All right. Mr. Galardi, as we sit here today, you've been identified as the backup bidder, correct?

MR. GALARDI: We have been identified as the backup bidder under an auction that we have contested.

THE COURT: Right. And so do you -- if I were to approve the sale, do you wish to remain in the capacity as the backup bidder, or would you like to be released from whatever obligations go along with that?

MR. GALARDI: Your Honor, I guess I'm going to ask -- answer your question with a question.

THE COURT: Okay.

MR. GALARDI: That is, we do have this order that gave us the one-million-dollar expense reimbursement.

THE COURT: Uh-huh.

MR. GALARDI: We did ultimately, as the debtors can confirm, ultimately, despite all the issues you've heard about the TSA, we do have a signed TSA, we do have a signed APA. It was important to us to have that before we commenced.

THE COURT: Uh-huh.

MR. GALARDI: Again, I have been threatened that we will not have the expense reimbursement if we're relieved as the backup bidder at $57 million. So I am keeping that bid open because I don't have another (indiscernible) regarding that.

THE COURT: Okay.

MR. GALARDI: But quite honestly, we don't believe that that auction was appropriate. We will challenge, as Your Honor will understand, appeal Your Honor's order, nothing personal. We'll ask for a stay and all of those types of things. And I know Your Honor doesn't take that personally --

THE COURT: Sure.

MR. GALARDI: -- at all, and we're going to reserve our rights.

But if we succeed on that, that the auction should have never been reopened, then we'll see where that goes. And if they don't close -- and frankly, for the estate's benefit, we hope they close at that higher price, quite

frankly. I don't have a problem with somebody paying more. But if it doesn't close, we'll make our determination to stand by. Everybody here has made clear that they will seek to enforce that.

And I don't want to be relieved of that obligation because we do want the assets, we do want the west -- you know, Virgin Islands to have an operating refinery. We do believe we would be better at operating that refinery. So I just want to reserve my rights on the reopening of the auction and whatever consequences that may have, in the event that we are successful on that with respect to my backup bid.

THE COURT: Right.

MR. GALARDI: And I'm reserving my rights on other expenses and costs that we may seek to have (indiscernible) as a result of this process.

THE COURT: No, I got it. And you've done a terrific job of preserving everything. The issue really was there's a strategic call there to make. I can see it, I know you see it. And I just wanted to understand where you were. If you've made the strategic call that you want that backup bid to stay in place, I'm not -- certainly not trying to take that away from you. I just want to -- I want to understand what your thought process was, as I walk through this.

MR. GALARDI: Yes. And Your Honor, I think it's important, and quite frankly, I do think it's important for

the record, as you -- as I'm sure you have read in the transcript, there was a point in time when the Committee was supporting us and did suggest that we would go forward. One of the conversations, quite frankly, we had -- which every party on this call knows there was (indiscernible) was when we made X dollars for a certain period of time if they close on December 22nd, and then reduce our bid and keep that bid open.

Because we wanted the Committee's (indiscernible) and frankly, we're a little bit disappointed because we are -- we did make that strategic decision. We have made all of these strategic decisions, and some people may criticize them and some people may not. But I do believe what you should understand, that I think everybody understands, is St. Croix will -- St. Croix Energy wants an operating refinery as soon as possible on the Island of St. Croix. And the gentlemen that I represent are committed to the Island of St. Croix. So I don't think we want to be relieved of that bid right now. I don't think we will be relieved of that bid right now.

I would never say to Your Honor that, if they fail to close, we might not have another renegotiation at that point, as Your Honor would expect. But right now, we want to stand by that. We also want to stand by our objection that the auction should never have been reopened.

THE COURT: Understood. And I want to tell you because, again, I'm -- you're being very careful, I can see that. And my mind was there, they are independent of one another. And so it -- you know, obviously -- my memory is that the expense reimbursement is tied to the closing of a sale. That was my memory --

MR. GALARDI: It --

THE COURT: -- because I think --

MR. GALARDI: It --

THE COURT: -- you were paid --

MR. GALARDI: It --

THE COURT: -- from the proceeds, right?

MR. GALARDI: We get paid. But the condition -- and it was very clear on the document and heavily negotiated --

THE COURT: Okay.

MR. GALARDI: -- (indiscernible) with me and the others. It was, if we bid $20 million at the first auction --

THE COURT: Uh-huh.

MR. GALARDI: -- and we got to a TSA that the debtors executed --

THE COURT: Uh-huh.

