# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| LIMETREE BAY SERVICES, LLC, *et al.*, | Case No. 21-32351 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

**PREPETITION REVOLVER AGENT'S RESPONSE TO (I) OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO DISMISS THE CHAPTER 11 CASES AND (II) BANKRUPTCY COURT'S ORDER TO SHOW CAUSE AS TO WHY THE CHAPTER 11 CASES SHOUD NOT BE CONVERTED TO CHAPTER 7**

The Prepetition Revolver Agent[2] files this response (the "Response") to the *Official Committee of Unsecured Creditors' Emergency Motion for Entry of an Order Dismissing the Chapter 11 Cases and Granting Related Relief* (ECF No. 1212) (the "Motion" or "Motion to Dismiss"), and the Bankruptcy Court's *Order to Show Cause as to Why the Chapter 11 Cases Should Not Be Converted to Chapter 7* as stated on the record at the hearing on March 30, 2022, and respectfully states as follows:

## PRELIMINARY STATEMENT

1. In principle, the Revolver Lenders[3] are not opposed to a dismissal or conversion of these Chapter 11 Cases. That said, in the interest of reducing the potential costs and delay arising

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Limetree Bay Services, LLC and Affiliated Debtors* (ECF No. 1204) (the "Plan").

[3] As defined in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (ECF No. 495) (the "Final DIP Order").

out of litigation over a potential dismissal or conversion of the Chapter 11 Cases, the Revolver Lenders have been working with the Debtors, the Term Lenders and the Creditors' Committee toward a consensual plan with the goal of maximizing recoveries for creditors. Compared to a dismissal, the framework described in the Plan may be the most viable path to ending these cases expeditiously and providing the possibility of recoveries to unsecured creditors. The Revolver Lenders have concerns that conversion could result in further delays and diminished recoveries. In the event that the Court determines that dismissal or conversion is a better option, the Revolver Lenders will work with the other creditor constituencies to pursue that path promptly.

## RESPONSE

**I.   Introduction**

2.   The Revolver Lenders are the only class of senior secured creditors entitled to 100% of the sale proceeds following the payment in full of the DIP Obligations. Pursuant to that Intercreditor Agreement by and among the Revolver Lenders and the Term Lenders, the proceeds from the Sale must first be used to repay the Revolver Lenders.[4] If the Chapter 11 Cases were dismissed, or the cases were converted, the Revolver Lenders would be entitled to the bulk of the $18 million in cash that is currently held by the Debtors' estates and administrative creditors would not have to be paid in full, and in cash, pursuant to the requirement under section 1129 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(9). Admittedly, this could be a better result for the Revolver Lenders than the Plan.

3.   Even so, in an attempt to expedite distributions and minimize litigation costs, the Revolver Lenders have been working with the Debtors, Term Lenders and Committee on the terms of a Plan that would resolve potential disputes about dismissal or conversion. As the most senior

---

[4]   *See* Section 3.7 of the Intercreditor Agreement, dated as of November 20, 2018 (the "Intercreditor Agreement").

2

creditors in the Debtors' capital structure, the Revolver Lenders' acceptance is necessary for any Chapter 11 plan to be confirmed. To allow the Plan to go effective, at the request of the Debtors and the Term Lenders, the Revolver Lenders have been willing to allow the Debtors to use the Sale Proceeds to (a) pay administrative and priority claims on the Effective Date (currently estimated at approximately $5 million), and (b) fund $500,000 in seed money to fund a Liquidation Trust to pursue certain causes of action (including business interruption insurance claims, D&O claims, and avoidance claims).

4.  Pursuant to the Plan, the Debtors, Term Lenders and Revolver Lenders have agreed to a waterfall, under which (a) $750,000 of initial recoveries from the Liquidation Trust would be used to fund the ongoing pursuit of claims for the benefit of the estates, (b) following the receipt of the first $750,000, the next available proceeds in an amount equal to the amount of the Sale Proceeds used for payment of administrative claims, priority claims and the Liquidation Trust funding on the Effective Date would be distributed to the Revolver Lenders,[5] and (c) all remaining proceeds after such distributions would be distributed to various classes of creditors in accordance with their relative priorities. The Plan is intended to honor the priority scheme under the Bankruptcy Code and avoid disputes with the Debtors, the Term Lenders and the Committee while

