EXHIBIT  A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | CHAPTER 11 |
| **LIMETREE BAY SERVICES, LLC, *et al.*,**[1] | **CASE NO.: 21-32351 (DRJ)** |
| **Debtors.** | **(Jointly Administered)** |

**COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN
OF LIQUIDATION OF LIMETREE BAY SERVICES, LLC
AND AFFILIATED DEBTORS**

Dated: May 17, 2022
Houston, Texas

**BAKER & HOSTETLER LLP**
*Attorneys to the Debtors*

Elizabeth A. Green, Esq. (Fed ID No. 903144)
Email:  egreen@bakerlaw.com
Jimmy D. Parrish, Esq. (Fed ID No. 2687598)
Email: jparrish@bakerlaw.com
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone:  (407) 649-4000
Facsimile:  (407) 841-0168

-and-

Jorian L. Rose, Esq. (*admitted pro hac vice*)
Email:  jrose@bakerlaw.com
45 Rockefeller Plaza
New York, New York
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

# TABLE OF CONTENTS

I. EXECUTIVE SUMMARY ........................................................................................................ 3
    A.    Introduction........................................................................................................ 3
    B.    Plan Overview..................................................................................................... 4
    C.    Treatment of Claims and Interests Under the Plan. ........................................... 4

II. DEFINITIONS AND CONSTRUCTION OF TERMS ...................................................... 7
    A.    Definitions. ......................................................................................................... 7
    B.    Interpretation; Application of Definitions and Rules of Construction............................ 23

III. BACKGROUND ................................................................................................................. 23
    A.    Nature and History of the Debtors' Business. ................................................... 23
    B.    Corporate Structure and Ownership.................................................................. 24
    C.    The Debtors' Prepetition Indebtedness. ............................................................ 25
    D.    Events Leading to the Filing of the Bankruptcy Case. ...................................... 26
    E.    The Chapter 11 Cases. ...................................................................................... 27
            1.    Administrative Motions. ................................................................... 27
            2.    First Days Orders............................................................................. 27
            3.    Appointment of the Creditors' Committee. ...................................... 28
            4.    Employment of Professionals and Advisors. .................................... 28
            5.    Stay of Pending Litigation. ............................................................... 29
            6.    Claims Process and Bar Date............................................................. 29
            7.    Postpetition Financing and Cash Collateral Orders. ......................... 29
            8.    Sale of Substantially All the Debtors' Assets. .................................. 30
            9.    Settlements. ....................................................................................... 32

IV. CONFIRMATION AND VOTING .................................................................................... 34
    A.    Plan Confirmation Hearing. .............................................................................. 34
    B.    Requirements for Plan Confirmation. ............................................................... 34
    C.    Best Interests of the Creditors Test. .................................................................. 35
    D.    Plan Feasibility. ................................................................................................ 35
    E.    Classification of Claims and Interests. .............................................................. 36
    F.    Impaired Claims or Interests. ............................................................................ 36
    G.    Eligibility to Vote on this Plan.......................................................................... 37
    H.    Voting Procedure and Deadlines. ...................................................................... 37
    I.    Acceptance of this Plan...................................................................................... 38
    J.    Elimination of Vacant Classes........................................................................... 38

V. TREATMENT OF UNCLASSIFIED CLAIMS ........................................................................ 38

    A.       Administrative Expense Claims....................................................................... 39

    B.       Professional Fee Claims................................................................................. 39

    C.       Priority Tax Claims........................................................................................ 40

VI. CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES ..................... 41

VII. TREATMENT OF CLAIMS AND INTERESTS ................................................................. 42

    A.       Classification and Treatment of Claims and Interests. ..................................... 42

        1.       Class 1 — Other Priority Claims. ................................................... 42

        2.       Class 2 — Prepetition Revolver Secured Debt Claims....................... 42

        3.       Class 3 — Prepetition Term Secured Debt Claims............................. 42

        4.       Class 4 — Other Secured Claims. ................................................... 43

        5.       Class 5 — General Unsecured Claims.............................................. 43

        6.       Class 6 — Governmental Fine and Penalty Claims............................ 43

        7.       Class 7 — Prepetition Holdco Secured Debt Claims.......................... 44

        8.       Class 8 — Intercompany Claims. .................................................... 44

        9.       Class 9 — Equity Interests............................................................. 44

    B.       Solicitation of the Debtors. ............................................................................ 45

    C.       Limited Substantive Consolidation. ............................................................... 45

VIII. THE LIQUIDATION OF THE DEBTORS ...................................................................... 45

    A.       Liquidation.................................................................................................... 45

    B.       Reorganization of LBR as the Transition Refinery Entity................................ 46

    C.       Transition Refinery Entity. ............................................................................ 46

    D.       Permits and Shared Authorizations................................................................. 47

IX. PROVISIONS REGARDING THE LIQUIDATING TRUST ................................................. 47

    A.       Appointment of the Liquidating Trustee......................................................... 47

    B.       Creation of the Liquidating Trust. .................................................................. 48

    C.       Beneficiaries of the Liquidating Trust. ........................................................... 48

    D.       Vesting and Transfer of Assets to the Liquidating Trust. ................................. 49

    E.       Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee. .. 50

        1.       General Powers of the Liquidating Trustee ...................................... 50

        2.       Books and Records ...................................................................... 51

        3.       Investments of Cash ..................................................................... 51

        4.       Costs and Expenses of Administration of the Liquidating Trust ......... 51

        5.       Reporting .................................................................................... 51

    F.       Post-Effective Date Notice. ........................................................................... 52

G.    Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust
      Assets; Preparation and Filing of Tax Returns for Debtor ................................. 52

H.    Term of Liquidating Trust. ...................................................................... 53

I.    Limitation of Liability of the Liquidating Trustee. ....................................... 53

X. MEANS FOR IMPLEMENTATION ................................................................ 54

A.    Preservation of Right to Conduct Investigations. ........................................ 54

B.    Prosecution and Resolution of Causes of Action and Avoidance Actions. ...... 54

C.    Effectuating Documents and Further Transactions. ...................................... 54

D.    Funding of Liabilities and Distributions. .................................................. 54

E.    Release of Liens. .................................................................................. 55

F.    Exemption from Securities Laws. ............................................................ 55

G.    Exemption from Certain Taxes and Fees. .................................................. 55

H.    Debtors' Privileges as to Certain Causes of Action. .................................... 55

I.    Insurance Policies. ............................................................................... 56

J.    Filing of Monthly and Quarterly Reports and Payment of Statutory Fees. ...... 56

K.    Completion of Services of Professionals. .................................................. 57

L.    Operations of the Debtors Between the Confirmation Date and the Effective Date.
      57

M.    Structured Dismissal. ............................................................................ 57

XI. PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN ........................ 58

A.    Distribution Record Date. ...................................................................... 58

B.    Method of Payment. .............................................................................. 58

C.    Claims Objection Deadline. .................................................................... 58

D.    No Distribution Pending Allowance. ......................................................... 58

E.    Reserve of Cash Distributions. ................................................................ 58

F.    Distribution After Allowance. ................................................................. 59

G.    Delivery of Distributions. ...................................................................... 59

H.    Fractional Dollars; *De Minimis* Distributions. ......................................... 59

I.    Excess Funds. ...................................................................................... 59

J.    Unclaimed Distributions. ....................................................................... 60

K.    Set-Off. 60

L.    Maximum Recovery and Postpetition Interest. ........................................... 60

M.    Allocation of Distributions Between Principal and Interest. .......................... 60

N.    Prepayment. ........................................................................................ 61

XII. EXECUTORY CONTRACTS ............................................................................................. 61

    A.      Rejection of Executory Contracts and Unexpired Leases. ................................. 61

    B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. ...................... 61

XIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................................... 61

XIV. RELEASE, EXCULPATION, INJUNCTION, AND RELATED PROVISIONS ........................... 63

    A.      Releases by the Debtors. ................................................................................... 63

    B.      Releases by the Releasing Parties. ................................................................... 64

    C.      Exculpation. ....................................................................................................... 66

    D.      Preservation of Causes of Action. .................................................................... 66

    1.      Vesting of Causes of Action ............................................................................ 66

    2.      Preservation of All Causes of Action Not Expressly Settled or Released. ...................... 67

    E.      Injunction. ......................................................................................................... 67

    F.      Termination of All Employee and Workers' Compensation Benefits. ............................. 69

    G.      Exclusions and Limitations on Liability. ......................................................... 69

XV. RETENTION OF JURISDICTION ..................................................................................... 69

XVI. MISCELLANEOUS PROVISIONS ................................................................................... 71

    A.      Modification of Plan. ......................................................................................... 71

    B.      Revocation of Plan. ........................................................................................... 71

    C.      Successors and Assigns. .................................................................................... 71

    D.      Governing Law. ................................................................................................. 72

    E.      Reservation of Rights. ....................................................................................... 72

    F.      Effectuating Documents; Further Transactions. ............................................... 72

    G.      Further Assurances. ........................................................................................... 72

    H.      Payment of Fees and Expenses of the Prepetition Revolver Agent, Prepetition Term Agent and Ad Hoc Term Lender Group. ................................................. 72

    I.      Dissolution of the Debtors and Closing of the Chapter 11 Cases. .................... 72

    J.      Dissolution of the Committee. .......................................................................... 73

    K.      Service of Documents. ...................................................................................... 73

    L.      Filing of Additional Documents. ...................................................................... 75

XVII. RISKS AND OTHER CONSIDERATIONS ..................................................................... 75

    A.      Bankruptcy Considerations. .............................................................................. 75

    B.      No Duty to Update Disclosures. ....................................................................... 75

    C.      Alternatives to Confirmation and Consummation of the Plan. ......................... 76

    1.      Alternate Plan ................................................................................................... 76

    2.      Chapter 7 Liquidation or Dismissal ................................................................. 76

D.      Certain Federal Tax Consequences ................................................................. 76

    1.      Consequences to U.S. Holders of Allowed Claims ............................... 78

    2.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed
        Claims ...................................................................................................... 80

    3.      Tax Treatment of the Liquidating Trust and U.S. Holders of Beneficial
        Interests Therein ..................................................................................... 81

    4.      FATCA .................................................................................................... 84

    5.      Backup Withholding and Information Reporting ................................. 84

XVIII. RECOMMENDATION AND CONCLUSION ............................................................. 85

## <u>EXHIBITS</u>

**Exhibit A:  LIQUIDATION ANALYSIS**

## DISCLAIMER

This Combined Plan and Disclosure Statement[2] has been prepared in accordance with section 1125 of the Bankruptcy Code, Rules 3016 and 3017 of the Federal Rules of Bankruptcy Procedure, Rule 3016-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of Texas, and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas, and not in accordance with federal or state securities law or other applicable non-bankruptcy law. Persons or Entities trading in or otherwise purchasing, selling, or transferring Claims against the Debtors should evaluate this Combined Plan and Disclosure Statement considering the purpose for which it was prepared.

Pursuant to Local Rule 3016-2, this Combined Plan and Disclosure Statement is being submitted for conditional approval only. Contemporaneously with the filing of this Combined Plan and Disclosure Statement, the Debtors are filing a motion to, among other things, schedule a joint hearing to consider final approval of the adequacy of the Disclosure Statement and confirmation of the Plan.

To ensure compliance with IRS circular 230, Holders of Claims and Equity Interests are hereby notified that: (a) any discussion of U.S. federal tax issues contained or referred to in this Combined Plan and Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) Holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.

There has been no independent audit of the financial information contained in this Combined Plan and Disclosure Statement except as expressly indicated herein. This Combined Plan and Disclosure Statement was compiled from information obtained from numerous sources believed to be accurate to the best of the Plan Proponents' knowledge, information, and belief. This Combined Plan and Disclosure Statement was not filed with the Securities and Exchange Commission or any state authority and neither the Securities and Exchange Commission nor any state authority has passed upon the accuracy, adequacy, or merits of this Combined Plan and Disclosure Statement. Neither this Combined Plan and Disclosure Statement nor the solicitation of votes to accept or reject the Plan constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Combined Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.

---

[2] Referred to herein as the "**Combined Plan and Disclosure Statement**" or the "**Plan**."

Any projected recoveries to Creditors set forth in this Combined Plan and Disclosure Statement are based upon the analyses performed by the Debtors and their advisors. Although the Plan Proponents and their advisors have made every effort to verify the accuracy of the information presented herein, the Plan Proponents and their advisors cannot make any representations or warranties regarding the accuracy of the information.

Nothing stated herein shall be deemed or construed as an admission of any fact or liability by any party or be admissible in any proceeding involving the Debtors or any other party. The statements contained herein are made as of the date hereof unless another time is specified. The delivery of this Combined Plan and Disclosure Statement shall not be deemed or construed to create any implication that the information contained herein is correct at any time after the date hereof.

It is the Plan Proponents' opinion that the treatment of Creditors under the Plan contemplates a greater recovery for Creditors than that which is likely to be achieved under other alternatives for the Debtors. Accordingly, the Plan Proponents believe that confirmation of the Plan is in the best interests of Creditors and recommend that all Holders of Claims whose votes are being solicited to vote to accept the Plan.

# I. EXECUTIVE SUMMARY[3]

## A.    Introduction.

Limetree Bay Services, LLC and its affiliated Debtors in the above-captioned jointly administered Chapter 11 Cases hereby propose this Combined Plan and Disclosure Statement, as may be further amended from time to time, for the full and final resolution of outstanding claims against and interests in the Debtors.

The Plan contemplates a liquidation of each of the Debtors and their Estates. The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates and therefore seek to confirm the Plan.

Pursuant to prior orders of the Bankruptcy Court, the Debtors sold substantially all their assets to West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP as a going concern. The Plan provides for the distribution of the proceeds from the sale of those assets remaining after satisfaction of the DIP Obligations on the Effective Date of the Plan. The Plan also contemplates the creation of a liquidating trust to liquidate and administer substantially all remaining property of the Debtors, including Claims and Causes of Action, not sold, transferred or otherwise waived or released before the Effective Date.

As set forth in greater detail below, the Plan provides for the liquidation of the Debtors (and the eventual termination of each of the Debtors' respective corporate existences), and payment, or other satisfaction, as described below, on or after the Effective Date, of all allowed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Prepetition Revolver Secured Debt Claims, Prepetition Term Secured Debt Claims, Other Secured Claims, General Unsecured Claims, Governmental Fine and Penalty Claims, and Prepetition Holdco Secured Debt Claims (each as defined and discussed below). The Plan further provides for the potential reorganization of Debtor Limetree Bay Refining, LLC at the election of the Purchaser into an entity which shall be owned and managed by the Purchaser and to which the Debtors' permits to operate the Refinery shall be transferred on the Effective Date, and the cancellation of Equity Interests, the Holders of which shall receive no distribution under the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Section XVI.A of this Combined Plan and Disclosure Statement, the Plan Proponents expressly reserve the right to alter, amend, or modify this Combined Plan and Disclosure Statement, including the Plan Supplement, one or more times before substantial consummation thereof.

---

[3] Capitalized terms used but not defined in this section shall have the meaning ascribed to them in Section II herein. While this Executive Summary is believed to be accurate, in the event of an inconsistency or conflict between this summary and the more complete terms set forth in other sections of this Combined Plan and Disclosure Statement, those other sections shall control over the Executive Summary.

B.    **Plan Overview.**

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Combined Plan and Disclosure Statement, and the exhibits thereto, as may be further amended from time to time. If any inconsistency or conflict exists between this summary and the terms contained herein, the terms contained herein will control.  The Plan is a joint plan for the liquidation of all the Debtors and their Estates. The Debtors will be consolidated for voting purposes and for the purposes of determining the Allowed amounts of Claims to be used in calculating Distributions to be made pursuant to the Plan.

The Debtors sold substantially all their assets on January 21, 2022. Under the terms of the Sale, the Debtors retained certain litigation claims and funds in order to wind down their operations and make distributions to Creditors with Allowed Claims. The Plan contemplates the creation of a Liquidating Trust on the Effective Date for the purposes of effectuating the liquidation of the Liquidating Trust Assets and distributing the proceeds of the Liquidating Trust to the Beneficiaries of the Liquidating Trust, which Liquidating Trust shall issue Class A Liquidating Trust Units, Class B Liquidating Trust Units, and Class C Liquidating Trust Units, each as described in this Plan and the Liquidating Trust Agreement. The Liquidating Trust shall be managed by a Liquidating Trustee in accordance with the Liquidating Trust Agreement and who shall be selected by the Debtors after consultation with the Committee and upon the consent of the Ad Hoc Term Lender Group. The primary purpose of the Liquidating Trust and its Liquidating Trustee shall be (i) administering, monetizing and liquidating the Liquidating Trust Assets, (ii) resolving all Disputed Claims and (iii) making all Distributions from the Liquidating Trust as provided for in the Plan and the Liquidating Trust Agreement.  The Liquidating Trust Assets shall primarily consist of the Liquidating Trust Funding Amount and the Liquidating Trust Causes of Action, among other things.

Following the Effective Date of the Plan, the Liquidating Trustee will be responsible for all payments and distributions to be made under the Plan to the Holders of Allowed Claims. Each executory contract and unexpired lease to which a Debtor is a party shall be deemed rejected unless (a) otherwise provided herein or in the Plan Supplement or (b) the Debtors expressly assume and assign such agreements to the Purchaser of the Debtors' Assets before the Effective Date.

C.    **Treatment of Claims and Interests Under the Plan.**

Each Holder of a Claim against the Debtors that is entitled to vote to accept or reject the Plan should read this Combined Plan and Disclosure Statement in its entirety before voting. No solicitation of votes to accept or reject this Plan may be made except pursuant to the terms hereof and Bankruptcy Code section 1125. If you are entitled to vote on the Plan, you are receiving a Ballot with your notice of this Combined Plan and Disclosure Statement. The Debtors strongly urge you to vote to accept the Plan.

The following chart provides a summary of the anticipated recovery to Holders of Claims or Equity Interests under the Plan. Any estimates of Claims or Equity Interests in this Plan may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive Distributions under the Plan depends on the Debtors' ability to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Except to the extent that a Holder of an Allowed Claim or Allowed Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest, each Holder of an Allowed Claim or Allowed Equity Interest shall receive under the Plan the treatment described below in full and final satisfaction of such Holder's Allowed Claim or Allowed Equity Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Equity Interest shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

As explained more fully in Sections VI and VII of this Combined Plan and Disclosure Statement,[4] the Plan provides for the creation of a Liquidating Trust. Beneficial Interests in the Liquidating Trust are divided into three classes—Class A, Class B, and Class C. Each series of Liquidating Trust Units shall receive Distributions from the liquidation of certain identified assets. Further, each series of Liquidating Trust Units is divided into separate sub-series of Liquidating Trust Units (e.g., Class A1, Class A2, Class B1, Class B2, etc.), which establishes priority among the various Creditors holding units in a certain Class. The classification and Distribution scheme proposed under the Plan is as follows:

| Class | Description | Estimated Recovery | Treatment | Entitled to Vote? |
|---|---|---|---|---|
| 1 | Other Priority Claims | 100% | Unimpaired. Each Holder of an Allowed Other Priority Claim shall receive in full and final satisfaction of such Holder's Allowed Claim: (i) Cash in an amount equal to such Allowed Other Priority Claim on the Effective Date or as soon thereafter as is reasonably practicable, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | No. Deemed to accept. |
| 2 | Prepetition Revolver Secured Debt Claims | 20-100% | Impaired. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Prepetition Revolver Secured Debt Claim shall receive in full and final satisfaction of such Holder's Allowed Claim its Pro Rata Share of (i) all Available Sale Proceeds, (ii) Class A1 Liquidating Trust Units, (iii) Class B1 Liquidating Trust Units, (iv) Class | Yes. |

---

[4] To the extent that the terms of this summary conflict with the terms of Sections VI and VII of this Combined Plan and Disclosure Statement, the terms of Sections VI and VII shall control.

| | | | | |
|---|---|---|---|---|
| | | | B2 Liquidating Trust Units, (v) Class B3 Liquidating Trust Units, (vi) Class C1 Liquidating Trust Units, and (vii) Class C2 Liquidating Trust Units. | |
| 3 | Prepetition Term Secured Debt Claims | 0-30% | Impaired. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Prepetition Term Secured Debt Claim shall receive in full and final satisfaction of such Holder's Allowed Claim its Pro Rata Share of (i) Class A2 Liquidating Trust Units, (ii) Class B2 Liquidating Trust Units, (iii) Class B3 Liquidating Trust Units, and (iv) Class C2 Liquidating Trust Units. | Yes. |
| 4 | Other Secured Claims | 100% | Unimpaired. On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive or retain, in full and final satisfaction and settlement of such Claim, at the election of the Debtors, except to the extent any Holder of an Allowed Other Secured Claim agrees to different treatment: (i) the Collateral securing such Allowed Other Secured Claim; (ii) Cash in an amount equal to the value of the collateral securing such Allowed Other Secured Claim; or (iii) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered unimpaired. | No. Deemed to accept. |
| 5 | General Unsecured Claims | 0-2% | Impaired. In full and final satisfaction of each Allowed General Unsecured Claim, the Holder of such Claim shall receive its Pro Rata Share of (i) the Class B3 Liquidating Trust Units and (ii) the Class C2 Liquidating Trust Units. | Yes. |

| 6 | Governmental Fine and Penalty Claims | 0% | Impaired. Each Holder of an Allowed Class 6 Governmental Fine and Penalty Claim shall receive, in full and final satisfaction of and in exchange for such Holder's Allowed Claim, its Pro Rata Share of (i) the Class B4 Liquidating Trust Units and (ii) the Class C3 Liquidating Trust Units. | Yes. |
|---|---|---|---|---|
| 7 | Prepetition Holdco Secured Debt Claims | 0% | Impaired. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Prepetition Term Secured Debt Claim shall receive in full and final satisfaction of such Holder's Allowed Claim, its Pro Rata Share of (i) the Class B5 Liquidating Trust Units and (ii) the Class C4 Liquidating Trust Units. | Yes. |
| 8 | Intercompany Claims | 0% | Impaired. All Allowed Intercompany Claims shall be cancelled. Holders of Intercompany Claims will receive no property or Distribution under the Plan on account of such Claims. | No. Deemed to reject. |
| 9 | Equity Interests | 0% | Impaired. On the Effective Date, all Equity Interests will be deemed cancelled and extinguished. Holders of Equity Interests will receive no property or Distribution under the Plan on account of such Interests. | No. Deemed to reject. |

Holders of Claims in Classes 1 and 4 are unimpaired under the Plan and are thus deemed to accept the Plan.  Holders of Claims and Equity Interests in Classes 8 and 9 will receive no Distribution on account of such Claims and Equity Interest under the Plan and are thus deemed to reject the Plan. Holders of Claims in Classes 2, 3, 5, 6 and 7 are impaired under the Plan and are the only Holders of Claims entitled to vote to accept or reject the Plan.

