IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-32351-11 |
| | § | (JOINTLY ADMINISTERED) |
| LIMETREE BAY SERVICES, LLC, | § | HOUSTON, TEXAS |
| ET AL, | § | WEDNESDAY, |
| | § | MAY 18, 2022 |
| DEBTORS. | § | 11:00 A.M. TO 12:29 P.M. |

CONFIRMATION HEARING DAY ONE (VIA ZOOM)

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: (SEE NEXT PAGE)

(Recorded via CourtSpeak)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (VIA ZOOM):

| | |
|---|---|
| FOR THE DEBTORS: | BAKER HOSTETLER, LLP<br>Elizabeth A. Green, Esq.<br>Jimmy D. Parrish, Esq.<br>200 S Orange Avenue<br>Suite 2300<br>Orlando, Florida 32801<br>407-649-4000 |
| | BAKER HOSTETLER, LLP<br>Jorian L. Rose, Esq.<br>45 Rockefeller Plaza<br>New York, New York 10111<br>212-589-4681 |
| | BAKER HOSTETLER, LLP<br>Michael T. Delaney, Esq.<br>Cleveland, Ohio<br>216-861-7478 |
| | BAKER HOSTETLER, LLP<br>David J. Richardson, Esq.<br>11601 Wilshire Boulevard<br>Suite 1400<br>Los Angeles, California 90025<br>310-442-8858 |
| FOR ST. CROIX REFINING AND TRANSPORTATION: | BAST AMRON, LLP<br>Jaime B. Leggett, Esq.<br>Jeffrey P. Bast, Esq.<br>One SE Third Avenue<br>Suite 1400<br>Miami, Florida 33131<br>305-379-7904 |
| FOR VWNA CARIBBEAN: | GIBBONS, PC<br>Dale E. Barney, Esq.<br>One Gateway Center<br>Newark, New Jersey 07102<br>973-596-4557 |
| FOR PINNACLE SERVICES: | KANE RUSSELL COLEMAN LOGAN, PC<br>Steven Kyle Woodard, Esq.<br>901 Main Street<br>Suite 5200<br>Dallas, Texas 75202<br>214-777-4200 |

(APPEARANCES CONTINUED VIA ZOOM):

| | |
|---|---|
| FOR BLACKLINE SYSTEMS: | FELDERSTEIN FITZGERALD WILLOUGHBY PASCUZZI & RIOS, LLP<br>Paul Pascuzzi, Esq.<br>400 Capitol Mall<br>Suite 1450<br>Sacramento, California 95814<br>916-329-7400 |
| FOR LIBERTY MUTUAL: | CHOATE HALL & STEWART, LLP<br>Jonathan D. Marshall, Esq.<br>Two International Place<br>Boston, MA 02110<br>617-248-4799 |
| FOR THE UNSECURED CREDITORS' COMMITTEE: | PACHULSKI STANG ZIEHL & JONES, LLP<br>Robert J. Feinstein, Esq.<br>780 Third Avenue<br>34th Floor<br>New York, New York 10017<br>212-561-7700 |
| FOR GOLDMAN SACHS BANK: | CLEARY GOTTLIEB STEEN & HAMILTON, LLP<br>Sean A. O'Neal, Esq.<br>One Liberty Plaza<br>New York, New York 10006<br>212-225-2416 |
| FOR LIMETREE BAY TERMINALS: | HUNTON ANDREWS KURTH, LLP<br>Joseph P. Rovira, Esq.<br>600 Travis<br>Suite 4200<br>Houston, Texas 77002<br>713-220-4609 |
| FOR UNIVERSAL PLANT SERVICES: | SIDLEY AUSTIN, LLP<br>Duston K. McFaul, Esq.<br>1000 Louisiana Street<br>Suite 6000<br>Houston, Texas 77002<br>713-495-4500 |

(APPEARANCES CONTINUED VIA ZOOM):

| | |
|---|---|
| FOR AXENS NORTH AMERICA: | CANTEY HANGER, LLP<br>M. Jermaine Watson, Esq.<br>600 W 6th Street<br>Suite 300<br>Fort Worth, Texas 76102<br>817-877-2800 |
| FOR TEAM INDUSTRIAL SERVICES, INC.: | HUSCH BLACKWELL, LLP<br>Lynn H. Butler, Esq.<br>111 Congress Avenue<br>Suite 1400<br>Austin, Texas 78701<br>512-479-9758 |
| FOR TERM LENDERS: | AKIN GUMP STRAUSS HAUER & FELD, LLP<br>Scott I. Alberino, Esq.<br>2001 K Street NW<br>Washington, DC 20006<br>202-887-4027 |
| FOR SAP AMERICA: | BROWN CONNERY, LLP<br>Donald K. Ludman, Esq.<br>6 N Broad Street<br>Suite 100<br>Woodbury, New Jersey 08096<br>856-812-8900 |
| FOR GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS: | WINSTON & STRAWN, LLP<br>Daniel J. McGuire, Esq.<br>35 W Wacker Drive<br>Chicago, Illinois 60601<br>312-558-5600 |
| FOR CLASS PLAINTIFFS: | NYE STIRLING HALE & MILLER, LLP<br>Joel M. Walker, Esq.<br>1145 Bower Hill Road<br>Suite 104<br>Pittsburg, PA 15243<br>412-857-5350 |

(APPEARANCES CONTINUED VIA ZOOM):

FOR THE EPA: DEPARTMENT OF JUSTICE
Alan Tenenbaum, Esq.
Washington, DC 20001

ALSO APPEARING: Debbie Melea, Esq.

(Also see Electronic Appearances.)

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| (NONE) | | | | |

| EXHIBITS: | Marked | Offered | Received |
|---|---|---|---|
| DEBTORS' EXHIBITS | | | |
| Nos. 1404-1 through 1404-27: | | 25 | 26 |
| No. 1367: | | 26 | 27 |
| No. 1616: | | 26 | 27 |

**HOUSTON, TEXAS; WEDNESDAY, MAY 18, 2022; 11:00 A.M.**

THE COURT: Good morning everyone. This is Judge Jones. The time is 11:00 o'clock Central. Today is May the 18th, 2022. This is the Docket for Houston, Texas. On the 11:00 o'clock Docket, we have the jointly administered cases under Case No. 21-32351, Limetree Bay Services, LLC.

Folks, please don't forget to record your electronic appearance this morning. If it's been a while or perhaps the first time, it's a quick trip to my website, a couple of mouse clicks, it'll take you less than 20 seconds. You can do that at any time prior to the conclusion of the hearing today.

The first time that you do speak I would ask that you please state your name and who you represent. That really does give the court reporters a good point of reference in the event that a transcript request is made.

We are recording this morning using CourtSpeak. There will be a copy of the audio up on the Docket shortly after the conclusion of today's hearing. If you came in late, I have activated the hand-raising feature. If you know you're going to be speaking, if you'd go ahead and hit five star, I'll get you unmuted. Obviously if you change your mind at any time during the hearing, I will see the hand raise and take care of you then.

All right. With that, Ms. Green, are you leading us off this morning?

MS. GREEN: I am, Your Honor.

THE COURT: All right. Thank you. Good morning.

MS. GREEN: Good morning. Your Honor, Elizabeth Green, on behalf of the Debtors. I have with me a number of my partners who will be appearing at the hearing, Jorian Rose, Jimmy Parrish, Michael Delaney, Dave Richardson all of whom will take part in various aspects of the hearing today so I want to make sure they're on the Record. In addition, we have the CRO, Mark Shapiro, live from Athens, Greece with us today.

And I want to thank the Court for the one-week adjournment that we were given last week. There was a lot of work that got done in the last week not only on the side of the Debtors, but on the side of all the other various parties in the case and I think it's going to make today a lot easier and a little bit more pleasant for everybody so thank you very much.

Your Honor, we filed the agenda and on the agenda you'll note that we've indicated that the administrative claims have been resolved under the cap set forth in the Plan and there are also -- as a result of that, there are really outstanding to be heard today four motions.

One is a 9019 related to the terminals claims,

which is (indiscernible) administrative claim at $1.6 million. That's at Docket 1405.

And then two Motions to assume and assign agreement, one with Crowley and of course the assumption and assignment as to the buyer, Port Hamilton, Crowley at 1408, and the Motion to assume and assign the Agreement with the US Virgin Islands.

And then finally we have the Motion on the secured claim reserves, which is at 1368. Those are going forward today.

There was another motion on the calendar which on our amended agenda we've indicated we'd like to have a short recess on.

THE COURT: All right.

MS. GREEN: That is the OSHA Motion. And the reason for that is there's some language that we sort of need to work out with the purchaser just to make sure we're that we're not end-capping anything that would be related to them, but that's unrelated to confirmation today.

THE COURT: Great.

MS. GREEN: Finally we've resolved all of the confirmation objections except for one. The Plaintiffs' objection is still going forward in some context and that's at 1343. But I think in terms of being ready for confirmation, we're ready to confirm.

I would like to put the administrative claim agreements on the Record at the beginning because there's some administrative claimants who don't want to attend the entire hearing, if that's acceptable to the Court.

THE COURT: Ms. Green, I was actually going to start there. If you could give me just a little bit more detail? Because you've got, what, you've got close to 20 of those agreements.

Am I going to see effectively an omnibus 9019, am I going to see separate orders for each of them because that's what the parties want, what can I anticipate sealing -- seeing, sorry?