MR. GALARDI: -- then we would be paid $1 million out of the closing on the transaction.

THE COURT: Right.

MR. GALARDI: The debtors can confirm on the record we did execute an APA. Before we commenced the next auction, we finalized the TSA. And again, you've had a lot of agita -- and I'll use my Italian word "agita" -- for the fact that they were worried about the land.

THE COURT: Uh-huh.

MR. GALARDI: We made clear that we got that agreement approved prior to making our first bid, as I candidly put on the record, and Your Honor will see the transcript. Our first bid was (indiscernible) the land because we understood that that was a major issue for the parties on this case, so we just cleared that up. And then they got our bid.

THE COURT: I got it. I -- again, I agree with everything you said, in terms of all of the prerequisites. And all you're waiting for now, for the expense reimbursement, is the closing on the sale. And again, I just want to make sure I understood where you're headed. I think it's -- you've made it very clear. I'm not trying to talk you out of anything. I just want to make sure that I understand where you are. All right.

MR. GALARDI: I don't know if I've gotten a text from my client to shoot me for keeping that bid open (indiscernible) but I believe that we are prepared to remain

open as the backup bid. And again, I -- and I know it's not an appropriate dialogue. But Your Honor, the way in which these bids work, we will be -- and I have said this to the parties -- we may have to close in five days. That would be very difficult if we don't have the financing --

THE COURT: Uh-huh.

MR. GALARDI: -- for the bigger bid, to do that in five days.

Again, I think the parties will work in good faith to deal with that issue. I hope not to come back to Your Honor, but if we'll have to, we'll have to come back, and Your Honor knows I'm not shy for coming back if we need to.

THE COURT: And quite honestly, Mr. Galardi, I wish folks would have come back sooner and more often. It never bothers me. I, you know, quite frankly, believe I could have had some impact on the direction, had I known some of these issues were out there. But that's just okay, I mean, I'm not complaining at all. If you need to come back, you will come back.

MR. GALARDI: Your Honor, I wish you were complaining about not (indiscernible) reconsider those facts and reopen the -- and reopen the auction.

THE COURT: All right.

MR. GALARDI: I wish they troubled you as much as they do us.

THE COURT: All right. Thank you.

Mr. Hughes.

MR. HUGHES: Your Honor, can you hear me okay?

THE COURT: Loud and clear.

MR. HUGHES: Do I have to push five-star?

THE COURT: No, it's -- you're there.

MR. HUGHES: Great. I didn't know.

Well, Your Honor, we largely join in Mr. Galardi's argument. And I do want to make clear that, for no fault of Your Honor or Bay, as a buyer, now jilted successful backup bidder, nor the debtors, you know, it appears we now have the results of a second auction. And I join in Mr. Galardi's compliments to the debtors for running an effective second auction. We don't blame the debtors for how we got here.

However, a little bit of a nuance (indiscernible) I think keyed up with Your Honor's comments. In the second auction, the participation by WIP -- I call them "WIP," West Indies Petroleum -- was teed off of a represented inability to participate in the prior auction process. And certainly, I'm sympathetic and hopeful that, if Mr. Chambers' condition continues to improve -- and I think that there's no doubt that he sustained something serious he had to deal with under Rule 15.

But what the evidence does show is that he was functioning normally, at least through the November 12

deadline, which was the deadline before the first auction that they complied with that had been pushed a day because the day before was the deposit deadline; it was a federal holiday. And we, Bay, actually got our deposit in on the evening of the 10th because we couldn't understand how we could be (indiscernible) for not being able to make a bid deposit on the 11th.

So there was a deadline on the 12th, and it was an important deadline, and one certainly that we took seriously. And the evidence shows it was a valid deadline and one that all parties knew about.

It was only on the 15th when the debtors actually decided to move that deadline to the 16th, and to move the auction to the 18th. And by that time, there's also no question that West Indies Petroleum, whether St. Lucia or Jamaica or any other affiliate thereof, had dropped out, maybe for good reason. And certainly, there's some evidence that Mr. Chambers definitely had to have some urgent attention under Rule 15 (indiscernible) but that doesn't excuse the fact that they could have participated on the 12th, and they didn't, or before the 12th.

And the reason that's significant to the relief that we're seeking here today is that, by coming in after the publication was made of the first auction, the day after, and exploring let us back in, we now changed our mind, we want to

participate, and doing so in a fashion that seems to be subject to estoppel -- maybe it wasn't bad faith, but maybe it rises to the level of estoppel.