---

[5]   The Committee misconstrues the Plan as an effort by the Revolver Lenders to assert "massive" adequate protection claims for all administrative expenses arising *after* the Petition Date. *See* Motion to Dismiss ¶ 51(f). The Committee is incorrect. The Plan does not grant the Revolver Lenders adequate protection claims for all expenses arising after the Petition Date. Instead, the Plan simply provides for a settlement with the Debtors by which any Sale Proceeds used to pay priority and administrative claims on the Effective Date and the $500,000 seed funding for the Liquidation Trust, which is currently estimated to be no more than $5 million, will be "paid back" to the Revolver Lenders first before other creditors, but only after the Liquidation Trust receives $750,000 in proceeds from Liquidation Trust Assets. The adequate protection claim is thus limited to Sale Proceeds that are used to allow the Plan to become effective. Separately, the difference between the defined term for "DIP Obligations" in the Plan and in the Final DIP Order was unintentional, and was not meant to create any advantage to the Revolver Lenders. The Revolver Lenders would not object to revising the definition of DIP Obligations in the Plan to be consistent with the definition in the DIP Order.

giving junior creditors potentially more recoveries than they would receive in a dismissal or conversion.

## II. The Revolver Lenders Are Bearing the Costs of these Cases

5. Contrary to the Committee's arguments, these Chapter 11 Cases are not being funded on the "backs of" the unsecured creditors. *See* Motion to Dismiss ¶ 31. In fact, the Revolver Lenders have borne all of the costs of these Chapter 11 Cases. To put this into perspective, approximately $40 million in Sale Proceeds were available for distribution to the Revolver Lenders following the repayment of the DIP Obligations. However, according to the current estimates, if the Plan were to go forward, the Revolver Lenders would receive only approximately $10 million of the Sale Proceeds on the Effective Date, after the payment of approximately $5 million in administrative and priority claims.

6. A fundamental feature of the Plan is the Administrative Expense Claims Cap, which provides that the Plan can go forward only if the estimated amount of administrative and priority claims is reasonable and provides for a recovery to the Revolver Lenders. In a dismissal or conversion, these costs would not have to be paid. Thus, the Revolver Lenders can support a Chapter 11 plan only if it provides some predictable, reasonable recovery for the Revolver Lenders by imposing a cap on administrative and priority claims. Since the Revolver Lenders' support is necessary to confirm any plan of reorganization, this is an essential provision in the proposed Plan. In the event that the Administrative Expense Claims Cap is exceeded, the cases would be dismissed or converted.

7. The Revolver Lenders' concerns about administrative expenses in these Chapter 11 Cases are well-founded. The professional fees incurred to date have been extraordinarily high, but not as the result of any actions by the Revolver Lenders. The Committee's Motion to Dismiss misleadingly groups together all fees of the Revolver Lenders and the Term Lenders in suggesting

that the Prepetition Secured Parties are *all* spending inordinate amounts. *See* Motion to Dismiss ¶ 16(b). In reality, the Revolver Lenders have incurred a small portion of the professional fees, which have been minimal relative to other professionals. For example, including prepetition amounts and amounts paid under the Interim DIP Order, the Term Lenders have incurred more than $6 million in fees and expenses through February 2022, which is more than three times the amount of fees and expense incurred by the Revolver Lenders during the same time period.

8. Similarly, the Committee's professionals have billed far more than the Revolver Lenders, even though their constituency has no claim to the proceeds from the sale of the Debtors' assets. Specifically, the Committee's professionals have incurred nearly $3 million in postpetition fees and expenses, which is more than double the amount of professional fees and expenses incurred by the Revolver Lenders for the postpetition period. The amount of professional fees that the Committee has spent is striking, given that there is no value in the estate for the unsecured creditors absent the Plan (which they are opposing).[6]

9. These exceedingly high professional fees have eviscerated potential recoveries of the Revolver Lenders, which they are entitled to as creditors on top of the Debtors' capital structure.