## II.  DEFINITIONS AND CONSTRUCTION OF TERMS

### A.     Definitions.

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.      "**Administrative Expense Claim**" means Claims that have been timely filed, pursuant to the deadline and procedures set forth in any bar date order or Plan Confirmation Order, as applicable, or late filed Claims otherwise allowed by Final Order for costs and expenses of administration under sections 503(b), 507(a)(2) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) administrative expense claims Allowed under section 503(b)(9) of the Bankruptcy Code (if any); and (c) Professional Fee Claims. For the avoidance of doubt, pursuant to Local Rule 3002-1, the government shall not be required to file any proof of claim or application for allowance for any claims covered by section 503(b)(1)(B), (C), or (D).

2.      "**Administrative Expense Claim Bar Date**" means May 5, 2022 at 5:00 p.m. (prevailing Central Time), the deadline for filing requests for allowance and payment of Administrative Expense Claims established by order of the Bankruptcy Court.

3.      "**Administrative Expense Claims Cap**" means Cash in an amount not to exceed $4.8 million, except as otherwise expressly agreed in advance by the Prepetition Revolver Agent in writing, which amount shall be used exclusively for purposes of paying Allowed Administrative Expense Claims, which shall be paid on or after the Effective Date. This amount shall include the $1 million payable under the *Order Granting Debtors' Emergency Motion to Amend Bid Procedures Order and Other Related Relief* [Doc No. 813].

4.      "**Administrative Expense and Priority Escrow Account**" means an interest-bearing escrow account established and funded by the Debtors as soon as reasonably practicable after the Plan Confirmation Date and no later than the Effective Date solely for the purpose of paying all Allowed Administrative Expense Claims, Other Priority Claims and Priority Tax Claims, to the extent such Claims have not been paid in full on or before the Effective Date.

5.      "**Ad Hoc Term Lender Group**" shall have the meaning ascribed in the Final DIP Order.

6.      "**Allowed**" means, with respect to Claims: (a) any Claim for which a proof of Claim was filed (or a Claim that does not require the filing of a proof of Claim as provided for under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court,); (b) any Claim which has been or hereafter is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent and for which no superseding proof of Claim has been filed; (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; and (d) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Liquidating Trustee under the Plan and the Liquidating Trust Agreement; provided that with respect to any Claim described in clauses (a) and (b), such Claim shall be considered Allowed only if and to the extent that with respect to such Claim, no objection to the allowance was timely filed (including but not limited to, an objection relating to the timeliness of the filing of the proof of claim), or if such timely objection was filed, the Claim is subsequently Allowed by a Final Order or through an agreement between the claimant and the Liquidating Trustee. Notwithstanding anything herein

to the contrary, Claims allowed solely for the purpose of voting to accept or reject this Combined Plan and Disclosure Statement pursuant to an order of the Bankruptcy Court shall not be considered "Allowed" Claims hereunder.

7.    "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtors and their Estates within the meaning of section 541 of the Bankruptcy Code.

8.    "**Available Sale Proceeds**" means all Sale Proceeds paid to the Holders of Class 2 Prepetition Revolver Secured Debt Claims on the Effective Date.

9.    "**Available Trust Cash**" means proceeds of the Liquidating Trust's Assets that are available for distribution to holders of Beneficial Interests in the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

10.   "**Avoidance Actions**" means all rights to avoid transfers or distributions and recover any such avoided transfers or distributions for the benefit of the Estates under chapter 5 of the Bankruptcy Code or otherwise, including, but not limited to, Bankruptcy Code sections 506(d), 522, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553, or otherwise under the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, voidable transfer, and/or other similar avoidance claims, rights, and causes of action, whether or not demand has been made or litigation has been commenced as of the Effective Date to prosecute such Avoidance Actions.

11.   "**Ballot**" means the ballot on which each Holder of a Claim entitled to vote to accept or reject this Plan casts such vote.

12.   "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time.

13.   "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

14.   "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as amended from time to time.

15.   "**Beneficiaries**" or "**Beneficial Interests**" means holders of or beneficial interests of Class A Liquidating Trust Units, Class B Liquidating Trust Units, and Class C Liquidating Trust Units, collectively.

16.   "**Bidding Procedures**" means those Bidding Procedures attached as Appendix A to the Bidding Procedures Order, as amended or modified from time to time.

17.   "**Bidding Procedures Motion**" means the *Debtors' Emergency Motion for Entry of Order: (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief* filed by the Debtors on July 26, 2021 [Doc. No. 191].

18.   "**Bidding Procedures Order**" means the *Order Granting Debtors' Emergency Motion for Entry of Order: (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets;*

*and (III) Granting Related Relief*, entered by the Bankruptcy Court on August 11, 2021 [Doc No. 392].

19.    "**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

20.    "**Business Interruption Claims**" means claims or causes of action against the insurers that provided business interruption insurance to the Debtors, including, without limitation, business interruption coverage under any property damage insurance policies.

21.    "**Cash**" means legal tender of the United States of America and equivalents thereof.

22.    "**Causes of Action**" means all claims, actions (including the Avoidance Actions), causes of action (including commercial tort claims), choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims of any Debtor and/or any Estate against any Person or Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted.

23.    "**Chapter 11 Cases**" means the Debtors' jointly administered bankruptcy cases commenced by the filing of voluntary petitions for relief for the Debtors on July 12, 2021, under chapter 11 the Bankruptcy Code, Case Nos. 21-32351, 21-32352, 21-32353, 21-32354, 21-32355, and 21-32356, currently pending in the Bankruptcy Court.

24.    "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

25.    "**Claims Agent**" or "**Balloting Agent**" means BMC Group, having the address of BMC Group, Attn: Limetree Bay Claims Processing, PO Box 90100, Los Angeles, CA 90009 and the following website:   https://www.bmcgroup.com/limetree.

26.    "**Claims Objection Deadline**" means the date that is one hundred and eighty (180) days after the Effective Date or such later date as may be approved by the Bankruptcy Court upon motion.

27.    "**Class**" means any group of substantially similar Claims or Equity Interests classified by this Combined Plan and Disclosure Statement pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

28.    "**Class A Liquidating Trust Recoveries**" means the recoveries from the Liquidating Trust on account of any proceeds from the liquidation of any Assets of the Debtors and their Estates not sold, transferred or otherwise waived or released prior to the Effective Date constituting Prepetition Collateral (as defined in the Final DIP Order) of the Debtors that was not transferred pursuant to the Sale Order; provided, however, for the avoidance of doubt, the Class A Liquidating Trust Recoveries shall not include the Business Interruption Claims or the Property Damage Claims or any recoveries or proceeds thereof.

29.     "**Class A Liquidating Trust Units**" means the Class A1 Liquidating Trust Units and Class A2 Liquidating Trust Units.

30.     "**Class A1 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class A Liquidating Trust Recoveries, until payment in full of the Prepetition Revolver Secured Debt Claims.

31.     "**Class A2 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class A Liquidating Trust Recoveries, following the payment in full of the Prepetition Revolver Secured Debt Claims.

32.     "**Class B Liquidating Trust Recoveries**" means recoveries from the Liquidating Trust on account of Business Interruption Claims and Property Damage Claims.

33.     "**Class B Liquidating Trust Units**" means Class B1 Liquidating Trust Units, Class B2 Liquidating Trust Units, Class B3 Liquidating Trust Units, Class B4 Liquidating Trust Units and Class B5 Liquidating Trust Units.

34.     "**Class B1 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class B Liquidating Trust Recoveries, until the Revolver Adequate Protection Claim Threshold Event.

35.     "**Class B2 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling  each Holder thereof to receive its Pro Rata Share of Distributions of Class B Liquidating Trust Recoveries, following the Revolver Adequate Protection Claim Threshold Event, until payment in full of the Prepetition Term Secured Debt Claims; provided that any Holder of a Prepetition Revolver Secured Debt Claim shall have no right to Distributions on account of Class B2 Liquidating Trust Units following payment in full of the Prepetition Revolver Secured Debt Claims.

36.     "**Class B3 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class B Liquidating Trust Recoveries, following the payment in full of the Prepetition Term Secured Debt Claims**; provided that any Holder of a Prepetition Revolver Secured Debt Claim shall have no right to Distributions on account of Class B3 Liquidating Trust Units following payment in full of the Prepetition Revolver Secured Debt Claims.**

37.     "**Class B4 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class B Liquidating Trust Recoveries, following the payment in full of General Unsecured Claims.

38.     "**Class B5 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class B Liquidating Trust Recoveries, following the payment in full of Governmental Fine and Penalty Claims.

39.     "**Class C Liquidating Trust Recoveries**" means recoveries received by the Liquidating Trust on account of any Claims or Causes of Action transferred to the Liquidating Trust other than the Business Interruption Claims and Property Damage Claims,  including (i) Claims or Causes of

Action to avoid and recover preferential transfers pursuant to Bankruptcy Code section 547 and other avoidance actions under Chapter 5 of the Bankruptcy Code,  (ii) Claims or Causes of Action against present and former shareholders, officers, directors, affiliates and other insiders of the Debtors, (iii) Claims or Causes of Action against any contractors, vendors, suppliers or other third parties relating to work performed on the Debtors' Assets or goods or services provided to the Debtors, including Claims or Causes of Action relating to breach of contract or arising under any warranty obligations, and (iv) any Claims or Causes of Action against St. Croix Energy LLLP and Berry Contracting LP, d/b/a Bay, Ltd.

40.     "**Class C Liquidating Trust Units**" means Class C1 Liquidating Trust Units, Class C2 Liquidating Trust Units, Class C3 Liquidating Trust Units, and Class C4 Liquidating Trust Units.

41.     "**Class C1 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class C Liquidating Trust Recoveries in excess of the Initial Class C Liquidating Trust Recoveries, until the Revolver Adequate Protection Claim Threshold Event.

42.     "**Class C2 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class C Liquidating Trust Recoveries in excess of the Initial Class C Liquidating Trust Recoveries, following the Revolver Adequate Protection Claim Threshold Event.

43.     "**Class C3 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class C Liquidating Trust Recoveries, following the payment in full of the General Unsecured Claims.

44.     "**Class C4 Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Class C Liquidating Trust Recoveries, following the payment in full of Governmental Fine and Penalty Claims.

45.     "**Clerk**" means the clerk of the Bankruptcy Court.

46.     "**Collateral**" means any property or interest in property of the Estates of the Debtors subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

47.     "**Combined Plan and Disclosure Statement**" or "**Plan**" means this *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Limetree Bay Services, LLC and Affiliated Debtors*, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time through substantial consummation thereof, including the Plan Supplement, with the consent of the Prepetition Agents.

48.     "**Creditors' Committee**" or "**Committee**" means the Official Committee of Unsecured Creditors of the Debtors, appointed in the Chapter 11 Cases by the United States Trustee on July 26, 2021, as such membership may be amended.

49.    "**Creditor**" shall have the meaning ascribed to such term in Bankruptcy Code section 101(10).

50.    "**Debtors**" means Limetree Bay Services, LLC, Limetree Bay Refining Holdings, LLC, Limetree Bay Refining Holdings II, LLC, Limetree Bay Refining, LLC, Limetree Bay Refining Operating, LLC, and Limetree Bay Refining Marketing, LLC, as Debtors-in-Possession in the Chapter 11 Cases.

51.    "**Debtors-in-Possession**" means the Debtors in their respective capacity as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

52.    "**DIP Collateral**" means such property of the Debtors encumbered by the DIP Liens as described in the Final DIP Order.

53.    "**DIP Facility**" means that certain super-priority, senior secured debtor-in-possession credit facility under the DIP Loan Documents and the DIP Orders.

54.    "**DIP Financing Motion**" means the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Approving Adequate Protection to Pre-petition Secured Creditors, (V) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing*, filed by the Debtors on July 12, 2021 [Doc No. 14].

55.    "**DIP Lender(s)**" means 405 Sentinel, LLC, on behalf of one or more funds managed by it and/or through certain affiliates and in its capacity as agent for such funds, as defined in the Final DIP Order.

56.    "**DIP Liens**" means such liens on and security interests granted to the DIP Lender(s) as described in the Final DIP Order.

57.    "**DIP Loan Documents**" means the term sheet for the DIP Facility entered into between the Debtors and the DIP Lenders, the DIP Orders, and all documents, instruments, guarantees, and agreements executed and delivered in connection therewith.

58.    "**DIP Obligations**" has the meaning ascribed in the Final DIP Order.

59.    "**DIP Orders**" means, collectively, the Interim DIP Orders and the Final DIP Order.

60.    "**DIP Secured Parties**" has the meaning ascribed in the Final DIP Order.

61.    "**Disputed Claim**" means any Claim that is or hereafter may be listed on the Schedules as disputed, contingent, or unliquidated, or which is objected to in whole or in part prior to the Claims Objection Deadline and has not been Allowed in whole or in part by settlement or Final Order or compromised, settled, or otherwise resolved pursuant to the authority granted to the Liquidating Trustee under the Plan and the Liquidating Trust Agreement.

13

62.     "**Disputed Claims Reserve**" means the reserve established by the Liquidating Trustee for the benefit of Holders of Disputed Claims. Any such reserve shall be made from the Liquidating Trust Assets.

63.     "**Distribution**" means any distribution to Holders of Allowed Claims, or their designated agents, Liquidating Trust Beneficiaries under or pursuant to this Plan and/or the Liquidating Trust Agreement.

64.     "**Distribution Record Date**" means the record date for purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

65.     "**Docket**" means the docket in the Chapter 11 Cases maintained by the Clerk.

66.     "**DPNR**" means Virgin Islands Department of Planning and National Resources.

67.     "**Effective Date**" means the date on which the conditions specified in Section XIII of this Plan have been satisfied or waived in accordance with the terms hereof and the transactions contemplated hereunder have been consummated. The Debtors shall file a Notice of Effective Date (as defined below) on the Docket indicating the calendar date which corresponds to the Effective Date.

68.     "**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

69.     "**EPA**" means the United States Environmental Protection Agency.

70.     "**Equity Interest**" means any equity or membership interest in any Debtor.

71.     "**Estates**" means the estates of the Debtors created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

72.     "**Exculpated Parties**" means each of the following solely in its capacity as such (i) the Debtors, (ii) the Debtors' officers and directors as of the Effective Date, solely in connection with the Chapter 11 Cases and solely with respect to the Exculpation Timeframe, (iii)  the Debtors' chief restructuring officer, Mark Shapiro, and GlassRatner Advisory & Capital Group LLC, d/b/a B. Riley Services, (iv) the Committee and its members in their capacities as members of the Committee, (v) the DIP Secured Parties, (vi) the Prepetition Secured Parties and their respective officers, directors, and partners (excluding, for the avoidance of doubt, any lenders under the Prepetition Term Credit Agreement that are Insider Creditors (as defined in the Final DIP Order)), (vii) the Prepetition Holdco Secured Parties and their respective officers, directors, and partners (excluding, for the avoidance of doubt, any lenders under the Prepetition Holdco Credit Agreement that are Insider Creditors (as defined in the Final DIP Order)), and (viii) the professionals and advisors of the foregoing parties.

73.     "**Exculpation Timeframe**" means the period from the Petition Date through and including the Effective Date.

74.    "**Executory Contract**" means any executory contract or unexpired lease, within the meaning of section 365 of the Bankruptcy Code, as of the Petition Date between one or more of the Debtors and any Entity.

75.    "**Extended Bar Date**" means February 15, 2022, the deadline for Putative Class Members to file a proof of Claim against the Debtors for a Claim that arose prior to the Petition Date.

76.    "**Final DIP Order**" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Doc No. 495], as may be amended or modified from time to time, entered by the Bankruptcy Court on August 27, 2021.

77.    "**Final Order**" means an Order of the Bankruptcy Court or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

78.    "**General Bar Date**" means November 15, 2021, the deadline for each Person or Entity, including without limitation, individuals, partnerships, corporations, joint ventures and trusts, other than Governmental Units and Putative Class Members, to file a proof of Claim against the Debtors for a Claim that arose prior to the Petition Date.

79.    "**General Unsecured Claim**" means any Claim against any Debtor that is (i) not an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Prepetition Revolver Secured Debt Claim, Prepetition Term Secured Debt Claim, Prepetition Holdco Secured Debt Claim, Other Secured Claim, or Governmental Fine and Penalty Claim, but includes (a) any Claim arising from the rejection of an executory contract under section 365 of the Bankruptcy Code and (b) any portion of a Claim to the extent the value of the Holder's interest in the Estates' interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to § 506(a) of the Bankruptcy Code, or (ii) otherwise determined by the Bankruptcy Court to be a general unsecured claim.

80.    "**Governmental Fine and Penalty Claim**" means any Claim against any Debtor by any Governmental Unit for fines, penalties, forfeiture, or punitive damages as set forth in section 726(a)(4) of the Bankruptcy Code.

81.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

82.    "**Governmental Unit Bar Date**" means January 10, 2022, the deadline for Governmental Units to file a proof of Claim against the Debtors for a Claim that arose prior to the Petition Date.

83.     "**Holder**" means the legal or beneficial holder of any Claim or Equity Interest.

84.     "**Impaired**" means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

85.     "**Initial Class C Liquidating Trust Recoveries**" means the first $750,000 in Class C Liquidating Trust Recoveries received by the Liquidating Trust which shall be available to the Liquidating Trust for the administration of the Liquidating Trust.

86.     "**Insurance Claimant(s)**" means any Holder of a Claim, which may be covered by any Insurance Policies or the proceeds of any Insurance Policies, including but not limited to: (a) all individuals and entities who have asserted Claims against the Debtors and filed a Proof of Claim and (b) all Named Plaintiffs and all Putative Class Members in the Putative Class Actions.

87.     "**Insurance Policies**" means all insurance policies of the Debtors, including any D&O Policies.

88.     "**Intercompany Claim**" means any Claim held by any of the Debtors against one or more of the Debtors.

89.     "**Interim Compensation Order**" means the Bankruptcy Court's September 7, 2021, Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals [Doc No. 397].

90.     "**Interim DIP Orders**" means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, entered by the Bankruptcy Court on July 14, 2021 [Doc No. 104], together with subsequent interim orders extending the terms thereof [Doc Nos. 271, 393, 411].

91.      "**IRS**" means the Internal Revenue Service.

92.     "**LBC II**" means Limetree Bay Cayman II, Ltd., a Cayman Islands exempted company. LBC II is a wholly owned subsidiary of LBE. LBC II is not a debtor in these Chapter 11 Cases.

93.     "**LBE**" means Limetree Bay Energy, LLC, a Delaware limited liability company and the parent company of each of the Debtors (directly or indirectly through subsidiaries) as well as the Terminal Entities (directly or indirectly through subsidiaries). LBE is not a debtor in these Chapter 11 Cases.

94.     "**LBR**" means Limetree Bay Refining, LLC, a limited liability company formed under the laws of the United States Virgin Islands. LBR is a wholly owned subsidiary of LBRH II. LBR is a debtor in these Chapter 11 Cases.

95.     "**LBRH**" means Limetree Bay Refining Holdings, LLC, a limited liability company formed under the laws of the United States Virgin Islands. LBRH is a wholly owned subsidiary of LBC II. LBRH is a debtor in these Chapter 11 Cases.

96. "**LBRH II**" means Limetree Bay Refining Holdings II, LLC, a limited liability company formed under the laws of the United States Virgin Islands. LBRH II is a wholly owned subsidiary of LBRH. LBRH II is a debtor in these Chapter 11 Cases.

97. "**LBRM**" means Limetree Bay Refining Marketing, LLC, a limited liability company formed under the laws of the United States Virgin Islands. LBRM is a wholly owned subsidiary of LBR. LBRM is a debtor in these Chapter 11 Cases.

98. "**LBRO**" means Limetree Bay Refining Operating, LLC, a limited liability company formed under the laws of the United States Virgin Islands. LBRO is also a wholly owned subsidiary of LBR. LBRO is a debtor in these Chapter 11 Cases.

99. "**LBS**" means Limetree Bay Services, LLC, a Delaware limited liability company. LBS is a wholly owned subsidiary of LBE. LBS is a debtor in these Chapter 11 Cases.

100. "**LBV**" means Limetree Bay Ventures, LLC, a Delaware limited liability company. LBV is not a debtor in these Chapter 11 Cases. Prior to April 2021, LBS and LBC II were wholly owned subsidiaries of LBV.

101. "**Lien**" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge, right of first refusal or surrender right, or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code.

102. "**Liquidating Trust**" means the trust that will come into existence upon the Effective Date and into which all of the Liquidating Trust Assets will vest pursuant to the Plan, which trust shall be formed pursuant to and governed by the Liquidating Trust Agreement.

103. "**Liquidating Trust Advisors**" means any firm(s) or individual(s) retained by a Liquidating Trustee to serve as a legal counsel or provide other professional services in connection with the performance of the Liquidating Trustee's duties and responsibilities under this Plan and a Liquidating Trust Agreement.

104. "**Liquidating Trust Agreement**" means the agreement governing the Liquidating Trust, dated on or about the Effective Date, substantially in the form included in the Plan Supplement.

105. "**Liquidating Trust Assets**" means (i) the Liquidating Trust Funding Amount, (ii) the Liquidating Trust Causes of Action and (iii) all other Assets of the Debtors and their Estates as of the Effective Date, excluding Assets previously distributed and not otherwise subject to recovery. For the avoidance of doubt, the Liquidating Trust Assets exclude funds in the Professional Fee Escrow Account and the Administrative Expense and Priority Escrow Account.

106. "**Liquidating Trust Causes of Action**" means all Causes of Action held or owned by the Debtors' Estates immediately prior to the Effective Date (whether asserted directly or derivatively) against all parties, *provided that* the Liquidating Trust Causes of Action exclude (i) any Causes of Action sold to the Purchaser pursuant to the Sale Order; (ii) any Claims or Causes of Action released or exculpated as provided in the Plan, including pursuant to Section XIV of the Plan; and (iii) any Claims or Causes of Action released pursuant to the Final DIP Order. The Liquidating Trust Causes of Action shall include all Preserved Causes of Action.