MS. GREEN: I think the anticipation -- and Mr. Delaney can correct me if I'm incorrect, but I believe at least in the conversations that I've had with the various parties is that we were going to put the settlement amounts on the Record --

THE COURT: Ah.

MS. GREEN: -- and include them in the Confirmation Order. And then there are some various settlement agreements. We figured we've just file those separately with the Court, but in terms of trying to get this all set up in one place, that made the most sense to us.

THE COURT: Makes perfect sense to me if we have

agreement. let me ask.

Is there any administrative claimant that is on GoToMeeting or just on the phone that does not find the identification of the agreed-upon amount on the Record this morning, which I would accept as a binding Rule 11 agreement, and then in the Confirmation Order not to be acceptable?

(No verbal response.)

THE COURT: That was horribly worded, but hopefully everybody understood. All right.

MR. MCFAUL: Your Honor?

THE COURT: Yes.

MR. MCFAUL: This is Duston McFaul for Universal Plant Services. Sorry I'm not on video, I'm driving (indiscernible). I have not seen the new Confirmation Order. I did a word search for my client last night and this morning, it just didn't come up, but I can confirm that we're agreed to a 40K admin claim and beyond the settlement agreement (indiscernible) with the Debtors will be paid by the effective date.

THE COURT: All right. And so what I think Ms. Green is going to do, Mr. McFaul, is she's going to read out a list of the various parties and the agreed-upon amounts.

Ms. Green, correct?

MS. GREEN: Correct.

THE COURT: And then, Mr. McFaul, those parties that are identified along with those amounts would then be incorporated into a version of the Confirmation Order that neither you nor I have seen at this point.

MS. GREEN: Yes.

MR. MCFAUL: Okay. Thank you.

MS. GREEN: Correct, Your Honor.

THE COURT: Yes, sir.

MS. GREEN: And can I address the Confirmation Order too? Because we might want to start at the beginning. We have been making changes literally up until five minutes ago to the Confirmation Order --

THE COURT: Uh-huh.

MS. GREEN: -- reflecting all of the various agreements of all the parties. What I thought would make the most sense is to have it uploaded by noon tomorrow so that we're sure we have everybody's language right and then have the Court, if acceptable, to set a placeholder hearing either late tomorrow or Friday morning just to keep everybody's feet sort of to the fire if it's not.

THE COURT: Ms. Green, absolutely. The only reason I said what I said was: I've known Mr. McFaul for 20-plus years, I know what's important to him so I was simply just making him happy so that he will keep his eyes

on the road as he drives.

(Laughter.)

MS. GREEN: Yeah, I hope so. So with that, I'll go through the various amounts that will be paid to each of the administrative claimants. I'll do it by docket number. They'll all be paid on the effective date of the Plan. That's the agreement with all of the parties. And the -- you can actually follow along on the agenda because this is in the same order as the agenda.

THE COURT: I have it printed out and pen in hand.

MS. GREEN: The first one is AVEVA, which is Docket No. 1365, settlement amount $90,000.

THE COURT: All right.

MS. GREEN: Next one is -- I'm sorry.

THE COURT: No, no, go ahead, I'm with you.

MS. GREEN: 1328, settlement amount 42,500.

THE COURT: All right.

MS. GREEN: Catalyst Chemicals and Containers, 1356, settlement amount $30,000.

THE COURT: Did you intend to skip over BlackLine Systems?

MS. GREEN: I did not, sorry.

THE COURT: Okay.

MS. GREEN: BlackLine Systems, 1342, $15,000.

THE COURT: All right.

MS. GREEN: Christiansted Equipment, Docket No. 945, $200,000.

THE COURT: All right.

MS. GREEN: Comdata, 631, 30,233.

THE COURT: 30,233. All right.

MS. GREEN: Control Systems Technologies, they did not file an administrative claim. They sent us a letter and we settled their claim at $30,000.

THE COURT: All right.

MS. GREEN: Crowley, Docket 1359, zero, and that is one of the 9019s that's part of the 9019 at 1408. That will basically be the assumption and assignment of the agreement with no administrative claim to the Estate.

THE COURT: Got it. All right. Thank you.

MS. GREEN: DNOW, 1361, $78,000.

THE COURT: All right.

MS. GREEN: Dresser-Rand, 127, zero.

THE COURT: Okay.

MS. GREEN: The EPA, 1347, $500,000. And the EPA's administrative claim was also linked to various language that led to the withdrawal of their confirmation objection, which all the language has already been approved and is in the Order that they've seen.

THE COURT: Got it.

MS. GREEN: Government of the US Virgin Islands,

1355. Their claim will be zero. That's subject to the assumption and assignment of the USVI Agreement. Again the provisions of that Agreement provide that there will be no liability to the Estate or an administrative claim.

THE COURT: Got it. Thank you.

MS. GREEN: Intertek, 1132, $150,000.

THE COURT: Okay. Did you intend to skip over Gulf Oil Limited Partnership?

MS. GREEN: I think I need to get new glasses.

Gulf Oil, 765, 20,000.

THE COURT: All right.

MS. GREEN: Ironshore, 1312, zero.

THE COURT: Okay.

MS. GREEN: National Industrial Services, 1357, zero.

THE COURT: Okay.

MS. GREEN: Pinnacle Services, 1348, zero.

THE COURT: Okay.

MS. GREEN: SAP America, 1338, 325,000. That's also linked to the withdrawal of their confirmation objection. We had language related to removing the software from any of the existing Debtors' computers.

THE COURT: Got it. Okay.

MS. GREEN: TISI, Docket No. 1360, zero.

Universal Plant Services, 1362, 40,000.

THE COURT: And, I'm sorry, Ms. Green, could we go back? I just for whatever reason I lost you.

What was the amount for TISI?

MS. GREEN: Zero.

THE COURT: Zero. All right. And back to Universal again, I'm sorry.

MS. GREEN: 1362, 40,000.

THE COURT: Okay.

MS. GREEN: VWNA, 1357, 75,000.

THE COURT: All right.

MS. GREEN: And Weldship, 1337, 35,000.

THE COURT: All right. Then let me ask.

Any of the parties that were identified by Ms. Green, is there anyone on the line that has a different understanding of their agreement than Ms. Green announced?

Mr. Watson, can you hear me?

MR. WATSON: (No verbal response).

THE COURT: Mr. Watson?

MR. WATSON: Yes, Your Honor.

THE COURT: Yes, sir.

MR. WATSON: Yeah. So we are continuing to finalize language, but I just wanted to make it clear for the Record that our understanding was that the allowed administrative claim was for 42,000, but if the Debtors are coming up with an extra 500 bucks, we're okay with that.

But we wanted to make clear that we request an allowed general unsecured claim of $2,094,099.22. And I wanted to note for the Record that this resolves the motion and claims against the Estate, but we want to receive treatment for administrative claim and unsecured claims under the Plan and wanted to make sure that our release is not a release as to the purchaser.

THE COURT: As to the purchaser. So let me work my way through that because, Mr. Watson, you said an awful lot. So first of all, I'm just -- by the numbers I wrote down, I want to just -- I don't want to assume anything. Your client is Axens North America?

MR. WATSON: Yes, Your Honor.

THE COURT: All right. Thank you. So, Ms. Green, you did say 42,500. Mr. Watson believed the claim was 42,000.

MS. GREEN: That is actually what I have on my chart and Mr. Delaney may be able to correct that.

THE COURT: Mr. Delaney, do you agree that the right number is 42?

MR. DELANEY: I believe the number we agreed to was 42-5.

THE COURT: Was 42-5. So, Mr. Watson, you got 500 bucks today. I'm sure that'll cover all your legal fees for the next 15-20 minutes.

(Laughter.)

MR. WATSON: Thank you, Your Honor.

THE COURT: All right. And thank you.

Mr. Delaney, any issue at all with the unsecured claim?

MR. DELANEY: No, Your Honor. We agreed to that as part of the resolution.

THE COURT: All right. Thank you. The only thing that I heard in that that caused me any issues was the reservation of claims against the purchaser and is that -- Mr. Watson, is that some sort of successor liability type issue? Because I think those have already been cut off, but again I'm just trying to understand.

MR. WATSON: Yes, Your Honor. So we have a license and I guess the point that the client wanted me to make was that to the extent that the purchaser assumes the Agreement, that they will still have to pay on that license. That's my understanding. I don't believe my client is asserting any additional claims against the purchaser, but they're assuming it and we want them to pay pursuant to the terms of the license.

THE COURT: I got it. So you're just saying to the extent that a license has been assumed, any costs associated with that license are not affected by this agreement; is that what you're telling me?

MR. WATSON: Yes, Your Honor, that's my understanding.

THE COURT: Mr. Delaney, to me that sound consistent with applicable law.

Any concerns from the Debtors' point of view?

MS. GREEN: No, Your Honor.

MR. DELANEY: Sorry to -- I muted myself again, Your Honor, but, no, that's fine.

THE COURT: Okay. Fair enough. So, Mr. Watson, with that, are you comfortable?

MR. WATSON: Absolutely, Your Honor. Thank you.

THE COURT: Yes, sir. Anyone else that --

MR. LEGGETT: Your Honor?

THE COURT: Yes, sir.

MR. LEGGETT: Your Honor, thank you. This is Jaime Leggett at Bast Amron, LLP, on behalf of purchaser, Port Hamilton Refining and Transportation, LLP. Also here today is Jeffrey Bast with my firm. I just wanted to be heard very quickly on this. That particular license is not being assumed (indiscernible) --

THE COURT: Okay.

MR. LEGGETT: -- as part of the sale or pursuant to the Plan so I think that's just (indiscernible).