And so, for these reasons, Bay, and I think Sabin's position would be they're the legitimate backup bidders from the second auction, and that St. Croix should be the prevailing winning bidder, and that West Indies Petroleum, St. Lucia, Jamaica, or any other iteration, should be estopped from being the winning bidder under this sale. Thank you, Your Honor.

THE COURT: All right. Thank you.

Anyone else?

(No verbal response)

THE COURT: All right. Then I've got before me the debtors' request to approve the sale to the "West Indies Group," as I'm going to refer to it.

I do find that I have jurisdiction over the matter, pursuant to 28 U.S.C., Section 1334. I do find that the request and the request and the dispute constitutes a core proceeding under 28 U.S.C., Section 157. I further find that I have the requisite constitutional authority to enter a final order with respect to the request.

I want to deal first with the complaints about standing. I certainly under -- I certainly understand the debtors' complaints, as well as others, that I allowed the

inquiry. I went back and tried to do some research just into my own history, and this was the first circumstance I could find where I had ever reopened an auction for any reason.

I am convinced that, by giving the bidders -- the unhappy bidders standing to participate, my conclusion today is that it was exactly the right decision to have made. We -- I had gained clarity into the process, I think the public has gained clarity into the process. And I think that issues which might have been a bit murky are now in the public for all to see, and I think that's exactly where they should be.

We spent the majority of the hearing, effectively, trying a motion to reconsider. And while phrased in a number of different ways, I'm going to evaluate it as a motion to reconsider my prior order reopening the auction. By definition, I have somewhat granted that motion because I've heard all of the evidence. Having heard the evidence, I am more convinced than ever that the original decision was correct; and, therefore, I am denying that request for reconsideration of the auction.

With respect to the insinuation about the Committee -- and although Mr. Galardi came back and cleaned that up, I want to be very clear about the issue about a Committee member resigning and participating. Mr. Warner knows how serious I take this, he sat through Neiman Marcus. It is something that is a very big deal to me, and that there is no

one that will ever usurp the process.

And in my view, Mr. Roberts did exactly what he should have done. As soon as he became interested, he got off the Committee and didn't participate in the process. So I have zero evidence that Mr. Roberts did anything that would contravene any rule, regulation, or even spirit of the Bankruptcy Code in acting as he did, and I want that to be very clear.

With respect to all of the questions about who the bidder is, how the structure works, having spent some time in my prior career dealing with multiple jurisdictions in the islands, I understand that those ultimate structures get driven by considerations other than those right before us, which is the sale. There are liability issues, tax issues, ownership issues, citizenship issues. All of those things come into play. And it does not surprise me that the structure is continuing to evolve. My guess is it will probably evolve more before a closing takes place.

I don't find there to be any evidence of any inappropriate behavior. I think that it -- the best I can tell, it is a -- you've got a businessman who is good at doing one thing, and he depends upon his professionals to do it right and in a way that is most efficient, given the controlling regulatory body under which he works.

I want to go back, also. The test, as all of you

know, is highest and best. Mr. Brookner, on behalf of his client, made a big deal in the initial hearing that it was all about the money. I didn't say anything. I disagree with that position. It really is highest and best, in terms of my evaluation.

And I agree with Mr. Warner's criteria, as he looked at all of the non-monetary issues in trying to figure out what is the highest and best way to proceed forward. Doing the math is easy. It is all of the other stuff that is difficult. But I appreciate the Committee, in the face of not ever having a chance to receive a distribution, spending the time to try and figure out the right answer. So I compliment the Committee on that.

I've had prior occasion to see Mr. O'Hara's work, and be it good for him or be it bad for him, I trust him. I've seen the work that he does, and I've never seen him stretch one iota beyond the absolute truth. I think he's truly an investment banker. And there are some, but there are some who look at it a different way. The money is secondary to him. His goal is to get it right and he cares about his representation and he cares about credibility, and that's really important. He has further demonstrated that priority scheme in this case.

In looking at the evidence, again, we spent most of the time focused on the motion to reconsider, which I've

already ruled on. With respect to the proposed sale, yeah, I hope that it closes, I hope that it proceeds down the path and gets done as quickly as it possibly can. I know that there are other land mines that are going to have to be dealt with, and this is not the end of something; this is the beginning of something.

But when I look at the debtors' business judgment, the Circuit has been very clear, I do not substitute my judgment for that of the debtor. My job is to look at what the debtor has considered, thought about, and that's -- which is why I even followed up with the questions to Mr. Shapiro with sort of an after-the-fact view. And I do find that the debtor has exercised its prudent business judgment in deciding to accept the West Indies offer and proceed forward.