### III. The Committee's Desire to Evade Preference Causes of Action is Not a Basis for Dismissal

10. Preference claims are fundamental protections provided to unsecured creditors under the Bankruptcy Code. *See* 11 U.S.C. § 547; *Gill v. Winn (In re Perma Pacific Props.)*, 983 F.2d 964, 968 (10th Cir.1992) (*citing Johnson v. Barnhill (In re Antweil)*, 931 F.2d 689, 692 (10th Cir.1991)) ("It is the ultimate aim of the preference law in the [Bankruptcy Code] to insure that all

---

[6] The Committee's reported legal fees thus far have totaled $1,711,050.54. *See* ECF No. 615, 656, 780. 796, 960, 1078, 1150, 1172, 1209. The Committee's reported financial advisors' fees thus far have totalled $1,231,522.16. *See* ECF No. 616, 668, 781, 796, 991, 1079, 1151, 1177.

creditors receive an equal distribution from the available assets of the debtor."). Virtually every insolvency regime in the world gives the estate the ability to "claw back" preferential payments.[7] There is nothing unusual or untoward about pursuing preference claims, and the process is designed to be equitable to all creditors and not disadvantage a certain group of creditors. Accordingly, a desire to evade preference actions, particularly for a liquidating estate, is not an appropriate reason to oppose a plan or seek dismissal of these Chapter 11 Cases.

11. The Committee has a fiduciary duty to all unsecured creditors as a group, not just the creditors who are members of the Committee or trade creditors as a subset of all unsecured creditors. *In re Gen. Homes Corp.*, 181 B.R. 870, 882 (Bankr. S.D. Tex. 1994) ("The Committee's counsel, as well, has of course a fiduciary relation to all unsecured creditors, not just Committee members."); *In re Richmond Tank Car Co.*, 93 B.R. 504, 507 (Bankr. S.D. Tex. 1988) ("[W]here a committee representative or agent seeks to represent or advance the interest of an individual member of a competing class of creditors or various interests or groups whose purposes and desires are dissimilar, this fiduciary is in breach of his duty of loyal and disinterested service.").

12. Of the eight current members of the Committee, seven received substantial payments, totaling $21.6 million, during the 90-day preference period before the Petition Date, according to information supplied by the Debtors' advisors.[8] At least one of the Committee members is a large multinational corporation with market capital of approximately $40 billion that

---

[7] *See e.g.* Aurelio Gurrea-Martinez, *The Avoidance of Pre-Bankrutptcy Transactions: An Economic and Comparative Approach*, International Insolvency Institute (2017) at 4 ("Most jurisdictions provide several mechanisms to challenge transactions entered into by a debtor prior to the commencement of the bankruptcy procedure. These mechanisms, generally known as avoiding powers or claw-back actions, allow the retrospective avoidance of perfectly valid transactions.") (internal citations omitted).

[8] *See Statement of Financial Affairs for Non-Individual for Limetree Bay Refining, LLC* (ECF No. 547).

can hardly be described as a "mom and pop" trade creditor. Individual Committee members owe fiduciary duties to the unsecured body as a whole.

13. The Committee alleges that the Prepetition Secured Parties, including the Revolver Lenders, are exerting too much control over the plan process, yet it shares in most of the consultation rights of the Prepetition Secured Parties under the Plan.[9] The few consultation or consent rights granted to the Prepetition Agents and not the Committee, such as waivers of conditions to confirmation or the Effective Date of the Plan, are included in the Plan because the Revolver Lenders are effectively funding the Plan with their collateral (i.e., the sale proceeds) to pay administrative claims and priority claims and the Liquidating Trust Funding Amount on the Effective Date in an effort to permit the Plan to become effective.[10]

## IV. Conclusion

14. In conclusion, the Prepetition Revolver Agent does not oppose dismissal or conversion of these Chapter 11 Cases, but remains willing to continue to a seek consensual resolution to these Chapter 11 Cases that honors the relative priorities of the estates' creditors and provides recoveries to the Revolver Lenders consistent with dismissal or conversion.

---

[9] *See* Plan § I.B, II.A.110, IV.B.c, IX.A, XIII.a, XIII.c, XIII.f.

[10] *See* Plan at XIII, XVI.A.

Dated: April 1, 2022
New York, New York

*/s/ Sean A. O'Neal*
Sean A. O'Neal
Jane VanLare

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999

*Counsel to the Prepetition Revolver Agent*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 1, 2022, a true copy of the foregoing was filed with the Court using the CM/ECF System, which will provide notice of such filing to all parties requesting such service.

*/s/ Sean A. O'Neal*
Sean A. O'Neal