107.    "**Liquidating Trust Funding Amount**" means $500,000 of Cash which shall be contributed to the Liquidating Trust by the Debtors on the Effective Date for the administration of the Liquidating Trust.

108.    "**Liquidating Trust Operating Expenses**" means the overhead and other operational expenses of the Liquidating Trust including, but not limited to, (i) reasonable compensation for the Liquidating Trustee in accordance with the Liquidating Trust Agreement, (ii) costs and expenses incurred by the Liquidating Trustee in administering the Liquidating Trust, (iii) Statutory Fees that may become payable by the Liquidating Trust after the Effective Date to the U.S. Trustee, and (iv) any fees and expenses payable to the Liquidating Trust Advisors.

109.    "**Liquidating Trust Units**" means Class A Liquidating Trust Units, Class B Liquidating Trust Units, and Class C Liquidating Trust Units.

110.    "**Liquidating Trustee**" means the person or Entity identified in the Liquidating Trust Agreement and selected by the Debtors after consultation with the Committee and upon the consent of the Ad Hoc Term Lender Group, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Liquidating Trust, and any successor subsequently appointed pursuant to the Liquidating Trust Agreement.

111.    "**Local Rules**" means the of Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas, as amended from time to time.

112.    "**Notice of Effective Date**" means a notice to be filed with the Bankruptcy Court by the Debtors upon the occurrence of all the conditions precedent to the Effective Date set forth in Section XIII of this Combined Plan and Disclosure Statement.

113.    "**Order**" means an order, opinion, or judgment of the Bankruptcy Court as entered on the Docket.

114.    "**Other Priority Claim**" means unsecured Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims or Priority Tax Claims.

115.    "**Other Secured Claims**" means Claims (or portions thereof), except Prepetition Revolver Secured Debt Claims, Prepetition Term Secured Debt Claims, and Prepetition Holdco Secured Debt Claims that are secured by a lien on property in which any of the Debtors' Estates has an interest, which liens are valid, perfected and enforceable under applicable law, and are senior to the liens held by the Holders of the Prepetition Revolver Secured Debt Claims, Prepetition Term Secured Debt Claims, and Prepetition Holdco Secured Debt Claims.

116.    "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

117.    "**Petition Date**" means July 12, 2021, the date on which the Debtors commenced the Chapter 11 Cases.

118.    "**Plan Confirmation Date**" means the date on which the Clerk of the Bankruptcy Court enters the Plan Confirmation Order on the Docket.

119.    "**Plan Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider approval and confirmation of this Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

120.    "**Plan Confirmation Order**" means an order entered by the Bankruptcy Court approving and confirming this Combined Plan and Disclosure Statement under section 1125 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Prepetition Agents.

121.    "**Plan Documents**" means this Combined Plan and Disclosure Statement, the Plan Supplement, and all exhibits and schedules attached to any of the foregoing, each of which shall be in form and substance acceptable to the Prepetition Agents.

122.    "**Plan Proponents**" means the Debtors, collectively.

123.    "**Plan Supplement**" means the appendix of any schedules or exhibits that may be filed at least five (5) days prior to the deadline for submission of Ballots to vote to accept or reject a plan. The Plan Supplement will be filed with the Bankruptcy Court and served on the required notice parties and shall be made available on the Debtors' claims agent's website (https://www.bmcgroup.com/limetree). The Plan Supplement shall be in form and substance acceptable to the Prepetition Agents.

124.    "**Prepetition Agents**" means the Prepetition Term Agent, the Prepetition Revolver Agent, and the Ad Hoc Term Lender Group.

125.    "**Prepetition Holdco Credit Agreement**" shall have the meaning ascribed in the Final DIP Order.

126.    "**Prepetition Holdco Secured Debt Claim**" means any Claim against LBRH and LBRHII arising under the Prepetition Holdco Credit Agreement, as defined in the Final DIP Order.

127.    "**Prepetition Revolver Agent**" means Goldman Sachs Bank USA, in its capacity as the administrative agent under the Revolver Credit Agreement.

128.    "**Prepetition Revolver Secured Debt Claim**" means any Claim arising under the Revolver Credit Agreement, as defined in the Final DIP Order.

129.    "**Prepetition Term Agent**" means Wilmington Trust, National Association, as successor administrative agent under the Prepetition Term Credit Agreement.

130.    "**Prepetition Term Credit Agreement**" shall have the meaning ascribed in the Final DIP Order.

131.    "**Prepetition Term Secured Debt Claim**" means any Claim arising under the Prepetition Term Credit Agreement, as defined in the Final DIP Order.

132.    "**Prepetition Secured Parties**" means the Prepetition Agents, Prepetition Term Lenders (as defined in the DIP Order), and Revolver Lenders (as defined in the DIP Order).

133.    "**Prepetition Holdco Secured Parties**" shall have the meaning ascribed in the Final DIP Order.

134.    "**Preserved Claims and Causes of Action**" means the Claims and Causes of Action that shall be preserved and vest in the Liquidating Trust in accordance with the Plan and shall be identified in a schedule attached to the Plan Supplement. The Preserved Claims and Causes of Action include but are not limited to (i) the Business Interruption Claims, (ii) the Property Damage Claims, (iii) Claims or Causes of Action to avoid and recover preferential transfers pursuant to Bankruptcy Code section 547 and other avoidance actions under Chapter 5 of the Bankruptcy Code, (iv) Claims or Causes of Action against present and former shareholders, officers, directors, affiliates and other insiders of the Debtors, (v) Claims or Causes of Action against any contractors, vendors, suppliers or other third parties relating to work performed on the Debtors' Assets or good or services provided to the Debtors, including Claims or Causes of Action relating to breach of contract or arising under any warranty obligations, (vi) any Claims or Causes of Action against St. Croix Energy LLLP and Berry Contracting LP, d/b/a Bay, Ltd.; (vii) Claims or Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies, and occurrence contracts to which any of the Debtors is a party or pursuant to which any of the Debtors has any rights whatsoever, including any failure to provide insurance coverage and bad faith insurance claims; and (viii) all remaining Liquidating Trust Causes of Action.

135.    "**Priority Amounts**" means as of the Effective Date, the amount of all Allowed Administrative Expense Claims (other than Professional Fee Claims), Priority Tax Claims, and Other Priority Claims, or such other amount as may be determined by Final Order of the Court.

136.    "**Priority Tax Claim**" means an unsecured Claim, or a portion thereof, that is entitled to priority under sections 502(i) or 507(a)(8) of the Bankruptcy Code.

137.    "**Privilege**" means the attorney client privilege, work product protections or other immunities (including without limitation those related to a common interest or a joint defense with other parties to the extent set forth in such documents), or protections from disclosure of any kind held by the Debtors or Estates as permitted under the Federal Rule of Evidence 501 and all other applicable law.

138.    "**Professional**" means any professional person employed by the Debtors or the Committee in the Chapter 11 Cases pursuant to sections 327, 363, or 1103 of the Bankruptcy Code or otherwise pursuant to an Order of the Bankruptcy Court.

139.    "**Professional Fee Claim**" means a Claim under Bankruptcy Code Sections 328, 330(a), 331, or 503 for compensation of a Professional or other Entity for services rendered or expenses incurred in the Chapter 11 Cases.

140.    "**Professional Fee Escrow Account**" means an interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors as soon as reasonably practicable after the Plan Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed and unpaid Professional Fee Claims. Such Cash shall remain subject to the jurisdiction of the Bankruptcy Court.

141.   "**Professional Fee Escrow Amount**" means the aggregate unpaid Professional Fee Claims through the Effective Date plus such reasonable fees estimated to be incurred by Professionals in connection with seeking approval of final fee applications as estimated in accordance with Section V.B. and subject to the budgeted amounts in the Approved Budget, as that term is defined in the Final DIP Order.

142.   "**Property Damage Claims**" means claims or causes of action against the insurers that provided property damage insurance to the Debtors.

143.   "**Pro Rata Share**" means, with respect to any Distribution on account of any Allowed Claim, a percentage represented by a fraction (i) the numerator of which shall be an amount equal to such Claim and (ii) the denominator of which shall be an amount equal to the aggregate amount of Allowed Claims in the same Class as such Claim, provided that in cases where Pro Rata Share is used in reference to series of Liquidating Trust Units distributed to multiple series or Classes, Pro Rata Share means the portion that such Holder's Claim in a particular Class bears to the aggregate amount of all Allowed Claims in such series or Class entitled to Distributions as of the date of such Distribution.

144.   "**Purchaser**" means West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP, collectively.

145.   "**Putative Class Action Litigation**" means the following class actions pending in the United States District Court of the Virgin Islands: Cotton et al. v. Limetree Bay Ventures, LLC et al., Case No. 1:21-cv-00262; Shirley et al. v. Limetree Bay Ventures, LLC et al., Case No. 1:21-cv-00259; Charles et al. v. Limetree Bay Ventures 1:21-cv-00260; and Boynes et al. v. Limetree Bay Ventures, LLC et al., Case No. 1:21-cv-00253.

146.   "**Putative Class Members**" means the named plaintiffs, and others similarly situated, who filed the Putative Class Action Litigation in the United States District Court of the Virgin Islands.

147.   "**Refinery Entities**" means LBC II, LBRH, LBRH II, LBR, LBRM, and LBRO.

148.   "**Rejection Damages Claim**" means any Claim under section 502(g) of the Bankruptcy Code arising from, or relating to, the rejection of an Executory Contract pursuant to section 365(a) of the Bankruptcy Code by the Debtors, as limited, in the case of a rejected employment contract or unexpired lease, by section 502(b) of the Bankruptcy Code.

149.   "**Released Party**" means each of the following solely in its capacity as such: (i) the Debtors, (ii) Steven Pully, the independent director of the Debtors, (iii) the Debtors' chief restructuring officer, Mark Shapiro, and GlassRatner Advisory & Capital Group LLC, d/b/a B. Riley Services, (iv) the Prepetition Secured Parties and their respective officers, directors and partners (excluding, for the avoidance of doubt, any lenders under the Prepetition Term Credit Agreement that are Insider Creditors (as defined in the Final DIP Order), (v) the Prepetition Holdco Secured Parties and their respective officers, directors and partners (excluding, for the avoidance of doubt, any lenders under the Prepetition Holdco Credit Agreement that are Insider Creditors (as defined in the Final DIP Order), and (vi) the professionals and advisors of the foregoing parties. Notwithstanding the foregoing, any Person or Entity that opts out of the releases set forth in the Plan shall not be a Released Party. For the avoidance of doubt, each of the Debtor's non-debtor

affiliates, including LBE, LBV, LBC II, and any directors appointed by an affiliate prior to the Petition Date (other than Steven Pully) shall not be a Released Party.

150.     "**Releasing Party**" means each of the following, solely in its capacity as such: (a) all Released Parties; and (b) all Holders of Claims who vote to accept the Plan <u>and</u> who do not affirmatively elect to opt out of the releases provided in the Plan in accordance with the solicitation procedures. For the avoidance of doubt, the Holders of Claims in Classes deemed to accept the Plan shall not be deemed Releasing Parties on account of such Claims. The United States is not a Releasing Party under the Plan.

151.     "**Revolver Adequate Protection Claim Amount**" means an amount equal to the sum of (i) the Priority Amounts and (ii) the Liquidating Trust Funding Amount. The Revolver Adequate Protection Claim Amount is estimated to be between $4.5-6 million.

152.     "**Revolver Adequate Protection Claim Threshold Event**" means the time at which the Holders of Prepetition Revolver Secured Debt Claims receive Distributions of Class B1 Liquidating Trust Recoveries and Class C1 Liquidating Trust Recoveries in an aggregate amount equal to the Revolver Adequate Protection Claim Amount.

153.     "**Revolver Credit Agreement**" shall have the meaning ascribed in the Final DIP Order.

154.     "**Sale**" means the Debtors' sale of assets to the Purchaser approved pursuant to the Sale Order.

155.     "**Sale Order**" means the *Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Perform Under the Asset Purchase Agreement, (III) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief*, entered by the Bankruptcy Court on December 21, 2021 [Doc No. 977].

156.     "**Sale Proceeds**" means the net proceeds from the sale of Assets to Purchaser held by the Debtors, after payment of all DIP Obligations and payments under the Approved Budget, as that term is defined in the Final DIP Order.

157.     "**Schedules**" means the schedules of assets and liabilities and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(b), as such schedules or statements may be amended or supplemented from time to time.

158.     "**Statutory Fees**" means any and all fees payable to the U.S. Trustee pursuant to section 1930 of title 28 of the United States Code and any interest thereupon.

159.     **"Tax Code"** means the Internal Revenue Code of 1986, as amended.

160.     "**Terminal Entities**" means Limetree Bay Terminal Holdings, LLC, Limetree Bay Terminal Holdings II, LLC, Limetree Bay Cayman, Ltd., and Limetree Bay Terminals, LLC.

161.    "**Transition Refinery Entity**" means the entity created under the Plan and managed by the Purchaser whose primary purpose shall be the ownership of the permits necessary for the operation of the refinery.

162.    "**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

163.    "**Unclaimed Distribution Deadline**" means three (3) months from the date the Liquidating Trustee makes a Distribution.

164.    "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

165.    "**Voting Deadline**" means [•], 2022, at 5:00 p.m. (prevailing Central Time).

166.    "**Voting Procedures**" means the plan voting procedures approved by the Bankruptcy Court.

**B.    Interpretation; Application of Definitions and Rules of Construction.**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in this Combined Plan and Disclosure Statement are to the respective section in, Article of, Schedule to, or Exhibit to this Combined Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in this Combined Plan and Disclosure Statement. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Combined Plan and Disclosure Statement. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in this Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Combined Plan and Disclosure Statement. Any reference to the "Liquidating Trustee" shall be deemed to include a reference to the "Liquidating Trust" and any reference to the "Liquidating Trust" shall be deemed to include a reference to the "Liquidating Trustee" unless the context otherwise requires. Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Combined Plan and Disclosure Statement unless otherwise set forth herein or provided by the Bankruptcy Court.

## III.  BACKGROUND

**A.    Nature and History of the Debtors' Business.**

Prior to the Petition Date, the Debtors owned and operated an oil refinery (the "**Refinery**") located on the island of St. Croix in the United States Virgin Islands ("**USVI**"). The Refinery is part of a 2,000-acre industrial complex located on the southern coast of St. Croix comprised of (a) the Refinery and (b) an oil storage facility (or terminal) and docks (the "**Terminal**") owned and operated by the Terminal Entities, non-debtor affiliates of the Debtors.

23

The Debtors and the Terminal Entities acquired the Refinery and Terminal, respectively, in or about December 2015 through the 2015 HOVENSA[5] chapter 11 cases. Beginning in 2018, the Debtors began refurbishing the Refinery and preparing to restart operations. At the time, the Refinery was more than 50 years old and had been dormant since February 2012, following its idling by HOVENSA—rendering the task of restarting the Refinery a substantial undertaking.

Initially, the Debtors anticipated restarting operations of the Refinery in early 2020 with an investment of approximately $2.1 billion. As the project progressed, the Debtors encountered unanticipated impediments to completion, including, without limitation, issues with infrastructure and certain foundational systems. Identifying and correcting these issues caused the timeline to expand and budget for completion of the Refinery refurbishment to swell. The emergence of the COVID-19 virus in early 2020 only exacerbated the delay due to restrictions on available workers, access to the island and the Refinery, and the need to implement protocols to ensure the health and safety of employees.

Ultimately, the Debtors completed the refurbishment of the main process units of the Refinery in or about December 2020—nearly a year later than projected and more than $1 billion over-budget. Shortly thereafter, the Refinery began producing small amounts of refined petroleum products to test the facilities' operational capabilities. The operational outlook based on the preliminary production runs was promising. As a result, the Debtors continued to move forward preparing for a relaunch of the facility in early 2021. In January 2021, the Debtors began readying the Refinery to begin production of additional refined products—testing the operational capabilities of additional processes necessary to produce more refined products, such as gasoline. The Debtors restarted Refinery operations on or about February 1, 2021.

Because the Debtors were unable to complete the Refinery restart under prior ownership, a number of preferred equity investors were forced to equitize their interests pursuant to a consensual restructuring process that resulted in a new owner consortium acquiring a majority interest in the Refinery Entities and the Terminal Entities.

From the time the Debtors acquired the Refinery to the Petition Date, the Debtors had invested approximately $4.1 billion in repairing, refurbishing and modernizing the Refinery to bring the operation into compliance with existing regulations.

## B.   <u>Corporate Structure and Ownership.</u>

The graphic below provides a summary of the Debtors' corporate structure:

---

[5] Capitalized terms used but not defined in section III shall have the meaning ascribed to them in the *Declaration of Mark Shapiro in Support of Chapter 11 Petitions and First Day Motions* [Doc No. 8].



*Not a debtor entity.

## C.  The Debtors' Prepetition Indebtedness.

The Debtors funded the project of refurbishing the Refinery through a combination of equity contributions and debt financing. Between 2018 and 2021, the Debtors raised approximately $2.5 billion from equity through capital contributions, issuance of membership interests, as well as subordinated shareholder loans. In addition to equity contributions, the Debtors incurred approximately $1.6 billion in debt financing under three principal facilities—(a) a $900 million term loan facility (the "**LBR Term Loan**") from a consortium of lenders (collectively, the "**Term Lenders**") with Goldman Sachs Bank USA ("**Goldman Sachs**") serving as administrative agent and project collateral agent, (b) a $50 million revolving line of credit (the "**Revolving LOC**") from certain lenders, with Goldman Sachs serving as administrative agent and project collateral agent, and (c) a credit facility from a consortium of lenders with Wilmington Trust, National Association ("**Wilmington Trust**"), as administrative agent and collateral agent (the "**Prepetition Holdco Loan**"). As of the Petition Date, the Debtors owed approximately $768.9 million under the LBR Term Loan, had drawn approximately $50 million of the Revolving LOC, and LBRH II owed approximately $782.56 million under the Prepetition Holdco Loan.

LBR also entered into certain hedging arrangements, including an ISDA Master Agreement with J. Aron & Company LLC ("**J. Aron**") and certain transactions thereunder, to hedge interest rate risk associated with the LBR Term Loan. The Debtors also borrowed funds via intercompany unsecured and subordinated loan transactions memorialized in certain subordinated promissory notes (collectively, the "**LBV Subordinated Notes**").

In addition to the funding required to complete the Refinery refurbishment and relaunch, the Debtors secured capital and certain liquidity arrangements to fund existing Refinery operations and future expansions thereof. This liquidity was secured through a series of agreements with BP

Products North America Inc. ("**BP**") as well as a supply and offtake agreement and other agreements relating to the purchase and sale by J. Aron of Feedstock and Product (collectively, the "**Safe Harbor Agreements**"), a monetization master agreement and a financing agreement (collectively, together with the Safe Harbor Agreements and all other transaction documents associated therewith, the "**J. Aron Transaction Documents**") with J. Aron.

### D.      Events Leading to the Filing of the Bankruptcy Case.

Despite years of planning and preparation, the Debtors began experiencing operational issues shortly after restarting the Refinery, which prompted investigations by the EPA and the DPNR, as well as a request from the United States Attorney for the Virgin Islands to visit and tour certain operations at the Refinery. Specifically, in late April 2021, residents in the communities neighboring the Refinery began reporting a foul odor allegedly emanating from the Refinery, which prompted internal investigations as well as inquiries by the EPA and DPNR into the Refinery's emissions of gaseous by-products of the refining processes. Although the investigation concluded that the odor was due, at least in part, to an exposed sewage access point on USVI government property, the investigation also uncovered irregularities in the emission of certain gases from the Refinery. In conjunction with the EPA and DPNR, the Debtors began creating a plan to remedy the issues and ensure emissions complied with applicable standards.

Then, on May 12, 2021, an incident occurred at the Refinery—causing a small amount of oil to disperse in certain areas downwind of the Refinery. In response, on May 13, 2021, the Debtors voluntarily ceased all refining operations at the Refinery on a temporary basis to investigate and remedy potential issues prior to any further incidences. Despite the voluntary cessation of operations, on May 14, 2021, the Debtors received an order from the EPA directing the Debtors to immediately cease any and all Refinery operations for a period of 60 days pending the completion of certain operational and compliance audits. Upon receipt, the Debtors immediately took action to comply with the EPA Order, including the continuation of the voluntary suspension of Refinery operations and engagement of qualified auditors to evaluate the Debtors' operations and processes as well as the Debtors' compliance with applicable regulations. The auditors concluded their audits and provided final reports simultaneously to the EPA and the Debtors on or about June 25, 2021.

Due to these events, the Debtors' investors and lenders began expressing concerns about the ability to restart the Refinery, which severely impacted the Debtors' ability to access funding necessary to maintain operations and preserve the Refinery's assets. Furthermore, certain Debtors and non-debtor affiliates have been named as defendants in multiple class actions lawsuits alleging private causes of action related to purported pollution caused by the Refinery following the February 1, 2021, relaunch.

As a result of the foregoing, and the Debtors' deteriorating liquidity position, the Debtors retained professionals to advise on potential strategies to address any compliance issues identified in the audits, address the Debtors' liquidity position, explore options to attract new capital, and restructure existing obligations in light of the shutdown and contemplated remediation efforts and expenses. Additionally, each of the Debtors also appointed an independent board member with extensive experience as a director for distressed companies. Despite taking these steps, the Debtors were unable to devise a plan to preserve the Refinery in operational condition without new capital.

Unable to attract the new capital necessary to fund operational costs during the temporary shutdown and ultimately restart operations after remediating any alleged deficiencies, on June 21, 2021, the Debtors announced that they were suspending indefinitely plans to restart the Refinery. Simultaneously, on June 21, 2021, LBRO, which employed the principal workforce of the Refinery, provided notice to its employees in accordance with the Worker Adjustment and Retraining Notification (WARN) Act and, out of an abundance of caution, the Virgin Islands Plant Closing Act of its intention to reduce its workforce by 271 employees.

On or about July 9, 2021, the Debtors' members and boards of directors, as applicable, adopted resolutions approving the commencement of the Chapter 11 Cases. On the Petition Date, the Debtors filed their respective Petitions commencing these Chapter 11 Cases.

## E.   The Chapter 11 Cases.

The following is a brief description of certain material events that have occurred during these Chapter 11 Cases.

### 1.   Administrative Motions.

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtors, the Debtors filed limited administrative motions and notices seeking certain "first day" relief.  A summary of the relief sought pursuant to the administrative motions is set forth below:

- ***Joint Administration Motion.*** Pursuant to the *Debtors' Emergency Motion Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases* [Doc No. 4], the Bankruptcy Court entered an Order approving the joint administration of the Chapter 11 Cases for procedural purposes only [Doc No. 20].