THE COURT: Let me ask this: Mr. Watson, would it help you to simply have an email from Mr. Leggett that just

confirmed that the license wasn't being assumed?

MR. WATSON: That would be extremely helpful, Judge.

THE COURT: Mr. Leggett, would it be too much trouble to ask you just to send that confirming email? It seems to me that could avoid an awful lot of expense on both sides.

MR. LEGGETT: Certainly, Your Honor, and I'll get his contact info (indiscernible).

THE COURT: All right. Thank you. I'm going to bet that one of the members of the Debtors' team can probably just zip that to you so hopefully that will show up very quickly. All right.

MS. GREEN: Your Honor, I have two or three little corrections because I think I was (indiscernible) older chart that I'd like to make if that's acceptable.

THE COURT: Of course.

MS. GREEN: National Industrial Services at 1357 actually has an administrative claim of 35. I had indicated it was zero.

THE COURT: So 35,000, correct?

MS. GREEN: Yes.

THE COURT: Okay.

MS. GREEN: Yes. They also had filed a priority claim in the amount of $14 million and they've agreed that

that's being treated as unsecured.

THE COURT: So priority is a -- okay.

MS. GREEN: Yep. And then Pinnacle is 23,500, not zero.

THE COURT: All right.

MS. GREEN: And TISI is zero at 1360, but they're also paying the Estate $60,000 for a preference claim in exchange for waiving -- and also waiving their admin claim.

THE COURT: Paying the Estate 60K. Okay. So let me ask again.

Is there anybody on the line or on the phone who was referenced in the administrative claim settlements that disagrees with the treatment? I had a couple of folks raise their hand.

Mr. Butler, let me start with you.

MR. BUTLER: Yes, Your Honor. Lynn Butler, on behalf of TISI, VI. But with the correction on the settlements, we're resolving both the administrative expense claim and potential preference liability and she did correctly state the agreement. Thank you, Your Honor.

THE COURT: Thank you, Mr. Butler. There were two other folks that I didn't recognize the phone numbers.

Does either one of you wish to be heard?

MR. BARNEY: Your Honor, this is Dale Barney.

Can you hear me?

THE COURT: Yes, sir.

MR. BARNEY: Your Honor, Dale Barney, Gibbons in Newark, New Jersey. I represent VWNA Caribbean. I don't disagree with Ms. Green's recitation of the amount being paid to my client, but the other aspect of our agreement -- may just be going unsaid here -- but is that the balance of our administrative claim would be added to our general unsecured claim entry and such under the Plan.

THE COURT: Got it. And who is your client that's actually in possession? I'm sorry, go ahead.

MR. BARNEY: Your Honor, it's VWNA Caribbean, LLC.

THE COURT: VWNA. So that actually -- that wasn't on my list.

Ms. Green, can you help or, Mr. Delaney, can you help?

MR. BARNEY: I think she referenced it just as VWNA.

THE COURT: Oh, VWNA. Got it.

MS. GREEN: I did.

MR. BARNEY: V, as in Victor.

MS. GREEN: At Docket 1657.

THE COURT: Thank you. So $75,000 administrative claim with the balance as a general unsecured claim.

Ms. Green, can you confirm that that is the agreement?

MS. GREEN: Mr. Delaney, go ahead.

THE COURT: Mr. Delaney?

MR. DELANEY: Yes, Your Honor, that's the agreement with VWNA. And across the board, we've agreed to the allowance of any portion of an asserted administrative claim that is not allowed as an administrative claim to be moved into Class 5 as a general unsecured claim.

THE COURT: That's very helpful. Thank you, Mr. Delaney.

Counsel, does that satisfy VWNA?

MR. BUTLER: It does, Your Honor.

THE COURT: All right.

MR. BARNEY: Appreciate it. And again as with the other counsel that spoke, I have not seen either the Settlement Agreement or the Confirmation Order language, but I'm sure we'll be able to work that out.

THE COURT: And so I'll give everybody some comfort. I thought Ms. Green's statement, just given the number of things that are on the Docket, setting the hearing for tomorrow or Friday just as a placeholder absolutely seems to me to be the right thing to do, so you'll have a forum if there is a dispute to -- we can wordsmith together.

MR. BARNEY: Thank you very much, Your Honor.

THE COURT: Yes, sir. I think there was someone else.

MR. WOODARD: Good morning, Your Honor.

Can you hear me?

THE COURT: Mr. Woodard, it's very muffled.

Is it -- is there any -- are you talking on a speaker phone perhaps?

MR. WOODARD: Is that better?

THE COURT: That is better. Thank you, sir.

MR. WOODARD: Yes, sir. Kyle Woodard here, on behalf of Pinnacle Services. I had raised my hand to clarify the unsecured claims issue that Mr. Delaney just noted that the balance of our claim would be allowed as unsecured.

THE COURT: Right.

MR. WOODARD: With that clarification, we have nothing further to add.

THE COURT: Thank you, Mr. Woodard.

Anyone else?

(No verbal response.)

THE COURT: All right. Then with those statements -- oops, we've got one more person.

Mr. Pascuzzi?

MR. PASCUZZI: Yes. Thank you, Your Honor.

Paul Pascuzzi for BlackLine Systems. And I have the same clarification. The BlackLine administrative claim is 15,000 and then the balance would be an unsecured claim

of $4,740.75. So I've got a settlement agreement, a draft one, and we'll work on the additional details, but since we were noting those things, that's why I raised my hand. Thank you.

THE COURT: No, Mr. Pascuzzi, I appreciate you doing that. Thank you. All right.

Anyone else?

(No verbal response.)

THE COURT: All right. Then with that, Ms. Green, I will accept that announcement as a Rule 11 agreement on the Record. Parties are bound subject to further documentation and orders as required.

MS. GREEN: Thank you, Your Honor. I think it probably makes sense now to turn to the 9019 and the assumption and assignment Motions and then the secured claim Motion.

THE COURT: Okay.

MS. GREEN: We provided an exhibit list and uploaded all the documents with the Court. I don't think any of them are controversial so it may make sense to move Exhibits 1 through 27 into evidence now so that the various lawyers who are handling these matters can refer to them.

THE COURT: All right. Thank you. And that would encompass both the evidence in support of the Motions as well as confirmation if we're moving 1 through 27 in.

MS. GREEN: Yes.

THE COURT: Okay. All right. Thank you.

Then any objections to the admission, pursuant to the protocol of the Debtors' exhibits identified as 1404-1 through 1404-27?

(No verbal response.)

THE COURT: All right. Then they are admitted without objection.

(Debtors' Exhibit Nos. 1404-1 through 1404-27 received in evidence.)

MS. GREEN: Your Honor, there were also two other declarations filed. I'm not quite sure that they made it into that description, which would be Exhibit No. 1 at 1416, the confirmation affidavit of Mark Shapiro, and Exhibit No. 27 on the list is at Docket 1417, the declaration in support of the claim reserve Motion.

THE COURT: All right. So I actually think that those -- 27 was admitted so that's there.

And to the extent you're telling me that Shapiro's declaration in support of confirmation at 1416 was not in the 1404 list; is that what you're telling me?

MS. GREEN: I don't think it was.

THE COURT: All right. So to the extent that -- let me just do this: to the extent that they've not been included, we've got Daniel's declaration on the voting at

1367, Shapiro's declaration at 1416.

Any objection subject to the right to cross-examine with the admission of those two declarations?

(No verbal response.)

THE COURT: All right. Then they are admitted.

(Debtors' Exhibit Nos. 1367 and 1616 received in evidence.)

MS. GREEN: Your Honor, I think it makes sense to start with the terminals 9019, which is at Docket 1405. Mr. Parrish is going to be handling that.

THE COURT: All right. Mr. Parrish?

MR. PARRISH: Good morning, Your Honor.

THE COURT: Good morning.

MR. PARRISH: Your Honor, as the Court and the parties-in-interest are all familiar, they're all familiar with the interconnections and business relationships between the Debtors and the terminal entities and when the Debtors filed these bankruptcy cases, it started the process of detangling those business relationships. We have a plethora of disputes that arose.

Specifically, Your Honor, the terminal entities at Docket No. 435 filed an administrative claim over the summer of a little under $8 million related to storage costs and other obligations of the Debtors. Earlier this month, the terminal entities at Docket No. 1358 supplemented that

earlier admin claim request and now assert an admin claim of just under $15 million. And the Debtors oppose both of those claims and I don't think that that's a secret to anybody.

In addition, Your Honor, the Debtors filed a motion to reject the two terminal services agreements related to storage and delivery of hydrocarbons in connection with operating the refinery.

There are also numerous other disputes that arose specifically related to joint rights of the Debtors and the terminal entities related to insurance coverages under policies that cover both of those -- all of those entities, pending lawsuits where there was ongoing mediation, as well as various permits and licensing issues where both terminal and the Debtors had rights.

The compromise that's been agreed to by the Debtors and the terminal entities resolves all of those issues and if I may just go quickly through the specific terms of the compromise? The administrative claim -- for satisfaction of the administrative claim and satisfaction of the existing unsecured claims submitted by the terminal entities, the Debtors are going to pay the terminal entities $1.6 million and so that's in satisfaction again not only just the under $15 million admin claim but also the current unsecured claim.

In addition, Your Honor, the terminal entities and the Debtors will be exchanging mutual releases. And I think it's important for the parties to understand or the parties-in-interest to understand that that release is a release from the Debtor or the Debtor's Estate. It's not a third-party release. So we're not asking for a release from other parties-in-interest there.