So, with that, I will approve -- I will approve the sale as requested by the debtor. In making that finding, the record that I have before me demonstrates that the West Indies Group has acted in good faith, has participated in an arm's length process, has not engaged in any behavior that I would in any way consider to be inappropriate, and is entitled to the protections afforded to a good faith purchaser under 363(m).

First, let me ask. Mr. Bast, is that -- does that give you the -- is that a sufficient ruling for what you were after this afternoon?

MR. BAST: It is, Your Honor. Thank you.

THE COURT: All right. Thank you.

Now, Ms. Green, as I understand it, the Committee has got a tweak, Mr. Galardi may have a tweak. So, as I understand it, you're going to take an opportunity to try and get that done and get me an order, you know, by noon tomorrow. Is that the goal or is there something different?

(No verbal response)

THE COURT: So, Ms. Green, I think that you muted me, perhaps, inadvertently.

MS. GREEN: I'm sorry, Your Honor.

THE COURT: Go ahead.

MS. GREEN: Yes, that's the goal.

THE COURT: All right. So, once you --

MR. WARNER: And Your Honor, Michael Warner.

THE COURT: Yes, sir, Mr. Warner.

MR. WARNER: I apologize. I don't mean to interrupt. But I know that the goal is to try and get you something that everybody has signed off on. The paragraph -- I'm sorry -- the sentence that I want to add is not something everybody is going to sign off on. It's something that you need to hear and say yea or nay inserting it into the order. We've debated it until Mr. Brookner has told me, in no uncertain terms, ain't happening.

THE COURT: Okay. Can you just highlight for me

what the issue is?

MR. WARNER: Very simple. There's a provision in the order that say, on the receipt of the gross proceeds, the debtor will distribute the amount necessary to pay the DIP lender. It then goes on to say and the amount necessary to escrow, essentially the carveouts. Fine. It stops there. We want to add a sentence that says, if there's no enough money to fund the carveouts, we will not distribute money to the DIP lender until the Court has a say on the issue.

It's reserving for later on the simple issue of if there's not enough money. We're all hoping there's enough money, that this is an irrelevant issue if there's enough money. But I don't practice law on hope; I practice law on fact.

THE COURT: So let me ask the two of you, so that we can get an order and move the process forward. Closing is not anticipated to be until the third week in January, correct?

MR. WARNER: Yes, sir.

THE COURT: So, if I give you -- if I give you a hearing date today where the subject matter will be that particular issue, does that work for everybody, so that we can get an order and we can get the process started? Because Mr. Bast tells me there's a lot of work to do, and that work can't commence until they have an order. And if it can't

close until the 21st, I mean, I'll give you a hearing right now, and we can come back, and I'll give you an opportunity to prepare, when you're not tired, and we can hammer out that issue. Would that work for the two of you?

MR. WARNER: Fine by me, Your Honor.

THE COURT: Mr. Brookner?

MR. BROOKNER: Yeah, I guess I'm just confused, Your Honor, because, right now, there doesn't need to be an argument or a hearing about what the carveout says or what it doesn't say, what it means, what it doesn't mean. And we're creating an issue and spending time and money that may never have to be spent and may never have to be dealt with.

And Your Honor just said a few minutes ago, hey, come back and see me, the door is open, I'm open for business. And so why not sign the order the way it's been proposed? And if it turns out, at some point between now and the closing, you see we have a problem, then, between Mr. Warner and myself, we'll come back and see you --

THE COURT: So --

MR. BROOKNER: -- and we'll get it figured out because, right now, if the world unfolds the way it's supposed to unfold --

THE COURT: Right. Mister --

MR. BROOKNER: -- we never have to come see you about this.

THE COURT: So, Mr. Brookner, I think I just proposed exactly that. I said we sign the order as it is, subject to whatever Mr. Galardi is going to raise, I give you a hearing date, and everybody knows that, if you all can't work your way through it before then, then everybody has got a hearing date. Did I miss something?

MR. BROOKNER: I guess maybe I read something into your statement that wasn't there, which is that the hearing would be prior to the time of the prospective closing.

THE COURT: It -- I --

MR. BROOKNER: If it's --

THE COURT: I offered that, just to try and, quite frankly, get this off -- this shouldn't be an issue. And it's always my belief that, if I give you all a deadline, that it will force -- it will force you all to -- it will force you all to talk and figure out what your dispute is. But I did offer it prior to closing, absolutely I did.