- ***Application to Retain BMC Group.*** Pursuant to the *Debtors' Emergency Application for Order Appointing BMC Group, Inc. as Claims, Noticing, Solicitation, and Administrative Agent* [Doc No. 9], the Bankruptcy Court entered an Order appointing BMC Group as claims and noticing agent for the Chapter 11 Cases [Doc No. 23].

- ***Designation as Complex Chapter 11 Cases.*** Pursuant to the Debtors' *Notice of Designation as Complex Chapter 11 Case* [Doc No. 2], the Bankruptcy Court entered an Order directing that the Procedures for Complex Chapter 11 Cases in the Southern District of Texas apply to the Chapter 11 Cases [Doc No. 21].

### 2.   First Days Orders.

On the Petition Date, the Debtors filed several "first day" motions with the Bankruptcy Court seeking various forms of relief designed to facilitate a smooth transition for the Debtors into Chapter 11.  Following a hearing, the Bankruptcy Court entered the following orders:

o *Order Granting Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Doc No. 101].

o *Order Granting Debtors' Emergency Motion for Authority to (I) Pay Prepetition Wages, Benefits, and Employee Business Expenses; and (II) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in The Ordinary Course* [Doc. No. 103].

o *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Doc. No. 495].

o *Final Order Granting Debtors' Emergency Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 345(B), 363, and 364 Authorizing: (I) the Continued Use of the Debtors' Prepetition Cash Management System, Including Existing Bank Accounts, Business Forms, and Company Credit Cards; (II) Continued Use of Intercompany Arrangements and Historical Practices; and (III) Opening New Debtor In Possession Accounts, if Necessary* [Doc. No. 513].

### 3. Appointment of the Creditors' Committee.

On July 26, 2021, the Office of the United States Trustee for Region 7 appointed the Official Committee of Unsecured Creditors, consisting of the following nine members: (i) Universal Plant Services (IV), LLC; (ii) Excel Construction & Maintenance VI, Inc.,[6] (iii) InServ Field Services USVI, LLC; (iv) National Industrial Services, LLC; (v) Christiansted Equipment Ltd.; (vi) Pinnacle Services, LLC; (vii) Baker Hughes Oilfield Operations LLC; (viii) Englobal U.S. Inc.; and (ix) Pamela Colon. [Doc No. 189].

### 4. Employment of Professionals and Advisors.

The Debtors sought and obtained Bankruptcy Court approval of the employment of various professionals and advisors to assist with the Chapter 11 Cases. Specifically, the Bankruptcy Court has approved the Debtors' retention of the following professionals and advisors: (i) Baker & Hostetler LLP as its legal counsel [Doc. No. 534]; (ii) GlassRatner Advisory & Capital LLC *dba* B. Riley Advisory Services as Chief Restructuring Officer to the Debtors [Doc. No. 535]; (iii) Beckstedt & Kucynski LLP, as special counsel to the Debtors [Doc. No. 562]; (iv) Jefferies LLC, as investment banker to the Debtors [Doc. No. 563]; (v) Hughes Arrell Kinchen LLP, as special counsel to the Debtors [Doc. No. 630]; and (vi) The Claro Group, LLC, as Insurance Consultant to the Debtors [Doc. No. 676].

---

[6] Counsel to the Committee informed the Debtors' counsel that Excel Construction & Maintenance VI, Inc., later resigned as a member of the Committee.

5. **Stay of Pending Litigation.**

As set forth in the Schedules and First Day Affidavit, as of the Petition Date, the Debtors were parties to a number of investigations, claims, or lawsuits.  The automatic stay under section 362(a) of the Bankruptcy Code had the immediate effect of halting a significant number such actions against the Debtors, allowing the Debtors to save money that would otherwise have been used on legal expenses. It does not stay the pursuit of governmental police and regulatory actions based on an exception in Section 362(b)(4) of the Bankruptcy Code.

6. **Claims Process and Bar Date.**

    a. **Schedules and Statements.** On September 7, 2021, the Debtors filed their Schedules with the Bankruptcy Court. The U.S. Trustee held the meeting of creditors pursuant to section 341(a) of the Bankruptcy Code on August 17, 2021 and September 13, 2021.

    b. **Bar Dates.**  The General Bar Date was November 15, 2021; the Governmental Unit Bar Date was January 10, 2022; and the Extended Bar Date was February 15, 2022

    c. **Administrative Expense Claims Bar Date**. The Administrative Expense Claims Bar Date is May 5, 2022 at 5:00 p.m. (prevailing Central Time).

7. **Postpetition Financing and Cash Collateral Orders.**

On the Petition Date, the Debtors also filed the DIP Financing Motion. On July 14, 2021, the Bankruptcy Court entered the Interim DIP Order, which among other things, authorized the Debtors to enter into the DIP Loan Documents, incur postpetition financing thereunder of up to an aggregate principal amount of $5.5 million on an interim basis, to use cash collateral of the Prepetition Secured Parties in accordance with the Interim DIP Order and an agreed budget, and granting related relief.

On August 27, 2021, the Bankruptcy Court entered the Final DIP Order, under which the Debtors were authorized to, among other things, incur up to the full amount of the postpetition commitments under the DIP Loan Documents of $25 million, to use cash collateral in accordance with the Final DIP Order and an agreed budget, granting adequate protection for the liens and security interests, and granting related relief.  Except as provided in the Final DIP Order, the DIP Lender was granted priming liens pursuant to Bankruptcy Code section 364(d)(1).

The Final DIP Order specifically excluded certain classes of assets from the DIP Liens (the "**Unencumbered Assets**").  The Unencumbered Assets are: (1) any commercial tort claims and claims against the Debtors' current or former officers or directors of the Debtors' boards, (2) the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law, (3) the IFF Property (as defined in the Final DIP Order), and (4) all proceeds of any of the foregoing; *provided, however* that the DIP Collateral shall include, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations secured by the DIP Liens

in full, any proceeds of, or property recovered in connection with (whether by judgment, settlement or otherwise), the Unencumbered Assets.

Without the funds provided under the DIP Loan Documents, the Debtors would not have had sufficient available sources of capital and financing to, among other things, fund the Chapter 11 Cases and effectuate the various sales of their assets pursuant to section 363 of the Bankruptcy Code.  Thus, as the Bankruptcy Court determined, entry of the Interim DIP Order and the Final DIP Order were necessary to preserve, maintain, and enhance the value of the Debtors' assets for the benefit of the Estates.

The Final DIP Order provided the Committee with the opportunity to investigate any claims or challenges to the Debtors' stipulations provided under the Final DIP Order. The Committee's Challenge Period (as defined by the Final DIP Order and modified by stipulation[7]) has expired pursuant to the provisions of the Final DIP Order, and the Committee is bound by the Debtors' stipulations and releases set forth in the Final DIP Order.

The Final DIP Order further provides for the terms and conditions of the Debtors' continued consensual use of Cash Collateral, the adequate protection to be provided to the Prepetition Secured Parties and the terms of a cash collateral budget. As a result of the occurrence of a DIP Repayment Event and to avoid the occurrence of a Cash Collateral Termination Event under Paragraph 16 of the Final DIP Order (each as defined in the Final DIP Order), the Prepetition Secured Parties and Debtors entered into a stipulation to supplement the terms of the Final DIP Order and provide for the consensual interim use of the Cash Collateral [Doc. Nos. 1143, 1189, 1210] (as amended, the "**Cash Collateral Stipulation**"). Under the stipulation, the Debtors' failure to achieve the following constitute a Cash Collateral Termination Event: (i) if April 6, 2022, an order granting conditional approval of the combined disclosure statement and plan of liquidation of the Debtors has not been entered by the Court, containing terms and conditions acceptable to the Prepetition Agents; (ii) if by May 12, 2022, an order granting final approval and confirmation of the combined disclosure statement and plan has not been entered by the Court, containing terms and conditions acceptable to the Prepetition Agents; and (iii) if by May 19, 2022, the Combined Disclosure Statement and Plan has not been consummated and the effective date thereunder has not occurred.

The DIP Facility was repaid on or about January 24, 2022.

### 8.    Sale of Substantially All the Debtors' Assets.

On July 26, 2021, the Debtors filed the Bidding Procedures Motion that sought Bankruptcy Court approval of bidding procedures to govern the auction and sale of substantially all the Debtors' assets, to approve the sale of those assets to the successful bidder at the conclusion of that auction, and to approve certain procedures for the assumption and assignment of executory contracts and unexpired leases.

---

[7] *See Stipulation Between Committee and Prepetition Holdco Agent Clarifying Certain Committee Challenge Rights Pursuant to Final Postpetition Financing Order* [Doc No. 947] and *Stipulation Between Committee and Prepetition Agents Clarifying Certain Committee Challenge Rights Pursuant to Final Postpetition Financing Order* [Doc No. 621].

The Bankruptcy Court entered the Bidding Procedures Order on August 11, 2021, approving the Bidding Procedures Motion and the Bidding Procedures annexed thereto as Appendix A. Thereafter, the Debtors and their advisors worked to ensure a robust marketing and sale process to maximize the value of the Debtors' assets. On November 18, 2021, the Debtors conducted an auction in accordance with the Bidding Procedures. At the conclusion of that auction, the Debtors declared St. Croix Energy, LLLP ("**SCE**") as the winning bidder and, collectively, Sabin Metal Corporation ("**Sabin**") and Bay, Ltd. ("**Bay**") as the back-up bidders. The proposed transaction with SCE was structured as an asset sale for consideration consisting of approximately $20 million in cash with an expected continuation of the business operations as a going concern upon SCE's retention of the requisite personnel and securing certain authorizations during a transition period. The Sabin and Bay bids were piecemeal bids for the acquisition and/or liquidation of certain of the Debtors' assets. After conducting the auction, the Debtors were contacted by a potential bidder, West Indies Petroleum Limited ("**WIPL**"), who was unable to participate in the auction due to a sudden an unforeseen medical emergency, with a proposal to purchase substantially all assets of the Debtors' Estates for the sum of $30 million.

For these reasons, on December 6, 2021, the Debtors filed the *Debtors' Emergency Motion to (I) Reopen Auction Pursuant to Bidding Procedures, (II) Approve Schedule and Procedures for Continued Auction, and (III) Grant Related Relief* (the "**Motion to Reopen**") [Doc No. 862]. After conducting a hearing, the Bankruptcy Court entered an Order granting the Motion to Reopen ("**Order Reopening Auction**") [Doc No. 913] over the objections of SCE and Bay. The Bankruptcy Court specifically authorized the Debtors to reopen the auction for the purpose of allowing SCE, Bay/Sabin, and WIPL to submit subsequent bids, declared WIPL a qualified bidder and deemed the asset purchase agreement with WIPL a qualified bidder under the Bidding Procedures.

On December 17, 2021, the Debtors commenced the reopened auction and concluded it on December 18, 2021. After carefully considering the structure and value of all bids received at the reopened auction, the Debtors selected WIPL's $62 million bid as the winning bid and SCE's $57 million bid as the back-up bid. The sale hearing occurred on December 21, 2021, and the Bankruptcy Court entered the Sale Order that same day approving the Debtors' sale to WIPL and Port Hamilton Refining and Transportation LLLP together as the Purchaser. The sale to the Purchaser closed on January 21, 2022 [Doc No. 1112].

SCE and Bay appealed the Order Reopening Auction and Sale Order (collectively, the "**Appeals**"), which are pending in the United States District Court for the Southern District of Texas (the "**District Court**"). SCE moved for a stay pending appeal [Doc No. 1018] before the Bankruptcy Court. On January 13, 2022, the Bankruptcy Court denied SCE's motion [Doc No. 1066]. Thereafter, SCE moved for a stay pending appeal in the District Court, which denied SCE's motion. On February 10, 2022, the Debtors moved to dismiss the Appeals as moot (the "**Motions to Dismiss the Appeals**"). As of the filing of this Consolidated Plan and Disclosure Statement, the District Court has yet to rule on the Motions to Dismiss the Appeals and, as such, the Appeals remain ongoing.

### 9.    Settlements.

During the Chapter 11 Cases, the Debtors reached two settlements described below arising out of their pre-petition business operations. After extensive negotiations, the parties memorialized those settlement agreements and obtained the Bankruptcy Court's approval resulting in millions of dollars being paid to the Estates for the benefit of Creditors.

### a.    J. Aron

Prior to the Petition Date, LBR entered into certain hedging arrangements with J. Aron and related transactions to hedge interest rate risk associated with the LBR Term Loan. The Debtors and J. Aron were parties to that certain Monetization Master Agreement dated as of March 3, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified, the "**Monetization Agreement**") and certain related J. Aron Transaction Documents. In connection with the transactions contemplated by the J. Aron Transaction Documents, J. Aron entered into a series of agreements and transactions with BP.

Pursuant to the Monetization Agreement, J. Aron designated June 25, 2021, as an "Early Termination Date" due to events of default that had occurred and were continuing under the J. Aron Transaction Documents. As a result of the default, J. Aron provided notice of its right to liquidate the IFF Property and then commenced liquidation. On October 15, 2021, J. Aron delivered to Debtors a settlement statement (the "**Settlement Statemen**t"), under the requirements of the Monetization Agreement. The Settlement Statement provided that, after J. Aron has setoff and netted the Margin (as defined in the J. Aron Transaction Documents) against all obligations currently owed by the Debtors to J. Aron under the J. Aron Transaction Documents and pays BP under the terms of their agreements, J. Aron owed the Debtors the sum of $8,384,371.02 (the "**Settlement Amount**"). The Debtors did not dispute J. Aron's calculation.

Prior to payment of the Settlement Amount, certain issues required resolution. BP asserted it was owed (i) $3,964,235.56 on account of obligations related to trade contracts entered into in connection with the J. Aron Transaction Documents and (ii) $957,953.24 in connection with a transaction with Unipec.

After extensive multi-lateral negotiations, the Debtors, Committee, J. Aron, and BP entered into a stipulation (the "**Stipulation**") to: (i) resolve any potential issues or disputes pertaining to the calculation of the Settlement Amount; (ii) facilitate the prompt payment of the Settlement Amount to the Estates; (iii) terminate and cancel arrangements, agreements and other obligations owing by J. Aron to the Debtors and third-parties in connection with the J. Aron Transaction Documents; and (iv) resolve and/or otherwise address certain matters among J. Aron, the Debtors and BP related to the amount BP asserted were owed to it.

On October 29, 2021, the Debtors filed a motion with the Bankruptcy Court for approval of the Stipulation [Doc No. 697]. The Bankruptcy Court entered an order approving the Stipulation on November 2, 2021 (the "**J. Aron Settlement Order**") [Doc No. 712].

### b.    BP

The Debtors entered into a series of prepetition agreements with BP governing the supply of crude oil and additional investments in the Refinery, including (i) a feedstock supply agreement (the "**Feedstock Agreement**"), (ii) a product offtake agreement (the "**Off-Take Agreement**"), and (iii) a tolling agreement, including an amended and restated tolling agreement (collectively, the "**Tolling Agreement**"). Under the terms of the Feedstock Agreement, BP agreed to provide crude oil (i.e., feedstock) and other materials to the Refinery. Per the Off-Take Agreement, BP agreed to market refined petroleum products from the Refinery.

As consideration for a share in the net margin of the Refinery, BP agreed to invest up to $533 million in the Refinery to complete improvements and expansions related to the manufacture of certain petroleum products, including low-sulfur transportation fuel. BP would recoup its investment under the Tolling Agreement via its share in the net margin generation of the Refinery. BP's obligation to invest funds pursuant to the Tolling Agreement was subject to certain operational benchmarks.

Pursuant to the terms of the Tolling Agreement, BP agreed to pay LBRM an amount equal to 50% of the absolute value of Commissioning Margin Share (as defined in the Tolling Agreement; hereinafter, "**CMS**"), if negative, which amounts were to be invoiced monthly by LBRM and, to the extent not disputed, paid by BP. In the event of a dispute over a CMS invoice, BP would deliver a dispute notice (a "**Dispute Notice**") to LBRM and timely pay the undisputed portion of such invoice. The Debtors asserted that they were owed funds from BP on account of accrued and unpaid CMS pursuant to the Tolling Agreement, and BP disputed that it owed any such amounts, as set forth in Dispute Notices delivered to the Debtors (the "**CMS Dispute**").

As provided in the J. Aron Settlement Order, the Debtors' counsel had been holding in escrow for BP's benefit $4,464,236 on account of, among other things, obligations related to trade contracts entered into in connection with the J. Aron Transaction Documents.

On November 12, 2021, BPPNA filed a proof of claim (the "**BP Proof of Claim**") in the Chapter 11 Cases, asserting a claim of not less than $34,376,981.98 owed to BP by the Debtors under the BP Agreements, plus certain contingent and unliquidated amounts.

After extensive negotiations, the Debtors, Committee, and BP entered into a settlement agreement to, among other things, avoid the delay, uncertainty, inconvenience and expense of litigation relating to the CMS Dispute and any other potential claims and/or causes of action that could be asserted against BP by or on behalf of the Debtors' Estates. The settlement resulted in payment by BP of $5,035,764 to the Debtors (consisting of gross consideration of $9,000,000 less amounts held in escrow under the J. Aron Settlement Order).

On December 1, 2021, the Debtors filed a motion with the Bankruptcy Court for approval of the settlement agreement [Doc No. 837]. The Bankruptcy Court entered an order approving the settlement on January 6, 2022 [Doc No. 896].

# IV.  CONFIRMATION AND VOTING

## A.  Plan Confirmation Hearing.

The Bankruptcy Code, Bankruptcy Rules, and Local Rules require the Bankruptcy Court, after appropriate notice, to hold a hearing on approval and confirmation of this Combined Plan and Disclosure Statement. On April 7, 2022, the Bankruptcy Court entered an order scheduling the Plan Confirmation Hearing for **May 11, 2022 at 1:00 p.m. (prevailing Central Time)**, to consider, among other things, final approval and confirmation of this Combined Plan and Disclosure Statement under section 1125 of the Bankruptcy Code [Doc No. 1261]. Notice of the Plan Confirmation Hearing will be provided to all known Creditors, Holders of Equity Interests, and other parties in interest. The Plan Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Plan Confirmation Hearing or by filing a notice with the Bankruptcy Court.

Any objection to confirmation of this Plan and approval of the Disclosure Statement on a final basis must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon the following parties by no later than **May 4, 2022 at 4:00 p.m. (prevailing Central Time)** through the CM/ECF system, with courtesy copies by email: (i) Counsel to the Debtors at the contact information on the first page of this Plan; (ii) Counsel to the Committee; (iii) the Office of the United States Trustee for Region 7; and (iv) such other parties as the Bankruptcy Court may order.

Bankruptcy Rule 9014 governs objections to approval and confirmation of this Combined Plan and Disclosure Statement. **UNLESS AN OBJECTION TO APPROVAL AND CONFIRMATION OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO APPROVE AND CONFIRM THIS COMBINED PLAN AND DISCLOSURE STATEMENT.**

## B.  Requirements for Plan Confirmation.

The Bankruptcy Court will confirm this Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in these Chapter 11 Cases is that this Plan be (i) accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that this Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; and (ii) feasible.  The Bankruptcy Court must also find, among other things, that:

> a.  this Plan has classified Claims and Equity Interests in a permissible manner;
>
> b.  this Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

        c.      this Plan has been proposed in good faith.

In addition, in accordance with the settlement agreements regarding cash collateral reached with the Prepetition Revolver Agent, it shall be a condition to Confirmation of the Plan that the estimate of Allowed Administrative Expense Claims, to be conducted in good faith by the Debtors in consultation with the Committee and Prepetition Agents, shall not exceed the Administrative Expense Claims Cap; provided, however, to the extent the amount of Allowed Administrative Expense Claims exceed the Administrative Expense Claims Cap, the Debtors will attempt to negotiate with the Prepetition Revolver Agent. In the event that the Court does not confirm the Plan on or before May 21, 2022, the Debtors have agreed, and intend to, immediately seek dismissal of these Chapter 11 Cases as provided in Section X.M.

## C.    <u>Best Interests of the Creditors Test.</u>

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date.

The costs of a chapter 7 liquidation would necessarily include fees payable to a trustee in bankruptcy, as well as fees likely to be payable to attorneys, advisors, and other professionals that a chapter 7 trustee may engage to carry out its duties under the Bankruptcy Code. Other costs of liquidating the Debtors' Estates would include the expenses incurred during the Chapter 11 Cases and allowed by the Bankruptcy Court in the chapter 7 cases. The foregoing types of claims, costs, expenses, and fees that may arise in a chapter 7 liquidation case would be paid in full before payments would be made towards chapter 11 administrative, priority, and unsecured claims. Like a chapter 7 trustee, the Liquidating Trustee will have the power to retain professionals, but unlike a chapter 7 trustee's professionals, the Bankruptcy Court does not need to approve the retention of such professionals, or their fees. The "learning curve" that the chapter 7 trustee and new professionals would be faced with comes with potential additional costs to the Estate and with a delay compared to the timing of Distributions under the Plan. Furthermore, a chapter 7 trustee would be entitled to statutory fees relating to the Distributions. Accordingly, a portion of the Cash that will be available for Distribution to Holders of Allowed Claims would instead be paid to the chapter 7 trustee. Notwithstanding, like the chapter 7 trustee, the Liquidating Trustee also will be paid fees for his or her services.

Accordingly, as demonstrated in the liquidation analysis **attached hereto as Exhibit A**, the Debtors believe that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under this Plan. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

## D.    <u>Plan Feasibility.</u>

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor under the plan, unless such liquidation or reorganization is proposed under the plan.  Pursuant to the Plan, the Debtors' Assets are being transferred to the Liquidating Trust. These Assets will be liquidated and distributed to Holders of Allowed Claims pursuant to the terms of this Plan. Therefore, as this is a liquidating plan, the Bankruptcy Court's confirmation of this Plan will not be followed by liquidation or the need for any further reorganization.

**E.**     **Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code requires a plan to place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  This Plan creates separate Classes to treat the Other Priority Claims, Prepetition Revolver Secured Debt Claims, Prepetition Term Secured Debt Claims, Other Secured Claims, Prepetition Holdco Secured Debt Claims, General Unsecured Claims, Governmental Fine and Penalty Claims, Intercompany Claims and Equity Interests of the Debtors. The Plan Proponents believe that the Plan's classification scheme places substantially similar Claims or Equity Interests in the same Class and thus meets the requirements of section 1122 of the Bankruptcy Code.