In addition, Your Honor, there was several -- there's language that we added. It's attached as Exhibit A to the compromise and it just goes through -- and it's basically a reservation of rights on the issues related to the interest related to the ongoing mediation with the class action Plaintiffs as well as rights related to the various permits and licenses that both the Debtors and terminals have rights in respect to.

This compromise was heavily negotiated. It's been -- we've been working on this for quite some time. It certainly became more intensive over the course of the last I would say two or three weeks. We tried our best to keep other parties-in-interest advised of our progress as we made it and ultimately this is what we ended up to -- ended up with.

We do have a couple -- there are a couple of language tweaks that we are -- that we're going to adding to satisfy a limited objection from the class action Plaintiffs

as well as a limited objection from the Port Hamilton parties, the purchaser in this case, and so that language has been agreed to. It's pretty minor, just reserving rights and clarifying the language that we've already submitted in connection with the 9019 itself.

Your Honor, we just -- we submit that this is really a no-brainer for us. It reduced an administrative claim from just under $15 million to 1.6 million. It also paves the way for confirmation in this case. This was a huge obstacle to confirmation. And we think it's in the best interest of the Estate and creditors in this case and we would ask the Court to approve the compromise.

THE COURT: Let me ask you, Mr. Parrish.

The additional language, is that going -- is that additional language to be included in the Confirmation Order or the Order approving the settlement?

MR. PARRISH: It would be submitted -- it would be added to the Confirmation Order, Your Honor, to the clarified language that we're adding to the Confirmation Order.

The other thing, Your Honor, that I would just note. To the extent that the Court is inclined to approve the compromise, I would just note that because of where we are with respect to the Confirmation Order and the fact that different parties are submitting language and we're just

trying to make sure that the new language is coming into the confirmation isn't upsetting the applecart with respect to terminals, that nothings really going to be final and completely buttoned up until we have approval on the Confirmation Order.

THE COURT: Let me ask you why -- or let me just be more pointed in my question. The reason I was asking about where that language is going to be is that the proposed Order on the compromise references the Exhibit A to the Motion and so I was trying to figure out -- that was my roundabout way of asking are you going to be submitting an amended order, assuming I approve the compromise, or how is that going to be handled? Just so the parties are comfortable.

MR. PARRISH: No, we can absolutely submit an amended order, Your Honor.

THE COURT: All right. Thank you.

Anyone else wish to be heard?

MR. LEGGETT: Your Honor, this is Jaime Leggett (indiscernible) Port Hamilton (indiscernible).

THE COURT: We are -- you are very muffled.

Is there any way that you could pick up your phone or whatever it might be that you're talking on?

MR. LEGGETT: Certainly, Your Honor. I hope you can hear me better now.

THE COURT: Much better. Thank you, sir.

MR. LEGGETT: Okay. Sorry about that.

THE COURT: No. All right.

MR. LEGGETT: So, Your Honor, we advised the Debtors that we had concerns about this settlement with terminals and the releases in favor of terminals and so we basically agreed on language preserving our rights under the Sale Order including without limitation our rights under paragraph 22 of that Sale Order, which permits us to step into the shoes of the Debtors to seek the turnover of our property and to demand the turnover of the property that we purchased pursuant to the APA and the Sale Order and that that would not be affected by the settlement or by the Confirmation Order or by the Plan.

And since Your Honor approved the sale via the Sale Order, ECF No. 977, we have closed the sale with the Debtors and terminals have failed to comply with the requirement to turn over certain assets that we purchased, that specifically terminals is holding files and records of the Debtors and is refusing to turn over physical title certifications for about 80 vehicles.

As a result, we have asked the Debtors and terminals to include in the Order approving the settlement and in the Confirmation Order language which confirms that our rights and terminals obligations under the Sale Order

are not affected by the settlement and by the Plan and Confirmation Order.

And, Your Honor, we just want to let you know that unless terminals complies, turns over these remaining purchased assets this week, we expect to be before -- back with the Court as early as next week to seek to compel terminals' compliance with the Sale Order. And thank you, Your Honor. We just wanted to get that on the Record and to let Your Honor know that this may be coming down the pike in short order.

THE COURT: All just fine. And I can't imagine that anybody has an objection to that language. Obviously orders are orders and orders are law of the case. And to the extent that there's any violation of a court order, I treat that as contempt. I expect you to pursue it as such and seek all available remedies on behalf of your client and I will deal with that quickly and harshly to the extent that you're right, okay?

MR. LEGGETT: Thank you, Your Honor.

THE COURT: All right. Then anyone else? I didn't mean to pass over anyone.

MR. ROVIRA: Yes, Your Honor. This is Joseph Rovira from Hunton Andrews Kurth on behalf of the terminal entities.

THE COURT: Sure.

MR. ROVIRA: Your Honor, the terminal entities support approval of the settlement. Based on the particular and difficult circumstances of the matter and the sale of the refinery, we agree to the settlement set forth by -- in the Motion and that Mr. Parrish further described.

I just wanted to say on the Record that we appreciate the efforts the Debtors and their advisors as well as the lenders and their advisors coming to a resolution of the admin claims as well as addressing other issues in the Plan. As Mr. Parrish noted, they were lengthy, hard-fought and arm's length negotiations, but I just wanted to say we appreciate the professionalism of the parties involved.

As to the statements by counsel for the purchaser, we obviously reserve our rights. We don't believe there's been any violation to the Sale Order. There's nothing before Your Honor and appreciate your comments noting that you'll deal with it if he wanted to get it before Your Honor, but we do confirm that we have an agreement to add language that effectively says that our deal is not upsetting the rights to the sale.

THE COURT: I appreciate your approaching it that way.

Anyone else?

MR. ALBERINO: Your Honor, this is Scott Alberino

from Aiken Gump, on behalf of the term lenders.

THE COURT: Yes, sir.

MR. ALBERINO: So, Your Honor, I just wanted to kind of surface one issue that (indiscernible) address on a real-time basis with everyone on this phone call in particular with the company -- with terminals and with SAP and this deals with probably not a sexy issue, but a very important issue, which is ensuring access to books and records to the Liquidating Trust at the conclusion of the case.

And as we've kind of navigated our way through this, as Your Honor recalls, there were a lot of systems that were jointly used by both the terminals and the refineries and I think as we began to work our way through this and discussions with SAP and the terminals, it became apparent that hopefully we would have to find a way to gain access to those books and records likely through some type of amended licensing agreement with SAP and would likely flow through the terminals that are continuing to operate -- continue to operate their side of the business.

THE COURT: Sure.

MR. ALBERINO: We've not yet finalized those agreements. We've had a lot of good calls with SAP and the terminals on these issues and as Ms. Green said, we are finalizing language in the Confirmation Order including

language that SAP had proposed, which I think will get finalized very shortly. But I did just want to just raise the issue because the expectation of the Trust that we'll continue to have access to books and records through some form of access agreement with the terminals as we kind of work with SAP and that they work with SAP is to finalize a new licensing arrangement going forward to access historical data and whatever software tools we need to make that information readable and usable by the Trust.

I don't anticipate that is an issue with the Trust -- with the terminals, I'm sorry, but I did want to raise the issue to the extent that anybody on the phone whether it's SAP or the terminals wanted to raise any issue or kind of get forth -- putting anything on the Record with respect to that issue.

THE COURT: So, Mr. Alberino, I've actually been thinking about this a fair amount. If you have this all worked out -- and I know if there's anyone that can do it, you can work your way through it, but if you can't, I'm perfectly prepared to receive an emergency motion just for some sort of preservation order just to give everybody confidence that we can maintain status quo while you folks do whatever it is you're going to do to work through those issues. Not going to surprise me. Hopefully you'll reach some accommodation that works for everybody, but if not, I'm

certainly prepared to address it.

MR. ALBERINO: Thank you, Your Honor. The hope and expectation is there are a lot of good professionals on this phone, SAP's been through this before. I think we're going to get this done. I would have preferred to have -- resolved it through the terminals Settlement Agreement but I think the issue just didn't get addressed in that context, but I'm hoping to finalize it very shortly and if there's an issue, we'll be back before Your Honor.

THE COURT: All right. Thank you.

MR. ALBERINO: Thank you.

THE COURT: Anyone else?

(No verbal response.)

THE COURT: All right. Mr. Parrish, just listening to all of the issues as well as just my own knowledge that I've gained during the course of the case and the complexity of the relationship between the Debtor and terminals, this is cheap peace and I got that and I applaud everyone that worked together to find a way to bring this at least to almost a conclusion, hopefully a total conclusion. I don't have any concerns at all.

I will find that the proposed compromise satisfies the requirements set forth by the Fifth Circuit in cases such as *Foster Mortgage*, *Jackson Brewer* (phonetic) *In re Weco* (phonetic) and there are a host of others.

I do find that the Debtor has properly exercised its business judgment. I don't have any concerns at all. Obviously we need to see some final language, we need to see a final order, but I will approve the compromise based on what's been announced on the Record subject to the submission of a proposed final order.

Mr. Parrish, does that work for you?

MR. PARRISH: Yes, Your Honor. Thank you very much.

THE COURT: All right. Thank you.

Ms. Green, what's next?

MS. GREEN: The Crowley Motion to assume and assign at Docket No. 1408 and Mr. Delaney is handling that.

THE COURT: All right. Thank you. Mr. Delaney?

MR. DELANEY: Good afternoon again, Your Honor.