MR. BROOKNER: I was just trying to avoid, again, expending what our -- what's now somebody else's money, potentially --

THE COURT: Right.

MR. BROOKNER: -- arguing an issue that may never have to be argued.

THE COURT: Yeah. I was trying to get it to the point where it was only two people on my video screen versus

82.

So, Mr. Melko, did you have -- do you want to weigh in?

(No verbal response)

THE COURT: So, Mr. Melko, I think you've got -- either you're muted from your side or you hadn't hit five-star. Not yet. Ah, there you are.

MR. MELKO: Thank you.

THE COURT: Yes, sir.

MR. MELKO: Thank you, Your Honor. I'll be very brief.

Your Honor is being asked to sign an order to approve a sale for roughly $62 million.

THE COURT: Uh-huh.

MR. MELKO: And if, for some reason -- and that will not only cover the DIP and all -- and provide sufficient cash to escrow all the fees, but it should leave the debtor other funds that would fall to the pre-petition secured lenders.

THE COURT: Uh-huh.

MR. MELKO: So the point is I think, if -- the only way things happen is if the order that Your Honor is signing -- the closing that Your Honor is approving, in fact, through the order doesn't occur for some reason and there's a significant modification of the transaction that's been

presented to you. In that case, everybody is going to have to come back here. And I think that's essentially why Mr. Brookner is saying is this is a hearing we really don't need.

THE COURT: I got it.

So, Mr. Warner, I'm going to give you your hearing, should you need it, and I'm going to be -- I'm going to be a lot harsher than I am today because I want to understand that it's a real issue, not just one that's made up. But I'm going to give you a hearing for Tuesday, January the 11th, at 2:30.

MR. WARNER: Perfect, Your Honor.

THE COURT: All right. And so --

MR. GALARDI: Your Honor?

THE COURT: I'm sorry. Who is that?

MR. GALARDI: Your Honor, it's Greg Galardi. I think we can resolve my order issue and one quick matter that I wanted to bring to the Court's attention --

THE COURT: Okay.

MR. GALARDI: -- so that we can move this as quickly as possible.

THE COURT: All right.

MR. GALARDI: I believe the order has a provision in it that -- and it -- and I may (indiscernible) I think this (indiscernible) --

THE COURT: So, Mr. Galardi, I think --

MR. GALARDI: -- (indiscernible) --

THE COURT: I think your plug is -- yeah.

(Pause in proceedings)

MR. GALARDI: Okay. Hopefully, this will work better and you can all watch me on my phone.

THE COURT: Loud and clear.

MR. GALARDI: I think the order -- and I may be corrected, so I'll take the embarrassment. I think the order may have a waiver of the period -- the automatic stay period on a sale of 14 days that it can't be closed. If that hasn't (indiscernible) strike that.

The second question, which is very much related, Your Honor -- and do this with some trepidation. You know, I don't know -- it is a holiday period. I don't know if you will entertain a motion for stay pending appeal. I know we (indiscernible) but that's a lot of lawyers and a lot of money and a lot of holiday time. Your Honor knows that I have to make a motion first to you before I go to the District Court.

THE COURT: Uh-huh.

MR. GALARDI: I would ask if Your Honor would entertain an oral motion for a stay pending appeal, so that I can perfect my procedural rights.

THE COURT: So --

MR. GALARDI: I understand (indiscernible) pending appeal, but I'd like to at least dot my I's on a procedural matter before I take up and discuss with my client the further appellate rights that we have.

THE COURT: No, certainly. And Mr. Galardi, I fully understand that rule, I've availed myself of it many times in the past. I will gladly read any written motion that you would wish to file for a stay, and I will set a bond hearing.

MR. GALARDI: And Your Honor, that also goes back to your question about we don't think a bond -- you asked me about my analysis of (indiscernible) with the backup bidder. So we can have that, if you're going to request a written motion. I was trying to avoid coming back to the Court and having a big hearing with 89 people on it, but if we want to file that motion, we will do so.

So then I'll really stand on my first request that Your Honor not, given the outside closing date, waive the fourteen-day period for consummating a transaction and ask not to have that part of the sale order.

THE COURT: So, Ms. Green, let me ask you: If the closing date is not scheduled until January the 21st and I sign the order today, I fail to understand the import of the fourteen-day stay.

MS. GREEN: Your Honor, I think you're right about

that. The order -- the -- to be clear, though, the APA does provide "on or before the 21st," I leave that to the buyer.