**EXCEPT AS SET FORTH IN THE PLAN OR UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 3019(A), UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The classification of Claims and Equity Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponents believes that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Equity Interests. The Bankruptcy Court, however, must find that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Equity Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

**F.**     **Impaired Claims or Interests.**

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving a Distribution under this Plan may vote on this Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable, or contractual rights of the Holders of such Claims or Equity Interests treated in such Class.  The Holders of Claims or Equity Interests not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  The Holders of Claims

or Equity Interests in any Class that will not receive any Distribution or retain any property pursuant to this Plan are deemed to reject this Plan and do not have the right to vote.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 2, 3, 5, 6 AND 7.**

G.      **Eligibility to Vote on this Plan.**

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Classes 2, 3, 5, 6 and 7 may vote on this Plan. To vote on this Plan, you must hold an Allowed Claim in Class 2, 3, 5, 6 and 7 or be the Holder of a Claim that has been temporarily Allowed for voting purposes under Bankruptcy Rule 3018(a).

H.      **Voting Procedure and Deadlines.**

For your Ballot to count, you must (1) properly complete, date, and execute the Ballot and (2) deliver the Ballot to the Balloting Agent at one of the following addresses: (i) if by First Class mail, Limetree Bay Ballot Processing, c/o BMC Group, Attn: Limetree Bay Ballot Processing, 3732 West 120th Street, Hawthorne, CA 90250; (ii) if by hand delivery or overnight delivery, Limetree Bay Ballot Processing, c/o BMC Group, Attn: Limetree Bay Ballot Processing, PO Box 90100, Los Angeles, CA 90009; or (iii) if by electronic ballot, by using the electronic balloting service available at https://bmcgroup.com/limetree**.**

The Balloting Agent must **RECEIVE** original ballots on or before **May 4, 2022 at 4:00 p.m. (prevailing Central Time)**. Except as otherwise ordered by the Bankruptcy Court, you may not change your vote once a Ballot is submitted to the Balloting Agent.

Any Ballot that is timely received, executed, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of this Plan will be counted and cast as an acceptance or rejection, as the case may be, of this Plan.

The following Tabulation Rules will be utilized for tabulating the Ballots in determining whether this Plan has been accepted or rejected by the Class in which such Holder holds a Claim or Equity Interest:

a.      any Ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of the Plan will be counted and cast as an acceptance or rejection, as the case may be, of the Plan. Except as otherwise ordered by the Bankruptcy Court, a claimant may not change its vote once a Ballot is submitted to the Balloting Agent;

b.      any Ballot that is illegible or contains insufficient information to permit the identification of the claimant will not be counted;

c.      any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan will not be counted;

37

d.       any Ballot cast for a Claim designated or determined as unliquidated, contingent, or disputed or as zero or unknown in amount and for which no 3018(a) Motion has been filed by the 3018(a) Motion Deadline will not be counted;

e.       any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan will not be counted;

f.       any Ballot received by the Balloting Agent after the Voting Deadline will not be counted;

g.       any Ballot not bearing an original signature will not be counted (for the avoidance of doubt, the electronic signature on a Ballot submitted and signed electronically by using the electronic balloting service established by the Balloting Agent shall constitute an original signature); and

h.       any Ballot received by the Balloting Agent by facsimile, e-mail or other electronic communication will not be counted, provided however that a Ballot may be submitted electronically by using the electronic balloting service established by the Balloting Agent.

## I.       Acceptance of this Plan.

As a Creditor, your acceptance of this Plan is important.  For this Plan to be accepted by an impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept this Plan.  At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept this Plan.  The Plan Proponents strongly urge that you vote to accept this Plan but you are not required to accept it and failure to accept will not preclude you from receiving a Distribution under this Plan to which you are entitled.  **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE BALLOT OR SUBMIT A BALLOT VIA THE BMC ELECTRONIC BALLOTING SERVICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR AND, IF SUBMITTING A PHYSICAL BALLOT, INCLUDE AN ORIGINAL SIGNATURE ON THE BALLOT.**

## J.       Elimination of Vacant Classes.

Any Class of Claims or Equity Interests that does not contain, as of the date of commencement of the Plan Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from this Combined Plan and Disclosure Statement for all purposes, including for purposes of determining acceptance of this Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## V.  TREATMENT OF UNCLASSIFIED CLAIMS

**A.**    <u>Administrative Expense Claims.</u>

Unless otherwise agreed by the Holder of an Administrative Expense Claim and the applicable Debtor or the Liquidating Trustee, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash by the Debtors or Liquidating Trust, as applicable: (a) if Allowed, on the Effective Date or as soon as practicable thereafter, but in no event later than 30 days after the Effective Date (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as practicable thereafter); (b) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter, but in no event later than 30 days after such Claim is Allowed; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or Liquidating Trust, as applicable; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of Administrative Expense Claims accruing from the Petition Date through and including the Effective Date, other than Professional Fee Claims, shall file with the Bankruptcy Court and serve on the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, no later than the Administrative Expense Claim Bar Date. Any such Claim not filed by such deadline shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.

As soon as reasonably practicable after the Plan Confirmation Date and no later than the Effective Date, the Debtors shall fund the Administrative Expense and Priority Escrow Account with Cash necessary to pay any unpaid Allowed Administrative Expense Claims, Priority Tax Claims and Other Priority Claims. Following the Effective Date, the sole source of payment of Allowed Administrative Expense Claims shall be the amounts held in the Administrative Expense and Priority Escrow Account. The Administrative Expense and Priority Escrow Account shall be maintained in trust solely for Holders of Allowed Administrative Expense Claims, Priority Tax Claims and Other Priority Claims. No Liens, claims or interests shall encumber the Administrative Expense and Priority Escrow Account in any way. For the avoidance of doubt, neither the Liquidating Trust nor the Liquidating Trustee shall have any liability with respect to any Administrative Expense Claims, Priority Tax Claims or Other Priority Claims and shall not be required to satisfy any Administrative Expense Claims, Priority Tax Claims or Other Priority Claims from any Liquidating Trust Assets. For the avoidance of doubt, any remaining amounts in the Administrative Expense and Priority Escrow Account after the payment in full of any unpaid Allowed Administrative Expense Claims, Priority Tax Claims and Other Priority Claims shall be transferred to the Liquidating Trust.

**B.**    <u>Professional Fee Claims.</u>

On the later of (i) the Effective Date and (ii) the date the Bankruptcy Court enters an order approving the final fee applications of the applicable Professional, the Debtors, or the Liquidating Trust, as applicable, shall pay all unpaid amounts approved by the Bankruptcy Court owing to such Professional from the Professional Fee Escrow Account, relating to prior periods and for the period ending on the Effective Date. Each Professional shall estimate its Professional Fee Claims due for periods that have not been billed as of the Effective Date. On or prior to thirty (30) days

after service of notice of the Effective Date, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date; provided that the Liquidating Trustee may pay retained Liquidating Trust Advisors, Professionals or other Entities in the ordinary course of business for services rendered and expenses incurred after the Effective Date, without further Bankruptcy Court order. Objections to any Professional Fee Claim must be filed and served on counsel to the Liquidating Trustee and the requesting party no later than thirty (30) days after such Professional Fee Claim is filed with the Bankruptcy Court, and served on the parties entitled to service under the Interim Compensation Order. For the avoidance of doubt, to the extent there is any conflict between the terms of the Plan Confirmation Order, this Combined Plan and Disclosure Statement, and/or the Interim Compensation Order, the Plan Confirmation Order shall govern. Within ten (10) days after entry of a Final Order with respect to its final fee application, each Professional shall remit any overpayment or unused retainer to the Liquidating Trust, and the Liquidating Trust, shall pay any unpaid amounts approved by the Bankruptcy Court to each Professional.

Holders of Professional Fee Claims shall not constitute Beneficiaries of the Liquidating Trust and shall not receive any Distributions from the Liquidating Trust or Liquidating Trust Assets on account of their Professional Fee Claims; *provided, however*, that Liquidating Trust Advisors, even if formerly Professionals, shall be entitled to payment from the Liquidating Trust for fees and expenses incurred in service of the Liquidating Trust. For the avoidance of doubt, neither the Liquidating Trust nor the Liquidating Trustee shall have any liability with respect to any Professional Fee Claims and shall not be required to satisfy any Professional Fee Claims from any Liquidating Trust Assets.

As soon as is reasonably practicable after the Plan Confirmation Date and no later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The sole source of payment of Allowed Professional Fee Claims shall be the amounts held in the Professional Fee Escrow Account. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. B. Riley Advisory Services shall act as escrow agent for the Professional Fee Escrow Account. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. For the avoidance of doubt, any amounts remaining in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Fee Claims shall be transferred to the Liquidating Trust.

## C.    Priority Tax Claims.

On the later of the Effective Date or the date on which a Priority Tax Claim (secured or unsecured) becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, but in no event later than 30 days after such event, each Holder of an Allowed Priority Tax Claim will be paid an amount equal to the Allowed amount of such Claim plus, to the extent applicable, any amount required to comply with section 1129(a)(9)(C) or 1129(a)(9)(D) of the Bankruptcy Code, in Cash by the Debtors or, if applicable, the Liquidating Trust, from the Administrative Expense and Priority Escrow Account. For the avoidance of doubt, the sole source of payment of Allowed Priority Tax Claims shall be the amounts held in the Administrative

Expense and Priority Escrow Account. Neither the Liquidating Trust nor the Liquidating Trustee shall have any liability with respect to any Priority Tax Claims and shall not be required to satisfy any Priority Tax Claims from Liquidating Trust Assets.

## VI.   CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES

Claims – other than Administrative Expense Claims, Priority Tax Claims, and Statutory Fees – are classified for all purposes, including voting, confirmation, and Distribution pursuant to the Plan, as follows:

| Class | Type | Status Under Plan | Voting Status | Recovery Estimate |
|-------|------|-------------------|---------------|-------------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Prepetition Revolver Secured Debt Claims | Impaired | Entitled to Vote | 20-100% |
| 3 | Prepetition Term Secured Debt Claims | Impaired | Entitled to Vote | 0-30%* |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote | 0-2%* |
| 6 | Governmental Fine and Penalty Claims | Impaired | Entitled to Vote | 0% |
| 7 | Prepetition Holdco Secured Debt Claims | Impaired | Entitled to Vote | 0% |
| 8 | Intercompany Claims | Impaired | Deemed to Reject | 0% |
| 9 | Equity Interests | Impaired | Deemed to Reject | 0% |

* The Revolver Adequate Protection Claim Amount is estimated to be between $4.5-6 million, the amount of which will be determined on or prior to the Effective Date. The Revolver Adequate Protection Claim Amount shall be payable ahead of any recoveries.

# VII. TREATMENT OF CLAIMS AND INTERESTS

**A.  Classification and Treatment of Claims and Interests.**

**1.  Class 1 — Other Priority Claims.**

    a.  *Classification*: Class 1 consists of all Other Priority Claims.

    b.  *Treatment:* Each Holder of an Allowed Other Priority Claim shall receive in full and final satisfaction of such Holder's Allowed Claim: (i) Cash in an amount equal to such Allowed Claim on the Effective Date or as soon thereafter as is reasonably practicable, or if disputed, as provided elsewhere in the Plan,[8] or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

    c.  *Voting*: Class 1 is Unimpaired, and Holders of Allowed Other Priority Claims are conclusively deemed to have accepted this Plan.

**2.  Class 2 — Prepetition Revolver Secured Debt Claims.**

    a.  *Classification*: Class 2 consists of Holders of Claims arising under the Revolver Credit Agreement.  The amount of Allowed Class 2 Prepetition Revolver Secured Debt Claims, as of August 27, 2021, is no less than $50 million.

    b.  *Treatment*: On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Prepetition Revolver Secured Debt Claim shall receive in full and final satisfaction of such Holder's Allowed Claim: its Pro Rata Share of (i) all Available Sale Proceeds, (ii) Class A1 Liquidating Trust Units, (iii) Class B1 Liquidating Trust Units, (iv) Class B2 Liquidating Trust Units, (v) Class B3 Liquidating Trust Units, (vi) Class C1 Liquidating Trust Units, and (vii) Class C2 Liquidating Trust Units.

    c.  *Voting*: Class 2 Prepetition Revolver Secured Debt Claims are impaired; Holders of such Claims are entitled to vote on the Plan.

**3.  Class 3 — Prepetition Term Secured Debt Claims.**

    a.  *Classification*: Class 3 consists of Holders of Claims arising under the Prepetition Term Credit Agreement. The amount of Allowed Class 3 Prepetition Term Secured Debt Claims, as of August 27, 2021, is no less than $768,956,393.

---

[8] For the avoidance of doubt, the sole source of payment of Allowed Other Priority Claims shall be the amounts held in the Administrative Expense and Priority Escrow Account. Neither the Liquidating Trust nor the Liquidating Trustee shall have any liability with respect to any Other Priority Claims and shall not be required to satisfy any Other Priority Claims from Liquidating Trust Assets.

      b.    *Treatment*: On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Prepetition Term Secured Debt Claim shall receive in full and final satisfaction of such Holder's Allowed Claim its Pro Rata Share of (i) Class A2 Liquidating Trust Units, (ii) Class B2 Liquidating Trust Units, (iii) Class B3 Liquidating Trust Units, and (iv) Class C2 Liquidating Trust Units.

      c.    *Voting*: Class 3 Prepetition Term Secured Debt Claims are impaired; Holders of such Claims are entitled to vote on the Plan.

**4.     Class 4 — Other Secured Claims.**

      a.    *Classification*: Class 4 consists of Allowed Other Secured Claims.

      b.    *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive or retain, in full and final satisfaction and settlement of such Claim, at the election of the Debtors, except to the extent any Holder of an Allowed Other Secured Claim agrees to different treatment: (i) the collateral securing such Allowed Other Secured Claim; (ii) Cash in an amount equal to the value of the collateral securing such Allowed Other Secured Claim; or (iii) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered unimpaired.

      c.    *Voting*: Class 4 Other Secured Claims are unimpaired; Holders of such Claims are deemed to accept the Plan.

**5.     Class 5 — General Unsecured Claims.**

      a.    *Classification*: Class 5 consists of all General Unsecured Claims. The Debtors estimate that the amount of General Unsecured Claims is no less than $274,000,000.[9]

      b.    *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, the Holder of such Claim shall receive in full and final satisfaction of such Holder's Allowed Claim its Pro Rata Share of (i) the Class B3 Liquidating Trust Units and (ii) the Class C2 Liquidating Trust Units.

      c.    *Voting*: Class 5 General Unsecured Claims are impaired; Holders of such Claims are entitled to vote on the Plan.

**6.     Class 6 — Governmental Fine and Penalty Claims.**

---

[9] The amount of General Unsecured Claims is subject to ongoing review and without prejudice to the Debtors' and the Liquidating Trustee's rights to object to such Claims.

a.      *Classification*: Class 6 consists of all Allowed Governmental Fine and Penalty Claims.

b.      *Treatment*: Each Holder of an Allowed Class 6 Governmental Fine and Penalty Claim shall receive, in full and final satisfaction of such Holder's Allowed Claim, its Pro Rata Share of (i) the Class B4 Liquidating Trust Units and (ii) the Class C3 Liquidating Trust Units.

c.      *Voting*: Class 6 Governmental Fine and Penalty Claims are impaired; Holders of such Claims are entitled to vote on the Plan.

**7.      Class 7 — Prepetition Holdco Secured Debt Claims.**

a.      *Classification*: Class 7 consists of Holders of Prepetition Holdco Secured Debt Claims.

b.      *Treatment*: On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Prepetition Holdco Secured Debt Claim shall receive in full and final satisfaction of such Holder's Allowed Claim, its Pro Rata Share of (i) the Class B5 Liquidating Trust Units and (ii) the Class C4 Liquidating Trust Units.

c.      *Voting*: Class 7 Prepetition Holdco Secured Debt Claims are impaired; Holders of such Claims are entitled to vote on the Plan.

**8.      Class 8 — Intercompany Claims.**

a.      *Classification*: Class 8 consists of all Holders of Equity Interests.

b.      *Treatment*: All Allowed Intercompany Claims shall be cancelled. Holders of Intercompany Claims will receive no property or Distribution under the Plan on account of such Claims.

c.      *Voting*: Class 8 Intercompany Claims are impaired; Holders of such Claims are deemed to have rejected the Plan and are not entitled to vote.

**9.      Class 9 — Equity Interests.**

a.      *Classification*: Class 9 consists of all Equity Interests.

b.      *Treatment*: On the Effective Date, all Equity Interests will be deemed cancelled and extinguished.  Holders of Equity Interests will receive no property or Distribution under the Plan on account of such Equity Interests.

c.      *Voting*: Class 9 Equity Interests are impaired; Holders of such Equity Interests are deemed to have rejected the Plan and are not entitled to vote.

B.      **Solicitation of the Debtors.**

Notwithstanding anything to the contrary herein, each Debtor that is entitled to vote to accept or reject this Plan as a Holder of an Intercompany Claim against another Debtor shall not be solicited for voting purposes, and each such Debtor will be deemed to have voted to accept this Plan.

C.      **Limited Substantive Consolidation.**

Except as otherwise stated herein, this Combined Plan and Disclosure Statement provides for the limited substantive consolidation of the Debtors' Estates, but solely for the purposes of the Plan, including making any Distributions to Holders of Claims. The Debtors propose limited substantive consolidation to avoid the inefficiency of proposing Entity-specific Claims for which there would be no material impact on Distributions. On the Effective Date, (i) all assets and liabilities of the Debtors will, solely for Distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) any Claims filed or to be filed in the Chapter 11 Cases will be deemed single Claims against each of the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of the other Debtor shall be eliminated and canceled, (v) all transfers, disbursements, and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of each of the Debtors' Estates, and (vi) any obligation of the Debtors as to Claims or Equity Interests will be deemed to be one obligation of each of the Debtors. Holders of Allowed Claims entitled to Distributions under the Plan shall be entitled to their share of assets available for Distribution without regard to which Debtor was originally liable for such Claim.  Except as set forth herein, such limited substantive consolidation shall not (other than for purposes related to this Combined Plan and Disclosure Statement) affect the legal and corporate structures of the Debtors.

Should the Debtors receive any objection to the proposed limited substantive consolidation contemplated herein, the Debtors may elect to dismiss one or more of the Chapter 11 Cases to avoid the inefficiency of proposing Entity-specific Claims for which there would be no material impact on Distributions.

## VIII.   THE LIQUIDATION OF THE DEBTORS

A.      **Liquidation.**

On and after the Effective Date, the Liquidating Trust and the Liquidating Trustee will, among other things, (i) investigate and, if appropriate, pursue Causes of Action and Avoidance Actions, including the Liquidating Trust Causes of Action, (ii) administer, monetize and liquidate the Liquidating Trust Assets, (iii) resolve all Disputed Claims, if appropriate, and (iv) make all Distributions from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement. The Liquidating Trust and Liquidating Trustee shall be authorized to take such actions without further order of the Bankruptcy Court; *provided, however,* the Liquidating Trustee may seek such Bankruptcy Court authority as the Liquidating Trustee, in its absolute discretion, deems necessary or appropriate.  The transfer of the Liquidating Trust Assets attributable to the

Beneficiaries of the Liquidating Trust shall be treated as a transfer of such assets directly to such Beneficiaries followed by a contribution of the Liquidating Trust Assets to the Liquidating Trust.

**B.       Reorganization of LBR as the Transition Refinery Entity.**

On the Effective Date, at the election of the Purchaser, LBR shall reorganize as the Transition Refinery Entity and issue 100% of its membership Interests (the "**New Interests**") to the Purchaser. The Purchaser shall file notice of its election no less than fourteen (14) days prior to the filing of the Plan Supplement. If the Purchaser elects for LBR not to reorganize, LBR shall be dissolved on the Effective Date without the necessity for any other or further actions to be taken by or on behalf of the Debtors as provided under Section XVI.I, and the Debtors need take no further action with respect to the assets or interests of the Transition Refinery Entity.

The issuance of the New Interests shall be authorized without the need for any further corporate action and without any further action by the Debtors or the Purchaser. All of the New Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The purpose of the Transition Refinery Entity shall be the ownership of the permits necessary for the operation of the Refinery previously owned by the Debtors and sold to the Purchaser. The Purchaser shall serve as its manager and sole equity interest Holder. The Debtors and Liquidating Trust shall have no obligations to the Transition Refinery Entity.

The corporate governance of Transition Refinery Entity shall be determined before the Effective Date. The Transition Refinery Entity shall have the authority to engage in any lawful business purpose, including without limitation, the authority to sell, lease, license, and/or dispose of the permits transferred by the Debtors, enter a transition services agreement for the operation of the Refinery, all without further order of the Bankruptcy Court. The Transition Refinery Entity shall be vested with full authority to take any and all steps necessary, appropriate or desirable to cause its own dissolution.

**C.       Transition Refinery Entity.**

Nothing in the Plan Confirmation Order or the Plan releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that the Transition Refinery Entity or that any other Person or Entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order.  Nothing in the Plan Confirmation Order or the Plan authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under applicable nonbankruptcy law including but not limited to police or regulatory law. Nothing in the Plan Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Plan Confirmation Order or to adjudicate any defense asserted under the Plan Confirmation Order.

Furthermore, notwithstanding anything in the Plan Confirmation Order or in the Plan to the contrary, nothing in the Plan Confirmation Order or the Plan shall modify (a) the Consent Decree

as modified by the First Modification and Second Modification in United States and the *United States Virgin Islands v. HOVENSA L.L.C.*, Civ. No. 1:11-cv-00006, in the United States District Court of the Virgin Islands, St. Croix Division (the "Consent Decree"), or (b) the Joint Stipulation in *United States v. Limetree Bay Refining, LLC, and Limetree Bay Terminals, LLC*, Civ. No. 1:21-cv-00264 (the "Joint Stipulation") (as each may be amended with the mutual consent of the parties). The Transition Refinery Entity shall be fully bound by all provisions of the Consent Decree and the Joint Stipulation and shall cooperate in the substitution of the Transition Refinery Entity as a named defendant in both cases. Nothing in the Plan Confirmation Order or the Plan (a) prevents the U.S. Environmental Protection Agency or other agency from issuing any order or taking other action under applicable nonbankruptcy law, or (b) modifies the Consent Decree, the Joint Stipulation, or any other applicable environmental, health and safety, or police and regulatory law. Notwithstanding anything in the Plan Confirmation Order or in the Plan to the contrary, nothing in this Plan Confirmation Order or the Plan, including without limitation the Purchaser's receipt and ownership of the New Membership Interests, shall modify the Sale Order or the protections in the Sale Order in favor of Purchaser and governmental units; for the avoidance of doubt, the New Membership Interests shall be issued to Purchaser in furtherance of the transactions contemplated by the Sale Order and shall be afforded the same protections as those set forth in the Sale Order in favor of Purchaser and governmental units.