Michael Delaney, Baker Hostetler, on behalf of the Debtors. This Motion -- (indiscernible) this Motion, essentially Crowley was a shipper that was utilized by the Debtors prior to the petition date. In addition to being a shipper, Crowley leased certain ISO tanks and it's my understanding that's used for storage of various items.

Following the petition date, we worked with Crowley to resolve several issues. However, the issue with respect to the ISO tanks remained. To my knowledge, the ISO tanks remained on an island at the facility and as a result,

Crowley asserted an administrative claim in the amount of $101,000 approximately and that's Docket No. 1359.

Thereafter Port Hamilton and Crowley engaged in discussions and it was decided that Port Hamilton, the purchaser, would like to assume the Debtors' rights under that Services Agreement with Crowley. The Debtors worked with Port Hamilton and Crowley extensively to come to an arrangement. The terms of the arrangement are as follows.

The Debtors will assume and assign to Port Hamilton the Master Services Agreement with Crowley.

In exchange, Crowley has agreed to waive any and all administrative claims against the Estate as well as any cure claims that they might be entitled to in association with the Assumption and Assignment Agreement.

And, Your Honor, that's really kind of the long and short of it. It was the result of arm's length negotiation through counsel for the various parties and the Debtors believe that based upon the waiver of the administrative claims, which is in excess of $100,000, and other benefits associated with the Assumption and Assignment Agreement, that it's in the best interest of the Estate under our business judgment.

THE COURT: All right. Thank you.

Do I have counsel for Crowley on the line?

(No verbal response.)

THE COURT: All right. And, Mr. Leggett, I assume that you have seen this and this is what your client wants to do?

MR. LEGGETT: That is correct, Your Honor.

THE COURT: All right. Thank you.

Did I just -- I just saw someone raise their hand.

Do we have counsel for Crowley?

(No verbal response.)

THE COURT: Whoever raised their hand, do they wish to be heard?

Mr. Ludman, do you perhaps -- I had two people raise their hands, my apologies. Mr. Ludman, I still don't have you. Let me -- how about now?

MR. LUDMAN: Now you have me, Your Honor.

THE COURT: Thank you, sir, my apologies.

MR. LUDMAN: For the Record, Don Ludman, on behalf of SAP America. I had raised my hand in connection with Mr. Alberino's statements regarding the 9019 before your ruling on it and I did just want to reflect we did have some productive conversations. The issue comes from -- a lot of the Debtors' data is hosted in a SAP Cloud platform which --

(Phone noise.)

THE COURT: So I promise you that's not me. That's someone not following the rules and recording the hearing.

MR. LUDMAN: Very good. Anyway, Your Honor, so we're in discussions and notwithstanding --

(Phone noise.)

THE COURT: You know, sometimes you stay on a little too long and I can see the source. So it's gone.

MR. LUDMAN: I'll try for a third time, Your Honor.

THE COURT: Yeah.

MS. GREEN: Your Honor, I apologize. It's actually me and I don't even know how to record so I wouldn't know. I think I'm going to call back in.

THE COURT: No, so the number that was recording I terminated.

MS. GREEN: Oh, okay. So it just sounded like it was me. All right. Thanks.

THE COURT: Mr. Ludman, so let's try one more time. My apologies, sir.

MR. LUDMAN: So the issue was notwithstanding the issue of SAP's software license and related Cloud service agreements, the majority of the Debtors' records are through the Cloud. SAP is agreeing to -- for the resolution of the admin claim and some other issues with our objection to allow the Cloud to remain open through July 6th, 2022, which is the natural subscription for the current Cloud. And during that time, SAP is going to help the Debtors, their

consultants and terminals offload that data into an alternative Cloud platform, which we understand that terminals and SAP might be entering negotiation so terminals can use that and as part of that, that will be a resolution through that.

THE COURT: I got it.

MR. LUDMAN: But there was definitely -- the Order to the confirmation will include language addressing some of these issues and that's been circulated earlier today and we'll expect to do that (indiscernible) and circulate it later.

THE COURT: Got it. Mr. Ludman, thank you. Obviously something I'm accustomed to seeing. Happy to be of any help that I can be as you all work your way through it.

MR. LUDMAN: Great. Thank you, Your Honor.

THE COURT: Thank you. All right.

Anyone else?

(No verbal response.)

THE COURT: And we do not -- I just want to confirm. We don't have counsel for Crowley, correct?

(No verbal response.)

THE COURT: Then with that, Mr. Delaney, I'm going to accept the representations that have been made. Again with the negotiation that has occurred, the results, I don't

have any issue at all. I have Mr. Leggett's statements that this is a benefit to his client as purchaser. I don't have any concerns at all.

I just want to make sure just given the number of changes that have been made that the original Order at 1408-1 is still the Order you want me to sign.

MR. DELANEY: That's correct, Your Honor.

THE COURT: All right.

MR. DELANEY: There's been no revisions to this Order. And for the Record, this Order has been agreed to by counsel for Crowley and counsel for the purchaser.

THE COURT: No, I got that, but thank you for affirming. It has been signed. It's on its way to docketing.

MR. DELANEY: Thank you, Your Honor.

THE COURT: Thank you. Ms. Green?

MS. GREEN: Yes, Your Honor. The next is the Motion to assume and assign the USVI agreement. That's at 1414. And that is Mr. Rose.

THE COURT: All right. Mr. Rose, good afternoon.

MR. ROSE: Good afternoon. Jorian Rose of Baker Hostetler, on behalf of the Debtor. Your Honor, the Motion at 1414 arises out of the January sale of the refinery to Port Hamilton Refinery and Transportation, LLP. One of the principle assets purchased by Port Hamilton was the Refinery

Operating Agreement between the refinery operator and the Island, which is the purpose of the Operating Agreement.

The proposed relief -- in addition to the assumption and assignment of the Refinery Operating Agreement, Your Honor, the Motion provides for a lift stay so that the Island may seek recovery under an LC that is to the benefit of the refinery and the amount -- the proposed cure amount would be $7.5 million. And so the lift stay just provides for the Island to go seek those dollars through the LC.

In connection with the settlement, the Island is waiving any administrative claim or secured claim against the Estate. And, Your Honor, just because the assumption and assignment is not simultaneous whereas the Island has to go look to the LC for cure, there are contingencies built in to the extent that the Island is unable to recover and the contingencies are future looking to the extent that does not happen, the Motion -- or the Order provides that the Refinery Operating Agreement will be deemed rejected, so assumed and assigned will be deemed rejected to the extent the cure is unpaid and that's at a date in the future.

THE COURT: Got it.

MR. ROSE: Your Honor, the Order provides for immediate waiver of the admin and secured claims so that's not really an issue for the Estate.

THE COURT: Thank you. Mr. McGuire, I assumed you've looked at this and this is all in order from your client's perspective?

MR. MCGUIRE: (No verbal response.)

THE COURT: Ah, Mr. McGuire, hold on.

How about now?

MR. MCGUIRE: Thank you, Your Honor. Dan McGuire for the Government of the United States Virgin Islands. "Yes" is the short answer to your question. I was involved in the drafting and negotiation of this, both the Motion and the Order and we are fully in support of the proposed Motion, Your Honor.

THE COURT: All right. Thank you.

And, Mr. Leggett, again just to confirm that this is in accordance with what your client believed that it purchased?

MR. LEGGETT: Your Honor, Jaime Leggett on behalf of the purchaser, and that is correct, Your Honor.

THE COURT: All right. Thank you.

Anyone else wish to be heard?

MR. ROVIRA: Yes, Your Honor. Joseph Rovira on behalf of Limetree Bay Terminals. Your Honor, as was described and set forth in the Motion, the assumption and assignment is -- the Refinery Operating Agreement is contingent on the draw on the letter of credit and just want

to note that the specific and technical requirements in that letter of credit are complex and not covered by the Motion beyond the scope of the relief, as we understand it, being sought today, but we did want to be clear particularly in light of the Motion referenced that contemplated litigation, that we are reserving our rights with respect to the letter of credit and didn't want our silence today to somehow be construed as us consenting with the Debtors framing or description of the letter of credit or any rights (indiscernible).

THE COURT: So honesty, Mr. Rovira, I don't know what that means. You're reserving your rights against something that people have said is going to happen. If what you're saying is is that you're going to wait and see if a timely and accurate draw is made on the letter of credit, I got it, but I don't really understand what a "reservation of all rights" means with respect to that, but you've said it. I don't attribute anything to it, but I've heard you.

Anything else you wanted to add?

MR. ROVIRA: No, Your Honor, that's fine.

THE COURT: All right. Thank you. Then again I think this is a continuation of implementing the sale process that it's occurred. I'm not sure that I have any concerns at all with respect to a letter of credit. I'm not sure that that has anything to do with this Estate at this

point. Obviously applicable law will control. I applaud the parties for working through the issues and coming up with something that has both a plan A and a plan B to it. I don't have any concerns at all.

I will find that the requested relief constitutes the prudent exercise of the Debtors' business judgment.

And again I just wanted to make sure, Mr. Rose, the original Order that was attached as 1414-1 is still the operative Order?

MR. ROSE: Yes, Your Honor. Thank you.

THE COURT: All right. Thank you. Then that has been signed. It's on its way to docketing.

All right. Ms. Green?

MS. GREEN: Yes, Your Honor. The final outstanding motion is the other secured claim reserve Motion at 1368. Mr. Delaney will be arguing that.

THE COURT: All right. Thank you.

Mr. Delaney?

MR. DELANEY: Good afternoon again, Your Honor.