THE COURT: So, Mr. Bast, is there any chance you're going to close this within 14 days?

MR. BAST: Your Honor, as much as I believe it could be unlikely, we do want that right. And the closing date is an outside closing date and we did negotiate, you know, the terms, including the provision of a fourteen-day stay in the sale order.

THE COURT: All right.

MR. BAST: So we do -- we would like that language to remain.

THE COURT: Okay. So let's go through this.

MR. GALARDI: Your --

THE COURT: First of all, you didn't negotiate with me and you don't negotiate with me.

MR. BAST: Right.

THE COURT: And a waiver of that provision requires a showing of sufficient cause. What evidence was adduced that would establish sufficient cause to waive that fourteen-day stay?

MR. BAST: The only evidence would be what was presented today, Your Honor (indiscernible) participation, the significance of the deposit, and our client's wherewithal to close, but ...

THE COURT: Anyone else want to weigh in on that? Ms. Green?

MS. GREEN: No, Your Honor.

THE COURT: All right. In that case, I will strike that provision of the order. I don't think there's been a showing. I routinely grant that, but there's got to be an evidentiary basis for the granting of it, and I don't recall any testimony whatsoever that would justify waiving the stay imposed by the Code.

Mr. Galardi, anything else?

MR. GALARDI: No. And I appreciate that very much. Thank you, Your Honor.

THE COURT: So let me ask: With that -- with what I've done with respect to Mr. Warner's issue, with what -- with Mr. Galardi's issue, Ms. Green, is -- can I -- can we interlineate -- can we interlineate the last version of the order and just simply take out that paragraph and proceed forward, or are there other tweaks that you need to make?

MS. GREEN: Your Honor, I don't believe -- I don't know if Mr. Delaney is still on.

MR. GALARDI: Your Honor, it's Greg Galardi. I just would like to take a quick read. I don't know (indiscernible) if there's anything about my expense reimbursement. If it doesn't, and there's a representation --

THE COURT: So --

MR. GALARDI: -- on the record, then I'm fine.

THE COURT: Let me ask this.

MS. GREEN: Yes.

THE COURT: So, if -- let's do this. Ms. Green, if you would have a conversation with Mr. Galardi about that issue, if you would --

MS. GREEN: Okay.

THE COURT: -- get Mr. Delaney to delete that paragraph, it is 5:36 Central time, I will sit in my office until 6:15 or -- and wait for a text sent to Mr. Alonzo that the order is there. After that, I'm going home. Fair enough?

MS. GREEN: Your Honor, Mr. Delaney, I think is trying to tell me that we need to add some of the objection language --

THE COURT: Can you get that --

MS. GREEN: -- that he talked about.

THE COURT: Can you get that done by 6:15 or do you want to -- I can take my computer home, but you know, when I go walk my dogs, I'm not as responsive.

MS. GREEN: Mr. Delaney says yes we can.

THE COURT: Okay. Then I will sit here until 6:15. And again, if you would make sure, when you text Mr. Alonzo to tell him that the order has been uploaded, you include all

the folks that care about this. Okay?

MS. GREEN: Yes, Your Honor.

THE COURT: Mr. Brookner?

MR. BROOKNER: Your Honor, I'm sorry. I don't want to get you upset or get you angry. I just want to try this one more time --

THE COURT: Okay.

MR. BROOKNER: -- and I'll leave you alone.

THE COURT: Okay.

MR. BROOKNER: And I apologize up front.

I would respectfully request that the hearing you just set for the 11th --

THE COURT: Uh-huh.

MR. BROOKNER: -- be moved out to perhaps January 22nd or 23rd, after the hearing because what's going to happen is there is going to be potentially briefing and argument on an issue that may be completely academic, and the fees and expenses for that endeavor will be coming out of the hide of the pre-petition lenders.

THE COURT: Okay. So we'll do this. I'll make this really easy for you. We'll add a provision that says no disbursements pending further order, and I'll give you a hearing on the 22nd. Would that be easier for you?

MR. BROOKNER: No, Your Honor.

THE COURT: So you got your choice, A or B.

MR. BROOKNER: Then I'll go with A.

THE COURT: So, yeah, I thought you'd see that.

All right, folks. Anything else?

(No verbal response)

THE COURT: Everyone have a wonderful evening and I will see everybody soon. We'll be adjourned.

UNIDENTIFIED: Thank you, Your Honor.

(Proceedings concluded at 5:38 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

/S./ MARY D. HENRY

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #64973*

*DATE FILED: DECEMBER 30, 2021*