For the avoidance of doubt, the New Membership Interests shall be issued as limited liability company membership interests rather than stock.

### D.     **Permits and Shared Authorizations.**

Notwithstanding anything to the contrary in the Plan or Plan Confirmation Order, the permits retained by the Transition Refinery Entity is limited to the retention of any rights of the Debtors under such permits and shall not alter or impact the rights of the Terminal Entities under any permits, all of which rights of the Terminal Entities are expressly reserved and preserved. The retention of permits by the Transition Refinery Entity and use of such permits remains subject to compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in the Plan Confirmation Order or the Plan imposes any obligation of the Purchaser, Transition Refinery Entity, or the Debtors on the Terminal Entities to comply with applicable regulatory or governmental laws or authorities.

### IX.   **PROVISIONS REGARDING THE LIQUIDATING TRUST**

### A.     **Appointment of the Liquidating Trustee.**

The Liquidating Trustee shall be identified in the Plan Supplement and shall be selected by the Debtors after consultation with the Committee and consent of the Ad Hoc Term Lender Group. All compensation for the Liquidating Trustee, and Liquidating Trust Advisors, shall be paid from the Liquidating Trust Assets, in accordance with the Liquidating Trust Agreement. The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of his/her duties unless otherwise ordered by the Bankruptcy Court. On the Effective Date, all Beneficiaries of the Liquidating Trust shall be deemed to have ratified and become bound

by the terms and conditions of the Liquidating Trust Agreement. In the event that the Liquidating Trustee resigns or is removed, terminated, or otherwise unable to serve as the Liquidating Trustee, then a successor shall be appointed as set forth in the Liquidating Trust Agreement.  Any successor Liquidating Trustee appointed shall be bound by and comply with the terms of the Plan, the Plan Confirmation Order, and the Liquidating Trust Agreement.

**B.      Creation of the Liquidating Trust.**

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, among other things, (i) investigating and, if appropriate, pursuing the Liquidating Trust Causes of Action, (ii) administering, monetizing and liquidating the Liquidating Trust Assets, (iii) resolving all Disputed Claims, if appropriate, and (iv) making all Distributions from the Liquidating Trust as provided for in the Plan and the Liquidating Trust Agreement.  The Liquidating Trust Agreement shall be filed with the Plan Supplement. The Liquidating Trust Agreement is incorporated herein in full and is made a part of this Combined Plan and Disclosure Statement.

Upon execution of the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized to take all steps necessary to complete the formation of the Liquidating Trust; provided, that, prior to the Effective Date, the Debtors, in consultation with the Prepetition Agents, may take such steps in furtherance of the formation of the Liquidating Trust as may be necessary, useful or appropriate under applicable law to ensure that the Liquidating Trust shall be formed and in existence as of the Effective Date. The Liquidating Trust shall be administered by the Liquidating Trustee in accordance with the Liquidating Trust Agreement.

Except for those Liquidating Trust Assets attributable to the Disputed Claims Reserve, it is intended that the Liquidating Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code.  In furtherance of this objective, the Liquidating Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the Liquidating Trust and have no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  All Liquidating Trust Assets held by the Liquidating Trust on the Effective Date (except for those assets attributable to the Disputed Claims Reserve) shall be deemed for federal income tax purposes to have been distributed by the Debtors on a Pro Rata share basis to those Holders of Allowed Claims that are entitled to receive Distributions from the Liquidating Trust, and then contributed by such Holders to the Liquidating Trust in exchange for the Beneficial Interests.  All Holders of Claims have agreed or shall be deemed to have agreed to use the valuation of the Assets transferred to the Liquidating Trust as established by the Liquidating Trustee for all federal income tax purposes. The Beneficiaries under the Liquidating Trust will be treated as the grantors and deemed owners of the Liquidating Trust.  The Liquidating Trust will be responsible for filing information on behalf of the Liquidating Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

**C.      Beneficiaries of the Liquidating Trust.**

On the Effective Date, each Holder of an Allowed Prepetition Revolver Secured Debt Claim, Allowed Prepetition Term Secured Debt Claim, Allowed General Unsecured Claim, Allowed Governmental Fine and Penalty Claim and Allowed Prepetition Holdco Secured Debt Claim shall, by operation of the Plan and Plan Confirmation Order, receive a Pro Rata Share of Liquidating Trust Units, as provided in Section VII. Holders of Disputed Prepetition Revolver Secured Debt Claims, Disputed Prepetition Term Secured Debt Claims, Disputed General Unsecured Claims, Disputed Governmental Fine and Penalty Claims, and Disputed Prepetition Holdco Secured Debt Claims shall be contingent Beneficiaries and funds for their Distribution shall be held by the Liquidating Trustee in the Disputed Claims Reserve pending allowance or disallowance of such Claims.

Upon the occurrence of the Effective Date, no other Entity or Person, including the Debtors, shall have any interest, legal, beneficial, or otherwise, in the Liquidating Trust, the Liquidating Trust Assets, or the Liquidating Trust Causes of Action. Without limiting the generality of the preceding sentence, and for the avoidance of doubt, Holders of Administrative Priority Claims, Professional Fee Claims, Priority Tax Claims, and Claims in Classes 1 and 4, 8, and 9 of this Plan shall not constitute Beneficiaries of the Liquidating Trust. Following the Effective Date, the sole source of payment of any such Claims that become Allowed shall be the Administrative Expense and Priority Escrow Account or the Professional Fee Escrow Account, as applicable.  Neither the Liquidating Trust nor the Liquidating Trustee shall have any liability with respect to any such Claims and shall not be required to satisfy any such Claims from the Liquidating Trust Assets.

The Beneficial Interests shall not be evidenced by any certificate, security, receipt, or any other form or manner whatsoever, except as maintained on the books and records of the Liquidating Trust by the Liquidating Trustee.  Any and all Beneficial Interests shall be non-transferable except (i) upon death of the Holder, (ii) by operation of law or (iii) to an affiliate of the Holder. Beneficiaries shall have no voting rights with respect to such Beneficial Interests. The Liquidating Trust shall have a term of five (5) years from the Effective Date, without prejudice to the rights of the Liquidating Trust and Liquidating Trustee to extend such term by the filing of a motion in the Bankruptcy Court, conditioned upon the Liquidating Trust not becoming subject to the Securities Exchange Act of 1934 (as now in effect or hereafter amended).

D.      **Vesting and Transfer of Assets to the Liquidating Trust.**

Except as otherwise set forth in the Plan, pursuant to section 1141(b) of the Bankruptcy Code, the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Claims, Liens, charges or other encumbrances, on the condition that the Liquidating Trustee comply with the terms of the Plan, including the making of all payments and distributions to Creditors provided for in the Plan.  If the Liquidating Trustee defaults in performing under the provisions of this Plan and the Chapter 11 Cases are converted to Chapter 7 Cases, all property vested in the Liquidating Trust and all subsequently acquired property owned as of or after the conversion date shall revest and constitute property of the Estates in the Chapter 7 Cases. The Liquidating Trustee may abandon or otherwise not accept any Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, has no value or will be unduly burdensome to the Liquidating Trust. Any Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall cease to be Liquidating Trust Assets. The Liquidating Trust Assets shall vest in the Liquidating Trust for the

benefit of the Beneficiaries and the Debtors and their Estates will have no further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

On the Effective Date, the Liquidating Trustee shall be deemed the representative of the of the Debtors' Estates pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code and as such shall be vested with the authority and power (subject to the Liquidating Trust Agreement and the Plan) to, among other things: (i) administer, object to or settle any Claims; (ii) make distributions in accordance with the terms of the Plan and Liquidating Trust Agreement, and (iii) carry out the provisions of the Plan related to the Liquidating Trust, including but not limited to, prosecuting or settling all Causes of Action in his or her capacity as trustee for the benefit of the Beneficiaries.  As the representative of the Debtors' Estates, in its capacity as trustee for the benefit of the Beneficiaries, the Liquidating Trustee will succeed to all of the rights and powers of the Debtors and their Estates with respect to all Causes of Action assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted and will replace the Debtors, their estate, and any official committee appointed in these cases, in all such Causes of Action, whether or not such claims are pending in filed litigation.

## E.   Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee.

### 1.   General Powers of the Liquidating Trustee

The rights and powers of the Liquidating Trustee are specified in the Liquidating Trust Agreement, which shall be filed with the Plan Supplement.  This Section IX provides a summary of the terms of the Liquidating Trust Agreement.  In the event of any conflict between this Section IX and the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement control, unless otherwise ordered in the Plan Confirmation Order. The omission of any terms or provisions of the Liquidating Trust Agreement from this summary shall not constitute a conflict between this section and the Liquidating Trust Agreement.

Except as expressly set forth in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, or the Liquidating Trust Agreement, and subject to his/her duties and obligations, the Liquidating Trustee, on behalf of the Liquidating Trust, shall have absolute discretion in the administration of the Liquidating Trust and Liquidating Trust Assets.

The Liquidating Trust Agreement generally will provide for, among other things: (i) the payment of the Liquidating Trust Operating Expenses; (ii) the payment of other reasonable expenses of the Liquidating Trust; (iii) the retention and compensation of counsel, accountants, financial advisors, or other professionals for the Liquidating Trust; (iv) the investment of Cash by the Liquidating Trustee within certain limitations, including those specified in the Plan; (v) the orderly liquidation of the Liquidating Trust Assets; (vi) litigation of the Liquidating Trust Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action; and (vii) the prosecution and resolution of objections to such Claims as the Liquidating Trustee deems reasonable and appropriate.

The Liquidating Trustee, on behalf of the Liquidating Trust, may employ, without further order of the Bankruptcy Court, Liquidating Trust Advisors to assist in carrying out the Liquidating Trustee's duties under the Plan, Plan Confirmation Order, and Liquidating Trust Agreement and

may compensate and reimburse the reasonable expenses of the Liquidating Trust Advisors from the Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement without further Order of the Bankruptcy Court.

The Liquidating Trust Agreement provides that the Liquidating Trustee shall be indemnified by and receive reimbursement from the Liquidating Trust Assets against and from any and all loss, liability, expense (including reasonable attorneys' fees), or damage which the Liquidating Trustee incurs or sustains, in good faith and without willful misconduct, gross negligence, or fraud, acting as Liquidating Trustee under or in connection with the Liquidating Trust Agreement.

On and after the Effective Date, the Liquidating Trustee shall have the power and responsibility to do all acts contemplated by the Plan and Liquidating Trust Agreement to be done by the Liquidating Trustee and all other acts that may be necessary or appropriate in connection with the disposition of the Liquidating Trust Assets and the distribution of the proceeds thereof, as contemplated by the Plan and in accordance with the Liquidating Trust Agreement. In all circumstances, the Liquidating Trustee shall act in its reasonable discretion in the best interests of the Beneficiaries pursuant to the terms of the Plan and the Liquidating Trust Agreement.

### 2. Books and Records

On or before the Effective Date, the Debtors shall provide the Liquidating Trustee an electronic copy of or access to any and all of their documents, books, records, files, and emails available to the Debtors and their Estates.

### 3. Investments of Cash

To the extent provided in the Liquidating Trust Agreement, the Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments; provided, however, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### 4. Costs and Expenses of Administration of the Liquidating Trust

All Liquidating Trust Operating Expenses, including the costs associated with retaining Liquidating Trust Advisors, shall be the responsibility of, and paid by, the Liquidating Trust in accordance with the Liquidating Trust Agreement from the Liquidating Trust Assets.

### 5. Reporting

No later than forty-five (45) days after the last day of each calendar quarter in which the Liquidating Trust shall remain in existence, the Liquidating Trustee shall file a report of all Liquidating Trust Assets held and received by the Liquidating Trust, all Available Trust Cash (as defined in the Liquidating Trust Agreement) disbursed to Beneficiaries, and all fees, income, and expenses related to the Liquidating Trust during the preceding calendar quarter.

**F.**   **Post-Effective Date Notice.**

After the Effective Date, to continue to receive notice of documents pursuant to Bankruptcy Rule 2002, all Creditors and other parties in interest (except those listed in the following sentence) must file a renewed notice of appearance requesting receipt of documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Liquidating Trustee is authorized to limit the list of parties in interest receiving notice of documents pursuant to Bankruptcy Rules 2002 to the Office of the United States Trustee, the United States, and those parties in interest who have filed such renewed requests; provided, however, that the Liquidating Trustee also shall serve any known parties directly affected by or having a direct interest in, the particular filing in accordance with Local Rule 2002-1(b).  Notice given in accordance with the foregoing procedures shall be deemed adequate pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  This information shall be provided in the Notice of Effective Date.

**G.**   **Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets; Preparation and Filing of Tax Returns for Debtor.**

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its Beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Estates of an undivided interest in each of the Liquidating Trust Assets ((i) to the extent of the value of their respective share in the applicable assets and (ii) except for those assets attributable to the Disputed Claims Reserve) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

The Debtors shall be responsible for filing all required federal, state, and local tax returns and/or informational returns for the Debtors (including final tax returns).

The Liquidating Trust shall be responsible for filing all required federal, state and local tax returns and/or informational returns for the Liquidating Trust and shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.  The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of this Combined Plan and Disclosure Statement, (a) each Holder of an Allowed Claim that is to receive a Distribution from the Liquidating Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee to allow it to comply with its tax withholding and reporting requirements.  Any property to be distributed by the Liquidating Trust shall, pending the implementation of such arrangements, be treated as an Unclaimed Distribution to be held by the Liquidating Trustee, as the case may be, until such time as the Liquidating Trustee is satisfied

with the Holder's arrangements for any withholding tax obligations.  If the Liquidating Trustee makes such a request and the Holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the Liquidating Trust and any Claim or Equity Interest in respect of such Distribution shall be disallowed and forever barred from receiving a Distribution under the Plan or Liquidating Trust Agreement.

The Liquidating Trustee (i) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Liquidating Trustee and the Holders of Trust Interests) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.  The Liquidating Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay the U.S. federal, state and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.

## H.    Term of Liquidating Trust.

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed or temporarily Allowed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement, the Plan and the Plan Confirmation Order have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under the Plan, the Liquidating Trust Agreement and the Plan Confirmation Order have been made, and (v) the Chapter 11 Case has been closed; provided, however, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion filed prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed three (3) years per extension, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  Upon the Filing of such a motion, the term of the Liquidating Trust shall be automatically extended through entry of a Final Order thereon, unless the extension would adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes.

## I.    Limitation of Liability of the Liquidating Trustee.

As shall be provided in the Liquidating Trust Agreement, the Liquidating Trust shall indemnify the Liquidating Trustee and any retained professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the Liquidating Trustee and its professionals may incur or sustain by reason of being or having been a Liquidating Trustee or professionals thereof for performing any functions incidental to such service; provided, however, the foregoing shall not relieve the Liquidating Trustee or any retained professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing, or, in the case of an attorney or other professional and, as required any applicable rules of professional conduct, malpractice.

# X.  MEANS FOR IMPLEMENTATION

## A.    Preservation of Right to Conduct Investigations.

The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 or any other law, rule, or order, held by the Debtors prior to the Effective Date with respect to the Liquidating Trust Assets shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

## B.    Prosecution and Resolution of Causes of Action and Avoidance Actions.

From and after the Effective Date, prosecution and settlement of all Causes of Action and Avoidance Actions conveyed to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to the Plan and the Plan Confirmation Order.  The Liquidating Trustee may pursue such Causes of Action and Avoidance Actions, as appropriate, in accordance with the best interests of the Liquidating Trust Beneficiaries. From and after the Effective Date, with respect to the Liquidating Trust Assets, the Liquidating Trust shall have exclusive rights, powers, and interests of the Estate to pursue, settle, or abandon such Causes of Action and Avoidance Actions as the sole representative of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. Notwithstanding the occurrence of the Effective Date, all Causes of Action and Avoidance Actions that are not expressly released or waived under the Plan are reserved and preserved and vest in the Liquidating Trust in accordance with the Plan.

## C.    Effectuating Documents and Further Transactions.

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Combined Plan and Disclosure Statement, Plan Supplement, the Plan Confirmation Order and any other agreement or document related to or entered into in connection with the Plan, shall become, and shall remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice or Order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement).  The Liquidating Trustee may, and all Holders of Allowed Claims receiving Distributions pursuant to the Plan, at the request or direction of the Liquidating Trustee shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## D.    Funding of Liabilities and Distributions.

On the Effective Date, the Debtors shall transfer to the Liquidating Trust the Liquidating Trust Assets. The Liquidating Trust shall administer the Liquidating Trust Assets and distribute Available Trust Cash to the Beneficiaries of the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement, Plan, and Plan Confirmation Order. The Liquidating Trust shall

be responsible for and shall have standing to evaluate, prosecute and settle all causes of action transferred to the Liquidating Trust.

The Debtors shall transfer to the Liquidating Trust the Liquidating Trust Funding Amount on the Effective Date for the administration of the Liquidating Trust.  The Liquidating Trust shall also retain the Initial Class C Liquidating Trust Recoveries for funding the administration of the Liquidating Trust.  In the event of any inconsistency between the terms of the Plan, the Plan Confirmation Order and Liquidating Trust Agreement regarding the Liquidating Trust, the terms of the Plan shall govern, unless expressly ordered otherwise in the Plan Confirmation Order.

**E.      Release of Liens.**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to this Combined Plan and Disclosure Statement, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be deemed fully released without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code or other applicable law, provided however that any tax liens that have been asserted against the Debtors shall not be released until the underlying tax claim has been satisfied.

**F.      Exemption from Securities Laws.**

Any and all Beneficial Interests shall not constitute "securities" and under section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Liquidating Trust under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities.

**G.      Exemption from Certain Taxes and Fees.**

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment, and upon entry of the Plan Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfer of property without payment of any such tax, recordation fee, or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Plan Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**H.      Debtors' Privileges as to Certain Causes of Action.**

Effective as of the Effective Date, all Privileges of the Debtors relating to the Liquidating Trust Assets shall be deemed transferred, assigned, and delivered by the Debtors to the Liquidating Trust, without waiver or release, and shall vest with the Liquidating Trust. The Liquidating Trustee shall hold and be the beneficiary of all such Privileges and entitled to assert such Privileges. No such Privilege shall be waived by disclosures to the Liquidating Trustee of the Debtors' documents, information, or communications subject to attorney-client privileges, work product protections, or other immunities (including those related to common interest or joint defense with third parties), or protections from disclosure held by the Debtors. The Debtors' Privileges relating to the Liquidating Trust Assets will remain subject to the rights of third parties under applicable law, including any rights arising from the common interest doctrine, the joint defense doctrine, joint attorney-client representation, or any agreement; provided, however, prior to waiving such privilege, the Liquidating Trustee shall provide such third party with any written notice to the extent such notice is required by any joint defense or common interest agreements that might have existed at the time Debtors filed the Petitions. Nothing contained herein or in the Plan Confirmation Order, nor any Professional's compliance herewith and therewith, shall constitute a breach of any Privileges of the Debtors.

**I.**      **Insurance Policies.**

Except as otherwise specifically stated herein, nothing in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies. On the Effective Date, all of the Debtors' rights and their Estates' rights under any Insurance Policy to which the Debtors and/or the Debtors' Estates may have a claim or potential claim for coverage under shall vest with the Liquidating Trust. For the avoidance of doubt, the Debtors are deemed to have assumed all of the Insurance Policies prior to such vesting. Nothing in this provision shall be deemed to be an admission of any fact, liability or other matter whatsoever.

Each applicable insurer under the Insurance Policies is prohibited from, and the Plan Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Chapter 11 Cases, this Combined Plan and Disclosure Statement Plan or any provision herein, including the treatment or means of liquidation set out within this Combined Plan and Disclosure Statement for any insured Claims or Causes of Action. For the avoidance of doubt, nothing in Section X.I impairs the rights of the Debtors or the Debtors' directors and officers, or the Liquidating Trust with respect to the Insurance Policies.

Nothing in the Plan or Plan Confirmation Order shall impair or release any right of the United States with respect to any proceeds of any environmental insurance policy of the Debtors.

**J.**      **Filing of Monthly and Quarterly Reports and Payment of Statutory Fees.**

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. On and after the Effective Date, the Debtors and the Liquidating Trustee shall be jointly and severally liable to pay any and all Statutory Fees when due and payable. The

Debtors shall file all monthly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  Provided that the Debtors dissolve on the Effective Date, after the Effective Date, the Liquidating Trustee shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. If, after the Effective Date, disbursements, other than those made by the Liquidating Trust, are made in any quarter, the entity making such disbursements shall report same to the Liquidating Trustee for inclusion in the appropriate separate quarterly report. The Debtors and the Liquidating Trustee shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtors' Chapter 11 Cases being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Expense Claim in the case and shall not be treated as providing any release under the Plan in connection therewith.

Article VII.C of the Plan provides for limited substantive consolidation solely for the purposes of the Plan, including making distributions to Holders of Claims.  For purposes of Statutory Fee assessments and calculations under 28 U.S.C. § 1930(a)(6)(A) and (B), Article VII.C of the Plan will not result in a *de facto* substantive consolidation whereby the Chapter 11 Cases collapse into a single case.  Instead, all of the pre-confirmation Chapter 11 Cases will continue as separate Chapter 11 Cases post-confirmation, until such Chapter 11 Cases are closed, dismissed, or converted.

### K.  **Completion of Services of Professionals.**

On the Effective Date, the Professionals for the Debtors and the Committee shall be deemed to have completed their services to the Debtors' Estates and such Professionals shall be able to file final and interim applications and be paid for reasonable compensation and reimbursement of expenses related thereto allowed by the Bankruptcy Court in accordance with Section V.B. above. Any of such Professionals may be retained by the Liquidating Trustee to represent the Liquidating Trust.