Michael Delaney, Baker Hostetler. So the Motion we're referring to is Docket No. 1368 for the Record. As a bit of background, under the Plan, Class 4 of the Plan provides for the treatment of what is defined as "other secured claims." The purpose of this Motion is, in fact, that the Debtors dispute that really any other secured

claims exist, but to that end, we wish to establish a disputed claims reserve just in case any are established at a later point.

The amount of the disputed claims reserve that we propose to the Court by and through the Motion is $36,901.73, which is the total of certain statutory tax liens that are asserted by amongst other parties Harris County, Galena Park, La Porte. And so those parties by and through the Sale Order reserve certain rights with respect to the priority of their liens. They claim that they are senior and priority to the prepetition secured creditors and so we are reserving in full for them.

There are some other liens that have been Asserted -- or secured claims that have been asserted, excuse me, Your Honor. The Debtors have either dealt with them or, based on our analysis, we do not believe that there's any valid secured claim.

Just to summarize for the Record, there's been a claim asserted by Crowley Caribbean, a secured claim asserted by Crowley Caribbean. It's a shipper's lien. That was actually resolved by and through an agreed order. And forgive me, Your Honor, I don't have the document number right now and hopefully somebody can help find that.

And so that was resolved pursuant to an agreement order resolving Crowley Caribbean's relief from stay motion

earlier in the case.

There's another possessory lien that's been asserted by a company called HydroAir. To the best of our knowledge, they remain in possession of the purported collateral so their claims are not affected by this Motion.

And then we also have a variety -- the EPA is also asserting a potential secured claim that pertain to any setoff that might occur against their other claim. However we have resolved that by and through the inclusion of certain language in the Confirmation Order.

Lastly there's a number of construction liens that have been asserted under USVI law. Our analysis of those liens essentially show that they were filed on or after February 2nd, 2021, which is well after the prepetition secured claims were filed -- the prepetition secured debt obligations were perfected, which occurred at the end of November in 2018. And so under USVI law, we submit that those are junior priority. Additionally --

(Bathroom noise.)

MR. DELANEY: I'll just power on, Your Honor.

THE COURT: Yeah, Mr. Delaney, hold on.

To the person who decided to flush the toilet while they're in a hearing before a Federal Court, I'm going to ask politely that you mute yourself. If I figure out who you are, that will be the best part of your day. That's

just -- it's just rude. All right.

Mr. Delaney, my sincerest apologies. The behavior of some people is just beyond me sometimes, but my apologies on their behalf.

MR. DELANEY: I appreciate that, Your Honor. The risk of living in a digital world, I suppose.

THE COURT: No, that shouldn't be a risk, but okay.

MR. DELANEY: Agreed. And apologies, let me just get my train of thought back on course. So we were talking about the construction liens. We conducted an analysis of the construction liens. We ran a lien recorded prior to the petition date or right around the petition date with USVI we'd identified certain liens. In addition to that, a number of construction liens filed proofs of claim, which we've evaluated.

The earliest notice of construction lien we found was February 2nd, was filed on February 2nd, 2021. The remainder were filed after that date. We did not note any notices of commencement that were filed with respect to any of those constructions liens prior to the notice of construction lien being filed that would allow to claim an earlier secured or perfection date.

And as I noted earlier, the Debtors have a significant amount of prepetition secured loan debt

including approximately $769 million on the term loan and $50 million on the revolver, which pursuant to the final DIP Order was deemed to be a first priority secured claim.

I will note that there were four construction lien claims that reserved the rights by and through the DIP Order, but those parties also perfected their liens well after the prepetition secured obligations were perfected and we do not believe constitute allowed other secured claims under the Plan.

With that, we would just ask the Court to set the reserve amount at 36,901.73 and grant the Motion.

And in association therewith, we would proffer the declaration submitted by Mark Shapiro, the Debtors' CRO. The docket number on that is 1417 and we'd ask that it be admitted. I believe it was already admitted earlier in the hearing and we'd ask that -- and, of course, Mr. Shapiro is here in case any party has any questions or if the Court has any further questions. With that, we'd just ask the Court to grant the Motion.

THE COURT: And, Mr. Delaney, I'm not aware of any response, are you?

MR. DELANEY: We have not. I'm not aware -- I've not seen any responses on the Docket and we have not received any informal objections or other contact with respect to this motion.

THE COURT: All right. Thank you.

Does anyone else wish to be heard?

MS. MALEA: Your Honor?

THE COURT: Yes, ma'am.

MS. MALEA: This is Debbie Malea with (indiscernible) Crowley. He asked for the docket number for the Agreed Order regarding our automatic stay Motion and that is Docket No. 832.

THE COURT: Thank you. All right. And I assume just because there's been no filing that your client doesn't oppose the requested relief in this Motion, correct?

MS. MALEA: I believe not, no, sir.

THE COURT: All right. Thank you.

Anyone else?

(No verbal response.)

THE COURT: All right. Mr. Delaney, I've had an opportunity to review the Motion. I will certainly take the declaration of Mr. Shapiro as well as the presentation of just what has occurred and the numbers and the claims that have been asserted that was made by you.

I do find that service was appropriate, due process has been satisfied under the circumstances. I don't have any concerns at all.

I will grant the Motion.

I do want, Mr. Delaney, to just raise one issue.

The Motion was actually very particular that it allocated amounts per the claimants that you identified. I would like for the Order to do that as well because the Order arguably does something different by just preserving an aggregate amount without reference to the individual claimants and I would like for the relief in the Order to tie to the Motion. I also think it's a better idea. It avoids a race to the courthouse, if you will, and interest calculations, all that sort of thing. It treats everybody the same.

So I will grant the Motion. I would ask that you conform the Order to the Motion just to specifically identify those claimants. I can't imagine that anyone would have an objection to it because first of all, it will follow the Motion itself and, quite frankly, it protects everyone.

I would ask just run that by the Committee just to make sure that I'm not missing something as well as any of the lawyers for those taxing authorities that have appeared, okay?

MR. DELANEY: Of course, Your Honor.

THE COURT: All right.

MR. DELANEY: We will submit a revised order once it's signed off on by everybody.

THE COURT: All right. Thank you. All right.

Ms. Green?

MS. GREEN: Yes, Your Honor. I was just making

sure I was not muted. So with that, that basically resolves all of the administrative claims, the 9019, the assumption and assignment and the secured claim Motion, which means that we're ready to turn towards confirmation.

THE COURT: Okay.

MS. GREEN: I didn't ever think I was going to say that, but anyway we're turning towards confirmation. The ballots have -- and the affidavit of Brent Daniel has been admitted into evidence as Exhibit No. 2 and Your Honor will note that of the classes entitled to vote, four of the classes have voted in favor of the Plan --

THE COURT: Right.

MS. GREEN: -- and one class did not vote.

I'd note that the unsecured claims voted 88 percent in number and 72 percent in amount to accept the Plan.

The class that did not is the governmental fine and penalty claims. We reserve the right to cram down under the Plan and in an abundance of caution filed also a separate motion for cramdown as Class 6. That would be at Docket No. 1415.

The claims in this class relate to governmental fines and penalties that are not for pecuniary claims and we believe that it's appropriate to cram them down under 1129(b)(2)(B). The Plan is fair and equitable. No lower

class takes any property under the Plan.

And the claims are subordinate to the unsecured claims. That's what the class provides. The reason for that is: we believe, in the Debtors' business judgment, that there was a rational basis to separately classify those fines and penalties because they are not actual pecuniary loss. That's actually the same distribution scheme as in 726 although I agree does not apply to Chapter 11, but we believe there is a rational basis to do that and we believe the treatment is appropriate also.

THE COURT: All right. So let me do this. First of all, I have read Mr. Daniel's declaration at 1367. It's been admitted. There was no request for cross.

Mr. Daniel, you're obviously welcome to remain. I also assume that you have many other cases that you need to attend to and you are certainly free to go if you wish, and thank you for what you've done in the case.

Ms. Green, let me ask you. With respect to -- I got it. I saw the separate motion for cramdown, made me smile. Not sure that you needed it, but I got it and your were being careful all just fine. I think that that's part of what I'm required to do in my analysis under 1129. I'll get there.

As I understand it, the only thing that remains outstanding are some concerns by the class Plaintiffs; am I

right about that?

MS. GREEN: Yes, Your Honor. The only objection that has not been resolved is the class Plaintiffs' objection. I think it's at Docket No. 1343.

THE COURT: Right.

MS. GREEN: Mr. Richardson has been handling not only that objection, but the entire mediation process with Judge Isgur and so he'll be handling that.

THE COURT: All right. Got it.

So, Mr. Richardson, my apologies for having to put up with Isgur because I understand you've had numerous sessions.

Why don't you take just a moment and tell me what you think the gap is?

And, Mr. Walker, are you taking lead on behalf of the class Plaintiffs?

MR. WALKER: (No verbal response).

THE COURT: I see you talking and I can't hear you.

Have you hit five star or do you have yourself muted?

MR. WALKER: There we go, Your Honor?

THE COURT: There we -- yes, sir.

MR. WALKER: Yeah, I muted myself. Apologies, Your Honor.

THE COURT: Quite all right. I wish I had that effect on more people. It would be great.

(Laughter.)

THE COURT: Mr. Richardson, let me -- if you would just take a moment and tell me where you think the remaining gap is between the Debtors and the class Plaintiffs?

MR. RICHARDSON: Yes. Thank you, Your Honor. There's actually two objections I wish to address this morning, but I'm going to start with the class Plaintiffs objection 1343.