### L.  **Operations of the Debtors Between the Confirmation Date and the Effective Date.**

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate as Debtors-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

### M.  **Structured Dismissal.**

In accordance with the settlement agreement regarding cash collateral reached with the Prepetition Revolver Agent, as memorialized in this Plan, if the Bankruptcy Court shall not have entered an order confirming the Plan by May 21, 2022, or the Effective Date shall not have occurred by a date that is thirty (30) days after the Plan Confirmation Hearing, or should the amount of Allowed Administrative Expense Claims exceed the Administrative Expense Claims Cap, the Debtors shall file a motion seeking a structured dismissal of these Chapter 11 Cases, as provided in Section X.M. However, to the extent the amount of Allowed Administrative Expense

Claims exceed the Administrative Expense Claims Cap, the Debtors will attempt to negotiate with the Prepetition Revolver Agent.

## XI.  PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

**A.     Distribution Record Date.**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. The Debtors and the Liquidating Trustee shall have no obligation to recognize any ownership transfer of the Claims or Equity Interests occurring after the Distribution Record Date.  The Debtors and the Liquidating Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**B.     Method of Payment.**

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or an electronic wire or ACH transfer.

**C.     Claims Objection Deadline.**

The Debtors or Liquidating Trustee, as applicable, to the extent permitted pursuant to this Plan or section 502(a) of the Bankruptcy Code, shall file and serve any objection to any Claim no later than the Claims Objection Deadline; provided, however, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion of the Debtors or the Liquidating Trustee, as applicable, and notice to the Bankruptcy Rule 2002 service list and all parties holding claims as to which the objection is to be extended for cause.

**D.     No Distribution Pending Allowance.**

Notwithstanding any other provision of the Plan or the Liquidating Trust Agreement, no Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by the Plan or the Liquidating Trust Agreement.

**E.     Reserve of Cash Distributions.**

On any date that Distributions are to be made under the terms of the Plan, the Debtors or Liquidating Trustee, or their respective agents, as applicable, shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim, but for the pendency of a dispute with respect thereto. Such Cash or property shall be held in a separate bank account maintained by the Debtors or Liquidating Trust, as applicable, for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto, if any.

F. **Distribution After Allowance.**

The Debtors shall make Distributions to Holders of Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims to the extent such claims are Allowed prior to the Effective Date. After the Effective Date, the Liquidating Trustee shall make such Distributions solely from the Professional Fee Escrow Account and Administrative Expense and Priority Escrow Account, as applicable, and shall make Distributions to Holders of Allowed Claims in Classes 2, 3, 5, 6, and 7 as determined in the Liquidating Trustee's discretion in accordance with the Liquidating Trust Agreement.

G. **Delivery of Distributions.**

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (i) at the addresses set forth on the respective proofs of Claim filed by such Holders; (ii) at the addresses set forth on any written notices of address changes delivered to the Claims Agent after the date of any related proof of Claim; or (iii) at the address reflected in the Schedules, or, if not reflected in the Schedules, then in other records of the Debtors, if no proof of Claim is filed and the Liquidating Trustee or the Debtors have not received a written notice of a change of address.

If the Distribution to the Holder of any Claim is returned to the Debtors or Liquidating Trustee as undeliverable, no further Distribution shall be made to such Holder unless and until the Debtors or Liquidating Trustee, as applicable, are notified in writing of such Holder's then current address. Undeliverable Distributions shall remain in the possession of the Debtors or Liquidating Trustee until the earlier of (i) such time as a Distribution becomes deliverable, or (ii) such undeliverable Distribution becomes an Unclaimed Distribution pursuant to Section XI.I of this Combined Plan and Disclosure Statement. Undeliverable Distributions shall revert to the Liquidating Trust. The Liquidating Trustee shall not have an obligation to update or correct the contact information for recipients of undeliverable Distributions.

H. **Fractional Dollars; *De Minimis* Distributions.**

Notwithstanding any other provision of the Plan to the contrary, (a) the Debtors and Liquidating Trust shall not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down; and (b) the Debtors and Liquidating Trust shall have no duty to make a Distribution on account of any Allowed Claim (i) if the aggregate amount of all Distributions authorized to be made on such date is less than $25,000, in which case such Distributions shall be deferred to the next Distribution, (ii) if the amount to be distributed to a Holder on the particular Distribution date is less than $100.00, unless such Distribution constitutes the final Distribution to such Holder, or (iii) if the amount of the final Distribution to such Holder is $50.00 or less. If the Liquidating Trust or Debtors withhold any Distribution under this provision, the withheld funds shall inure to the benefit of the Liquidating Trust.

I. **Excess Funds.**

After final Distributions have been made from the Liquidating Trust in accordance with the terms of the Plan and the Liquidating Trust Agreement, if the amount of remaining Cash in the

Liquidating Trust is $15,000 or less, the Liquidating Trustee, may donate such amount to charity; *provided that* the charity shall be unrelated to the Debtors, the Committee and its members, the Liquidating Trustee, the Liquidating Trust Advisors, the DIP Lender, the Prepetition Secured Parties, and their respective professionals.

**J.    Unclaimed Distributions.**

Any Cash or other property to be distributed under the Plan to a Beneficiary shall revert to the Liquidating Trust if it is not claimed by the Beneficiary within three (3) months after the date of such Distribution.  If such Cash or other property is not claimed on or before such date, the Distribution made to such Beneficiary shall be deemed to be reduced to zero and such returned, undeliverable, or unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall be returned to the Liquidating Trust. All Unclaimed Distributions shall revert to the Liquidating Trust.

**K.    Set-Off.**

Except as otherwise provided herein, the Debtors or Liquidating Trustee, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtors' books and records.  Rights of setoff and recoupment, if any, held by any Entity or Person are preserved for the purpose of asserting such rights as a defense to any Claims or Causes of Action or Avoidance Actions of the Debtors, their Estates, or the Liquidating Trustee and regardless of whether such Entity or Person is the Holder of an Allowed Claim. Nothing in the Plan or Plan Confirmation Order shall impair the United States' right to setoff, which is fully preserved.

**L.    Maximum Recovery and Postpetition Interest.**

Except as may be expressly provided herein, interest shall not accrue on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date. No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of Secured Claims under section 506(b) of the Bankruptcy Code.

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

**M.    Allocation of Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a Distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid prepetition interest.

N.      **Prepayment.**

Except as otherwise provided herein or the Plan Confirmation Order, the Debtors and the Liquidating Trustee, as applicable, shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

## XII.  EXECUTORY CONTRACTS

A.      **Rejection of Executory Contracts and Unexpired Leases.**

This Plan shall constitute a motion to reject all executory contracts and unexpired leases not previously rejected pursuant to an order of the Bankruptcy Court unless (i) otherwise set forth in the Plan Supplement or (ii) expressly assumed by the Debtors under this Plan, and the Debtors shall have no further obligation thereunder. Notwithstanding the foregoing, upon the Effective Date, the Debtors shall be deemed to have assumed the Master Consignment Agreement by and between LBR and NRI Industrial Sales LLC and assigned such agreement to the Liquidating Trust. Without limiting the foregoing, a schedule of the executory contracts and unexpired leases that the Debtors intend to assume and assign shall be filed with the Plan Supplement. The entry of the Plan Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtor, their Estate and all parties in interest in the Chapter 11 Cases.  The foregoing information shall be included in the notice of entry of the Plan Confirmation Order. Notwithstanding the foregoing, to the extent any Insurance Policies are deemed to be executory, (i) the Debtors do not seek to reject the Insurance Policies through this general rejection provision and (ii) the Insurance Policies shall be assumed by the Debtors pursuant to Section X.I. of this Plan.

B.      **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Claims created by the rejection of executory contracts and unexpired leases pursuant to this Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after service of notice of entry of the Plan Confirmation Order by the Bankruptcy Court, which notice shall set forth the deadline to file such Claims.  Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Section XII.A, for which proofs of Claim are not timely filed within that period will be forever barred from assertion against the Debtors, their Estates, the Liquidating Trust, and their respective successors and assigns, and their respective assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims and shall be subject to the provisions of this Plan.

## XIII.  CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

The following are conditions precedent to the Effective Date that must be satisfied or waived (as provided below):

a.     The estimate of Allowed Administrative Expense Claims, to be conducted in good faith by the Debtors in consultation with the Prepetition Agents and the Committee, shall not exceed $4.8 million;

b.     The aggregate amount of Available Sale Proceeds shall not be less than $10 million;

c.     The Plan Confirmation Order, which shall be in a form acceptable to the Debtors and each of the Prepetition Agents in consultation with the Committee, shall have been entered by the Bankruptcy Court, and shall become a Final Order;

d.     The Plan Confirmation Order shall be in full force and effect;

e.     The Liquidating Trust Agreement, in a form and substance acceptable to the Debtors and each of the Prepetition Agents, shall have been fully executed and the Liquidating Trust shall have been formed;

f.     The final version of all schedules, documents, and Plan exhibits, including a Plan Supplement, shall have been filed in form and substance acceptable to the Prepetition Agents in consultation with the Committee;

g.     The Debtors shall have funded the Professional Fee Escrow Account and the Administrative Expense and Priority Escrow Account;

h.     The Debtors shall have paid all reasonable and documented fees and expenses of the Prepetition Revolver Agent, the Prepetition Term Agent and the Ad Hoc Term Lender Group, in accordance with the terms of the Plan and the Approved Budget;

i.     All actions, agreements, instruments, or other documents necessary to implement the terms and conditions of the Plan are effected or executed and delivered;

j.     All Liquidating Trust Assets shall have been transferred to and/or vested in the Liquidating Trust; and

k.     The Court shall have determined by Final Order the allowance and amount of any and all superpriority administrative Claims of the Prepetition Secured Parties under Section 9.a. and/or 9.b. of the Final DIP Order, or sections 364(c) and 507(b) of the Bankruptcy Code; it being understood that the Revolver Adequate Protection Claim Amount shall be the amount set forth in the Plan without any further order of the Court.

Notwithstanding the foregoing, the Debtors may, acting jointly, waive the occurrence of the conditions precedent to the Effective Date; provided, however, conditions precedent a.-j. may not be waived without the written consent of the Prepetition Agents (and upon consultation with the Committee) and condition precedent k. may not be waived without the written consent of the

Committee. Any such written waiver of a condition precedent set forth in this Section may be affected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate this Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## XIV.  RELEASE, EXCULPATION, INJUNCTION, AND RELATED PROVISIONS

### A.  Releases by the Debtors.

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is hereby released by the Debtors, their Estates, the Transition Refinery Entity, the Liquidating Trustee, and the Liquidating Trust (as applicable) from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, their Estates, the Transition Refinery Entity, the Liquidating Trustee, or the Liquidating Trust), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or that could be asserted on behalf of the Debtors, that the Debtors, their Estates, the Transition Refinery Entity, the Liquidating Trustee, or the Liquidating Trust (as applicable), that such Person or its estate, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their Estates, the Transition Refinery Entity, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the Prepetition Secured Debt Documents (as defined in the DIP Orders), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Transition Refinery Entity, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, or any restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Plan Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan Documents and any related agreements, instruments, and other documents, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Definitive Documentation,**

or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section XIV.A do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, including any such obligations created in connection with the restructuring, and (ii) any Preserved Claims and Causes of Action. Nothing in this Section XIV.A shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud or willful misconduct.

Entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in this Section XIV.A, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to such releases.

Notwithstanding anything to the contrary herein, the Insurance Claimants and their counsel may file, assert, and/or continue to assert their Claims and any putative class action litigation, including the Putative Class Action Litigation, against any of the Debtors as nominal defendants for the purpose of (a) establishing Claims against the Debtors and their Estates and (b) preserving rights with respect to insurance coverage for such Claims, and for no other purpose.

B.     **Releases by the Releasing Parties.**

As of the Effective Date, each Releasing Party hereby releases each Debtor, Estate, the Transition Refinery Entity, and Released Party from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Transition Refinery Entity, their Estates, the Liquidating Trustee, or the Liquidating Trust), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its estate, affiliates (excluding the Debtors' affiliates that are not Debtors in these Chapter 11 Cases), heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their Estates, the Transition Refinery Entity, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, Prepetition Secured Debt Documents (as defined in the

DIP Orders), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Transition Refinery Entity, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, or any restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Plan Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan Documents and any related agreements, instruments, and other documents, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit of Confirmation, the pursuit of consummation of the Plan, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Plan Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section XIV.B do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, including any such obligations created in connection with the restructuring, and (ii) any Preserved Claims and Causes of Action. Nothing in this Section XIV.B shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud or willful misconduct. The releases set forth in this Section XIV.B do not apply to any Holder of a Claim or Equity Interest if such Holder "opts out" of such releases in accordance with the solicitation procedures.

Entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Section XIV.B, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.

Notwithstanding anything to the contrary herein, the Insurance Claimants and their counsel may file, assert, and/or continue to assert their Claims and any putative class action litigation, including the Putative Class Action Litigation, against any of the Debtors as nominal defendants for the purpose of (a) establishing Claims against the Debtors and their Estates and (b) preserving rights with respect to insurance coverage for such Claims, and for no other purpose.

C.      **Exculpation.**

**The Exculpated Parties shall neither have nor incur any liability to any Entity, including the Exculpated Parties, for any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, PII Laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances taking place or arising during the Exculpation Timeframe related in any way to the Liquidating Trust Agreement, Chapter 11 Cases, or this Combined Plan and Disclosure Statement, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the post-petition debtor-in-possession financing approved by the Bankruptcy Court, the Liquidating Trust Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with this Combined Plan and Disclosure Statement, including, without limitation, those that any of the Debtors would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or the Estates; provided, however, the foregoing provisions of this section XIV.C shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted gross negligence, fraud, a violation of criminal law, or willful misconduct. Notwithstanding anything provided herein, the foregoing provisions of this section XIV.C shall have no effect on the liability of any Entity that results from any act or omission that occurred prior to or after the Exculpation Timeframe or the rights of any person or Entity to enforce the Plan or other agreements or documents delivered under or in connection with the Plan.**

D.      **Preservation of Causes of Action.**

1.      **Vesting of Causes of Action**

Except as otherwise provided in this Plan or the Plan Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any and all Causes of Action and Avoidance Actions that are Liquidating Trust Assets are reserved for, assigned to, and shall become property of the Liquidating Trust, and the Liquidating Trustee shall be vested with any and all rights and standing to commence, prosecute, and resolve such Causes of Action, on the Effective Date.

Except as otherwise proved in this Plan, Plan Confirmation Order or the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action conveyed to the Liquidating Trust, in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

## 2. Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a Cause of Action against any Entity is expressly waived, relinquished, released, compromised, or settled in this Plan or any Final Order (including the Plan Confirmation Order), the Debtors expressly reserve such Cause of Action, including all Causes of Action to be transferred by the Debtors to the Liquidating Trust pursuant to this Plan and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Plan Confirmation Order or Effective Date based on the Disclosure Statement, this Plan or the Plan Confirmation Order or any other Final Order (including the Plan Confirmation Order).  In addition, the Liquidating Trust reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors or the Committee is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits. Furthermore, in the pursuit of an Avoidance Action, the Debtors, Liquidating Trust, the Liquidating Trustee and/or their assignees shall certify in writing in any demand, claim, complaint, and other effort to collect on an Avoidance Action to compliance with section 547(b) of the Bankruptcy Code.

The failure of the Debtors to list a claim, right, cause of action, suit or proceeding shall not constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding.  IT IS THE EXPRESSED INTENTION OF THE PLAN TO PRESERVE RIGHTS, CLAIMS, AND CAUSES OF ACTION OF THE DEBTORS, WHETHER NOW KNOWN OR UNKNOWN, FOR THE BENEFIT OF THE LIQUIDATING TRUST AND THE DEBTORS' CREDITORS. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Causes of Action against them as any indication that the Liquidating Trustee will not pursue any and all available Causes of Action against them.**

Notwithstanding the foregoing, the Debtors have made a good faith effort to identify and disclose all known Causes of Action. A schedule identifying the Debtors' known Causes of Action to be transferred and retained by the Liquidating Trust, which consists of the Preserved Claims and Causes of Action, shall be attached to the Plan Supplement.

## E. <u>Injunction.</u>

**From and after the Effective Date and except as otherwise set forth in the Combined Plan and Disclosure Statement or the Plan Confirmation Order, all Persons are permanently enjoined from commencing or continuing in any manner against the Debtors, the Committee or its members, the Released Parties, the Liquidating Trust or the Liquidating Trustee, or their respective predecessors, successors, and assigns, current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, consultants, limited partners, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to the Plan or the Plan Confirmation Order.**

Notwithstanding anything to the contrary herein, the Insurance Claimants and their counsel may file, assert, and/or continue to assert their Claims and any putative class action litigation, including the Putative Class Action Litigation, against any of the Debtors as nominal defendants for the purpose of (a) establishing Claims against the Debtors and their Estates and (b) preserving rights with respect to insurance coverage for such Claims, and for no other purpose.

Notwithstanding any other provision of this Plan, the Debtors shall not receive a discharge pursuant to Bankruptcy Code section 1141(d)(3).

Except as otherwise specifically provided in the Combined Plan and Disclosure Statement or the Plan Confirmation Order, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtors and any successors, assigns or representatives of such Person shall be precluded and permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any Claim, action or other proceeding of any kind against any of the assets to be distributed under the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order with respect to any of the assets to be distributed under the Plan, and (c) creating, perfecting or enforcing any encumbrance of any kind with respect to any of the assets to be distributed under the Plan.  Except as otherwise expressly provided for in this Combined Plan and Disclosure Statement, with respect to obligations issued pursuant to this Combined Plan and Disclosure Statement, or to the extent that a permissible right of subrogation is asserted with respect to a timely filed proof of claim, all Persons are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby, from: commencing or continuing in any manner any action or other proceeding of any kind against any the Liquidating Trust or the Liquidating Trustee, or their successors and assigns, and their assets and properties; enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any the Liquidating Trust or the Liquidating Trustee, their successors and assigns, and their assets and properties; creating, perfecting, or enforcing any encumbrance of any kind against any the Liquidating Trust or the Liquidating Trustee, or the property or estate of the Liquidating Trust; asserting any right of subrogation against any the Liquidating Trust or the Liquidating Trustee, or against the property or estate of any of the Liquidating Trust; or commencing or continuing in any manner any action or other proceeding of any kind in respect of any claim or equity interest or cause of action released or settled hereunder.

Notwithstanding any provision in this Combined Plan and Disclosure Statement or the Plan Confirmation Order to the contrary, nothing contained in this Combined Plan and Disclosure Statement or the Plan Confirmation Order shall (i) extinguish, impact, or release any right of setoff, recoupment, or subrogation of any kind (a) held by any creditor or vendor which is asserted in a timely filed proof of claim or objection to this Combined Plan and Disclosure Statement, or pursuant to section 503(b)(1)(d) of the Bankruptcy Code or (b) that is or may be asserted as an affirmative defense or other defense to a cause of action or claim asserted by a Debtor or the Liquidating Trust against such creditor or vendor; or (ii) affect the applicability of 26 U.S.C. § 7421(a).

**Notwithstanding any provision in this Combined Plan and Disclosure Statement or the Plan Confirmation Order, the United States is not enjoined or barred by this subsection XIV.E but shall be bound by the Plan and Plan Confirmation Order as against the Liquidating Trustee and Liquidating Trust with respect to any Claim or Administrative Claim of the United States that arose prior to the Effective Date.**

F.    **Termination of All Employee and Workers' Compensation Benefits.**

Except as otherwise provided in the Liquidating Trust Agreement, all existing employee benefit plans and workers' compensation benefits not previously expired or terminated by the Debtors will be deemed terminated on or before the Effective Date.

G.    **Exclusions and Limitations on Liability.**

Notwithstanding anything in this Combined Plan and Disclosure Statement to the contrary, no provision of this Combined Plan and Disclosure Statement or the Plan Confirmation Order, including, without limitation, the exculpation provision contained in Section XIV.A of this Plan, shall (a) modify, release or otherwise limit the liability of any Entity not specifically released or exculpated hereunder, including, without limitation, any Entity that is otherwise liable under theories of vicarious or other derivative liability or that is a non-Debtor third party guarantor of any obligation of the Debtor, or (b) affect the ability of the Internal Revenue Service to pursue non-Debtor to the extent allowed by non-bankruptcy law for any liabilities that are related to any federal income tax liabilities that owed by the Debtors or the Debtors' Estates.

## XV.  RETENTION OF JURISDICTION

After the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as is legally permissible, including, but not limited to, jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and Professional Fee Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2.  grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

3.  resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4. ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

5. hear and determine any motions, adversary proceedings, mediations, contested or litigated matters, applications involving a Debtor, and any other matters that may be pending on the Effective Date or instituted by the Liquidating Trust after the Effective Date, including any Liquidating Trust Causes of Action;

6. hear and determine disputes (i) arising in connection with the interpretation, implementation or enforcement of the Liquidating Trust or the Liquidating Trust Agreement or (ii) arising out of or related to the issuance of any subpoenas or requests for examination pursuant to Bankruptcy Rule 2004 issued before or after the entry of the Plan Confirmation Order relating to the subject matter of the Liquidating Trust Causes of Action;

7. enter such orders as may be necessary or appropriate to implement, interpret, enforce or consummate the provisions of this Plan, the Confirmation Order, the Liquidating Trust Agreement and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, Plan Supplement or the Disclosure Statement;

8. resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

9. issue and enforce injunctions and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of this Plan, except as otherwise provided in this Plan;

10. enforce all of the provisions of this Plan;

11. enforce all Orders previously entered by the Bankruptcy Court;

12. resolve any cases, controversies, suits or disputes with respect to the exculpation, injunctions, releases, and other provisions contained in this Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such exculpation, injunction, release and other provisions;

13. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

14. resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Plan Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement;

15. enter an order and/or the decree contemplated in Bankruptcy Rule 3022 concluding the Chapter 11 Cases; and

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including any request made under section 505 of the Bankruptcy Code for the expedited determination of any unpaid liability of a Debtor for any tax incurred during the administration of the Chapter 11 Case, including any tax liability arising from or relating to the transactions contemplated by the Plan, for tax periods ending after the Petition Date and through the closing of the Chapter 11 Case.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court retains jurisdiction to the fullest extent permitted by applicable law to adjudicate Liquidating Trust Causes of Action and to hear and determine disputes concerning Liquidating Trust Causes of Action and any motions to compromise or settle such Liquidating Trust Causes of Action or disputes relating thereto. Despite the foregoing, if the Liquidating Trustee on behalf of the Liquidating Trust chooses to pursue any Liquidating Trust Cause of Action in another court of competent jurisdiction, the Liquidating Trustee will have authority to bring such action in any other court of competent jurisdiction.