THE COURT: Okay.

MR. RICHARDSON: We are continuing to discuss the issue of language in the Confirmation Order that will confirm the preservation of class action Plaintiffs' claims and rights. We were exchanging proposed language just recently as of the start of this hearing this morning. I'm hopeful that the various parties who have an interest in that language will be able to come together on agreed language before we upload the Confirmation Order.

THE COURT: So is this the objection that was raised that if for some reason no class is certified, that the individuals would maintain those rights? Is that the objection that you're referring to?

MR. RICHARDSON: We believe that's been addressed with some simple language changes --

THE COURT: Okay.

MR. RICHARDSON: -- for a new definition.

THE COURT: What's left?

MR. RICHARDSON: This goes to ensuring that nothing about the Plan or Confirmation Order releases their claims or impairs their claims in ways that otherwise they're expressly provided for. So we're just working out some final language that will give them that confidence and hopefully that will be in the Confirmation Order.

The larger issue that I don't think we can come to agreement on --

THE COURT: Wait a minute. Mr. Richardson, just hold on. I'm a very serial person. I like to do things one at a time.

So, Mr. Walker, with respect to that issue, is it simply that you want to make sure that you're not somehow waiving claims against the insurers or third parties? Is that what you're concerned about or is it something different?

MR. WALKER: Yes, Your Honor, that's essentially it. We thought actually this issue had been put to bed until we received some revised language last evening that then also said that that language -- there would be some related language in the Confirmation Order, which again we did receive right as the hearing was started, haven't seen

yet. So, yeah, we'll see if we can work through it. I think we probably can. But, yeah, you hit the nail on the head in terms of exactly what our concerns are. The language that was in the Plan already we were comfortable with --

THE COURT: I got it.

MR. WALKER: -- which provided that we could establish our claims against the Debtor and it wouldn't -- our rights against insurance companies were preserved.

THE COURT: I got it.

MR. WALKER: That's been changed to some degree and then there's some language in the Confirmation Order. So I'm confident we can work through it.

THE COURT: So just to give you both some motivation, this is a really easy way -- this is an easy thing for me to address. Because I have so much respect for both of you, I'll give you until our hearing to go over the Confirmation Order to do that, but if not, I will stop listening and I will start writing and it will take me two sentences and my guess is neither one of you will like the language, but I will think it's perfect. So hopefully you'll common ground without me having to do that.

MR. RICHARDSON: Thank you, Your Honor.

MR. WALKER: Thank you, Your Honor, understood.

THE COURT: All right. What's the next issue?

MR. RICHARDSON: The larger issue, Your Honor, is the bad faith claim issue. In the Plan and Confirmation Order, the language that preserved --

THE COURT: Let me interrupt you because this likewise is a very easy issue for me.

So, Mr. Walker, there is no section of 1129 that I'm aware of that would require what you are asking for. However, I understand the point that you make and it would seem to me that if we added some language that just said you have the right to come to me to compel the Liquidating Trustee to take action or to -- for you to be able to pursue those claims, that way I can satisfy due process, I've got something in place, everybody will get notice and you will get your day in court and you can tell me all the bad things that have been going on that necessitate your taking action. It would seem to me that that's the right balance.

You want to tell me where I'm wrong?

MR. WALKER: No, Your Honor. Actually one of the things I was going to tell you is that there's no provision in the Code that would require you to do this or no case law, so I'm comfortable with that solution.

What we were trying to avoid just so Your Honor knows is having to come back to the Court. We were trying to establish an option for us to take use of it.

THE COURT: I enjoy seeing you all so let's just

add some language that says that if things don't go the way you think they should or, quite frankly, if the Liquidation Trustee is uncomfortable and wants a cover order, there's that opportunity that either party could come back and it would seem to me that that's a very -- that that's just a very easy change. That would have to be acceptable to both. And quite frankly protects the Trustee against things that he doesn't yet know that are going to occur.

Anybody want to argue against that?

MR. WALKER: Not I, Your Honor.

THE COURT: Mr. Richardson?

MR. RICHARDSON: No, Your Honor. I think that's an effective resolution.

THE COURT: Terrific. Anything else we need to talk about?

MR. RICHARDSON: I would just like to add, Your Honor, since we've raised the concept of bad faith claims, that the mediation has been proceeding. We expect it to continue to proceed. We believe everybody has been participating in good faith and we're hopeful that it will continue to bring that up as to all parties.

THE COURT: Me too. I like to make fun of Isgur because that's just one of the best perks I get in this job, but he's been working on it. He tells me he's continuing to work on it. And if there's anybody that can find common

ground, it will be him.

MR. RICHARDSON: Your Honor, the other --

MR. WALKER: Your Honor --

THE COURT: I'm sorry.

MR. WALKER: I'm sorry, Your Honor.

THE COURT: Yeah, Mr. Walker.

MR. WALKER: Joel Walker again. With regard to the litigation in the Virgin Islands and the mediation, we're continuing with the mediation. It's moving slowly, as you can tell. And one of the things that I know that we've been told will be in the Confirmation Order is a listing of the injunction or stays that prevents the class action Plaintiffs from proceeding in the USVI, which we would intend to continue or to actually start up again in the USVI while we're going through the mediation.

THE COURT: And, Mr. Richardson, is that a topic of concern?

MR. RICHARDSON: It is not, Your Honor. That specific reference has been added to the language that lifts all stays and injunctions that --

THE COURT: All right. So, Mr. Walker --

MR. RICHARDSON: -- were entered during the case.

THE COURT: So, Mr. Walker, does that satisfy you?

MR. WALKER: Yes, Your Honor. We look forward to seeing the language, but that satisfies us.

THE COURT: Absolutely. We've all got something to read that we don't yet have and so we're going to deal with that issue. All right.

Then with that, Ms. Green, seems like we've got the only remaining --

MR. RICHARDSON: Your Honor, if I may?

THE COURT: Yes, sir.

MR. RICHARDSON: I'm sorry. The second insurance related objection, which is filed by certain insurers --

THE COURT: Right.

MR. RICHARDSON: -- and that's at 1346. We believe that we have come to a resolution of that with agreed language that will be asserted into the Confirmation Order, but the parties just -- the language is too long to read into the Record and so we just wanted to state on the Record today that the settlement that we've come to is language that will confirm that the rights and obligations of the parties under the policies will pass through the bankruptcy case upon assumption and assignment and that there's nothing in this process that has created any new rights that deny coverage.

THE COURT: Totally agree, something I've seen before.

Do I have counsel for any of the insurers on the line?

MR. MARSHALL: Yes. Good afternoon, Your Honor. Can you hear me okay?

THE COURT: Very well, Mr. Marshall. Thank you.

MR. MARSHALL: Thank you, sir. Jonathan Marshall from Choate Hall and Stewart, on behalf of Liberty Mutual and the "other certain insurers," as we call ourselves in the pleadings. We do confirm that's exactly what the point of the language was. I very much hesitate to say this, but we are resolved subject to of course seeing the Confirmation Order, Your Honor, which everybody is, but just had to clarify that point. But, yes, what Mr. Richardson said is correct. There is no intent on trying to create any new rights or obligations. The language simply preserves those rights and obligations that existed prepetition for any post-petition coverage dispute that may arise.

THE COURT: Totally agree. All right. Thank you, Mr. Marshall.

Mr. Richardson, anything else that we need to talk about on that front?

MR. RICHARDSON: Nothing on that front, Your Honor. Thank you.

THE COURT: All right. Thank you.

Ms. Green?

MS. GREEN: Yes, Your Honor. So with that, we have admitted the confirmation affidavit of Mr. Shapiro.

He’s available for cross-examination. I think his Affidavit submits in detail that he has reviewed the Plan, the Disclosure Statement, all of the settlements, the administrative claims, the priority claims, the requirements of 1129(a) and that the Plan complies with all of those provisions and that the Plan should be confirmed, but he is available to testify and he is also available to cross-examine.

THE COURT: All right. Thank you. I have read Mr. Shapiro’s declaration. At this point, I don’t think we have any outstanding objections, but let me just ask.

Is there any party that wishes to cross-examine Mr. Shapiro?

(No verbal response.)

THE COURT: All right. Mr. Shapiro, you slid through without that riveting cross-examination. I’m not going to ask why you are where you are, but I hope that it’s enjoyable. Let me do that, let me ask.

Ms. Green, did you want to make any -- at this point, any closing comments? I’ll consider the Record to be closed.

MS. GREEN: No, Your Honor, other than everybody’s worked really hard to get this case from the first day when we stood in front of you and I think everybody thought maybe we were just a little crazy to where we are today to get the

case confirmed, and so I appreciate everybody's hard work both on my team and everybody else in the case and certainly Your Honor's so thank you.

THE COURT: All right. Thank you. I'm not going to suggest that I wasn't one that thought you were a little bit crazy, but I compliment you on all the hard work.

Let me ask, Mr. Feinstein or Mr. Wallen, did you want to make any comments on behalf of the Committee?

MR. FEINSTEIN: Thank you, Your Honor.

THE COURT: Yes, sir.

MR. FEINSTEIN: Can you hear me?

THE COURT: Loud and clear.

MR. FEINSTEIN: Thank you. Only briefly, Your Honor. The Committee cut its deal a month or so ago and agreed to support the Plan. We do support the Plan.

We also have been afforded the opportunity to review in advance the various administrative claim settlements and stipulations and motions that the Debtor filed. We supported all of them and we support confirmation. We're very pleased with the result. Thank you.