## XVI.  MISCELLANEOUS PROVISIONS

### A.  Modification of Plan.

Subject to the limitations contained in this Plan: (1) the Debtors (with the consent of the Prepetition Agents) reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and subject to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 (a), to amend or modify this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Plan Confirmation Order and before substantial consummation of the Plan, the Liquidating Trust may, with the consent of the Prepetition Agents, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, and Bankruptcy Rule 3019(b).

### B.  Revocation of Plan.

The Debtors reserve the right to revoke or withdraw this Plan, prior to the entry of the Plan Confirmation Order and to file subsequent plans of liquidation. If the Debtors revoke or withdraw this Plan, or if entry of the Plan Confirmation Order or the Effective Date does not occur within one-hundred and eighty (180) days after entry of the Confirmation Order, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

### C.  Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## D.        Governing Law.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of New York, without giving effect to the principles of conflict of laws thereof.

## E.        Reservation of Rights.

Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the Holders of Claims or Equity Interests or other parties-in- interest; or (2) any Holder of a Claim or other party-in-interest prior to the Effective Date.

## F.        Effectuating Documents; Further Transactions.

The Debtors or the Liquidating Trustee or its valid designee in accordance with the Liquidating Trust Agreement shall be authorized to (1) execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan and (2) certify or attest to any of the foregoing actions.

## G.        Further Assurances.

The Debtors and the Liquidating Trust shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Plan Confirmation Order.

## H.        Payment of Fees and Expenses of the Prepetition Revolver Agent, Prepetition Term Agent and Ad Hoc Term Lender Group.

On the Effective Date, the Debtors shall pay all accrued and unpaid reasonable and documented fees and expenses of the Prepetition Revolver Agent,  the Prepetition Term Agent and the Ad Hoc Term Lender Group incurred in connection with the Chapter 11 Cases, including the reasonable and documented fees and expenses of Cleary Gottlieb Steen & Hamilton LLP, Akin Gump Strauss Hauer & Feld LLP and Perella Weinberg Partners LP, excluding any success or transaction fees, in each case subject to the Approved Budget (as defined in the Final DIP Order) and Cash Collateral Budget (as defined under the Cash Collateral Stipulation), their respective engagement letters, and the Cash Collateral Stipulation, and as otherwise agreed by such advisors and the Prepetition Revolver Agent.

## I.        Dissolution of the Debtors and Closing of the Chapter 11 Cases.

Upon the Effective Date, the Debtors' officers and directors shall be deemed to have resigned their respective positions with the Debtors. From and after the Effective Date, the Debtors shall be deemed to be immediately dissolved upon the Effective Date under applicable law and shall have no corporate existence thereafter without the necessity for any other or further actions to be taken by or on behalf of the Debtors or action or formality which might otherwise be required under applicable non-bankruptcy laws. The Debtors shall be treated as having completely liquidated for state, local, and U.S. federal income tax purposes, and the Debtors shall not be required to pay any taxes or fees to cause such dissolution.

The Liquidating Trustee shall file a motion closing the Chapter 11 Cases after the Liquidating Trust Assets are fully administered or as soon as reasonably permissible.

**J.**     **Dissolution of the Committee.**

Upon the occurrence of the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of Professionals, or Committee members, or attending to any other issues related to applications for payment of fees and reimbursement of expenses of Professionals, and (iii) prosecuting or participating in any appeal of the Plan Confirmation Order or any request for reconsideration thereof.

**K.**     **Service of Documents.**

Any pleading, notice or other document required by this Plan to be served on or delivered to the Debtors, Committee, Holders of the Prepetition Revolver Secured Debt Claims, Holders of the Prepetition Term Secured Debt Claims, or Liquidating Trustee shall be sent by first class U.S. mail, postage prepaid to:

| <u>To the Debtors</u>: | Limetree Bay Services, LLC<br>11100 Brittmoore Park Drive<br>Houston, TX 77041<br><br>With a copy to: |
|---|---|

|  | Baker & Hostetler LLP<br>Attn: Elizabeth A. Green<br>     Jimmy D. Parrish<br>SunTrust Center, Suite 2300<br>200 South Orange Avenue<br>Orlando, FL  32801-3432<br><br>And<br><br>Attn: Jorian L. Rose<br>45 Rockefeller Plaza<br>New York, New York 10111 |
|---|---|
| To the Committee: | Pachulski Stang Ziehl & Jones LLP<br>Attn: Michael D. Warner<br>440 Louisiana Street, Suite 900<br>Houston, TX 77002<br><br>And<br><br>Attn: Jeffrey N. Pomerantz<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br><br>And<br><br>Attn: Robert J. Feinstein<br>780 Third Avenue, 34th Floor<br>New York, NY 10017 |
| To the Holders of the Prepetition Revolver Secured Debt Claims: | Cleary Gottlieb Steen & Hamilton LLP<br>Attn: Sean A. O'Neal<br>     Jane VanLare<br>One Liberty Plaza<br>New York, NY 10006 |
| To the Holders of the Prepetition Term Secured Debt Claims: | Akin Gump Strauss Hauer & Feld LLP<br>Attn: Ira S. Dizengoff<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036<br><br>And<br><br>Attn: Scott L. Alberino<br>     Kevin M. Eide<br>     Benjamin L. Taylor<br>2001 K Street N.W.<br>Washington, DC 20006 |

| To the Liquidating Trust: | [•] |
|---|---|

**L.     Filing of Additional Documents.**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

# XVII.  RISKS AND OTHER CONSIDERATIONS

**A.     Bankruptcy Considerations.**

Although the Plan Proponents believe that this Combined Plan and Disclosure Statement will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed.  Moreover, there can be no assurance that modifications of this Combined Plan and Disclosure Statement will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent specified herein, and there can be no assurance that such conditions will be satisfied or waived.  In the event such conditions precedent have not been satisfied or waived (to the extent possible hereunder) within forty five (45) days after the Plan Confirmation Date, which period may be extended by the Plan Proponents, then the Plan Confirmation Order may be vacated, no Distributions will be made pursuant to the Plan, and the Debtors and all Holders of Claims and Equity Interests will be restored to the status quo ante as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Equity Interests encompass Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

While the Plan Proponents believe that there are sufficient Liquidating Trust Assets to make Distributions to Liquidating Trust Beneficiaries, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay all Liquidating Trust Operational Expenses or make Distributions to the Liquidating Trust Beneficiaries.

**B.     No Duty to Update Disclosures.**

The Plan Proponents have no duty to update the information contained in this Combined Plan and Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless

the Plan Proponents are required to do so pursuant to an Order of the Bankruptcy Court. Delivery of this Combined Plan and Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

## C.   Alternatives to Confirmation and Consummation of the Plan.

### 1.   Alternate Plan

If the Plan is not confirmed, the Debtors or any other party in interest (if, pursuant to section 1121 of the Bankruptcy Code, the Debtors have not filed a plan within the time period prescribed under the Bankruptcy Code) could attempt to formulate and propose a different plan. Such a plan likely would result in additional costs, including, among other things, additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expense Claims (subject to allowance). The Plan Proponents believe that the Plan provides for an orderly and efficient liquidation of the Debtors' remaining assets and enables creditors to realize the best return under the circumstances.

### 2.   Chapter 7 Liquidation or Dismissal

If a plan pursuant to Chapter 11 is not confirmed by the Bankruptcy Court, the Chapter 11 Cases could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, pursuant to applicable provisions of Chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. The Plan Proponents believe that liquidation under Chapter 7 of the Bankruptcy Code of the Debtors' remaining assets would result in a substantial reduction in the value to be realized by Holders of Claims as compared to Distributions contemplated under the Plan. This is so because a Chapter 7 liquidation would require the appointment of a trustee, which would require substantial additional expenses (including the costs associated with the Trustee's retention of attorneys and other professionals) and would delay the orderly liquidation of the Estates' Assets, thereby lowering recoveries to such Holders of Claims. Consequently, the Debtors believe that confirmation of the Plan will provide a substantially greater return to Holders of Claims than would liquidation under Chapter 7 of the Bankruptcy Code. A copy of the Plan Proponents' liquidation analysis is attached to this Plan.

## D.   Certain Federal Tax Consequences

Certain Debtors are organized and subject to tax in USVI and, accordingly, are generally subject to the system of taxation applicable to entities established under the tax laws of USVI. Additionally, Holders of Claims may be subject to tax in USVI on payments received on the implementation of the Plan. The Tax Code generally is applied in USVI by what has become known as the "mirror theory," by which the words "Virgin Islands" are substituted for the words "United States," but the tax laws of USVI are not identical to the tax laws of the United States. Furthermore, USVI generally is not a party to any of the tax treaties signed by the United States. That said, this summary does not address any USVI tax consequences of the Plan to Holders and is limited to a description of certain U.S Federal income tax consequences to U.S. Holders (as defined below) of their participation in the Plan. Holders of Claims should consult their tax

advisors on the applicable US and USVI tax consequences of participation in the Plan and, if applicable, Liquidating Trust.

**THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO CERTAIN U.S. HOLDERS OF ALLOWED CLAIMS. THIS SUMMARY DOES NOT ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS WHO ARE UNIMPAIRED, DEEMED TO HAVE REJECTED THE PLAN IN ACCORDANCE WITH THE PROVISIONS OF SECTION 1126(G) OF THE BANKRUPTCY CODE, OR HOLDERS WHOSE CLAIMS ARE ENTITLED TO PAYMENT IN FULL IN CASH.**

This summary is based on the Tax Code, existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all of the U.S. federal income tax consequences of the Plan to special classes of taxpayers (*e.g.*, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, controlled foreign corporations, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, states or their subdivisions or integral parts, other governmental entities, Holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, U.S. Holders engaged in a trade or business in USVI, U.S. Holders' whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes.

For purposes of this discussion, a "**U.S. Holder**" is a beneficial owner of a Claim or a Liquidation Trust Beneficiary that is, for U.S. federal income tax purposes:

1.   an individual citizen or resident of the United States;

2.   a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States, any state therein or the District of Columbia;

3.   an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

4.      a trust if a court within the United States is able to exercise primary supervision over its administration and one or more "United States persons" (as defined in the Tax Code) have the authority to control all substantial decisions of the trust or otherwise if the trust has a valid election in effect under current Treasury regulations to be treated as a United States person.

A "**Non-U.S. Holder**" is any Holder that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

**THE SUMMARY CONTAINED IN THIS SECTION XVII.D. IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

### 1.      Consequences to U.S. Holders of Allowed Claims

Pursuant to the Plan, each U.S. Holder of an Allowed Claim will receive, in full and final satisfaction of its applicable claim, Liquidating Trust Units, as described in Section VII. As discussed below (see D.[4]—"Tax Treatment of the Liquidating Trust and  Holders of Beneficial Interests Therein"), each U.S. Holder of an Allowed Claim that receives a Beneficial Interest will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, an undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust.

a.      <u>Realization and Recognition of Gain or Loss</u>.  In general, a U.S. Holder of an Allowed Claim will recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of its undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust received in respect of its Claim (other than any consideration attributable to a Claim for accrued but unpaid qualified stated interest) and (ii) the adjusted tax basis of the Claim exchanged therefor. A U.S. Holder's adjusted tax basis in a Claim will be its cost increased by the amount of original issue discount ("OID") and market discount previously taken into account and reduced by the amount of amortizable bond premium previously amortized with respect to the Claim and any cash payments on the Claim other than payments of qualified stated interest.  Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the Liquidating Trust, and all

parties to the Liquidating Trust (including U.S. Holders of Allowed Claims receiving Beneficial Interests) must consistently use such valuation for all U.S. federal income tax purposes.   To the extent that a portion of the Allowed Claim, as applicable, is allocable to accrued but unpaid qualified stated interest, the U.S. Holder will recognize ordinary interest income, except to the extent previously included in income by a U.S. Holder under its method of accounting. See D.2.b—"Distributions  to U.S. Holders in Respect of Accrued Interest" below.

In the event of the subsequent disallowance of any Disputed Claim or the reallocation of undeliverable Distributions, it is possible that a U.S. Holder of a previously Allowed Claim may receive additional Distributions in respect of its Claim.   Accordingly, it is possible that the recognition of any loss realized by a U.S. Holder with respect to an Allowed Claim may be deferred until all Claims are Allowed or Disallowed. Alternatively, it is possible that a U.S. Holder will have additional gain in respect of any additional Distributions received. See also Section XVII.D.3. —"Tax Treatment of the Liquidating Trust and U.S. Holders of Beneficial Interests Therein – Tax Reporting for Assets Allocable to Disputed Claims," below.

After the Effective Date, a U.S. Holder's share of any collections received on the assets of the Liquidating Trust (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable Distributions) should not be included, for U.S. federal income tax purposes, in the U.S. Holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such U.S. Holder's ownership interest in the underlying assets of the Liquidating Trust.

Subject to the market discount rules discussed below, if gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed Claim disposed of is a capital asset in the hands of the U.S. Holder and has been held for more than one year.  The deduction for capital losses is subject to limitations. Each U.S. Holder of an Allowed Claim should consult its tax advisor to determine whether gain or loss recognized by such U.S. Holder will be long-term capital gain or loss and the specific tax effect thereof on such U.S. Holder.  The character of any gain or loss may depend on, among other things, the origin of the U.S. Holder's Allowed Claim, when the U.S. Holder receives payment in respect of such Allowed Claim, whether the U.S. Holder reports income using the accrual or cash method of tax accounting, whether the U.S. Holder acquired its Allowed Claim at a discount, whether the U.S. Holder has taken a bad debt deduction with respect to such Allowed Claim, and/or whether (as intended and herein assumed) the Plan implements the liquidating of the Debtors for U.S. federal income tax purposes.

In general, a U.S. Holder's aggregate tax basis in its undivided interest in the Liquidating Trust Assets will equal the fair market value of such interest at the time of receipt increased by its share of the Debtors' liabilities to which such assets remain subject upon transfer to the Liquidating Trust, and a U.S. Holder's holding period generally will begin the day following establishment of the Liquidating Trust.

b.     <u>Distributions to U.S. Holders in Respect of Accrued Interest.</u>  In general, the gross amount of payments received (whether stock, Cash, or other property) by a U.S. Holder of a debt instrument in satisfaction of accrued qualified stated interest will be taxable to the U.S. Holder as ordinary interest income (if not previously included in the U.S. Holder's gross income under the U.S. Holder's normal method of accounting).  Conversely, a U.S. Holder generally

recognizes a deductible loss to the extent any accrued qualified stated interest was previously included in its gross income and is not paid in full. The amount of payments received by a U.S. Holder may include USVI withholding tax imposed on the payment, if any, at the withholding tax rate applicable to the U.S. Holder. Subject to generally applicable restrictions and conditions, USVI withholding tax paid at the appropriate rate applicable to the U.S. Holder generally will be treated as foreign income tax eligible (i) for credit against a U.S. Holder's U.S. federal income tax liability, or (ii) at the election of such U.S. Holder, for deduction in computing such U.S. Holder's taxable income (provided that the U.S. Holder elects to deduct, rather than credit, all foreign income taxes paid or accrued for the relevant taxable year). Ordinarily, interest will constitute income from sources without the United States for foreign tax credit purposes. Such income generally will constitute "passive category income" or, in the case of certain U.S. Holders, "general category income." The calculation of foreign tax credits and, in the case of a U.S. Holder that elects to deduct foreign taxes, the availability of such deduction, involves the application of rules that depend on a U.S. Holder's particular circumstances. U.S. Holders should consult their tax advisors regarding the availability of foreign tax credits or deductions in their particular situations.

Pursuant to Section XI.L., except as otherwise required by law (as reasonably determined by the Debtors or Liquidating Trustee, as applicable), Distributions with respect to an Allowed Claim will be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. U.S. Holders are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid qualified stated interest and the character of any loss claimed with respect to accrued but unpaid qualified stated interest previously included in gross income for U.S. federal income tax purposes.

c.    Market Discount considerations for U.S. Holders. Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Allowed Claim (unless the U.S. Holder elected to include market discount in income as it accrued).

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest or (b) in the case of a debt instrument issued OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

## 2.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims

(a)    Gain Realized. Subject to the discussion below under "Backup Withholding and Information Reporting", any gain realized by a Non-U.S. Holder on the

exchange of its Claim generally will not be subject to U.S. federal income taxation, unless (a) the Non-U.S. Holder is an individual who was present in the United States for a hundred and eighty-three (183) days or more during the taxable year in which the exchange occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain in the same manner as a U.S. Holder. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(b)    Interest.  As discussed above, certain Debtors are organized and may be subject to tax in USVI.  As a result, payments attributable to interest (including OID) may not be U.S. source and consideration received by a Non-U.S. Holder on the exchange of its Claim that is attributable to interest (including OID) generally should not be subject to U.S. federal income or withholding tax;  unless such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) may be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest (or OID) at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the US and USVI tax consequences of receiving consideration in exchange of its Claim, including the potential application of USVI withholding taxes to such payment and any exemption from any such withholding tax that may be available.

### 3.    Tax Treatment of the Liquidating Trust and U.S. Holders of Beneficial Interests Therein

a.    Classification of the Liquidating Trust.  The Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below).  In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Liquidating Trust will be structured with the intention of complying with such general criteria.

Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtor, the Liquidating Trustee, and U.S. Holders of Beneficial Interests) shall treat the transfer of Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to U.S. Holders of Beneficial Interests (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the Liquidating Trust of Liquidating Trust Assets in exchange for the Beneficial Interests. Accordingly, except in the event of contrary definitive guidance, U.S. Holders of Beneficial Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims). While the following discussion assumes that the Liquidating Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trust and the U.S. Holders of Claims could vary from those discussed herein.

    b. <u>General Tax Reporting by the Liquidating Trust and U.S. Holders of Beneficial Interests</u>. For all U.S. federal income tax purposes, all parties must treat the Liquidating Trust as a grantor trust of which the U.S. Holders of Beneficial Interests are the owners and grantors, and treat the U.S. Holders of Beneficial Interests, as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein.  The Liquidating Trustee will file tax returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).  The Liquidating Trustee also shall annually send to each U.S. Holder of a Beneficial Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes.

    Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidated Trust) among the U.S. Holders of Beneficial Interests will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and, if applicable, other than assets allocable to Disputed Claims) to the U.S. Holders of Beneficial Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

    As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust

Assets.   All parties to the Liquidating Trust (including, without limitation, the Debtor, the Liquidating Trustee, and U.S. Holders of Beneficial Interests) must consistently use such valuation for all U.S. federal income tax purposes.  The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to U.S. Holders of Beneficial Interests should be treated as income or loss with respect to such holder's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim.  The character of any income and the character and ability to use any loss may depend on the particular situation of the U.S. Holders of the Beneficial Interests.

The U.S. federal income tax obligations of a U.S. Holder with respect to its Beneficial Interest are not dependent on the Liquidating Trust distributing any Cash or other proceeds.  Thus, a U.S. Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent Distribution to the U.S. Holder.  In general, other than in respect of Cash retained on account of Disputed Claims and Distributions resulting from undeliverable Distributions (the subsequent distribution of which still relates to a U.S. Holder's Allowed Claim), a distribution of Cash by the Liquidating Trust will not be separately taxable to the U.S. Holders of Beneficial Interests since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust).  U.S. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements.  Thus, in the case of any Holders of Beneficial Interests that are not U.S. Holders, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is interest and the source of the income under U.S. federal income tax rules).  However, the taxation of Non-U.S. Holders of Beneficial Interests are complex and Non-U.S. Holders of Beneficial Interests should consult their tax advisors.

c.      <u>Tax Reporting for Assets Allocable to Disputed Claims</u>. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (A) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (i.e., a Disputed Claim Reserve) as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.  Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claim Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets (including any gain recognized upon the disposition of such assets).  All Distributions from such reserves (which Distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by U.S. Holders in respect of their Claims as if distributed by the Debtor.

All parties (including, without limitation, the Debtor, the Liquidating Trustee and the U.S. Holders of Beneficial Interests) will be required to report for tax purposes consistently with the foregoing. A Disputed Claim Reserve will be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes.

### 4.      FATCA

Under U.S. tax rules known as the Foreign Tax Compliance Act ("FATCA"), "withholdable payments" received by a Non-U.S. Holder will generally be subject to a 30% U.S. withholding tax if the holder is not FATCA compliant, or holds its Claim through a foreign financial institution that is not FATCA compliant.  Additionally, although FATCA withholding may also apply to gross proceeds of a disposition of property of a type that can produce U.S.-source interest or dividends, proposed Treasury Regulations suspend withholding on such gross proceeds payments indefinitely.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

In order to be treated as FATCA compliant, a Non-U.S. Holder must provide certain documentation (usually an IRS Form W-8BEN or W-8BEN-E) containing information about its identity, its FATCA status, and if required, its direct and indirect U.S. owners.  These requirements may be modified by the adoption or implementation of an intergovernmental agreement between the United States and another country or by future Treasury Regulations.

Documentation that holders provide in order to be treated as FATCA compliant may be reported to the IRS and other tax authorities, including information about a holder's identity, its FATCA status, and if applicable, its direct and indirect U.S. owners.  Holders should consult their own tax advisers about how information reporting and the possible imposition of withholding tax under FATCA may apply to transactions contemplated by the Plan.

### 5.      Backup Withholding and Information Reporting

Distributions to certain U.S. Holders of Allowed Claims under the Plan generally will be subject to information reporting requirements.  In addition, certain U.S. Holders may be subject to backup withholding in respect of such amounts if they do not provide their taxpayer identification numbers to the person from whom they receive payments.  Non-U.S. Holders may be required to comply with applicable certification procedures to establish that they are not U.S. Holders in order to avoid the application of such information reporting requirements and backup withholding.  The amount of any backup withholding from a payment to a U.S. or Non-U.S. Holder may be allowed as a credit against the Holder's U.S. federal income tax liability and may entitle the Holder to a refund, provided that the required information is timely furnished to the IRS.

In addition, Treasury Regulations generally require disclosure by a U.S. Holder on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's

claiming a loss in excess of specified thresholds.  U.S. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the U.S. Holder's tax returns.

## XVIII.  RECOMMENDATION AND CONCLUSION

The Plan Proponents strongly believe that the Plan is in the best interests of the Estates and urges the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their Ballots.

Dated: May 17, 2022                LIMETREE BAY SERVICES, LLC, on
Houston, Texas                    behalf of itself and its affiliated Debtors

                                       By: */s/ Mark Shapiro*
                                       Name: Mark Shapiro
                                       Title: Chief Restructuring Officer