THE COURT: Mr. Feinstein, thank you.

Anyone else?

MR. O'NEAL: Good afternoon, Your Honor.

Sean O'Neal. If I may?

THE COURT: Of course, Mr. O'Neal.

MR. O'NEAL: Thank you very much. Sean O'Neal, Clearly Gottlieb, on behalf of Goldman Sachs. First, we just wanted to thank Your Honor for your patience and perseverance and focus during this case. There were some moments in the case where we weren't sure if we would end up where we are today so thank you for that.

We are pleased that we were able and -- we use "we" royally because really credit goes to the Baker Botts -- or the Baker Hostetler team (indiscernible) Mr. Delaney in terms of pulling together a series of settlements with administrative claimants. And so pleased to report that we are under the $4.8 million administrative claims caps and that's really due to the really good work of the Baker Hostetler team so I just wanted to express appreciation to them for that.

Your Honor will recall that there is an adequate protection claim that's baked into the Plan and I think that it was an important part of the settlement with the UCC that that amount be liquidated. Our calculation of that amount is that it's approximately $5.6 million. That's important for purposes of determining the waterfall, how things flow through the waterfall through the Trust. We'll work with the Debtors and other parties-in-interest to confirm that number, but that number will be part of the Record and will

be included in the litigation -- or the Liquidation Trust Agreement.

And so we wanted to just express our appreciation and then say that we do look forward to kind of a speedy exit, kind of a prompt effective date following entry of the Confirmation Order. Thank you.

THE COURT: All right. Thank you, Mr. O'Neal.

Any else? All right.

MR. ROVIRA: Your Honor, this is Joseph Rovira. On behalf of the terminals, I just wanted to say for the Record and consistent with the settlement that we support approval. Appreciate all the hard work of the Debtors and everyone involved.

THE COURT: All right. Thank you.

Anyone else?

MR. TENENBAUM: Your Honor, can you hear me?

THE COURT: Loud and clear.

MR. TENENBAUM: Alan Tenenbaum from the Department of Justice for the United States on behalf of the Environmental Protection Agency.

THE COURT: Yes, sir.

MR. TENENBAUM: Good afternoon. We would also like to thank Debtors' counsel for their cooperation in resolving our objection on behalf of the EPA.

We do also want to state for the Record on this

point that came up earlier that the treatment of Class 6, the penalty claims, just for purposes of the Record, we have no objected to the Motion -- Debtors' Motion on that, but we don't want that to be misread as an agreement to it in any way. We're deferring to the Court, as Your Honor said about your application of Section 1129, which is deferring to the Court. We didn't think this was the right case to disagree and litigate on that issue given that the payments to unsecured creditors are estimated to be (indiscernible) percent so since all this is just for clarification on the Record and we're not objecting, but that doesn't mean (indiscernible) of law.

THE COURT: Mr. Tenebaum, no precedential value whatsoever. How about that?

MR. TENENBAUM: Perfect. Thanks so much.

THE COURT: All right. Thank you, sir.

Anyone else?

(No verbal response.)

THE COURT: All right. Then with that, let me make a couple of comments. Number one, I said this before, Mr. Feinstein, I publically want to thank you and your Committee for realizing that value is not always just currency. I appreciate the way you looked at the problem and the way that you found value for your constituency when there was no cash to be had. Not lost on me, but I just

can't tell you how much I appreciate the approach.

MR. FEINSTEIN: Thank you.

THE COURT: I also -- I'm just call them the "secured lender group." This is a horrible outcome and I know that. It is bad decision, upon bad decision, upon bad decision and I recognize that. It's not a criticism. It's just commercial life. And I really appreciate the way that everybody just recognized the realities of where we were and found a way to get this done.

I really had my doubts about whether or not you would ever have this hearing. The fact that we are is a testament to all of you, your skillsets, your ability to read the room, read the world and come to a commercial resolution that has bits of benefit to everybody so I just compliment you all on a job well done.

With respect to my part in the process, I just -- I can run the video software. That's all I do.

And with that, with respect to the final approval of the Disclosure Statement, it's always really fun to rule in hindsight. I have had an opportunity to reread everything. There are no outstanding objections. My initial decision I believe was correct in all respects.

I do find on a final basis that the Disclosure Statement contained "adequate information," as that term is defined under Section 1125, and I do give final approval to

the Disclosure Statement.

With respect to the Plan itself, I do find that the proposed Plan satisfies the mandatory requirements of 1123(a), does not otherwise run afoul of any of the permissive options that are set forth in 1123(b) or other applicable sections of the Bankruptcy Code.

With respect to confirmation, I am -- even in the absence of any objection, I'm required to conduct an independent analysis of each of the elements of Section 1129 based upon the uncontested Record that I have before me.

I will find that the proposed Plan satisfies the requirements of 1129(a)(1), (a)(2), (a)(3), (a)(4) and (a)(5).

I'll find that the requirements of 1129(a)(6) do not apply to this case.

I will find that the proposed Plan satisfies the requirements of 1129(a)(7), (a)(9), (a)(10), (a)(11) and (a)(12).

I will find that the requirements of 1129(a)(13), (a)(14) and (a)(15) do not apply to this case.

With respect to (a)(16), I'm going to find that it doesn't apply to the case, but to the extent that I'm wrong about that with respect to the transfers to the Liquidating Trust, I will find that the requirements of (a)(16) have been satisfied.

Having found that all of the sections of 1129(a) other than (a)(8) have been met, then I am required to go to 1129(b).

Before I do that, I want to make it very clear throughout my entire career both as a lawyer and a judge, I have always argued and followed the Tenth Circuit's decision in *In re Ruti-Sweetwater*. I actually think that the logic was both right and practical. However I do realize that my predecessor here in the Southern District of Texas wrote an opinion -- I think I was actually the lawyer that lost -- that said that *In re Ruti-Sweetwater* simply was wrong. I disagree with that decision. I don't follow it. I think again *In re Ruti-Sweetwater* is just a practical answer to a common problem.

I also want to suggest that perhaps in future cases, when you start to look at your solicitation Motion, that perhaps you think about the concept of collapsing a class for voting purposes only when you have no votes. Again I've seen it done in the Plan. I don't think that works because the Plan doesn't become effective until it's confirmed and it can't be confirmed to have language become operative without it. But I do that in a solicitation motion, it makes sense to think about it. Again not a criticism, just perhaps a suggestion. I've done a lot of things wrong at least once over 32 years. That was one that

I may have actually gotten right.

But in the interest of being complete, having found that all the requirements of 1129(a) have been satisfied other than (a)(8), I will move to 1129(b).

And I will find, based upon the evidence, that the Plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interest that is impaired under and has not accepted the Plan.

I further find that there's only one plan that the Debtor has presented for confirmation. Therefore the requirements of 1129(c) has been satisfied.

I'll further find that the primary purpose of the Plan is not the avoidance of taxes or the avoidance of the appliance of Section 5 of 1933 Securities Act. Therefore, the requirements of 1129(b) have been satisfied.

I find that the requirements of 1129(e) are not applicable to this case.

With that -- and I will find that subject to the submission of a proposed final form of order confirming the Plan, I will confirm the Debtors' Plan, final approval of the Disclosure Statement.

Again, everyone, job well done.

Ms. Green, you started the hearing with saying, "Hey, we need to pick a hearing so that we have a deadline to get this done." You tell me what you want. If you want

it tomorrow, I'll find time tomorrow. If you want it on Friday, I will find time on Friday. You just need to tell me -- you know what you've got working. You know how many emails you have to answer, you know how many phone calls you're going to have to get on. You tell me what you think is rational.

MS. GREEN: I think probably Friday morning makes the most sense just to give us a little bit more time to make sure we get everything right.

THE COURT: Let me ask.

Can everybody live with say 9:30 Central, will that work for everybody?

(No verbal response.)

THE COURT: All right. Then with that -- and again if you have -- here's what I'd like to do, Ms. Green, so that there is absolutely no question in anybody's mind. Even if you think you have everybody's agreement, I want to have the hearing anyway just in case someone wasn't sure, got lost listening to the recording, just got it wrong. Let's have a hearing at 9:30 even if you have worked everything out and you have a final form of order that you think everyone has signed off on. That will just give me comfort that we have given everybody the last opportunity to take a look.

What I would tell everybody who is listening, if

you haven't had a specific conversation with Mr. Delaney, Mr. Rose, Ms. Green, whoever else is working on this -- didn't mean to leave anybody out -- if you want to see that Order, what I -- I want you to send an email to Mr. Delaney saying, "Hey, want to make sure that I'm included on the distribution list." I am not going to look favorably upon, "Well, no, I haven't seen the Confirmation Order, I need more time," and you hadn't seen that email. Everybody has an obligation to participate responsibly. So if you want to see the Confirmation Order, you send Mr. Delaney an email.

Unfortunately, Mr. Delaney, you drew the short straw. Everyone sends Mr. Delaney an email that says, "Hey, I want to be on the distribution list," okay? All right.

Then with that, Ms. Green, anything else?

MS. GREEN: No, that's it, Your Honor.

THE COURT: All right. Then I will see everybody Friday morning 9:30 Central. Until then, everybody be well. We'll be adjourned.

(Counsel thank the Court.)

(Hearing adjourned at 12:29 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the ZOOM/video/telephonic proceedings in the above-entitled matter.*

/S/ MARY D. HENRY

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*
*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
*JTT TRANSCRIPT #65883*
*DATE FILED: JUNE 5, 2022*